1               UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS
2                  HOUSTON DIVISION

3   ALBERTO PATINO, ET AL              *    4:14-CV-03241
                                       *
4   VS.                                *    1:19 p.m.
                                       *
5   CITY OF PASADENA, ET AL            *    FEBRUARY 10, 2016

6                    DISCOVERY HEARING
           BEFORE THE HONORABLE LEE H. ROSENTHAL
7              Volume 1 of 1, Pages 1 - 47

8   APPEARANCES:

9   FOR THE PLAINTIFFS:
    Mr. Ernest I. Herrera
10  Ms. Nina Perales
    MALDEF
11  110 Broadway
    Suite 300
12  San Antonio, Texas 78205
    (210) 244-5476
13
    FOR THE DEFENDANTS, CITY OF PASADENA, MAYOR JOHNNY ISBELL,
14  ORNALDO YBARRA, BRUCE LEAMON, DON HARRISON, PAT VAN HOUTE,
    CODY RAY WHEELER, PHIL CAYTEN, STEVE COTE AND DARRELL
15  MORRISON:
    Ms. Kathryn K. Ahlrich
16  Andrews Kurth LLP
    600 Travis
17  Suite 4200
    Houston, Texas 77002
18  (713) 220-4427

19  FOR THE MOVANT, CITIZENS TO KEEP PASADENA STRONG and
    CITIZENS FOR POSITIVE CHANGE:
20  Mr. Jerad Wayne Najvar
    Najvar Law Firm
21  4151 Southwest Freeway
    Suite 625
22  Houston, Texas 77027
    (281) 404-4696
23
    ALSO IN ATTENDANCE:
24  Mr. Jeff Yates

25

1                         **APPEARANCES** **(continued)**

2    Court Reporter:
     Laura Wells, RPR, RMR, CRR
3    515 Rusk, Suite 8004
     Houston, Texas 77002
4
     Proceedings recorded by mechanical stenography.
5    Transcript produced by computer-assisted transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

THE COURT:  Good afternoon.  Go ahead and state your appearances for the record; and then, you may be seated.

01:38:39    MR. NAJVAR:  Jerad Najvar for Citizens to Keep Pasadena Strong and also for Citizens for Positive Change.

THE COURT:  All right.

MR. HERRERA:  Ernest Herrera and Nina Perales for the plaintiffs.

01:38:50    THE COURT:  Very good.  I have now had a chance to go through the supplemental filings and to review the materials that were submitted in camera, and I have got some questions on these.  So -- and I want to take them up kind of one at a time.

01:39:25    Let's start with the question of the invoices themselves.  What is the relevance of the amounts charged for the consulting services provided?

MR. HERRERA:  Your Honor, the invoices would show what exactly was done by the different vendors.

01:39:48    THE COURT:  They don't.  They don't.  I mean, they are very -- they show what was done but not much.  There is very little detail in the invoices.

MR. HERRERA:  Your Honor, they would also show whether or not the pact is paying for these -- who is the
01:40:07    source for the payment of these services.

1          THE COURT:  No, they don't.  They simply show --

2  I mean, it's billed to CKPS.  They don't show anything

3  beyond that.  They don't show the payment, just the

4  invoices.

01:40:19   5          MR. HERRERA:  That would be the type of

6  information that the plaintiffs would be looking for.

7          THE COURT:  So the amounts aren't relevant.

8          MR. HERRERA:  The amounts would be relevant to

9  match up with the campaign finance disclosures to make

01:40:32  10  sure that the pact is who is paying for these.

11          THE COURT:  Do you have any basis to dispute that

12  it was Citizens to Keep Pasadena Strong?  And you know who

13  funded Citizens to Keep Pasadena Strong.

14          MR. HERRERA:  No, Your Honor.  Plaintiffs don't

01:40:47  15  have any doubt about that or reason to doubt that.

16          THE COURT:  Then I don't think there is a need

17  for the amounts.  But I do agree that the invoices with

18  the amounts redacted, but there is nothing privileged

19  about them under the First Amendment.  They don't reveal

01:41:09  20  anything.

21          MR. NAJVAR:  No.  I mean, I noticed some

22  handwritten notes on there; but I think they are very

23  minimal, just noting some dates and things.

24          THE COURT:  Received and the check.

01:41:20  25          MR. NAJVAR:  I don't think -- from the

 1  descriptions that I saw I don't think that they -- I think

 2  you are right.  They don't add a whole lot other than what

 3  is already recorded.

 4          THE COURT:  There is nothing privileged.  You can

01:41:29   5  redact the amounts if you want to.  If you don't -- if you

 6  are not worried about that because so much information

 7  about the finances has already been disclosed, that's

 8  fine, too.

 9          MR. NAJVAR:  Yes, Your Honor.

01:41:42  10          THE COURT:  All right.  But they are not

11  privileged.

12      Moving on to the second -- I'm just going through

13  these in the order of the folders that you produced.

14  Yates 234 to 255 appear to be e-mails and ads relating to

01:42:15  15  Mr. Carmona's March 2015 campaign materials, Emilio

16  Carmona.  And they are just putting together information,

17  photographs and information on some material to include in

18  the ads.  I don't see any strategy revealed; but I'm not

19  sure what is relevant in the March 23rd, 2015, election of

01:43:00  20  Mr. Carmona.

21          MR. HERRERA:  Your Honor --

22          THE COURT:  There is no reference to anything

23  relating to the amendment to the city charter, and perhaps

24  you can enlighten me.  Was Mr. Carmona running in one of

01:43:15  25  the new districts, the at-large districts; or was he

1    running in a single-member district?

2          MR. HERRERA:  Your Honor, he was running in a

3    single-member district.

4          THE COURT:  All right.

01:43:24    5          MR. HERRERA:  Your Honor --

6          THE COURT:  Tell me what would be --

7          MR. HERRERA:  Even though they don't have

8    strategy material in them, if you are saying they do not

9    involve strategy, they would still be relevant because

01:43:36   10    they would go to slating.

11          THE COURT:  Slating?

12          MR. HERRERA:  Slating evidence, Your Honor.

13          THE COURT:  In this context you mean selection of

14    a candidate for a particular appeal?

01:43:46   15          MR. HERRERA:  Well, more specifically to the

16    Senate factors of the Voting Rights Act, Your Honor, of a

17    Section 2 claim.  It would go to showing that there were

18    slating activities that excluded candidates of choice of

19    the Latino community.

01:44:03   20          THE COURT:  How would it show this?  This is a

21    photograph to include of Mr. Carmona looking at papers.

22          MR. HERRERA:  Right, Your Honor.  But it would

23    show he was on the slate that ran together.  Furthermore,

24    it would --

01:44:17   25          THE COURT:  There is no dispute about who is on

1  the slate that ran together.

2        MR. HERRERA:  It would show, Your Honor, the

3  senders and recipients of the e-mails of the people who

4  are responsible for assembling the slate in addition to

01:44:30   5  that.

6        THE COURT:  This is a -- these are the

7  individuals who you already knew were involved.  And they

8  are essentially Mr. Richard Scott, who has already been

9  identified and his role has been made clear.  And --

01:44:51   10        MR. HERRERA:  I'm sorry, Your Honor.

11        THE COURT:  -- Sam Safety?  Who is

12  SamSafety@aol.com?

13        MR. HERRERA:  Your Honor, plaintiffs do not know

14  who SamSafety@aol.com would be.

01:45:02   15        THE COURT:  Does the defendant know?

16        MR. NAJVAR:  It's Richard Scott.  He is

17  identified in the log.

18        MR. HERRERA:  Your Honor, Richard Scott,

19  additionally, we don't believe communications with Richard

01:45:14   20  Scott would be privileged because he is a third party to

21  this political committee.

22        THE COURT:  Why would it be privileged?

23        MR. NAJVAR:  The Perry decision --

24        THE COURT:  It's not internal.

01:45:26   25        MR. NAJVAR:  Well, it still -- it goes to -- the

1   First Amendment privilege extends to anybody who is

2   participating in strategy discussions or --

3             THE COURT:  But this is not strategy.

4             MR NAJVAR:  If a particular e-mail wouldn't

01:45:37   5   involve strategy, then I agree it wouldn't be privileged.

6             THE COURT:  This is not -- this is -- I mean,

7   there is discussion of -- there is an exchange of

8   information to put in an ad.  It appears to be the

9   information that was, in fact, put in the ad.  I don't see

01:45:56  10   any evidence of strategy in that, I mean, in any kind of

11   privileged sense.  It doesn't reveal anything about the

12   overall strategy of the campaign one way or the other, as

13   best I can tell.

14        Now, you all know better than I do about that; but

01:46:19  15   there is nothing here that is, in essence, secret because

16   it is information that was used in the -- or versions of

17   it that were used in the materials that were published.

18             MR. NAJVAR:  And this small batch of e-mails does

19   -- I just reviewed them on my computer.  There is very

01:46:40  20   minimal discussion.  It looks like mostly forwarding and

21   attachments that were included.

22             THE COURT:  It is certainly not privileged, that

23   I see, by any First Amendment claim simply because there

24   is nothing in it that would be revealing -- well, there is

01:47:01  25   nothing in it inconsistent with any privilege, assuming

1    one would even apply to the nature of these

2    communications.

3             MR. NAJVAR:  For this -- if it were a larger

4    batch of e-mails that showed -- even if it were the same

01:47:17    5    kind of things, I would argue it could be privileged if it

6    shows timing and, you know, who is talking to whom, who is

7    providing information and that.

8             THE COURT:  It doesn't disclose any information

9    that wasn't already available about who was talking to

01:47:32    10   whom, to Mr. Yates and Mr. Scott in this instance; getting

11   some information, publicly-available information from

12   someone at the city, what a particular ordinance says.

13            MR. HERRERA:  Your Honor, plaintiffs are not sure

14   that it involves publicly-available information.

01:47:52    15            THE COURT:  This is an ordinance.  The only other

16   thing that's attached is the ordinance itself.  That is

17   publicly available.  Now, which ordinance it is is one

18   referenced in the ad that I believe did go out to members

19   of the public.

01:48:10    20            MR. HERRERA:  Right.

21            THE COURT:  But I just don't see any basis in

22   which to withhold because there is any kind of a threat to

23   any privilege that is revealed -- privileged communication

24   revealed by these communications.

01:48:29    25            MR. NAJVAR:  Again, I don't want to concede that

1  point with respect to if it were a larger batch like we

2  have that --

3          THE COURT:  I was looking at the e-mails that

4  were actually submitted.  That's why I reviewed them in

01:48:39  5  camera so I could make a more nuanced and fact-specific

6  assessment.

7          MR. NAJVAR:  Yes, Your Honor.

8          THE COURT:  Applying the Perry test, which again

9  I would note the Fifth Circuit itself has not applied.

01:48:51  10      In fact, I don't have that folder.  Would you bring it

11  to me, please, sir.  It's on the desk.

12      All right.  Turning now to the 2013 folder of ads and

13  e-mails, these are CKPS 92-162 and 221.  These appear to

14  be e-mails between Mr. Yates and Mr. Spencer Neumann; and

01:49:26  15  I gather that he is at Neumann & Company, the mail list

16  people, the vendor.

17          MR. NAJVAR:  That's correct.

18          THE COURT:  All right.  And these are described

19  as different ads.  They are dated in 2013; and they are

01:49:45  20  described as different advertisements that deal with the

21  candidacy of Don Harris, in opposition to that candidacy

22  in 2013.

23      There is discussion of certain aspects of the

24  advertisements such as -- but the bulk of these don't deal

01:50:39  25  with any strategic decisions other than the decision

1    whether to -- other than the need to ensure the factual

2    accuracy of fact statements and to check on the historical

3    accuracy of statements made about actions taken in the

4    past in order to avoid any exposure to a defamation claim.

01:51:22    5         What is the First Amendment implication of that?

6              MR. NAJVAR:  Well, although the e-mails are --

7    they are including need for legal review.  But the chain

8    of e-mails shows variations of the ads.  They are changed

9    over time.

01:51:43   10              THE COURT:  But they are very minor, and you

11   would know better than I do about the variations between

12   what was published and what wasn't published.  Can you

13   address that?

14              MR. NAJVAR:  It was very minor.  Most of the time

01:51:58   15   it was moving the order of things or it was changing a

16   couple of lines.  But that is the kind of thing, the kind

17   of statements that are put out to the public.  And what is

18   decided to excise and what is decided to include in a

19   final advertisement is the kind of thing that is a

01:52:13   20   strategy decision made by the people internal to the pact.

21   Unless they can show that --

22              THE COURT:  That's a very broad description of

23   strategy, and that's my concern.  But taking that as

24   correct, I find it difficult to conclude that disclosing

01:52:49   25   these kinds of very minor tweaks through draft

1    advertisements or mailings -- that I would note do not

2    refer to the particular issues involved here -- do not

3    appear to present a reasonable likelihood of chilling an

4    associational right.  And I'm concerned about that unless

01:53:19   5    you accept that any disclosure would chill -- any threat

6    of possible disclosure in future litigation would chill

7    associational rights.

8              MR. NAJVAR:  Well, that is, in fact, our claim.

9              THE COURT:  I understand that, but I find that a

01:53:37   10   very dubious claim in light of the evidence supporting it.

11   I think that there is a -- you've certainly made a broad

12   statement to that effect.  But the mere possibility that

13   compelled disclosure would deter membership or deter

14   methods of communication because there would be a

01:54:10   15   possibility that in future litigation under -- if the

16   First Amendment associational privilege applied that there

17   would be an ad hoc balancing that might require the

18   disclosure of some of the communications, I find it very

19   difficult to conclude that that mere possibility, which is

01:54:32   20   what Perry recognizes, would chill associational rights as

21   applied to this kind of document.

22             MR. NAJVAR:  Well, part of the problem is that in

23   order to even get to that point we have been through three

24   hearings; and my clients have incurred legal fees.  We

01:54:50   25   have had to put these together.

1              THE COURT:  The fact that --

2              MR. NAJVAR:  I realize the burden isn't

3    particularly relevant to that balancing, but it is -- it

4    should go to the factor of whether it realistically can

01:55:03   5    chill somebody and make them decide maybe rather than

6    sending e-mails, which is easier than meeting in person,

7    maybe they will just meet in person.  Maybe it makes it

8    harder to associate for these purposes.  That is the kind

9    of chill that is also relevant.

01:55:16   10             THE COURT:  I'm also am not sure that these are

11   really relevant either because the tweaks are so minor,

12   but what we are arguing here is the First Amendment

13   associational rights.  I think they are relevant.  I do

14   not think that they are likely to assist you in any

01:55:33   15   material way.  So the balance of your need is fairly

16   minimal --

17             MR. HERRERA:  Your Honor, I --

18             THE COURT:  -- once you get to the balancing

19   factors.  That is not true for other e-mails that we're

01:55:47   20   about to discuss.

21             MR. HERRERA:  Yes, Your Honor.  But if plaintiffs

22   may, the pact's targeting of the incumbent of a Latino

23   majority district is part of the totality of the

24   circumstances.

01:55:59   25             THE COURT:  No.  I understand that.  I'm saying

1  that I agree that they are relevant.

2          MR. HERRERA:  Thank you, Your Honor.

3          THE COURT:  I agree.  I wanted to be more precise

4  than I was initially about that.  But the question is the

01:56:09  5  balance of the factors.  Yes, they are relevant.  The need

6  for the information, I think here it is a little bit more

7  difficult to determine that.  Whether it's available from

8  other sources, I don't believe it is.  That weighs in

9  favor of disclosure.  The nature of the information

01:56:30  10  sought, it is not highly privileged because it does not

11  involve or reveal core associational privileges or

12  activities protected by the First Amendment.

13      And did the defendant place the information in issue?

14  Yes, I think the state of mind relating to the campaign

01:56:54  15  activities is certainly at issue.  And it's unclear who

16  placed it at issue, but I'm not sure that that matters.

17  It is clearly an issue in the lawsuit.  It's a little bit

18  unclear whether it goes into -- it goes to relevance or

19  something else in the relationship of those two factors.

01:57:23  20      So, I do think that there is a need that might

21  outweigh any particular First Amendment associational

22  privilege on these documents.  And I'm doing these on a

23  document category by document category basis.

24          MR. NAJVAR:  Your Honor, just to clarify --

01:57:44  25          THE COURT:  Now, one other point on some of

1   these.  To the extent -- and I'm looking in particular at

2   CKPS 137.  Mister -- it's communication between

3   Mr. Neumann and Mr. Najvar.  Najvar, I guess.  But it is

4   about a matter of what election law requires to be

01:58:13  5   disclosed.  And the particular issue is -- it's unclear if

6   it is a matter on which Mr. Najvar weighed in as an

7   attorney or weighed in as the treasurer of CKPS or whether

8   those can be meaningfully separated.

9       It is also unclear whether Mr. Neumann as the vendor

01:58:42  10  is -- if this even a communication that would be protected

11  by any kind of work product or attorney-client but rather

12  waived because it was sent to a vendor.

13      So I believe it is probably waived by being sent to a

14  vendor.  It is not communication with a client, and it is

01:59:04  15  disclosed work product.  It is a statement by Mr. Najvar,

16  who is obviously an attorney.

17          MR. NAJVAR:  Many of these e-mails do include me.

18  It's not just the issue of reporting compliance.  It also

19  goes, as you mentioned, to the issue of defamation and the

01:59:23  20  factual substantiation.  And I have always considered the

21  vendors to the pact as an agent of the pact because they

22  are the ones -- they are the ones doing this.  They are

23  hired by the pact to do the work just like --

24          THE COURT:  I'm not sure.  Unless you give me

01:59:39  25  authority for that, I'm not confident that that's correct

1  as a matter of privilege law.  You may be right that they

2  are agents of the pact for the purpose that is that they

3  are hired to do -- to perform acts for money on behalf of

4  the pact.  But I don't understand that that would

01:59:55  5  necessarily cloak them with the privilege that the pact

6  itself would enjoy in its communications with you as the

7  attorney.  Certainly -- but I am happy to look at

8  authority to that effect, if you can produce it.

9          MR. NAJVAR:  I will be glad to look that one up.

02:00:14  10          THE COURT:  All right.  I don't know if the

11  plaintiff has authority to that effect already.

12          MR. HERRERA:  No, Your Honor.

13          THE COURT:  All right.  I think you better look

14  at that before those are required to be produced.

02:01:03  15      Okay.  The third issue for the third folder are 2013

16  ads.  They deal -- again, Mr. Neumann is involved heavily.

17  They are drafts of ads relating to primarily Mr. Harrison

18  -- and then, what district was he running?  This is

19  obviously before the city charter was amended.

02:02:12  20          MR. HERRERA:  In the previous map, Your Honor, I

21  believe that would have been District D, which is, of

22  course, a Latino majority district.

23          THE COURT:  There is nothing -- I would note that

24  there is nothing -- a lot of the -- a lot of the subjects

02:02:31  25  and indeed the communications themselves appear to be

1    duplicates of what was included in the earlier folder, and

2    none of them appear to deal with any issue that, as far as

3    I can tell, is specifically addressing any issue relating

4    to on its face, in any event, or even below that deals

02:04:02  5    with racial matters.

6         The target, the subjects -- and, again, these are not

7    very different from the ads that, in fact, went out.  The

8    mailings that were used deal with what is just in those

9    mailings, funding for police and fire departments, the

02:04:21  10    kind of who owns the trash cans that Pasadena city

11    residents receive from the city, those kinds of matters

12    with respect to -- and prior conduct by the candidate,

13    Mr. Harrison, that apparently drew criticism in the past.

14         There are also -- there is also correspondence

02:05:09  15    relating to Cody Ray Wheeler; and, again, this is more

16    overtly partisan in that it is -- it ties Mr. Wheeler and

17    the opposition to him to prior votes in the democratic

18    primary and what -- and its relation and its tie,

19    obviously, to President Obama and various organizations

02:06:07  20    that are highlighted in the ads that did go out.  And

21    there is some editorial comment on the ad content.

22         Who is mister -- again, these are, I believe,

23    within -- to the extent there is a First Amendment

24    associational privilege implicated by this kind of

02:06:47  25    discussion of the content of advertisements and the -- and

1    mailings for the 2013 election that --

2        Steven, do you have a copy of the revised timeline

3    handy?

4            THE CLERK:  I do.

02:07:23    5            THE COURT:  Thank you.

6        To the extent the privilege applies that there is a

7    prima facie showing -- although I don't, again, see a

8    direct threat -- the plaintiff here does have a clear

9    interest in obtaining the disclosures; and I think that

02:07:59   10    any deterrent effect on the free exercise of

11    constitutionally protected rights is, again, so minimal

12    that -- and because there is no alternative means to get

13    this information, I do believe that the interests weigh in

14    favor of requiring the disclosure.

02:08:20   15        Again, having said that, that is subject to the review

16    to ensure that there are no privileged communications by

17    way of attorney-client privilege that would not be subject

18    to the balancing and, number two, that there would not be

19    -- and subject to, for all of these, the entry of a

02:08:43   20    protective order that would limit the information to use

21    within this lawsuit, prevent its dissemination outside

22    this lawsuit and prevent any reference by parties or

23    others to the contents outside this -- the purposes of

24    this lawsuit and subject to the protective order.

02:09:13   25        So to the extent that there would be a requirement for

1    prior court approval of certain kinds of statements

2    concerning the contents, I would be happy to entertain

3    those requests; but I think that they are -- with them

4    that they would vary, provide robust protection against

02:09:32    5    any concern of deterrence of communications that would be

6    -- in the future that would be protected by the First

7    Amendment because it is so limited in distribution.

8         There could be no competitive disadvantage inflicted

9    on Mr. Yates, as he testified yesterday, because the

02:09:53    10   information would not be revealed to competitors.  Further

11   undermining any showing of deterrence.

12        The next category, which is Yates 324 through 374,

13   deals with communications in March of 2013 relating to ads

14   in opposition to Mr. Harrison and to Mr. Wheeler, very

02:10:30    15   similar to what we discussed before, and to calls simply

16   supporting Mr. Isbell's re-election that -- with a script

17   that is very bare bones.  And bare bones in the sense of

18   only making very narrow requests such as to place a yard

19   sign and not going into any additional information about

02:11:05    20   positions, issues, policies, views, anything else.  Bare

21   bones as can be.

22        The same analysis that I went through a moment ago

23   would appear to apply identically to this category of

24   e-mails, again subject to the protective order and to

02:11:29    25   review to ensure that there are no attorney-client or

1   work-product protected communications.  I believe that

2   there is a basis for disclosure.

3       The next category, Fall of 2013, documents that are a

4   little hard -- it looks like Yates 1 through 166.  Now,

02:11:56   5   these are much more central to the plaintiffs' claims and,

6   therefore, the case for compelled disclosure even against

7   the First Amendment associational privilege invoked by the

8   defendants is even stronger because these are, many of

9   them, e-mails and relating to communications, mailings,

02:12:26  10  ads about the city council charter that -- the city

11  charter amendment to change the voting method to include

12  three at-large districts.

13       MR. NAJVAR:  Well, Your Honor, what range of

14  documents?

02:12:51  15       THE COURT:  Yates 1 to what appears to be 166.

16  And I believe that the case for compelled disclosure as to

17  this group of documents is the strongest and the easiest

18  to resolve because of that, because they are central to

19  the very claim that is made in this case, that the

02:13:23  20  decision to propose to city council to obtain its approval

21  and then to put to the voters the referendum on the change

22  to the city charter was intentionally directed to diluting

23  Hispanic voting strength.

24       So I am going to compel the disclosure, again subject

02:13:46  25  to the protective order and attorney-client protections

1    and work-product protections.

2           MR. NAJVAR:  I just want to clarify for the

3    record.  The first -- there are two -- within that range,

4    the larger range, there is the 1 through 49 from the 2013

02:14:00    5    time period.

6           THE COURT:  Yes.

7           MR. NAJVAR:  And that is --

8           THE COURT:  But then many of the later ones --

9    and you are right.  62, for example, deals with March of

02:14:08   10    2015 and the election then.  But much of the -- but the

11    subject of the e-mails and the attachments includes

12    references to positions taken on the city charter

13    amendment back when it was approved.

14           So for that reason I think that the case for compelled

02:14:35   15    disclosure applies in the same fashion.  Not all of the

16    2015 communications have that reference at all but many do

17    and they are within the -- and they fall within the -- and

18    because the campaign is the same as the campaign that

19    included those references, I think the case for disclosure

02:15:04   20    is a strong one.

21           There are some results of calls about at-large

22    district elections; and again, I think that that is -- I

23    think that that does perhaps implicate an associational

24    privilege.  Assuming it does, I don't -- again, I see a

02:15:31   25    particularized need because the focus was made on the

1    comparing the results in at-large districts to other

2    districts.

3        So again, subject to the same conditions, Yates 1

4    through 162 would have to be produced.

02:16:02    5        Yates 167 to 204 are 2015 e-mails.  I don't see any of

6    the same kind of references that were in the prior set

7    that I referred to.  There are discussions of choices

8    involving the appearance of various mailings and ads,

9    color used and things like that.  Again, those hardly seem

02:16:36   10    the stuff of strategic choices that need -- that are

11    secret sauce in any fashion.

12        On the other hand, they do loosely fall within a broad

13    concept of internal communications about political

14    communications with the public.  It is unclear the extent

02:17:05   15    to which these ads that are discussed deviate or vary from

16    what was ultimately published in any material or

17    substantive way; but to the extent that the privilege has

18    been shown, that there has been a prima facie showing that

19    the privilege applies, I don't see, again, because of the

02:17:26   20    restrictions that I have put on release or lack thereof,

21    disclosure.

22        And because of the absence of the plaintiffs' ability

23    to get what are relevant documents because they do reveal

24    how the campaigning was conducted in the at-large

02:17:52   25    districts that were newly created because of the city

1    council amendment -- the city charter amendment, excuse

2    me, that counsel approved and the voters approved, I do --

3    and because the plaintiffs have no ability to get this

4    information from any other source I believe it needs to be

02:18:15   5    produced subject to the prior conditions I have

6    identified.

7        There are some invoices in here.  Again, you may

8    redact the amounts if that is appropriate.

9        MR. NAJVAR:  Your Honor, may I ask you a question

02:18:29   10   about that?  We briefed this issue of relevancy in terms

11   of in context of a ballot measure election and they filed

12   a response and they never addressed that point.

13       THE COURT:  I do believe it is relevant.  The

14   mere fact that it was put to the voters and a campaign was

02:18:47   15   run in order to have that put into place I don't think

16   immunizes a finding or prevents a finding of relevance

17   because it was put to the city council in the first place

18   and then put to the voters through the city council's

19   action as a result of actions taken by Mayor Isbell and,

02:19:12   20   at his urging, members of the city council.  Oh, and

21   because Mayor Isbell's pact is the one that is then

22   creating the campaign materials in order to have the

23   charter amendments approved.

24       So, I don't think that that immunizes the existence of

02:19:38   25   the -- of the changes or the redistricting choices that

1    city council made to implement them from a relevance

2    finding.

3        MR. NAJVAR:  Would that apply also, Your Honor,

4    to the communications that come back from the voters?

02:19:52    5    Like, for example, some of those e-mails attach the

6    results of the calls that went out.  I don't think that

7    would be relevant.  Even if the pact's communications to

8    the voters are relevant, the communications back aren't

9    relevant to what the intent was of the pact.

02:20:07    10        THE COURT:  The only -- what is relevant is the

11    type of information sought on the calls and the way in

12    which it is described, which, again, are an effort to

13    isolate out how at-large districts would vote as compared

14    to single-member districts if elections were held on the

02:20:27    15    moment of the survey that was taken and the calls.

16        So I think that there is a basis, a theory of

17    relevance there that is sufficient.  And the volume is not

18    so large.  The documents have already been provided; and

19    many of them, as I said, are very close to what was

02:20:55    20    publicly available.  Some are not; and those are the ones

21    that are the most critical, that are critical in the sense

22    that they are not otherwise available to the plaintiffs.

23    I believe that this is sufficient for a finding of both

24    relevance and proportionality.

02:21:15    25        The final tranche of documents go back -- and this is

1   labeled as Yates 375 through 558 or 560, excuse me.  These

2   appear to deal primarily with Mr. Yates' own re-election

3   and support for Mr. Rick Guerrero's election and I

4   believe, also, Mr. Larry -- Leroy Stanley's election.

02:22:09   5     These are 2013.  They -- they predate the ballot

6   measure or the city council action to change the charter.

7   There are some references to efforts to identify in call

8   surveys non-English speaking households, but I did not see

9   other references to issues that directly speak to the

02:23:09   10   concerns that have been made in this -- that are at the

11   center of this case.

12     But because this shows the way in which the campaigns

13   were run prior to the change to the city charter and the

14   redistricting that occurred after the voters approved the

02:23:44   15   change, I believe it is relevant and not available

16   elsewhere.  And because of the nature of the

17   communications, which again deals with very minor changes

18   and very technical questions, and because of the limits

19   and restrictions put on dissemination, I believe that the

02:24:08   20   plaintiffs' need for the information outweighs any

21   possible deterrent effect to associational privileges and

22   that there is no less restrictive way of obtaining any of

23   the information.  Again, subject to any attorney-client

24   communications that might be involved.

02:24:32   25     That is where I am in the disclosure requirements.  I

1   have not, obviously, looked at the CPC documents because

2   this is the first I was aware that it was also represented

3   by Mr. Najvar.

4        And I'm sorry if I keep mispronouncing your name.

02:25:08   5        MR. NAJVAR:  I'm used to that, Your Honor.

6        THE COURT:  Yes.

7        MR. NAJVAR:  And I wasn't their representative

8   until after Monday's hearing.

9        THE COURT:  That's fine.  CPC -- I understand.

02:25:17   10  I'm not being critical.

11       The final item to -- and you can tell me because you

12  know the CPC documents better than I do, much better.  I

13  have never seen them.  Are they similar in nature to what

14  we have just seen?

02:25:33   15       MR. NAJVAR:  They are very similar.  I mean, if I

16  flip through them again, in light of what the Court has

17  discussed today, I might ad some nuance.  I think they are

18  substantially similar in terms of the types of

19  communications.

02:25:46   20       THE COURT:  Can you implement the same approach

21  to disclosure with the same conditions and same limits in

22  the protective order that I have outlined or do you need

23  me to go through them as well?  Or perhaps an intermediate

24  step, you can review them in order to implement the same

02:26:04   25  approach; and if there are particular documents that you

1  want to have the Court review in-camera, I'm happy to do

2  that.  You tell me.

3          MR. NAJVAR:  I think, given what the Court said,

4  I can accommodate that.  There might be some I would

5  isolate and ask for an in-camera review.

6          THE COURT:  That's fine.  That's fine.  I don't

7  have any problem with that at all.  Okay.

8          MR. HERRERA:  Your Honor, plaintiffs have a

9  question about --

10          THE COURT:  Hang on one second.

11          MR. HERRERA:  Yes, Your Honor.

12          THE COURT:  We also have this issue of the list

13  of the individuals who were the recipients of various

14  mailings.  That has been provided.  And there is a

15  citywide list and other similar lists, and these are the

16  recipients of the communications from 2015 and the

17  phone/walk list for Carmona, Herbert and Bass support

18  communications, again, I believe, for 2015, correct?  Also

19  deals with the support for candidates running at large,

20  and that was a citywide mailer.

21      I am concerned about revealing personal information

22  such as addresses -- phone numbers and addresses.  But I

23  think the best way of limiting that, further protecting

24  that information, is to eliminate the names and eliminate

25  the phone numbers, redact them but do have the addresses

1   so that you can then tell and the zip codes.  And the zip

2   codes may be enough.  You tell me.

3          MR. HERRERA:  Your Honor, I believe the

4   plaintiffs would need the names; and we would be willing

02:28:46   5   to enter into a protective order that is attorney's eyes

6   only.

7          THE COURT:  Why do you need the names?

8          MR. HERRERA:  To look at the number of surnames

9   and the various --

02:28:58  10          THE COURT:  Fair enough.  You want

11   Spanish-speaking names or Spanish surnames?

12          MR. HERRERA:  Spanish surnames, yes, Your Honor.

13          THE COURT:  That's a point that I had not

14   considered.  Is it sufficient, then, to eliminate first

02:29:15  15   names?

16          MR. HERRERA:  Yes, Your Honor.

17          THE COURT:  All right.  That would have to be

18   done carefully because some of these refer to the last

19   name under the rubric "the family", with the name "family

02:29:26  20   name used" in the first name column.  So you couldn't

21   simply block out a column.  You would have to go down the

22   column and be much more precise about what was blocked.

23          MR. NAJVAR:  I'll have to look at it.  If that --

24   okay.

02:29:43  25          THE COURT:  There are voter ID numbers.  I don't

1  know if you need those.

2          MR. HERRERA:  Those -- we don't need those, Your

3  Honor.

4          THE COURT:  Those can be redacted.  Telephone

02:29:53  5  numbers, I don't think you would need those.

6          MR. HERRERA:  No, Your Honor.

7          THE COURT:  Those can be redacted.  And that will

8  amplify the protections for the privacy interests of the

9  individuals involved.  But, for example, the use of a

02:30:19  10  citywide list for at-large seats hardly seems to reflect

11  nuances of strategy that would deter future communications

12  about strategy.

13          MR. NAJVAR:  Right.  The only -- the thing I

14  would ask for redaction on would be the parameters that

02:30:44  15  were used to select the list; but if the plaintiffs are

16  already going to have the documents where that is

17  discussed, then -- that's reflected on the list, as well,

18  that's the same procedure.

19          THE COURT:  Well, but the parameters seem not to

02:30:54  20  be mysterious.  Citywide for at large.  And then, there is

21  one reference to people targeted for the single-member

22  districts; and I don't believe, again, that that -- that

23  the compelled production of these lists adds to

24  information that was previously required to be disclosed

02:31:21  25  subject to the limits that I have already identified.

1      The walk lists, I believe, fall under the same

2   category unless there is some alternate basis for treating

3   them that I have not considered.  I'm happy to hear any

4   suggestions along those lines.

02:31:45   5          MR. NAJVAR:  I don't have any, Your Honor.

6          THE COURT:  All right.  Very good.

7      Matters relating to invoicing, such as CKPS 228, you

8   can deal with those the same as we discussed earlier.

9      And there are references to how -- to selection

02:32:22  10   methods that I think are germane, certainly relevant to

11   the plaintiffs' claims in this case and that cannot be

12   obtained anywhere else and that are the subject of a

13   compelling need on the part of the plaintiffs, that would

14   justify compelled disclosures subject to the limits I have

02:32:45  15   identified.

16      I think that addresses all of the documents that I was

17   provided for in-camera review.

18          MR. HERRERA:  Your Honor, can the Court state for

19   the record the Bates numbers for the documents contained

02:32:59  20   in 2013 e-mails regarding Harrison and Wheeler?  We don't

21   have a specific discussion of Bates Nos. 205 to 233.

22          MS. PERALES:  Yates.

23          MR. HERRERA:  Yates 205 to 233.

24          THE COURT:  Yates.

02:33:17  25          MR. HERRERA:  Yates 256 to 308.

1          THE COURT:  I'm not sure you need a specific

2     discussion of each one.

3          MR. HERRERA:  Probably not, no, Your Honor; but

4     these are the ones I'm looking at here.

02:33:33   5          THE COURT:  I'm sorry.  The numbers again.

6          MR. HERRERA:  Of course.  Yes, first, Yates 205

7     to 233.

8          THE COURT:  Hold on.  Let me make sure I was

9     getting it.

02:33:52   10          MR. NAJVAR:  Your Honor, I don't believe you have

11    those.  Those would be responsive to the other subpoena to

12    Mr. Yates because those were --

13          THE COURT:  Can you treat those in the same

14    fashion?

02:34:02   15          MR. NAJVAR:  Yes, Your Honor.

16          THE COURT:  All right.  I think that will take

17    care of it.

18          MR. HERRERA:  Two other ranges, Your Honor.

19    Yates 256 to 308.

02:34:11   20          THE COURT:  Hold on.  256 I don't believe --

21          MR. NAJVAR:  I think these are all --

22          THE COURT:  I think that you still have them.

23          MR. NAJVAR:  These are all responsive -- these

24    were not CKPS documents.  These would be dealt with with

02:34:21   25    the Yates subpoena.

1           MR. HERRERA:  And then, finally, 309 to 323, also

2      Yates.

3           MR. NAJVAR:  Same thing.

4           THE COURT:  All right.  So those will be treated

02:34:29   5   in the same fashion.  If I need to review in camera any

6      specific documents within those categories and ranges, I

7      assume that you will provide them to me promptly.

8           MR. NAJVAR:  Yes, Your Honor.

9           THE COURT:  All right.

02:34:40  10        MR. NAJVAR:  Can I just ask?  I missed a document

11     range, also.  After we talked about 1 through -- the Yates

12     1 through 162 and before Yates 375 to 560 there was a

13     range in there.

14           THE COURT:  221 is in there.

02:35:01  15        THE CLERK:  167 to 204.

16           THE COURT:  For Yates?  No, that's CKPS.

17           MR. NAJVAR:  168 to 204, that sounds right.

18           THE COURT:  For Yates?

19           THE CLERK:  I wrote down 168 to 204 Yates.

02:35:26  20        THE COURT:  I've got -- I'm sorry.  Give me the

21     numbers again.

22           MR. NAJVAR:  I think it must be 168 to 204.

23           THE COURT:  These are 2015 --

24           MR. NAJVAR:  These are --

02:35:48  25        THE COURT:  2015 documents.  They deal with some

invoices, some campaign photos.  They deal with Mr. Bass
and campaign materials supporting him.  These appear to be
for a single-member district, and I believe that they
would be subject to disclosure on the same basis.  They do
not specifically implicate or specifically address the
amendment to the city charter or the impact of the
redistricting but it is the first post-redistricting
election under the redistricts and I believe that it is --
it contains relevant information, communications other
than the amounts of the invoices perhaps which may be
redacted consistent with our earlier discussion and
subject to the same restrictions on dissemination.

I'm going to mark these as an exhibit to this hearing
so that the documents themselves will be available for
appellate review if that becomes an issue.  It's a Court
exhibit.

Is there anything else that we need to do today?

MR. HERRERA:  Your Honor, the only other thing
would be scheduling.

Well, Your Honor, one more thing about the subpoena to
the Citizens for Positive Change pact.  Plaintiffs would
still seek disclosure of any documents that would not be
in Mr. Yates' possession or Mr. Bass's possession.

It is the plaintiffs' understanding Citizens for
Positive Change never produced a privileged log or set of

1    responses and objections.  Therefore, they also -- the

2    only documents produced by Citizens for Positive Change

3    prior to Mr. Najvar's representation of the pact were

4    disclosure -- finance disclosure reports required by state

02:38:45   5    law to the city.

6        So the plaintiffs would ask that anything that's not

7    in Mr. Yates' possession be disclosed.

8            MR. NAJVAR:  I have spoken with Mr. Bass since

9    the hearing, and I am representing Citizens for Positive

02:39:03   10   Change here.  He gave me a copy of what was provided,

11   which is limited to the publicly-filed reports.  Mr. Bass

12   attached a cover letter that, obviously, states his

13   objection.  First of all, he says I'm giving you

14   everything that I have except for the bank statements.

02:39:23   15   The only thing he withheld was the bank statements.

16       And Mr. Bass, after speaking with him, I understand

17   more of the situation with that organization.  He was

18   asked to be the treasurer, but he literally had no

19   interaction in terms of anything that the pact did other

02:39:41   20   than to write checks to people.  I think there were three

21   checks issued by the pact.

22       All of the documents that go to what Citizens for

23   Positive Change did are actually already logged and

24   responsive to the subpoena to the Yates company, and those

02:39:59   25   are some of the documents we have already discussed.  So

1   it's literally true.  I asked -- Mr. Bass told me

2   yesterday he didn't know what Citizens for Positive Change

3   did until he got the mail piece at his door.  I mean, he

4   literally had no interaction in terms of with Mr. Yates or

02:40:17   5   anybody else working on the advertisements or any

6   decisions that the pact made.

7        And so, I'm not saying there are not documents; but

8   the documents would come in response to the subpoena to

9   Jeff Yates.  Mr. Bass has no documents.

02:40:31   10        MR. HERRERA:  Your Honor, to the extent that any

11   of this -- first of all, the plaintiffs object to anything

12   that Mr. Najvar says that Mr. Bass said to not be

13   testimony.  To the extent it is testimony, it would be

14   hearsay.

02:40:44   15        THE COURT:  I'm a little confused though.  If you

16   are going to get them through Mr. Bass then what is the

17   issue of or through Mr. -- if they are going to be

18   produced, what does the -- is it critical that we focus on

19   who is going to be the party responding to the request,

02:41:09   20   which appears to be what we are arguing about, unless I

21   have lost something in the exchange.

22        MR. HERRERA:  That's -- I believe that's right,

23   Your Honor.  Plaintiffs don't believe that Mr. Bass is the

24   end of the line when it comes to who is in custody of the

02:41:24   25   pact's documents.  We don't have -- plaintiffs don't have

1  reason to doubt Mr. Bass's representations to plaintiff so

2  far, but we also don't believe that Mr. Bass is the pact.

3          MR. NAJVAR:  And just a procedural point, Your

4  Honor.  You mentioned evidentiary issues.  They have asked

02:41:43  5  for a discovery conference with regard to Mr. Bass's

6  subpoena.  There is no motion to compel on file.

7          THE COURT:  It doesn't have to be a motion.  This

8  is a conference that precedes any motion.

9          MR. NAJVAR:  Right.  And so, in terms of that,

02:41:54  10  the evidentiary burden is not the same.  It's not like we

11  are here --

12          THE COURT:  But you still need to articulate the

13  basis for your refusal to provide the information.

14          MR. NAJVAR:  Right.  He objected to me talking

02:42:06  15  about what Mr. Bass told me.  I'm just explaining.

16          THE COURT:  That's fine.  That's fine.  Is the

17  information going to be produced?

18          MR. NAJVAR:  The information --

19          THE COURT:  Subject to the restrictions and

02:42:16  20  categories we have identified.

21          MR. NAJVAR:  Right.  The information just comes

22  from Mr. Yates, not from Bass or anybody else.

23          THE COURT:  Does that matter at this juncture?

24          MR. HERRERA:  I believe it does matter beyond

02:42:27  25  Mr. Yates.  Mr. Bass has to retrieve the documents even if

1   not in his possession.

2          THE COURT:  What does that -- but if Mr. Yates is

3   going to be the one from whom he will retrieve it, does

4   that matter?  What is the distinction that creates a

02:42:43   5   difference here?

6          MR. HERRERA:  There is no distinction, Your

7   Honor, just that Mr. Yates is one person in custody of

8   pact documents; and it is clear from the privilege logs we

9   have seen for these other two subpoenas that there are

02:42:58  10   other -- there are likely other people in custody of

11   documents pertaining to the pact.

12          THE COURT:  Unless they are documents that cannot

13   otherwise be obtained through the pact and Mr. Yates, I

14   don't understand the need to require a duplicative

02:43:19  15   production simply because it is in the possession of

16   someone else.  That's where I am not connecting with your

17   argument.

18          MR. HERRERA:  Of course, Your Honor.  We don't

19   need to get the e-mails that Mr. Yates has twice, for

02:43:33  20   example, or the list that Mr. Yates has twice.  But if

21   there are, for example, communications between Mr. Scott

22   and Mr. Isbell pertaining to the pact, for example --

23          THE COURT:  That would not otherwise be contained

24   in what Mr. Yates has.

02:43:46  25          MR. HERRERA:  Correct, Your Honor.

1        THE COURT:  That is fine.  But the question is

2   whether there are -- whether there are communications or

3   information that is not otherwise contained in what

4   Mr. Yates has, and that's what we are asking -- what I

02:44:07   5   understood you to be asking.

6        So, Mr. Najvar, are there?

7        MR. NAJVAR:  No.

8        THE COURT:  Have you searched to be sure that

9   that is a wholly accurate statement?

02:44:19   10        MR. NAJVAR:  I talked -- well, I talked to

11   Mr. Yates -- I mean, Mr. Bass for more than half an hour

12   and verified this several ways.  He does not have

13   possession of any of them.  I think to the extent that

14   they are trying to use this subpoena to require Mr. Bass

02:44:35   15   to go to Mr. Isbell's e-mail account and get stuff that

16   might not have been in what we have already put together

17   for Mr. Yates, it sounds like that is what they are asking

18   for and mister -- that goes beyond the scope of the

19   subpoena.  Mr. Bass is not responsible for people he

02:44:51   20   doesn't control.

21        MR. HERRERA:  The subpoena, Your Honor, is not to

22   Mr. Bass.  The subpoena is to the pact.  And it's obvious

23   that Mr. Bass is not the only person in the pact.

24   Therefore, it would require Mr. Bass or whomever to go to

02:45:07   25   the other people who would have custody of the requested

1   documents.  The subpoena is not drawn --

2        THE COURT:  Who else would he go to besides

3   Mr. Yates?

4        MR. HERRERA:  We don't fully know, Your Honor.

5        THE COURT:  Let me ask Mr. Najvar.  Who else has

6   custody or control?

7        MR. NAJVAR:  My understanding -- and I'll look,

8   again, and verify this now that I have all the reports

9   that are filed.  But my understanding is everything would

10  come from Mr. Yates, which we already have.  There were

11  only three checks written.  The only consulting check, I

12  believe, went to Mr. Yates.  He was the one hiring the

13  subcontractors which are already logged here.  PMI did the

14  phoning.  Spencer Neumann for the mail.  These are

15  documents already in the privileged log.

16     So all the e-mails between Isbell and Scott and Yates

17  and then between Yates and the vendors to CPC have already

18  been produced or logged and assembled in terms of the

19  subpoena to Jeff Yates.

20       MR. HERRERA:  Your Honor, to the extent that

21  we're hearing about representations from Mr. Bass,

22  Mr. Bass told me in a phone call that he had gone to --

23  that he had -- I'm sorry.  That he had not spoken with

24  anyone, I believe, about the documents.  The only person

25  he has spoke with in preparing his response to the

02:45:20
02:45:32
02:45:47
02:46:05
02:46:31

1   subpoena was his wife, who helped him put it together,

2   basically.  And what plaintiffs received was a letter, a

3   short letter, as well as the campaign finance disclosures.

4   That's just --

02:46:49   5        THE COURT:  Again, you just heard counsel's

6   representation about who had custody of any duplicative

7   e-mails.  I would urge you to verify that and report back

8   to plaintiffs' counsel.  And if there is any issue that

9   remains, you can bring it up with me; but I don't see any

02:47:06   10  basis at this point to not to -- to require additional

11  duplicative production just as a means of double-checking

12  that what has been described is, in fact, accurate.

13  That's what I hear you requiring.

14       MR. HERRERA:  Yes, Your Honor.  Thank you.

02:47:30   15       THE COURT:  Not absent any specific basis to

16  believe what has been said is, in fact, not accurate.

17       MR. HERRERA:  No, Your Honor.

18       THE COURT:  All right.  In that case, what kind

19  of scheduling order are you looking for?  Have you

02:47:47   20  conferred with opposing counsel?

21       MR. HERRERA:  We have not.

22       THE COURT:  Perhaps that would be a wise move.

23       MR. HERRERA:  Thank you, Your Honor.

24       THE COURT:  Would you like to use the jury room

02:47:58   25  to do so, and I can come back in half an hour?

1        MR. HERRERA:  That would -- I don't know if we

2  need half an hour.  15 minutes, I think, might suffice

3  unless -- this would be discussion with defense counsel, I

4  believe, as well, for the city.

02:48:15   5        THE COURT:  Are they here?

6        MR. HERRERA:  Yes, Your Honor.

7        THE COURT:  All right.  Very good.  You are

8  welcome to stay in the courtroom and use this space as

9  well.

02:48:23   10        MR. HERRERA:  Thank you, Your Honor.

11        THE COURT:  Thank you.  I'll be back in about 15

12  minutes.

13     (Recess from 2:48 p.m. to 3:14 p.m.)

14        THE COURT:  Were you able to confer productively

03:14:07   15  on a schedule?

16        MR. HERRERA:  Yes, Your Honor.  On the scheduling

17  after discussing --

18        THE COURT:  You may be seated, please.

19        MR. HERRERA:  After discussing with counsel for

03:14:15   20  the city and Mr. Najvar, plaintiffs would ask that --

21        THE COURT:  And let me get an appearance from

22  counsel for the city, please.

23        MS. AHLRICH:  Katy Ahlrich for the City of

24  Pasadena.

03:14:26   25        THE COURT:  Thank you.  Go ahead, please.

         1          MR. HERRERA:  Plaintiffs would ask that the Court

         2   extend all discovery by 60 days beyond the date the

         3   documents are produced, and we have agreed with Mr. Najvar

         4   on a production date of next Friday.

03:14:41 5          THE COURT:  Okay.  So what is the current

         6   discovery date cut-off?

         7          MR. HERRERA:  Currently the 15th, Your Honor, of

         8   this month.  Sorry.  February 15th.

         9          THE COURT:  Okay.  Can you get me the up-to-date

03:14:58 10  docket sheet?  It should be in there.  Do you have one,

        11   Jesus, handy?

        12          CASE MANAGER:  I've got it for you.

        13          THE COURT:  It's changed somewhat.  I have last

        14   week's or earlier this week's.

03:15:12 15          MS. AHLRICH:  Your Honor, if I may, the city

        16   would agree to that; but we would also request that if we

        17   do have --

        18          THE COURT:  I'm sorry.  Request for what?

        19          MS. AHLRICH:  I'm sorry.  The city would agree to

03:15:23 20  the extension of the discovery deadline; but we would ask

        21   the Court to consider resetting the trial date, as well.

        22          THE COURT:  The question is whether it all needs

        23   to be rolled forward 60 days.

        24          MS. AHLRICH:  Yes, Your Honor.

03:15:35 25          THE COURT:  And it looks.  Okay.  I don't have

1  any objection to doing that.  Is anybody opposed?

2            MR. HERRERA:  No, Your Honor.

3            THE COURT:  We'll issue an amended scheduling

4  order that will extend all the deadlines, starting with

03:15:47  5  the February 15th deadline, 60 days.

6            MR. HERRERA:  Yes, Your Honor.  Before we discuss

7  a problem or an issue we have with -- well, the only other

8  issue then, Your Honor, is having to do with the Citizens

9  for Positive Change and production there; and it seems

03:16:09  10  that we are at somewhat of an impasse with counsel for

11  Citizens for Positive Change in that the pact doesn't

12  believe it has to go to donors to retrieve documents.

13            THE COURT:  Were documents sent to donors,

14  because they weren't for CKPS?

03:16:28  15            MR. NAJVAR:  I'm sorry, Your Honor.

16            THE COURT:  Were documents sent to donors?

17            MR. NAJVAR:  No, not that I'm aware of.

18            THE COURT:  Were there any e-mails for

19  communications sent to donors from CPC or received from

03:16:40  20  donors by CPC responsive to the subpoena?

21            MR. NAJVAR:  Not that I'm aware of.

22            THE COURT:  Check again and make sure.  If there

23  are none, then I believe that that satisfies your inquiry.

24            MR. HERRERA:  There is another check, Your Honor.

03:16:57  25  For example, one of the donors is the mayor.  He was

1    responsible for 84 percent of the funding for the pact.

2         THE COURT:  If Mayor Isbell communicated with

3    CPC, those would be responsive and subject to the

4    categories of production that we have already gone

03:17:15  5  through.  I thought you were referring primarily to other

6    donors.

7         What was Mayor Isbell's role in the pact?  Was he an

8    officer?

9         MR. HERRERA:  We don't know, Your Honor.  The

03:17:27  10  only officer listed for this pact, as is usual from what I

11   understand, is the treasurer; and that was Mr. Bass.

12        THE COURT:  All right.  So besides Mr. Bass was

13   Johnny Isbell, J.J. Isbell involved?

14        MR. NAJVAR:  I believe there were -- it was

03:17:43  15  substantially the same as with --

16        THE COURT:  So any e-mails to and from or other

17   communications to and from the pact and Isbell and the

18   Isbells, Richard Scott and Mr. Bass, as well as Mr. Yates

19   and the vendors would obviously be called for in the same

03:18:02  20  fashion they were for the CKPS subpoena.  Do you have any

21   difficulty with that?

22        MR. NAJVAR:  We have no problem with that.  That

23   stuff is already here in response to the Yates subpoena.

24        THE COURT:  So I'm trying to figure out what the

03:18:16  25  issue is.  The non-Isbell donors?

1          MR. HERRERA:  That would be -- we would include

2      that with donors, Your Honor.  That's not the only --

3      that's the --

4          THE COURT:  What I just -- I'm sorry to interrupt

03:18:29   5      you.  I don't mean to, Mr. Herrera.  I have just been told

6      that there are no communications responsive to the request

7      to or from donors other than the individuals identified

8      already, the Isbells, Scott and Mr. Bass.

9          MR. HERRERA:  That's right, Your Honor.  But it

03:18:51  10      has been -- we have heard -- we have been told that

11      Mr. Bass doesn't believe he has to go to other people,

12      other donors to see if there -- or other principals to see

13      if there are communications between or among them.  And so

14      the issue -- the bigger issue is --

03:19:11  15          THE COURT:  There is nothing to or from CPC and

16      these other donors that has turned up so far.  We have

17      just been told there is nothing.

18          MR. HERRERA:  As far as we're concerned -- Your

19      Honor, Mr. Najvar was, from what we understand, retained

03:19:29  20      as counsel on Monday night or Monday afternoon and --

21          THE COURT:  I have already asked him to verify

22      that there are no communications between CPC and these

23      other donors responsive to the subpoena.  Does that take

24      care of your concern?

03:19:47  25          MR. HERRERA:  Yes, Your Honor.  There is another

1  check.

2          THE COURT:  All right.  And can you do that by

3  this coming Monday the 15th?

4          MR. NAJVAR:  Absolutely.  And that would be --

03:20:00   5  make sure -- communications that went from anybody

6  about -- from any of the donors about CPC to CPC --

7          THE COURT:  About any of the issues relating that

8  are responsive to the subpoena.

9          MR. NAJVAR:  Right.

03:20:16   10          THE COURT:  To and from CPC and any of its

11  principals like Mr. Isbell.

12          MR. NAJVAR:  Mr. Isbell, Mr. Yates, J.J. Isbell.

13          THE COURT:  Richard Scott, vendors, that's

14  exactly right.

03:20:29   15          MR. NAJVAR:  Right.  Right.

16          THE COURT:  All right.  With that check and the

17  amended scheduling order, have we done what we need to do

18  today?

19          MR. NAJVAR:  I believe so, Your Honor.

03:20:40   20          MR. HERRERA:  No other issues, Your Honor.

21          THE COURT:  All right.  Very good.  Thank you.

22      *(Proceedings concluded at 3:20 p.m.)*

23  *Date: February 28, 2016*

24              ***COURT REPORTER'S CERTIFICATE***

25      *I, Laura Wells, certify that the foregoing is a*

1   *correct transcript from the record of proceedings in the*

2   *above-entitled matter.*

3

4                                   */s/ Laura Wells*
     _____

5                          *Laura Wells, CRR, RMR*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25