1      **UNITED STATES DISTRICT COURT**
       **SOUTHERN DISTRICT OF TEXAS**
2        **HOUSTON DIVISION**

3  ALBERTO PATINO, ET AL    *  4:14-CV-03241
             *
4  VS.           *  1:19 p.m.
             *
5  CITY OF PASADENA, ET AL   *  FEBRUARY 10, 2016

6       **DISCOVERY HEARING**
    **BEFORE THE HONORABLE LEE H. ROSENTHAL**
7     **Volume 1 of 1, Pages 1 - 47**

8 **APPEARANCES:**

9 **FOR THE PLAINTIFFS:**
  Mr. Ernest I. Herrera
10 Ms. Nina Perales
  MALDEF
11 110 Broadway
  Suite 300
12 San Antonio, Texas 78205
  (210) 244-5476
13

  **FOR THE DEFENDANTS, CITY OF PASADENA, MAYOR JOHNNY ISBELL,**
14 **ORNALDO YBARRA, BRUCE LEAMON, DON HARRISON, PAT VAN HOUTE,**
  **CODY RAY WHEELER, PHIL CAYTEN, STEVE COTE AND DARRELL**
15 **MORRISON:**
  Ms. Kathryn K. Ahlrich
16 Andrews Kurth LLP
  600 Travis
17 Suite 4200
  Houston, Texas 77002
18 (713) 220-4427

19 **FOR THE MOVANT, CITIZENS TO KEEP PASADENA STRONG and**
  **CITIZENS FOR POSITIVE CHANGE:**
20 Mr. Jerad Wayne Najvar
  Najvar Law Firm
21 4151 Southwest Freeway
  Suite 625
22 Houston, Texas 77027
  (281) 404-4696
23

  **ALSO IN ATTENDANCE:**
24 Mr. Jeff Yates

25

1                           **APPEARANCES (continued)**

2     Court Reporter:
      Laura Wells, RPR, RMR, CRR
3     515 Rusk, Suite 8004
      Houston, Texas 77002
4
      Proceedings recorded by mechanical stenography.
5     Transcript produced by computer-assisted transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

1

2          THE COURT:  Good afternoon.  Go ahead and state

3    your appearances for the record; and then, you may be

4    seated.

01:38:39    5          MR. NAJVAR:  Jerad Najvar for Citizens to Keep

6    Pasadena Strong and also for Citizens for Positive Change.

7          THE COURT:  All right.

8          MR. HERRERA:  Ernest Herrera and Nina Perales for

9    the plaintiffs.

01:38:50    10          THE COURT:  Very good.  I have now had a chance

11    to go through the supplemental filings and to review the

12    materials that were submitted in camera, and I have got

13    some questions on these.  So -- and I want to take them up

14    kind of one at a time.

01:39:25    15       Let's start with the question of the invoices

16    themselves.  What is the relevance of the amounts charged

17    for the consulting services provided?

18          MR. HERRERA:  Your Honor, the invoices would show

19    what exactly was done by the different vendors.

01:39:48    20          THE COURT:  They don't.  They don't.  I mean,

21    they are very -- they show what was done but not much.

22    There is very little detail in the invoices.

23          MR. HERRERA:  Your Honor, they would also show

24    whether or not the pact is paying for these -- who is the

01:40:07    25    source for the payment of these services.

THE COURT:  No, they don't.  They simply show --
I mean, it's billed to CKPS.  They don't show anything
beyond that.  They don't show the payment, just the
invoices.

01:40:19
                    MR. HERRERA:  That would be the type of
information that the plaintiffs would be looking for.

                    THE COURT:  So the amounts aren't relevant.

                    MR. HERRERA:  The amounts would be relevant to
match up with the campaign finance disclosures to make
01:40:32    sure that the pact is who is paying for these.

                    THE COURT:  Do you have any basis to dispute that
it was Citizens to Keep Pasadena Strong?  And you know who
funded Citizens to Keep Pasadena Strong.

                    MR. HERRERA:  No, Your Honor.  Plaintiffs don't
01:40:47    have any doubt about that or reason to doubt that.

                    THE COURT:  Then I don't think there is a need
for the amounts.  But I do agree that the invoices with
the amounts redacted, but there is nothing privileged
about them under the First Amendment.  They don't reveal
01:41:09    anything.

                    MR. NAJVAR:  No.  I mean, I noticed some
handwritten notes on there; but I think they are very
minimal, just noting some dates and things.

                    THE COURT:  Received and the check.

01:41:20            MR. NAJVAR:  I don't think -- from the

descriptions that I saw I don't think that they -- I think
you are right.  They don't add a whole lot other than what
is already recorded.

THE COURT:  There is nothing privileged.  You can
redact the amounts if you want to.  If you don't -- if you
are not worried about that because so much information
about the finances has already been disclosed, that's
fine, too.

MR. NAJVAR:  Yes, Your Honor.

THE COURT:  All right.  But they are not
privileged.

Moving on to the second -- I'm just going through
these in the order of the folders that you produced.
Yates 234 to 255 appear to be e-mails and ads relating to
Mr. Carmona's March 2015 campaign materials, Emilio
Carmona.  And they are just putting together information,
photographs and information on some material to include in
the ads.  I don't see any strategy revealed; but I'm not
sure what is relevant in the March 23rd, 2015, election of
Mr. Carmona.

MR. HERRERA:  Your Honor --

THE COURT:  There is no reference to anything
relating to the amendment to the city charter, and perhaps
you can enlighten me.  Was Mr. Carmona running in one of
the new districts, the at-large districts; or was he

1   running in a single-member district?

2           MR. HERRERA:  Your Honor, he was running in a

3   single-member district.

4           THE COURT:  All right.

01:43:24   5           MR. HERRERA:  Your Honor --

6           THE COURT:  Tell me what would be --

7           MR. HERRERA:  Even though they don't have

8   strategy material in them, if you are saying they do not

9   involve strategy, they would still be relevant because

01:43:36  10   they would go to slating.

11           THE COURT:  Slating?

12           MR. HERRERA:  Slating evidence, Your Honor.

13           THE COURT:  In this context you mean selection of

14   a candidate for a particular appeal?

01:43:46  15           MR. HERRERA:  Well, more specifically to the

16   Senate factors of the Voting Rights Act, Your Honor, of a

17   Section 2 claim.  It would go to showing that there were

18   slating activities that excluded candidates of choice of

19   the Latino community.

01:44:03  20           THE COURT:  How would it show this?  This is a

21   photograph to include of Mr. Carmona looking at papers.

22           MR. HERRERA:  Right, Your Honor.  But it would

23   show he was on the slate that ran together.  Furthermore,

24   it would --

01:44:17  25           THE COURT:  There is no dispute about who is on

1      the slate that ran together.

2              MR. HERRERA:  It would show, Your Honor, the

3      senders and recipients of the e-mails of the people who

4      are responsible for assembling the slate in addition to

01:44:30   5      that.

6              THE COURT:  This is a -- these are the

7      individuals who you already knew were involved.  And they

8      are essentially Mr. Richard Scott, who has already been

9      identified and his role has been made clear.  And --

01:44:51   10             MR. HERRERA:  I'm sorry, Your Honor.

11             THE COURT:  -- Sam Safety?  Who is

12     SamSafety@aol.com?

13             MR. HERRERA:  Your Honor, plaintiffs do not know

14     who SamSafety@aol.com would be.

01:45:02   15             THE COURT:  Does the defendant know?

16             MR. NAJVAR:  It's Richard Scott.  He is

17     identified in the log.

18             MR. HERRERA:  Your Honor, Richard Scott,

19     additionally, we don't believe communications with Richard

01:45:14   20     Scott would be privileged because he is a third party to

21     this political committee.

22             THE COURT:  Why would it be privileged?

23             MR. NAJVAR:  The Perry decision --

24             THE COURT:  It's not internal.

01:45:26   25             MR. NAJVAR:  Well, it still -- it goes to -- the

1  First Amendment privilege extends to anybody who is

2  participating in strategy discussions or --

3          THE COURT:  But this is not strategy.

4          MR NAJVAR:  If a particular e-mail wouldn't

5  involve strategy, then I agree it wouldn't be privileged.

6          THE COURT:  This is not -- this is -- I mean,

7  there is discussion of -- there is an exchange of

8  information to put in an ad.  It appears to be the

9  information that was, in fact, put in the ad.  I don't see

10  any evidence of strategy in that, I mean, in any kind of

11  privileged sense.  It doesn't reveal anything about the

12  overall strategy of the campaign one way or the other, as

13  best I can tell.

14      Now, you all know better than I do about that; but

15  there is nothing here that is, in essence, secret because

16  it is information that was used in the -- or versions of

17  it that were used in the materials that were published.

18          MR. NAJVAR:  And this small batch of e-mails does

19  -- I just reviewed them on my computer.  There is very

20  minimal discussion.  It looks like mostly forwarding and

21  attachments that were included.

22          THE COURT:  It is certainly not privileged, that

23  I see, by any First Amendment claim simply because there

24  is nothing in it that would be revealing -- well, there is

25  nothing in it inconsistent with any privilege, assuming

01:45:37
01:45:56
01:46:19
01:46:40
01:47:01

1   one would even apply to the nature of these

2   communications.

3           MR. NAJVAR:  For this -- if it were a larger

4   batch of e-mails that showed -- even if it were the same

01:47:17   5   kind of things, I would argue it could be privileged if it

6   shows timing and, you know, who is talking to whom, who is

7   providing information and that.

8           THE COURT:  It doesn't disclose any information

9   that wasn't already available about who was talking to

01:47:32  10   whom, to Mr. Yates and Mr. Scott in this instance; getting

11   some information, publicly-available information from

12   someone at the city, what a particular ordinance says.

13           MR. HERRERA:  Your Honor, plaintiffs are not sure

14   that it involves publicly-available information.

01:47:52  15           THE COURT:  This is an ordinance.  The only other

16   thing that's attached is the ordinance itself.  That is

17   publicly available.  Now, which ordinance it is is one

18   referenced in the ad that I believe did go out to members

19   of the public.

01:48:10  20           MR. HERRERA:  Right.

21           THE COURT:  But I just don't see any basis in

22   which to withhold because there is any kind of a threat to

23   any privilege that is revealed -- privileged communication

24   revealed by these communications.

01:48:29  25           MR. NAJVAR:  Again, I don't want to concede that

1  point with respect to if it were a larger batch like we

2  have that --

3          THE COURT:  I was looking at the e-mails that

4  were actually submitted.  That's why I reviewed them in

01:48:39   5  camera so I could make a more nuanced and fact-specific

6  assessment.

7          MR. NAJVAR:  Yes, Your Honor.

8          THE COURT:  Applying the Perry test, which again

9  I would note the Fifth Circuit itself has not applied.

01:48:51  10     In fact, I don't have that folder.  Would you bring it

11  to me, please, sir.  It's on the desk.

12     All right.  Turning now to the 2013 folder of ads and

13  e-mails, these are CKPS 92-162 and 221.  These appear to

14  be e-mails between Mr. Yates and Mr. Spencer Neumann; and

01:49:26  15  I gather that he is at Neumann & Company, the mail list

16  people, the vendor.

17          MR. NAJVAR:  That's correct.

18          THE COURT:  All right.  And these are described

19  as different ads.  They are dated in 2013; and they are

01:49:45  20  described as different advertisements that deal with the

21  candidacy of Don Harris, in opposition to that candidacy

22  in 2013.

23     There is discussion of certain aspects of the

24  advertisements such as -- but the bulk of these don't deal

01:50:39  25  with any strategic decisions other than the decision

1    whether to -- other than the need to ensure the factual

2    accuracy of fact statements and to check on the historical

3    accuracy of statements made about actions taken in the

4    past in order to avoid any exposure to a defamation claim.

01:51:22    5        What is the First Amendment implication of that?

6            MR. NAJVAR:  Well, although the e-mails are --

7    they are including need for legal review.  But the chain

8    of e-mails shows variations of the ads.  They are changed

9    over time.

01:51:43   10            THE COURT:  But they are very minor, and you

11   would know better than I do about the variations between

12   what was published and what wasn't published.  Can you

13   address that?

14            MR. NAJVAR:  It was very minor.  Most of the time

01:51:58   15   it was moving the order of things or it was changing a

16   couple of lines.  But that is the kind of thing, the kind

17   of statements that are put out to the public.  And what is

18   decided to excise and what is decided to include in a

19   final advertisement is the kind of thing that is a

01:52:13   20   strategy decision made by the people internal to the pact.

21   Unless they can show that --

22            THE COURT:  That's a very broad description of

23   strategy, and that's my concern.  But taking that as

24   correct, I find it difficult to conclude that disclosing

01:52:49   25   these kinds of very minor tweaks through draft

advertisements or mailings -- that I would note do not

refer to the particular issues involved here -- do not

appear to present a reasonable likelihood of chilling an

associational right.  And I'm concerned about that unless

01:53:19   you accept that any disclosure would chill -- any threat

of possible disclosure in future litigation would chill

associational rights.

MR. NAJVAR:  Well, that is, in fact, our claim.

THE COURT:  I understand that, but I find that a

01:53:37   very dubious claim in light of the evidence supporting it.

I think that there is a -- you've certainly made a broad

statement to that effect.  But the mere possibility that

compelled disclosure would deter membership or deter

methods of communication because there would be a

01:54:10   possibility that in future litigation under -- if the

First Amendment associational privilege applied that there

would be an ad hoc balancing that might require the

disclosure of some of the communications, I find it very

difficult to conclude that that mere possibility, which is

01:54:32   what Perry recognizes, would chill associational rights as

applied to this kind of document.

MR. NAJVAR:  Well, part of the problem is that in

order to even get to that point we have been through three

hearings; and my clients have incurred legal fees.  We

01:54:50   have had to put these together.

1        THE COURT:  The fact that --

2        MR. NAJVAR:  I realize the burden isn't

3  particularly relevant to that balancing, but it is -- it

4  should go to the factor of whether it realistically can

01:55:03  5  chill somebody and make them decide maybe rather than

6  sending e-mails, which is easier than meeting in person,

7  maybe they will just meet in person.  Maybe it makes it

8  harder to associate for these purposes.  That is the kind

9  of chill that is also relevant.

01:55:16  10        THE COURT:  I'm also am not sure that these are

11  really relevant either because the tweaks are so minor,

12  but what we are arguing here is the First Amendment

13  associational rights.  I think they are relevant.  I do

14  not think that they are likely to assist you in any

01:55:33  15  material way.  So the balance of your need is fairly

16  minimal --

17        MR. HERRERA:  Your Honor, I --

18        THE COURT:  -- once you get to the balancing

19  factors.  That is not true for other e-mails that we're

01:55:47  20  about to discuss.

21        MR. HERRERA:  Yes, Your Honor.  But if plaintiffs

22  may, the pact's targeting of the incumbent of a Latino

23  majority district is part of the totality of the

24  circumstances.

01:55:59  25        THE COURT:  No.  I understand that.  I'm saying

1    that I agree that they are relevant.

2              MR. HERRERA:  Thank you, Your Honor.

3              THE COURT:  I agree.  I wanted to be more precise

4    than I was initially about that.  But the question is the

01:56:09   5    balance of the factors.  Yes, they are relevant.  The need

6    for the information, I think here it is a little bit more

7    difficult to determine that.  Whether it's available from

8    other sources, I don't believe it is.  That weighs in

9    favor of disclosure.  The nature of the information

01:56:30   10   sought, it is not highly privileged because it does not

11   involve or reveal core associational privileges or

12   activities protected by the First Amendment.

13        And did the defendant place the information in issue?

14   Yes, I think the state of mind relating to the campaign

01:56:54   15   activities is certainly at issue.  And it's unclear who

16   placed it at issue, but I'm not sure that that matters.

17   It is clearly an issue in the lawsuit.  It's a little bit

18   unclear whether it goes into -- it goes to relevance or

19   something else in the relationship of those two factors.

01:57:23   20        So, I do think that there is a need that might

21   outweigh any particular First Amendment associational

22   privilege on these documents.  And I'm doing these on a

23   document category by document category basis.

24              MR. NAJVAR:  Your Honor, just to clarify --

01:57:44   25              THE COURT:  Now, one other point on some of

01:58:13

1  these.  To the extent -- and I'm looking in particular at

2  CKPS 137.  Mister -- it's communication between

3  Mr. Neumann and Mr. Najvar.  Najvar, I guess.  But it is

4  about a matter of what election law requires to be

5  disclosed.  And the particular issue is -- it's unclear if

6  it is a matter on which Mr. Najvar weighed in as an

7  attorney or weighed in as the treasurer of CKPS or whether

8  those can be meaningfully separated.

01:58:42

9      It is also unclear whether Mr. Neumann as the vendor

10  is -- if this even a communication that would be protected

11  by any kind of work product or attorney-client but rather

12  waived because it was sent to a vendor.

13      So I believe it is probably waived by being sent to a

14  vendor.  It is not communication with a client, and it is

01:59:04

15  disclosed work product.  It is a statement by Mr. Najvar,

16  who is obviously an attorney.

17          MR. NAJVAR:  Many of these e-mails do include me.

18  It's not just the issue of reporting compliance.  It also

19  goes, as you mentioned, to the issue of defamation and the

01:59:23

20  factual substantiation.  And I have always considered the

21  vendors to the pact as an agent of the pact because they

22  are the ones -- they are the ones doing this.  They are

23  hired by the pact to do the work just like --

24          THE COURT:  I'm not sure.  Unless you give me

01:59:39

25  authority for that, I'm not confident that that's correct

1  as a matter of privilege law.  You may be right that they

2  are agents of the pact for the purpose that is that they

3  are hired to do -- to perform acts for money on behalf of

4  the pact.  But I don't understand that that would

01:59:55  5  necessarily cloak them with the privilege that the pact

6  itself would enjoy in its communications with you as the

7  attorney.  Certainly -- but I am happy to look at

8  authority to that effect, if you can produce it.

9          MR. NAJVAR:  I will be glad to look that one up.

02:00:14  10          THE COURT:  All right.  I don't know if the

11  plaintiff has authority to that effect already.

12          MR. HERRERA:  No, Your Honor.

13          THE COURT:  All right.  I think you better look

14  at that before those are required to be produced.

02:01:03  15    Okay.  The third issue for the third folder are 2013

16  ads.  They deal -- again, Mr. Neumann is involved heavily.

17  They are drafts of ads relating to primarily Mr. Harrison

18  -- and then, what district was he running?  This is

19  obviously before the city charter was amended.

02:02:12  20          MR. HERRERA:  In the previous map, Your Honor, I

21  believe that would have been District D, which is, of

22  course, a Latino majority district.

23          THE COURT:  There is nothing -- I would note that

24  there is nothing -- a lot of the -- a lot of the subjects

02:02:31  25  and indeed the communications themselves appear to be

1   duplicates of what was included in the earlier folder, and

2   none of them appear to deal with any issue that, as far as

3   I can tell, is specifically addressing any issue relating

4   to on its face, in any event, or even below that deals

02:04:02  5   with racial matters.

6      The target, the subjects -- and, again, these are not

7   very different from the ads that, in fact, went out.  The

8   mailings that were used deal with what is just in those

9   mailings, funding for police and fire departments, the

02:04:21  10  kind of who owns the trash cans that Pasadena city

11  residents receive from the city, those kinds of matters

12  with respect to -- and prior conduct by the candidate,

13  Mr. Harrison, that apparently drew criticism in the past.

14     There are also -- there is also correspondence

02:05:09  15  relating to Cody Ray Wheeler; and, again, this is more

16  overtly partisan in that it is -- it ties Mr. Wheeler and

17  the opposition to him to prior votes in the democratic

18  primary and what -- and its relation and its tie,

19  obviously, to President Obama and various organizations

02:06:07  20  that are highlighted in the ads that did go out.  And

21  there is some editorial comment on the ad content.

22     Who is mister -- again, these are, I believe,

23  within -- to the extent there is a First Amendment

24  associational privilege implicated by this kind of

02:06:47  25  discussion of the content of advertisements and the -- and

mailings for the 2013 election that --

Steven, do you have a copy of the revised timeline handy?

THE CLERK:  I do.

THE COURT:  Thank you.

To the extent the privilege applies that there is a prima facie showing -- although I don't, again, see a direct threat -- the plaintiff here does have a clear interest in obtaining the disclosures; and I think that any deterrent effect on the free exercise of constitutionally protected rights is, again, so minimal that -- and because there is no alternative means to get this information, I do believe that the interests weigh in favor of requiring the disclosure.

Again, having said that, that is subject to the review to ensure that there are no privileged communications by way of attorney-client privilege that would not be subject to the balancing and, number two, that there would not be -- and subject to, for all of these, the entry of a protective order that would limit the information to use within this lawsuit, prevent its dissemination outside this lawsuit and prevent any reference by parties or others to the contents outside this -- the purposes of this lawsuit and subject to the protective order.

So to the extent that there would be a requirement for

1    prior court approval of certain kinds of statements

2    concerning the contents, I would be happy to entertain

3    those requests; but I think that they are -- with them

4    that they would vary, provide robust protection against

02:09:32   5    any concern of deterrence of communications that would be

6    -- in the future that would be protected by the First

7    Amendment because it is so limited in distribution.

8         There could be no competitive disadvantage inflicted

9    on Mr. Yates, as he testified yesterday, because the

02:09:53   10    information would not be revealed to competitors.  Further

11    undermining any showing of deterrence.

12        The next category, which is Yates 324 through 374,

13    deals with communications in March of 2013 relating to ads

14    in opposition to Mr. Harrison and to Mr. Wheeler, very

02:10:30   15    similar to what we discussed before, and to calls simply

16    supporting Mr. Isbell's re-election that -- with a script

17    that is very bare bones.  And bare bones in the sense of

18    only making very narrow requests such as to place a yard

19    sign and not going into any additional information about

02:11:05   20    positions, issues, policies, views, anything else.  Bare

21    bones as can be.

22        The same analysis that I went through a moment ago

23    would appear to apply identically to this category of

24    e-mails, again subject to the protective order and to

02:11:29   25    review to ensure that there are no attorney-client or

1   work-product protected communications.  I believe that

2   there is a basis for disclosure.

3       The next category, Fall of 2013, documents that are a

4   little hard -- it looks like Yates 1 through 166.  Now,

02:11:56   5   these are much more central to the plaintiffs' claims and,

6   therefore, the case for compelled disclosure even against

7   the First Amendment associational privilege invoked by the

8   defendants is even stronger because these are, many of

9   them, e-mails and relating to communications, mailings,

02:12:26   10   ads about the city council charter that -- the city

11   charter amendment to change the voting method to include

12   three at-large districts.

13       MR. NAJVAR:  Well, Your Honor, what range of

14   documents?

02:12:51   15       THE COURT:  Yates 1 to what appears to be 166.

16   And I believe that the case for compelled disclosure as to

17   this group of documents is the strongest and the easiest

18   to resolve because of that, because they are central to

19   the very claim that is made in this case, that the

02:13:23   20   decision to propose to city council to obtain its approval

21   and then to put to the voters the referendum on the change

22   to the city charter was intentionally directed to diluting

23   Hispanic voting strength.

24       So I am going to compel the disclosure, again subject

02:13:46   25   to the protective order and attorney-client protections

1    and work-product protections.

2           MR. NAJVAR:  I just want to clarify for the

3    record.  The first -- there are two -- within that range,

4    the larger range, there is the 1 through 49 from the 2013

02:14:00    5    time period.

6           THE COURT:  Yes.

7           MR. NAJVAR:  And that is --

8           THE COURT:  But then many of the later ones --

9    and you are right.  62, for example, deals with March of

02:14:08   10    2015 and the election then.  But much of the -- but the

11    subject of the e-mails and the attachments includes

12    references to positions taken on the city charter

13    amendment back when it was approved.

14         So for that reason I think that the case for compelled

02:14:35   15    disclosure applies in the same fashion.  Not all of the

16    2015 communications have that reference at all but many do

17    and they are within the -- and they fall within the -- and

18    because the campaign is the same as the campaign that

19    included those references, I think the case for disclosure

02:15:04   20    is a strong one.

21         There are some results of calls about at-large

22    district elections; and again, I think that that is -- I

23    think that that does perhaps implicate an associational

24    privilege.  Assuming it does, I don't -- again, I see a

02:15:31   25    particularized need because the focus was made on the

1    comparing the results in at-large districts to other

2    districts.

3        So again, subject to the same conditions, Yates 1

4    through 162 would have to be produced.

02:16:02    5        Yates 167 to 204 are 2015 e-mails.  I don't see any of

6    the same kind of references that were in the prior set

7    that I referred to.  There are discussions of choices

8    involving the appearance of various mailings and ads,

9    color used and things like that.  Again, those hardly seem

02:16:36   10    the stuff of strategic choices that need -- that are

11    secret sauce in any fashion.

12        On the other hand, they do loosely fall within a broad

13    concept of internal communications about political

14    communications with the public.  It is unclear the extent

02:17:05   15    to which these ads that are discussed deviate or vary from

16    what was ultimately published in any material or

17    substantive way; but to the extent that the privilege has

18    been shown, that there has been a prima facie showing that

19    the privilege applies, I don't see, again, because of the

02:17:26   20    restrictions that I have put on release or lack thereof,

21    disclosure.

22        And because of the absence of the plaintiffs' ability

23    to get what are relevant documents because they do reveal

24    how the campaigning was conducted in the at-large

02:17:52   25    districts that were newly created because of the city

1    council amendment -- the city charter amendment, excuse

2    me, that counsel approved and the voters approved, I do --

3    and because the plaintiffs have no ability to get this

4    information from any other source I believe it needs to be

02:18:15    5    produced subject to the prior conditions I have

6    identified.

7         There are some invoices in here.  Again, you may

8    redact the amounts if that is appropriate.

9              MR. NAJVAR:  Your Honor, may I ask you a question

02:18:29    10   about that?  We briefed this issue of relevancy in terms

11   of in context of a ballot measure election and they filed

12   a response and they never addressed that point.

13             THE COURT:  I do believe it is relevant.  The

14   mere fact that it was put to the voters and a campaign was

02:18:47    15   run in order to have that put into place I don't think

16   immunizes a finding or prevents a finding of relevance

17   because it was put to the city council in the first place

18   and then put to the voters through the city council's

19   action as a result of actions taken by Mayor Isbell and,

02:19:12    20   at his urging, members of the city council.  Oh, and

21   because Mayor Isbell's pact is the one that is then

22   creating the campaign materials in order to have the

23   charter amendments approved.

24        So, I don't think that that immunizes the existence of

02:19:38    25   the -- of the changes or the redistricting choices that

1    city council made to implement them from a relevance

2    finding.

3            MR. NAJVAR:  Would that apply also, Your Honor,

4    to the communications that come back from the voters?

02:19:52    5    Like, for example, some of those e-mails attach the

6    results of the calls that went out.  I don't think that

7    would be relevant.  Even if the pact's communications to

8    the voters are relevant, the communications back aren't

9    relevant to what the intent was of the pact.

02:20:07    10           THE COURT:  The only -- what is relevant is the

11   type of information sought on the calls and the way in

12   which it is described, which, again, are an effort to

13   isolate out how at-large districts would vote as compared

14   to single-member districts if elections were held on the

02:20:27    15   moment of the survey that was taken and the calls.

16       So I think that there is a basis, a theory of

17   relevance there that is sufficient.  And the volume is not

18   so large.  The documents have already been provided; and

19   many of them, as I said, are very close to what was

02:20:55    20   publicly available.  Some are not; and those are the ones

21   that are the most critical, that are critical in the sense

22   that they are not otherwise available to the plaintiffs.

23   I believe that this is sufficient for a finding of both

24   relevance and proportionality.

02:21:15    25           The final tranche of documents go back -- and this is

1   labeled as Yates 375 through 558 or 560, excuse me.  These

2   appear to deal primarily with Mr. Yates' own re-election

3   and support for Mr. Rick Guerrero's election and I

4   believe, also, Mr. Larry -- Leroy Stanley's election.

02:22:09   5   These are 2013.  They -- they predate the ballot

6   measure or the city council action to change the charter.

7   There are some references to efforts to identify in call

8   surveys non-English speaking households, but I did not see

9   other references to issues that directly speak to the

02:23:09   10   concerns that have been made in this -- that are at the

11   center of this case.

12   But because this shows the way in which the campaigns

13   were run prior to the change to the city charter and the

14   redistricting that occurred after the voters approved the

02:23:44   15   change, I believe it is relevant and not available

16   elsewhere.  And because of the nature of the

17   communications, which again deals with very minor changes

18   and very technical questions, and because of the limits

19   and restrictions put on dissemination, I believe that the

02:24:08   20   plaintiffs' need for the information outweighs any

21   possible deterrent effect to associational privileges and

22   that there is no less restrictive way of obtaining any of

23   the information.  Again, subject to any attorney-client

24   communications that might be involved.

02:24:32   25   That is where I am in the disclosure requirements.  I

1  have not, obviously, looked at the CPC documents because

2  this is the first I was aware that it was also represented

3  by Mr. Najvar.

4      And I'm sorry if I keep mispronouncing your name.

02:25:08  5          MR. NAJVAR:  I'm used to that, Your Honor.

6          THE COURT:  Yes.

7          MR. NAJVAR:  And I wasn't their representative

8  until after Monday's hearing.

9          THE COURT:  That's fine.  CPC -- I understand.

02:25:17  10  I'm not being critical.

11      The final item to -- and you can tell me because you

12  know the CPC documents better than I do, much better.  I

13  have never seen them.  Are they similar in nature to what

14  we have just seen?

02:25:33  15          MR. NAJVAR:  They are very similar.  I mean, if I

16  flip through them again, in light of what the Court has

17  discussed today, I might ad some nuance.  I think they are

18  substantially similar in terms of the types of

19  communications.

02:25:46  20          THE COURT:  Can you implement the same approach

21  to disclosure with the same conditions and same limits in

22  the protective order that I have outlined or do you need

23  me to go through them as well?  Or perhaps an intermediate

24  step, you can review them in order to implement the same

02:26:04  25  approach; and if there are particular documents that you

1    want to have the Court review in-camera, I'm happy to do

2    that.  You tell me.

3            MR. NAJVAR:  I think, given what the Court said,

4    I can accommodate that.  There might be some I would

02:26:22    5    isolate and ask for an in-camera review.

6            THE COURT:  That's fine.  That's fine.  I don't

7    have any problem with that at all.  Okay.

8            MR. HERRERA:  Your Honor, plaintiffs have a

9    question about --

02:26:39    10            THE COURT:  Hang on one second.

11            MR. HERRERA:  Yes, Your Honor.

12            THE COURT:  We also have this issue of the list

13    of the individuals who were the recipients of various

14    mailings.  That has been provided.  And there is a

02:27:13    15    citywide list and other similar lists, and these are the

16    recipients of the communications from 2015 and the

17    phone/walk list for Carmona, Herbert and Bass support

18    communications, again, I believe, for 2015, correct?  Also

19    deals with the support for candidates running at large,

02:27:55    20    and that was a citywide mailer.

21        I am concerned about revealing personal information

22    such as addresses -- phone numbers and addresses.  But I

23    think the best way of limiting that, further protecting

24    that information, is to eliminate the names and eliminate

02:28:30    25    the phone numbers, redact them but do have the addresses

1    so that you can then tell and the zip codes.  And the zip

2    codes may be enough.  You tell me.

3            MR. HERRERA:  Your Honor, I believe the

4    plaintiffs would need the names; and we would be willing

02:28:46   5    to enter into a protective order that is attorney's eyes

6    only.

7            THE COURT:  Why do you need the names?

8            MR. HERRERA:  To look at the number of surnames

9    and the various --

02:28:58  10            THE COURT:  Fair enough.  You want

11   Spanish-speaking names or Spanish surnames?

12            MR. HERRERA:  Spanish surnames, yes, Your Honor.

13            THE COURT:  That's a point that I had not

14   considered.  Is it sufficient, then, to eliminate first

02:29:15  15   names?

16            MR. HERRERA:  Yes, Your Honor.

17            THE COURT:  All right.  That would have to be

18   done carefully because some of these refer to the last

19   name under the rubric "the family", with the name "family

02:29:26  20   name used" in the first name column.  So you couldn't

21   simply block out a column.  You would have to go down the

22   column and be much more precise about what was blocked.

23            MR. NAJVAR:  I'll have to look at it.  If that --

24   okay.

02:29:43  25            THE COURT:  There are voter ID numbers.  I don't

1  know if you need those.

2          MR. HERRERA:  Those -- we don't need those, Your

3  Honor.

4          THE COURT:  Those can be redacted.  Telephone

5  numbers, I don't think you would need those.

6          MR. HERRERA:  No, Your Honor.

7          THE COURT:  Those can be redacted.  And that will

8  amplify the protections for the privacy interests of the

9  individuals involved.  But, for example, the use of a

10  citywide list for at-large seats hardly seems to reflect

11  nuances of strategy that would deter future communications

12  about strategy.

13          MR. NAJVAR:  Right.  The only -- the thing I

14  would ask for redaction on would be the parameters that

15  were used to select the list; but if the plaintiffs are

16  already going to have the documents where that is

17  discussed, then -- that's reflected on the list, as well,

18  that's the same procedure.

19          THE COURT:  Well, but the parameters seem not to

20  be mysterious.  Citywide for at large.  And then, there is

21  one reference to people targeted for the single-member

22  districts; and I don't believe, again, that that -- that

23  the compelled production of these lists adds to

24  information that was previously required to be disclosed

25  subject to the limits that I have already identified.

1    The walk lists, I believe, fall under the same

2 category unless there is some alternate basis for treating

3 them that I have not considered.  I'm happy to hear any

4 suggestions along those lines.

02:31:45  5    MR. NAJVAR:  I don't have any, Your Honor.

6    THE COURT:  All right.  Very good.

7    Matters relating to invoicing, such as CKPS 228, you

8 can deal with those the same as we discussed earlier.

9    And there are references to how -- to selection

02:32:22  10 methods that I think are germane, certainly relevant to

11 the plaintiffs' claims in this case and that cannot be

12 obtained anywhere else and that are the subject of a

13 compelling need on the part of the plaintiffs, that would

14 justify compelled disclosures subject to the limits I have

02:32:45  15 identified.

16    I think that addresses all of the documents that I was

17 provided for in-camera review.

18    MR. HERRERA:  Your Honor, can the Court state for

19 the record the Bates numbers for the documents contained

02:32:59  20 in 2013 e-mails regarding Harrison and Wheeler?  We don't

21 have a specific discussion of Bates Nos. 205 to 233.

22    MS. PERALES:  Yates.

23    MR. HERRERA:  Yates 205 to 233.

24    THE COURT:  Yates.

02:33:17  25    MR. HERRERA:  Yates 256 to 308.

1          THE COURT:  I'm not sure you need a specific

2     discussion of each one.

3          MR. HERRERA:  Probably not, no, Your Honor; but

4     these are the ones I'm looking at here.

02:33:33     5          THE COURT:  I'm sorry.  The numbers again.

6          MR. HERRERA:  Of course.  Yes, first, Yates 205

7     to 233.

8          THE COURT:  Hold on.  Let me make sure I was

9     getting it.

02:33:52    10          MR. NAJVAR:  Your Honor, I don't believe you have

11     those.  Those would be responsive to the other subpoena to

12     Mr. Yates because those were --

13          THE COURT:  Can you treat those in the same

14     fashion?

02:34:02    15          MR. NAJVAR:  Yes, Your Honor.

16          THE COURT:  All right.  I think that will take

17     care of it.

18          MR. HERRERA:  Two other ranges, Your Honor.

19     Yates 256 to 308.

02:34:11    20          THE COURT:  Hold on.  256 I don't believe --

21          MR. NAJVAR:  I think these are all --

22          THE COURT:  I think that you still have them.

23          MR. NAJVAR:  These are all responsive -- these

24     were not CKPS documents.  These would be dealt with with

02:34:21    25     the Yates subpoena.

```
 1              MR. HERRERA:  And then, finally, 309 to 323, also
 2    Yates.
 3              MR. NAJVAR:  Same thing.
 4              THE COURT:  All right.  So those will be treated
 5    in the same fashion.  If I need to review in camera any
 6    specific documents within those categories and ranges, I
 7    assume that you will provide them to me promptly.
 8              MR. NAJVAR:  Yes, Your Honor.
 9              THE COURT:  All right.
10              MR. NAJVAR:  Can I just ask?  I missed a document
11    range, also.  After we talked about 1 through -- the Yates
12    1 through 162 and before Yates 375 to 560 there was a
13    range in there.
14              THE COURT:  221 is in there.
15              THE CLERK:  167 to 204.
16              THE COURT:  For Yates?  No, that's CKPS.
17              MR. NAJVAR:  168 to 204, that sounds right.
18              THE COURT:  For Yates?
19              THE CLERK:  I wrote down 168 to 204 Yates.
20              THE COURT:  I've got -- I'm sorry.  Give me the
21    numbers again.
22              MR. NAJVAR:  I think it must be 168 to 204.
23              THE COURT:  These are 2015 --
24              MR. NAJVAR:  These are --
25              THE COURT:  2015 documents.  They deal with some
```

02:34:29
02:34:40
02:35:01
02:35:26
02:35:48

1  invoices, some campaign photos.  They deal with Mr. Bass

2  and campaign materials supporting him.  These appear to be

3  for a single-member district, and I believe that they

4  would be subject to disclosure on the same basis.  They do

02:36:18  5  not specifically implicate or specifically address the

6  amendment to the city charter or the impact of the

7  redistricting but it is the first post-redistricting

8  election under the redistricts and I believe that it is --

9  it contains relevant information, communications other

02:36:48  10  than the amounts of the invoices perhaps which may be

11  redacted consistent with our earlier discussion and

12  subject to the same restrictions on dissemination.

13      I'm going to mark these as an exhibit to this hearing

14  so that the documents themselves will be available for

02:37:17  15  appellate review if that becomes an issue.  It's a Court

16  exhibit.

17      Is there anything else that we need to do today?

18          MR. HERRERA:  Your Honor, the only other thing

19  would be scheduling.

02:37:40  20      Well, Your Honor, one more thing about the subpoena to

21  the Citizens for Positive Change pact.  Plaintiffs would

22  still seek disclosure of any documents that would not be

23  in Mr. Yates' possession or Mr. Bass's possession.

24      It is the plaintiffs' understanding Citizens for

02:38:21  25  Positive Change never produced a privileged log or set of

1    responses and objections.  Therefore, they also -- the

2    only documents produced by Citizens for Positive Change

3    prior to Mr. Najvar's representation of the pact were

4    disclosure -- finance disclosure reports required by state

02:38:45    5    law to the city.

6         So the plaintiffs would ask that anything that's not

7    in Mr. Yates' possession be disclosed.

8              MR. NAJVAR:  I have spoken with Mr. Bass since

9    the hearing, and I am representing Citizens for Positive

02:39:03   10    Change here.  He gave me a copy of what was provided,

11    which is limited to the publicly-filed reports.  Mr. Bass

12    attached a cover letter that, obviously, states his

13    objection.  First of all, he says I'm giving you

14    everything that I have except for the bank statements.

02:39:23   15    The only thing he withheld was the bank statements.

16         And Mr. Bass, after speaking with him, I understand

17    more of the situation with that organization.  He was

18    asked to be the treasurer, but he literally had no

19    interaction in terms of anything that the pact did other

02:39:41   20    than to write checks to people.  I think there were three

21    checks issued by the pact.

22         All of the documents that go to what Citizens for

23    Positive Change did are actually already logged and

24    responsive to the subpoena to the Yates company, and those

02:39:59   25    are some of the documents we have already discussed.  So

1   it's literally true.  I asked -- Mr. Bass told me

2   yesterday he didn't know what Citizens for Positive Change

3   did until he got the mail piece at his door.  I mean, he

4   literally had no interaction in terms of with Mr. Yates or

02:40:17   5   anybody else working on the advertisements or any

6   decisions that the pact made.

7        And so, I'm not saying there are not documents; but

8   the documents would come in response to the subpoena to

9   Jeff Yates.  Mr. Bass has no documents.

02:40:31   10            MR. HERRERA:  Your Honor, to the extent that any

11   of this -- first of all, the plaintiffs object to anything

12   that Mr. Najvar says that Mr. Bass said to not be

13   testimony.  To the extent it is testimony, it would be

14   hearsay.

02:40:44   15            THE COURT:  I'm a little confused though.  If you

16   are going to get them through Mr. Bass then what is the

17   issue of or through Mr. -- if they are going to be

18   produced, what does the -- is it critical that we focus on

19   who is going to be the party responding to the request,

02:41:09   20   which appears to be what we are arguing about, unless I

21   have lost something in the exchange.

22            MR. HERRERA:  That's -- I believe that's right,

23   Your Honor.  Plaintiffs don't believe that Mr. Bass is the

24   end of the line when it comes to who is in custody of the

02:41:24   25   pact's documents.  We don't have -- plaintiffs don't have

1    reason to doubt Mr. Bass's representations to plaintiff so

2    far, but we also don't believe that Mr. Bass is the pact.

3           MR. NAJVAR:  And just a procedural point, Your

4    Honor.  You mentioned evidentiary issues.  They have asked

02:41:43   5    for a discovery conference with regard to Mr. Bass's

6    subpoena.  There is no motion to compel on file.

7           THE COURT:  It doesn't have to be a motion.  This

8    is a conference that precedes any motion.

9           MR. NAJVAR:  Right.  And so, in terms of that,

02:41:54   10   the evidentiary burden is not the same.  It's not like we

11   are here --

12          THE COURT:  But you still need to articulate the

13   basis for your refusal to provide the information.

14          MR. NAJVAR:  Right.  He objected to me talking

02:42:06   15   about what Mr. Bass told me.  I'm just explaining.

16          THE COURT:  That's fine.  That's fine.  Is the

17   information going to be produced?

18          MR. NAJVAR:  The information --

19          THE COURT:  Subject to the restrictions and

02:42:16   20   categories we have identified.

21          MR. NAJVAR:  Right.  The information just comes

22   from Mr. Yates, not from Bass or anybody else.

23          THE COURT:  Does that matter at this juncture?

24          MR. HERRERA:  I believe it does matter beyond

02:42:27   25   Mr. Yates.  Mr. Bass has to retrieve the documents even if

1    not in his possession.

2          THE COURT:  What does that -- but if Mr. Yates is

3    going to be the one from whom he will retrieve it, does

4    that matter?  What is the distinction that creates a

5    difference here?

6          MR. HERRERA:  There is no distinction, Your

7    Honor, just that Mr. Yates is one person in custody of

8    pact documents; and it is clear from the privilege logs we

9    have seen for these other two subpoenas that there are

10   other -- there are likely other people in custody of

11   documents pertaining to the pact.

12         THE COURT:  Unless they are documents that cannot

13   otherwise be obtained through the pact and Mr. Yates, I

14   don't understand the need to require a duplicative

15   production simply because it is in the possession of

16   someone else.  That's where I am not connecting with your

17   argument.

18         MR. HERRERA:  Of course, Your Honor.  We don't

19   need to get the e-mails that Mr. Yates has twice, for

20   example, or the list that Mr. Yates has twice.  But if

21   there are, for example, communications between Mr. Scott

22   and Mr. Isbell pertaining to the pact, for example --

23         THE COURT:  That would not otherwise be contained

24   in what Mr. Yates has.

25         MR. HERRERA:  Correct, Your Honor.

| | |
|---|---|
| 1 | THE COURT:  That is fine.  But the question is |
| 2 | whether there are -- whether there are communications or |
| 3 | information that is not otherwise contained in what |
| 4 | Mr. Yates has, and that's what we are asking -- what I |
| 02:44:07  5 | understood you to be asking. |
| 6 | So, Mr. Najvar, are there? |
| 7 | MR. NAJVAR:  No. |
| 8 | THE COURT:  Have you searched to be sure that |
| 9 | that is a wholly accurate statement? |
| 02:44:19  10 | MR. NAJVAR:  I talked -- well, I talked to |
| 11 | Mr. Yates -- I mean, Mr. Bass for more than half an hour |
| 12 | and verified this several ways.  He does not have |
| 13 | possession of any of them.  I think to the extent that |
| 14 | they are trying to use this subpoena to require Mr. Bass |
| 02:44:35  15 | to go to Mr. Isbell's e-mail account and get stuff that |
| 16 | might not have been in what we have already put together |
| 17 | for Mr. Yates, it sounds like that is what they are asking |
| 18 | for and mister -- that goes beyond the scope of the |
| 19 | subpoena.  Mr. Bass is not responsible for people he |
| 02:44:51  20 | doesn't control. |
| 21 | MR. HERRERA:  The subpoena, Your Honor, is not to |
| 22 | Mr. Bass.  The subpoena is to the pact.  And it's obvious |
| 23 | that Mr. Bass is not the only person in the pact. |
| 24 | Therefore, it would require Mr. Bass or whomever to go to |
| 02:45:07  25 | the other people who would have custody of the requested |

1   documents.  The subpoena is not drawn --

2        THE COURT:  Who else would he go to besides

3   Mr. Yates?

4        MR. HERRERA:  We don't fully know, Your Honor.

02:45:20  5        THE COURT:  Let me ask Mr. Najvar.  Who else has

6   custody or control?

7        MR. NAJVAR:  My understanding -- and I'll look,

8   again, and verify this now that I have all the reports

9   that are filed.  But my understanding is everything would

02:45:32  10  come from Mr. Yates, which we already have.  There were

11  only three checks written.  The only consulting check, I

12  believe, went to Mr. Yates.  He was the one hiring the

13  subcontractors which are already logged here.  PMI did the

14  phoning.  Spencer Neumann for the mail.  These are

02:45:47  15  documents already in the privileged log.

16       So all the e-mails between Isbell and Scott and Yates

17  and then between Yates and the vendors to CPC have already

18  been produced or logged and assembled in terms of the

19  subpoena to Jeff Yates.

02:46:05  20       MR. HERRERA:  Your Honor, to the extent that

21  we're hearing about representations from Mr. Bass,

22  Mr. Bass told me in a phone call that he had gone to --

23  that he had -- I'm sorry.  That he had not spoken with

24  anyone, I believe, about the documents.  The only person

02:46:31  25  he has spoke with in preparing his response to the

1    subpoena was his wife, who helped him put it together,

2    basically.  And what plaintiffs received was a letter, a

3    short letter, as well as the campaign finance disclosures.

4    That's just --

02:46:49    5    THE COURT:  Again, you just heard counsel's

6    representation about who had custody of any duplicative

7    e-mails.  I would urge you to verify that and report back

8    to plaintiffs' counsel.  And if there is any issue that

9    remains, you can bring it up with me; but I don't see any

02:47:06    10    basis at this point to not to -- to require additional

11    duplicative production just as a means of double-checking

12    that what has been described is, in fact, accurate.

13    That's what I hear you requiring.

14    MR. HERRERA:  Yes, Your Honor.  Thank you.

02:47:30    15    THE COURT:  Not absent any specific basis to

16    believe what has been said is, in fact, not accurate.

17    MR. HERRERA:  No, Your Honor.

18    THE COURT:  All right.  In that case, what kind

19    of scheduling order are you looking for?  Have you

02:47:47    20    conferred with opposing counsel?

21    MR. HERRERA:  We have not.

22    THE COURT:  Perhaps that would be a wise move.

23    MR. HERRERA:  Thank you, Your Honor.

24    THE COURT:  Would you like to use the jury room

02:47:58    25    to do so, and I can come back in half an hour?

1          MR. HERRERA:  That would -- I don't know if we

2   need half an hour.  15 minutes, I think, might suffice

3   unless -- this would be discussion with defense counsel, I

4   believe, as well, for the city.

02:48:15   5          THE COURT:  Are they here?

6          MR. HERRERA:  Yes, Your Honor.

7          THE COURT:  All right.  Very good.  You are

8   welcome to stay in the courtroom and use this space as

9   well.

02:48:23   10          MR. HERRERA:  Thank you, Your Honor.

11          THE COURT:  Thank you.  I'll be back in about 15

12   minutes.

13       (Recess from 2:48 p.m. to 3:14 p.m.)

14          THE COURT:  Were you able to confer productively

03:14:07   15   on a schedule?

16          MR. HERRERA:  Yes, Your Honor.  On the scheduling

17   after discussing --

18          THE COURT:  You may be seated, please.

19          MR. HERRERA:  After discussing with counsel for

03:14:15   20   the city and Mr. Najvar, plaintiffs would ask that --

21          THE COURT:  And let me get an appearance from

22   counsel for the city, please.

23          MS. AHLRICH:  Katy Ahlrich for the City of

24   Pasadena.

03:14:26   25          THE COURT:  Thank you.  Go ahead, please.

                    MR. HERRERA:  Plaintiffs would ask that the Court

extend all discovery by 60 days beyond the date the

documents are produced, and we have agreed with Mr. Najvar

on a production date of next Friday.

03:14:41            THE COURT:  Okay.  So what is the current

discovery date cut-off?

                    MR. HERRERA:  Currently the 15th, Your Honor, of

this month.  Sorry.  February 15th.

                    THE COURT:  Okay.  Can you get me the up-to-date

03:14:58   docket sheet?  It should be in there.  Do you have one,

Jesus, handy?

                    CASE MANAGER:  I've got it for you.

                    THE COURT:  It's changed somewhat.  I have last

week's or earlier this week's.

03:15:12            MS. AHLRICH:  Your Honor, if I may, the city

would agree to that; but we would also request that if we

do have --

                    THE COURT:  I'm sorry.  Request for what?

                    MS. AHLRICH:  I'm sorry.  The city would agree to

03:15:23   the extension of the discovery deadline; but we would ask

the Court to consider resetting the trial date, as well.

                    THE COURT:  The question is whether it all needs

to be rolled forward 60 days.

                    MS. AHLRICH:  Yes, Your Honor.

03:15:35            THE COURT:  And it looks.  Okay.  I don't have

1    any objection to doing that.  Is anybody opposed?

2              MR. HERRERA:  No, Your Honor.

3              THE COURT:  We'll issue an amended scheduling

4    order that will extend all the deadlines, starting with

03:15:47  5    the February 15th deadline, 60 days.

6              MR. HERRERA:  Yes, Your Honor.  Before we discuss

7    a problem or an issue we have with -- well, the only other

8    issue then, Your Honor, is having to do with the Citizens

9    for Positive Change and production there; and it seems

03:16:09  10   that we are at somewhat of an impasse with counsel for

11   Citizens for Positive Change in that the pact doesn't

12   believe it has to go to donors to retrieve documents.

13             THE COURT:  Were documents sent to donors,

14   because they weren't for CKPS?

03:16:28  15             MR. NAJVAR:  I'm sorry, Your Honor.

16             THE COURT:  Were documents sent to donors?

17             MR. NAJVAR:  No, not that I'm aware of.

18             THE COURT:  Were there any e-mails for

19   communications sent to donors from CPC or received from

03:16:40  20   donors by CPC responsive to the subpoena?

21             MR. NAJVAR:  Not that I'm aware of.

22             THE COURT:  Check again and make sure.  If there

23   are none, then I believe that that satisfies your inquiry.

24             MR. HERRERA:  There is another check, Your Honor.

03:16:57  25   For example, one of the donors is the mayor.  He was

1   responsible for 84 percent of the funding for the pact.

2       THE COURT:  If Mayor Isbell communicated with

3   CPC, those would be responsive and subject to the

4   categories of production that we have already gone

03:17:15   5   through.  I thought you were referring primarily to other

6   donors.

7       What was Mayor Isbell's role in the pact?  Was he an

8   officer?

9       MR. HERRERA:  We don't know, Your Honor.  The

03:17:27   10   only officer listed for this pact, as is usual from what I

11   understand, is the treasurer; and that was Mr. Bass.

12       THE COURT:  All right.  So besides Mr. Bass was

13   Johnny Isbell, J.J. Isbell involved?

14       MR. NAJVAR:  I believe there were -- it was

03:17:43   15   substantially the same as with --

16       THE COURT:  So any e-mails to and from or other

17   communications to and from the pact and Isbell and the

18   Isbells, Richard Scott and Mr. Bass, as well as Mr. Yates

19   and the vendors would obviously be called for in the same

03:18:02   20   fashion they were for the CKPS subpoena.  Do you have any

21   difficulty with that?

22       MR. NAJVAR:  We have no problem with that.  That

23   stuff is already here in response to the Yates subpoena.

24       THE COURT:  So I'm trying to figure out what the

03:18:16   25   issue is.  The non-Isbell donors?

1          MR. HERRERA:  That would be -- we would include

2     that with donors, Your Honor.  That's not the only --

3     that's the --

4          THE COURT:  What I just -- I'm sorry to interrupt

03:18:29    5     you.  I don't mean to, Mr. Herrera.  I have just been told

6     that there are no communications responsive to the request

7     to or from donors other than the individuals identified

8     already, the Isbells, Scott and Mr. Bass.

9          MR. HERRERA:  That's right, Your Honor.  But it

03:18:51    10    has been -- we have heard -- we have been told that

11    Mr. Bass doesn't believe he has to go to other people,

12    other donors to see if there -- or other principals to see

13    if there are communications between or among them.  And so

14    the issue -- the bigger issue is --

03:19:11    15         THE COURT:  There is nothing to or from CPC and

16    these other donors that has turned up so far.  We have

17    just been told there is nothing.

18         MR. HERRERA:  As far as we're concerned -- Your

19    Honor, Mr. Najvar was, from what we understand, retained

03:19:29    20    as counsel on Monday night or Monday afternoon and --

21         THE COURT:  I have already asked him to verify

22    that there are no communications between CPC and these

23    other donors responsive to the subpoena.  Does that take

24    care of your concern?

03:19:47    25         MR. HERRERA:  Yes, Your Honor.  There is another

1  check.

2          THE COURT:  All right.  And can you do that by

3  this coming Monday the 15th?

4          MR. NAJVAR:  Absolutely.  And that would be --

03:20:00  5  make sure -- communications that went from anybody

6  about -- from any of the donors about CPC to CPC --

7          THE COURT:  About any of the issues relating that

8  are responsive to the subpoena.

9          MR. NAJVAR:  Right.

03:20:16  10          THE COURT:  To and from CPC and any of its

11  principals like Mr. Isbell.

12          MR. NAJVAR:  Mr. Isbell, Mr. Yates, J.J. Isbell.

13          THE COURT:  Richard Scott, vendors, that's

14  exactly right.

03:20:29  15          MR. NAJVAR:  Right.  Right.

16          THE COURT:  All right.  With that check and the

17  amended scheduling order, have we done what we need to do

18  today?

19          MR. NAJVAR:  I believe so, Your Honor.

03:20:40  20          MR. HERRERA:  No other issues, Your Honor.

21          THE COURT:  All right.  Very good.  Thank you.

22      *(Proceedings concluded at 3:20 p.m.)*

23  *Date: February 28, 2016*

24              ***COURT REPORTER'S CERTIFICATE***

25      *I, Laura Wells, certify that the foregoing is a*

1    *correct transcript from the record of proceedings in the*

2    *above-entitled matter.*

3

4                         */s/ Laura Wells*

5                    *Laura Wells, CRR, RMR*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25