**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:14-CV-03241-LHR** |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant*. | § | |

**APPENDIX TO DEFENDANT CITY OF PASADENA'S**
**MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-3956
Facsimile:  (713) 238-7294

By:   */s/ C. Robert Heath*
      C. ROBERT HEATH
      Texas State Bar No. 09347500
      Southern District No. 13381
      *bheath@bickerstaff.com*
      BICKERSTAFF HEATH
      DELGADO ACOSTA LLP
      3711 S. MoPac Expressway
      Building One, Suite 300
      Austin, Texas 78746
      Telephone: (512) 472-8021
      Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR**
**DEFENDANTS**

1

# TABLE OF CONTENTS

Page

1. Summary of Facts ..................................................................................................3

2. Declaration of Sherry McCall ...............................................................................6

3. Declaration of Linda Rorick ................................................................................13

4. Expert Report of David Ely .................................................................................23

5. Expert Report of Norfleet W. (Bill) Rives, Ph.D................................................72

6. Expert Report of Richard L. Engstrom, Ph.D....................................................106

7. Expert Report of John Alford, Ph.D. .................................................................145

# SUMMARY OF FACTS

## The Demographics of Pasadena

**Approximately half of Pasadena's voting-age citizens are Hispanic**

Although the demographic experts come up with slightly different percentages due to the selection of the time period from which the data is collected, both agree that roughly half of the city's citizen-voting-age population (CVAP) is Hispanic.

The plaintiffs' expert concludes Hispanics averaged 45.87% of the city's CVAP during the five-year period of 2009-13 and 47.22% during the three-year period 2011-13.  **Ely Table 6**............................................**33**

The city's demographic expert reported 48.1% of the city's CVAP was Hispanic in 2014.  **Rives Report, Exh. 5-A**................................**89**

## The History of Pasadena's Council Election Systems

**Prior to 1992 Pasadena had an at-large election system, which elected one Hispanic member of the council.**

A Hispanic, Roy Ybarra was elected to the council from an at-large position in 1973, 1975, and 1977  **Rorick declaration ¶ 5** ...........................................**14**

**In 1992, Pasadena replaced the at-large system with an all single-member-district election system.  For the first 20 years of the single-member district system no more than one Hispanic served on the council at any one time as one Hispanic served four two-year terms from 1993 to 2001, and another was elected in 2009 and served through the end of the 8-0-1 system in late 2013 and continues to serve today in the 6-2-1 system.**

The charter was amended in 1992 to replace the prior all at-large council with a council containing eight single-member districts.  The first Hispanic elected under the 8-0-1 plan was Emilo Carmona who was elected to represent District C in 1993 and reelected in 1995, 1997, and 1999.  Ornaldo Ybarra was elected in 2009 to represent District A and has been reelected in 2011, 2013, and 2015.  **Rorick declaration ¶¶ 3, 6, 8-10** .................................... **13-15**

Another Hispanic was elected under the 8-0-1 plan in 2013 when Cody Ray Wheeler was elected to represent District E.  Wheeler's election marked the first time two Hispanics served on the council at the same time.  **Rorick declaration ¶ 9** ..................................................................................**14**

**In November 2013 the Pasadena city charter was amended to replace the 8-0-1, all single-member-district system, with a 6-2-1 system that had six single-member districts with two council members elected at-large.  In 2015, in the**

sole election held under the new system, three Hispanic members of the council were elected.

In the first election under the 6-2-1 system in 2015, Pasadena voters elected three Hispanic members of the council—Ornaldo Ybarra in District A, Cody Ray Wheeler in District D (formerly District E), and Sammy Casados in District C, thus increasing Hispanic representation on the council from the highest level achieved under the all single-member-district system. **Rorick declaration ¶ 10** ................................................................................**15**

### Hispanics in Pasadena have the opportunity to elect candidates of their choice to a number of city council positions that is proportional to their percentage of the city's citizen-voting-age population.

**Hispanics have the opportunity to elect in at least four of the eight council districts.**

Hispanics constitute a majority of the citizen-voting-age population and the registered voters in Districts A, B, and C.  **Ely and Rives reports** ...........................**34, 84**

Hispanic candidates were elected in Districts A and C.  **Rorick declaration ¶¶ 10, 12** ....................................................................**15, 18**

Although the Hispanic candidate did not win the 2015 District B election, losing by only 34 votes, fully 57 percent of the registered voters in the district were Hispanic.  Further, Mr. Perez's failure to be elected may not be an indication of an inability of Hispanics to be successful in this Hispanic-majority district, since Mr. Perez was running against an incumbent and had the lowest level of Hispanic support of any Hispanic council candidate or issue studied.  **Rorick declaration ¶ 11, Rives report, Engstrom report** ..........................**15, 84, 118-19**

District D is a district in which Hispanics can elect the candidate of their choice.

Cody Ray Wheeler has been elected in the 2015 District D and in its predecessor the 2013 District E **Rorick declaration ¶¶ 9, 10** ......................**14-15**

The 2015 District D is essentially the same demographically as the 2013 District E.  **McCall declaration** ................................................................**6-12**

Cody Ray Wheeler is the candidate of Hispanic choice.  **Engstrom report** ...........................................................................................................**118**

District D is one where Hispanics have developed a working electoral coalition with other groups as both Hispanics and non-Hispanics gave majority support to the Hispanic candidate **Engstrom report** ................................................................................**118**

**<u>There are no issues of material fact</u>**

The material facts are established by election returns, census data, official voter registration records, and expert analysis in which the experts do not disagree.

The only dispute between the demographic experts is what time period to use to measure the city's citizen-voting-age population—a dispute that involves whether the number is 45.9 or 48.1 percent and is immaterial to the question of whether the percentage is roughly 50 percent.   **Ely and Rives reports**.................................................................................**32, 33, 89**

There is no dispute regarding the voting analysis, since the city's expert adopted the voter polarization totals derived by the plaintiffs' expert. **Engstrom and Alford report** ................ **118-19, 150**

All other facts relied on in this motion come from official government records such as the 2010 census, election canvasses, and voter registration lists maintained by the Harris County voter registrar.  The City believes that none of these data sources is the subject of any material dispute.

Note:      For the Court's convenience portions of the voluminous expert reports that are specifically relied on are highlighted.

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:14-CV-03241-LHR** |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant.* | § | |

**<u>DECLARATION OF SHERRY MCCALL</u>**

1.      My name is Sherry McCall.  I am over twenty-one years of age and competent to make this declaration.  The facts set out in this declaration are within my personal knowledge.  I make this declaration under penalty of perjury and pursuant to 28 U.S.C. § 1746.

2.      Since 1997 I have been employed by the law firm of Bickerstaff Heath Delgado Acosta LLP, where I am a geographic information system specialist.  Prior to that time I did similar work for the Texas Education Agency.  Basically, I work with computer systems that integrate data from the federal census and computerized maps.  Using commercially available software, it is possible to take a defined geographic area and determine its population, area, and many other characteristics.  I perform this sort of information retrieval and presentation routinely.  Information of this sort that I have prepared has been presented to and relied on by the United States Department of Justice, for which I have prepared several hundred submissions under section 5 of the Voting Rights Act, 52 U.S.C. § 10304.  Additionally, I have prepared information for use in litigation under section 2 of the Voting Rights Act, 52 U.S.C. § 10301, that has been relied on by federal courts.  Much of the information I am presenting in this declaration is merely a matter of extracting and presenting information from the United States Census.  The citizen-voting-age population data does require some allocation of data furnished by the Census Bureau at the census-block-group level to census blocks through use of ratios.  The voter registration data comes from the county

6

voter registrar and is geo-coded by locating the address of the voters on an electronic map of the city.  All of the analysis presented in this declaration is a matter of formality and, I believe, uncontested.

3.      Attached as Exhibit A to this declaration is a map in which the current District D is overlaid on District E as it existed between 2011 and 2013.  In this declaration, District E refers to the council district with that designation in the plan adopted following the 2010 Census and that had eight single-member districts.  District D refers to the council district with that designation that currently exists in the plan adopted following the 2013 charter amendment that provided for six single-member districts and two at-large positions.

4.      Because District D has roughly one-sixth of the city's population, it is necessarily somewhat larger than District E, which had approximately one-eighth of the city's population.  Specifically, District D has a population of 24,800 persons, while District E had 19,001 persons.  Almost all (92.40%) of District E's population is now found in District D.  Those persons who resided in the former District E make up 70.79 percent of the larger District D.

5.      The former District E and the current District D have similar demographic compositions with District D having a slightly larger percentage of Hispanic voting-age population.  Specifically, 59.08 percent of District D's voting-age population is Hispanic compared to District E's 57.20 percent.

6.      In District E 45.90 percentage of the citizen-voting-age population was Hispanic compared to District D's 45.33 percent.   In regard to voter registration, in District E 41.06 percent of the registered voters had Spanish surnames compared to District D's 42.53 percent.  The Spanish surname registered voter comparison is made using a list of registered voters provided by the Harris County Election Office in March 2015.  The address of voters on that list were geo-coded

2

7

so that the computer located each voter's address on an electronic map so that the number of voters in each district configuration could be computed.

7.      The data supporting the percentages set out in the preceding three paragraphs is set out in tables found in Exhibit B to this declaration.

8.      In summary, virtually all of the former District E is now found in District D.  The former District E represents more than two-thirds of District D's population.  Both districts have a very similar demographic composition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the ___10th___ day of June, 2016.


Sherry McCall

3

8

# EXHIBIT A



Legend

City of Pasadena - 2014 - District D
City of Pasadena - 2011 - District E

Pasadena - Plan 8-0
A
B
C
D
F
G
H
Water

Exhibit A
City of Pasadena
Plan 8-0 (2011 Plan) with the
Current 6-2 District D as an Overlay

© 2016 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2010
Tiger/line files, U.S. Census Bureau

Coordinate System: GCS North American 1983;
Datum: North American 1983; Created:5/11/2016

0  0.125  0.25    0.5
Miles

10

# EXHIBIT B

**Exhibit B**

**City of Pasadena**

### Comparison of Population in 2014 District D and 2011 District E

|  | 2014 District D | 2011 District E |
|---|---|---|
| Total Population | 24,800 | 19,001 |
| 2014 District D Population that was in 2011 District E | 17,556 | |
| Percentage of 2011 District E that remains in 2014 District D | 92.40% | |
| Percentage of 2014 District D that was in 2011 District E | 70.79% | |

### Demographic Comparisons Between 2014 District D and 2011 District E

|  | 2014 District D | 2011 District E |
|---|---|---|
| Total Voting Age Population | 17,068 | 13,188 |
| Hispanic Voting Age Population | 10,083 | 7,544 |
| Percent Hispanic Voting Age Population | **59.08%** | **57.20%** |
| Total Citizen Voting Age Population | 12,990 | 10,010 |
| Hispanic Citizen Voting Age Population | 5,889 | 4,595 |
| Percent Hispanic Citizen Voting Age Population | **45.33%** | **45.90%** |
| Total Registered Voters | 8,309 | 6,734 |
| Total Spanish Surname Registered Voters | 3,534 | 2,765 |
| Percent Spanish Surname Registered Voters | **42.53%** | **41.06%** |

*Data Sources: Total and Hispanic population obtained from the 2010 Census;*
*Total voters and Spanish Surname voters geocoded from the March 2015*
*voter list obtained from the Harris County Voter Registration office.*
*Citizen Voting Age Population is derived from the 2009-2013 5-Year American Community Survey data.*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | Civil Action No. 4:14-CV-03241-LHR |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant.* | § | |

## DECLARATION OF LINDA RORICK

    1.      My name is Linda Rorick.  I am over twenty-one years of age and fully qualified to make this declaration.  The facts set out in this declaration are within my personal knowledge or are reflected in the official governmental records of the City of Pasadena for which I am the custodian.  I make this declaration under penalty of perjury and pursuant to 28 U.S.C. § 1746.

    2.      The City of Pasadena adopted a home rule charter at an election held on December 12, 1964.  Under that charter the city was governed by a mayor and a city council with six members.  Four of the members of the council had to live in a designated district while two could live anywhere in the city.  All six, though, were elected by the voters in the entire city.

    3.      The structure of the city council was changed by a charter amendment adopted on August 8, 1992.  Under the amended charter, the size of the council was expanded to eight members, all of whom were elected from single-member districts.  The mayor continued to be elected from the city at large.

    4.      The charter was changed again by an election held on November 5, 2013.  Under the amendment adopted on that day, the system that previously consisted of eight single-member districts was changed to a mixed system containing six single-member districts and two at-large positions, The method of electing the mayor from the city at large did not change.

13

5.      Under the all at-large election system that was in place from 1964 through 1992, one Hispanic served on the council.  Roy Ybarra was elected in 1973 when he defeated Erwin Barton in a run-off by a vote of 712 to 581.  Mr. Ybarra was re-elected in 1975 when he defeated Joe V. Fowler by a vote of 4,136 to 2,142.  Mr. Ybarra's final term on the council began in 1977 when he defeated Ms. Jo Allen by a vote of 6,251 to 3,079.

6.      In 1993, in the first election using single-member districts, Mr. Emilio Garza was elected from District C n a run-off with Robert Martinez by a vote of 407 to 356.  Previously, Messrs. Martinez and Carmona had advanced to the run-off after eliminating a third candidate, Mr. Garvin in the general election.[1]  In 1995, Mr. Carmona was re-elected over Louis Adame by a vote of 259 to 92.  In 1997, Mr. Carmona again defeated Robert Martinez by a vote of 290 to 194.  In 1999, Mr Carmona was re-elected without opposition.

7.      From 2001 until 2009 the all single-member-district council system did not elect a Hispanic member of the council.

8.      In 2009, Ornaldo Ybarra and Ralph Riggs advanced to a run-off in District A after eliminating Nona Phillips.  Mr. Ybarra prevailed in the run-off and was elected by a vote of 333 to 232.  In 2011 Mr. Ybarra was re-elected without opposition.

9.      In 2013, which was the final election under the all single-member-district system, two Hispanics were elected to the city council.  Mr. Ornaldo Ybarra was re-elected in District A defeating Bruce K. Walters by a vote of 94 to 32.  In District E, Cody Ray Wheeler, who is Hispanic, defeated Leroy Stanley by a vote of 150 to 129.  This represented the first time that two Hispanics served on the council at the same time.

---

[1] The 1993 canvass showed only the last name of unsuccessful candidates.

10.    In 2015, which is the most recent election and was the first election under the 6-2-1 election system, three Hispanics were elected to the council.  Ornaldo Ybarra was elected to District A, defeating Keith Neilsen, by a vote of 338 to 68.  Cody Ray Wheeler was elected to District D with 521 votes to 296 for J. E. "Bear" Hebert and 89 for Pat Riley.  In District C Sammy Cassados defeated Emilio Carmona by a vote of 347 to 267.

11.    In summary, under the at-large system[2] that was in effect from 1964 to 1992 the council had one Hispanic member who served from 1973 until 1979.  Under the all single-member district system that was in effect from 1992 until 2013, one Hispanic (Emilio Carmona) served on the council from 1993 until 2001.  No Hispanic served between 2001 and 2009 and one Hispanic (Ornaldo Ybarra) served from 2009 through 2013.  A second Hispanic, Cody Ray Wheeler was elected in 2013, so that two Hispanics served on the council from 2013 until the first election under the new mixed 6-2-1 system that first elected councilmembers in 2015.  Under the first election using the 6-2-1 system three Hispanic councilmembers (Ybarra, Wheeler, and Carmona) were elected from three of the six single-member districts.  A fourth Hispanic, Celestino Perez, attempted to defeat a non-Hispanic incumbent in District B but he failed by 34 votes with a final tally of 298 for Bruce Leamon to 264 for Celestino Perez.

12.    I have attached a chart as Exhibit A to this declaration that graphically represents the service and tenure of Hispanic members of the council in the last three systems of electing the city council.

13.    Additionally, I have attached as Exhibit B the Official Cumulative Report of election returns for the 2015 city election.  This is the only election that has been held under the 6-2-1 election system at issue in this litigation.

---

[2] As noted in paragraph 2 above, four councilmembers were required to reside in designated districts while two could live anywhere in the city.  All six councilmembers, though, were elected by the entire city.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 28th day of June, 2016.

_____
Linda Rorick

# EXHIBIT A



# EXHIBIT B

Cumulative Report — Official
City of Pasadena — General Election — May 09, 2015

Page 1 of 3

05/18/2015 01:47 PM

Total Number of Voters : 4,455 of 57,411 = 7.76%

Precincts Reporting 56 of 58 = 100.00%

| Party | Candidate | Absentee | | Early | | Election | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| **Councilmember - District A, Vote For 1** | | | | | | | | | |
| | Omaldo Ybarra | 54 | 71.05% | 188 | 89.52% | 96 | 80.00% | 338 | 83.25% |
| | Keith Nielsen | 22 | 28.95% | 22 | 10.48% | 24 | 20.00% | 88 | 16.75% |
| | Cast Votes: | 76 | 95.00% | 210 | 98.13% | 120 | 96.00% | 406 | 96.90% |
| | Over Votes: | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| | Under Votes: | 4 | 5.00% | 4 | 1.87% | 5 | 4.00% | 13 | 3.10% |

| | Precincts | | | Voters | | |
|---|---|---|---|---|---|---|
| | Counted | Total | Percent | Ballots | Registered | Percent |
| | 8 | 8 | 100.00% | 419 | 6,508 | 6.44% |

| Party | Candidate | Absentee | | Early | | Election | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| **Councilmember - District B, Vote For 1** | | | | | | | | | |
| | Bruce Leamon | 97 | 71.85% | 107 | 47.56% | 94 | 46.53% | 298 | 53.02% |
| | Celestino Perez | 38 | 28.15% | 118 | 52.44% | 108 | 53.47% | 264 | 46.98% |
| | Cast Votes: | 135 | 97.12% | 225 | 98.68% | 202 | 99.02% | 562 | 98.42% |
| | Over Votes: | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| | Under Votes: | 4 | 2.88% | 3 | 1.32% | 2 | 0.98% | 9 | 1.58% |

| | Precincts | | | Voters | | |
|---|---|---|---|---|---|---|
| | Counted | Total | Percent | Ballots | Registered | Percent |
| | 8 | 8 | 100.00% | 571 | 7,165 | 7.97% |

| Party | Candidate | Absentee | | Early | | Election | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| **Councilmember - District C, Vote For 1** | | | | | | | | | |
| | Emilio Carmona | 97 | 45.12% | 81 | 42.86% | 89 | 42.38% | 267 | 43.49% |
| | Sammy Casados | 118 | 54.88% | 108 | 57.14% | 121 | 57.62% | 347 | 56.51% |
| | Cast Votes: | 215 | 93.48% | 189 | 97.42% | 210 | 97.67% | 614 | 96.09% |
| | Over Votes: | 0 | 0.09% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| | Under Votes: | 15 | 6.52% | 5 | 2.58% | 5 | 2.33% | 25 | 3.91% |

| | Precincts | | | Voters | | |
|---|---|---|---|---|---|---|
| | Counted | Total | Percent | Ballots | Registered | Percent |
| | 11 | 11 | 100.00% | 639 | 8,874 | 7.20% |

20

05/18/2015 01:47 PM

## Cumulative Report — Official
### City of Pasadena — General Election — May 09, 2015
Page 2 of 3

Precincts Reporting 56 of 56 = 100.00%

Total Number of Voters - 4,455 of 57,411 = 7.76%

| Party | Candidate | Absentee | | Early | | Election | | Total | |
|---|---|---|---|---|---|---|---|---|---|

**Councilmember - District D, Vote For 1**

| Candidate | Absentee | | Early | | Election | | Total | |
|---|---|---|---|---|---|---|---|---|
| Pat Riley | 49 | 14.24% | 28 | 9.76% | 12 | 4.36% | 89 | 9.82% |
| Cody Ray Wheeler | 184 | 53.49% | 182 | 63.41% | 155 | 56.36% | 521 | 57.51% |
| J E "Bear" Hebert | 111 | 32.27% | 77 | 26.83% | 108 | 39.27% | 298 | 32.67% |
| Cast Votes: | 344 | 97.73% | 287 | 98.63% | 275 | 98.21% | 905 | 98.16% |
| Over Votes: | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Under Votes: | 8 | 2.27% | 4 | 1.37% | 5 | 1.79% | 17 | 1.84% |

| | Precincts | | | Voters | | |
|---|---|---|---|---|---|---|
| | Counted | Total | Percent | Ballots | Registered | Percent |
| | 6 | 6 | 100.00% | 923 | 7,511 | 12.29% |

**Councilmember - District E, Vote For 1**

| Candidate | Absentee | | Early | | Election | | Total | |
|---|---|---|---|---|---|---|---|---|
| Cary Bass | 174 | 62.82% | 144 | 60.00% | 178 | 48.38% | 497 | 56.03% |
| Larry Peacock | 103 | 37.18% | 96 | 40.00% | 181 | 51.62% | 390 | 43.97% |
| Cast Votes: | 277 | 97.19% | 240 | 97.17% | 370 | 96.86% | 887 | 97.05% |
| Over Votes: | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Under Votes: | 8 | 2.81% | 7 | 2.83% | 12 | 3.14% | 27 | 2.95% |

| | Precincts | | | Voters | | |
|---|---|---|---|---|---|---|
| | Counted | Total | Percent | Ballots | Registered | Percent |
| | 8 | 8 | 100.00% | 914 | 11,215 | 8.15% |

**Councilmember - District F, Vote For 1**

| Candidate | Absentee | | Early | | Election | | Total | |
|---|---|---|---|---|---|---|---|---|
| Jeff Wagner | 178 | 100.00% | 154 | 100.00% | 433 | 100.00% | 785 | 100.00% |
| Cast Votes: | 178 | 84.36% | 154 | 82.80% | 433 | 78.44% | 785 | 80.61% |
| Over Votes: | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Under Votes: | 33 | 15.64% | 32 | 17.20% | 119 | 21.56% | 184 | 19.39% |

| | Precincts | | | Voters | | |
|---|---|---|---|---|---|---|
| | Counted | Total | Percent | Ballots | Registered | Percent |
| | 15 | 15 | 100.00% | 949 | 16,138 | 5.88% |

**Councilmember - District G at large, Vote For 1**

| Candidate | Absentee | | Early | | Election | | Total | |
|---|---|---|---|---|---|---|---|---|
| Pat Van Houte | 637 | 51.00% | 769 | 80.36% | 742 | 45.53% | 2,148 | 51.72% |
| Steve Cote | 612 | 49.00% | 505 | 39.84% | 888 | 54.48% | 2,005 | 48.28% |
| Cast Votes: | 1,249 | 93.91% | 1,274 | 93.68% | 1,630 | 92.72% | 4,153 | 93.37% |
| Over Votes: | 1 | 0.08% | 0 | 0.00% | 0 | 0.00% | 1 | 0.02% |
| Under Votes: | 80 | 6.02% | 86 | 6.32% | 128 | 7.28% | 294 | 6.61% |

21

Cumulative Report — Official

City of Pasadena — General Election — May 09, 2015

Page 3 of 3

05/18/2015 01:47 PM

Precincts Reporting 56 of 56 = 100.00%

Total Number of Voters : 4,455 of 57,411 = 7.76%

| Party | Candidate | Absentee | | Early | | Election | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| **Councilmember - District H at large, Vote For 1** | | | | | | | | | |
| | Oscar Del Toro | 267 | 22.38% | 846 | 50.31% | 706 | 42.40% | 1,619 | 39.09% |
| | Darrell Morrison | 926 | 77.62% | 838 | 49.69% | 959 | 57.60% | 2,523 | 60.91% |
| | **Cast Votes:** | 1,193 | 93.72% | 1,284 | 94.41% | 1,665 | 94.71% | 4,142 | 94.33% |
| | **Over Votes:** | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| | **Under Votes:** | 80 | 6.28% | 76 | 5.59% | 93 | 5.29% | 249 | 5.67% |

22

# Analysis of Voters and City Council Districts in the City of Pasadena, Texas.

Expert Report of David Ely
October 14, 2015

Pursuant to 28 U.S.C. sec. 1746, I declare the following:

## I. Introduction

1.  I, David Ely, am the founder of Compass Demographics, a consulting and database management firm specializing in projects involving Census and Election Data.  I have extensive experience in the management of redistricting projects, the analysis of voting behavior, and demographic analysis.  I received a Bachelor of Science in Mechanical Engineering and Social Sciences from the California Institute of Technology in 1987.

2.  I have served as an expert and testified on behalf of the United States in numerous cases involving voting rights issues, in which I performed analyses similar to those utilized in this report.

3.  I have also served as a consultant and expert on behalf of private plaintiffs in voting rights litigation challenging election systems in multiple jurisdictions.

4.  I have also served as a consultant and expert on behalf of defendant jurisdictions in voting rights litigation challenging election systems or districts.

5.  I have also served as a consultant to construct databases, draw district lines or prepare presentation maps and reports for the many jurisdictions in conducting their normal redistricting.  These have included statewide congressional and legislative redistricting in California, as well as

a variety of County Boards, City Councils, School Boards, Water Districts, Regional Transit Boards and others following the 1990, 2000, and 2010 Census.

6.  A copy of my CV is attached as Appendix A.  It contains a listing of my publications from the last 10 years and cases in which I testified as an expert witness in the last 4 years.

7.  I was asked by Plaintiffs' attorneys to perform analyses related to the Hispanic community in the City of Pasadena, Texas. The analyses performed were:

    A.  Identify Spanish surnamed voters from lists of voters for a number of Harris County and City of Pasadena elections in 2007, 2008, 2010, 2012, 2013 and 2015;

    B.  Combine counts of voters and Spanish surnamed voters by precinct with election returns for elections listed above;

    C.  Analyze the socio-economic and demographic characteristics of the City of Pasadena and the Hispanic community in the City;

    D.  Analyze the six single member City Council districts adopted by the City of Pasadena in 2014;

    E.  Analyze the eight single member City Council districts previously in effect in the City of Pasadena;

8. For the purposes of this report, I reviewed and relied upon the following:

    2010 Census TIGER geography

    2010 Census Pl94-171 redistricting data

    Census Bureau American Community Survey (ACS) data from 2009 through 2013

Harris County Elections Department Voter List for City of Pasadena Nov 2013 Election

Harris County Elections Department Voter List for City of Pasadena May 2015 Election

Harris County Elections Department Voter List from March 2008 Democratic Primary

Harris County Elections Department Voter List from November 2008 General Election

Harris County Elections Department Voter List from March 2010 Republican Primary

Harris County Elections Department Voter List from November 2010 General Election

Harris County Elections Department Voter List from May 2012 Republican Primary

Harris County Elections Department Voter List from May 2012 Democratic Primary

Harris County Elections Department Voter List from November 2012 General Election

Harris County Elections Department Election Returns for Elections listed above

9.  This report may be supplemented or revised in response to the discovery of additional issues and information.

10.  I am being compensated at a rate of $150 per hour by Plaintiffs' attorneys for my analysis in this case.

## II. Voter Surname Analysis

11.  A Spanish surname is a commonly used proxy for Hispanic ethnicity in determining the ethnic composition of a group of people identified by name, when ethnic self-identification is not practical.  I have used this type of analysis extensively to build databases for use in the analysis of voting behavior as well as to measure potential voting strength in districts.  I and others have used Spanish surname databases as the foundation for numerous expert reports in voting rights litigation, as well as to provide important criteria to guide decisions by jurisdictions in the redistricting process.

12.  A Spanish surname list and rules for matching the list were developed by the Census Bureau for use in the 1980 Census.  I have used this list and set of rules in my surname matching analysis.  Studies by the Census Bureau have shown that surname matching tends to slightly underestimate Hispanic ethnicity, except in groups with significant Filipino populations.  Jeffrey S. Passel and David R. Word, "Constructing the List of Spanish Surnames for the 1980 Census: An Application of Bayes' Theorem," presented at the Annual Meeting of the Population Association of America, 1980.  2010 Census data for the City of City of Pasadena indicate that there is a minimal Filipino population in the city, so Spanish surname results may be accepted as a reliable, if somewhat conservative, indication of Hispanic ethnicity.

13.  Each of the voters on the various lists analyzed was coded to indicate if the voter had a Spanish surname according to Census Bureau rules.  This information was then aggregated to the precinct level in order to produce a count for each precinct of total voters and Spanish surnamed voters for each election.

14.  The surname matching procedure was carried out on voter lists, which indicated voting participation in various elections.  In order to produce a data file for election analysis I combined precinct counts of voters for elections in each of the elections listed above with precinct by precinct election results for that election downloaded from the Harris County Elections Website (http://www.harrisvotes.com/ElectionResults.aspx), or supplied to me by plaintiff's attorney.

15.  For each of the elections which included areas outside of the City of Pasadena I selected precincts where a majority of voters had Pasadena addresses, and separately listed the results for those precincts.

16.  The results of this analysis were provided to Professor Richard Engstrom for further analysis.

## III.  Citywide Demographic Characteristics

17.  I have examined the housing, income and education characteristics of the population of Pasadena, as well as the White-Non Hispanic population and the Hispanic Population, based on tables from the 2009-2013 5-year American Community Survey. These tables indicate a clear pattern of lower income, lower homeownership, less education, less adequate housing, and a higher incidence of poverty for the Hispanic population, relative to the White Non-Hispanic population in Pasadena.

**Table 1**

| HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2013 INFLATION-ADJUSTED DOLLARS) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | All Households | | | WHITE ALONE, NOT HISPANIC OR LATINO HOUSEHOLDER | | | HISPANIC OR LATINO HOUSEHOLDER | |
| Total: | 47387 | % | Cum % | 19926 | % | Cum % | 24534 | % | Cum % |
| Less than $10,000 | 3578 | 7.6% | 7.6% | 1057 | 5.3% | 5.3% | 2067 | 8.4% | 8.4% |
| $10,000 to $14,999 | 2269 | 4.8% | 12.3% | 834 | 4.2% | 9.5% | 1265 | 5.2% | 13.6% |
| $15,000 to $19,999 | 3326 | 7.0% | 19.4% | 1307 | 6.6% | 16.0% | 1945 | 7.9% | 21.5% |
| $20,000 to $24,999 | 3469 | 7.3% | 26.7% | 1280 | 6.4% | 22.5% | 2104 | 8.6% | 30.1% |
| $25,000 to $29,999 | 2621 | 5.5% | 32.2% | 926 | 4.6% | 27.1% | 1622 | 6.6% | 36.7% |
| $30,000 to $34,999 | 2799 | 5.9% | 38.1% | 989 | 5.0% | 32.1% | 1715 | 7.0% | 43.7% |
| $35,000 to $39,999 | 2637 | 5.6% | 43.7% | 792 | 4.0% | 36.1% | 1731 | 7.1% | 50.7% |
| $40,000 to $44,999 | 2569 | 5.4% | 49.1% | 1027 | 5.2% | 41.2% | 1426 | 5.8% | 56.6% |
| $45,000 to $49,999 | 2026 | 4.3% | 53.4% | 673 | 3.4% | 44.6% | 1265 | 5.2% | 61.7% |
| $50,000 to $59,999 | 4432 | 9.4% | 62.7% | 1733 | 8.7% | 53.3% | 2288 | 9.3% | 71.0% |
| $60,000 to $74,999 | 4520 | 9.5% | 72.3% | 2079 | 10.4% | 63.7% | 2275 | 9.3% | 80.3% |
| $75,000 to $99,999 | 5108 | 10.8% | 83.0% | 2526 | 12.7% | 76.4% | 2213 | 9.0% | 89.3% |
| $100,000 to $124,999 | 3462 | 7.3% | 90.4% | 1699 | 8.5% | 84.9% | 1427 | 5.8% | 95.1% |
| $125,000 to $149,999 | 1675 | 3.5% | 93.9% | 983 | 4.9% | 89.9% | 492 | 2.0% | 97.2% |
| $150,000 to $199,999 | 1584 | 3.3% | 97.2% | 1060 | 5.3% | 95.2% | 458 | 1.9% | 99.0% |
| $200,000 or more | 1312 | 2.8% | 100.0% | 961 | 4.8% | 100.0% | 241 | 1.0% | 100.0% |
| MEDIAN Household income | $ 46,058 | | | $ 55,896 | | | $ 39,354 | | |
| Per Capita Income | $ 20,146 | | | $ 32,051 | | | $ 13,984 | | |

**Table 2**

| TENURE (Occupied Housing Units) | | | |
|---|---|---|---|
| | All Households | WHITE ALONE, NOT HISPANIC OR LATINO | HISPANIC OR LATINO |
| Total | 47387 | 19926 | 24534 |
| Owner | 26888 | 13370 | 12150 |
| Renter | 20499 | 6556 | 12384 |
| % Renter | 43.3% | 32.9% | 50.5% |

**Table 3**

| EDUCATIONAL ATTAINMENT FOR THE POPULATION 25 YEARS AND OVER | | | | | | |
|---|---|---|---|---|---|---|
| | All | | WHITE ALONE, NOT HISPANIC OR LATINO | | HISPANIC OR LATINO | |
| Total | 87524 | | 34477 | | 47771 | |
| Less than high school diploma | 25687 | 29.3% | 3753 | 10.9% | 21300 | 44.6% |
| High school graduate, GED, or alternative | 26911 | 30.7% | 11163 | 32.4% | 14834 | 31.1% |
| Some college or associate's degree | 23159 | 26.5% | 12140 | 35.2% | 9029 | 18.9% |
| Bachelor's degree or higher | 11767 | 13.4% | 7421 | 21.5% | 2608 | 5.5% |

– 7 –

**Table 4**

| POVERTY STATUS IN THE PAST 12 MONTHS BY AGE | | | | | | |
|---|---|---|---|---|---|---|
| | TOTAL | | WHITE ALONE, NOT HISPANIC OR LATINO | | HISPANIC OR LATINO | |
| Total: | 149414 | | 46233 | | 94375 | |
| Income in the past 12 months below poverty level: | 32598 | 21.8% | 5137 | 11.1% | 25680 | 27.2% |
| Under 5 years | 5315 | 36.0% | 613 | 24.8% | 4525 | 38.9% |
| 5 years | 4837 | 32.0% | 439 | 19.1% | 4248 | 35.7% |
| 6 to 11 years | 4187 | 26.5% | 367 | 11.3% | 3525 | 30.4% |
| 12 to 17 years | 16052 | 18.9% | 2818 | 10.8% | 12243 | 22.8% |
| 18 to 64 years | 1634 | 12.5% | 611 | 7.6% | 896 | 21.1% |
| 65 to 74 years | 381 | 9.1% | 167 | 5.4% | 173 | 17.7% |
| 75 years and over | 192 | 13.9% | 122 | 11.1% | 70 | 26.7% |
| Income in the past 12 months at or above poverty level | 116816 | | 41096 | | 68695 | |
| Under 5 years | 9444 | | 1860 | | 7103 | |
| 5 years | 10270 | | 1857 | | 7644 | |
| 6 to 11 years | 11636 | | 2874 | | 8073 | |
| 12 to 17 years | 68995 | | 23235 | | 41535 | |
| 18 to 64 years | 11460 | | 7394 | | 3342 | |
| 65 to 74 years | 3817 | | 2898 | | 806 | |
| 75 years and over | 1194 | | 978 | | 192 | |

**Table 5**

| OCCUPANTS PER ROOM (Occupied Housing Units) | | | |
|---|---|---|---|
| | All Households | WHITE ALONE, NOT HISPANIC OR LATINO | HISPANIC OR LATINO |
| Total: | 47387 | 19926 | 24534 |
| 1.00 or less occupants per room | 43049 | 19678 | 20593 |
| 1.01 or more occupants per room | 4338 | 248 | 3941 |
| % 1.01 or more | 9.2% | 1.2% | 16.1% |

**IV.  Single Member Districts**

18.  I was asked to analyze the size and geographic distribution of the Hispanic population in the City of Pasadena relative to the benchmark and recently-adopted 6-2 City Council district configurations. This analysis is intended to demonstrate the number of districts in which Hispanics make up a majority of the eligible voters in these district configurations.

19.  For my analysis I have used data from the 2010 Census PL94-171 redistricting data file as the source for total population and voting age population (VAP) by race and Hispanic Origin. Data from the 2013 5-year American Community Survey (ACS) was the source for citizen voting age population (CVAP) breakdowns. The PL94-171 redistricting data file has data by Census Block.  A Special Tabulation of CVAP data by race and Hispanic Origin from the 2011 5–year ACS is available at the Census Block Group (BG) level of geography from the 2010 Census.  Attached as Appendix B is a document titled Geographic Terms and Concepts, downloaded from the Census Bureau Website.  The discussions of census geographic hierarchy appearing therein at A-4, as well as the discussion of Blocks and BGs appearing at A-10 and partially included below, and a graphical presentation of the hierarchy appearing at A-27 are particularly relevant.

> Blocks (Census Blocks) are statistical areas bounded by visible features, such as streets, roads, streams, and railroad tracks, and by nonvisible boundaries, such as selected property lines and city, township, school district, and county limits and short line-of-sight extensions of streets and roads. Generally, census blocks are small in area; for example, a block in a city bounded on all sides by streets.

> Block Groups (BGs) are statistical divisions of census tracts, are generally defined to contain between 600 and 3,000 people, and are used to present data and control block numbering. A block group consists of clusters of blocks within the same census tract that have the same first digit of their four-digit census block number…. A BG usually covers a contiguous area. Each census tract contains at least one BG, and BGs are uniquely numbered within the census tract. Within the standard census geographic hierarchy, BGs never cross state, county, or census tract boundaries but may cross the boundaries of any other geographic entity.

20.  In order to properly analyze the City of Pasadena and single member City Council district alternatives, it is necessary to use Census Blocks.  Although population and VAP data is available at the Census Block level, CVAP data is only available at the BG level.  In order to calculate Hispanic share of CVAP in the various single member districts, it was necessary to create an estimate of Hispanic and non-Hispanic CVAP at the Census Block level.  For each Census Block, I calculated the block's share of Hispanic and non-Hispanic VAP within the corresponding BG.  I then assigned to each Census Block the appropriate share of Hispanic and non-Hispanic CVAP within the corresponding BG.[1]

21. The CVAP estimates for districts are calculated from the ACS survey results over a 5 year period, 2009 – 2013.  In order to examine the effect of this 5 year time period, I compared the calculated estimates with citywide Hispanic share of VAP and the citizenship rate for Hispanic VAP shown in the 5 year ACS with ACS data from 2 non-overlapping 3 year periods and the most recent single year period, as well as VAP data from the 2010 Census enumeration. The results of this comparison are shown in Table 6. This comparison shows a relatively steady but slightly increasing Hispanic share of VAP together with a pattern of increase in Hispanic citizenship over time.  This increase is seen both in the Hispanic share of CVAP and in citizenship rate among Hispanic VAP. The comparison of data from two non-overlapping 3 year periods shows that this increase in citizenship is statistically significant.  Therefore the calculated 5 year estimates used in this report are likely somewhat conservative. Although the 5-year data is likely somewhat conservative, it is much more statistically reliable than the 1-year or 3 year data, and it is the only data that can be used to create local level estimates, so it is relied on throughout this report.

---

1 .   The ACS Special Tabulation also includes a margin of error (MOE) for each estimate. The MOE for an aggregate estimate is calculated as the square root of the sum of the squares of individual estimates. In order to calculate the MOE for the district level CVAP estimates, I computed BG level MOE for the CVAP categories according to Census Bureau guidance, and then disaggregated the square of this MOE to the Block level in the same way as the corresponding CVAP estimate. This square MOE is meaningless at the Block level but the square root of the sum of the Block level square MOE provides an estimated MOE for groupings of Blocks that are much larger than a single BG, as are the districts analyzed here.

**Table 6  City of Pasadena Census Data Comparison**

| DATES | 2009-2013 | 2009-2013 | 2008-2010 | 2011-2013 | DIFFERENCE | 2014 | 4/1/2010 |
|---|---|---|---|---|---|---|---|
| TYPE | Calculated | Spec Tab | ACS 3YR | ACS 3YR | | ACS 1YR | DECENNIAL |
| VAP | | 104275 | 101036 | 106432 | | 110432 | 103267 |
| Hispanic Share of VAP | | 59360 | 54993 | 61236 | | 63679 | 57710 |
| | | 56.93% | 54.43% | 57.54% | 3.11% | 57.66% | 55.88% |
| CVAP | 79704 | 80240 | 76355 | 82637 | | 88638 | |
| Hispanic Share of CVAP | 36561 | 36815 | 31474 | 39024 | | 42647 | |
| | 45.87% | 45.88% | 41.22% | 47.22% | 6.00% | 48.11% | |
| MOE | 1.90% | 1.46% | 1.70% | 1.82% | 2.49% | 3.13% | |
| Hispanic Citizenship Rate | | 62.02% | 57.23% | 63.73% | 6.09% | 66.97% | |
| MOE | | 1.76% | 2.30% | 2.38% | 3.31% | 3.11% | |

22. I examined the six single member City Council districts currently in use in the City of Pasadena.  There are three districts with a substantial Hispanic majority of eligible voters. There is an additional district with an Hispanic VAP majority but below 50% CVAP, similar to the Citywide Hispanic share. Table 7 shows the demographic characteristics of these districts.

**Table 7  City of Pasadena 6 Single Member City Council Districts**

| District | City of Pasadena | Current 1 | Current 2 | Current 3 | Current 4 | Current 5 | Current 6 |
|---|---|---|---|---|---|---|---|
| Population | 149043 | 24607 | 25013 | 24737 | 24800 | 24694 | 25192 |
| Deviation from Ideal 8 | | 5977 | 6383 | 6107 | 6170 | 6064 | 6562 |
| | | 32.08% | 34.26% | 32.78% | 33.12% | 32.55% | 35.22% |
| Hispanic Population | 92692 | 21263 | 19512 | 17470 | 16504 | 11705 | 6238 |
| | 62.19% | 86.41% | 78.01% | 70.62% | 66.55% | 47.40% | 24.76% |
| Voting Age Population | 103267 | 15962 | 16559 | 16611 | 17068 | 18417 | 18650 |
| Hispanic VAP | 57710 | 13224 | 12000 | 10830 | 10083 | 7588 | 3985 |
| | 55.88% | 82.85% | 72.47% | 65.20% | 59.08% | 41.20% | 21.37% |
| Citizen Voting Age Population | 79704.0 | 9840.5 | 11117.5 | 12719.5 | 12996.6 | 15599.7 | 17430.3 |
| Hispanic CVAP | 36561.1 | 7036.7 | 6450.7 | 7803.3 | 5889.2 | 5496.0 | 3885.1 |
| | 45.87% | 71.51% | 58.02% | 61.35% | 45.31% | 35.23% | 22.29% |

23.  I also examined the eight single member City Council districts previously in use in the City of Pasadena.  There are four districts with a substantial Hispanic majority of eligible voters. There is an additional district with an Hispanic VAP majority but below 50% CVAP, similar to the Citywide Hispanic share. The demographic characteristics of these districts are shown in Table 8.

**Table 8  City of Pasadena 8 Single Member City Council Districts**

| District | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Population | 17915 | 18362 | 18353 | 17986 | 19002 | 19449 | 19426 | 18550 |
| Deviation from Ideal 8 | -715 | -268 | -277 | -644 | 372 | 819 | 796 | -80 |
| | -3.84% | -1.44% | -1.49% | -3.46% | 2.00% | 4.40% | 4.27% | -0.43% |
| Hispanic Population | 15017 | 14585 | 14811 | 12541 | 12391 | 8386 | 11778 | 3183 |
| | 83.82% | 79.43% | 80.70% | 69.73% | 65.21% | 43.12% | 60.63% | 17.16% |
| Voting Age Population | 11827 | 12231 | 11907 | 12051 | 13189 | 14455 | 13733 | 13874 |
| Hispanic VAP | 9456 | 9017 | 9087 | 7723 | 7546 | 5360 | 7462 | 2059 |
| | 79.95% | 73.72% | 76.32% | 64.09% | 57.21% | 37.08% | 54.34% | 14.84% |
| Citizen Voting Age Population | 7367.0 | 8727.2 | 7859.6 | 9624.9 | 10031.3 | 12388.3 | 10143.6 | 13562.2 |
| Hispanic CVAP | 4823.1 | 5420.5 | 5108.0 | 5877.8 | 4597.0 | 4253.9 | 4043.3 | 2437.5 |
| | 65.47% | 62.11% | 64.99% | 61.07% | 45.83% | 34.34% | 39.86% | 17.97% |

24.  My analysis demonstrates that the benchmark 8 Council District Plan included 4 districts in which Hispanics were a clear majority of eligible voters while the current Six Council Districts only include 3 such districts.

– 13 –

35

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 14, 2015.

David Ely

# Appendix A

VITA

# DAVID R. ELY

Compass Demographics, Inc.
6575 N. Vista Street
San Gabriel, CA 91775
(626) 285-3074
E-mail:  ely@compass-demographics.com


**Employment:**

**2007 to present**
David Ely is the manager and founder of Compass Demographics, a consulting and database management firm specializing in projects involving census and election data, redistricting projects, demographic analysis, and analysis of voting behavior.

**1986 to 2007**
Director of Research for the Redistricting and Reapportionment practice of Pactech Data and Research, Pasadena, California.  As Director of Research, Mr. Ely testified or consulted to counsel in a variety of litigation involving the configuration of election districts as well as providing database construction and redistricting consulting for numerous jurisdictions.

**Education:**
California Institute of Technology in Pasadena, CA with a B.S. in Social Sciences and Mechanical Engineering in 1987.


**Redistricting Consulting**
Activities include database construction, demographic and voter analysis, development of districting plans, public hearings and presentation of plans, technical assistance, and analysis of alternative redistricting plans.

2014   Whittier City Council District Formation

2014   Sulphur Springs School District Trustee Area Formation

2014   Lancaster Elementary School District Trustee Area Formation

2012   Los Angeles Unified School District Redistricting

2012   Los Angeles City Council Redistricting

2012   Pasadena Unified School Board Districting

2012   Pasadena City Council Redistricting

David R. Ely, Vita, page 2

**(Redistricting Consulting, cont.)**

2011   Bay Area Rapid Transit (BART) Board Redistricting

2011   California Legislative Redistricting

2011   Los Angeles County Redistricting

2008   Ceres Unified School District Redistricting

2008   Madera Unified School District Redistricting

2008   Merced Elementary School District Redistricting

2008   Merced High School District Redistricting

2005   Hanford Joint Union High School District Redistricting

2003   Oakland City Council and Oakland Unified School Board Redistricting

2002   Los Angeles City Council Redistricting

2002   Los Angeles Unified School District Board Member Redistricting

2002   Pasadena, California, City Council Redistricting

2001   California Legislative Redistricting (Senate, Assembly, and Congressional)

2001   Los Angeles County Supervisorial Redistricting

2001   Bay Area Rapid Transit Board Member Districts Redistricting

1992   Rancho Mirage, California, City Council Redistricting

1992   Three Valleys Municipal Water District Redistricting

1992   Los Angeles Unified School Board Member Redistricting

1992   Los Angeles City Council Redistricting

1992   Pasadena, California, City Council Redistricting

1991   California Congressional Redistricting

1991   California State Assembly Redistricting

1991   Los Angeles County Board of Supervisors Redistricting

1987   City of Boston, Massachusetts Redistricting

1986   Los Angeles City Council Redistricting

1987 to 2012, California State Legislature, Redistricting Database construction

David R. Ely, Vita, page 3

**Litigation Analysis**
Activities include database construction, demographic analysis, expert witness testimony, surname matching, geocoding of registered and actual voter lists, and construction of illustrative districting plans.

2000-Present Provided analysis on numerous voting rights investigations

*Ramos v. Carrollton-Farmers Branch Independent School District* (2015), expert witness (Texas)

*Rodriguez v. City of Grand Prairie* (2015), expert witness (Texas)

*Rodriguez v. Grand Prairie Independent School District* (2014), expert witness (Texas)

*Solis v. City of Santa Clarita* (2014), expert witness (California)

*Jauregui v. City of Palmdale* (2013), expert witness (California)

*Gonzalez v. City of Compton* (2012), expert witness (California)

*Fabela v. City of Farmers Branch* (2011), expert witness (Texas)

*Benavidez v. Irving Independent School District* (2008, 2013), expert witness (Texas)

*Benavidez v. City of Irving* (2008), expert witness (Texas)

*Avitia v. Tulare Local Health Care District* (2008), expert witness (California)

*U.S. v. City of Euclid* (2007), election data consultant (Ohio)

Bexar Metropolitan Water District (2007), election data consultant (Texas)

*U.S. v. City of Springfield, Massachusetts* (2006)

*U.S. v. State of Missouri* (2006), election data consultant

*U.S. v. City of Philadelphia and Philadelphia City Commission* (2006), Pennsylvania

*State of Georgia v. Ashcroft,* (2004) election data consultant

*Gomez v. Hanford Joint Union High School District,* (2004) California

*Sanchez v. City of Modesto,* (2004), California

*Governor Gray Davis v. Kevin Shelley,* (2003) data analysis and declaration (California)

*U.S. v. Alamosa County,* (2002), expert witness (Colorado)

*Cano v. Davis,* (2002), election data consultant, (California)

*U.S. v. City of Lawrence,* (2000), expert witness (Massachusetts)

*U.S. v. City of Santa Paula,* (2000) voting rights litigation (California)

David R. Ely, Vita, page 4

**(Litigation Analysis, cont.)**

*U.S. v. Upper San Gabriel Valley Municipal Water District,* (2000) voting rights litigation (California)

*U.S. v. Passaic* (2000) voting rights litigation (New Jersey)

*U.S. v. City of Lawrence*, (1999)  voting rights litigation (Massachusetts)

*Bonilla v. Chicago City Council* (1992-1998), expert witness (Illinois)

*Ruiz v. City of Santa Maria*, (1992-1998), voting rights litigation (California)

*Garza v. County of Los Angeles*, (1988-90), Constructed databases and designed remedial plans for Los Angeles County Supervisorial Districts

# Appendix B

# Appendix A.
# Geographic Terms and Concepts

Alaska Native Regional Corporation (ANRC) (see American Indian, Alaska Native,
  Native Hawaiian Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5
Alaska Native Village (ANV) (see American Indian, Alaska Native, Native Hawaiian Area) . . . . . . A-5
Alaska Native Village Statistical Area (ANVSA) (see American Indian, Alaska Native,
  Native Hawaiian Area). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8
American Indian, Alaska Native, and Native Hawaiian Area . . . . . . . . . . . . . . . . . . . . . . . . . A-5
American Indian Off-Reservation Trust Land (see American Indian, Alaska Native,
  Native Hawaiian Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-7
American Indian Reservation (see American Indian, Alaska Native, Native Hawaiian Area) . . . . A-6
American Indian Tribal Subdivision (see American Indian, Alaska Native,
  Native Hawaiian Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6
American National Standards Institute (ANSI) Codes (see Codes for Geographic Entities). . . . . A-13
American Samoa (see Island Areas of the United States) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-20
Area Measurement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9
Barrio (see Puerto Rico) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
Barrio-Pueblo (see Puerto Rico) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
Block . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-10
Block Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-10
Borough (see County or Statistically Equivalent Entity; see County Subdivision; see Place) . . . A-16
Boundary Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
Census Area (see County or Statistically Equivalent Entity) . . . . . . . . . . . . . . . . . . . . . . . . . . A-16
Census Block (see Block). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-10
Census Bureau Codes (see Codes for Geographic Entities). . . . . . . . . . . . . . . . . . . . . . . . . . . A-14
Census County Division (CCD) (see County Subdivision) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-18
Census Designated Place (CDP) (see Place) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-21
Census Division (see also Census Region) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12
Census Region (see also Census Division) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12
Census Subarea (see County Subdivision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-18
Census Tract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12
Central Place (see Urban and Rural) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25
City (see Place) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-21
City and Borough (see County or Statistically Equivalent Entity; see Place) . . . . . . . . . . . . . . A-16
Codes for Geographic Entities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13
Combined New England City and Town Area (see Core Based Statistical Area). . . . . . . . . . . . A-15
Combined Statistical Area (CSA) (see Core Based Statistical Area) . . . . . . . . . . . . . . . . . . . . . A-15
Commonwealth of the Northern Mariana Islands (see Island Areas of the United States) . . . . . A-20
Comparability (see Boundary Changes) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11
Comunidad (see Puerto Rico) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22
Congressional District (CD) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-14
Consolidated City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-14
Core Based Statistical Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-15
County or Statistically Equivalent Entity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-16
County Subdivision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-17

Density (see Population and Housing Unit Density) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22

District (see County or Statistically Equivalent Entity) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-16

Division (see Census Division) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12

Extended Place (see Urban and Rural) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

FIPS Class Codes (see Geographic Area Attributes) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-19

FIPS Codes (see Codes for Geographic Entities) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13

Functional Status (see Geographic Area Attributes) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-19

Geographic Area Attributes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-18

Geographic Hierarchy (see Introduction—Geographic Presentation of Data) . . . . . . . . . . . . . A-4

Geographic Names Information System (GNIS) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-20

Geographic Names Information System Identifier (GNIS ID) (see Codes for
    Geographic Entities) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-20

Geographic Presentation (see Introduction—Geographic Presentation of Data) . . . . . . . . . . . A-4

Guam (see Island Areas of the United States) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-20

Hawaiian Home Land (HHL) (see American Indian, Alaska Native, and Native Hawaiian Area) . . A-7

Hierarchical Presentation (see Introduction—Geographic Presentation of Data) . . . . . . . . . . . A-4

Incorporated Place (see Place; see County Subdivision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-21

Independent City (see County or Statistically Equivalent Entity; see Place) . . . . . . . . . . . . . . A-16

Independent Place (see County Subdivision; see Place) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-17

Internal Point (see Geographic Area Attributes) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-19

Introduction—Geographic Presentation of Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3

Inventory Presentation (see Introduction—Geographic Presentation of Data) . . . . . . . . . . . . . A-4

Island (see County or Statistically Equivalent Entity) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-16

Island Areas of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-20

Joint-Use Areas (see American Indian Area, Alaska Native Area, Hawaiian Home Land) . . . . . . A-7

Land Area (see Area Measurement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9

Legal/Statistical Area Description (see Geographic Area Attributes) . . . . . . . . . . . . . . . . . . . . . A-19

MAF/TIGER (Master Address File/Topologically Integrated Geographic Encoding and
    Referencing) Database . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-20

Metropolitan Division (see Core Based Statistical Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-15

Metropolitan Statistical Area (see Core Based Statistical Area) . . . . . . . . . . . . . . . . . . . . . . . . A-15

Micropolitan Statistical Area (see Core Based Statistical Area) . . . . . . . . . . . . . . . . . . . . . . . . A-15

Minor Civil Division (MCD) (see County Subdivision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-17

Municipality (see County or Statistically Equivalent Entity; see Place) . . . . . . . . . . . . . . . . . . . A-16

Municipio (see Puerto Rico; see County or Statistically Equivalent Entity) . . . . . . . . . . . . . . . . A-22

Names of Geographic Entities (see Geographic Area Attributes) . . . . . . . . . . . . . . . . . . . . . . . A-19

National Standard Feature Identifier (see Codes for Geographic Entities; see Geographic
    Names Information System [GNIS ID]) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13

New England City and Town Area (NECTA) (see Core Based Statistical Area) . . . . . . . . . . . . . . A-16

New England City and Town Area Division (see Core Based Statistical Area) . . . . . . . . . . . . . . A-16

Northern Mariana Islands (see Island Areas of the United States) . . . . . . . . . . . . . . . . . . . . . . A-20

Off-Reservation Trust Land (See American Indian, Alaska Native, and Native Hawaiian Area) . . . A-7

Oklahoma Tribal Statistical Area (OTSA) (see American Indian, Alaska Native, and
    Native Hawaiian Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8

Oklahoma Tribal Statistical Area (OTSA) Joint-Use Area (see American Indian, Alaska Native,
    and Native Hawaiian Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8

Outlying Areas (see Island Areas of the United States) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-20

Parish (see County or Statistically Equivalent Entity) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-16

Geographic Terms and Concepts

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

Place. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-21

Place Within Consolidated City (see Place) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-21

Population and Housing Unit Density . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22

Principal City (see Core Based Statistical Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-16

Public Use Microdata Area. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22

Puerto Rico . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22

Region (see Census Region) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12

Rural (see Urban and Rural) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

School District (Elementary, Secondary, and Unified) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-23

State or Statistically Equivalent Entity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-23

State Designated American Indian Statistical Area (SDAISA) (see American Indian,
   Alaska Native, and Native Hawaiian Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-5

State Designated Tribal Statistical Area (SDTSA) (see American Indian, Alaska Native,
   and Native Hawaiian Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-8

State Legislative District (Upper and Lower Chambers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-23

Subbarrio (see Puerto Rico) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22

Subminor Civil Division. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13

Town (see County Subdivision; see Place) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-17

Township (see County Subdivision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-17

Tract (see Census Tract) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12

Tribal Block Group (see Block Group). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-24

Tribal Census Tract (see Census Tract). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-24

Tribal Designated Statistical Area (TDSA) (see American Indian, Alaska Native,
   and Native Hawaiian Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9

Trust Land (see American Indian, Alaska Native, and Native Hawaiian Area) . . . . . . . . . . . . . . A-5

United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

United States Minor Outlying Islands (see Island Areas of the United States) . . . . . . . . . . . . A-20

United States Virgin Islands (see Island Areas of the United States) . . . . . . . . . . . . . . . . . . . . A-20

Unorganized Territory (see County Subdivision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-18

Urban (see Urban and Rural) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

Urban and Rural . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

Urban Cluster (UC) (see Urban and Rural) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

Urban Growth Area (UGA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-26

Urbanized Area (UA) (see Urban and Rural) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

Village (see Place). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-21

Voting District. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-26

Water Area (see Area Measurement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-9

ZIP Code (see ZIP Code Tabulation Area) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-26

ZIP Code Tabulation Area (ZCTA). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-26

Zona Urbana (see Puerto Rico) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-22

## INTRODUCTION

This document provides definitions of geographic terms and concepts as well as a description of the different methods used to present information for geographic entities in U.S. Census Bureau data products. This document contains definitions for all geographic area terms and concepts recognized by the Census Bureau and that may appear in any Census Bureau product presenting demographic and housing data (geographic terms and concepts unique to the economic census and other specialized surveys and censuses are not included in this document). **The inclusion of a particular term or concept in this**

**document does not imply that data for that geographic entity or attribute appear in each data product.** For instance, data for tribal census tracts and tribal block groups will appear only in products providing data according to the American Indian Nation-based geographic hierarchy (see Figure A-2). As another example, because urban areas are defined on the basis of decennial census population counts, data for urban areas do not appear in initial decennial census data products. In addition, the description of both the hierarchical and inventory approaches to presenting data for geographic entities does not imply that both formats are used in each data product.

## GEOGRAPHIC PRESENTATION OF DATA

In Census Bureau data products, geographic entities usually are presented in a hierarchical arrangement or as an inventory listing.

### Hierarchical Presentation

A hierarchical geographic presentation shows the geographic entities in a superior/subordinate structure. This structure is derived from the legal, administrative, or areal relationships of the entities. The hierarchical structure is depicted in report tables by means of indentation. For computer-readable media, the hierarchy is shown in the descriptive name applied to a summary level, with the hierarchy in order separated by hyphens. An example of hierarchical presentation is the census geographic hierarchy consisting of census block, within block group, within census tract, within place, within county subdivision, within county, within state. Graphically, this is shown as:

State
  County
    County subdivision
      Place (or part)
        Census tract (or part)
          Block group (or part)
            Block

Figure A–1, which is a diagram of the geographic hierarchy, presents this information as a series of nesting relationships. For example, a line joining the lower-level entity place and the higher-level entity state means that a place cannot cross a state boundary; a line linking census tract and county means that a census tract cannot cross a county line; and so forth. There is no implied hierarchy between different line tracks; for example, census tract nests within county, but it may cross a county subdivision boundary even though county subdivision also nests within county.

### Inventory Presentation

An inventory presentation of geographic entities is one in which all entities of the same type are shown in alphabetical, code, or geographic sequence, without reference to their hierarchical relationships. Generally, an inventory presentation shows totals for entities that may be split in a hierarchical presentation, such as place, census tract, or block group. An example of a series of inventory presentations is state, followed by all the counties in that state, followed by all the places in that state. Graphically, this is shown as:

State

County A
County B
County C

Place X
Place Y
Place Z

Geographic Terms and Concepts

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

**Nation-Based Hierarchies**

Exceptions to the standard hierarchical presentation occur for entities that do not necessarily nest within states, most notably American Indian, Alaska Native, and Native Hawaiian areas and core based statistical areas.

*American Indian, Alaska Native, and Native Hawaiian Area (AIANNHA) Hierarchy*

Because federally recognized American Indian areas can cross state lines, a separate American Indian, Alaska Native, and Native Hawaiian area (AIANNHA) hierarchy exists for these areas. For instance, the following American Indian entities can cross state lines: federally recognized American Indian reservations and/or off-reservation trust lands, tribal subdivisions, tribal designated statistical areas, tribal census tracts, and tribal block groups. National summary data for American Indian reservations or statistical areas may be presented as an alphabetical listing of names followed by the state portions of each area. Also, a tribal census tract or tribal block group may be located in more than one state or county. Data for tribal census tracts and tribal block groups are presented only in Census Bureau products utilizing the AIANNHA hierarchy and are not present in products utilizing the standard census geographic hierarchy.

The diagram in Figure A–2 shows geographic relationships among geographic entities in the AIANNHA hierarchy. It does not show the geographic levels county, county subdivision, and place, among others, because AIANNHAs do not necessarily nest within them.

## DEFINITIONS OF GEOGRAPHIC ENTITIES, TERMS, AND CONCEPTS

The definitions below are for geographic entities and concepts that the Census Bureau includes in its standard data products. Not all entities, terms, and concepts are shown in any one data product.

## AMERICAN INDIAN, ALASKA NATIVE, AND NATIVE HAWAIIAN AREA

There are both legal and statistical American Indian, Alaska Native, and Native Hawaiian areas (AIANNHAs) for which the Census Bureau provides data. The legal entities consist of federally recognized American Indian reservations and off-reservation trust land areas, the tribal subdivisions that can divide these entities, state-recognized American Indian reservations, Alaska Native regional corporations, and Hawaiian home lands. The statistical entities are Alaska Native village statistical areas, Oklahoma tribal statistical areas, tribal designated statistical areas, and state designated tribal statistical areas. Statistical tribal subdivisions can exist within Oklahoma tribal statistical areas. In all cases, these areas are mutually exclusive in that no AIANNHA can overlap another tribal entity, except for tribal subdivisions, which by definition subdivide some American Indian entities, and Alaska Native village statistical areas, which exist within Alaska Native regional corporations. In cases where more than one tribe claims jurisdiction over an area, the Census Bureau creates a joint-use area as a separate entity to define this area of dual claims. The following provides more detail about each of the various AIANNHAs.

**Legal Entities**

*Alaska Native regional corporations (ANRCs)* were created pursuant to the Alaska Native Claims Settlement Act (ANCSA) (Pub. L. 92–203, 85 Stat. 688 [1971]; 43 U.S.C. 1602 et seq. [2000]), enacted in 1971 as a "Regional Corporation" and organized under the laws of the state of Alaska to conduct both the for-profit and non-profit affairs of Alaska Natives within a defined region of Alaska. For the Census Bureau, ANRCs are considered legal geographic entities. Twelve ANRCs cover the entire state of Alaska except for the area within the Annette Island Reserve (a federally recognized American Indian reservation under the governmental authority of the Metlakatla Indian Community). A thirteenth ANRC represents Alaska Natives who do not live in Alaska and do not identify with any of the twelve corporations. The Census Bureau does not provide data for this thirteenth ANRC because it has no defined geographic extent and thus, it does not appear in the TIGER/Line® shapefiles. The Census Bureau offers representatives of the 12 nonprofit ANRCs in Alaska the opportunity to review and update the ANRC boundaries before each decennial census.

Each ANRC is assigned a five-digit numeric Federal Information Processing Series (FIPS) code and an eight-digit National Standard (ANSI) code.

*American Indian reservations—Federal (federal AIRs)* are areas that have been set aside by the United States for the use of tribes, the exterior boundaries of which are more particularly defined in the final tribal treaties, agreements, executive orders, federal statutes, secretarial orders, or judicial determinations. The Bureau of Indian Affairs maintains a list of all federally recognized tribal governments and makes final determination of the inventory of federal AIRs. The Census Bureau recognizes federal reservations (and associated off-reservation trust lands) as territory over which American Indian tribes have primary governmental authority. American Indian reservations can be legally described as colonies, communities, Indian colonies, Indian communities, Indian rancherias, Indian reservations, Indian villages, pueblos, rancherias, ranches, reservations, reserves, settlements, or villages. The Census Bureau contacts representatives of American Indian tribal governments to identify the boundaries for federal reservations through its annual Boundary and Annexation Survey. Federal reservations may cross state and all other area boundaries.

Each federal AIR is assigned a four-digit census code ranging from 0001 through 4799 in alphabetical order of AIR names nationwide. This nation-based census code is the primary unique identifier for the AIR. Each federal AIR also is assigned a five-digit Federal Information Processing Series (FIPS) code and an eight-digit National Standard (ANSI) code. Because FIPS codes are assigned in alphabetical sequence within each state, the FIPS code will be different in each state for reservations that include territory in more than one state.

*American Indian reservations—State (state AIRs)* are reservations established by some state governments for tribes recognized by the state. A governor-appointed state liaison provides the names and boundaries for state-recognized American Indian reservations to the Census Bureau. State reservations must be defined within a single state but may cross county and other types of boundaries. Each state AIR is assigned a four-digit census code ranging from 9000 through 9499. Each state AIR also is assigned a five-digit Federal Information Processing Series (FIPS) code and an eight-digit National Standard (ANSI) code. To further identify and differentiate state-recognized American Indian areas from those that are federally recognized, the text "(state)" is appended to the AIR name.

*American Indian tribal subdivisions*, described as additions, administrative areas, areas, chapters, county districts, communities, districts, or segments, are legal administrative subdivisions of federally recognized American Indian reservations and off-reservation trust lands or are statistical subdivisions of Oklahoma tribal statistical areas (OTSAs). These entities are internal units of self-government or administration that serve social, cultural, and/or economic purposes for the American Indians on the reservations, off-reservation trust lands, or OTSAs. The Census Bureau obtains the boundary and name information for tribal subdivisions from tribal governments. Each American Indian tribal subdivision is assigned a three-digit census code that is alphabetically in order and unique within each American Indian area, a five-digit Federal Information Processing Series (FIPS) code assigned alphabetically within state, and an eight-digit National Standard (ANSI) code. Because FIPS codes are assigned in alphabetical sequence within each state, the FIPS code will be different in each state for tribal subdivisions that include territory in more than one state. All the summary levels that include tribal subdivisions in the presentation hierarchy will only have records for the 24 American Indian areas and two OTSAs that actually have tribal subdivisions. The list of areas and four-digit census codes is:

Geographic Terms and Concepts

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

| Code | American Indian area |
|------|---------------------|
| 0335 | Bois Forte Reservation, MN |
| 0605 | Cheyenne River Reservation and Off-Reservation Trust Land. SD |
| 0855 | Crow Creek Reservation, SD |
| 0990 | Eastern Cherokee Reservation, NC |
| 1110 | Flathead Reservation, MT |
| 1150 | Fort Belknap Reservation and Off-Reservation Trust Land, MT |
| 1160 | Fort Berthold Reservation, ND |
| 1250 | Fort Peck Indian Reservation and Off-Reservation Trust Land, MT |
| 1310 | Gila River Indian Reservation, AZ |
| 1505 | Hopi Reservation and Off-Reservation Trust Land, AZ |
| 1830 | Lac Vieux Desert Reservation, MI |
| 1860 | Lake Traverse Reservation and Off-Reservation Trust Land, ND-SD |
| 2175 | Menominee Reservation, WI |
| 2430 | Navajo Nation Reservation and Off-Reservation Trust Land, AZ-NM-UT |
| 2490 | Northern Cheyenne Indian Reservation and Off-Reservation Trust Land, MT |
| 2810 | Pine Ridge Reservation, SD-NE |
| 3100 | Red Lake Reservation, MN |
| 3235 | Rosebud Indian Reservation and Off-Reservation Trust Land, SD |
| 3340 | Salt River Reservation, AZ |
| 3680 | Shakopee Mdewakanton Sioux Community, MN |
| 3935 | Spirit Lake Reservation, ND |
| 3970 | Standing Rock Reservation, SD-ND |
| 4200 | Tohono O'odham Nation Reservation and Off-Reservation Trust Land, AZ |
| 4290 | Tulalip Reservation and Off-Reservation Trust Land, WA |
| 5550 | Cherokee OTSA, OK |
| 5590 | Choctaw OTSA, OK |

*Hawaiian home lands (HHLs)* are areas held in trust for Native Hawaiians by the state of Hawaii, pursuant to the Hawaiian Homes Commission Act of 1920, as amended. The Census Bureau obtains the names and boundaries for HHLs from state officials. The names of the home lands are based on the traditional ahupua'a names of the Crown and government lands of the Kingdom of Hawaii from which the lands were designated or from the local name for an area. Being lands held in trust, HHLs are treated as equivalent to off-reservation trust land areas with the American Indian Trust Land/Hawaiian Home Land Indicator coded as "T." Each HHL is assigned a national four-digit census code ranging from 5000 through 5499 based on the alphabetical sequence of each HHL name, a five-digit Federal Information Processing Series (FIPS) code in alphabetical order within the state of Hawaii, and an eight-digit National Standard (ANSI) code.

*Joint-use areas*, as applied to any American Indian area by the Census Bureau, means an area that is administered jointly and/or claimed by two or more American Indian tribes. The Census Bureau designates legal joint-use areas as unique geographic entities equivalent to a reservation for the purpose of presenting statistical data. Each is assigned a national four-digit census code ranging from 4800 through 4999 based on the alphabetical sequence of each joint-use area name, a five-digit Federal Information Processing Series (FIPS) code in alphabetical order within state, and an eight-digit National Standard (ANSI) code. No joint-use areas exist in multiple states.

*Off-reservation trust lands* are areas for which the United States holds title in trust for the benefit of a tribe (tribal trust land) or for an individual American Indian (individual trust land). Trust lands can be alienated or encumbered only by the owner with the approval of the Secretary of the Interior or his/her authorized representative. Trust lands may be located on or off a reservation; however, the Census Bureau tabulates data only for off-reservation trust lands with the off-reservation trust lands always associated with a specific federally recognized reservation and/or tribal government. As for federally recognized reservations, the Census Bureau obtains the boundaries of off-reservation trust lands from American Indian

Geographic Terms and Concepts

A-7

tribal governments through its annual Boundary and Annexation Survey. The Census Bureau recognizes and tabulates data for reservations and off-reservation trust lands because American Indian tribes have primary governmental authority over these lands. The Census Bureau does not identify fee land (or land in fee simple status) or restricted fee lands as specific geographic areas.

Off-reservation trust lands are assigned a four-digit census code, a five-digit Federal Information Processing Series (FIPS) code, and an eight-digit National Standard (ANSI) code that is the same as that for the reservation with which they are associated. Trust lands associated with tribes that do not have a reservation are assigned unique codes. The census code is assigned by tribal name within the range 0001 through 4799, interspersed alphabetically among the reservation names. Because FIPS codes are assigned in alphabetical sequence within each state, the FIPS code will be different in each state for off-reservation trust lands that include territory in more than one state. In decennial census data tabulations, the American Indian Trust Land/Hawaiian Home Land Indicator uniquely identifies off-reservation trust lands, as well as reservation or statistical area only portions, Hawaiian home lands, and records that consist of the combination of reservation and off-reservation trust land territory.

## Statistical Entities

*Alaska Native village statistical areas (ANVSAs)* represent the more densely settled portion of Alaska Native villages (ANVs). The ANVs constitute associations, bands, clans, communities, groups, tribes, or villages recognized pursuant to the Alaska Native Claims Settlement Act of 1971 (Public Law 92-203). Because ANVs do not have boundaries that are easy to locate, the Census Bureau does not delimit ANVs. Instead, the Census Bureau presents statistical data for ANVSAs that represent the settled portion of ANVs. In addition, each ANVSA should include only an area where Alaska Natives, especially members of the defining ANV, represent a substantial proportion of the population during at least one season of the year. ANVSAs are delineated or reviewed by officials of the ANV or, if no ANV official chose to participate in the delineation process, officials of the Alaska Native Regional Corporation (ANRC) in which the ANV is located. An ANVSA may not overlap the boundary of another ANVSA or an American Indian reservation. Each ANVSA is alphabetically assigned a national four-digit census code ranging from 6000 through 7999, an alphabetically assigned state-based five-digit Federal Information Processing Series (FIPS) code, and an eight-digit National Standard (ANSI) code.

*Oklahoma tribal statistical areas (OTSAs)* are statistical entities identified and delineated by the Census Bureau in consultation with federally recognized American Indian tribes that had a former reservation in Oklahoma. The boundary of an OTSA will be that of the former reservation in Oklahoma, except where modified by agreements with neighboring tribes for statistical data presentation purposes. Each OTSA is alphabetically assigned a national four-digit census code ranging from 5500 through 5899, an alphabetically assigned state-based five-digit Federal Information Processing Series (FIPS) code, and an eight-digit National Standard (ANSI) code. Tribal subdivisions are allowed within OTSAs and exist for the 2010 Census in the Cherokee and Choctaw OTSAs.

*Oklahoma tribal statistical area (OTSA) Joint-Use Areas*, as applied to OTSAs by the Census Bureau, means an area that is administered jointly and/or claimed by two or more American Indian tribes that have a delineated OTSA. The Census Bureau designates statistical joint-use areas as unique geographic entities for the purpose of presenting statistical data. Only Oklahoma tribal statistical areas have statistical joint-use areas. Each Oklahoma tribal joint-use area is alphabetically assigned a national four-digit census code ranging from 5900 through 5999, an alphabetically assigned state-based five-digit Federal Information Processing Series (FIPS) code, and an eight-digit National Standard (ANSI) code.

*State designated tribal statistical areas (SDTSAs—referred to as State Designated American Indian Statistical Areas for Census 2000)* are statistical entities for state-recognized American Indian tribes that do not have a state-recognized land base (reservation). SDTSAs are identified and delineated for the Census Bureau by a state liaison identified by the governor's office in each state. SDTSAs generally encompass a compact and contiguous area that contains a concentration of people who identify with a

Geographic Terms and Concepts

state-recognized American Indian tribe and in which there is structured or organized tribal activity. An SDTSA may not be located in more than one state and it may not include area within any other American Indian, Alaska Native, or Native Hawaiian area. Each SDTSA is alphabetically assigned a four-digit census code ranging from 9500 through 9998, an alphabetically assigned state-based five-digit Federal Information Processing Series (FIPS) code, and an eight-digit National Standard (ANSI) code.

*Tribal designated statistical areas (TDSAs)* are statistical entities identified and delineated for the Census Bureau by federally recognized American Indian tribes that do not currently have a federally recognized land base (reservation or off-reservation trust land). A TDSA generally encompasses a compact and contiguous area that contains a concentration of individuals who identify with a federally recognized American Indian tribe and in which there is structured or organized tribal activity. A TDSA may be located in more than one state (although none do for 2010), but it may not include area within any other American Indian, Alaska Native, or Native Hawaiian area. Each TDSA is alphabetically assigned a four-digit census code ranging from 8000 through 8999, an alphabetically assigned state-based five-digit Federal Information Processing Series (FIPS) code, and an eight-digit National Standard (ANSI) code.

**American Indian, Alaska Native, and Native Hawaiian Area (AIANNHA) Codes**—AIANNHAs are represented in Census Bureau products using a national four-character numeric census code field and a single alphabetic character American Indian trust land/Hawaiian home land indicator field. The census codes are assigned in alphabetical order in assigned ranges by AIANNHA type nationwide, except that joint-use areas appear at the end of the code range. Off-reservation trust lands are assigned the same code as the reservation with which they are associated. Trust lands associated with tribes that do not have a reservation are assigned codes based on tribal name. Federal Information Processing Series (FIPS) codes for all AIANNHAs range from 00001 through 89999, without differentiation among the many types of areas.

The type of AIANNHA can be identified either by the census code or by the FIPS class code. The range of census codes allocated to each AIANNHA and the valid FIPS class code(s) associated with each are as follows:

| AIANNHA type | Census code range | Valid FIPS class code(s)* |
|---|---|---|
| Federal American Indian reservation (AIR)/off-reservation trust land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0001 to 4799 | D1, D2, D3, D5, D8 |
| Joint-use federal AIR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4800 to 4999 | D0 |
| Hawaiian home land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5000 to 5499 | F1 |
| Oklahoma tribal statistical area (OTSA) . . . . . . . . . . . . . . . . . . . . . | 5500 to 5899 | D6 |
| Joint-use OTSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5900 to 5999 | D0 |
| Alaska Native village statistical area (ANVSA) . . . . . . . . . . . . . . . . | 6000 to 7999 | E1 |
| Tribal designated statistical area (TDSA) . . . . . . . . . . . . . . . . . . . . | 8000 to 8999 | D6 |
| State AIR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9000 to 9499 | D4 |
| State designated tribal statistical area (SDTSA) . . . . . . . . . . . . . . . | 9500 to 9998 | D9 |

| AIANNHA type | American Indian, Alaska Native, Native Hawaiian area indicator |
|---|---|
| Hawaiian home land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | T |
| American Indian reservation including associated off-reservation trust land . . . . . . . . . . . . . . . . . . . . . . . . | M |
| American Indian reservation or statistical entity only . . . . . . . . . . | R |
| Off-reservation trust land only . . . . . . . . . . . . . . . . . . . . . . . . . | T |

  * Refer to the Data Dictionary for specific value descriptions.

## AREA MEASUREMENT

Area measurement data provide the size, in square units (metric and nonmetric) of geographic entities for which the Census Bureau tabulates and disseminates data. Area is calculated from the specific boundary

recorded for each entity in the Census Bureau's geographic database (see "MAF/TIGER Database"). The Census Bureau provides area measurement data for both land area and water area. The water area figures include inland, coastal, Great Lakes, and territorial sea water. Inland water consists of any lake, reservoir, pond, or similar body of water that is recorded in the Census Bureau's geographic database. It also includes any river, creek, canal, stream, or similar feature that is recorded in that database as a two-dimensional feature (rather than as a single line). The portions of the oceans and related large embayments (such as Chesapeake Bay and Puget Sound), the Gulf of Mexico, and the Caribbean Sea that belong to the United States and its territories are classified as coastal and territorial waters; the Great Lakes are treated as a separate water entity. Rivers and bays that empty into these bodies of water are treated as inland water from the point beyond which they are narrower than 1 nautical mile across. Identification of land and inland, coastal, territorial, and Great Lakes waters is for data presentation purposes only and does not necessarily reflect their legal definitions.

Land and water area measurements may disagree with the information displayed on Census Bureau maps and in the MAF/TIGER database because, for area measurement purposes, hydrologic features identified as intermittent water, glacier, or swamp are reported as land area. The water area measurement reported for some geographic entities includes water that is not included in any lower-level geographic entity. Therefore, because water is contained only in a higher-level geographic entity, summing the water measurements for all the component lower-level geographic entities will not yield the water area of that higher-level entity. This occurs, for example, where water is associated with a county but is not within the legal boundary of any county subdivision. The accuracy of any area measurement data is limited by the accuracy inherent in (1) the location and shape of the various boundary information in the MAF/TIGER database, (2) the identification, and classification of water bodies coupled with the location and shapes of the shorelines of water bodies in that database, and (3) rounding affecting the last digit in all operations that compute and/or sum the area measurements.

## BLOCK

**Blocks (Census Blocks)** are statistical areas bounded by visible features, such as streets, roads, streams, and railroad tracks, and by nonvisible boundaries, such as selected property lines and city, township, school district, and county limits and short line-of-sight extensions of streets and roads. Generally, census blocks are small in area; for example, a block in a city bounded on all sides by streets. Census blocks in suburban and rural areas may be large, irregular, and bounded by a variety of features, such as roads, streams, and transmission lines. In remote areas, census blocks may encompass hundreds of square miles. Census blocks cover the entire territory of the United States, Puerto Rico, and the Island Areas. Census blocks nest within all other tabulated census geographic entities and are the basis for all tabulated data.

**Census Block Numbers**—Census blocks are numbered uniquely with a four-digit census block number from 0000 to 9999 within census tract, which nest within state and county. The first digit of the census block number identifies the block group. Block numbers beginning with a zero (in Block Group 0) are only associated with water-only areas.

## BLOCK GROUP

**Block Groups (BGs)** are statistical divisions of census tracts, are generally defined to contain between 600 and 3,000 people, and are used to present data and control block numbering. A block group consists of clusters of blocks within the same census tract that have the same first digit of their four-digit census block number. For example, blocks 3001, 3002, 3003, . . ., 3999 in census tract 1210.02 belong to BG 3 in that census tract. Most BGs were delineated by local participants in the Census Bureau's Participant Statistical Areas Program. The Census Bureau delineated BGs only where a local or tribal government declined to participate, and a regional organization or State Data Center was not available to participate.

A BG usually covers a contiguous area. Each census tract contains at least one BG, and BGs are uniquely numbered within the census tract. Within the standard census geographic hierarchy, BGs never cross state, county, or census tract boundaries but may cross the boundaries of any other geographic entity. Tribal

census tracts and tribal BGs are separate and unique geographic areas defined within federally recognized American Indian reservations and can cross state and county boundaries (see "Tribal Census Tract" and "Tribal Block Group"). The tribal census tracts and tribal block groups may be completely different from the census tracts and block groups defined by state and county.

**Block Group Codes**—BGs have a valid code range of 0 through 9. BGs beginning with a zero only contain water area and are generally in coastal and Great Lakes water and territorial seas, but also in larger inland water bodies. For the 2010 Census, a block group 0 for the water portion can be delineated in any census tract and not just those census tracts also defined to only include water area. This is a change from Census 2000, when block groups coded 0 only existed in census tracts with a code of 0. To differentiate between county-based block groups and tribal block groups, the codes for tribal block groups use an alphabetic character (see "Tribal Block Group").

## BOUNDARY CHANGES

Many of the legal and statistical entities for which the Census Bureau tabulates decennial census data have had boundary changes between Census 2000 and the 2010 Census; that is, between January 1, 2000, and January 1, 2010. Boundary changes to legal entities result from:

1. Annexations to or detachments from legally established governmental units.

2. Mergers or consolidations of two or more governmental units.

3. Establishment of new governmental units.

4. Disincorporations or disorganizations of existing governmental units.

5. Changes in treaties or executive orders and governmental action placing additional lands in trust.

6. Decisions by federal, state, and local courts.

7. Redistricting for congressional districts and state legislative districts.

8. Ancillary changes to legal or statistical areas as a result of annexations and detachments; for example, reduction of territory for a census designated place as the result of an annexation by an adjacent incorporated place.

9. Changes to correct errors or more accurately place boundaries relative to visible features.

10. Changes to statistical areas as the result of concept or criteria changes.

All legal boundaries used for the 2010 Census are those reported to the Census Bureau to be in effect as of January 1, 2010. The statistical area boundaries also reflect a January 1, 2010, date for delineation. The legal boundaries are collected through various surveys and programs: the Boundary and Annexation Survey, Redistricting Data Program, and the School District Review Program. There is a Geographic Change User Note Indicator in data files that identifies entities for which there have been changes to boundaries or data attributes (for example, legal/statistical area description or code) between the two censuses.

Statistical entity boundaries generally are reviewed by local, state, or tribal governments and can have changes to adjust boundaries to visible features to better define the geographic area each encompasses or to account for shifts and changes in the population distribution within an area. Where statistical areas have a relationship to legal area boundaries, complementary updates occur; for example, removing territory from a census designated place if annexed to an incorporated place or contracting a tribal designated statistical area if the area is added to an American Indian reservation.

The historical counts shown for states, counties, county subdivisions, places, American Indian, Alaska Native, and Native Hawaiian areas, and other areas are not updated for boundary changes and thus, reflect the population and housing units in each entity as delineated at the time of each decennial census.

## CENSUS DIVISION

**Census Divisions** are groupings of states and the District of Columbia that are subdivisions of the four census regions (see "Census Region"). There are nine census divisions, and each is identified by a single-digit census code. Puerto Rico and the Island Areas are not part of any census region or census division. For a list of all census regions, census divisions, and their constituent states, see Figure A–3.

## CENSUS REGION

**Census Regions** are groupings of states and the District of Columbia that subdivide the United States for the presentation of census data. There are four census regions—Northeast, Midwest, South, and West. Each of the four census regions is divided into two or more census divisions (see "Census Division"). Each census region is identified by a single-digit census code. Puerto Rico and the Island Areas are not part of any census region or census division. For a list of all census regions, census divisions, and their constituent states, see Figure A–3.

## CENSUS TRACT

**Census Tracts** are small, relatively permanent statistical subdivisions of a county or equivalent entity that are updated by local participants prior to each decennial census as part of the Census Bureau's Participant Statistical Areas Program. The Census Bureau delineates census tracts in situations where no local participant existed or where state, local, or tribal governments declined to participate. The primary purpose of census tracts is to provide a stable set of geographic units for the presentation of statistical data.

Census tracts generally have a population size between 1,200 and 8,000 people, with an optimum size of 4,000 people. A census tract usually covers a contiguous area; however, the spatial size of census tracts varies widely depending on the density of settlement. Census tract boundaries are delineated with the intention of being maintained over a long time so that statistical comparisons can be made from census to census. Census tracts occasionally are split due to population growth or merged as a result of substantial population decline.

Census tract boundaries generally follow visible and identifiable features. They may follow nonvisible legal boundaries, such as minor civil division (MCD) or incorporated place boundaries in some states and situations, to allow for census-tract-to-governmental-unit relationships where the governmental boundaries tend to remain unchanged between censuses. State and county boundaries always are census tract boundaries in the standard census geographic hierarchy. Tribal census tracts are a unique geographic entity defined within federally recognized American Indian reservations and off-reservation trust lands and can cross state and county boundaries. Tribal census tracts may be completely different from the census tracts and block groups defined by state and county (see "Tribal Census Tract").

**Census Tract Codes and Numbers**—Census tracts are identified by an up to four-digit integer number and may have an optional two-digit suffix; for example 1457.02 or 23. The census tract codes consist of six digits with an implied decimal between the fourth and fifth digit corresponding to the basic census tract number but with leading zeroes and trailing zeroes for census tracts without a suffix. The tract number examples above would have codes of 145702 and 002300, respectively.

Some ranges of census tract numbers in the 2010 Census are used to identify distinctive types of census tracts. The code range in the 9400s is used for those census tracts with a majority of population, housing, or land area associated with an American Indian area and matches the numbering used in Census 2000. The code range in the 9800s is new for 2010 and is used to specifically identify special land-use census tracts; that is, census tracts defined to encompass a large area with little or no residential population with special characteristics, such as large parks or employment areas. The range of census tracts in the 9900s represents census tracts delineated specifically to cover large bodies of water. This is different from Census 2000 when water-only census tracts were assigned codes of all zeroes (000000); 000000 is no longer used as a census tract code for the 2010 Census.

Geographic Terms and Concepts

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

The Census Bureau uses suffixes to help identify census tract changes for comparison purposes. Census tract suffixes may range from .01 to .98. As part of local review of existing census tracts before each census, some census tracts may have grown enough in population size to qualify as more than one census tract. When a census tract is split, the split parts usually retain the basic number but receive different suffixes. For example, if census tract 14 is split, the new tract numbers would be 14.01 and 14.02. In a few counties, local participants request major changes to, and renumbering of, the census tracts; however, this is generally discouraged. Changes to individual census tract boundaries usually do not result in census tract numbering changes.

**Tribal Census Tracts in American Indian Areas**—The Census Bureau introduced the concept of tribal census tracts for the first time for Census 2000. Tribal census tracts for that census consisted of the standard county-based census tracts tabulated within American Indian areas, thus allowing for the tracts to ignore state and county boundaries for tabulation. The Census Bureau assigned the 9400 range of numbers to identify specific tribal census tracts; however, not all tribal census tracts used this numbering scheme. For the 2010 Census, tribal census tracts no longer are tied to or numbered in the same way as the county-based census tracts (see "Tribal Census Tract").

## CODES FOR GEOGRAPHIC ENTITIES

The Census Bureau and other federal agencies assign codes to geographic entities to facilitate the organization, presentation, and exchange of statistical data and other information. Geographic entity codes allow for the unambiguous identification of individual entities, generally within a specific, higher-level geographic entity (for example, county codes are assigned uniquely within each state). For geographic entities that have names (such as states, counties, places, county subdivisions, urban areas, and metropolitan and micropolitan statistical areas), codes generally are assigned alphabetically based on name.

Census Bureau data products contain several types of geographic entity codes:  Federal Information Processing Series (FIPS), American National Standards Institute (ANSI), and Census Bureau codes.

*Federal Information Processing Series (FIPS)*—These are codes formerly known as Federal Information Processing Standards codes, until the National Institute of Standards and Technology (NIST) announced its decision in 2005 to remove geographic entity codes from its oversight. The Census Bureau continues to maintain and issue codes for geographic entities covered under FIPS oversight, albeit with a revised meaning for the FIPS acronym. Geographic entities covered under FIPS include states, counties, congressional districts, core based statistical areas, places, county subdivisions, subminor civil divisions, consolidated cities, and all types of American Indian, Alaska Native, and Native Hawaiian areas. FIPS codes are assigned alphabetically according to the name of the geographic entity and may change to maintain alphabetic sort when new entities are created or names change. FIPS codes for specific geographic entity types are usually unique within the next highest level of geographic entity with which a nesting relationship exists. For example, FIPS state, congressional district, and core based statistical area codes are unique within nation; FIPS county, place, county subdivision, and subminor civil division codes are unique within state. The codes for American Indian, Alaska Native, and Native Hawaiian areas also are unique within state; those areas in multiple states will have different codes for each state.

*American National Standards Institute (ANSI)*—With the removal of geographic entities from Federal Information Processing Standards oversight, the Census Bureau and other federal agencies have sought American National Standards Institute (ANSI) oversight authority for geographic entity codes. These codes are referred to as "National Standard" codes in some Census Bureau products. Geographic entities covered under ANSI include states, counties, congressional districts, core based statistical areas and related statistical areas, places, county subdivisions, consolidated cities, subminor civil divisions, and all types of American Indian, Alaska Native, and Native Hawaiian areas—Alaska Native regional corporations, Alaska Native village statistical areas, American Indian reservation and off-reservation trust lands, American

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

Indian tribal subdivisions, Hawaiian home lands, Oklahoma tribal statistical areas, state designated tribal statistical areas, and tribal designated statistical areas.

*Relationship between FIPS and ANSI codes*—Geographic entities for which NIST formerly provided Federal Information Processing Standards oversight will continue to be referred to as FIPS (Federal Information Processing Series) codes in some Census Bureau data products, despite the Census Bureau having sought ANSI oversight authority. These geographic entities include states, counties, congressional districts, and core based statistical areas and related statistical areas. The Census Bureau continues to maintain and issue codes for these entities following the same structure and without change to existing codes, except when necessary to maintain alphabetic sorting based on names of entities. The Census Bureau also continues to maintain and issue five-digit FIPS codes (formerly FIPS 55) for places, county subdivisions, consolidated cities, subminor civil divisions, Alaska Native Regional Corporations, and all types of American Indian, Alaska Native, and Native Hawaiian areas but is not seeking ANSI oversight authority for these entity codes. The U.S. Geological Survey has ANSI oversight authority for its Geographic Names Information System identifier (GNIS ID), which has been adopted as a National Standard (NS) code for states, counties, places, county subdivisions, subminor civil divisions, consolidated cities, Alaska Native Regional Corporations, and all types of American Indian, Alaska Native, and Native Hawaiian areas. The Census Bureau will include the GNIS ID for these entities in its data products, portrayed as an eight-digit character numeric code and identified as "ANSI." NS codes (GNIS IDs) will not sort geographic entities in alphabetical order based on name or title, as is the case with FIPS codes.

*Census Bureau codes*—The Census Bureau assigns and issues codes for a number of geographic entities for which FIPS or ANSI codes are not available, and sometimes in addition to FIPS and ANSI codes. Geographic entities for which census codes are assigned and issued in Census Bureau data products include regions, divisions, census tracts, block groups, census blocks, urban areas, and all types of American Indian, Alaska Native, and Native Hawaiian areas. Some codes—voting district, state legislative district, and school district—use standards established by the states—or for school districts, the U.S. Department of Education.

## CONGRESSIONAL DISTRICT

**Congressional Districts** are the 435 areas from which people are elected to the U.S. House of Representatives. After the apportionment of congressional seats among the states based on decennial census population counts, each state with multiple seats is responsible for establishing congressional districts for the purpose of electing representatives. Each congressional district is to be as equal in population to all other congressional districts in a state as practicable. For the District of Columbia, Puerto Rico, and each Island Area, a separate code is used to identify the entire areas of these state-equivalent entities as having a single nonvoting delegate.

**Congressional District Codes**—Congressional districts are identified by a two-character numeric Federal Information Processing Series (FIPS) code numbered uniquely within state. The District of Columbia, Puerto Rico, and the Island Areas have code 98 assigned identifying their nonvoting delegate status with respect to representation in Congress:

    01 to 53—Congressional district codes
    00—At large (single district for state)
    98—Nonvoting delegate

## CONSOLIDATED CITY

**Consolidated City**—A consolidated government is a unit of local government for which the functions of an incorporated place and its county or minor civil division (MCD) have merged. This action results in both the primary incorporated place and the county or MCD continuing to exist as legal entities, even though the county or MCD performs few or no governmental functions and has few or no elected officials. Where this occurs—and where one or more other incorporated places in the county or MCD continue to function as separate governments, even though they have been included in the consolidated government—the

Geographic Terms and Concepts

primary incorporated place is referred to as a consolidated city. The Census Bureau classifies the separately incorporated places within the consolidated city as place entities and creates a separate place (balance) record for the portion of the consolidated city not within any other place.

**Consolidated City (Balance) Portions** refer to the areas of a consolidated city not included in another separately incorporated place. For example, Butte-Silver Bow, MT, is a consolidated city (former Butte city and Silver Bow County) that includes the separately incorporated municipality of Walkerville city. The area of the consolidated city that is not in Walkerville city is assigned to Butte-Silver Bow (balance). The name always includes the "(balance)" identifier (see "Place").

## CORE BASED STATISTICAL AREAS AND RELATED STATISTICAL AREAS

**Core Based Statistical Areas (CBSAs)** consist of the county or counties or equivalent entities associated with at least one core (urbanized area or urban cluster) of at least 10,000 population, plus adjacent counties having a high degree of social and economic integration with the core as measured through commuting ties with the counties associated with the core. The general concept of a CBSA is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core. The term "core based statistical area" became effective in 2003 and refers collectively to metropolitan statistical areas and micropolitan statistical areas. The U.S. Office of Management and Budget (OMB) defines CBSAs to provide a nationally consistent set of geographic entities for the United States and Puerto Rico for use in tabulating and presenting statistical data. Current CBSAs are based on application of the 2000 standards (published in the *Federal Register* of December 27, 2000) with Census 2000 data. The first set of areas defined based on the 2000 standards were announced on June 6, 2003; subsequent updates have been made to the universe of CBSAs and related statistical areas. No CBSAs are defined in the Island Areas. Statistical areas related to CBSAs include metropolitan divisions, combined statistical areas (CSAs), New England city and town areas (NECTAs), NECTA divisions, and combined NECTAs.

**Combined New England City and Town Areas (Combined NECTAs)** consist of two or more adjacent New England city and town areas (NECTAs) that have substantial employment interchange. The NECTAs that combine to create a combined NECTA retain separate identities within the larger combined NECTA. Because combined NECTAs represent groupings of NECTAs, they should not be ranked or compared with individual NECTAs.

**Combined Statistical Areas (CSAs)** consist of two or more adjacent CBSAs that have substantial employment interchange. The CBSAs that combine to create a CSA retain separate identities within the larger CSA. Because CSAs represent groupings of metropolitan and/or micropolitan statistical areas, they should not be ranked or compared with individual metropolitan and micropolitan statistical areas.

**Metropolitan Divisions** are smaller groupings of counties or equivalent entities defined within a metropolitan statistical area containing a single core with a population of at least 2.5 million. Not all metropolitan statistical areas with urbanized areas of this size will contain metropolitan divisions. A metropolitan division consists of one or more main/secondary counties that represent an employment center or centers, plus adjacent counties associated with the main/secondary county or counties through commuting ties. Because metropolitan divisions represent subdivisions of larger metropolitan statistical areas, it is not appropriate to rank or compare metropolitan divisions with metropolitan and micropolitan statistical areas. It would be appropriate to rank and compare metropolitan divisions.

**Metropolitan Statistical Areas** are CBSAs associated with at least one urbanized area that has a population of at least 50,000. The metropolitan statistical area comprises the central county or counties or equivalent entities containing the core, plus adjacent outlying counties having a high degree of social and economic integration with the central county or counties as measured through commuting.

**Micropolitan Statistical Areas** are CBSAs associated with at least one urban cluster that has a population of at least 10,000 but less than 50,000. The micropolitan statistical area comprises the central

county or counties or equivalent entities containing the core, plus adjacent outlying counties having a high degree of social and economic integration with the central county or counties as measured through commuting.

**New England City and Town Areas (NECTAs)** are an alternative set of geographic entities, similar in concept to the county-based CBSAs defined nationwide, that OMB defines in New England based on county subdivisions—usually cities and towns. NECTAs are defined using the same criteria as county-based CBSAs, and, similar to CBSAs, NECTAs are categorized as metropolitan or micropolitan.

**New England City and Town Area (NECTA) Divisions** are smaller groupings of cities and towns defined within a NECTA containing a single core with a population of at least 2.5 million. A NECTA division consists of a main city or town that represents an employment center, plus adjacent cities and towns associated with the main city or town through commuting ties. Each NECTA division must contain a total population of 100,000 or more. Because NECTA divisions represent subdivisions of larger NECTAs, it is not appropriate to rank or compare NECTA divisions with NECTAs. It would be appropriate to rank and compare NECTA divisions.

**Principal Cities** of a CBSA (or NECTA) include the largest incorporated place with a population of at least 10,000 in the CBSA, or if no incorporated place of at least 10,000 population is present in the CBSA, the largest incorporated place or census designated place (CDP) in the CBSA. Principal cities also include any additional incorporated place or CDP with a population of at least 250,000 or in which 100,000 or more persons work; any additional incorporated place or CDP with a population of at least 50,000 and in which the number of jobs meets or exceeds the number of employed residents; and any additional incorporated place or CDP with a population of at least 10,000 but less than 50,000 and at least one-third the population size of the largest place and in which the number of jobs meets or exceeds the number of employed residents. Note that there are some places designated as principal cities of NECTAs that are not principal cities of a CBSA.

**Core Based Statistical Area Codes**—Metropolitan statistical areas, micropolitan statistical areas, NECTAs, metropolitan divisions, and NECTA divisions are identified using a five-digit numeric code that is assigned alphabetically based on title and is unique within the nation. The combined statistical area and combined NECTAs are identified using a three-digit numeric code, also assigned alphabetically based on title and unique within the nation. Codes, length, and ranges are:

| CBSA entity | Length | Range* |
|---|---|---|
| Metropolitan statistical area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Five digits | 10000–49999 |
| Micropolitan statistical area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Five digits | 10000–49999 |
| Metropolitan division . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Five digits | 10004–49994 |
| New England city and town area (NECTA) . . . . . . . . . . . . . . . . . . | Five digits | 70000–79999 |
| NECTA division . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Five digits | 70004–79994 |
| Combined statistical area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Three digits | 100–599 |
| Combined NECTA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | Three digits | 700–799 |

\* Metropolitan divisions and NECTA divisions are distinguished from metropolitan and micropolitan statistical areas and NECTAs by codes that end in "4." Metropolitan and micropolitan statistical areas and NECTAs cannot end in "4."

## COUNTY OR STATISTICALLY EQUIVALENT ENTITY

The primary legal divisions of most states are termed counties. In Louisiana, these divisions are known as parishes. In Alaska, which has no counties, the equivalent entities are the organized boroughs, city and boroughs, municipalities, and census areas; the latter of which are delineated cooperatively for statistical purposes by the state of Alaska and the Census Bureau. In four states (Maryland, Missouri, Nevada, and Virginia), there are one or more incorporated places that are independent of any county organization and thus constitute primary divisions of their states. These incorporated places are known as independent cities and are treated as equivalent entities for purposes of data presentation. The District of Columbia

Geographic Terms and Concepts

and Guam have no primary divisions, and each area is considered an equivalent entity for purposes of data presentation. All of the counties in Connecticut and Rhode Island and nine counties in Massachusetts were dissolved as functioning governmental entities; however, the Census Bureau continues to present data for these historical entities in order to provide comparable geographic units at the county level of the geographic hierarchy for these states and represents them as nonfunctioning legal entities in data products. The Census Bureau treats the following entities as equivalents of counties for purposes of data presentation: municipios in Puerto Rico, districts and islands in American Samoa, municipalities in the Commonwealth of the Northern Mariana Islands, and islands in the U.S. Virgin Islands. Each county or statistically equivalent entity is assigned a three-character numeric Federal Information Processing Series (FIPS) code based on alphabetical sequence that is unique within state and an eight-digit National Standard feature identifier.

## COUNTY SUBDIVISION

**County Subdivisions** are the primary divisions of counties and equivalent entities. They include census county divisions, census subareas, minor civil divisions, and unorganized territories and can be classified as either legal or statistical. Each county subdivision is assigned a five-character numeric Federal Information Processing Series (FIPS) code based on alphabetical sequence within state and an eight-digit National Standard feature identifier.

### Legal Entities

*Minor civil divisions (MCDs)* are the primary governmental or administrative divisions of a county in many states (parishes in Louisiana) and the county equivalents in Puerto Rico and the Island Areas. MCDs in the United States, Puerto Rico, and the Island Areas represent many different kinds of legal entities with a wide variety of governmental and/or administrative functions. MCDs include areas variously designated as barrios, barrios-pueblo, boroughs, charter townships, commissioner districts, election districts, election precincts, gores, grants, locations, magisterial districts, parish governing authority districts, plantations, purchases, reservations, supervisor's districts, towns, and townships. The Census Bureau recognizes MCDs in 29 states, Puerto Rico, and the Island Areas. The District of Columbia has no primary divisions and is considered equivalent to an MCD for statistical purposes. (It is also considered a state equivalent and a county equivalent.)  The 29* states in which MCDs are recognized are:

| | | |
|---|---|---|
| Arkansas | Michigan | Ohio |
| Connecticut | Minnesota | Pennsylvania |
| Illinois | Mississippi | Rhode Island |
| Indiana | Missouri | South Dakota |
| Iowa | Nebraska | Tennessee |
| Kansas | New Hampshire | Vermont |
| Louisiana | New Jersey | Virginia |
| Maine | New York | West Virginia |
| Maryland | North Carolina | Wisconsin |
| Massachusetts | North Dakota | |

* Tennessee, a state with statistical census county divisions (CCDs) in 2000, reverted to MCDs in 2008.

In some states, all or some incorporated places are not part of any MCD; these places are termed independent places. Independent places also serve as primary legal subdivisions and have a Federal Information Processing Series (FIPS) county subdivision code and National Standard (ANSI) code that is the same as the FIPS and ANSI place code. In nine states—Maine, Massachusetts, New Hampshire, New Jersey, North Dakota, Pennsylvania, Rhode Island, South Dakota, and Wisconsin—all incorporated places are independent places. In other states, incorporated places are part of, or dependent within, the MCDs in which they are located, or the pattern is mixed—some incorporated places are independent of MCDs and others are included within one or more MCDs.

The MCDs in 12 states (Connecticut, Maine, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Wisconsin) also serve as general-purpose local governments that can perform the same governmental functions as incorporated places. The Census Bureau presents data for these MCDs in all data products for which place data are provided.

In New York and Maine, American Indian reservations (AIRs) generally exist outside the jurisdiction of any town (MCD) and thus also serve as the equivalent of MCDs for purposes of data presentation.

In states with MCDs, the Census Bureau assigns a default FIPS county subdivision code of 00000 and ANSI code of eight zeroes in some coastal, territorial sea, and Great Lakes water where county subdivisions do not legally extend into the Great Lakes or out to the 3-mile limit.

### Statistical Entities

*Census county divisions (CCDs)* are areas delineated by the Census Bureau in cooperation with state, tribal, and local officials for statistical purposes. CCDs have no legal function and are not governmental units. CCD boundaries usually follow visible features and usually coincide with census tract boundaries. The name of each CCD is based on a place, county, or well-known local name that identifies its location. CCDs exist where:

1.  There are no legally established MCDs.

2.  The legally established MCDs do not have governmental or administrative purposes.

3.  The boundaries of the MCDs change frequently.

4.  The MCDs are not generally known to the public.

CCDs exist within the following 20* states:

| | | |
|---|---|---|
| Alabama | Hawaii | Oregon |
| Arizona | Idaho | South Carolina |
| California | Kentucky | Texas |
| Colorado | Montana | Utah |
| Delaware | Nevada | Washington |
| Florida | New Mexico | Wyoming |
| Georgia | Oklahoma | |

   * Tennessee, a CCD state in 2000, reverted to a MCD state in 2008.

*Census subareas* are statistical subdivisions of boroughs, city and boroughs, municipalities, and census areas, all of which are statistical equivalent entities for counties in Alaska. The state of Alaska and the Census Bureau cooperatively delineate the census subareas to serve as the statistical equivalents of MCDs.

*Unorganized territories (UTs)* are defined by the Census Bureau in nine MCD states where portions of counties or equivalent entities are not included in any legally established MCD or incorporated place. The Census Bureau recognizes such separate pieces of territory as one or more separate county subdivisions for census purposes. It assigns each unorganized territory a descriptive name, followed by the designation "UT" and a county subdivision FIPS and ANSI code. The following states have unorganized territories:

| | | |
|---|---|---|
| Arkansas | Maine | North Carolina |
| Indiana | Minnesota | North Dakota |
| Iowa | New York | South Dakota |

## GEOGRAPHIC AREA ATTRIBUTES

The Census Bureau collects and maintains information describing selected attributes and characteristics of geographic areas. These attributes are Federal Information Processing Series (FIPS) class code, functional status, legal/statistical area description, internal point, and name of geographic entities.

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

*FIPS class codes* describe the general characteristics of a geographic area related to its legal or statistical status, governmental status, and in some cases relationship to other geographic entities. Class codes exist for counties; county subdivisions; subminor civil divisions; places; consolidated cities; Alaska Native Regional Corporations; American Indian, Alaska Native, and Native Hawaiian areas; and American Indian tribal subdivisions.

*Functional status* describes whether a geographic entity is a functioning governmental unit, has an inactive government, is an administrative area without a functioning government, or is a statistical area identified and defined solely for tabulation and presentation of statistical data. Functional status codes are:

A   Active government providing primary general-purpose functions.

B   Active government that is partially consolidated with another government but with separate officials providing primary general-purpose functions.

C   Active government consolidated with another government with a single set of officials.

E   Active government providing special-purpose functions.

F   Fictitious entity created to fill the Census Bureau's geographic hierarchy.

G   Active government that is subordinate to another unit of government and thus, not considered a functioning government.

I   Inactive governmental unit that has the power to provide primary special-purpose functions.

N   Nonfunctioning legal entity.

S   Statistical entity.

*Internal point*—The Census Bureau calculates an internal point (latitude and longitude coordinates) for each geographic entity. For many geographic entities, the internal point is at or near the geographic center of the entity. For some irregularly shaped entities (such as those shaped like a crescent), the calculated geographic center may be located outside the boundaries of the entity. In such instances, the internal point is identified as a point inside the entity boundaries nearest to the calculated geographic center and, if possible, within a land polygon.

*Legal/statistical area description (LSAD)*—The LSAD describes the particular typology for each geographic entity; that is, whether the entity is a borough, city, county, town, or township, among others. For legal entities, the LSAD reflects the term that appears in legal documentation pertaining to the entity, such as a treaty, charter, legislation, resolution, or ordinance. For statistical entities, the LSAD is the term assigned by the Census Bureau or other agency defining the entity. The LSAD code is a two-character field that corresponds to a description of the legal or statistical type of entity and identifies whether the LSAD term should be capitalized and should precede or follow the name of the geographic entity. Note that the same LSAD code is assigned to entities at different levels of the geographic hierarchy when they share the same LSAD. For example, the Census Bureau assigns the same LSAD code ("21") to boroughs in New York and Connecticut, although they are county subdivisions in the former and incorporated places in the latter.

*Name*—Each geographic entity included in Census Bureau products has a name. For most geographic entities, the name is derived from the official legally recognized name, is assigned by local officials participating in Census Bureau statistical area programs, or is based on component entities and determined according to specified criteria. For legal entities, the name appearing in Census Bureau products may be the more commonly used name rather than the name as it appears in legal documents. For example, "Virginia" instead of "the Commonwealth of Virginia"; "Baltimore" instead of "City of Baltimore."  In some instances, the name for an entity in Census Bureau products will reflect the official name as well as a more commonly used name listed parenthetically; i.e., San Buenaventura (Ventura), CA, or Bath (Berkeley Springs), WV. For some types of geographic entities, the name reflected in Census Bureau products may be the geographic entity code assigned by local officials. For example, a census tract's name

is the actual number assigned by local officials, such as 1.01, whereas the census tract code would reflect a full four-digit base code and two-digit suffix (for example, for the preceding tract named 1.01, 000101).

## GEOGRAPHIC NAMES INFORMATION SYSTEM

The Geographic Names Information System (GNIS) is the federal standard for geographic nomenclature. The U.S. Geological Survey (USGS) developed the GNIS for the U.S. Board on Geographic Names as the official repository of domestic geographic names data; the official vehicle for geographic names use by all departments of the federal government; and the source for applying geographic names to federal electronic and printed products. The GNIS contains information about physical and cultural geographic features of all types in the United States and its territories, current and historical, but not including roads and highways. The database holds the federally recognized name of each feature and defines the feature location by state, county, USGS topographic map, and geographic coordinates. Other attributes include names or spellings other than the official name, feature designations, feature classification, historical and descriptive information, and, for some categories, the geometric boundaries.

## GEOGRAPHIC NAMES INFORMATION SYSTEM IDENTIFIER

The Geographic Names Information System Identifier (GNIS ID) is a variable length, permanent, numeric identifier of up to ten digits in length that identifies each entity uniquely within the nation. The GNIS is the new American National Standards Institute (ANSI) national standard code for several entity types. Because each entity's GNIS ID is permanent, it will not change if the entity changes its name or if creation of a new entity changes the alphabetic sort. (Federal Information Processing Series codes are assigned based on the alphabetic sorting of entity names within a state and occasionally require changing codes to maintain the alphabetic sort.)  The GNIS IDs are assigned sequentially and stored in a right-justified, variable-length, numeric field without leading zeroes. The GNIS now contains more than 2.6 million sequential records, thus no GNIS ID currently exceeds seven digits. The Census Bureau portrays the GNIS ID in its data products as a fixed-width eight-character field with leading zeroes.

## ISLAND AREAS OF THE UNITED STATES

The Island Areas of the United States are American Samoa, Guam, the Commonwealth of the Northern Mariana Islands (Northern Mariana Islands), and the United States Virgin Islands.

The Census Bureau treats the Island Areas as entities that are statistically equivalent to states for data presentation purposes; data for the Island Areas, however, are presented separately from data for the United States and Puerto Rico. Geographic definitions specific to the Island Areas are shown in the appropriate publications and documentation that accompany the data products for the Island Areas. Sometimes the Island Areas are referred to as "Island Territories" or "Insular Areas."  For the 1990 and previous censuses, the U.S. Census Bureau referred to the entities as "Outlying Areas."

Separate from the Island Areas is the term "U.S. Minor Outlying Islands."  The U.S. Minor Outlying Islands refers to certain small islands under U.S. jurisdiction in the Caribbean and Pacific: Baker Island, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Islands, Navassa Island, Palmyra Atoll, and Wake Island. These areas usually are not part of standard data products.

## MAF/TIGER DATABASE

MAF/TIGER is an acronym for the Master Address File/Topologically Integrated Geographic Encoding and Referencing system or database. It is a digital (computer-readable) geographic database that automates the mapping and related geographic activities required to support the Census Bureau's census and survey programs. The Census Bureau developed the TIGER® system to automate the geographic support processes needed to meet the major geographic needs of the 1990 census: producing cartographic products to support data collection and map presentations, providing geographic structure for tabulation and dissemination of the collected statistical data, assigning residential and employer addresses to the

Geographic Terms and Concepts

correct geographic location and relating those locations to the geographic entities used for data tabulation, and so forth. During the 1990s, the Census Bureau developed an independent Master Address File (MAF) to support field operations and allocation of housing units for tabulations. After Census 2000, both the address-based MAF and geographic TIGER® databases merged to form MAF/TIGER. The content of the MAF/TIGER database is undergoing continuous updates and is made available to the public through a variety of TIGER/Line® shapefiles.

## PLACE

**Incorporated Places** are those reported to the Census Bureau as legally in existence as of January 1, 2010, as reported in the latest Boundary and Annexation Survey (BAS), under the laws of their respective states. An incorporated place is established to provide governmental functions for a concentration of people as opposed to a minor civil division, which generally is created to provide services or administer an area without regard, necessarily, to population. Places always are within a single state or equivalent entity, but may extend across county and county subdivision boundaries. An incorporated place usually is a city, town, village, or borough, but can have other legal descriptions. For Census Bureau data tabulation and presentation purposes, incorporated places exclude:

- Boroughs in Alaska (treated as statistical equivalents of counties).
- Towns in the New England states, New York, and Wisconsin (treated as MCDs).
- Boroughs in New York (treated as MCDs).

**Census Designated Places (CDPs)** are the statistical counterparts of incorporated places, and are delineated to provide data for settled concentrations of population that are identifiable by name but are not legally incorporated under the laws of the state in which they are located. The boundaries usually are defined in cooperation with local or tribal officials and generally updated prior to each decennial census. These boundaries, which usually coincide with visible features or the boundary of an adjacent incorporated place or another legal entity boundary, have no legal status, nor do these places have officials elected to serve traditional municipal functions. CDP boundaries may change from one decennial census to the next with changes in the settlement pattern; a CDP with the same name as in an earlier census does not necessarily have the same boundary. CDPs must be contained within a single state and may not extend into an incorporated place. There are no population size requirements for CDPs.

Hawaii is the only state that has no incorporated places recognized by the Census Bureau. All places shown in decennial census data products for Hawaii are CDPs. By agreement with the state of Hawaii, the Census Bureau does not show data separately for the city of Honolulu, which is coextensive with Honolulu County. In Puerto Rico, which also does not have incorporated places, the Census Bureau recognizes only CDPs and refers to them as comunidades or zonas urbanas. Guam also has only CDPs.

**Place Codes** are of two types. The five-digit Federal Information Processing Series (FIPS) place code is assigned based on alphabetical sequence within a state. If place names are duplicated within a state and they represent distinctly different areas, a separate code is assigned to each place name alphabetically by the primary county in which each place is located, or if both places are in the same county, they are assigned alphabetically by their legal descriptions (for example, "city" before "village"). Places also are assigned an eight-digit National Standard (ANSI) code.

**Dependent and Independent Places** refers to the relationship of places to the county subdivisions. Depending on the state, incorporated places are either dependent within, or independent of, county subdivisions, or there is a mixture of dependent and independent places in the state and in a county. Dependent places are part of the county subdivision; the county subdivision code of the place is the same as that of the underlying county subdivision(s) but is different from the place code. Independent places are not part of any minor civil division (MCD) and serve as primary county subdivisions. The independent place FIPS code usually is the same as that used for the MCD for the place. The only exception is if the place is independent of the MCDs in a state (Iowa, Louisiana, Maryland, Nebraska, North Carolina, and

Geographic Terms and Concepts

A-21

Virginia) in which the FIPS MCD codes are in the 90000 range. Then, the FIPS MCD and FIPS place codes will differ. CDPs always are dependent within county subdivisions and all places are dependent within statistical county subdivisions.

**Consolidated City (Balance) Portions** refer to the areas of a consolidated city not included in another separately incorporated place. For example, Butte-Silver Bow, MT, is a consolidated city (former Butte city and Silver Bow County) that includes the separately incorporated municipality of Walkerville city. The area of the consolidated city that is not in Walkerville city is assigned to Butte-Silver Bow (balance). The name of the area of a consolidated city not specifically within a separately incorporated place always includes the "(balance)" identifier. Balance portions of consolidated cities are included with other places in Census Bureau products.

## POPULATION AND HOUSING UNIT DENSITY

Population and housing unit density are computed by dividing the total population or number of housing units within a geographic entity by the land area of that entity measured in square miles or in square kilometers. Density is expressed as "population per square mile (kilometer)" or "housing units per square mile (kilometer)."

## PUBLIC USE MICRODATA AREAS

**Public Use Microdata Areas (PUMAs)** are geographic areas for which the Census Bureau provides selected extracts of raw data from a small sample of census records that are screened to protect confidentiality. These extracts are referred to as public use microdata sample (PUMS) files.

For the 2010 Census, each state, the District of Columbia, Puerto Rico, and some Island Area participants delineated PUMAs for use in presenting PUMS data based on a 5 percent sample of decennial census and American Community Survey data. These areas are required to contain at least 100,000 people. This is different from Census 2000 when two types of PUMAs were defined: a 5 percent PUMA as for 2010 and an additional super-PUMA designed to provide a 1 percent sample. The PUMAs are identified by a five-digit census code unique within state.

## PUERTO RICO

The Census Bureau treats the Commonwealth of Puerto Rico as the statistical equivalent of a state for data presentation purposes.

### Municipio

The primary legal divisions of Puerto Rico are termed "municipios." For data presentation purposes, the Census Bureau treats a municipio as the equivalent of a county in the United States.

### Barrio, Barrio-Pueblo, and Subbarrio

The Census Bureau recognizes barrios and barrios-pueblo as the primary legal divisions of municipios. These entities are similar to the minor civil divisions (MCDs) used for reporting data in 29 states of the United States. Subbarrios in 23 municipios are the primary legal subdivisions of the barrios-pueblo and some barrios. The Census Bureau presents the same types of statistical data for these subminor civil divisions (sub-MCDs) as it does for the barrios and barrios-pueblo. (There is no geographic entity in the United States equivalent to the subbarrio.)

### Zona Urbana and Comunidad

There are no incorporated places in Puerto Rico; instead, the Census Bureau provides data for two types of census designated places (CDPs): zonas urbanas, representing the governmental center of each municipio, and comunidades, representing other settlements. There are no minimum population size requirements for zonas urbanas and comunidades.

Geographic Terms and Concepts

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

Some types of geographic entities do not apply in Puerto Rico. For instance, Puerto Rico is not in any census region or census division (see also "Congressional District").

## SCHOOL DISTRICTS (ELEMENTARY, SECONDARY, AND UNIFIED)

**School Districts** are geographic entities within which state, county, local officials, the Bureau of Indian Affairs, or the U.S. Department of Defense provide public educational services for the area's residents. The Census Bureau obtains the boundaries, names, local education agency codes, and school district levels for school districts from state and local school officials for the primary purpose of providing the U.S. Department of Education with estimates of the number of children "at risk" within each school district, county, and state. This information serves as the basis for the Department of Education to determine the annual allocation of Title I funding to states and school districts.

The Census Bureau tabulates data for three types of school districts: elementary, secondary, and unified. Each school district is assigned a five-digit code that is unique within state. School district codes are the local education agency number assigned by the Department of Education and are not necessarily in alphabetical order by school district name.

The elementary school districts provide education to the lower grade/age levels and the secondary school districts provide education to the upper grade/age levels. Unified school districts provide education to children of all school ages in their service areas. In general, where there is a unified school district, no elementary or secondary school district exists; and where there is an elementary school district, the secondary school district may or may not exist.

The Census Bureau's representation of school districts in various data products is based both on the grade range that a school district operates and also the grade range for which the school district is financially responsible. For example, a school district is defined as an elementary school district if its operational grade range is less than the full kindergarten through 12 or prekindergarten through 12 grade range (for example, K–6 or pre-K–8). These elementary school districts do not provide direct educational services for grades 7–12, 9–12, or similar ranges. Some elementary school districts are financially responsible for the education of all school-aged children within their service areas and rely on other school districts to provide service for those grade ranges that are not operated by these elementary school districts. In these situations, in order to allocate all school-aged children to these school districts, the secondary school district code field is blank. For elementary school districts where the operational grade range and financially responsible grade range are the same, the secondary school district code field will contain a secondary school district code. There are no situations where an elementary school district does not exist and a secondary school district exists in Census Bureau records.

## STATE OR STATISTICALLY EQUIVALENT ENTITY

**States and Equivalent Entities** are the primary governmental divisions of the United States. In addition to the 50 states, the Census Bureau treats the District of Columbia, Puerto Rico, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, and the U.S. Virgin Islands as the statistical equivalents of states for the purpose of data presentation.

## STATE LEGISLATIVE DISTRICTS (UPPER AND LOWER CHAMBERS)

**State Legislative Districts (SLDs)** are the areas from which members are elected to state legislatures. The Census Bureau first reported data for SLDs as part of the 2000 Public Law (P.L.) 94-171 Redistricting Data File.

**Current SLDs (2010 Election Cycle)**—States participating in Phase 1 of the 2010 Census Redistricting Data Program voluntarily provided the Census Bureau with the 2006 election cycle boundaries, codes, and, in some cases, names for their SLDs. All 50 states, plus the District of Columbia and Puerto Rico, participated in Phase 1, State Legislative District Project (SLDP) of the 2010 Census Redistricting Data

Program. States subsequently provided legal changes to those plans through the Redistricting Data Office and/or corrections as part of Phase 2 of the 2010 Census Redistricting Data Program, as needed.

The SLDs embody the upper (senate—SLDU) and lower (house—SLDL) chambers of the state legislature. Nebraska has a unicameral legislature and the District of Columbia has a single council, both of which the Census Bureau treats as upper-chamber legislative areas for the purpose of data presentation. A unique three-character census code, identified by state participants, is assigned to each SLD within a state. In Connecticut, Hawaii, Illinois, Louisiana, Maine, Massachusetts, New Jersey, Ohio, and Puerto Rico, state officials did not define the SLDs to cover all of the state or state equivalent area (usually bodies of water). In these areas with no SLDs defined, the code "ZZZ" has been assigned, which is treated within state as a single SLD for purposes of data presentation. Maryland also has areas with no SLDs defined; in Maryland, these areas are coded with an initial "Z" by county or equivalent and treated as a unique SLD by county or equivalent. In Nebraska and the District of Columbia, the Census Bureau assigned the code 999 to represent a single SLDL where legally none exist.

**SLD Names**—The Census Bureau first reported names for SLDs as part of Phase 1 of the 2010 Census Redistricting Data Program. The SLD names with their translated legal/statistical area description are associated only with the current SLDs. Not all states provided names for their SLDs, therefore the code (or number) also serves as the name.

## TRIBAL BLOCK GROUP

The 2010 tribal block group concept and criteria are completely different from those used in 2000. For the Census 2000, tribal block groups were the standard state-county-census tract-block group areas retabulated under an American Indian area hierarchy; that is, American Indian area-tribal census tract-tribal block group. Tribal block groups only were applicable to legal federally recognized American Indian reservation and off-reservation trust land areas. Tribal block groups were defined to provide statistically significant sample data for small areas within American Indian areas, particularly those American Indian areas that crossed state or county boundaries where these boundaries were not meaningful for statistical purposes. The 2000 tribal block group used the block group numbers and comprised all blocks beginning with a single number.

The 2010 tribal block groups are defined independently of the standard county-based block group delineation. For federally recognized American Indian tribes with reservations or off-reservation trust land and a population less than 1,200, a single tribal block group is defined. Tribal participants in qualifying areas with a population greater than 1,200 could define additional block groups within their reservation and/or off-reservation trust land without regard to the standard block group configuration.

Tribal block groups will contain blocks beginning with the same number as the standard county-based block group and could contain seemingly duplicate block numbers. To better identify and differentiate tribal block groups from county-based block groups, tribal block groups use the letter range A through K (except "I," which could be confused with a number "1") to identify and code the tribal block group. Tribal block groups nest within tribal census tract.

## TRIBAL CENSUS TRACT

The 2010 tribal census tract concept and criteria are completely different from those used in 2000. Tribal census tracts (also known as tribal tracts) in 2000 were the standard state-county-census tract areas retabulated under an American Indian area hierarchy; that is, American Indian area-tribal census tract. Federally recognized tribes with a reservation or off-reservation trust land delineated tribal census tracts working with local census tract participants to produce a single census tract plan. Tribal census tracts were designed to be permanent statistical divisions of American Indian areas for the presentation of comparable data between censuses, particularly for those American Indian areas that crossed state or county boundaries where these boundaries were not meaningful for statistical purposes.

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

For 2010, tribal census tracts are defined independently of the standard county-based tract delineation. For federally recognized American Indian tribes with reservations or off-reservation trust land and a population less than 2,400, a single tribal census tract is defined. Qualifying areas with a population greater than 2,400 could define additional tribal census tracts within their area.

In 2000, the tract number range of 9400 through 9499 was reserved for tribal census tracts and was required for those tribal census tracts that crossed state or county boundaries. Not all tribal census tracts in 2000, however, used this range. For 2010, tribal census tract codes will be six characters long with a leading "T" alphabetic character followed by five numeric codes having an implied decimal between the fourth and fifth character; for example, T01000, which translates as tribal census tract 10. Tribal block groups will nest within tribal census tract. Since individual blocks are defined within the standard state-county-census tract hierarchy, a tribal census tract can contain seemingly duplicate block numbers, thus tribal census tracts cannot be used to uniquely identify census blocks.

## UNITED STATES

The United States consists of the 50 states and the District of Columbia.

## URBAN AND RURAL

For the 2010 Census, the Census Bureau classified as urban all territory, population, and housing units located within urbanized areas (UAs) and urban clusters (UCs), both defined using the same criteria.  The Census Bureau delineates UA and UC boundaries that represent densely developed territory, encompassing residential, commercial, and other nonresidential urban land uses. In general, this territory consists of areas of high population density and urban land use resulting in a representation of the "urban footprint." Rural consists of all territory, population, and housing units located outside UAs and UCs.

For the 2010 Census, the urban and rural classification was applied to the 50 states, the District of Columbia, Puerto Rico, American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, and the U.S. Virgin Islands.

**Urbanized Areas (UAs)**—An urbanized area consists of densely developed territory that contains 50,000 or more people.  The Census Bureau delineates UAs to provide a better separation of urban and rural territory, population, and housing in the vicinity of large places.

**Urban Clusters (UCs)**—An urban cluster consists of densely developed territory that has at least 2,500 people but fewer than 50,000 people.  The Census Bureau first introduced the UC concept for Census 2000 to provide a more consistent and accurate measure of urban population, housing, and territory throughout the United States, Puerto Rico, and the Island Areas.

**Urban Area Titles and Codes**—The title of each UA and UC may contain up to three incorporated place or census designated place (CDP) names and will include the two-letter U.S. Postal Service abbreviation for each state or statistically equivalent entity into which the UA or UC extends.  However, if the UA or UC does not contain an incorporated place or CDP, the urban area title will include the single name of a minor civil division or populated place recognized by the U.S. Geological Survey's Geographic Names Information System.

Each UC and UA is assigned a five-digit numeric census code based on a national alphabetical sequence of all urban area names.  A separate flag is included in data tabulation files to differentiate between UAs and UCs.  In printed reports, this differentiation is included in the name.

**Central Place**—The 2010 Census urban areas will no longer include one or more designated central places. In preceding censuses, the central place included all incorporated or census designated places included in the urban area title, plus additional incorporated areas that met a population size criterion. The concept of central place for urban areas no longer is being applied.

**Relationship to Other Geographic Entities**—Geographic entities, such as metropolitan areas, counties, minor civil divisions, places, and census tracts, often contain both urban and rural territory, population, and housing units.

## URBAN GROWTH AREAS

**Urban Growth Areas (UGAs)** are legally defined entities in Oregon and Washington that the Census Bureau includes in the MAF/TIGER database in agreement with the states. UGAs, which are defined around incorporated places, are used to regulate urban growth. UGA boundaries, which need not follow visible features, are delineated cooperatively by state and local officials and then confirmed in state law. UGAs are a pilot project first defined only in Oregon for Census 2000. Each UGA is identified by a five-digit numeric census code, usually the same as the five-digit Federal Information Processing Series (FIPS) code associated with the incorporated place for which the UGA is named.

## VOTING DISTRICTS

**Voting Districts (VTDs)** refer to the generic name for geographic entities, such as precincts, wards, and election districts, established by state governments for the purpose of conducting elections. States voluntarily participating in Phase 2 of the 2010 Census Redistricting Data Program provided the Census Bureau with boundaries, codes, and names for their VTDs. Each VTD is identified by a one-to-six-character alphanumeric census code that is unique within county. The code "ZZZZZZ" identifies a portion of counties (usually bodies of water) for which no VTDs were identified. For the 2010 Census, only Rhode Island did not participate in Phase 2 (the Voting District/Block Boundary Suggestion Project) of the 2010 Census Redistricting Data Program. Kentucky chose not to provide VTDs as part of their participation in Phase 2, and the states of Montana and Oregon provided VTDs for some counties. Therefore, for 2010 Census data products, no VTDs exist in select counties in Montana and Oregon or for the states of Rhode Island and Kentucky in their entirety. Participating states often submitted VTDs conforming to the feature network in the MAF/TIGER database rather than the complete legal boundary of the VTD. If requested by the participating state, the Census Bureau identified the VTDs that represent an actual voting district with an "A" in the voting district indicator field. Where a participating state indicated that the VTD has been modified to follow existing features, the VTD is a pseudo-VTD, and the voting district indicator contains "P."

## ZIP CODE TABULATION AREAS

**ZIP Code Tabulation Areas (ZCTAs)** are approximate area representations of U.S. Postal Service (USPS) five-digit ZIP Code service areas that the Census Bureau creates using whole blocks to present statistical data from censuses and surveys. The Census Bureau defines ZCTAs by allocating each block that contains addresses to a single ZCTA, usually to the ZCTA that reflects the most frequently occurring ZIP Code for the addresses within that tabulation block. Blocks that do not contain addresses but are completely surrounded by a single ZCTA (enclaves) are assigned to the surrounding ZCTA; those surrounded by multiple ZCTAs will be added to a single ZCTA based on limited buffering performed between multiple ZCTAs. The Census Bureau identifies five-digit ZCTAs using a five-character numeric code that represents the most frequently occurring USPS ZIP Code within that ZCTA, and this code may contain leading zeros.

There are significant changes to the 2010 ZCTA delineation from that used in 2000. Coverage was extended to include the Island Areas for 2010 so that the United States, Puerto Rico, and the Island Areas have ZCTAs. Unlike 2000, when areas that could not be assigned to a ZCTA were given a generic code ending in "XX" (land area) or "HH" (water area), for 2010 there is no universal coverage by ZCTAs, and only legitimate five-digit areas are defined. The 2010 ZCTAs will better represent the actual Zip Code service areas because the Census Bureau initiated a process before creation of 2010 blocks to add block boundaries that split polygons with large numbers of addresses using different Zip Codes.

Data users should not use ZCTAs to identify the official USPS ZIP Code for mail delivery. The USPS makes periodic changes to ZIP Codes to support more efficient mail delivery. The ZCTAs process used primarily residential addresses and was biased towards Zip Codes used for city-style mail delivery, thus there may be Zip Codes that are primarily nonresidential or boxes only that may not have a corresponding ZCTA.

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

Figure A–1.
## Standard Hierarchy of Census Geographic Entities



* Refer to the "Hierarchy of American Indian, Alaska Native, and Native Hawaiian Areas"

Figure A–2.
**Hierarchy of American Indian, Alaska Native, and Native Hawaiian Areas**



Geographic Terms and Concepts

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File

Figure A–3.

**Census Regions, Census Divisions, and Their Constituent States**

**Northeast Region**

*New England Division:*
Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut

Middle Atlantic Division:
New York, New Jersey, Pennsylvania

**Midwest Region**

*East North Central Division:*
Ohio, Indiana, Illinois, Michigan, Wisconsin

*West North Central Division:*
Minnesota, Iowa, Missouri, North Dakota, South Dakota, Nebraska, Kansas

**South Region**

*South Atlantic Division:*
Delaware, Maryland, District of Columbia, Virginia, West Virginia, North Carolina, South Carolina, Georgia, Florida

*East South Central Division:*
Kentucky, Tennessee, Alabama, Mississippi

*West South Central Division:*
Arkansas, Louisiana, Oklahoma, Texas

**West Region**

*Mountain Division:*
Montana, Idaho, Wyoming, Colorado, New Mexico, Arizona, Utah, Nevada

*Pacific Division:*
Washington, Oregon, California, Alaska, Hawaii

U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File