IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

ALBERTO PATINO, MARIA DEL ROSARIO
MARTINEZ, MARIA MARI, RODOLFO R.
TENREIRO, PATRICIA GONZALES


      Plaintiffs,

v.

CITY OF PASADENA, Mayor JOHNNY
 ISBELL, Council members ORNALDO
YBARRA, BRUCE LEAMON, DON
HARRISON, PAT VAN HOUTE, CODY
RAY WHEELER, PHIL CAYTEN, STEVE
COTE, and DARRELL MORRISON.


      Defendants.


**<u>EXPERT WITNESS REPORT OF RICHARD L. ENGSTROM, Ph.D.</u>**

RICHARD L. ENGSTROM, acting in accordance with 28 U.S.C. § 1746, Fed. R. Civ. P.

26(a)(2)(B), and Fed. R. Evid. 702 and 703, does hereby declare and say:

      1.     My name is Richard L. Engstrom and I am a resident of Chapel Hill, North

Carolina.  I am a Research Associate at the Center for the Study of Race, Ethnicity, and Gender

in the Social Sciences and a Visiting Fellow in the Social Science Research Institute at Duke

University.  I am also a member of the Graduate Faculty in political science at Duke.

      2.     I started my work at Duke in 2008.  Prior to that, from August of 2006 through

2007, I was employed as a consultant at the Center for Civil Rights at the School of Law,

University of North Carolina at Chapel Hill.  I am a former Research Professor of Political

107

Science and Endowed Professor of Africana Studies at the University of New Orleans, where I was employed from August 1971 to May 2006. I have served two terms as the Chairperson of the Representation and Electoral Systems Section of the American Political Science Association (1993-1995, 1995-1997) and served as a member of the Executive Council for that section from 1993 to 2007. A copy of my curriculum vitae is attached as an Appendix to this report.

3.      I have done extensive research into the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice. The results of my research on this topic have been published in the *American Political Science Review*, *Journal of Politics*, *Western Political Quarterly*, *Legislative Studies Quarterly*, *Social Science Quarterly*, *Journal of Law and Politics*, *St. Louis University Public Law Review, Electoral Studies*, *Representation*, *Publius*, and other journals and books. Three articles authored or co-authored by me were cited with approval in *Thornburg v. Gingles*, 478 U.S. 30 (1986), the U.S. Supreme Court decision interpreting amended Section 2 of the Voting Rights Act. *See* 478 U.S. at 46 n.11, 48 n.15, 53 n.20, 55, 71. I am the co-author, with Mark A. Rush, of *Fair and Effective Representation? Debating Electoral Reform and Minority Rights* (Lanham, MD: Rowman and Littlefield Publishers, Inc. 2001). The attached curriculum vitae contains a list of all of my publications.

4.      I also have testified as an expert witness in numerous cases in federal and state courts across the United States. Since 2009, inclusive, I have testified at trial and/or been deposed in the following cases: *Benavidez v. Irving Independent School District* (N.D. Tex. 2009), *United States v. Euclid City School District Board of Education* (N.D. Ohio 2009), *Texas Latino Redistricting Task Force v. Perry* (W.D. Tex. 2011), *Committee for a Fair and Balanced Map v. Illinois State Board of Elections* (N.D. Ill. 2011), *Egolf v. Duran* (N.M. 1st Judicial Dist.

Ct. Santa Fe Cnty. 2011), *Texas v. United States* (D.D.C. 2012), *Fabela v. City of Farmers Branch* (N.D. Tex. 2012), *Romo v. Detzner* (Fla. 2d Judicial Cir. Leon Cnty. 2013), *Montes v. City of Yakima* (E.D. Wash. 2014), *Benavidez v. Irving Independent School District* (N.D. Tex. 2014), *Rodriguez v. Grand Prairie Independent School District* (N.D. Tex. 2014), *Texas Latino Redistricting Task Force v. Perry* (W.D. Tex. 2014), *Hall* v. *State of Louisiana* (M.D. La. 2014), and *Missouri State Conference of the National Association for the Advancement of Colored People v. Ferguson-Florissant School District and St Louis County Board of Election Commissioners* (E.D. Mo. 2015). I have also testified by deposition as a fact witness in *Backus v. South Carolina* (D.S.C. 2012).

5.      I have reviewed Rule 702 of the Federal Rules of Evidence. As I understand that rule, I am an expert in election systems and their impact on minority voters. I am being compensated at a rate of $400 an hour for my work on this case.

6.      Attorneys for the Plaintiffs have asked me to identify whether there are features of the new at-large Pasadena City Council elections that enhance the dilutive potential of those elections. They also have asked me to analyze the extent to which, if any, the candidate preferences of Latino voters and the other voters in the City of Pasadena electorate, as revealed by their voting behavior, have been characterized by "racially polarized voting," and to do the same for their votes cast on ballot Proposition 1 in 2013 that resulted in the city's new election system to elect the members of its city council, which was used for the first time in the 2015 election.

## PASADENA CITY COUNCIL ELECTION SYSTEM

7.      Proposition 1 changed the city's councilmanic election system. Prior to its adoption the city elected all eight of its council members from single member districts. The new

3

109

structure reduces the number of single member districts from eight to six.  In addition, two positions on the council were switched from being elected by single-member districts to being elected at-large.  This is known as the "6-2" system.

8.      The Pasadena City Council consists of eight members.   Nonpartisan elections are used to elect the Council, with a majority vote required for election.  The new at-large elections in Pasadena however contain a feature that enhances the ability of the non-Latino voters in the city to control which candidates win both of the at-large seats.   Latinos would have a better opportunity to win an at-large seat under an alternative at-large system used by many cities.  In this system all the candidates for those seats would be required to compete together, with voters allocated as many votes as at-large seats to be filled.  The seats would then be awarded to a number of candidates equal to the number of seats based on a plurality vote rule, i.e., the top N vote recipients among the candidates win the N seats.

9.      Under this arrangement, members of a minority group that is a quantitative minority may employ the "single shot" voting strategy to improve the chances for their representative of choice to finish among the top N candidates and win a seat.  Single shot voting entails group members casting one vote, if they wish, for the candidate favored by the group, and not casting any of their remaining votes for any other candidate.  By withholding their remaining votes from the candidates competing with their preferred choice, their representative of choice has a better chance to finish among the top N candidates and win one of the N seats.  Given that the citizen voting age population in Pasadena, as estimated by Plaintiffs' Expert in Demography, David Ely, is 45.87 percent Latino, allowing single-shot voting could provide Latinos with a reasonable opportunity to elect a representative of their choice to one of the at-large seats.

10.     The arrangement for electing the new at-large seats in Pasadena precludes the use of single-shot voting however.  The city has chosen to elect those seats through a place system, combined with a majority vote rule for determining the winning candidates.  This precludes single-shot voting and is widely recognized to enhance the potential dilutive effect of an at-large system on minority voters.[1]  Candidates for these seats do not all compete together for the seats. Rather the two seats are contested separately.  Candidates for an at-large position on the council file for one of the particular places and compete only with the other candidates that file for that same place.  Each voter may cast only one vote between or among the candidates for each place. This of course precludes employing the single-shot voting strategy.  In addition, a candidate must win a majority of the votes cast in these citywide elections in order to win the seat.[2]  If no candidate receives a majority of the votes in the initial election then a runoff election is held between the top two vote recipients.  This of course advantages the majority group of voters in the city.

### RACIALLY POLARIZED VOTING

11.     I have been asked to analyze the extent to which, if any, the candidate preferences of Latino voters and the other voters in the City of Pasadena electorate, as revealed by their voting behavior, have been characterized by "racially polarized voting" (hereinafter RPV).  The Supreme Court has defined that term to refer to "a consistent relationship between [the] race of the voter and the way in which the voter votes," or alternatively, voters within a protected

---

[1] See, e.g., *Fabela* v. *City of Farmers Branch, TX* (2012 U.S. Dist. LEXIS 108086, at 59-60, N.D. TX 2012, August 2, 2012), and also Richard L. Engstrom and Michael D. McDonald, "'Enhancing' Factors in At-Large Plurality and Majority Systems: A Reconsideration," *Electoral Studies* 12 (December 1993), 385-401.

[2] PASADENA, TEX., CODE OF ORDINANCES, CHARTER, art. IV, § 2 (1983).

111

minority group vote differently that the other voters.[3]   The elections to be analyzed for this purpose are this year's elections to the city council in Pasadena, and elections to Harris County offices since 2008 in which all registered voters in Pasadena could vote.  The elections analyzed are, to my knowledge, all such elections presenting voters with a choice between or among Latino and non-Latino candidates.  Elections with this type of candidate pool are generally considered the most probative for assessing RPV when Latinos are the minority at issue in a case.[4]   In the elections for county offices, only the votes cast in the Pasadena precincts are analyzed.  In addition, Proposition 1, which was on the ballot in Pasadena in 2013, has been analyzed for racially polarized voting as well.

### METHODS AND DATA

12.     The data used in the analyses of the candidate preferences of Latino and non-Latino voters include the numbers of votes cast for the various candidates in each of the precincts in Pasadena used in the respective elections, and the racial composition of those precincts as reflected by the total number of voters receiving ballots and the number of Latinos among them.[5]

13.     The estimates of the candidate preferences of the different groups of voters are derived through Professor Gary King's Ecological Inference ("EI") procedure, accessible

---

[3] *Thornberg* v. *Gingles,*  478 U.S. 30, 54 n. 21 (1986).

[4] *See, e.g.*, *Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291, 304 (D. Mass. 2004), and cases cited therein. *See also Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1011-12 (D.S.D. 2004).

[5]  These data have been provided to me in computer readable files created by David Ely, an Expert in Demography for the Plaintiffs.  He performed the Spanish surname analysis of voters that serves as the basis for the Latino voter counts.  The files for the Pasadena City Council elections take advantage of the fact that votes in those election are recorded separately for absentee voters, early voters, and election day voters in each of the precincts, and these have been matched with the data on total voters voting in that fashion and the numbers of them with Spanish surnames.  There was an administrative error however in the file for the Dist. D election that resulted in unreliable results.  The votes in that election were aggregated across the types for the precincts and analyzed that way, which resulted in realistic estimates that are reported for that election.

112

through R software.  This version of EI not only provides a specific, or point, estimate of a group's support for a particular candidate, but also provides confidence intervals for that estimate.  These intervals identify the range of estimates within which we can be 95 percent confident, statistically, that the actual level of a group's support for a candidate falls.  The point estimate is the best estimate, in that it is the value most likely to be the actual value, and estimates within the range of a confidence interval are less likely to be the true value the further away they are from the point estimate.[6]  This procedure considers the votes cast in all of the precincts.

## RESULTS OF RPV ANALYSES

14.    The results of the EI analyses for the 2015 city council election are reported in Table 1 at the end of the text of this report.  This table contains the estimates of the levels of support for the Latino candidates among Latino and the other, non-Latino voters derived through EI.[7]  In the left column of Table 1 the council seats being elected and the names of the Latino candidates are provided.  The subsequent columns contain the estimates of the levels of support provided to the candidate by the respective groups.  Reported in the columns are the point

---

[6] This procedure is detailed in Gary King, *A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data* (Princeton University Press, 1997), and is now used widely by expert witnesses in assessing racially polarized voting in voting rights cases.  On the superiority of EI over ecological regression for assessing differences in the candidate preferences between or among groups of voters, which had been relied upon by the Supreme Court about 30 years ago in 1986 in *Gingles*, 478 U.S. at 52-53, see King, *A Solution*, at 15-16, and Justin de Benedictis-Kessner, "Evidence in Voting Rights Act Litigation: Producing Accurate Estimates of Racial Voting Patterns," *Election Law Journal*, forthcoming 2015.  EI was developed subsequent to the *Gingles* case for the explicit purpose of improving these estimates.  *See also* D. Stephen Voss, "Using Ecological Inference for Contextual Research," in Gary King, Ori Rosen, and Martin Tanner (eds.), *Ecological Inference: New Methodological Strategies* (Cambridge University Press, 2004), at 93 (EI "is unparalleled when applied to the actual sort of data needed for analyzing important social issues such as racial voting patterns").

[7] Section 2 of the Voting Rights Act states that a protected minority is supposed to have no less opportunity to elect representatives of its choice equal to that of the "other members of the electorate."  The reference to a "white majority" in Prong III in the *Gingles* decision is a function of the data specific to that case, in that the State of North Carolina recorded voters as either white or non-white at the time, with non-whites referred to as blacks in that case. The proper comparison under the statute, however, is between the protected class and the other voters.

7

estimates of the level of support by the groups for the candidates, and below the point estimates, in parentheses, are the values of the 95 percent confidence interval for each estimate. The best estimates of the voting choices of each group, the point estimates, are also reported in the text. Table 2 is structured similarly, with the year and type of election and the office contested, and the names of the Latino candidates provided in the left column and point estimates and values of the 95 percent confidence internal provided in the second and third columns.

15.     Both Tables 1 and Table 2 reveal the presence of racially polarized voting in elections, especially elections in which all voters in Pasadena can participate. The councilmanic elections in Table 1 are for the four elections in 2015 in which the voters had a choice between or among Latino and non-Latino candidates. While identified as Dist. H by the city, Dist H is not a single-member district but rather one of the at-large seats, and therefore, to avoid confusion, is identified as Table 1 as Place H. As noted above, Mr. Ely estimates that Latinos constitute 45.87 percent of the citizen voting age population in the city.[8] The estimates of the Latino support and the non-Latino support for the Latino candidate in this election, Oscar Del Toro, reported in Table 1, are 87.3 and 28.3 percent respectively. He lost this citywide election, receiving 39.1 percent of the votes in this two candidate contest.[9]

16.     The other city council contests involving a choice between or among Latino and non-Latino candidates were for three of the new single-member districts. These were Dists. A, B, and D. Mr. Ely estimates the CVAP for these districts to be 71.51, 58.02, and 45.31 percent

---

[8]  Expert Report of David Ely: Analysis of Voters and City Council Districts in the City of Pasadena, Texas, Oct. 14, 2015, Table 2.

[9]  Voters with Spanish surnames account for 23.5 percent of those receiving ballots for this election.

114

Latino respectively.[10]  As was the case in the election for Place H, Latinos were very cohesive in their support for the Latino candidates in these elections, receiving an estimated 97.0, 82.0, and 89.5 percent of the votes cast by Latino voters.  The Latino candidates in Dists. A and D, Ornaldo Ybarra and Cody Ray Wheeler, who were already members of the council but were now contesting new districts, are estimated to have received a majority of votes cast by non-Latino voters, 55.4 percent and 55.1 percent respectively.  These Latino candidates were returned to the council.  The Latino candidate in Dist. B however, Celestino Perez, was not the choice of non-Latino voters and lost, receiving 47.0 percent of the total vote in this two-candidate contest.[11]

17.    As noted above, RPV is especially present in elections in which all the eligible voters in Pasadena can participate.  This was true in the election for Place H, and Table 2 reveals that it is also true of voting on Proposition 1 and within the city for county offices.  Table 2 provides estimates for the divisions among city voters in these elections.  The first election in the table concerns Proposition 1.  Latino voters in the city opposed it with an estimated 99.9 percent of their votes.  Despite that, the proposition did pass with 50.6 percent of the votes.  Across the seven elections to Harris County offices, Latino voters cast an estimated vote of more than 95 percent in all the general elections, and above 85 percent in all of the Democratic primaries.  Latino voters in the Republican primary of 2010 cast a majority of their votes for Dorothy Olmos for Precinct 2 on the County Commission, and Latino voters cast an estimated plurality of 38.6 percent of their votes for Ruben Monzon in the Republican primary for Sheriff in 2012.  None of these candidates preferred by Latino voters, however, would have obtained an office if only votes cast by Pasadena residents had counted.  These results suggest that at-large elections now

---

[10]  Ely Report, note 8.

used in Pasadena will be dilutive of the Latino vote, especially given the place system and majority vote rule under which they are conducted.

## CONCLUSION

18.    Voting in the City of Pasadena is racially polarized, as that concept has been defined by the United States Supreme Court.   Latino voters are highly cohesive in their preference to be represented by people from within their own group, and the non-Latino voters across the city do not share that preference.   The non-Latino voters have the ability to veto the election of those candidates, as has been demonstrated by the election to Place H on the council in 2015, by the votes cast within the city for elections to Harris County offices in 2008, 2010, and 2012, and also by the result of the Proposition 1 vote in 2013.   The new at-large election system now employed by the city serves to exacerbate that situation by enhancing the ability of the non-Latino voters to veto the Latino candidates preferred by Latino voters.

Should additional documents or information be provided to me for review and analyze, I reserve the right to take these additional materials into account, modify and/or supplement my opinions, as well as to offer new opinions.

---

[11]   Voters with Spanish surnames accounted for 60.5 percent of those receiving ballots for the Dist. 1 election, 37.7 percent for the Dist. B election, and 18.8 percent for the Dist. D election.

116

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on October 14, 2015 in Durham, North Carolina.

_____

Richard L. Engstrom

**Table 1:  Racially Polarized Voting Analysis**

**Pasadena City Council Election, 2015**

**EI Estimates of the Votes for the Latino Candidates**

|  | % of Latino Votes | % of non-Latino Votes |
|---|---|---|
| **At-Large Place H** | | |
| Del Toro | 87.3 (78.8 –96.2) | 28.3 (21.5 – 34.7) |
| **Dist. A** | | |
| Ybarra | 97.0 (88.3 – 99.9) | 54.4 (32.0 – 76.6) |
| **Dist. B** | | |
| Perez | 82.0 (53.2 – 99.3) | 36.3 (16.6 – 68.1) |
| **Dist. D** | | |
| Wheeler | 89.5 (66.2 – 99.2) | 55.1 (48.5 – 69.0) |

118

**Table 2:  Racially Polarized Voting Analysis**

**Elections to Harris County Offices and on Proposition 1**

**EI Estimates of the Votes for Latino Candidates by Pasadena Voters**

| | % of <br> Latino Votes | % of non- <br> Latino Votes |
|---|---|---|
| **Proposition 1, 2013** | | |
| No Vote | 99.6 <br> (98.5 – 99.9) | 39.8 <br> (35.2 – 45.4) |
| **General Election 2012** | | |
| Sheriff/Adrian Garcia <br> Democrat | 95.9 <br> (91.4 – 98.9) | 17.6 <br> (14.8 – 22.4) |
| **General Election 2010** | | |
| County Commission Precinct 2 <br> Sylvia Garcia | 98.4 <br> (96.4 – 99.3) | 20.9 <br> (18.9 – 23.6) |
| **General Election 2008** | | |
| Sheriff/ Adrian Garcia <br> Democrat | 98.2 <br> (94.7 – 99.6) | 28.6 <br> (26.3 – 31.7) |
| **Democratic Primary 2012** | | |
| Sheriff/ Adrian Garcia | 86.7 <br> (76.5 – 94.5) | 73.2 <br> (65.6 – 81.2) |

13

119

**Democratic Primary 2008**

Sheriff/Adrian Garcia       88.4              36.5
                         (84.2 – 92.3)        (30.0 – 44.0)

**Republican Primary 2012**

Sheriff/Ruben Monzon       38.6               8.7
                         (31.0 – 44.8)        (7.1 – 10.7)

**Republican Primary 2010**

County Commission Precinct 2/
Dorothy Olmos                   56.2               34.5
                         (16.4 – 95.8)        (29.2 – 40.4)

120

# APPENDIX

**VITA**
**RICHARD L. ENGSTROM**

September 2015

OFFICE                                            HOME
Center for the Study of Race, Ethnicity,          23 Banbury Lane
    and Gender in the Social Sciences          Chapel Hill, NC 27517
Social Science Research Institute             Phone = (504)-756-1478
Duke Box 90420
Duke University
Erwin Mill
Durham, NC 27705
Phone:(504-756-1478)  Fax:(919)-681-4183
E-Mail Address = richard.engstrom@uno.edu
                            richard.engstrom@duke.edu

PERSONAL AND EMPLOYMENT INFORMATION

Born May 23, 1946.  Married to former Carol L. Verheek.  Four children: Richard Neal, born 3/10/70; Mark Andrew, born 1/14/73; Brad Alan, born 3/31/77; and Amy Min, born 8/18/84.

Assistant Professor of Political Science, University of New Orleans, 1971-74; Associate Professor, 1974-1979; Professor, 1979-2006; Research Professor, 1987-2006, Endowed Professor of Africana Studies, 2003-2005.

Chairperson, Department of Political Science, University of New Orleans, 1976-1979.  Coordinator of Graduate Studies, 1990-1992, 1993-2006.

Consultant, Center for Civil Rights, School of Law, University of North Carolina, Chapel Hill, 2006-2007.

Research Associate, Center for the Study of Race, Ethnicity, and Gender in the Social Sciences (REGSS), Duke University, 2013 – present.  Visiting Research Fellow, REGSS, 2008 - 2012. Visiting Professor of Political Science, Duke University 2008 - present.

Fulbright-Hays Professor, National Taiwan University and National Chengchi University, and Visiting Research Fellow, Institute of American Culture, Academic Sinica, Taipei, Taiwan, R.O.C., 1981-82.

122

Fulbright-Hays Professor, University College, Galway, Ireland, 1985-86.

Senior Research Fellow, Institute of Irish Studies, the Queen's University of Belfast, 1990.

David Bruce Fellow, Bruce Centre for American Studies, University of Keele, England, 1993.

Visiting Fellow, School of Politics, Australian Defence Force Academy, Canberra, Australia, 1998.

Program Visitor, Political Science Program, Research School of Social Sciences, Australian National University, Canberra, Australia, June-July, 2005.

Recipient, UNO Alumni Association's Career Distinction Award for Excellence in Research, December 1985.

Recipient, George W. Lucas Community Service Award, New Orleans NAACP, 1993.

Recipient, Emmitt J. Douglass Memorial Award, Louisiana NAACP, 2013.

FORMAL EDUCATION

Ph.D., University of Kentucky, 1971

M.A., University of Kentucky, 1969

A.B., Hope College (Holland, Michigan), 1968.
    (recipient of Class of '65 Political Science Award, 1968.

PRIMARY TEACHING FIELDS

Election Systems, Urban and Minority Politics, Legislative Process, American Politics.

PROFESSIONAL ACTIVITIES

Member, Election Review Committee, American Political Science Association, 2003-2004.

Chair, Section on Representation and Electoral Systems, American Political Science Association, 1993-95, 95-97.  Section Board, 1993-present.

Book review editor, American Review of Politics, 1995-present.

Lecture tour, under sponsorship of United States Information Agency, of Tanzania, Ethiopia, Kenya, Malawi, and Liberia, January, 1994. Topics include, among others, comparative election systems, legislatures within democratic regimes, and race and gender in contemporary politics.

Associate Member, Centre for the Study of Irish Elections, University College Galway.

123

Member, Board of Editors, <u>Public Administration Quarterly</u> 1977- present.

Member, Editorial Board, <u>Journal of Politics</u>, 1988-1993.

Member, Board of Editors, <u>State and Local Government Review</u>, 1988- 1990.

Member, Committee on the Status of Blacks, Southern Political Science Association, 1991-1996.

Treasurer, Southwestern Political Science Association, 1981 (position resigned during term due to Fulbright Lectureship).

Chair, Harold D. Lasswell Award Committee, American Political Science Association, 1995-1996 (best dissertation in public policy).

Chair, Ted Robinson Award Committee, Southwestern Political Science Association, 1995-1996 (best research project in minority politics by a graduate student).

Member, Nominating Committees, Southern Political Science Association, 1980; Louisiana Political Science Association, 1981, Study Group on Comparative Representation and Electoral Systems, International Political Science Association, 1988, Section on Representation and Electoral Systems, American Political Science Association, 1999.

Member, Chastain Award Committee, Southern Political Science Association, 1978.  V.O. Key Award Committee, Southern Political Science Association, 1990.  Ted Robinson Memorial Award Committee, Southwestern Political Science Association, 1995, 1996 (chair).   Hallett Award Committee, Section on Representation and Electoral Systems, American Political Science Association, 1999, 2000.

Member, Program Committee (Urban Politics Section), 1976 Annual Meeting of the Southern Political Science Association.  Program Committee (Urban Politics Section), 1992 Annual Meeting of the Midwest Political Science Association.  Program Committee (Representation and Electoral Systems Section), 1994 Annual Meeting of the American Political Science Association.  Program Committee (Representation and Electoral Systems Section), 2002 Annual Meeting of the American Political Science Association.

Member, Membership Committee, Southwestern Social Science Association, 1973-74.

Presented papers at meetings of the American Political Science Association, International Political Science Association, Midwest Political Science Association, Southern Political Science Association, Southwestern Political Science Association, Louisiana Political Science Association, Citadel Symposium on Southern Politics, International Society of Political Psychology, Harvard University Computer Graphics Week, Australian-New Zealand Academy for the Advancement of Science.  Formal papers also presented at programs at Tulane University, Sagamon State University, University of Keele (England),  Rice University, and Chief Justice Earl Warren Institute on Law and Social Policy, University of California School of Law.

124

Chaired panels at meetings of the American Political Science Association, Southern Political Science Association, Midwest Political Science Association, Southwestern Political Science Association, and International Political Science Association.

Served as discussant for panels at meetings of the American Political Science Association, Midwest Political Science Association, Southern Political Science Association; Southwestern Social Science Association; Louisiana Political Science Association; Institute of American Culture, Academic Sinica (Taiwan), and International Political Science Association.

Reviewed manuscripts for the American Political Science Review, American Journal of Political Science, Journal of Politics, Political Research Quarterly, Polity, Social Science Quarterly, Legislative Studies Quarterly, American Politics Quarterly, Urban Affairs Review, Electoral Studies, Election Law Journal, Political Analysis, National Political Science Review, Women and Politics, Southeastern Political Review, State and Local Government Review, Public Administration Review, Public Administration Quarterly, American Review of Politics, Presidential Studies Quarterly, Law and Policy, Journal of Policy History, Public Administration and Management, Journal of Women, Politics, and Policy, Du Bois Review, Howard University Press, Stanford University Press, and Northern Illinois University Press.

Recipient of grant from Pacific Cultural Foundation, Taipei, Taiwan to support project entitled "The Legislative Yuan: A Study of Legislative Adaptation" (1982).

Recipient of grant from private sources, New Orleans, to support a study of mayoral tenure in large American cities (1983).

Recipient of grant from Southern Regional Council, Atlanta, Georgia, to conduct exit poll of cumulative voting election in Chilton County, Alabama (1992).

Recipient of grants from Louisiana Education Quality Support Fund, Fellowship Funding for Superior Graduate Students, 1992 (1993-1997) $48,000; 1996 (1997-2001) $64,000; 1997 (1998-2002) $48,000; 1998 (1999-2003) $56,000.

Reviewed grant proposals for National Science Foundation programs in Political Science and Law and Social Sciences, and National Science Foundation graduate fellowship applications for the National Research Council.
Served as mentor in Southern Regional Council's Voting Rights Fellowship Program to Jason F. Kirksey, 1992-1993, and Dr. Olethia Davis, 1993-1994.

United Nations Consultant on Election Systems and Constituency Delimitation, National Election Commission of Liberia, UN Mission in Liberia, 2004.

COMMUNITY AND UNIVERSITY SERVICE

Consultant, Charter Task Force Committee, New Orleans, 2000. Preparation of Term Limits: A Report to the Charter Task Force Committee, February, 2000.

125

Interviewed on term limits issue on "Crescent City Close Up," public affairs program on three radio stations, WNOE, KKND, and KUMX, March 19, 2000.

Participant, Roundtable on At-Large Elections for the Internet Corporation for Assigned Names and Numbers (ICANN), sponsored by Common Cause, the Center for Democracy and Technology, and the Markle Foundation, at the Kennedy School of Government, Harvard University, February 9, 2000.

Member, Board of Directors, Concern International Charities, 1998-2003.

Chairperson, Taskforce on Civil Service, Mayor-Elect Ernest Morial's Transition Office (New Orleans), 1977-78.

Member, Chachere Subcommittee of UNO Diversity Cabinet, 2003-2004.

Member, Graduate Council, UNO, 1975-76, 1994-95, 2006.

Member, Research Council, UNO, 1995-97, 2005.

Member, International Student Recruitment Committee, UNO, 1993-96.

Chairperson, Search Committee for Vice Chancellor for Research and Graduate Studies and Dean of the Graduate School, UNO, 1987-88.

Chairperson, Search Committee for Graduate Dean, UNO, 1978-79.

Member, University Budget Committee, UNO, 1983-84.

Member, Liberal Arts Advisory Committee, UNO, 1975-76, 1982-84.

Member, Academic Planning Committee, UNO, 1982-1988.
Member, Faculty Council Committee on Faculty Honors, UNO, 1985-1990.

Member, Committee on Research, UNO Self-Study, 1972-73; 1982-83.

Member, Dean's Advisory Committee on Academic Planning, College of Liberal Arts, UNO, 1983-84.
Member, University Senate, UNO, 1975-77; 1980-81; 83-85; 87-91.

Member, Steering Committee, Legal Division, New Orleans Chapter,    American Foundation for Negro Affairs, 1977-79.

Service as expert witness in numerous vote dilution cases in federal courts.  Employed by the United States Department of Justice, Lawyers' Committee for Civil Rights Under Law, NAACP Legal Defense and Educational Fund, Center for Constitutional Rights, Mexican-American Legal

Defense and Educational Fund; Native American Rights Fund, and other organizations.  Served as court-appointed expert for the remedial portion of <u>Williams</u> v. <u>City of Dallas</u>, United States District Court for the Northern District of Texas, Dallas Division, 1991.  Service as Special Master for the remedial portion of <u>Harper</u> v. <u>City of Chicago Heights</u>, United States District Court for the Northern District of Illinois, Eastern Division, 2002-2004.

<u>INVITED LECTURES / PRESENTATIONS</u> (Since 1986)

<u>1986</u>:   McGee College, University of Ulster - "The Reagan Elections: Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

The Queen's University of Belfast - "The Reagan Elections:  Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

University of Keele - "The Contemporary Voting Rights Issue in American Politics"

University College Dublin - "The Contemporary Voting Rights Issue in American Politics" (4/30/86).

University College Galway - "The Reagan Elections: Realignment or Dealignment?"

<u>1987</u>:  Southern University -"The Equal Protection Clause and Electoral Reapportionment" (4/8/87).

APSA Summer Institute for Black Students, Louisiana State University - "The Political Scientist as Expert Witness" (7/26/87).

NAACP Legal Defense Fund, Conference on Voting Rights, San Antonio, Texas - "Cumulative and Limited Voting as Remedies for Minority Vote Dilution."

<u>1988</u>:   College of William and Mary - "The Contemporary Voting Rights Issue" and "The Role of Social Scientists in Voting Rights Litigation"

University of Queensland - "One Vote, One Value:  The U.S. Experience After 25 Years" (5/24/88).

Griffith University (Brisbane) - "One Vote, One Value: The U.S. Experience After 25 Years" (5/25/88).

<u>1989</u>:   Tulane University - "Frontiers of Voting Rights: Vote Dilution in Judicial Elections" (3/9/89).
Lamar University - "Voting Rights:  A Retrospective" (10/30/89).

Oklahoma State University -  "Frontiers of Voting Rights" (November/10/89).

Prairie View A and M University - "Reapportionment and Black Political Power" (11/16/89).

127

1990:  The Queen's University of Belfast-Institute of Irish Studies, "The Irish Election System: Manipulation and Reform" (3/13/90); Department of Politics, "The Reagan Presidency: An Assessment" (3/8/90).

Brookings Institution - "Social Scientists and the Voting Rights Act" (10/19/90).

Lyndon Baines Johnson Library (Austin, Texas) - "The Evolution of the Voting Rights Act of 1965" (10/29/90).

1991:  University of Texas at Dallas - "Redistricting the Dallas City Council" (3/8/91).
United States Department of Justice, Voting Section - "Alternative Election Systems" (3/15/91).
Stetson University School of Law - "Alternative Election Systems as Remedies for Minority Vote Dilution" (4/27/91).

Norfolk State University - "Election Analyses in Voting Rights Litigation" (6/15/91).

1992:  University of Colorado, Summer Workshop in Urban Politics - "Race and Voting in Judicial Elections: New Orleans as a Case Study Setting" (7/9/91).

Harold Washington College, Chicago - "Political Science Research and Testimony in the Miami-Dade County Core" (9/5/92 - not presented to illness).

Southern Regional Council, Atlanta, Georgia - "Exit Polls and Voting Rights Litigation" (10/2/92).
1994:  Lecture tour of Tanzania, Ethiopia, Malawi, and Liberia for United States Information Agency, January, 1994.

National Conference of State Legislators, Annual Meeting, New Orleans - "Redistricting and the Courts" (7/26/94)

1995:   Department of International Politics, Peking University, "Constitutional Law, Comparative Electoral Systems, and the Politics of Race and Gender" (10/17/95).

1997:  John D. Lees Memorial Lecture, Keynote Address, 1997 Annual Meeting of the American Politics Group, (United Kingdom) Political Science Association, Keele, England, "Affirmative Action: The Election and the Election System" (1/3/97).

Alumni College, College of Liberal Arts, University of New Orleans, "Racial Gerrymandering in the 1990s: The Issues and the Alternatives" (2/1/97).

Commission on Governmental Reorganization, City of New Orleans, "Principles for Governmental Organization" (9/23/97).

Civil Rights Training Institute (Airlie Conference), NAACP Legal Defense and Educational Fund, "Alternative Election Systems in the Post-Shaw Era" (11/8/97).

1998

128

School of Politics, Australian Defence Force Academy, Canberra, "Racial Gerrymandering in the United States" (4/1/98) and "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (5/29/98).

School of Political Science, University of New South Wales, Sydney, "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (4/8/98).

Illinois Secretary of State's Commission on Redistricting, Chicago, IL, "Computer Generated Districting Plans: Necessary Conditions and Tie Breaking Criteria" (12/16/98).

2001

Carinthian Institute of Minority Affairs, Villach, Austria, "Spiders, Earmuffs, and the Mark of Zorro: Creating Electoral Opportunities for Minorities in America's Single Member District System" (5/5/01).

Bureau of Governmental Research, New Orleans, LA, "The Mayor: How Many Terms?" (10/10/01).

2002

Pomona College, Claremont, CA, "Spiders, Earmuffs, and the Mark of Zorro: There Must be a Better Way" (3/13/02).

Utah State University, "The Redistricting Thicket: Are There Alternatives?" Bennion Teachers' Workshop (8/9/02).

Utah State University, "Missing the Target: Priorities among Districting Constraints," Redistricting in the New Millennium: A Lecture Series, (11/26/02).

2003

Florida State University, "Missing the Target: Priorities among Districting Constraints," (1/21/03).

2004

Cleveland City Club/Cleveland State University, "Metro Reform and Minority Voting Rights," (2/25/04).

Liberian National Election Commission Consultative Assembly, Monrovia, Liberia, "Constituency Boundary Redemarcation: Concepts and Timeframes," (6/7/04).

2005

129

Subcommittee on the Constitution, Committee on the Judiciary, United States House of Representatives, written and oral testimony, hearing on Extension of the Preclearance Provision of the Voting Rights Act, (10/25/05).

William C. Velasquez Institute, San Antonio, TX, "Influence Districts," (11/19/05)

2006

University of West Georgia, "The Gerrymandering Problem:  Lessons from Australia?" (4/3/06).

Duke University, "Racially Polarized Voting: Pervasive and Persistent in the American South," Conference on "W(h)ithering the Voting Rights Act?" (4/7/06).

International Political Science Association, Fukuoka, Japan. Roundtable on Electronic Voting. "E Voting in the U.S.," (7/13/06).

Brennan Center for Justice, New York University School of Law, "The Gerrymandering Problem: Lessons from Australia?," (8/7/06).

Short Course on The National Popular Vote Plan to Revamp the Electoral College, American Political Science Association Annual Meeting, Philadelphia, "Potential Impact of the National Popular Vote Plan on Presidential Elections and Other Electoral Reforms," (8/30/06).

American Bar Association, Administrative Law Section, "Redistricting Reform: Lessons from Australia," Washington, D.C. (10/26/06).

2008

Morehouse College, "The Gerrymandering Problem in the United States:  Judicial Protection or Redistricting Commissions or Alternative Election Systems," Voting Analysis in Mathematics and Politics: Interdisciplinary Research and Education Seminar (VAMPIRES) (4/18/08).

2009

Duke University, "Response to Thomas Brunell, 'Why Competitive Elections are Bad for America'," Duke University Political Science Students' Association (2/10/09).

Chief Justice Earl Warren Institute on Race, Ethnicity, and Diversity, University of California at Berkeley School of Law, presenter, panel on "The Redistricting Experience: Tales from the Field," conference on Redistricting Reform and Voting Rights: Identifying Common Ground and Challenges, UC Washington Center, (11/11/09).

2010

130

Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University Presentation on "Race and Redistricting" at the conference "Counting Race: Racial Classifications and the 2010 Census," Duke University (3/19/10).

St. Louis University Law School, Presentation on "Cumulative and Limited Voting as Remedies for Dilutive Election Systems," at the symposium on "Voting 45 Years after the Voting Rights Act," (3/26/10).

Demos, Presentation on "Issues in the Post-2010 Round of Redistricting" and Discussion Leader for Session on Redistricting, "An In-Depth Discussion with Demos," Washington, DC (9/4/10).

NAACP Legal Defense and Educational Fund, Presentation on "Prongs II and III: Necessary Preconditions under *Thornburg* v. *Gingles*," at the Voting Rights and Redistricting Training Institute, Airlie Conference, Warrenton, VA (10/9/10).

Center for Democratic Performance, Binghamton University, "Influence Districts and the Courts:  A Concept in Need of Clarity," (10/28/10).

Mexican American Legal Defense and Educational Fund,  Short presentation on "Racially Polarized Voting Analyses," National Redistricting Convening, San Antonio, TX (12/9/10).

2011

Columbia University, "IRCs in Comparative Perspective: Lessons from Australia?", Conference on Do Independent Redistricting Commissions .Affect Minority Representation?, New York City (12/9/11).


2012

Duke University, "Minorities and the New Round of Redistricting: Native Americans, Latinos, and African Americans, Plus (of course) The Great State of Texas," Center for the Study of Race, Ethnicity, and Gender Colloquium, (3/22/12).

Georgia Perimeter College, Clarkston Campus, "Minority-Majority Districts: Their Adoption and Consequences," (10/4/12).

2013

National Bar Association and Louisiana Judicial Conference, Baton Rouge, LA,   "Judicial Subdistricts: Where Do We Go from Here?", Baton Rouge, LA (2/16/13).

University of North Carolina Greenboro, "Controversies over Election Reform in North Carolina," panel at the Twenty-Fourth Annual MPA Alumni Reunion, (11/1/13).

2015

131

National Bar Association and Louisiana Judicial Conference, Baton Rouge, LA (2/16/13). "Judicial Subdistricts: Where Do We Go From Here?", (2/16/13).

U.S. Grant Presidential Library, Mississippi University, "Symposium: The Fifteenth Amendment from U.S. Grant to Lyndon B. Johnson's Voting Rights Act, "Preclearance Politics in Mississippi," (9/25/15), with Tommie Cardin.
.


Numerous other presentations before groups such as the Louisiana Municipal Association; New Orleans League of Women Voters; Public Policy Forums at Southern University in Baton Rouge; Louisiana Municipal Clerks Institute; (La.) Black Legislative Caucus Institute; Robert A. Taft Institute of Government Seminars, Southern University; Special Committee on Elective Law and Voter Participation, American Bar Association; Subcommittee on Civil and Constitutional Law, United States House of Representatives Committee on the Judiciary; Institute of American Culture, Academic Sinica (Taiwan), Foundation for Scholarly Exchange (Taiwan), and Tulane University, Department of Political Science and College of Law.


REFERENCES


Dr. Christine L. Day, former Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148, 504-280-6266, clday@uno.edu.

Dr. Charles D. Hadley, former Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148, 504-810-3087, cdhadley@gmail.com.

Dr. Kerry L. Haynie, Department of Political Science, Duke University, Durham, NC  27708, 919-660-4366, klhaynie@duke.edu.

Dr. Baodong Liu, Associate Professor of Political Science, University of Utah, Salt Lake City, UT 84112, 801-581-6473, baodong.liu@utah.edu.

Dr. Michael D. McDonald, Department of Political Science, University of Binghamton, Binghamton, NY  13901  607-777-4563, mdmcd@binghamton.edu.

Dr. Henry Flores, Distinguished Professor of Political Science, St. Marty's University, San Antonio, TX.


CURRENT RESEARCH

132

"Districting by Independent Commissions: Lessons from Australia?"  being prepared for a  volume on Independent Redistricting Commissions and Minority Representation, edited by Rudilfo O. de la Garza.

"Native Americans and Redistricting Issues: State Legislative Redistricting in New Mexico," an invited submission to the *Justice Systems Journal*,

Analysis of Instance Runoff Voting Elections in North Carolina, 2007 and 2009 (with Michael Cobb).

A Review of the Evidentiary Record for the Renewal and Amendment of the Special Provisions of the Voting Rights Act, 2006, with a focus on Louisiana.

LATEST CONFERENCE PAPERS

"Influence District and the Courts: A Concept in Need of Clarity."  Initially presented at the Conference on "Lessons from the Past, Prospects for the Future: Honoring the Fortieth Anniversary of the Voting Rights Act of 1965," Center for the Study of American Politics, Yale University, April 21-23, 2005.  Expanded version forthcoming in volume edited by Daniel McCool, The Most Fundamental Right: The 2006 Reauthorization of the Voting Rights Act.

"Racially Polarized Voting: Pervasive and Persistent in the American South," Conference on "W(h)ithering the Voting Rights Act?" John Hope Franklin Center, Duke University, April 7, 2006.

"Majority Vote Rule and Runoff Elections," presented at a conference on "Plurality and Multi-Round Elections," University of Montreal, June, 2006 (co-authored with Richard N. Engstrom), Montreal,  June 17-18, 2006.   Expanded version selected for inclusion in mini-symposium in Electoral Studies, edited by Bernard Grofman, 27 (September 2008)  407-416.

"Cumulative and Limited Voting: Remedies for Dilutive Election Systems and More," presented at the symposium on *Voting 45 Years* after the *Voting Rights Act,* St. Louis University School of Law, March 26, 2010; published in the Fall 2010 edition of the St. Louis University Public Law Review.

"Political Scientists as Expert Witness," Annual Meeting of the State Politics and Policy Association,  Springfield, IL, June, 2010), with Michael P. McDonald.  (Presented by Michael P. McDonald). Published in PS 44 (April 2011), 285-289.

"Social Science Expert Witness Testimony in Voting Rights Cases," Eighth International Conference on Interdisciplinary Social Sciences, Charles University, Prague, Czech Republic, July, 2013, with Daniel McCool, Jorge Chapa, and Gerald Webster.

"The Elephant in the Room: *NAMUDNO*, *Shelby County*, and Racially Polarized Voting," Annual Meeting of the American Political Science Association, August 2013, Chicago, IL

133

# **PUBLICATIONS**

BOOKS

Fair and Effective Representation? Debating Electoral Reform and Minority Rights (Lanham, MD: Rowman and Littlefield, 2001) (with Mark A. Rush).

MONOGRAPHS

Home Rule for Louisiana Parishes (Baton Rouge: Police Jury Association of Louisiana and Governmental Services Institute, Louisiana State University, 1974).

Municipal Home Rule in Louisiana (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1974).

Municipal Government Within the 1974 Louisiana Constitution: A Reference Guide for Municipal Officials (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1975).

Louisiana Mayor's Handbook (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1977), (with Edward Clynch and Konrad Kressley).

Mayoral Tenure in Large American Cities (New Orleans: School of Urban and Regional Studies, University of New Orleans, 1983).

ARTICLES, RESEARCH NOTES, AND BOOK CHAPTERS

"Statutory Restraints on Administrative Lobbying -- 'Legal Fiction'", Journal of Public Law, Vol. 19, No. 1 (1970), 90-103 (with Thomas G. Walker).  Reprinted in Dennis Ippolito and Thomas Walker (eds.), Reform and Responsiveness: Readings in American Politics (New York: St. Martin's Press, Inc., 1972), pp. 428-438.

"Race and Compliance: Differential Political Socialization," Polity, 3 (Fall 1970), 100-111. Reprinted in Charles S. Bullock, III, and Harrell Rogers, Jr. (eds.), Black Political Attitudes: Implications for Political Support (Chicago: Markham Publishing Co., 1972), pp. 33-44.

"Political Ambitions and the Prosecutorial Office," Journal of Politics, 33 (February 1971), 190-194.

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments," Midwest Journal of Political Science 15 (August 1971), 475-494 (with W.E. Lyons).

"Expectations and Images: A Note on Diffuse Support for Legal Institutions," Law and Society Review, 6 (May 1972), 631-636 (with Michael W. Giles).

"Black Control or Consolidation: The Fringe Response," <u>Social Science Quarterly</u>, 53 (June 1972), 161-167 (with W.E. Lyons).

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments: A Comparison of Survey Findings," <u>American Journal of Political Science</u>, 17 (February 1973), 182-188 (with W. W. E. Lyons).

"Racial Gerrymandering and Southern State Legislative Redistricting: Attorney General Determinations Under the Voting Rights Act," <u>Journal of Public Law</u>, Vol. 22, No. 1 (1973), 37-66 (with Stanley A. Halpin, Jr.).

"Socio-Political Cross Pressures and Attitudes Toward Political Integration of Urban Governments," <u>Journal of Politics</u>, 35 (August 1973), 682-711 (with W.E. Lyons).

"Candidate Attraction to the Politicized Councilmanic Office: A Note on New Orleans," <u>Social Science Quarterly</u>, 55 (March 1975), 975-982 (with James N. Pezant).

"Home Rule in Louisiana -- Could This Be The Promised Land?," <u>Louisiana History</u>, 17 (Fall 1976), 431-455.

"Judicial Activism and the Problem of Gerrymandering," in Randall B. Ripley and Grace A. Franklin (eds.), <u>National Government and Public Policy in the United States</u> (Itasca, IL: Peacock Publishers, Inc., 1977), pp. 239-244.

"The Supreme Court and Equi-Populous Gerrymandering: A Remaining Obstacle in the Quest for Fair and Effective Representation," <u>Arizona State Law Journal</u>, Vol. 1976, No. 2 (1977), 277-319. Cited in <u>Karcher</u> v. <u>Daggett</u>, 462 U.S. 725 (1983) (by J. Stevens, concurring, at 750 n. 8, 752 n. 10, 753 n. 11, and 758 n. 16, and J. White, dissenting, at 776 n. 12).

"State Centralization Versus Home Rule: A Note on Ambition Theory's Powers Proposition," <u>Western Political Quarterly</u> 30 (June 1977), 288-294 (with Patrick F. O'Connor).

"Pruning Thorns from the Thicket: An Empirical Test of the Existence of Racial Gerrymandering," <u>Legislative Studies Quarterly</u>, 2 (November 1977) 465-479 (with John K. Wildgen).  Cited extensively in <u>Thornburg</u> v. <u>Gingles</u>, _____ U.S. _____ (1986) (by J. Brennan).

"Racial Vote Dilution: Supreme Court Interpretations of Section 5 of the Voting Rights Act," <u>Southern University Law Review</u>, 4 (Spring 1978), 139-164.

"The Political Behavior of Lawyers in the Louisiana House of Representatives," <u>Louisiana Law Review</u> 39 (Fall 1978), 43-79 (with Patrick F. O'Connor, Justin J. Green, and Chong Lim Kim).

"Restructuring the Regime: Support for Change Within the Louisiana Constitutional Convention," <u>Polity</u> 11 (Spring 1979), 440-451 with Patrick F. O'Connor.

135

"The Hale Boggs Gerrymander: Congressional Redistricting, 1969," Louisiana History, 21 (Winter 1980), 59-66.

"Lawyer-Legislators and Support for State Legislative Reform," Journal of Politics, 42 (February 1980), 267-276 (with Patrick F. O'Connor).

"Racial Discrimination in the Electoral Process: The Voting Rights Act and the Vote Dilution Issue," in Robert P. Steed, Lawrence W. Moreland, and Tod A. Baker, (eds.), Party Politics in the South (New York: Praeger Publishing, 1980), pp. 197-213.

"Spatial Distribution of Partisan Support and the Seats/Votes Relationship," Legislative Studies Quarterly, 5 (August 1980), 423- 435 (with John K. Wildgen).

"Computer Graphics and Political Cartography: ASPEX of Gerrymandering," in Computer Mapping Applications in Urban, State, and Federal Government, Plus Computer Graphics in Education, Vol. 16, Harvard Library of Computer Graphics, 1981 Mapping Collection (Cambridge, Mass.: Laboratory for Computer Graphics and Spatial Analysis, Harvard University, 1981), pp. 51-57 (with John K. Wildgen).

"The Election of Blacks to City Councils: Clarifying the Impact of Electoral Arrangements on the Seats/Population Relationship," American Political Science Review, 75 (June 1981), 344-354 (with Michael D. McDonald).

"Post-Census Representational Districting: The Supreme Court, 'One Person, One Vote,' and the Gerrymandering Issue," Southern University Law Review, 7 (Spring 1981), 173-226.

"Municipal Government," in James Bolner (ed.), Louisiana Politics: Festival in a Labyrinth (Baton Rouge: Louisiana State University Press, 1982), pp. 181-219.

"The 1980 Election and the Realignment Thesis: A Note of Caution," American Studies (Mei-kuo-Yen-chiu), 12 (June 1982), 107-132.

"Racial Vote Dilution and the 'New' Equal Protection Clause: City of Mobile v. Bolden," American Studies (Mei-kuo-Yen-chiu) 12 (September 1982), 25-72.

"The Underrepresentation of Blacks on City Councils: Comparing the Structural and Socioeconomic Explanations for South/Non-South Differences," Journal of Politics, 44 (November 1982), 1088-1099 (with Michael D. McDonald).

"The Impact of the 1980 Supplementary Election on Nationalist China's Legislative Yuan," Asian Survey, 24 (April 1984), 447-458 (with Chu Chi-hung).

"The Marginality Hypothesis and the State Legislative Salary Issue," Southeastern Political Review, 13 (Spring 1985), 169-182 (with Patrick F. O'Connor).

"Racial Vote Dilution: The Concept and the Court," in Lorn Foster (ed.), <u>The Voting Rights Act</u>: <u>Consequences and Implications</u> (New York: Praeger Publishers, 1985), pp. 13-43.

"Quantitative Evidence in Vote Dilution Litigation: Political Participation and Polarized Voting," <u>The Urban Lawyer</u>, 17 (Summer 1985), 369-377 (with Michael D. McDonald).  Cited in <u>Thornburg</u> v. <u>Gingles</u>, _____ U.S. _____ (1986) (by J. Brennan).

"The Reincarnation of the Intent Standard: Federal Judges and At- Large Election Cases," <u>Howard Law Journal</u> 28 (No 2, 1985), 495-513.  Cited in <u>Thornburg</u> v. <u>Gingles</u>, _____ U.S. _____ (1986) (by J. Brennan).  Abbreviated version appeared in <u>Focus</u> (June, 1985).  (<u>Focus</u> is a monthly publication of the Joint Center for Political Studies in Washington, D.C.).

"The Effect of At-Large Versus District Elections on Racial Representation in U.S. Municipalities," in Bernard Grofman and Arend Lijphart (eds.), <u>Electoral Laws and Their Political Consequences</u> (New York: Agathon Press, Inc., 1986), pp. 203-225 (with Michael D. McDonald).

"Repairing the Crack in New Orleans' Black Vote: VRA's Results Test Nullifies 'Gerryduck'," <u>Publius</u> 16 (Fall 1986), 109-121.  Reprinted in Charles Vincent (ed.), <u>The African American Experience in Louisiana: From Jim Crow to Civil Rights</u> (Lafayette, LA: Center for Louisiana Studies).

"Quantitative Evidence in Vote Dilution Litigation, Part II: Minority Coalitions and Multivariate Analysis," <u>Urban Lawyer</u> 19 (Winter 1987), 65-75 (with Michael D. McDonald).

"District Magnitudes and the Election of Women to the Irish Dail," <u>Electoral Studies</u>, 6 (August 1987), 123-132.

"The Election of Blacks to Southern City Councils: The Dominant Impact of Electoral Arrangements," in Robert P. Steed, Laurence W. Moreland, and Tod A. Baker (eds.) <u>Blacks in Southern Politics</u> (New York: Praeger Publishers, 1987), pp. 245-258 (with Michael D. McDonald).

"Race, Referendums, and Rolloff," <u>Journal of Politics</u> 49 (November 1987), 1081-1092  (with Jim M. Vanderleeuw).

"Definitions, Measurements, and Statistics: Weeding Wildgen's Thicket," <u>Urban Lawyer</u> 20 (Winter 1988), 175-191 (with Michael D. McDonald).

"The Desirability Hypotheses and the Election of Women to City Councils: A Research Note," <u>State and Local Government Review</u> 20 (Winter 1988), 38-40 (with Michael D. McDonald and Bih-Er Chou).

"Black Politics and the Voting Rights Act(s):  1965-1982," in James Lea (ed.), <u>Contemporary Southern Politics</u>:  <u>Continuity and Change</u> (Baton Rouge:  Louisiana State University Press, 1988), pp. 83-106.

137

"Race and Representational Districting: Protections Against Delineational and Institutional Gerrymandering," <u>Comparative State Politics Newsletter</u> 9 (October 1988), 15-24.

"Cumulative Voting as a Remedy for Minority Vote Dilution: The Case of Alamogordo, New Mexico," <u>Journal of Law and Politics</u> 5 (Spring 1989), 469-497 (with Delbert A. Taebel and Richard L. Cole).  Reprinted in Roger L. Kemp, (ed.), <u>Local Government Election Practices: A Handbook for Public Officials and Citizens</u> (Jefferson, N.C.: McFarland & Co., 1999), 372-391.

"When Blacks Run for Judge: Racial Divisions in the Candidate Preferences of Louisiana Voters," <u>Judicature</u> 73 (August-September 1989), 87-89.

"Detecting Gerrymandering," in Bernard Grofman (ed.), <u>Political Gerrymandering and the Courts</u> (New York:  Agathon Press, Inc., 1990), pp. 178-202  (with Michael D. McDonald).

"Cumulative Voting in a Municipal Election: A Note on Voter Reactions and Electoral Consequences," <u>Western Political Quarterly</u>, 43 (March 1990), 191-199 (with Richard L. Cole and Delbert A. Taebel).

"Alternative Electoral Systems as Remedies for Minority Vote Dilution," <u>Hamline Journal of Public Law and Policy</u> 11 (Spring 1990), 19-29  (with Delbert A. Taebel and Richard L. Cole).  Cited in <u>Holder</u> v. <u>Hall</u>, _____ U.S. _____ (1994), (by J. Thomas, concurring).

"Cincinnati's 1988 Proportional Representation Initiative," <u>Electoral Studies</u> 9 (September 1990), 217-225.

"Getting the Numbers Right: A Response to Wildgen," <u>Urban Lawyer</u> 22 (Summer 1990), 495-502.

"Native Americans and Cumulative Voting: The Sisseton-Wahpeton Sioux," <u>Social Science Quarterly</u> 72 (June 1991), 388-393 (with Charles J. Barrilleaux).

"Proportional Representation Considered in Cincinnati," <u>Representation</u> 30 (Spring 1991), 3-5.

"Voting for Judges: Race and Roll-Off in Judicial Elections," in William Crotty (ed.), <u>Political Participation and Democratic Politics</u> (New York: Greenwood Press, 1991), pp. 171-191 (with Victoria M. Caridas).

"Minority Representation and Councilmanic Election Systems: A Black and Hispanic Comparison," in Anthony Messina, Laurie Rhodebeck, Frederick Wright, and Luis R. Fraga, (eds.), <u>Ethnic and Racial Minorities in Advanced Industrial Democracies</u>, (New York: Greenwood Press, 1992), pp. 127-142 (with Michael D. McDonald).

"Alternative Judicial Election Systems: Solving the Minority Vote Dilution Problem," in Wilma Rule and Joseph F. Zimmerman (eds.), <u>United States Electoral Systems</u>: <u>Their Impact on Women and Minorities</u> (New York: Greenwood Press, 1992), pp. 129-139.

"Modified Multi-Seat Election Systems as Remedies for Minority Vote Dilution," Stetson Law Review 21 (Summer 1992), 743-770.

"Councilmanic Redistricting Conflicts: The Dallas Experience," Urban News 6 (Fall 1992), 1, 4-8.

"The Single Transferable Vote: An Alternative Remedy for Minority Vote Dilution," University of San Francisco Law Review 27 (Summer, 1993), 781-813. Excerpt reprinted in Voting and Democracy Report, 1993 (Washington, D.C.: Center for Voting and Democracy, 1993).

"'Enhancing' Factors in At-Large Plurality and Majority Systems:  A Reconsideration," Electoral Studies 12 (December 1993), 385-401 (with Michael D. McDonald).

"Louisiana," in Chandler Davidson and Bernard Grofman (eds.), The Quiet Revolution: Minority Voting Rights and Representation in the South (Princeton: Princeton University Press, 1994), pp. 103-135, 413-417 (with Stanley A. Halpin, Jean A. Hill, and Victoria M. Caridas-Butterworth).

"The Voting Rights Act: Disfranchisement, Dilution, and Alternative Election Systems," PS: Political Science and Politics 27 (December 1994), 685-688.

"The 1994 New Orleans Mayoral Election: Racial Divisions Continue," Urban News 9 (Spring 1995), 6-9 (with Willie D. Kirkland).

"Shaw v. Reno and New Election Systems: The Cumulative Voting Alternative," Voting Rights Review (Spring 1995), 10, 12 (with Jason F. Kirksey and Edward Still) [excerpt reprinted in Voting and Democracy Report, 1995 (Washington, D.C.: Center for Voting and Democracy, 1995), 67-68].

"Voting Rights Districts: Debunking the Myths," Campaigns and Elections (April 1995), 24, 46.

"Shaw, Miller, and the Districting Thicket," National Civic Review, 84 (Fall-Winter 1995), 323-336.  Reprinted as "The Supreme Court on Redistricting" in Roger L. Kemp, (ed.), Local Government Election Practices: A Handbook for Public Officials and Citizens (Jefferson, N.C.: McFarland & Co., Inc., 1999), 80-92.

"Local Redistricting Under the Voting Rights Act," Communities and the Voting Rights Act: A Guide to Compliance in These Changing Times (Denver: National Civic League, Inc., 1996), 69-82.

"One Person, Seven Votes: The Cumulative Voting Experience in Chilton County, Alabama," in Anthony Peacock, (ed.), Affirmative Action and Representation: Shaw v. Reno and the Future of Voting Rights (Durham, N.C.: Carolina Academic Press, 1997), pp. 285-313 (with Jason Kirksey and Edward Still).

"Limited and Cumulative Voting in Alabama: An Assessment After Two Rounds of Elections," National Political Science Review, Vol. 6 Race and Representation (New Brunswick: Transaction Publishers, 1997), 180-191 (with Jason F. Kirksey and Ed Still).

"Cumulative Voting and Latino Representation: Exit Surveys in Fifteen Texas Communities," Social Science Quarterly 78 (December 1997), 973-991 (with Robert R. Brischetto).

"Is Cumulative Voting Too Complex? Evidence from Exit Polls," Stetson Law Review 27 (Winter 1998), 813-833 (with Robert R. Brischetto).

"Affirmative Action and the Politics of Race," in Gillian Peele, Christopher J. Bailey, Bruce Cain, and B. Guy Peters, (eds.), Developments in American Politics 3 (London: MacMillan Press Ltd. and New York: Chatham House Publishers, 1998), pp. 292-306.

"Race and Representational Districting in Louisiana," in Bernard Grofman, (ed.), Race and Redistricting in the 1990s (New York: Agathon Press, 1998), pp. 229-268 (with Jason F. Kirksey).

"Minority Electoral Opportunities and Alternative Election Systems in the United States," in Mark Rush, (ed.), Voting Rights and Redistricting in the United States (New York: Greenwood Publishing, 1998), pp. 227-243.

"Electoral Arrangements and Minority Political Incorporation," in Richard Kaiser and Katherine Underwood, (eds.), Minority Politics at the Millennium (New York: Garland Publishing, Inc., 2000), pp. 19-50.

"Louisiana," in Dale Krane, Platon R. Rigos, and Melvin Hill, (eds.), Home Rule in America: A Fifty-State Handbook (Washington, D.C.: Congressional Quarterly Press, 2001), 173-182 (with Robert K. Whelan).

"The Post-2000 Round of Redistricting: An Entangled Thicket within the Federal System," Publius, 32 (Fall 2002): 51-70.

"The United States: the Future – Reconsidering Single-Member Districts and the Electoral College," in Josep M. Colomer, (ed.), Handbook of Electoral System Choice (London: Palgrave Macmillan Ltd, 2004), 164-176.

"Expert Witness Testimony," Encyclopedia of Social Measurement, Vol. 1 (London: Elsevier Inc., 2005), 919-925.

"Revising Constituency Boundaries in the United States and Australia: It Couldn't be More Different," Democratic Audit of Australia    (August 2005), 1-10 (http://democratic. audit.anu.edu.au)

"Missing the Target: The Supreme Court, 'One Person, One Vote,' and Partisan Gerrymandering," in Peter Galderisi, (ed.), Redistricting in the New Millennium, (Lanham, MD: Lexington Books, 2005), 313-340.

"Reapportionment," in Joseph R. Marbach, Ellis Katz, and Troy E. Smith (eds.), Federalism in America: An Encyclopedia (Westport, CT: Greenwood Press, 2006), Vol. 2, 528-532.

140

"Race and Southern Politics: The Special Case of Congressional Districting," in Robert P. Steed and Laurence W. Moreland, (eds.), <u>Writing Southern Politics: Contemporary Interpretations and Future Directions</u>, (Lexington, KY: University Press of Kentucky, 2006), 91-118.

"Electoral College," in William A. Darity, Jr. (ed.), <u>International Encyclopedia od the Social Sciences</u> (Vol. 2, 2d ed; Detroit: Macmillan Reference USA, 2008), 559-560.

"Majority Vote Rules and Runoff Primaries in the United States," <u>Electoral Studies</u>, 27 (September 2008): 407-416 (with Richard N. Engstrom).

"*NAMUDNO*: A Curveball on Voting Rights," <u>Justice System Journal</u>, 30 (No. 3 2009): 351-360.

"Cumulative and Limited Voting: Remedies for Dilutive Election Systems and More," <u>St. Louis University Public Law Review</u> 30 (No. 1, 2010): 97-137.

"The Political Scientist as Expert Witness," <u>PS</u> 44 (April 2011): 285-289 (with Michael P. McDonald).

"Influence Districts: A Note of Caution and a Better Measure," Chief Justice Earl Warren Institute on Law and Social Policy, University of California Law School, <u>Policy Brief</u>, 2011.

"Influence District: The Concept and the Court," in Daniel McCool (ed.), <u>The Most Fundamental Right: Contrasting Perspectives on the Voting Rights Act,</u> (Bloomington, IN: Indiana University Press, 2012), 67-119.

"*Shelby County v. Holder* and the Gutting of Federal Preclearance of Election Law Changes," <u>Politics, Groups, and Identities</u>, 2 (No. 3, 2014): 530-548.

 "U.S. House Districts and the Republican 'Gerrymander' of 2012," in J. Clark Archer, Robert H. Watrel, Fiona Davidson, Erin H. Fouberg, Kenneth C. Matis, Richard L. Morrill, Fred M. Shelley, and Gerald R. Webster, (eds.), <u>Atlas of the 2012 Elections</u> (Landham, MD: Rowman and Littlefield, 2014): 21-25,

"The Elephant in the Room: *NAMUDNO*, *Shelby County*, and Racially Polarized Voting," <u>Transatlantica</u>, forthcoming, [En ligne], 1 I 2015.

"Social Science Expert Witness Testimony in Voting Rights Cases," <u>National Political Science Review</u>, forthcoming, 7 (2016), with Dan McCool, Jorge Chapa, and Gerald Webster.

TITLED BOOK REVIEWS

"Partisan Gerrymandering and State Legislative Districts," review of Jonathan Winburn, THE REALITIES OF REDISTRICTING: FOLLOWING THE RULES AND LIMITING GERRYMANDERING IN STATE LEGISLATIVE REDISTRICTICTING, in <u>Election Law Journal</u>, 8 (No. 3, 2009), 227-232.

"Thernstrom v. Voting Rights Act: Round Two," review of Abigail Thernstrom, VOTING RIGHTS – AND WRONGS:  THE ELUSIVE QUEST FOR RACIALLY FAIR ELECTIONS, Election Law Journal, 9 (No.3, 2010), 203-210

"Race and Southern Politics," review of Charles S. Bullock and Ronald Keith Gaddie, THE TRIUMPH OF VOTING RIGHTS IN THE SOUTH, in Election Law Journal, 10 (No. 1, 2011), 53-61.

"Minority Representatives and Minority Representation," Review Essay on Jason Casellas, LATINO REPRESENTATION IN STATE HOUSES AND CONGRESS, and Michael D. Minta, OVERSIGHT: REPRESENTING THE INTERESTS OF BLACKS AND  LATINOS IN CONGRESS, Journal of Politics, 75 (April, 2013), e7 (8 pages) (with Kerry L. Haynie)..

"African American State Legislators and Substantive Representation in Louisiana," review of Jas M. Sullivan and Jonathan Winburn, THE LOUISIANA LEGISLATIVE BLACK CAUCUS: RACE AND REPRESENTATION IN THE PELICAN STATE, in Election Law Journal, 12 (No.3, 2013),  346-352.


OTHER BOOK REVIEWS

Review of John Wilson Lewis (ed.), THE CITY IN COMMUNIST CHINA, in Journal of Politics, 34 (February 1972), 310-311.

Review of Arthur I. Blaustein and Geoffrey Faux, THE STAR-SPANGLED HUSTLE: WHITE POWER AND BLACK CAPITALISM in Wall Street Review of Books, 1 (June 1973), 215-229.

Review of Carroll Smith Rosenberg, RELIGION AND THE RISE OF THE AMERICAN CITY: THE NEW YORK CITY MISSION MOVEMENT, 1812-1870, in Christian Scholar's Review, Vol. 4, No. 1 (1974), 73-75.

Review of Robert Higgs, COMPETITION AND COERCION, BLACKS IN THE AMERICAN ECONOMY, 1865-1914, in Wall Street Review of Books, 6 (Spring 1978), 117-119.

Review of Herbert E. Alexander, MONEY IN POLITICS, and Herbert E. Alexander, FINANCING POLITICS: MONEY, ELECTIONS, AND POLITICAL REFORM, in Wall Street Review of Books, 6 (Summer 1978), 209-211.

Review of James M. Buchanan and Richard E. Wagner, DEMOCRACY IN DEFICIT:  THE POLITICAL LEGACY OF LORD KEYNES, in Wall Street Review of Books, 6 (Fall 1978), 319-320.

Review of American Enterprise Institute for Public Policy Research, ZERO-BASE BUDGETING AND SUNSET LEGISLATION, in Wall Street Review of Books, 7 (Winter 1979), 53-55.

142

Review of David Rogers, CAN BUSINESS MANAGEMENT SAVE THE CITIES? THE CASE OF NEW YORK, in Wall Street Review of Books, 7 (Spring 1979), 75-77.

Review of Kevin R. Cox and R. J. Johnston (eds.), CONFLICT, POLITICS AND THE URBAN SCENE, in American Political Science Review, 78 (June 1984), 531-532.

Review of Manuel Carballo and Mary Jo Bane (eds.), THE STATE AND THE POOR IN THE 1980s, in American Political Science Review, 79 (June 1985), 523-524.

Review of Terry Sanford, A DANGER TO DEMOCRACY: THE PRESIDENTIAL NOMINATING PROCESS, in Presidential Studies Quarterly, 16 (Winter 1986), 153-155.

Review of Charles W. Whalen, Jr., THE HOUSE AND FOREIGN POLICY: THE IRONY OF CONGRESSIONAL REFORM, in Presidential Studies Quarterly, 16 (Spring 1986), 369-371.

Review of Arend Lijphart and Bernard Grofman (eds.), CHOOSING AN ELECTORAL SYSTEM: ISSUES AND ALTERNATIVES, in Irish Political Studies, 1 (1986), 125-127.

Review of David McKay, AMERICAN POLITICS AND SOCIETY, in Presidential Studies Quarterly, 17 (Fall 1987), 784-785.

Review of Sheila D. Collins, THE RAINBOW CHALLENGE:  THE JACKSON CAMPAIGN AND THE FUTURE OF AMERICAN POLITICS, in Presidential Studies Quarterly, 19 (Fall 1988), 874-875.

Review of Abigail M. Thernstrom, WHOSE VOTES COUNT?  AFFIRMATIVE ACTION AND MINORITY VOTING RIGHTS, in Policy Studies Review 8 (Autumn 1988), 191-194.

Review of Herbert H. Haines, BLACK RADICALS AND THE CIVIL RIGHTS MAINSTREAM, 1954-1970, in Journal of Southern History, 56 (February 1990): 155-157.

Review of Harlan Hahn and Sheldon Kamienieki, PREFERENDUM VOTING: SOCIAL STATUS AND POLICY PREFERENCES, in Presidential Studies Quarterly 20 (Fall 1990): 828-830.

Review of Michael Gallagher and Michael Marsh (eds.), CANDIDATE SELECTION IN COMPARATIVE PERSPECTIVE: THE SECRET GARDEN OF POLITICS, in Presidential Studies Quarterly 21 (Winter 1991): 167- 168.

Review of Thomas Cronin, DIRECT DEMOCRACY: THE POLITICS OF INITIATIVE, REFERENDUM, AND RECALL, in Presidential Studies Quarterly, 22 (Fall 1992): 786-788.

Review of F. Leslie Seidle, (ed.), COMPARATIVE ISSUES IN PARTY AND ELECTION FINANCE, in British Journal of Canadian Studies, (1993).

143

Review of John Dittmer, LOCAL PEOPLE: THE STRUGGLE FOR CIVIL RIGHTS IN MISSISSIPPI, in Annals of the American Academy of Political and Social Science, 540 (July 1995): 170-171.

Review of Michael J. Glennon, WHEN NO MAJORITY RULES: THE ELECTORAL COLLEGE AND PRESIDENTIAL SUCCESSION, in National Political Science Review, 6 (1997): 323-325.

Review of Frederick M. Wirt, "WE AIN'T WHAT WE WAS": CIVIL RIGHTS IN THE NEW SOUTH, in American Political Science Review, 92 (June 1998): 474-475.

Review of David T. Canon, RACE, REDISTRICTING, AND REPRESENTATION: THE UNINTENDED CONSEQUENCES OF BLACK MAJORITY DISTRICTS, in The Law and Politics Book Review, 9 (October 1999): 467-471.

Review of Christopher M. Burke, THE APPEARANCE OF EQUALITY: RACIAL GERRYMANDERING, REDISTRICTING, AND THE SUPREME COURT, in The Law and Politics Book Review, 9 (November 1999): 506-508.

Review of J. Morgan Kousser, COLORBLIND INJUSTICE: MINORITY VOTING RIGHTS AND THE UNDOING OF THE SECOND RECONSTRUCTION, in Journal of Politics, 62 (August 2000): 934-937.

Review of Kathleen L. Barber, A RIGHT TO REPRESENTATION: PROPORTIONAL ELECTION SYSTEMS FOR THE TWENTIETH-FIRST CENTURY, in Representation, 38 (Summer/Autumn 2001), 171-173.

Review of Shaun Bowler and Bernard Grofman, (eds.), ELECTIONS IN AUSTRALIA, IRELAND, AND MALTA UNDER THE SINGLE TRANSFERABLE VOTE: REFLECTIONS ON AN EMBEDDED INSTITUTION, in American Political Science Review, 95 (December 2001), 1012 - 1013.

Review of Dianne T. Thompson, CONGRESSIONAL REDISTRICTING IN NORTH CAROLINA: RECONSIDERING TRADITIONAL CRITERIA, in The Law and Politics Book Review, 13 (December 2003).

Review of Douglas J. Amy, REAL CHOICES / NEW VOICES: HOW PROPORTIONAL REPRESENTATION ELECTIONS COULD REVITALIZE AMERICAN DEMOCRACY, in Representation, 40 (No. 2, 2004), 158-160.

Review of David M. Ferrell and Ian McAllister, THE AUSTRALIAN ELECTION SYSTEM: ORIGINS, VARIATIONS AND CONSEQUENCES, in Representation, 42 (November 2006), 368-370.

Review of Thomas E. Mann and Bruce E. Cain, (eds.), PARTY LINES: COMPETITION, PARTISANSHIP, AND CONGRESSIONAL REDISTRICTING, in Party Politics, 14 (May 2008), 373-376.

Review of Lisa Handley and Bernard Grofman, (eds.), REDISTRICTING IN COMPARATIVE PERSPECTIVE, in American Review of Politics, 30 (Winter 2010), 363-368.

Review of James Thomas Tucker, THE BATTLE OVER BILINGUAL BALLOTS: LANGUAGE MINORITIES AND POLITICAL ACCESS UNDER THE VOTING RIGHTS ACT, in International Journal of Law in Context, 8 (December. 2012), 524-526.

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:14-CV-03241-LHR** |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant*. | § | |

## DECLARATION OF JOHN ALFORD, Ph.D

1.      My name is John Alford, Ph.D.  I am over twenty-one years of age and fully qualified to make this declaration. Except where otherwise indicated, the facts set out in this declaration, and within my attached report, are within my personal knowledge. I make this declaration under penalty of perjury and pursuant to 28 U.S.C. § 1746.

2.      I was retained by City of Pasadena to serve as an expert in this case.  My findings and opinions in this matter, as well as the other information required by Federal Rule of Civil Procedure 26(A)(2)(B), are contained in my expert report of December 16, 2015, which is attached in its entirety as Exhibit A to this declaration, and incorporated by reference as though fully restated herein.

Pursuant to 28 U.S.C. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing, including the attached report, is true and correct to the best of my knowledge, information, and belief.

Executed on the __30th____ day of June, 2016.


_____
JOHN ALFORD

146

Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ALBERTO PATINO, *et al.*,** | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **VS.** | § | **Civil Action No.  H-14-3241** |
| | § | |
| | § | |
| **CITY OF PASADENA, *et al.*,** | § | |
| | § | |
| **Defendants** | § | |

**<u>EXPERT REPORT OF JOHN ALFORD, Ph.D.</u>**

I have been retained as an expert to provide analysis related to a Voting Rights Act challenge to the current mixed district system (six single member and two at-large districts) for the election of city council members in the Pasadena Texas.  My rate of compensation is $250 per hour. I am a tenured professor of political science at Rice University.  At Rice, I have taught courses on redistricting, elections, political representation, voting behavior, and statistical methods at both the undergraduate and graduate level.  Over the last thirty years, I have worked with numerous local governments on districting plans and on Voting Rights Act issues.  I have previously provided expert reports and/or testified as an expert witness on voting rights and statistical issues in a variety of court cases, working for the U.S. Attorney in Houston, the Texas Attorney General, U.S. Congressmen, and various cities and school districts, including two separate cases involving the Pasadena Independent School District.  In the 2001 round of redistricting, I was retained as an

147

expert to provide advice to the Texas Attorney General in his role as Chair of the Legislative Redistricting Board. I subsequently served as the expert for the State of Texas in the state and federal litigation involving the 2001 redistricting for U.S. Congress, the Texas Senate, the Texas House of Representatives, and the Texas Board of Education. In 2011 I again worked as an expert for the State of Texas in the consolidated cases challenging the 2011 statewide redistricting, and in the State's Section 5 challenge in the DC Court. I also have worked as an expert in redistricting and voting rights cases in Alabama, Florida, Louisiana, Mississippi, New Mexico, and Wisconsin. The details of my academic background, including all publications in the last ten years and work as an expert, including all cases in which I have testified by deposition or at trial in the last four years, are covered in the attached curriculum vita (Appendix A).

In preparing this report I have relied on population data from the Census Bureau and election results provided by Harris County and the City of Pasadena. I have also reviewed the expert reports of Mr. Ely, Professor Tijerina, and Professor Engstrom, as well as data and materials relied on in their reports and provided by them.

**Election Analysis**

In order to estimate the patterns of voting for Hispanics and Anglos in Pasadena, Professor Engstrom and I both rely on the statistical technique of Ecological Inference (EI), developed originally by Professor Gary King. EI is a more efficient technique developed specifically to improve on ecological regression, the analysis technique previously used in VRA lawsuits to assess voter cohesion and polarization. In a nutshell, traditional ecological regression is a mathematical technique for estimating the single best fitting straight line that could be drawn to describe the relationship between two variables in a scatter plot. Applied to voting rights cases, the logic of ecological regression analysis is to determine to what degree, if any, the vote for a candidate

increases in a linear fashion as the concentration of voters of a given ethnicity in the precincts increases.  In contrast, King's EI procedure utilizes a method of bounds analysis, combined with a more traditional statistical method, to improve on standard ecological regression.  While the details are mathematically complex, the differences mostly center on utilizing deterministic bounds information contained in individual precinct results that would not be exploited in ecological regression.  In addition, EI relaxes the linear constraint that a traditional ecological regression analysis would impose on the pattern across precincts.  This combination in EI of relaxing some assumptions and utilizing more information typically yields a more efficient estimation of cohesion and polarization when compared to standard ecological regression, though in practice the two different techniques seldom lead to any differences in the substantive conclusions.

In Voting Rights Act cases it is common to distinguish between two types of elections that are used to assess voting behavior.  Endogenous elections are the elections that are the actual focus of the lawsuit – in this case the elections for the Pasadena city council.  Exogenous elections are elections for offices other than the challenged government, but typically covering the same geography – in this case an assortment of general election and party primary contests for several Harris County offices.  Endogenous elections are central to the case, as the plaintiffs' burden under the Gingles threshold tests is to show that there is cohesion, bloc voting and polarization in those specific elections.  Exogenous elections are used to supplement or buttress evidence from the endogenous elections, particularly where patterns of voting in the endogenous elections are unclear due to limited availability of data for probative endogenous elections.

A replication of the EI election analysis reported by Professor Engstrom was performed, using the same election data that he relied on.  While there were the expected minor variations in estimated vote shares that are typically seen with these techniques, there were no substantive differences, with the single exception of a difference in the preferred candidate of Hispanic voters in

the 2010 Republican primary contest for County Commissioner.  Professor Engstrom has Olmos at a slight majority among Hispanic voters (56.2%), and the re-analysis here, reported in brackets in Table 2 below has Olmos at a slight minority among Hispanic voters (42.3%), but given the confidence interval reported by Professor Engstrom for the Olmos estimate of 16.4% to 95.8%, it is clear that we actually have very little idea of the precise location above or below 50% for Hispanic voters in this contest.  To make it clear that the differences in the conclusions that I reach in no way depend on differences in the analysis, I will use the vote share estimates that Professor Engstrom provided in his analysis for the election discussion that follows.  Those results, with the addition of estimates for one City of Pasadena election, the 2015 Place G contest (in brackets in Table 1), and one exogenous election, the 2010 Harris County Treasurer's contest (in brackets in Table 3), that were not included in Professor Engstrom's tables, are reported in Tables 1, 2, and 3 below.

**Table 1**

**City of Pasadena Elections**
(EI results from Engstrom Report Tables 1 and 2, with additional EI for Place G)

| Contest | Hispanic Voters | Non-Hispanic Voters |
|---|---|---|
| 2015 Place H – At Large - Del Toro | 87.3 | 28.3 |
| 2015 Place G – At Large – Van Houte | [70.6] | [41.6] |
| 2015 District A - Ybarra | 97.0 | 54.4 |
| 2015 District B - Perez | 82.0 | 36.3 |
| 2015 District D - Wheeler | 89.5 | 55.1 |
| 2013 Proposition 1 – 'No' Vote | 99.6 | 39.8 |

Looking first at the City of Pasadena elections, as reported above in Table 1, it is clear, as Professor Engstrom noted, that Hispanic voters are providing cohesive support for Hispanic candidates (Del Toro, Ybarra, Perez, and Wheeler) and in the case of Proposition 1, the Hispanic preferred policy position.  In contrast, the pattern for non-Hispanic voters in city elections is much

4

150

less cohesive and much more variable.  Non-Hispanic voters are estimated to have given a majority of their votes to the Hispanic preferred candidate in two of the three districted contests, and crossover voting is high in the other three contests as well.  Thus in the four city council contest two are clearly not polarized, as both groups of voters preferred the same Hispanic candidate, and in the other two city council contests, Anglo voter preference for the Anglo candidate is much less cohesive than Hispanic preference for the Hispanic candidate.

The nearly 40% crossover in the Proposition 1 vote in 2013 fits this same pattern of cohesive voting among Hispanics and a more evenly divided preference among non-Hispanics.  This is notable because it illustrates that even without constituting an outright majority of the voting electorate in a given contest, or receiving majority support among non-Hispanic voters, the combination of highly cohesive Hispanic voting with substantial non-Hispanic crossover, can result in the preference of Hispanic voters prevailing.  While in 2013 the 'No' vote preference of Hispanic voters did not quite carry the day, the defeat was very narrow, with Proposition 1 passing by a margin of less than a hundred votes out of a total of almost sixty-five hundred total votes cast.  This close result occurred despite the fact that in the 2013 election Hispanics accounted for only 17.3% of the voters in the election (compared to 23.5% in the 2015 city election).  Given the fact that the Hispanic share of registered voters in Pasadena has been rising over the last four years (see the Rives report in this case), and has recently reached 39.6%, these levels of cohesion and crossover could clearly result in net majorities for Hispanic preferred candidates and policy positions in the city at large.  Indeed, using the levels of Hispanic cohesion and Anglo crossover for the 2013 Proposition 1 contest from Table 1, and assuming a share of the electorate for Hispanic voters equal to that in the most recent 2015 election (23.5%), the predicted result would be defeat for Proposition 1 with a no vote of 53.9%.

The patterns of voting in the 2015 City elections by the Place G at-large contest between incumbents Pat Van Houte and Steve Cote are also instructive.  Van Houte was the incumbent in District D in the previous all single-member district plan.  District D was one of the Spanish surname majority districts in the northern part of Pasadena under that plan.  Van Houte was a vocal opponent on Council of Proposition 1 and also of the resulting 6-2 plan, including a notable Council meeting in which she was escorted out of the meeting by police officers on the instructions of Mayor Isbell for exceeding her two minute limit while speaking in opposition to the 6-2 map (Pasadena Citizen, May 8, 2015).  In contrast, her opponent in the newly created at-large G position, Steve Cote, was the incumbent in former single-member District G, an Anglo-registered-vote-majority district.  Unlike Van Houte, Cote was a supporter of the 6-2 plan.  In the 2015 contest Cote was indorsed by the Citizens to Keep Pasadena Strong PAC.  A look at the election results shows that Van Houte was the clear preference of Hispanic votes in the city (receiving an EI estimated 70.6% of Hispanic votes), and that Cote received the majority of Anglo votes (receiving an EI estimated 58.4% of Anglo votes).  However, despite the fact that non-Hispanics accounted a clear majority (76.5%) of the actual voters in the 2015 and despite the fact that these non-Hispanic voters gave a majority of their support to Cote, Van Houte, the Hispanic-preferred candidate, won the election with 52% of the vote.

The other at-large contest in 2015 featured an incumbent (Darrell Morrison) from the old single-member District H, who like Cote, represented a majority Anglo district.  The Hispanic-preferred candidate (Del Toro), unlike Van Houte, was not an incumbent.  He resides in District E, a majority Anglo district in the southern part of Pasadena.   Like Van Houte, he was the preferred candidate of Hispanic voters, getting an estimated 87.3% of the Hispanic vote.  He received a lower level of crossover support from non-Hispanics (28.3%) than Van Houte, and lost the contest to Cote.  However, even with this lower level of Anglo support, Del Toro could have won a majority if

the Hispanic share of the electorate had matched the Hispanic share of registration (39.6%).  In fact he would be projected to win a majority of the vote if Hispanic voters made up 37% or more of the electorate.  Similarly, Celestino Perez, the Hispanic preferred candidate in District B, would be projected to win a majority of the vote if Hispanic voters made up 29.7% or more of the electorate, a level far below the 57.1% Hispanic share of the registered voters in that district.

Taken together, the analysis of City of Pasadena elections show consistent cohesive voting among Hispanic voters in favor of Hispanic-preferred candidates and policies.  The analysis does not show a similarly consistent or cohesive pattern of Anglo voting in opposition to Hispanic-preferred candidates and policies.  In two of the four council contests that Professor Engstrom analyzed (2015 District A and District D), Anglo voters cast a majority of their votes for the Hispanic candidates. In two other contests (2015 District G and 2013 Proposition 1), Anglo crossover voting was sufficient to provide an actual or projected victory for the Hispanic-preferred candidate or policy position, even at the relatively low levels of Hispanic turnout evident in the 2015 election, where Hispanics made up only 23.5% of the voters.  In the one remaining contest (2015 District H), where Anglo crossover was the lowest, there was still sufficient Anglo crossover for the Hispanic preferred candidate to have won if the percent of Hispanic registered voters that turned out in the election had reached levels more similar to Anglo turnout.

It is important to note that Professor Engstrom has provided analysis for only four endogenous elections in his report.  All are from the 2015 election and two of the four elections are clearly not examples of racially polarized voting, as Hispanic and non-Hispanic voters in those elections shared the same preferred candidate, a candidate that was also the Hispanic candidate in the election.  In District B, while voting appeared to be more polarized, the fact that Hispanics have a registered vote majority of 57.1% suggested that the failure to elect the Hispanic preferred

candidate is less about Anglo voting patterns than about the failure of Hispanics to turn out in support of Perez at anything above minimal levels.

While there may be data limitations for earlier City elections, there are other non-partisan exogenous elections, specifically school board elections, which include the Pasadena electorate. The Pasadena Independent School District includes just over 80% of the persons in the City of Pasadena.  The pattern noted above in the City elections, of consistent Hispanic cohesion being present, but no evidence of consistent non-Hispanic cohesion in opposition to Hispanic candidates of choice is also apparent in school district contests that I analyzed for an expert report in the recent case challenging the at-large election system in the Pasadena Independent School District.  The details of that analysis are in my report from that case, attached here as Appendix B.

## Exogenous Elections

Professor Engstrom's Table 2 in his report mixes together results for the City Proposition 1 (covered above with the other City elections), with exogenous Harris county primary and general election contests.  I will cover the latter two types of elections separately, as they differ substantially in character.  Table 2 below collects the Engstrom EI results for the partisan primary contests. These party primaries are exogenous elections both in that they are not the elections at issue in the case (Harris County elections are not being challenged here) and in that they differ substantially in character from Pasadena City elections.  Most notable among the differences are that these elections are a part of a larger partisan election structure, hence the existence of primaries, a feature wholly absent in the City elections.  The primaries do have the advantage, relative to the County partisan general elections, of at least being internally non-partisan, and in that sense more similar to the city elections.

**Table 2**

**Exogenous Partisan Primaries**

(EI results from Engstrom Report Table 2, with additional EI for Olmos)

| Contest | Hispanic Voters | Non-Hispanic Voters |
|---|---|---|
| 2008 Dem. Primary – Sheriff – Adrian Garcia | 88.4 | 36.5 |
| 2012 Dem. Primary – Sheriff – Adrian Garcia | 86.7 | 73.2 |
| 2010 Rep. Primary - County Com. Prec. 2 - Olmos | 56.2 [42.3] | 34.5 [24.3] |
| 2012 Rep. Primary– Sheriff - Monzon | 38.6 | 8.7 |

Professor Enstrom's discussion of the primary elections is brief, and often refers to the combined results for the primary and general elections.  Taken separately, the analysis for the party primaries is clear.  The two Democratic primary contests show Hispanic cohesion at levels similar to that seen in the City elections.  Also, following the pattern seen above in City elections, Anglo cohesion is not consistent, with Garcia's Anglo support jumping from 36.5% in 2008 to 73.2% four years later.  Clearly the 2012 Democratic primary is not evidence of racially polarized voting, and in the 2008 Democratic primary the Anglo crossover vote was sufficient to give Adrian Garcia almost 60% of the vote in the Pasadena precincts.  In the two Republican contests, the results do not resemble the city results.  In neither contest is there evidence of cohesive voting among Hispanic voters.  Professor Engstrom suggests that his estimate at 56.2% gives Olmos a majority among Hispanic voters, but our estimate, at 42.3%, suggests that this may not be the case.  A glance at the confidence interval reported by Professor Engstrom for his estimate (a range from 16.4% – 95.8%), and the similarly broad range for our estimate (from 17.5% to 67.9%), suggests that we actually don't know much about the exact division of the Hispanic vote, but it clearly is distinct in both the estimate itself and in the extremely broad confidence interval from any of the previously discussed results.  In any case, this doesn't look like much evidence of a racially polarized election.  In the

9

155

Ruben Monzon contest, Professor Engstrom suggests that the 38.6% of the Hispanic vote going to Monzon makes him the plurality choice of Hispanic voters.  That is true, but it begs the fact that this estimate leaves 61.4% of Hispanic voters favoring one of Monzon's non-Hispanic opponents.   The non-Hispanic candidates in this contest received the clear majority of the votes cast by both Hispanics and non-Hispanic, and that doesn't provide much evidence of racially polarized voting.

**Table 3**

**Exogenous Partisan General Elections**

(EI results from Engstrom Report Table 2, with additional EI for Sanchez)

| Contest | Hispanic Voters | Non-Hispanic Voters |
|---|---|---|
| 2012 Sheriff – Adrian Garcia (Democrat) | 95.9 | 17.6 |
| 2010 County Com. Prec. 2 –Sylvia Garcia (Democrat) | 98.4 | 20.9 |
| 2008 Sheriff – Adrian Garcia (Democrat) | 98.2 | 28.6 |
| 2010 County Treasurer - Sanchez (Republican) | [17.8] | [79.9] |

Table 3 above collects the Engstrom EI results for the partisan general election contests. Again, these general elections are exogenous elections both in that they are not the elections at issue in the case and in that they differ substantially in character from Pasadena City elections.  Most notable among the differences are that these elections are a part of a larger partisan election structure, with features like separate partisan primary nominating contests, the widely used option of 'one check' straight ticket voting (used by about two-thirds of voters in Harris County), and prominent designation of candidate partisan affiliation on the ballot itself.

Professor Engstrom provides analysis for three Harris County general election contests.  He states on page 6 of his report that he included "elections to Harris County offices since 2008 in which all registered voters in Pasadena could vote. The elections analyzed are, to my knowledge, all

such elections presenting voters with a choice between or among Latino and non-Latino candidates." Table 3 above adds one such election that Professor Enstrom overlooked. This 2010 general election contest for County Treasurer was between Democratic nominee Billy Briscoe and Republican nominee Orlando Sanchez. The impact of the partisan nature of the election structure is clear. Billy Briscoe, the non-Hispanic candidate is the cohesive choice of Hispanic voters and Orlando Sanchez, the Hispanic candidate, is the cohesive choice of Non-Hispanic voters. This is the opposite of the pattern for the other three contests. What is consistent in the table is that the Democratic candidate is always the cohesive choice of Hispanic voters and the Republican candidate is always the cohesive choice of non-Hispanic voters.

This pattern is also apparent in a broader selection of contests that I analyzed for my report in the recent case challenging the at large election system in the Pasadena Independent School District (see Appendix B). The summary I offered in that report is equally apt here: "If their exogenous analysis showed that the ethnicity of the candidate was driving the behavior of the voters they would at least have the beginnings of a connection, since candidate ethnicity is a visible feature of both the exogenous partisan elections and the non-partisan elections like the PISD board elections. But here the factor driving the voting behavior is partisanship; a feature built in to the exogenous elections from the very start in the form of a party nomination system, incorporated into the ballot itself with party indications for each candidate, and ultimately mechanically connected to the majority of votes cast through the mechanism of straight-party ticket voting." (Page 20, report attached as Appendix B)

The fact that the party affiliation of candidates on a partisan general election ballot trumps the influence of the candidates' race or ethnicity when it comes to how voters cast ballots raises interesting questions about the how to properly assess the degree of racial polarization in those elections. The important point here is that whatever the nexus between ethnicity and voting in

157

explicitly partisan election systems, the party polarization that is evident in those elections cannot simply be asserted as prima facie evidence of racially polarized voting in non-partisan elections involving subsets of the geography and population of those larger partisan election structures.

## Mixed Election Systems

The National League of Cities website provides the following summary of the pluses and minuses of at-large elections.

*All at-large members are elected to serve the same constituency, which is the population of the city as a whole.  At-large election proponents favor having council members elected by the entire city because:*

- *Council members in an at-large system can be more impartial, rise above the limited perspective of a single district and concern themselves with the problems of the whole community.*
- *Vote trading between councilmembers is minimized.*
- *Better-qualified individuals are elected to the council because the candidate pool is larger.*

*However, at-large elections can weaken the representation of particular groups, especially if the group does not have a citywide base of operations or is an ethnic or racial group concentrated in a specific ward.*

*Nearly two-thirds (64 percent) of all municipalities use at-large elections in some way. At-large elections tend to be more popular in small cities and more affluent areas.*

A mixed system, like the 6-2 system currently in use in Pasadena, attempts to capture some of the benefits of at-large elections, while keeping the benefits of single member districts.  To date there is an indication of success.  Following the 2013 elections, the old 8-0 all single member district system produced a council with two Hispanic members - Ornaldo Ybarra in District A and Cody Ray Wheeler in District E.  Together they represented only 25% of the residents of Pasadena.

Following the 2015 elections, the new 6-2 mixed district system produced a council with three Hispanic members - Ornaldo Ybarra in District A, Sammy Casados in District C, and Cody Ray Wheeler in District D.  Together they represent 50% of the residents of Pasadena.  In addition, District B, in which Celestino Perez narrowly (47.0%) lost to incumbent Bruce Leamon, provides a very clear opportunity for an addition Hispanic seat, as 57.1% of the registered voters in the district are Hispanic.  Pat Van Houte, who had represented the old majority Hispanic District D, was elected to place G, one of the two at-large seats, and was the candidate of choice for Hispanic voters in the election.  Van Houte is now in a prominent political position as one of the two at-large members, represents the entire population of Pasadena, and is, for example, better positioned to run for Mayor when the current term-limited incumbent completes his term.  In addition, Van Houte was able to appeal for support to all of the over 21,000 Hispanic registered voters throughout the city, rather than being restricted to the 3520 Hispanic registered voters in the territory of her old District D.  Oscar Del Toro was not successful in his first run for council in the place H at-large seat, but given that he lived in old District G, if the old 8-0 system had remained in place he would have been running against incumbent Steve Cote.  Given that old District G had a lower proportion of Hispanic registered voters than the city at large, Del Toro would likely have not won there either in 2015.

### Rates of Hispanic Participation

Given the high proportion of Hispanics in the adult citizen population (CVAP) and in the registered voter ranks, a key to greater Hispanic success in Pasadena elections is clearly greater turnout.  Hispanic registration rates have risen over time, and while there is still room for improvement given the Hispanic CVAP proportion in the city, the registration proportion is already sufficient to provide Hispanic success in Districts A, B, C, and D and in the two at-large seats as

well.  Lower relative participation rates among eligible Hispanics voters are not unique to Pasadena. In a recent piece on the Latin Times website (Nov 6, 2015), Cedar Attanasio offered this reflection on the recent Houston mayoral election:

> *Latinos have a horrible turnout rate. Nationally, only 50 percent of eligible Latino voters make it to the polls during presidential elections. In Houston, in an off-year election, the number was even worse.  Only 20 percent of Latinos showed up at the polls, according to the Chronicle. That's even despite the prospect of Garcia becoming Houston's first Hispanic mayor, the kind of "first" excitement that gave Obama a bump.*
> *Latinos in the U.S. are growing not only in numbers, but also in financial clout. A 2015 Neilson report calculates that Latino buying power will reach an estimated $1.7 Trillion dollars by 2019. In 2016, Latinos will constitute 13 percent of eligible voters; enough to decide the election, in theory.*
> *"However, the turnout rate of eligible Latino voters has historically lagged that of whites and blacks by substantial margins," reads a 2012 Pew report. "In 2008, for example, 50% of eligible Latino voters cast ballots, compared with 65% of blacks and 66% of whites (Lopez and Taylor, 2009)."*
> *Latinos have the potential to steer both local and national elections. Will brown guys and gals actually cast ballots in future elections?*

The Pew Report that Attanasio references, *Dissecting the 2008 Electorate: Most Diverse in U.S. History* by Mark Hugo Lopez and Paul Taylor (Pew Research Center, April 30, 2009), discussed the trends and levels of participation in more detail:

> *The levels of participation by black, Hispanic and Asian eligible voters all increased from 2004 to 2008, reducing the voter participation gap between themselves and white eligible voters. This was particularly true for black eligible voters. Their voter turnout rate increased 4.9 percentage points, from 60.3% in 2004 to 65.2% in 2008, nearly matching the voter turnout rate of white eligible voters (66.1%). For Hispanics, participation levels also increased, with the voter turnout rate rising 2.7 percentage points, from 47.2% in 2004 to 49.9% in 2008. Among Asians, voter participation rates increased from 44.6% in 2004 to 47.0% in 2008. Meanwhile, among white eligible voters, the voter turnout rate fell slightly, from 67.2% in 2004 to 66.1% in 2008.*

Note that participation rates among eligible white and black voters is essentially equal by 2008 in the mid 60% range, while participation rates among eligible Hispanic and Asian voters is essentially equal in the high 40% range.  While there is some suggestion that the lower participation rates among Hispanic eligible voters relative to whites can be explained by socioeconomic factors

14

160

like lower relative levels of income and education, these patterns seem to contradict that.  Black income and education levels among adult citizens are very similar to those of Hispanic adult citizens, but despite falling well below whites on a variety of these socioeconomic indicators, black eligible voters now participate at rates comparable to whites.  The pattern for Asian participation is also at odds with this socioeconomic explanation for the participation gap.  Asian participation is similar, if slightly lower, than Hispanic participation, falling far below white participation rates, despite the fact that Asians are on average at or above whites in terms of statistics related to income and educational attainment.

## Conclusions

Evidence from endogenous elections suggests that Hispanic voters give cohesive support to Hispanic and Hispanic-preferred candidates and policy positions in City of Pasadena elections.  The voting patterns in the exogenous elections, including Pasadena Independent School District elections and the Harris County Democratic primaries, support this conclusion.  The pattern for non-Hispanic voters in the endogenous elections is much less cohesive and consistent, and non-Hispanic votes do not appear to usually work to defeat the preferred candidate of Hispanic voters. The voting patterns in the exogenous elections, including Pasadena Independent School District elections and the Harris County Democratic primaries, support this conclusion.  This conclusion is also supported by the fact that Hispanic representation appears to have improved as a result of the recent elections under the new 6-2 mixed plan relative to the results under the old 8-0 plan.

The demonstrated ability to elect in two districts (A and C) where Hispanics are a majority of the registered-voters, as well as in a district (D) with a demographic makeup that roughly mirrors the City's, and the undoubted ability to elect in District B, where almost three of every five registered voters are Hispanic, is clear evidence that Hispanics have an opportunity for

161

representation on the council that is roughly proportional to their share of the City's citizen voting age population.  The demonstrated ability to exert their influence for preferred candidates in at large elections, even though a Hispanic may not be running, also adds to the group's electoral strength under the existing 6-2 system.  The key to further Hispanic gains given current population patterns and trends would seem to be taking greater advantage of the relatively high levels of non-Hispanic crossover voting by moving Hispanic eligible voter participation levels up to levels more closely approaching Hispanic registration proportions in the city.

December 16, 2015

JOHN ALFORD, Ph.D.

16

162

# APPENDIX A

# John R. Alford

Curriculum Vitae

January, 2015

Dept. of Political Science

Rice University - MS-24

P.O. Box 1892

Houston, Texas   77251-1892

713-348-3364

jra@rice.edu

## Employment:

Associate Professor, Rice University, 1985 to present.

Assistant Professor, University of Georgia, 1981-1985.

Instructor, Oakland University, 1980-1981.

Teaching-Research Fellow, University of Iowa, 1977-1980.

Research Associate, Institute for Urban Studies, Houston, Texas, 1976-1977.

## Education:

Ph.D., University of Iowa, Political Science, 1981.

M.A., University of Iowa, Political Science, 1980.

M.P.A., University of Houston, Public Administration, 1977.

B.S., University of Houston, Political Science, 1975.

## Books:

*Predisposed: Liberals, Conservatives, and the Biology of Political Differences.* New York: Routledge, 2013. Co-authors, John R. Hibbing and Kevin B. Smith.

## Articles:

"Non-Political Images Evoke Neural Predictors Of Political Ideology."   with Woo-Young Ahn, Kenneth T. Kishida, Xiaosi Gu, Terry Lohrenz, Ann Harvey, Kevin Smith, Gideon Yaffe, John Hibbing, Peter Dayan, P. Read Montague. **Current Biology**.  (November, 2014).

164

"STRESS AND POLITICS: VARIANCE IN VOTING BEHAVIOR IS PREDICTED BY BASELINE CORTISOL LEVELS." WITH JEFFREY FRENCH, KEVIN SMITH, ADAM GUCK, ANDREW BIRNIE, AND JOHN HIBBING. **PHYSIOLOGY & BEHAVIOR**. (JUNE, 2014).

"DIFFERENCES IN NEGATIVITY BIAS UNDERLIE VARIATIONS IN POLITICAL IDEOLOGY." WITH KEVIN B. SMITH AND JOHN R. HIBBING. **BEHAVIORAL AND BRAIN SCIENCES**. (JUNE, 2014).

"GENETIC AND ENVIRONMENTAL TRANSMISSION OF POLITICAL ORIENTATIONS." WITH CAROLYN L. FUNK, MATTHEW HIBBING, KEVIN B. SMITH, NICHOLAS R. EATON, ROBERT F. KRUEGER, LINDON J. EAVES, JOHN R. HIBBING. **POLITICAL PSYCHOLOGY**, (DECEMBER, 2013).

"BIOLOGY, IDEOLOGY, AND EPISTEMOLOGY: HOW DO WE KNOW POLITICAL ATTITUDES ARE INHERITED AND WHY SHOULD WE CARE?" WITH KEVIN SMITH, PETER K. HATEMI, LINDON J. EAVES, CAROLYN FUNK, AND JOHN R. HIBBING. **AMERICAN JOURNAL OF POLITICAL SCIENCE**. (JANUARY, 2012)

"DISGUST SENSITIVITY AND THE NEUROPHYSIOLOGY OF LEFT-RIGHT POLITICAL ORIENTATIONS" WITH KEVIN SMITH, JOHN HIBBING, DOUGLAS OXLEY, AND MATTHEW HIBBING, **PLOSONE**, (2011), 6(10):E25552. DOI:10.1371/JOURNAL.PONE.0025552.

"THE POLITICS OF MATE CHOICE" WITH PETER HATEMI, JOHN R. HIBBING, NICHOLAS MARTIN AND LINDON EAVES, **JOURNAL OF POLITICS**, (2011) 73, DOI:10.1017/S0022381611000016.

"LINKING GENETICS AND POLITICAL ATTITUDES: RE-CONCEPTUALIZING POLITICAL IDEOLOGY" WITH KEVIN SMITH, JOHN HIBBING, DOUGLAS OXLEY, AND MATTHEW HIBBING, **POLITICAL PSYCHOLOGY**, (JUNE, 2011).

"NOT BY TWINS ALONE: USING THE EXTENDED TWIN FAMILY DESIGN TO INVESTIGATE THE GENETIC BASIS OF POLITICAL BELIEFS" WITH PETER HATEMI, JOHN HIBBING, SARAH MEDLAND, MATTHEW KELLER, KEVIN SMITH, NICHOLAS MARTIN, AND LINDON EAVES, **AMERICAN JOURNAL OF POLITICAL SCIENCE**, (JULY, 2010).

"THE ULTIMATE SOURCE OF POLITICAL OPINIONS: GENES AND THE ENVIRONMENT" WITH JOHN R. HIBBING IN **UNDERSTANDING PUBLIC OPINION**, 3RD EDITION EDS. BARBARA NORRANDER AND CLYDE WILCOX, WASHINGTON D.C.: CQ PRESS, (2010).

"IS THERE A 'PARTY' IN YOUR GENES" WITH PETER HATEMI, JOHN R. HIBBING, NICHOLAS MARTIN AND LINDON EAVES, **POLITICAL RESEARCH QUARTERLY**, (SEPTEMBER, 2009).

[19]

165

"TWIN STUDIES, MOLECULAR GENETICS, POLITICS, AND TOLERANCE: A RESPONSE TO BECKWITH AND MORRIS" WITH JOHN R. HIBBING AND CARY FUNK, **PERSPECTIVES ON POLITICS**, (DECEMBER, 2008). THIS IS A SOLICITED RESPONSE TO A CRITIQUE OF OUR 2005 APSR ARTICLE "ARE POLITICAL ORIENTATIONS GENETICALLY TRANSMITTED?"

"POLITICAL ATTITUDES VARY WITH PHYSIOLOGICAL TRAITS" WITH DOUGLAS R. OXLEY, KEVIN B. SMITH, MATTHEW V. HIBBING, JENNIFER L. MILLER, MARIO SCALORA, PETER K. HATEMI, AND JOHN R. HIBBING, **SCIENCE**, (SEPTEMBER 19, 2008).

"THE NEW EMPIRICAL BIOPOLITICS" WITH JOHN R. HIBBING, **ANNUAL REVIEW OF POLITICAL SCIENCE**, (JUNE, 2008).

"BEYOND LIBERALS AND CONSERVATIVES TO POLITICAL GENOTYPES AND PHENOTYPES" WITH JOHN R. HIBBING AND CARY FUNK, **PERSPECTIVES ON POLITICS**, (JUNE, 2008).  THIS IS A SOLICITED RESPONSE TO A CRITIQUE OF OUR 2005 APSR ARTICLE "ARE POLITICAL ORIENTATIONS GENETICALLY TRANSMITTED?"

"PERSONAL, INTERPERSONAL, AND POLITICAL TEMPERAMENTS" WITH JOHN R. HIBBING, **ANNALS OF THE AMERICAN ACADEMY OF POLITICAL AND SOCIAL SCIENCE**, (NOVEMBER, 2007).

"IS POLITICS IN OUR GENES?" WITH JOHN R. HIBBING, **TIDSSKRIFTET POLITIK**, (FEBRUARY, 2007).

"BIOLOGY AND RATIONAL CHOICE" WITH JOHN R. HIBBING, **POLITICAL ECONOMY NEWSLETTER**, (FALL, 2005)

"ARE POLITICAL ORIENTATIONS GENETICALLY TRANSMITTED?" WITH JOHN R. HIBBING AND CAROLYN FUNK, **AMERICAN POLITICAL SCIENCE REVIEW**, (MAY, 2005).  (THE MAIN FINDINGS TABLE FROM THIS ARTICLE HAS BEEN REPRINTED IN TWO COLLEGE LEVEL TEXT BOOKS - PSYCHOLOGY, 9TH ED. AND INVITATION TO PSYCHOLOGY 4TH ED. BOTH BY WADE AND TAVRIS, PRENTICE HALL, 2007).

"THE ORIGIN OF POLITICS:  AN EVOLUTIONARY THEORY OF POLITICAL BEHAVIOR" WITH JOHN R. HIBBING, **PERSPECTIVES ON POLITICS**, (DECEMBER, 2004).

"ACCEPTING AUTHORITATIVE DECISIONS:  HUMANS AS WARY COOPERATORS" WITH JOHN R. HIBBING, **AMERICAN JOURNAL OF POLITICAL SCIENCE**, (JANUARY, 2004).

"ELECTORAL CONVERGENCE OF THE TWO HOUSES OF CONGRESS" WITH JOHN R. HIBBING, IN **THE EXCEPTIONAL SENATE**, ED. BRUCE OPPENHEIMER, COLUMBUS: OHIO STATE UNIVERSITY PRESS, (2002).

[20]

"WE'RE ALL IN THIS TOGETHER:  THE DECLINE OF TRUST IN GOVERNMENT, 1958-1996." IN **WHAT IS IT ABOUT GOVERNMENT THAT AMERICANS DISLIKE?**, EDS. JOHN HIBBING AND BETH THEISS-MORSE, CAMBRIDGE:  CAMBRIDGE UNIVERSITY PRESS, (2001).

"THE 2000 CENSUS AND THE NEW REDISTRICTING," **TEXAS STATE BAR ASSOCIATION SCHOOL LAW SECTION NEWSLETTER**, (JULY, 2000).

"OVERDRAFT:  THE POLITICAL COST OF CONGRESSIONAL MALFEASANCE" WITH HOLLY TEETERS, DAN WARD, AND RICK WILSON, **JOURNAL OF POLITICS** (AUGUST, 1994).

"PERSONAL AND PARTISAN ADVANTAGE IN U.S. CONGRESSIONAL ELECTIONS, 1846-1990" WITH DAVID W. BRADY, IN **CONGRESS RECONSIDERED** 5TH EDITION, EDS. LARRY DODD AND BRUCE OPPENHEIMER, CQ PRESS, (1993).

"THE 1990 CONGRESSIONAL ELECTION RESULTS AND THE FALLACY THAT THEY EMBODIED AN ANTI-INCUMBENT MOOD" WITH JOHN R. HIBBING, **PS** 25 (JUNE, 1992).

"CONSTITUENCY POPULATION AND REPRESENTATION IN THE UNITED STATES SENATE" WITH JOHN R. HIBBING.  **LEGISLATIVE STUDIES QUARTERLY**, (NOVEMBER, 1990).

"EDITORS' INTRODUCTION:  ELECTING THE U.S. SENATE" WITH BRUCE I. OPPENHEIMER.  **LEGISLATIVE STUDIES QUARTERLY**, (NOVEMBER, 1990).

"PERSONAL AND PARTISAN ADVANTAGE IN U.S. CONGRESSIONAL ELECTIONS, 1846-1990" WITH DAVID W. BRADY, IN **CONGRESS RECONSIDERED** 4TH EDITION, EDS. LARRY DODD AND BRUCE OPPENHEIMER, CQ PRESS, (1988).  REPRINTED IN THE CONGRESS OF THE UNITED STATES, 1789-1989, ED. JOEL SILBY, CARLSON PUBLISHING INC., (1991), AND IN THE QUEST FOR OFFICE, EDS. WAYNE AND WILCOX, ST. MARTINS PRESS, (1991).

"CAN GOVERNMENT REGULATE FERTILITY?  AN ASSESSMENT OF PRO-NATALIST POLICY IN EASTERN EUROPE" WITH JEROME LEGGE.  **THE WESTERN POLITICAL QUARTERLY** (DECEMBER, 1986).

"PARTISANSHIP AND VOTING" WITH JAMES CAMPBELL, MARY MUNRO, AND BRUCE CAMPBELL, IN **RESEARCH IN MICROPOLITICS.  VOLUME 1 - VOTING BEHAVIOR**.  SAMUEL LONG, ED.  JAI PRESS, (1986).

"ECONOMIC CONDITIONS AND INDIVIDUAL VOTE IN THE FEDERAL REPUBLIC OF GERMANY" WITH JEROME S. LEGGE.  **JOURNAL OF POLITICS** (NOVEMBER, 1984).

"Television Markets and Congressional Elections" with James Campbell and Keith Henry. **Legislative Studies Quarterly** (November, 1984).

"Economic Conditions and the Forgotten Side of Congress:   A Foray into U.S. Senate Elections" with John R. Hibbing, **British Journal of Political Science** (October, 1982).

"Increased Incumbency Advantage in the House" with John R.  Hibbing, **Journal of Politics** (November, 1981).   Reprinted in The Congress of the United States, 1789-1989, Carlson Publishing Inc., (1991).

"The Electoral Impact of Economic Conditions:   Who is Held Responsible?" with John R. Hibbing, **American Journal of Political Science** (August, 1981).

"Comment on Increased Incumbency Advantage" with John R. Hibbing, Refereed communication: **American Political Science Review** (March, 1981).

"Can Government Regulate Safety?   The Coal Mine Example" with Michael Lewis-Beck, **American Political Science Review** (September, 1980).


## Awards and Honors:

CQ Press Award - 1988, honoring the outstanding paper in legislative politics presented at the 1987 Annual Meeting of the American Political Science Association.   Awarded for "The Demise of the Upper House and the Rise of the Senate: Electoral Responsiveness in the United States Senate" with John Hibbing.


## Research Grants:

National Science Foundation, 2009-2011, "Identifying the Biological Influences on Political Temperaments", with John Hibbing, Kevin Smith, Kim Espy, Nicolas Martin and Read Montague.   This is a collaborative project involving Rice, University of Nebraska, Baylor College of Medicine, and Queensland Institute for Medical Research.

National Science Foundation, 2007-2010, "Genes and Politics:   Providing the Necessary Data", with John Hibbing, Kevin Smith, and Lindon Eaves.   This is a collaborative project

[22]

168

INVOLVING RICE, UNIVERSITY OF NEBRASKA, VIRGINIA COMMONWEALTH UNIVERSITY, AND THE UNIVERSITY OF MINNESOTA.

NATIONAL SCIENCE FOUNDATION, 2007-2010, "INVESTIGATING THE GENETIC BASIS OF ECONOMIC BEHAVIOR", WITH JOHN HIBBING AND KEVIN SMITH. THIS IS A COLLABORATIVE PROJECT INVOLVING RICE, UNIVERSITY OF NEBRASKA, VIRGINIA COMMONWEALTH UNIVERSITY, AND THE QUEENSLAND INSTITUTE OF MEDICAL RESEARCH.

RICE UNIVERSITY FACULTY INITIATIVES FUND, 2007-2009, "THE BIOLOGICAL SUBSTRATES OF POLITICAL BEHAVIOR". THIS IS IN ASSISTANCE OF A COLLABORATIVE PROJECT INVOLVING RICE, BAYLOR COLLEGE OF MEDICINE, QUEENSLAND INSTITUTE OF MEDICAL RESEARCH, UNIVERSITY OF NEBRASKA, VIRGINIA COMMONWEALTH UNIVERSITY, AND THE UNIVERSITY OF MINNESOTA.

NATIONAL SCIENCE FOUNDATION, 2004-2006, "DECISION-MAKING ON BEHALF OF OTHERS", WITH JOHN HIBBING. THIS IS A COLLABORATIVE PROJECT INVOLVING RICE AND THE UNIVERSITY OF NEBRASKA.

NATIONAL SCIENCE FOUNDATION, 2001-2002, DISSERTATION GRANT FOR KEVIN ARCENEAUX, "DOCTORAL DISSERTATION RESEARCH IN POLITICAL SCIENCE: VOTING BEHAVIOR IN THE CONTEXT OF U.S. FEDERALISM."

NATIONAL SCIENCE FOUNDATION, 2000-2001, DISSERTATION GRANT FOR STACY ULBIG, "DOCTORAL DISSERTATION RESEARCH IN POLITICAL SCIENCE: SUB-NATIONAL CONTEXTUAL INFLUENCES ON POLITICAL TRUST."

NATIONAL SCIENCE FOUNDATION, 1999-2000, DISSERTATION GRANT FOR RICHARD ENGSTROM, "DOCTORAL DISSERTATION RESEARCH IN POLITICAL SCIENCE: ELECTORAL DISTRICT STRUCTURE AND POLITICAL BEHAVIOR."

RICE UNIVERSITY RESEARCH GRANT, 1985, RECENT TRENDS IN BRITISH PARLIAMENTARY ELECTIONS.

FACULTY RESEARCH GRANTS PROGRAM, UNIVERSITY OF GEORGIA, SUMMER, 1982. IMPACT OF MEDIA STRUCTURE ON CONGRESSIONAL ELECTIONS, WITH JAMES CAMPBELL.

## Papers Presented:

"The Physiological Basis of Political Temperaments" 6th European Consortium for Political Research General Conference, Reykjavik, Iceland (2011), with Kevin Smith, and John Hibbing.

"Identifying the Biological Influences on Political Temperaments" National Science Foundation Annual Human Social Dynamics Meeting (2010), with John Hibbing, Kimberly Espy, Nicholas Martin, Read Montague, and Kevin B. Smith.

"Political Orientations May Be Related to Detection of the Odor of Androstenone" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, Amanda Balzer, Michael Gruszczynski, Carly M. Jacobs, and John Hibbing.

"Toward a Modern View of Political Man: Genetic and Environmental Transmission of Political Orientations from Attitude Intensity to Political Participation" Annual meeting of the American Political Science Association, Washington, DC (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Genetic and Environmental Transmission of Political Involvement from Attitude Intensity to Political Participation" Annual meeting of the International Society for Political Psychology, San Francisco, CA (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Are Violations of the EEA Relevant to Political Attitudes and Behaviors?" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, and John Hibbing.

"The Neural Basis of Representation" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with John Hibbing.

"Genetic and Environmental Transmission of Value Orientations" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with Carolyn Funk, Kevin Smith, Matthew Hibbing, Pete Hatemi, Robert Krueger, Lindon Eaves, and John Hibbing.

"The Genetic Heritability of Political Orientations: A New Twin Study of Political Attitudes" Annual Meeting of the International Society for Political Psychology, Dublin, Ireland (2009), with John Hibbing, Cary Funk, Kevin Smith, and Peter K Hatemi.

[24]

170

"THE HERITABILITY OF VALUE ORIENTATIONS" ANNUAL MEETING OF THE BEHAVIOR GENETICS ASSOCIATION, MINNEAPOLIS, MN (2009), WITH KEVIN SMITH, JOHN HIBBING, CAROLYN FUNK, ROBERT KRUEGER, PETER HATEMI, AND LINDON EAVES.

"THE ICK FACTOR: DISGUST SENSITIVITY AS A PREDICTOR OF POLITICAL ATTITUDES" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, IL (2009), WITH KEVIN SMITH, DOUGLAS OXLEY MATTHEW HIBBING, AND JOHN HIBBING.

"THE IDEOLOGICAL ANIMAL: THE ORIGINS AND IMPLICATIONS OF IDEOLOGY" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, BOSTON, MA (2008), WITH KEVIN SMITH, MATTHEW HIBBING, DOUGLAS OXLEY, AND JOHN HIBBING.

"THE PHYSIOLOGICAL DIFFERENCES OF LIBERALS AND CONSERVATIVES" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, IL (2008), WITH KEVIN SMITH, DOUGLAS OXLEY, AND JOHN HIBBING.

"LOOKING FOR POLITICAL GENES: THE INFLUENCE OF SEROTONIN ON POLITICAL AND SOCIAL VALUES" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, IL (2008), WITH PETER HATEMI, SARAH MEDLAND, JOHN HIBBING, AND NICHOLAS MARTIN.

"NOT BY TWINS ALONE:  USING THE EXTENDED TWIN FAMILY DESIGN TO INVESTIGATE THE GENETIC BASIS OF POLITICAL BELIEFS" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, CHICAGO, IL (2007), WITH PETER HATEMI, JOHN HIBBING, MATTHEW KELLER, NICHOLAS MARTIN, SARAH MEDLAND, AND LINDON EAVES.

"FACTORIAL ASSOCIATION: A GENERALIZATION OF THE FULKER BETWEEN-WITHIN MODEL TO THE MULTIVARIATE CASE" ANNUAL MEETING OF THE BEHAVIOR GENETICS ASSOCIATION, AMSTERDAM, THE NETHERLANDS (2007), WITH SARAH MEDLAND, PETER HATEMI, JOHN HIBBING, WILLIAM COVENTRY, NICHOLAS MARTIN, AND MICHAEL NEALE.

"NOT BY TWINS ALONE:  USING THE EXTENDED TWIN FAMILY DESIGN TO INVESTIGATE THE GENETIC BASIS OF POLITICAL BELIEFS" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, IL (2007), WITH PETER HATEMI, JOHN HIBBING, NICHOLAS MARTIN, AND LINDON EAVES.

"GETTING FROM GENES TO POLITICS:  THE CONNECTING ROLE OF EMOTION-READING CAPABILITY" ANNUAL MEETING OF THE INTERNATIONAL SOCIETY FOR POLITICAL PSYCHOLOGY, PORTLAND, OR, (2007.), WITH JOHN HIBBING.

[25]

171

"THE NEUROLOGICAL BASIS OF REPRESENTATIVE DEMOCRACY." HENDRICKS CONFERENCE ON POLITICAL BEHAVIOR, LINCOLN, NE (2006), WITH JOHN HIBBING.

"THE NEURAL BASIS OF REPRESENTATIVE DEMOCRACY" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, PHILADELPHIA, PA (2006), WITH JOHN HIBBING.

"HOW ARE POLITICAL ORIENTATIONS GENETICALLY TRANSMITTED? A RESEARCH AGENDA" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO ILLINOIS (2006), WITH JOHN HIBBING.

"THE POLITICS OF MATE CHOICE" ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION, ATLANTA, GA (2006), WITH JOHN HIBBING.

"THE CHALLENGE EVOLUTIONARY BIOLOGY POSES FOR RATIONAL CHOICE" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, WASHINGTON, DC (2005), WITH JOHN HIBBING AND KEVIN SMITH.

"DECISION MAKING ON BEHALF OF OTHERS" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, WASHINGTON, DC (2005), WITH JOHN HIBBING.

"THE SOURCE OF POLITICAL ATTITUDES AND BEHAVIOR: ASSESSING GENETIC AND ENVIRONMENTAL CONTRIBUTIONS" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO ILLINOIS (2005), WITH JOHN HIBBING AND CAROLYN FUNK.

"THE SOURCE OF POLITICAL ATTITUDES AND BEHAVIOR: ASSESSING GENETIC AND ENVIRONMENTAL CONTRIBUTIONS" ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION, CHICAGO ILLINOIS (2004), WITH JOHN HIBBING AND CAROLYN FUNK.

"ACCEPTING AUTHORITATIVE DECISIONS: HUMANS AS WARY COOPERATORS" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, ILLINOIS (2002), WITH JOHN HIBBING

"CAN WE TRUST THE NES TRUST MEASURE?" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, ILLINOIS (2001), WITH STACY ULBIG.

"THE IMPACT OF ORGANIZATIONAL STRUCTURE ON THE PRODUCTION OF SOCIAL CAPITAL AMONG GROUP MEMBERS" ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION, ATLANTA, GEORGIA (2000), WITH ALLISON RINDEN.

"ISOLATING THE ORIGINS OF INCUMBENCY ADVANTAGE:  AN ANALYSIS OF HOUSE PRIMARIES, 1956-1998" ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION, ATLANTA, GEORGIA (2000), WITH KEVIN ARCENEAUX.

"THE ELECTORALLY INDISTINCT SENATE," NORMAN THOMAS CONFERENCE ON SENATE EXCEPTIONALISM, VANDERBILT UNIVERSITY; NASHVILLE, TENNESSEE; OCTOBER (1999), WITH JOHN R. HIBBING.

"INTEREST GROUP PARTICIPATION AND SOCIAL CAPITAL" ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION, CHICAGO, ILLINOIS (1999), WITH ALLISON RINDEN.

"WE'RE ALL IN THIS TOGETHER:  THE DECLINE OF TRUST IN GOVERNMENT, 1958-1996."  THE HENDRICKS SYMPOSIUM, UNIVERSITY OF NEBRASKA, LINCOLN. (1998)

"CONSTITUENCY POPULATION AND REPRESENTATION IN THE UNITED STATES SENATE," ELECTING THE SENATE; HOUSTON, TEXAS; DECEMBER (1989), WITH JOHN R. HIBBING.

"THE DISPARATE ELECTORAL SECURITY OF HOUSE AND SENATE INCUMBENTS," AMERICAN POLITICAL SCIENCE ASSOCIATION ANNUAL MEETINGS; ATLANTA, GEORGIA; SEPTEMBER (1989), WITH JOHN R. HIBBING.

"PARTISAN AND INCUMBENT ADVANTAGE IN HOUSE ELECTIONS," ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION (1987), WITH DAVID W. BRADY.

"PERSONAL AND PARTY ADVANTAGE IN U.S. HOUSE ELECTIONS, 1846-1986" WITH DAVID W. BRADY, 1987 SOCIAL SCIENCE HISTORY ASSOCIATION MEETINGS.

"THE DEMISE OF THE UPPER HOUSE AND THE RISE OF THE SENATE: ELECTORAL RESPONSIVENESS IN THE UNITED STATES SENATE" WITH JOHN HIBBING, 1987 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

"A COMPARATIVE ANALYSIS OF ECONOMIC VOTING" WITH JEROME LEGGE, 1985 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

"AN ANALYSIS OF ECONOMIC CONDITIONS AND THE INDIVIDUAL VOTE IN GREAT BRITAIN, 1964-1979" WITH JEROME LEGGE, 1985 ANNUAL MEETING OF THE WESTERN POLITICAL SCIENCE ASSOCIATION.

"CAN GOVERNMENT REGULATE FERTILITY?  AN ASSESSMENT OF PRO-NATALIST POLICY IN EASTERN EUROPE" WITH JEROME LEGGE, 1985 ANNUAL MEETING OF THE SOUTHWESTERN SOCIAL SCIENCE ASSOCIATION.

"ECONOMIC CONDITIONS AND THE INDIVIDUAL VOTE IN THE FEDERAL REPUBLIC OF GERMANY" WITH JEROME S. LEGGE, 1984 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION.

"THE CONDITIONS REQUIRED FOR ECONOMIC ISSUE VOTING" WITH JOHN R. HIBBING, 1984 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

"INCUMBENCY ADVANTAGE IN SENATE ELECTIONS," 1983 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

"TELEVISION MARKETS AND CONGRESSIONAL ELECTIONS:  THE IMPACT OF MARKET/DISTRICT CONGRUENCE" WITH JAMES CAMPBELL AND KEITH HENRY, 1982 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION.

"ECONOMIC CONDITIONS AND SENATE ELECTIONS" WITH JOHN R. HIBBING, 1982 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION. "POCKETBOOK VOTING:  ECONOMIC CONDITIONS AND INDIVIDUAL LEVEL VOTING," 1982 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

"INCREASED INCUMBENCY ADVANTAGE IN THE HOUSE," WITH JOHN R. HIBBING, 1981 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.


## Other Conference Participation:

ROUNDTABLE PARTICIPANT "GENES, BRAINS, AND CORE POLITICAL ORIENTATIONS" 2008 ANNUAL MEETING OF THE SOUTHWESTERN POLITICAL SCIENCE ASSOCIATION, LAS VEGAS.

ROUNDTABLE PARTICIPANT "POLITICS IN THE LABORATORY" 2007 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION, NEW ORLEANS.

SHORT COURSE LECTURER, "WHAT NEUROSCIENCE HAS TO OFFER POLITICAL SCIENCE" 2006 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PANEL CHAIR AND DISCUSSANT, "NEURO-SCIENTIFIC ADVANCES IN THE STUDY OF POLITICAL SCIENCE" 2006 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PRESENTATION, "THE TWIN STUDY APPROACH TO ASSESSING GENETIC INFLUENCES ON POLITICAL BEHAVIOR" RICE CONFERENCE ON NEW METHODS FOR UNDERSTANDING POLITICAL BEHAVIOR, 2005.

PANEL DISCUSSANT, "THE POLITICAL CONSEQUENCES OF REDISTRICTING," 2002 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PANEL DISCUSSANT, "RACE AND REDISTRICTING," 1999 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

INVITED PARTICIPANT, "ROUNDTABLE ON PUBLIC DISSATISFACTION WITH AMERICAN POLITICAL INSTITUTIONS", 1998 ANNUAL MEETING OF THE SOUTHWESTERN SOCIAL SCIENCE ASSOCIATION.

PRESENTATION, "REDISTRICTING IN THE '90S," TEXAS ECONOMIC AND DEMOGRAPHIC ASSOCIATION, 1997.

PANEL CHAIR, "CONGRESSIONAL ELECTIONS," 1992 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION.

PANEL DISCUSSANT, "INCUMBENCY AND CONGRESSIONAL ELECTIONS," 1992 ANNUAL MEETING OF THE AMERICAN POLITICAL SCIENCE ASSOCIATION.

PANEL CHAIR, "ISSUES IN LEGISLATIVE ELECTIONS," 1991 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

PANEL CHAIR, "ECONOMIC ATTITUDES AND PUBLIC POLICY IN EUROPE," 1990 ANNUAL MEETING OF THE SOUTHERN POLITICAL SCIENCE ASSOCIATION

PANEL DISCUSSANT, "RETROSPECTIVE VOTING IN U.S. ELECTIONS," 1990 ANNUAL MEETING OF THE MIDWEST POLITICAL SCIENCE ASSOCIATION.

CO-CONVENER, WITH BRUCE OPPENHEIMER, OF ELECTING THE SENATE, A NATIONAL CONFERENCE ON THE NES 1988 SENATE ELECTION STUDY.  FUNDED BY THE RICE INSTITUTE FOR POLICY ANALYSIS, THE UNIVERSITY OF HOUSTON CENTER FOR PUBLIC POLICY, AND THE NATIONAL SCIENCE FOUNDATION, HOUSTON, TEXAS, DECEMBER, 1989.

INVITED PARTICIPANT, UNDERSTANDING CONGRESS: A BICENTENNIAL RESEARCH CONFERENCE, WASHINGTON, D.C., FEBRUARY, 1989.

[29]

175

Invited participant--Hendricks Symposium on the United States Senate, University of Nebraska, Lincoln, Nebraska, October, 1988

Invited participant--Conference on the History of Congress, Stanford University, Stanford, California, June, 1988.

Invited participant, "Roundtable on Partisan Realignment in the 1980's", 1987 Annual Meeting of the Southern Political Science Association.

## Professional Activities:

### Other Universities:

Invited Speaker, Annual Lecture, Psi Kappa -the Psychology Club at Houston Community College, 2014.

Invited Speaker, Graduate Student Colloquium, Department of Political Science, University of New Mexico, 2013.

Invited Keynote Speaker, Political Science Alumni Evening, University of Houston, 2013.

Invited Lecturer, Biology and Politics Masters Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2010.

Invited Lecturer, Biology and Politics Senior Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2008.

Visiting Fellow, the Hoover Institution, Stanford University, 2007.

Invited Speaker, Joint Political Psychology Graduate Seminar, University of Minnesota, 2007.

Invited Speaker, Department of Political Science, Vanderbilt University, 2006.

### Member:

Editorial Board, Journal of Politics, 2007-2008.

Planning Committee for the National Election Studies' Senate Election Study, 1990-92.

Nominations Committee, Social Science History Association, 1988

**Reviewer for:**

American Journal of Political Science

American Political Science Review

American Politics Research

American Politics Quarterly

American Psychologist

American Sociological Review

Canadian Journal of Political Science

Comparative Politics

Electoral Studies

Evolution and Human Behavior

International Studies Quarterly

Journal of Politics

Journal of Urban Affairs

Legislative Studies Quarterly

National Science Foundation

PLoS ONE

Policy Studies Review

Political Behavior

Political Communication

Political Psychology

Political Research Quarterly

Public Opinion Quarterly

Science

Security Studies

Social Forces

Social Science Quarterly

Western Political Quarterly

## University Service:

MEMBER, UNIVERSITY BENEFITS COMMITTEE, 2013-2014.

MEMBER, UNIVERSITY COUNCIL, 2012-2013.

INVITED SPEAKER, RICE TEDxRICEU , 2013.

INVITED SPEAKER, RICE ALUMNI ASSOCIATION, ATLANTA, 2011.

LECTURER, ADVANCED TOPICS IN AP PSYCHOLOGY, RICE UNIVERSITY AP SUMMER INSTITUTE, 2009.

SCIENTIA LECTURE SERIES: "POLITICS IN OUR GENES: THE BIOLOGY OF IDEOLOGY" 2008

INVITED SPEAKER, RICE ALUMNI ASSOCIATION, SEATTLE, SAN FRANCISCO AND LOS ANGELES, 2008.

INVITED SPEAKER, RICE ALUMNI ASSOCIATION, AUSTIN, CHICAGO AND WASHINGTON, DC, 2006.

INVITED SPEAKER, RICE ALUMNI ASSOCIATION, DALLAS AND NEW YORK, 2005.

DIRECTOR: RICE UNIVERSITY BEHAVIORAL RESEARCH LAB AND SOCIAL SCIENCE COMPUTING LAB, 2005-2006.

INTERNSHIP DIRECTOR FOR THE DEPARTMENT OF POLITICAL SCIENCE, 2004-2012.

UNIVERSITY OFFICIAL REPRESENTATIVE TO THE INTER-UNIVERSITY CONSORTIUM FOR POLITICAL AND SOCIAL RESEARCH, 1989-2012.

DIRECTOR: RICE UNIVERSITY SOCIAL SCIENCE COMPUTING LAB, 1989-2004.

MEMBER, RICE UNIVERSITY INFORMATION TECHNOLOGY ACCESS AND SECURITY COMMITTEE, 2001-2002

RICE UNIVERSITY COMMITTEE ON COMPUTERS, MEMBER, 1988-1992, 1995-1996; CHAIR, 1996-1998, CO-CHAIR, 1999.

ACTING CHAIRMAN, RICE INSTITUTE FOR POLICY ANALYSIS, 1991-1992.

DIVISIONAL MEMBER OF THE JOHN W. GARDNER DISSERTATION AWARD SELECTION COMMITTEE, 1998

SOCIAL SCIENCE REPRESENTATIVE TO THE EDUCATIONAL SUB-COMMITTEE OF THE COMPUTER PLANNING COMMITTEE, 1989-1990.

DIRECTOR OF GRADUATE ADMISSIONS, DEPARTMENT OF POLITICAL SCIENCE, RICE UNIVERSITY, 1986-1988.

CO-DIRECTOR, MELLON WORKSHOP:  SOUTHERN POLITICS, MAY, 1988.

GUEST LECTURER, MELLON WORKSHOP:  THE U.S. CONGRESS IN HISTORICAL PERSPECTIVE, MAY, 1987 AND 1988.

FACULTY ASSOCIATE, HANSZEN COLLEGE, RICE UNIVERSITY, 1987-1990.

DIRECTOR, POLITICAL DATA ANALYSIS CENTER, UNIVERSITY OF GEORGIA, 1982-1985.


## CONSULTING:

EXPERT WITNESS, COLUMBUS PARTEE, ET AL. V. COAHOMA COUNTY, MISSISSIPPI, RACIALLY POLARIZED VOTING ANALYSIS, 2015.

EXPERT WITNESS, TERREBONNE PARISH NAACP V. JINDAL, RACIALLY POLARIZED VOTING ANALYSIS, 2015.

EXPERT WITNESS, PATINO V. CITY OF PASADENA, RACIALLY POLARIZED VOTING ANALYSIS, 2015.

EXPERT WITNESS, YORK V. CITY OF ST. GABRIEL, RACIALLY POLARIZED VOTING ANALYSIS, 2014.

CONSULTANT, HOUSTON ISD - INCORPORATION OF NORTH FOREST ISD, DEMOGRAPHIC ANALYSIS AND REDRAWING OF ELECTION DISTRICTS, 2014.

EXPERT WITNESS, RODRIGUEZ V. GRAND PRAIRIE ISD, RACIALLY POLARIZED VOTING ANALYSIS, 2014.

EXPERT WITNESS, BENEVIDES, V IRVING ISD, RACIALLY POLARIZED VOTING ANALYSIS, 2014.

EXPERT WITNESS, GARCIA-SONNIER ET AL V. PASADENA ISD, RACIALLY POLARIZED VOTING ANALYSIS, 2013.

EXPERT WITNESS, MONTES V. CITY OF YAKIMA, CHALLENGE TO YAKIMA, WASHINGTON AT-LARGE CITY COUNCIL ELECTIONS, 2012.

CONSULTANT, LAMAR ISD - DEMOGRAPHIC ANALYSIS AND REDRAWING OF ELECTION DISTRICTS, 2012.

EXPERT WITNESS, RODRIGUEZ, ET. AL. V HARRIS CO., CHALLENGE TO ADOPTED HARRIS COUNTY COMMISSIONERS' COURT PRECINCTS, 2011.

CONSULTANT, CITY OF BAYTOWN - DEMOGRAPHIC ANALYSIS AND REDRAWING OF ELECTION DISTRICTS, 2011.

CONSULTANT, GOOSE CREEK ISD - DEMOGRAPHIC ANALYSIS AND REDRAWING OF ELECTION DISTRICTS, 2011.

CONSULTANT, SAN ANTONIO WATER SYSTEM - ANALYSIS OF PRECLEARANCE ISSUES RELATED TO MERGER WITH BEXARMET WATER AUTHORITY, 2011.

EXPERT WITNESS, TEXAS V US, PRECLEARANCE SUIT FOR TEXAS STATEWIDE DISTRICTS, 2011.*

EXPERT WITNESS, DAVIS V PERRY (AND CONSOLIDATED CASES), CHALLENGE TO ADOPTED TEXAS SENATE DISTRICTS, 2011.

EXPERT WITNESS, PEREZ, ET. AL. V STATE OF TEXAS (AND CONSOLIDATED CASES), CHALLENGE TO ADOPTED TEXAS STATEWIDE DISTRICTS, 2011.*

EXPERT WITNESS, FABELA, ET. AL. V CITY OF FARMERS BRANCH, FARMERS BRANCH CITY COUNCIL AT LARGE DISTRICT CHALLENGE, 2011.

[34]

# APPENDIX B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GILBERT JOE CISNEROS, CATHERINE GARCIA SONNIER, MARTHA GONZALEZ, SALVADOR MARTINEZ,  EDWARD YBARRA, ARNOLD HURTADO, MELINDA VILLARREAL | § § § § § § § | |
| Plaintiffs | § § | |
| vs. | § § § | Civil Action No.  4:12-cv-02579 |
| PASADENA INDEPENDENT SCHOOL DISTRICT; MARSHALL KENDRICK, JERRY ROSS SPEER, NELDA SULLIVAN, VICKIE MORGAN, FRED ROBERTS, MARISELLE QUIJANO-LERMA, AND JACK BAILEY, ALL IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF THE PASADENA INDEPENDENT SCHOOL DISTRICT | § § § § § § § § § § § § | |
| Defendants | § | |

## EXPERT REPORT OF JOHN ALFORD, Ph.D.

I have been retained as an expert to provide analysis related to a Voting Rights Act

challenge to the current at-large system for the election of school board members in the Pasadena

Independent School District (PISD).  My rate of compensation is $250 per hour.  I am a tenured

associate professor of political science at Rice University.  At Rice, I have taught courses on

redistricting, elections, political representation, voting behavior, and statistical methods at both

[36]

182

the undergraduate and graduate level.  Over the last twenty-five years, I have worked with

numerous local governments on districting plans and on Voting Rights Act issues.  I have

previously provided expert reports and/or testified as an expert witness on voting rights and

statistical issues in a variety of court cases, working for the U.S. Attorney in Houston, the Texas

Attorney General, U.S. Congressmen, and various cities and school districts.  In the 2001 round

of redistricting, I was retained as an expert to provide advice to the Texas Attorney General in

his role as Chair of the Legislative Redistricting Board.  I subsequently served as the expert for

the State of Texas in the state and federal litigation involving the 2001 redistricting for U.S.

Congress, the Texas Senate, the Texas House of Representatives, and the Texas Board of

Education.  In 2011 I again worked as an expert for the State of Texas in the consolidated cases

challenging the 2011 statewide redistricting, and in the State's Section 5 challenge in the DC

Court.  I also have worked as an expert in redistricting and voting rights cases in New Mexico,

Mississippi, Wisconsin, Florida, and Alabama.  The details of my academic background,

including all publications in the last ten years and work as an expert, including all cases in which

I have testified by deposition or at trial in the last four years, are covered in the attached vita

(Appendix A).

In preparing this report I have relied on population data from the 2010 Census and Texas

election results as provided publicly by the Texas Legislative Council.    I also utilized election

results and election sign-in sheets for the PISD elections over the last decade.  Spanish surname

voter data was compiled by comparing names on the sign-in sheets for each polling place with

the Census Bureau list of Hispanic surnames. I have also reviewed the expert reports of Mr.

Korbel, Professor Murray, and Professors Barreto and Pedraza, as well as data and materials

[37]

relied on in their reports and provided by them.  I have also read the transcript that was provided of Mr. Birnberg's deposition in Rodriguez, et al vs. Harris County.

**PISD Endogenous Elections**

*Gingles* **Two and Three**

Two techniques commonly used in VRA lawsuits to assess voter cohesion and polarization – Ecological Inference (EI) and ecological regression (ER) – are described below. These techniques are the basis for my analysis presented in this report, and also for the analysis presented the report of Professors Barreto and Pedraza (where they refer to ecological regression as 'Goodman's ecological regression').

**A.  Techniques for Ecological Analysis**

Ecological regression analysis is a technique commonly used in VRA lawsuits to assess voter cohesion and polarization.  In a nutshell, regression is a mathematical technique for estimating the single best fitting straight line that could be drawn to describe the relationship between two variables in a scatter plot.  Ecological regression (also called Goodman's regression) is distinct from simple regression in that it relies on a data set made up of precinct level aggregations of voters and election results, rather than a data set of individual voter characteristics and vote choices.  This is necessary for the sort of analysis we wish to do here because while we have election results for groups of voters at the polling place level and can also estimate the demographic characteristics for the geography of the precinct, we do not have access to the actual vote choice of individual voters.

[38]

184

Applied to voting rights cases, the logic of regression analysis is to determine to what degree, if any, the vote for a candidate increases in a linear fashion as the concentration of voters of a given ethnicity in the precincts increases.  The estimated coefficients for the intercept and for the slope form the estimated equation of the actual regression line, with the intercept defining the point at which the line crosses the vertical axis, and the slope indicating rise over run.  More intuitively, the intercept tells us the predicted value of the dependent variable when the independent variable is equal to zero, or in this case the predicted share of the vote for the Hispanic candidate when the percent of actual voters with Spanish surnames in a precinct is zero.  Similarly, the slope tells us the predicted change in the dependent variable for a one unit change in the independent variable, or in this case the predicted change in the vote for the Hispanic candidate for a one percentage point change in the percent of voters who have Spanish surnames in the precinct.  By using the slope and the intercept we can compute an estimate for the vote for the Hispanic candidate when the percent of the voters in a precinct with Spanish surnames equals 100.  This estimate is then an estimate of Hispanic (or at least Spanish surname) voting cohesion for the candidate.  Similar procedures can be used to access non-Spanish surname (our proxy for non-Hispanic) voting cohesion.

Gary King's Ecological Inference (EI) procedure utilizes a method of bounds analysis, combined with a more traditional statistical method, to improve on standard ecological regression.  While the details are mathematically complex, the differences mostly center on utilizing deterministic bounds information contained in individual precinct results that would not be exploited in ecological regression, and by not imposing a linear constraint on the pattern across precincts.  The combination of relaxing some assumptions and utilizing more information typically yields a more efficient estimation of cohesion and polarization when compared to

[39]

185

standard ecological regression, though in practice the two different techniques seldom lead to any differences in the substantive conclusions.

### B.  Election Analysis Results

In Voting Rights Act cases it is common to distinguish between two types of elections that are used to assess voting behavior.  Endogenous elections are the elections that are the actual focus of the lawsuit – in this case the elections for the PISD school board.  Exogenous elections are elections for offices other than the challenged government, but typically covering the same geography – in this case an assortment of contests from the November general election ballot ranging from statewide offices like Governor or Supreme Court Justice to local Harris County offices like County Attorney.  Endogenous elections are central to the case, as the plaintiffs burden under the Gingles threshold tests is to show that there is cohesion, bloc voting and polarization in those specific elections.  Exogenous elections are used to supplement or buttress evidence from the endogenous elections, particularly where patterns of voting in the endogenous elections are unclear.  Throughout the discussion to follow 'endogenous elections' will refer to the PISD board elections and 'exogenous elections' will refer to the set of 25 statewide and countywide elections detailed in the report of Professors Barreto and Pedraza.

The concern with polarized voting in this case is with actual voting in PISD elections. Despite the length to which the various plaintiffs' experts go to try to shift the focus to other elections held by other governments where they believe the analysis is better for their client, the fact remains that to establish a Section 2 VRA vote dilution claim against an at-large election system the plaintiffs must prove that that *current* voting in *that* system – in this case PISD *school board elections* - exhibits both cohesive Hispanic voting for preferred candidates and Anglo bloc

[40]

186

voting that usually *defeats* those preferred candidates.  If this is the case in *PISD* elections then we should see some evidence of it in *PISD* elections, but as discussed below there is clearly not a pattern of polarized voting in PISD elections.  Professors Barreto and Pedraza admit as much when they summarize their analysis of these key elections by stating that "for the endogenous elections, where voting patterns are aggregated to the reduced 11 polling sites, we find no evidence of racially polarized voting" (page 6).  They go on to argue that the lack of evidence of polarized voting should be discounted because the analysis itself is limited by the fact that they have only ten observations (eleven in 2009) to work with - but that limitation is self-imposed (the estimates for these same PISD elections reported below utilized two to three time as many observations).  As it turns out, however, their estimates, even given their limited analysis, gets the main point right – the voting in PSID school board elections is not polarized.

It is true that there are ten polling places in PISD, and eleven for elections from 2008 forward.  In the previous PISD lawsuit (Perez v. PISD - 1997) the PISD elections took place at only four polling places (the four high schools).  The limited number of polling places was mentioned by Judge Rosenthal in her opinion as a problem for voters in the PISD elections and also as a limitation on the data available to assess voting patterns.  In response, the PISD board moved from a high school based polling system to one based on intermediate schools beginning with the May 1998 election.  In addition, the general move in Texas from restrictive absentee voting rules to much less restrictive early voting effectively doubles the number of polling places available for analytical purposes, as the early vote at a given polling place is reported separately from election day polling, in effect creating two distinct election reporting units for analytical purposes.  By 2000 almost a third of PISD voters were casting early ballots, and by 2008 voting was split almost 50/50 between early and election-day balloting.  In 2009, for the first time, there

[41]

187

were enough early votes by mail (an additional category in which vote totals and sign-in sheet information are reported separately) to allow the use of an additional data point for mail balloting in six of the eleven vote reporting locations, bringing the total number of reporting units available for analysis to 28.

The analysis provided here not only uses all of the available data, it also improves on the measurement of the key variable needed to establish the percentage of Hispanic voters that supported each candidate.  Specifically, the plaintiffs' experts rely on Hispanic voting age population - a poor proxy for Hispanic voters, since not everyone who is Hispanic and of voting age is eligible to vote (e.g., noncitizens), and not all of those eligible to vote actually register to vote, and not all those who are registered turn out in a given election. In contrast, the analysis here measures the proportion of the votes at a polling place that were Hispanic versus non-Hispanic by using the sign-in sheets maintained by law for each precinct to determine the actual proportion of Spanish surnamed voters that signed in to vote at a polling place.  This is a vast improvement in the accuracy of the measurement of the proportion of voters that are Hispanic over simply relying on the Census data for voting age population proportions, since it effectively eliminates the large error associated with variations in citizenship and turnout between Hispanics and non-Hispanics.  Likewise, the sign-in sheets are separate and unique for each reporting unit, even when the geography is not, allowing for an independent assessment of the proportion of Hispanics voting at a polling place early versus those voting on election day.

Finally, the analysis here improves on the endogenous election analysis reported by Professors Barreto and Pedraza by utilizing King's Ecological Inference for estimations, as well as reporting Goodman's ecological regression estimations.  Professors Barreto and Pedraza report both estimations, but only for the exogenous elections that they examine.  Their analysis

[42]

188

of the PISD elections relies only on the less efficient Goodman's ecological regression estimations.  The combination of these improvements in measurement and analysis for the endogenous PISD elections effectively addresses the 'granularity' concerns raised by Professors Barreto and Pedraza in their report.

Table 1 below summarizes the results for the six contested PISD board election since 2000.  Two of those elections, the 2009 Position 2 contest involving Mariselle Quijano-Lerma against Neel McGovern, and the 2002 contest for Position 2 involving Carmen Orozco versus Doris Barnes, were also analyzed by Professors Barreto and Pedraza in their report.  The results that they obtained from their analysis are included in Table 1 for convenience of comparison.  In each case the dependent variable is the proportion of the votes cast for a candidate taken directly from the final canvas sheets provided by the school district.  The independent variable is the proportion of the voters with Spanish surnames among those voters that received a ballot at that polling place for either the early vote, or separately on election day (for the Barreto and Pedraza estimates early and election day votes are added together, and the independent variable is the percent Hispanic in the voting age population for the geography of the polling place).

Several facts about current PISD voting patterns are apparent from the results in Table 1.  First, we can see that both Orozco and Quijano-Lerma are clearly the candidates of choice of Hispanic voters in PISD.  Both receive estimated shares of the Hispanic vote that are as high or higher than the Hispanic voter support for any of the Hispanic candidates of choice in the election analysis reported by Professors Barreto and Pedraza (the Barreto and Pedraza estimates are collected and reported below in Table 2 for ease of reference.  Importantly, however, both Orozco and Quijano-Lerma are also the preferred candidates of Non-Hispanic voters, albeit by lower margins.  Note also that the standard errors of these estimates, which are shown in

[43]

189

parentheses to the right of each estimate in the table, are very small particularly for the more efficient EI technique, indicating that the confidence intervals are also narrow.  This is the empirical indication that the 'granularity' issue raised by Professors Barreto and Pedraza has indeed been effectively addressed by employing more and better data and adding a more efficient analytical technique.

We can also see that the pattern seen in these two elections with Hispanic candidates - where the preferred candidate of Hispanic voters is also the preferred candidate of non-Hispanic voters - is not unusual in PISD elections more generally.  In the four other contested PISD elections since 2000 the preferred candidate of Hispanic voters has been the preferred candidate of non-Hispanic voters in three of the four elections.  In the 2000 Position 5 contest, Jerry Ross Speer defeated the long-serving incumbent Bob Blair.  In the voting analysis it is clear that Speer is the preferred candidate of Hispanic voters, with an estimated 97% share of the Hispanic vote.  This level of support among Hispanic voters exceeds even Orozco's very high 93%% share of the Hispanic vote, as well as Quijano-Lerma's 75% % share of the Hispanic vote.  Speer is also the preferred candidate of non-Hispanic voters, albeit only narrowly, with an estimated 50% of their vote, compared to 42% for Blair.  Vickie Morgan, the incumbent in Position 7 since the late 1980s, is the preferred candidate of Hispanic voters in both 2004 (with the estimated support of 73% of Hispanic voters versus 27% for challenger Randy Smith) and 2008 (with the estimated support of 75% of Hispanic voters).  She is also the preferred candidate of non-Hispanic voters with very similar estimated levels of support (77% in 2004 and 67% in 2008).

The 2009 re-election of incumbent Nelda Sullivan in Position 3 is the only exception to this pattern.  In that three-way contest the plurality preferred candidate of Hispanic voters was challenger Terry Robinson, with an estimated 47% percent Hispanic support, compared to 38%

[44]

190

for Sullivan.  Among non-Hispanic voters Sullivan is clearly preferred at 67% with Robinson

trailing at 21%.  Randy Smith draws the least support of the three candidates for both Hispanic

voters, at 14% and non-Hispanic voters, at 12%.

**Table 1**

| | EI | | Goodman | | |
|---|---|---|---|---|---|
| | Percent of Hispanics Supporting Candidate | Percent of Non-Hispanics Supporting Candidate | Percent of Hispanics Supporting Candidate | Percent of Non-Hispanics Supporting Candidate | Number of Precincts used in estimation |
| **2009, Position 2** | | | | | |
| Quijano-Lerma | 72% (2.26) | 57% (1.17) | 71% (7.39) | 54% (3.16) | 28 |
| *(Barreto-Pedraza)* | | | *59%* | *63%* | |
| McGovern | 28% (2.26) | 43% (1.12) | 29% (7.39) | 46% (3.16) | 28 |
| | | | | | |
| **2009, Position 3** | | | | | |
| Sullivan | 38% (2.36) | 67% (1.30) | 37% (7.39) | 70%  (3.16) | 28 |
| Smith | 14% (1.53) | 12% (0.84) | 13% (5.64) | 16%  (2.41) | 28 |
| Robinson | 47% (2.94) | 21% (1.63) | 50% (6.36) | 15%  (2.72) | 28 |
| | | | | | |
| **2008, Position 7** | | | | | |
| Morgan | 75% (.98) | 77% (0.41) | 75%  (5.56) | 74%  (2.30) | 22 |
| Smith | 25% (.90) | 23% (0.38) | 25%  (5.56) | 26%  (2.30) | 22 |
| | | | | | |
| **2004, Position 7** | | | | | |
| Morgan | 73% (9.23) | 65% (1.00) | 78%  (13.83) | 68%  (3.69) | 20 |
| Smith | 28% (9.06) | 34% (0.98) | 22%  (13.83) | 32%  (3.69) | 20 |
| | | | | | |
| **2002, Position 2** | | | | | |
| Orozco | 92% (4.43) | 68% (0.61) | 89%  (12.77) | 64%  (3.39) | 20 |
| *(Barreto-Pedraza)* | | | *74%* | *68%* | |
| Barnes | 8% (4.50) | 32% (0.61) | 11%  (12.77) | 36%  (3.39) | 20 |
| | | | | | |
| **2000, Position 5** | | | | | |
| Speer | 97% (2.64) | 50%  (0.22) | 65%  (46.17) | 49%  (9.25) | 20 |
| Blair | 1% (.52) | 42%  (0.04) | 12%  (43.97) | 43%  (8.81) | 20 |
| Others | 0.2% (.01) | 10%  (.001) | 23%  (10.37) | 8%  (2.08) | 20 |

Numbers in parentheses are standard errors.

[45]

191

[46]

192

Thus, in five of the six contested PISD board election since 2000 the preferred candidate of Hispanic voters has also been the preferred candidate of non-Hispanic voters - and has been elected to the board.  Both of the Hispanic preferred candidates who were also themselves Hispanic were elected.  The one Hispanic preferred candidate that was not elected was a non-Hispanic candidate, Terry Robinson, running against a non-Hispanic incumbent, Nelda Sullivan.

Based on the discussion in Professor Murray's report, one might assume that Orozco and Quijano-Lerma lack the support of Hispanic voters in PISD.  As Murray states:  "Two veteran incumbent Trustees, Cecil Ghormley and B. J. Garner, were defeated by challengers backed by business and conservative interests, and an open seat was won by Carmen Orozco, who was also supported by these same interests" (page 17) and later "The controlling clique recruited a suitable Hispanic candidate (Carmen Orozco) in the mid-1980s and supported her easy reelections until she recently retired. This 'Hispanic' seat was then filled in 2009 by Mariselle Quijano-Lerma, with the same base of establishment support that Ms. Orozco had enjoyed" (page 19).  Professors Barreto and Pedraza are similarly doubtful of the legitimacy of these two successful Hispanic candidates - describing specifically their presumed connection to Anglo incumbents.  As they assert: "Orozco in 2002 was already a well-established incumbent who originally gained a seat on the board a decade before and received the support of Anglo incumbents. The second candidate, Quijano-Lerma, replaced Orozco when she retired and ran her campaign in coordinate with one of the Anglo incumbents (Sullivan)" (page 5).

If, as the plaintiffs' experts claim, these two Hispanic candidates were really beholden mainly to conservative, Anglo interests, it is surprising that their support among Hispanics in the district could have been so high (as detailed in Table 1).  Certainly, Hispanic voters in PSID have not been shy about rejecting other Hispanic candidates that they judged to represent interests

[47]

193

other than their own – specifically, the Republican Hispanic candidates (Vanessa Velasquez, Orlando Sanchez, and Eva Guzman) included in the exogenous election analysis reported by Professors Barreto and Pedraza.  According to their analysis, in 2010 all three received 99% of the Anglo vote, but less than 40% of the Hispanic vote.  Thus, they were Hispanic candidates, but crucially *not* the preferred candidates of Hispanic voters.  So, for example, in the 2010 contest for Supreme Court Justice, the Anglo candidate, Blake Bailey is actually the preferred candidates of Hispanic voters, not Vanessa Velasquez. And accordingly, the voting in that election is ethnically polarized according to Professors Barreto and Pedraza, even though they estimate that 99.1% of the Anglo voters voted for the Hispanic candidate over the Anglo candidate, and only 38.6% of the Hispanic voters supported the Hispanic candidate.

Alternatively, Orozco and Quijano-Lerma could be like the 13 Democratic Hispanic candidates in 2010 that made up the bulk of the candidates in the exogenous election analysis. These Hispanic candidates all got about 60% of the Hispanic vote, and were therefore the candidates of choice of Hispanic voters, but not a single one got more than *one percent* of the Anglo vote. In the analysis presented by Professors Barreto and Pedraza of the exogenous partisan elections these are the only alternatives – and in fact neither of these patterns resembles the actual voting patterns of Hispanic and non-Hispanic voters in PISD elections.

Both the report of Professor Murray and the report of Professors Barreto and Pedraza assure us that the non-partisan PISD board elections will exhibit the same invariant levels of polarization between Hispanic and non-Hispanic voters that is created by the rigid patterns of partisan voting evident in the exogenous.  Everything in the analysis of the actual PISD elections at issue in this case directly contradicts those assertions, including even the admittedly cursory analysis provided by the plaintiffs' experts themselves.

[48]

194

That leaves the possibility of special circumstances - situations in which isolated occasional minority success is the result of special conditions such as running unopposed. Position 2 on the PISD board has been occupied continuously since 1987 by a Hispanic board member, who was also the preferred candidate of Hispanic voters.  In more than half of the nine election contests for Position 2 in that time period, the Hispanic candidate has been opposed by one or more non-Hispanic candidates, and despite this fact, has been elected with the support of non-Hispanic voters over the non-Hispanic alternatives.  Both of the Hispanic Position 2 board members were initially elected to the seat as non-incumbents in contested elections against non-Hispanic opponents.  Jerry Ross Speer, the preferred candidate of Hispanic voters in the 2000 contest for Position 5 was elected over a multi-candidate field that included the incumbent Bob Blair.

**Barreto and Pedraza Report**

The endogenous election analysis reported by Professors Barreto and Pedraza have already been discussed above.  The exogenous election analysis focuses on data for 26 partisan elections selected because they included a Hispanic candidate and also included voters in all 58 precincts in the PISD area[1].  All are elections to full-time, salaried, statewide or countywide positions, all are partisan elections and all of the candidates listed are nominees of the Democratic or Republican Party.  All of the elections are on the November even-numbered year ballot with contests for federal political office at the top of the ballots, partisan affiliation of the candidates identified, and the option of casting a straight party ticket, which about two-thirds of the voters in these elections take.  Elections for the PISD board are much different.  The

---

[1] The one contest that they included that was not countywide was for Harris County Commissioner, Precinct 2. But that district does not include all of the PISD geography, and as such the election was not on the ballot in 16 of the 58 precincts.  Thus the results for that one election are not strictly comparable to the other 25 elections and that election has been excluded from the tabulations reported here.

[49]

195

positions are part-time with no salary.  The elections are in the May, there are no primaries (partisan or otherwise), and there are no partisan elections on the ballot, no party labels, and no straight ticket voting.

Professors Barreto and Pedraza labor hard to shift attention away from the endogenous results and toward what they believe are the more supportive exogenous elections, but much of the discussion is simply misplaced.  Arguing that Courts often endorse the use of exogenous elections, or that the same pool of voters will cast votes in similar ways in similar elections, misses the point.  Professors Barreto and Pedraza used much the same set of exogenous elections in their analysis for the recent challenge involving Harris County Commissioner's Precincts, but the Commissioners are elected in partisan contests on the same November ballot as all these exogenous elections.  Using the behavior of voters in the Governor's contest or the contest for County Attorney to infer what the behavior of the same voters might be elsewhere on the same ballot makes some sense (especially given high levels of straight-ticket party voting in these elections), but is simply not comparable to what is being done here.

Barreto and Pedraza are correct in arguing that "research on voting behavior indicates that the decision making process used by voters to cast their preferences is the same across the ballot, and that local politics is often reflected in congressional, state and national votes. The same factors that explain why a voter selects a particular candidate for U.S. President at the top of a ballot influence the preference for candidates listed down-ballot for state and local elections" (page 3).  What they do not seem to fully grasp is that the PISD board elections are not 'local' down-ballot elections.  The board elections are not on the same ballot with the kinds of other contests that are being compared in the research that Barreto and Pedraza cite (or the kinds of

[50]

196

contests they use in their analysis), not on the same election month, day or year, and not the same election structure.

Setting the issue of the comparability of these exogenous elections aside for the moment, what does the analysis of these elections actually tell us about the behavior of the voters in those elections? Table 2 below summarizes the exogenous election analysis included in the Barreto and Pedraza report by culling estimates from the EI results that are attached at the end of their report for the 25 exogenous elections that include all of PISD. Reading across the first row of data for example we can see that in the 2010 contest for Justice of the 14th Court of Appeals, Place 8, the Democratic candidate, Julia Maldonado received an estimated .6% of the Anglo vote in that election (this is the number in the first data column labeled '% of the Anglo Vote for the Hispanic Candidate') compared to her 67.6% share of the Hispanic vote (this is the number in the second data column labeled '% of the Hispanic Vote for the Hispanic Candidate'). The last two columns simply reorganize the same information but connect the estimate to the Democratic candidate in each contest, rather than always staying with the Hispanic candidate.

If we look down the first data column we can see that Anglos don't typically give much support to Hispanic candidates, in fact in the 2010 election almost all the Hispanic candidates got less than 1% of the Anglo vote in these 58 PISD precincts. In contrast, looking down the second data column we can see that Hispanic voters favor the Hispanic candidate typically giving them 60-70% of their vote. There are however some jarring exceptions to this pattern. In five cases (these five are in bold in the Table) the Anglo vote for the Hispanic candidate almost exactly reverses, leaping to near 100%, while for the same candidates the Hispanic vote for the Hispanic candidate also flips, dropping to the 30-40% range.

[51]

197

**Table 2**

| Year | Office | Party ID | Candidate | % of Anglo Vote for the Hispanic candidate | % of Hispanic Vote for the Hispanic candidate | % of Anglo Vote for the Democratic candidate | % of Hispanic Vote for the Democratic candidate |
|---|---|---|---|---|---|---|---|
| 2012 | Justice 14th Court of Appeals, Place 8 | Dem. | Julia Maldonado | 0.6% | 67.6% | 0.6% | 67.6% |
| | | Rep. | John Donovan | | | | |
| 2010 | Lieutenant Governor | Dem. | Linda Chavez-Thompson | 0.6% | 58.8% | 0.6% | 58.8% |
| | | Rep. | David Dewhurst | | | | |
| 2010 | Commissioner of the General Land Office | Dem. | Hector Uribe | 0.5% | 59.5% | 0.5% | 59.5% |
| | | Rep. | Jerry Patterson | | | | |
| 2010 | Justice, Supreme Court, Place 9 | Dem. | Blake Bailey | | | 0.9% | 61.4% |
| | | **Rep.** | **Eva Guzman** | **99.1%** | **38.6%** | | |
| 2010 | Justice, 1st Court of Appeals District, Place 4 | Dem. | Michael Gomez | 1.0% | 62.1% | 1.0% | 62.1% |
| | | Rep. | Evelyn Keyes | | | | |
| 2010 | District Judge, 55th Judicial District | Dem. | Dion Ramos | 0.7% | 61.7% | 0.7% | 61.7% |
| | | Rep. | Jeff Shadwick | | | | |
| 2010 | District Judge, 183rd Judicial District | Dem. | Michael Gomez | | | 1.1% | 60.5% |
| | | **Rep.** | **Vanessa Velasquez** | **98.9%** | **39.5%** | | |
| 2010 | Family District Judge, 312th Judicial District | Dem. | Robert Hinojosa | 0.7% | 63.0% | 0.7% | 63.0% |
| | | Rep. | David Farr | | | | |
| 2010 | Family District Judge, 314th Judicial District | Dem. | David Longoria | 0.8% | 64.1% | 0.8% | 64.1% |
| | | Rep. | John F. Phillips | | | | |
| 2010 | Judge, County Criminal Court No. 2 | Dem. | Mary Connealy Acosta | 0.8% | 62.4% | 0.8% | 62.4% |
| | | Rep. | Bill Harmon | | | | |
| 2010 | Judge, County Criminal Court No. 4 | Dem. | Alfred G. "Al" Leal | 0.9% | 63.4% | 0.9% | 63.4% |
| | | Rep. | John Clinton | | | | |
| 2010 | Judge, County Criminal Court No. 5 | Dem. | Alfred "Bud" Valdez | 0.9% | 61.5% | 0.9% | 61.5% |
| | | Rep. | Margaret Stewart Harris | | | | |
| 2010 | Judge, County Criminal Court No. 7 | Dem. | Shelia Acosta | 0.9% | 62.7% | 0.9% | 62.7% |
| | | Rep. | Pam Derbyshire | | | | |
| 2010 | Judge, County Criminal Court No. 11 | Dem. | Mark Diaz | 0.7% | 62.3% | 0.7% | 62.3% |
| | | Rep. | Diane Bull | | | | |
| 2010 | County Treasurer | Dem. | Billy Briscoe | | | 0.5% | 60.1% |
| | | **Rep.** | **Orlando Sanchez** | **99.5%** | **39.9%** | | |
| 2008 | Family District Judge, 312th Judicial District | Dem. | Robert Hinojosa | 0.9% | 70.3% | 0.9% | 70.3% |
| | | Rep. | David Farr | | | | |
| 2008 | State Senator | Dem. | Richard J. (Rick) Noriega | 2.1% | 69.7% | 2.1% | 69.7% |
| | | Rep. | John Cornyn | | | | |
| 2008 | District Judge, 55th Judicial District | Dem. | Dion Ramos | 0.8% | 69.8% | 0.8% | 69.8% |
| | | Rep. | Jeff Shadwick | | | | |
| 2006 | Lieutenant Governor | Dem. | Maria Luisa Alvarado | 3.7% | 60.7% | 3.7% | 60.7% |
| | | Rep. | David Dewhurst | | | | |
| 2006 | District Judge, 183rd Judicial District | Dem. | Robert Voigt | | | 12.7% | 65.3% |
| | | **Rep.** | **Vanessa Velasquez** | **87.3%** | **34.7%** | | |
| 2006 | Judge, County Criminal Court No. 2 | Dem. | Silvia Pubchara | 7.7% | 67.6% | 7.7% | 67.6% |
| | | Rep. | Bill Harmon | | | | |
| 2006 | County Treasurer | Dem. | Richard Garcia | 10.9% | 65.9% | 10.9% | 65.9% |
| | | **Rep.** | **Orlando Sanchez** | **89.3%** | **33.8%** | | |
| 2002 | County Treasurer | Dem. | Richard Garcia | 2.6% | 77.2% | 2.6% | 77.2% |
| | | Rep. | Jack Cato | | | | |
| 2002 | Judge, County Criminal Court No. 2 | Dem. | Silvia Pubchara | 3.2% | 78.1% | 3.2% | 78.1% |
| | | Rep. | Michael Allen Peters | | | | |
| 2002 | Judge, County Criminal Court No. 5 | Dem. | Blanca E. Lopez | 2.7% | 80.0% | 2.7% | 80.0% |
| | | Rep. | M. Stewart Harris | | | | |

What accounts for near mirror reversal of voter preferences in these five contests?

Professors Barreto and Pedraza offer the following explanation on page 6 of their report:

> *In two cases the Latino candidates who ran for office were not preferred by Latino voters Vanessa Velasquez and Orlando Sanchez and both of these candidates were Republicans who were preferred by White voters. Still, the Velasquez and Sanchez*

[52]

198

*contests are strong evidence that the candidate preferences among Latinos are distinct from the preferences of non-Hispanic White voters. In two instances both Velasquez and Sanchez ran against a Latino Democrat and Latino voters greatly preferred the Latino Democratic candidates in those contests. This makes it clear that neither Velasquez nor Sanchez are Latino-preferred candidates and meet the Gingles test of candidates we should consider as exemplars, but rather they are significant outliers according to the data.*

There are several problems with this explanation.  As we can see from Table 1, there are actually *five* such contests, two involving Orlando Sanchez in (2002 and 2010), two involving Vanessa Velasquez (in 2006 and 2010), and one involving Eva Guzman in 2010.  And while it is true that in two of the five contests the Democrat who was the preferred candidate of Hispanic voters was also himself Hispanic (Sanchez's opponent Richard Garcia in the 2002 County Treasurer contest, and Velasquez's opponent Michael Gomez the Democrat in the 2010 contest for District Judge, 183rd Judicial District), in the other three contests the candidate that was preferred by Hispanic voters was not Hispanic - Sanchez's opponent Billy Briscoe in the 2002 County Treasurer contest, Eva Guzman's opponent Blake Bailey the Democrat in the 2010 contest for Justice, Supreme Court, Place 9, and Velasquez's opponent Robert Voigt the Democrat in the 2006 contest for District Judge, 183rd Judicial District.

In their explanation for these striking anomalies, Professors Barreto and Pedraza seem to be suggesting that this is simply a matter of Hispanic voters preferring one Hispanic candidate over the other in a contest of Hispanic versus Hispanic, but that explanation can't possibly account for the three seemingly identical contests that they fail to mention where Hispanic voters prefer *non-Hispanic* candidates over the Hispanic candidate.  Nor can this partial explanation account for the fact that in the two Hispanic versus Hispanic contests Anglos continue show the same extremely one sided split that they show in Hispanic versus non-Hispanic contests, rather

[53]

199

than appearing to be indifferent between the two Hispanic candidates.  And this explanation certainly can't account for the three contests where Anglo voters switch from giving almost all their votes to the non-Hispanic candidate, to giving an equally extreme share to the *Hispanic* candidate.

The last two data columns in Table 2 provide an alternative explanation for these five puzzling anomalous contests.  If we look down the third data column (labeled '% of the Anglo Vote for the Democratic Candidate') the anomalies disappear.  There are small variations across election years, but in every case Anglo vote for the Democratic candidate is minimal, and in 2010 never exceeds 1.1%.  Similarly, Hispanic vote for the Democratic candidates (in the last data column) is a steady 60 to 70%.  Comparing data column one to data column three is instructive.  Trying to predict the behavior of Anglo voters based on the *ethnicity* of the candidate leads to some spectacular mistakes in which the prediction is not just narrowly in the wrong direction, it is essentially exactly 180 degrees off.  In contrast, predicting the behavior of Anglo voters based on the *party* of a candidate leads to remarkably accurate predictions.  The same is true for Hispanic voters if we compare data column two to data column four.

The concluding paragraph of the 'Summary of Results' section of the Barreto and Pedraza report begins with the blanket statement that "in every instance where granular data are available," (which is to say in all of the exogenous elections, as opposed to what they characterize as the 'non-granular' endogenous elections) "Latino voters greatly prefer to vote for Latino candidates, and in every instance Latino voters demonstrate a statistically significantly higher vote for a Latino candidate than do Whites by huge margins" (page 6).  As explained above, their actual analysis clearly shows that this statement is not correct.  Moreover, this statement is not just off a bit in one or two anomalous random cases.  It is instead dramatically

[54]

200

wrong in 20 percent of the cases, and wrong in a fashion that is directly attributable to a single major structural feature of these exogenous elections – partisan voting - that is not a feature of the endogenous elections that this case must be decided on.

What the exogenous election analysis shows then, is that partisanship, and not the race or ethnicity of the candidates, is driving polarization in these contests.  This fact is not lost on Professors Barreto and Pedraza.  It is no accident that they conclude their report with a section titled "A note about partisanship and race" (page 8).  The section begins with a legal argument for the proposition that it makes no difference whether polarization is the result of partisanship or of racial voting, only that the result was a difference in how black and white voters cast their votes.  In other words, even if, as we can see is true here, the polarization in Anglo and Hispanic voting patterns is due to partisanship, it is the effect of that partisanship on the challenged election system that matters.  Professors Barreto and Pedraza then go on to buttress this line of thinking by suggesting that partisanship itself might be based, at least for some Southern white voters, in racial animus.  This is all interesting, and will undoubtedly continue to be at issue in cases where the elections at hand are partisan elections, but in this case it is simply a tangent. The PISD board elections are the challenged election system in this case, and the PISD board elections are non-partisan.

However one feels about treating party polarization as if it were racial polarization, on the sole basis of effect rather than causation, it simply doesn't bear on a case where the elections themselves are non-partisan.  Professors Barreto and Pedraza ignore the fact that in a Section 2 case, the voting polarization that prongs two and three of the Gingles test command plaintiffs to demonstrate, must be evident in the specific at-large election system at hand.  They cite Justice Brennan for the argument that only the effect matters, but they have lost sight of the fact that it is

[55]

201

the effect on the *PISD* elections that matters here.  If their exogenous analysis showed that the ethnicity of the candidate was driving the behavior of the voters they would at least have the beginnings of a connection, since candidate ethnicity is a visible feature of both the exogenous partisan elections and the non-partisan elections like the PISD board elections.  But here the factor driving the voting behavior is partisanship; a feature built in to the exogenous elections from the very start in the form of a party nomination system, incorporated into the ballot itself with party indications for each candidate, and ultimately mechanically connected to the majority of votes cast through the mechanism of straight-party ticket voting.

In the end, the best proof of the irrelevance of the partisan exogenous elections for making inferences about likely voting behavior in PISD elections is the fact that the voting patterns of Anglos and Hispanics in the PISD elections over the last decade don't look anything like the voting patterns of Anglos and Hispanics in the partisan exogenous election over the last decade.  One thing that everyone can agree on about the exogenous elections is that over the last decade Anglos and Hispanics *never* gave majority support to the same candidates in a partisan election, no matter what the permutations of candidate race or ethnicity.  In contrast, in the PISD board elections over the last decade, Anglos and Hispanics have done exactly that in almost every election, giving majority support to the same candidates, Hispanic and Anglo, in five of the six contested elections.

### Murray Report

Professor Murray's report begins with an extensive discussion of racial and ethnic politics in Texas. Throughout this history he focuses extensively on the interaction of partisan politics with racial and ethnic politics in Texas, and with the role of partisan politics in the history of the impact of the Voting Rights Act in Texas.  The importance of the party primaries is discussed

[56]

202

throughout, including increased importance of the Republican primary in providing disproportionate influence to the diminishing Anglo minority in Texas politics.  The connection of this narrative to the Pasadena school district is unclear.  Specifically school district elections are nonpartisan and do not involve primaries. As such, much of what Professor Murray discusses with regard to the history of racial and ethnic politics in the state of Texas does not apply directly to the elections at hand here, in the PISD.

Professor Murray then turns his attention specifically to the Pasadena school district.  His examination of population trends documents what he describes as an explosive growth in the Hispanic population in the school district.  He notes that in 1990 Hispanics accounted for only 26% of the voting age population and that by 2010 Hispanics constitute 60% of the voting age population. In contrast, Anglo (non-Hispanic whites) population has been dropping rapidly, and by 2010 Anglos constituted only 27% of the voting age population the Pasadena ISD.  Similarly, the proportion of Anglo students dropped from a 58% majority of PISD enrollment in the 1987-1988 school year to only 8% by the 2011-2012 school year.  Professor Murray also notes that there has been a rapid growth in the Hispanic proportion of the registered voters in the Pasadena ISD, with the 2012 proportion Hispanic among registered voters reaching 43%.

While exact figures are not available, given that Texas does not record race or ethnicity with voting registration, based on the demographics it seems likely that Anglos currently make up less than 50% of the registered voters in the Pasadena school district. Assuming that the trends noted by Professor Murray continue, the Anglo share of the vote in the school district will likely continue to shrink, and Hispanics will constitute the majority of the registered voters in PISD in the near future.  As a majority, the political influence of the Hispanic residents of PISD would be enhanced by the current at-large system, where they would be crucial to the election of

[57]

203

the entire board.  In contrast, in a single member system such as the plan proposed by Professor Murray or Mr. Korbel, Hispanic influence would be concentrated in three or four districts.

With regard to the political history of the PISD school board, Professor Murray offers a factual narrative combined with his own speculation.  The broad story is one of a sharp change centered on the 1987 election marking a shift from a more competitive, Democratic, and progressive PISD board and elections to a less competitive, more Republican, and conservative board.  The implication seems to be that this new board is less responsive to the Hispanic community in PISD, despite the fact that part of that 1987 shift was the election of Carmen Orozco to the board, and that there has been an elected Hispanic member present on the board ever since.

The first argument that Professor Murray provides in support of his characterization is that the board has somehow stifled opposing candidates.  He says "This new board majority, backed by the PISD administration, has been remarkably effective in dominating the balloting for the last 20 years" (page 17).  The evidence provided for connection of the PISD senior administration to the new board members is that the new board members did well in the absentee voting held at the polling place in the administration building during the period from 1987 to 1995.  During this period PISD had only two absentee, or early, voting locations – the administration building and Dobie high school. These were both polling places of convenience, and any voter could choose either location. Throughout this period the administration building was by far the more popular location for early voting, with over 80% of early votes in each of these elections being cast at the administration building rather than the much less popular Dobie location.  The idea that the senior administration may have been able to influence voting in the

[58]

204

administration building is an interesting speculation, but the mere fact that this is the physical location where most voters cast their early votes does not demonstrate that influence.

Professor Murray also suggests that the board majority has been able to "structure the election process to minimize participation. How has the PISD been able to do this? Let me list some of the ways" (page 17). He goes on to cite three specific things that the board has done to create this era of minimal participation, beginning with utilizing off-cycle elections. But as he notes, the use of off-cycle elections is neither new nor unusual. PISD elections in previous decades before the 'dramatic' shift in participation were off-cycle as well, as were many local elections at that time. Professor Murray also suggests that the lowering of participation has been further aided by a policy of "holding the school board elections at separate polling places from other jurisdictions like the City of Pasadena" (page 18). Again, this is not a new policy enacted by the new board majority, but instead, like off-cycle elections is simply a continuation of past practice. The new board did make one major change in polling however. Prior to 1996 PISD had only four election day polling places and two absentee locations. Beginning in 1998 the district moved to voting at the intermediate schools, providing an increase to 10 election day polling places, and also opening all ten places for early voting. In addition, the board has been holding joint elections with the San Jacinto Community College District throughout this period, and has also held joint elections the City of South Houston, a majority Hispanic city wholly within the PISD boundaries. Finally, Professor Murray argues that a "third important factor is maintaining the at-large, with place, positions for electing trustees" (page 18). Again, this is not a new policy of the new board majority, just a continuation of the election system used by the 'old' board.

[59]

205

The argument that the new board triggered and maintained a new era of low participation by cleverly continuing to employ the same at-large, off-cycle, separate polling location elections as the old board simply doesn't seem persuasive.  Professor Murray himself acknowledges that the PISD situation is not unusual.  On the contrary he says that the "pattern that we find in the PISD is quite common. A general factor that helps this very low turnout/very little board turnover work is that we have more than 40 school districts in this media market, and they get almost no media coverage. And with fewer and fewer voters having children in the public schools, the ability to stay below the radar is further enhanced" (page 19).  Professor Murray also points out that he does not believe that the board is intentionally discriminating against minority voters.  As he says their efforts "initially had nothing to do with discrimination against the local Hispanic minority whose voting rights were protected by the VRA" (page 19).

While acknowledging that the board did not intend to discriminate, Professor Murray nonetheless believes that maintaining the extant election system in the face of a growing Hispanic population now has that effect.  He notes in this regard that the PISD board has just one Latino member of seven (14%), in a district that is 66% Hispanic by population.  He believes that this under-representation can be resolved by instituting a single member district system with seven districts, three of which he believes could have clear Hispanic registered voter majorities. The living proof for Professor Murray is that "we have direct evidence that this works in the City of Pasadena, which adopted an eight single member district plan some years ago that has created three districts (A, B. and C) where Latinos are able to elect candidates of their choice" (page 22).

The City of Pasadena example is apt, as it shares much of population of PISD, and the majority Hispanic city council districts are similar to the single member districts that Mr. Korbel has proposed here for PISD.  The current single member district plan for the city council

[60]

206

includes four districts where over 60% of the voting age population is Hispanic, and where the majority of the registered voters have Spanish surnames. The four current City of Pasadena city council districts with Hispanic registered vote majorities have voting age Hispanic population proportions of 80.0% for District A, 76.3% for District C, 73.6% for District B, and 64.1% for District D.  Mr. Korbel's proposed districts for PISD have very similar, if slightly lower, demographics with voting age Hispanic population proportions of 77.9% in District 2 (located in the same area as City District A), 73.6% in district 3 (located in the same area as City District B), and 72.6% in District 1 (located in the same area as City District D).

At present there is only one Hispanic member of the city council - Ornaldo Ybarra, the current council member in District A, who was first elected in 2009.  Emilio Carmona had represented District C from 1993 to 2001, but in the interval between there were no Hispanic city council members elected from any of the eight single member districts in Pasadena.  In the most recent city elections, held in May of this year, there were Hispanic candidates in each of the three districts with the highest Hispanic voting age population.  Ornaldo Ybarra was reelected in District A with 78.7% of the vote, Richard Serna was a distant third in District B with 18.0% of the vote, and Rick Guerrero lost in District C with 39.5% of the votes.  The experience of the City of Pasadena with the use of a single member district system contradicts the central assertion that it is the use of an at large election system in PISD that is limiting Hispanic representation on the school board.  Hispanics have been more consistently successful in securing representation on the PISD board than they have been in the single member system of elections for the Pasadena city council.

**Birnberg Deposition**

Mr. Birnberg covers a variety of topics in the deposition that was provided, but I will focus here only on the issue most directly to the discussion of the exogenous elections above. Toward the end of the deposition (page 42, line 16) Ms. Sandill asked Mr. Birnberg:

> Q. Do you believe a Latino -- the Latino candidate of choice is a Latino candidate if that candidate is Republican?
> A. Yes, frequently. Based on the results of the 2008 election I would say, yes, to that.

After some discussion the 2008 election focusing mostly on a Democratic candidate, Michael Gomez, the discussion returned to the issue of Hispanic Republican candidates (page 43, line 23):

> I believe that Latino voters are more likely to vote for Hispanic surnamed -- would be more likely to vote for a Hispanic Republican than an Anglo Democrat at -- that is based upon the precinct by precinct results analysis from 2008 that we looked at. Is that a permanent condition? I don't know.

A bit later (page 44, line 15) Mr. Birnberg is asked:

> Q. Do you believe that the majority of Latino voters in Harris County would vote for a Latino Republican over a Democrat of another race?

After expressing some concern about the word 'majority' in light of straight party voting Mr. Birnberg concluded his answer by saying (page 45, line 9):

[62]

208

A. …So when you use the word majority I -- I -- I push back and hesitate
on that. If you change that to significant number I would say, yes, there is
a significant number of Latino voters who will vote for a Hispanic
surnamed Republican rather than a non-Latino Democrat.

In the 2010 exogenous elections from the Barreto and Pedraza report, as reproduced in
Table 2 above, we have enough contests with Hispanic Republicans (three) and non-Hispanic
Republicans (eleven) to test Mr. Birnberg's impressions.  The average estimated Hispanic vote
for the three Hispanic Republicans in 2010 was 39.3%, slightly higher than the average of 38.1%
for the eleven non-Hispanic Republicans, so there is evidence of a modest tendency for Hispanic
voters to cross over to Hispanic Republican in higher numbers than they cross over to non-
Hispanic Republicans, but it is only a very small proportion.  The related issue that Mr. Birnberg
does not discuss is whether the same small shift is evident in the behavior of Anglo voters.  The
average estimated Anglo vote for the eleven non-Hispanic Republicans was 99.2%, and the
average Anglo vote for the three Hispanic Republicans was the same 99.2%.

**Korbel Report**

Mr. Korbel's report contains a demonstration map with seven single-member districts for
the PISD School Board.  The map appears to have been created on the Texas legislative Council
mapping system, and provides a summary table of 2010 Census demographics for each district.
The district with the highest proportion of Hispanic voting age population is District 2 at 77.9%
Hispanic.  This district is situated the same area as District A in the single-member district
system for the city council of the City of Pasadena.  There are two other districts, District 1 and
Districts 3 that are above 70% Hispanic voting age population, and District 4 has a Hispanic

[63]

209

voting age population of 69.7%.  While this provides information regarding the voting age population of each of the districts there is no information for either the citizen voting age population or the proportion of Spanish surname registered voters in each district.

Mr. Korbel also provides a series of slides that provide graphics related to socio-economic conditions.  These are for all of Harris County, do not account for the significant proportion of Hispanics in the county and in PISD that are not citizens, and do not make any connection between these variables and the ability of Hispanic citizens in PISD to participate in board elections.

### Conclusions

Analysis of racial and ethnic voting patterns in Voting Rights Act cases can be complex, but that analysis seeks to answer a fairly simple question.  In this case – do non-Hispanic voters *in PISD board elections* vote as a bloc in sufficient numbers to *usually defeat* candidates that have the cohesive support of Hispanic voters, absent special circumstances?  There has been an elected Hispanic member on the PISD school board continuously since 1987.  In more than half of the nine election contests for that seat in that twenty-five year span, the Hispanic candidate has won the seat despite being opposed by one or more non-Hispanic candidates.  None of these terms of service were the result of appointment to the board - both of the Hispanic board members were initially elected to the seat as non-incumbents in contested elections against non-Hispanic opponents.  Statistical analysis of voting patterns shows that both of the Hispanic candidates, and three of the four Hispanic-preferred Anglo candidates in the contested PISD board elections since 2000 have also been the preferred candidates of non-Hispanic voters, and have been elected with that support at the polls.  This hardly constitutes a record of usual defeats.  In fact, the last time that a Hispanic candidate was defeated in a PISD board election was in the

[64]

210

1990s ( a decade when Hispanics made up only 26% of the voting age population, something closer to 20% of the citizen voting age population, and less than 10% of the voters in PISD board elections).  No Hispanic candidate in the last fifteen years has been defeated in a PISD board election.

Even the plaintiffs' experts admit that they find no evidence of racially polarized voting in the PISD board elections.  Pointing to the largely self-imposed limits on their analysis of these elections, they would have us ignore the lack of polarization in the PISD elections, and rely instead on the seemingly contradictory results that they obtain when they examine a very different set of exogenous election.  Setting aside the potential error of focusing exclusively on the secondary evidence of exogenous elections, an examination of those exogenous elections shows that they do not actually contradict the PISD election analysis.  Like the voters in the PISD board elections, voters in the exogenous election appear to place little weight on the ethnicity of the candidates, and instead the voting patterns are driven almost exclusively by partisan factors.  While the plaintiffs' experts assert that this *partisan* polarization has the *effect* of creating *results* in the exogenous elections that are ethnically polarized, that is an argument tailored for a challenge to one of the offices that are included in those partisan elections.  The PISD board elections are not partisan and do not even share a ballot with partisan elections.

What is left is the assertion that there should be more than one Hispanic member on the PISD board.  The suggestion is that a single member system would provide more Hispanic representation, perhaps as many as three or four based on the proposed district plan.  But this hypothetical increase in representation is directly contradicted by the actual experience with the single-member system in the City of Pasadena that Professor Murray holds up as the local single-member election system we should look to.  Despite having four districts with voting age

[65]

211

Hispanic majorities very similar to the ones proposed for PISD by Mr. Korbel, there is only one Hispanic on the Pasadena city council, and for most of the last decade there were no Hispanic members.  Moreover, the argument that there should be more than one Hispanic board member ignores the fact that proportional representation is explicitly disavowed in the language of the Voting Rights Act, and further ignores the fact that the issue is not whether a board member is Hispanic, but whether a board member is the preferred candidate of Hispanic voters.  Based on the election analysis reported here we can see that at a minimum three of the current PISD board members (Mariselle Quijano-Lerma, Vickie Morgan, and Jerry Ross Speer are the preferred candidates of Hispanic voters in their most recent elections.

JOHN ALFORD, Ph.D.

July 18th, 2013

[66]

212