IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | Civil Action No. 4:14-CV-03241-LHR |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant*. | § | |

## DEFENDANT CITY OF PASADENA'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-3956
Facsimile:  (713) 238-7294

By:   */s/ C. Robert Heath*
       C. ROBERT HEATH
       Texas State Bar No. 09347500
       Southern District No. 13381
       *bheath@bickerstaff.com*
       BICKERSTAFF HEATH
       DELGADO ACOSTA LLP
       3711 S. MoPac Expressway
       Building One, Suite 300
       Austin, Texas 78746
       Telephone: (512) 472-8021
       Facsimile: (512) 320-
       5638

ATTORNEY-IN-CHARGE FOR
DEFENDANTS

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities ...................................................................................................... iv

The Nature and Stage of the Proceedings ..................................................................1

Issue Before the Court ...................................................................................................1

Summary of the Argument............................................................................................2

Argument .........................................................................................................................4

    The Legal Framework ...........................................................................................4

    I.    The command of section 2 of the Voting Rights Act is to provide protected minority groups—in this case Hispanics—with an equal opportunity to participate in the political process and to elect candidates of their choice .............4

    II.    The Supreme Court has held that there is no section 2 violation when the minority group enjoys effective voting majorities in a number of districts roughly proportional to the group's share of the relevant population ....................5

        A.    The relevant population for measuring proportionality is citizen-voting-age population ..................................................................................6

        B.    Although proportionality is not a safe harbor, it is very highly probative of equal electoral opportunity, and where it exists the plaintiffs have a heavy burden of demonstrating the absence of equal opportunity ...................................................................................................7

        C.    None of the situations courts have listed as potentially being sufficient to overcome the existence of proportionality is present here..........................................................................................................9

    The Facts .................................................................................................................12

    III.    There is no genuine dispute as to any material fact ...............................12

        A.    Hispanics constitute both a growing proportion of Pasadena's citizen-voting-age population and an increased proportion of the city council..........................................................................................................13

B.     Hispanics enjoy proportional representation since they can elect half the council through their control of four of the six single-member districts ........................................................................................................14

1.     Hispanics constitute well over half of the registered voters in three single-member districts ........................................................15

2.     Hispanics have demonstrated the ability to elect in a fourth district—District D........................................................................18

Conclusion ...........................................................................................................20

Certificate of Service ...........................................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*African-American Voting Rights Legal Defense Fund, Inc. v. Villa*,
    54 F.3d 1345 (8th Cir. 1995) ...........................................................................2, 8, 9

*Cisneros v. Pasadena Ind. Sch. Dist.*,
    No. 4:12-CV-2579, 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014), at *22, *23 ...................19

*City of Mobile v. Bolden*,
    446 U.S. 55 (1980) (plurality opinion) ..................................................................1

*De Grandy v. Wetherell*, 815 F. Supp. 1550 (N.D. Fla. 1992) ...................................6, 7

*Fairley v. Hattiesburg, Miss.*,
    __ F.Supp.3d __, 2015 WL 4744315 (S.D. Miss. Aug. 11, 2015) .........................................17

*Fairley v. Hattiesburg, Miss.*,
    584 F.3d 660 (5th Cir. 2009) ..............................................................................9

*Johnson v. De Grandy*,
    512 U.S. 997 (1994)................................................................................... *passim*

*League of United Latin American Citizens v. Perry*,
    548 U.S. 399 (2006)....................................................................................7, 10

*Perez v. Pasadena Ind. Sch. Dist.*,
    165 F.3d 368 (5th Cir. 1999) ...............................................................................7

*Rodriguez v. Bexar County*,
    385 F.3d 853 (5th Cir. 2004) .............................................................................16

*Rural West Tennessee African-American Affairs Council v. McWherter*,
    877 F. Supp. 1096 (W.D. Tenn. 1995), *summ. aff'd sub nom., Rural West Tennessee African-American Affairs Council v. Sundquist,* 516 U.S. 801
    (1995)........................................................................................................19

*Salas v. Southwest Texas Junior College District*,
    964 F.2d 1542 (5th Cir. 1992) ...................................................................11, 12, 17

*Terrazas v. Clements*,
    581 F.Supp. 1329 (N.D. Tex. 1984) .....................................................................17

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)..................................................................................... *passim*

*Whitcomb v. Chavis*, 403 U.S. 124, 152-53 (1971) ........................................................................17

*Valdespino v. Alamo Heights Ind. Sch. Dist.*,
    168 F.3d 848 (5th Cir. 1999) ............................................................................7, 14

**Statutes**

52 U.S.C. § 10301 .............................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. Proc. 56(a) ............................................................................................2, 12

Fed. R. Civ. Proc. 56(c)(1)(B) ...................................................................................8

## The Nature and Stage of the Proceedings

This is a suit brought under section 2 of the Voting Rights Act[1] as well as the Fourteenth and Fifteenth Amendments to the United States Constitution requesting a declaratory judgment that the City of Pasadena's election system dilutes the votes of its Hispanic citizens and seeking an injunction against the system's continued use.[2]   The pretrial motion deadline is July 22, 2016. This motion seeks summary judgment in favor of the City of Pasadena.  The Court has set it for argument on August 24, 2016, at 8:30 a.m.

## Issue Before the Court

Section 2 of the Voting Rights Act sets out the legal issue:

> (b)   A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class of citizens  .  .  .  in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.[3]

Although the statute makes it clear there is no right to proportional representation, if proportional representation does exist it is inconsistent with a claim that equal opportunity has been denied.  Specifically, the Supreme Court, when analyzing a set of single-member districts,

---

[1] 52 U.S.C. § 10301.

[2] The constitutional claims require the court to find both discriminatory effect and discriminatory intent.  *E.g., City of Mobile v. Bolden,* 446 U.S. 55, 62-63 (1980) (plurality opinion).  The Supreme Court noted in that case that section 2 had the same effect as the Constitution.  *Id.* at 60-61.  Thus, under *City of Mobile,* to prove a violation under either section 2 or the Constitution, a plaintiff had to show both a discriminatory purpose *and* a discriminatory effect.  In 1982, the Congress amended section 2 to reject *City of Mobile's* view that a section 2 violation, like the Constitution, required proof of discriminatory intent.  *Thornburg v. Gingles,* 478 U.S. 30, 43-44 (1986).  As a result, section 2 now requires only a showing of a discriminatory effect.  Accordingly, the constitutional claims are irrelevant to this motion for summary judgment because if the plaintiffs cannot establish the discriminatory effect required to prevail under the section 2 claim, they cannot prevail under the constitutional claims that require proof of both discriminatory effect and discriminatory intent.

[3] 52 U.S.C. § 10301(b).

has said that it did not see how district lines that apparently provided political effectiveness in proportion to a group's share of the relevant population, denied political opportunity and, thus, concluded that the challenged election scheme did not violate the Voting Rights Act.[4]  Here, the issue in the motion for summary judgment is whether Hispanics, who constitute roughly half of the city's citizen-voting-age population, have effective political majorities in four single-member districts.   If so, those four districts constitute half of the eight-member council and provide proportional representation.

The ultimate question in a claim of vote dilution is a question of fact.[5]  Since the issue is presented here in a motion for summary judgment, the court must determine if there is a genuine issue of material fact.[6]  If the fact of proportionality is established, the non-moving plaintiff would have the burden of presenting facts showing that the election system does not actually result in equal political opportunity.[7]

### Summary of the Argument

This suit is a challenge to the City of Pasadena's 2013 decision to replace its all-single-member-district council (the 8-0-1 system[8]) with a mixed system consisting of six single-member

---

[4] *Johnson v. De Grandy,* 512 U.S. 997 (1994).

[5] *Gingles,* 478 U.S. at 78.

[6] FED. R. CIV. PROC. 56(a).

[7] *De Grandy,* 512 U.S. at 1024 (finding no violation of section 2 "where both minority groups constitute effective voting majorities in a number of state Senate districts substantially proportional to their share in the population, and where plaintiffs have not produced evidence otherwise indicating that under [the challenged plan] voters in either minority group have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'"); *African-American Voting Rights Legal Defense Fund, Inc. v. Villa,* 54 F.3d 1345, 1356-57 (8th Cir. 1995) (once proportionality had been established in a summary judgement case, shifting analysis to determine if the non-movant plaintiff had presented facts to show that equal opportunity was not present notwithstanding the existence of proportionality).

[8] In the standard terminology used in referring to city council election systems, the first number refers to the number of single-member districts, the second number refers to the number of at-large positions, and the third number refers to a mayor who is elected at large.  Thus, the 8-0-1 system has eight councilmembers elected from single-member districts, no at-large councilmembers, and a mayor who is elected from the entire city.  The 6-2-1 system has six single-member districts with two council members and the mayor elected at large.

district and two at-large council positions (the 6-2-1 system).[9]  While the city recognizes that there is often a belief—one that is apparently held here by the plaintiffs—that election systems with all single-member districts better serve the interests of minority voters, that belief is not always accurate.  In Pasadena, the boundaries of the six single-member districts have been drawn to afford Hispanic voters with substantial majorities of Hispanic registered voters in three districts and to preserve another district with a substantial percentage of Hispanic registered-voters and a history of electing a Hispanic councilmember.  As a result, the election following the change to the 6-2-1 system, rather than reducing Hispanic electoral strength, actually produced a 50 percent increase in the number of Hispanic members of the council.  More importantly, the new system provides Hispanics with the opportunity to elect their candidate of choice in half the council seats, a fraction that is roughly equal to the Hispanic percentage of the citizen-voting-age population.  The Supreme Court has determined that a districting plan that affords a protected minority group with the opportunity to elect in a number of districts that is proportionate to the group's share of the relevant population satisfies the requirements of section 2.  Even if the group is not successful in actually electing a representative in one or more of the districts, the requirements of the Act are satisfied because all it requires is an opportunity to elect, not a guarantee of electoral success.  Here, the existing 6-2-1 system provides the opportunity for proportionate representation and, thus, meets the requirements of section 2 of the Voting Rights Act.  The city is entitled to summary judgment.

---

[9] Plaintiffs' First Amended Complaint [Doc. 34] at ¶ 42 ("The change from eight single members districts to a hybrid system of six single member districts and two at-large seats will reduce Hispanic voting strength and will impede Hispanic voters' ability to elect candidates of choice in subsequent Pasadena City Council elections.").

## Argument

## The Legal Framework

I.      **The command of section 2 of the Voting Rights Act is to provide protected minority groups—in this case Hispanics—with an equal opportunity to participate in the political process and to elect candidates of their choice.**

The starting point and most familiar standard in a suit brought under section 2 of the Voting Rights Act is the three-part threshold test set out in *Thornburg v. Gingles*.[10]  Yet, as its designation as a threshold test makes clear, it is merely a preliminary step in the analysis by which a plaintiff demonstrates the existence of a potentially viable claim.  The ultimate issue the Court must address is expressly set out in the statute and is whether, based on the totality of the circumstances, "the political processes leading to nomination or election . . . in the political subdivision are not equally open to participation by members of a class of citizens protected by [the Act] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[11]

This motion for summary judgment focuses on a narrow, but outcome-determinative issue. We assume for the purpose of argument that the plaintiffs can meet the threshold test, and we look solely at the ultimate inquiry of equal opportunity to participate and elect.  Further, while the city believes that Hispanics have the ability to elect candidates of their choice in the two at-large council seats, this motion puts aside that potentially more fact-sensitive issue and looks only to the six single-member districts where the demographic composition of the single-member districts and the electoral history make it clear that Hispanics have the opportunity to elect in four of the six

---

[10] The three prongs of the test are:  (1) whether the minority group is sufficiently large and geographically compact to be able to constitute a majority in a single-member district, (2) whether the group is politically cohesive, and (3) whether, absent special circumstances, the white majority votes as a bloc usually to defeat the minority choice. *Thornburg v. Gingles,* 478 U.S. 30, 50-51 (1986).

[11] 52 U.S.C. § 10301(b); *DeGrandy,* 512 U.S. at 1013-14 (after addressing the three-part threshold test, the district court was required to ask whether the totality of the facts established that the minority group was denied equal opportunity).

single-member districts.  Thus, without even considering the likelihood of electoral success in the two at-large positions, those four single-member districts in which Hispanics have either an effective voting majority or a history of success provide Hispanics with the likelihood of success in half of the eight council positions.  Because the existing electoral system in the City of Pasadena contains districts in which Hispanics enjoy political effectiveness in proportion to their share of the potential electorate, the election system provides equal political and electoral opportunity to Hispanics and, thus, precludes any finding of a violation of section 2.

**II.     The Supreme Court has held that there is no section 2 violation when the minority group enjoys effective voting majorities in a number of districts roughly proportional to the group's share of the relevant population.**

*Johnson v. De Grandy*[12] is the seminal Supreme Court case on the relationship between proportionality and section 2's requirement that the political processes provide a protected group with an equal opportunity to participate and to elect candidates of its choice.  *De Grandy* was a challenge to the portion of the Florida legislative redistricting plan that affected the Dade County area.  About 50 percent of Dade County's voting-age population was Hispanic.  The county contained 18 House of Representatives districts, nine of which had substantial Hispanic voting-age-population majorities.  Because the percentage of districts with apparently effective voting majorities reflected the Hispanic percentage of the county's voting-age population, the Court was unable to conclude that the challenged redistricting scheme denied equal political opportunity even in the face of a "historical tendency to exclude Hispanics" and "in spite of that history and its legacy, including the racial cleavages that characterize Dade County politics today."[13]  The Court made a similar finding of proportionality in the configuration of state senate districts.[14]  Thus,

---

[12] 512 U.S. 997 (1994)
[13] *De Grandy,* 512 U.S. at 1014-15.
[14] *Id.* at 1023-24.

because the number of districts with significant Hispanic majorities approximated the Hispanic share of the relevant population, the court of appeals reversed the district court decision that had found a section 2 violation.

*De Grandy* is especially relevant because it largely mirrors the fact pattern in this case. In addition to the fact that the number of districts with effective Hispanic voting majorities was proportional to the Hispanic percentage of the relevant population, it also involved a challenge to a new and, in the case of the Florida legislative boundaries, an as yet unutilized districting plan. In many voting rights cases the courts are asked to make a decision based on a pattern of voting behavior over an extended period.[15]  In *De Grandy,* though, the three-judge district court decision, which provided the factual basis for the Supreme Court's opinion, was issued before any elections had occurred in the districts at issue there.[16]  Similarly, this suit was brought before there were any elections under the 6-2-1 plan, although one election has been held during the pendency of the litigation. Thus, there is little historical evidence of the electoral effect of the specific plan before the court here, and in *De Grandy* there was none. In the Florida case, though, the court was able to determine simply from the mix of voters in the challenged districts that Hispanics had the opportunity to succeed electorally. Here, the court can make the same analysis with the added benefit of having at least some direct evidence of how the new system has been effective in increasing Hispanic representation on the council.

>    **A.    The relevant population for measuring proportionality is citizen-voting-age population.**

In *De Grandy* there was some dispute among the parties whether the relevant measure to determine compliance under the Voting Rights Act was population or some subset of population

---

[15] *E.g., Gingles,* 430 U.S. at 57.

[16] *De Grandy v. Wetherell,* 815 F. Supp. 1550 (N.D. Fla. 1992) (three-judge court) (opinion dated July 17, 1992, on plan adopted earlier that year).

such as citizen-voting-age population.  The Court in *De Grandy*, which used voting-age population as the metric, found it unnecessary to resolve that dispute because it concluded that the answer was not dispositive under the facts in that case.[17]  In a subsequent case, though, the Supreme Court conducted the proportionality analysis by comparing the Latino opportunity districts to the "Latino share of the citizen voting-age population."[18]  In the Fifth Circuit it is well established that the relevant measure under the Voting Rights Act is citizen-voting-age population.[19]  While the court in *Valdespino*, *Perez*, and similar cases was addressing the first prong of the threshold test, the same reasoning applies to proportionality analysis.  Indeed, as the Fifth Circuit reasoned, since the Voting Rights Act's protections extend only to protecting "the right of any citizen of the United States to vote," it is difficult to imagine how a measure other than citizen-voting-age population would be relevant.[20]

> **B.** **Although proportionality is not a safe harbor, it is very highly probative of equal electoral opportunity, and where it exists the plaintiffs have a heavy burden of demonstrating the absence of equal opportunity.**

To be sure, the Court noted that the fact that a "percentage of single-member districts in which minority voters form an effective majority mirrors the minority voters' percentage of the relevant population" does not necessarily constitute a safe harbor.[21]  Rather, the equal opportunity issue must be determined after a consideration of the totality of the circumstances.  Once

---

[17] *Id.,* at 1017, n. 14.  Apparently the reason the Court did not have to decide if citizen-voting-age population was the appropriate metric was that the district court found that the challenged districts had a high enough level of voting-age population to ensure that they had at least 50 percent citizen-voting-age population.  *DeGrandy v. Wetherell*, 815 F. Supp. 1550, 1567 n. 28 (N.D. Fla. 1994) (three-judge court), *aff'd in part, rev'd in part, Johnson v. DeGrandy*, 512 U.S. 997 (1994).

[18] *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 436 (2006).

[19] *E.g., Valdespino v. Alamo Heights Ind. Sch. Dist.,* 168 F.3d 848, 853 (5ᵗʰ Cir. 1999) ("this court has already determined what factors limit the relevant population in the district [when analyzing the first *Gingles* factor]; voting-age and citizenship); *see also, Perez v. Pasadena Ind. Sch. Dist.,* 165 F.3d 368, 372 (5ᵗʰ Cir. 1999).

[20] *E.g., Perez,* 165 F.3d at 372 ("such a result is required by the plain language of Section 2"); *see* 52 U.S.C. § 10301(a) (protecting "the right of any citizen of the United States to vote"); 52 U.S.C. § 10301(b) (posing the equal opportunity test in terms of a class of citizens).

[21] *DeGrandy,* 512 U.S. at 1017.

proportionality is established, though, the burden is on the plaintiffs to produce evidence to overcome the presumption of equal opportunity.[22]

The cases suggest that plaintiffs will seldom, if ever, meet the burden of establishing the absence of equal opportunity in situations where proportionality exists. *De Grandy* itself noted that the Court could "not see how . . . district lines apparently providing political effectiveness in proportion to voting-age numbers deny equal political opportunity" and expressly found that the existence of proportionality overcame a history of exclusion and racial cleavages.[23] Presumably this is because the factors typically considered in the totality of the circumstances analysis are designed to be pieces of the puzzle that are relevant to the ultimate determination of whether the protected group has an opportunity to participate in the political process and to elect candidates of their choice that is equal to that of the rest of the population.[24] A finding of proportionality, by contrast, is not so much a piece of information that fits with other findings to lead us to a conclusion on the ultimate issue, but instead directly addresses the heart of the question of equal opportunity set out in the statute. If there are a number of districts where the group has effective voting

---

[22] *Id.* at 1024; *see also* Fed. R. Civ. Proc. 56(c)(1)(B); *African-American Voting Rights Legal Defense Fund,* 54 F.3d at 1356 (rejecting plaintiffs' offer of proof as insufficient to overcome finding of proportionality).

[23] *De Grandy,* 512 U.S. at 1014-15.

[24] The Supreme Court in *Gingles* set out the factors listed in the Senate Report that accompanied the 1982 Amendments to the Voting Rights Act as ones that might typically be relevant to a section 2 claim:

> The history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as an unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value.

*Gingles,* 478 U.S. at 44-45, citing S.Rep. No. 97-417 (1982). (internal citations omitted).

majorities that is proportional to the group's percentage of the potential electorate, then the political equality inquiry essentially answers itself.   Or, as the Fifth Circuit said, "[i]n the end, 'substantial proportionality' is what matters in the totality-of-circumstances analysis."[25]

**C.    None of the situations courts have listed as potentially being sufficient to overcome the existence of proportionality is present here.**

We do have some insight into what the Court had in mind when it gave extreme weight to proportionality yet declined to conclude that it was a safe harbor. The *De Grandy* Court listed three reasons it believed a system that reflected proportionality might still not result in equal opportunity. First, the Court was aware that some jurisdictions had relied on sophisticated devices to dilute minority voting strength.   These included examples such as ballot box stuffing, outright violence, and discretionary registration.[26]   There were other, less extreme, devices listed—*e.g.,* run-off requirements and gerrymandering—although the Court characterized them as objectionable "when the object of their use is censurable."[27]   Here, the extreme factors do not exist, and the less extreme ones, such as the existence of a majority-vote requirement and the way the districts are drawn, work, under the facts of this case, to enhance Hispanic opportunity.   Majority-vote requirements may make it harder for minority groups to prevail, but in Districts A, B, and C Hispanics constitute the majority[28] so that a majority-vote requirement works to their benefit.   Similarly, the way these district boundaries are drawn is not objectionable.   This is not a case of drawing boundaries to split the Hispanic population and minimize its electoral potential.   To the contrary, the districts are drawn to result in effective electoral majorities for Hispanics.[29]

---

[25] *Fairley v. Hattiesburg, Miss.,* 584 F.3d 660, 674 (5th Cir. 2009); *see also, African-American Voting Rights Legal Defense Fund,* 54 F.3d 1345 (affirming a summary judgment of no section 2 violation in light of determination of proportionality).

[26] *De Grandy,* 512 US. at 1018.

[27] *Id.,*

[28] App. 84.

[29] See discussion at pages 14-20, *infra*.

The second reason the Court gave for failing to designate proportionality as a safe harbor is that doing so might encourage jurisdictions to trade off the rights of some minority groups against others in order to fit into the proportionality safe harbor.[30]  That is not the case here as the four districts with Hispanic-voting majorities[31] are located in the areas with large Hispanic populations while the remaining two single-member districts are in areas are in the southern part of the city where there are relatively few Hispanics.[32]  The demographic realities are such that Hispanic majorities are created where it is virtually mandated by geography, and the rights of Hispanics who do not reside in Districts A, B, C, or D are not compromised.

The final reason given by the *De Grandy* Court for rejecting a safe harbor rule is that it would tend to encourage race-based efforts to devise majority-minority districts where they were not necessary to achieve equal opportunity.[33]  While the Court recognized that there are times when majority-minority districts are necessary to achieve equal electoral opportunities, there are also instances in which minority citizens are able to form coalitions with voters from other racial and ethnic groups to elect the candidate of the minority group's choice,  As the Court said, "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics."[34]  In fact, that is exactly what has happened in Pasadena.

---

[30] *Id.* at 1019.  An example of an unsuccessful attempt to use a proportionality defense as grounds for trading the rights of one group for another is found in *League of United Latin American Citizens v. Perry,* 548 U.S. 399, 437-42 (2006).  There the State claimed that it had achieved proportionality by creating a highly elongated congressional district running from Travis County to Hidalgo County and used that as a license to remove approximately 100,000 Latinos in Webb County from what would have been an effective Latino district.  The Court did not permit this use of proportionality to trade the rights of one group of protected voters (*i.e.,* Travis County Hispanics) for the rights of another (*i.e.,* Webb County Hispanics).

[31] Districts A, B, and C have substantial Hispanic-registered-voter majorities.  Hispanics in District D do not constitute a majority of the registered voters, but historically have been able to elect the Hispanic candidate of choice in that district.

[32] App. 83-84, 87-88, 96.

[33] *De Grandy,* 512 U.S. at 1019-20.

[34] *Id.* at 1020.

The city has drawn three compact districts (Districts A, B, and C) in which Hispanics have a total population, voting-age population, citizen-voting-age population, and a registered-voter majority.[35]  These are located in the northern portion of the city and are largely the result of the natural demographic distribution.  In District D, though, which largely mirrors the composition of the city as a whole and which has a substantial, but not majority, percentage of Hispanic voters, Hispanics have been able to work with other racial and ethnic groups to elect and re-elect a Hispanic candidate of choice[36]—the type of result *De Grandy* encourages and finds to meet the goal of the Voting Rights Act.

Finally, there is another Fifth Circuit case that is helpful in suggesting how a plaintiff might demonstrate that a plan providing apparent proportionality is not, in fact, effective in establishing an equal opportunity for Hispanic representation.  *Salas v. Southwest Texas Junior College District*[37] was not a true proportionality case since it involved a challenge to an at-large election system rather than a system using multiple single-member districts.  Nevertheless, it involved a jurisdiction that had a Spanish-surname-registered-voter majority and addressed how a plaintiff group might overcome the presumption that the Hispanic-majority election district provided Hispanics with equal electoral opportunity.  The type of potential proof the Fifth Circuit suggested might be acceptable to disprove the existence of equal electoral opportunity under a totality of the circumstances analysis included showing that the registered-voter majority was illusory because of inaccuracies in the voting rolls.[38]  Or, there might be practical impediments to voting because the Hispanic population might consist largely of migrant workers who were away from the county

---

[35] App. 84.
[36] App. 14-15, 118 (Wheeler obtains majority support from both Hispanic and non-Hispanic voters).
[37] 964 F.2d 1542 (5th Cir. 1992).
[38] *Id.* at 1555.

during the time of the election.[39]  Finally, the plaintiffs might show that low turnout was a result

of prior official discrimination.[40]  The court noted, though, that this involved a very high burden

of proof because the plaintiffs would need to offer evidence directly linking the depressed turnout

to the past official discrimination.[41]  The possibility of making such a showing was especially

remote since, as the Fifth Circuit noted, "the high incidence of Hispanic *registration* in the District

is persuasive evidence that Hispanic voters are not deterred from participation in the political

process because of the effects of prior discrimination, including unemployment, illiteracy, and low

income."[42]  As a result the Fifth Circuit concluded the registered-voter majority provided equal

opportunity even though the Hispanic residents of the junior college district had not yet taken

advantage of that opportunity.[43]  Of all the ways suggested by the Supreme Court in *De Grandy*

or the Fifth Circuit in *Salas* that a Hispanic majority might not result in a district where Hispanic

voters would have an opportunity to elect, none apply here.

How, then, does this legal framework of the impact of proportionality on the analysis of a

section 2 vote dilution claim apply to this case?

## The Facts

**III.    There is no genuine dispute as to any material fact.**

A critical element of any motion for summary judgment is the absence of a genuine dispute

as to any material fact.[44]  This case is rare, if not unique, in the parties' agreement on the relevant

facts.  In section 2 cases, the typical contest involves the analysis of experts in demography and

political science.  Here, the city's political science expert did not disagree with the statistical

---

[39] *Id.* at 1555-56.
[40] *Id.* at 1556.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] FED. R. CIV. PROC. 56(a).

analysis conducted by the plaintiffs' expert and adopted those numbers to be used in his own analysis.[45]  The competing demographic experts worked with the same census data, and the only disagreement related to the percentage of Pasadena's citizen-voting-age population that is Hispanic.  The city's expert relied on the latest one-year survey data (*i.e.,* 2014) from the American Community Survey (ACS), which reported that 48.1 percent of the city's citizen-voting-age population was Hispanic.[46]  By contrast, the plaintiffs' expert preferred to rely on an average of five years of ACS data collected between 2009 and 2013, and reported a slightly smaller Hispanic citizen-voting-age population of 45.9 percent.[47]  The roughly two-percentage-point difference between the two estimates is immaterial, since this motion for summary judgment assumes the Hispanic share of the city's citizen-voting-age population is roughly 50 percent—a conclusion supported by either estimate.  Additionally, since in the proportionality analysis, which is the basis of the motion for summary judgment, it is to the plaintiffs' advantage to show that they represent a higher percentage of the population, they can have no objection to showing a slightly higher percentage than found by their expert.

The relevant facts are summarized and set out in the Appendix to this motion.  They basically come from public records such as the Census, election returns, voter registration lists, and similar material that is highly unlikely to be the subject of any dispute.

### A. Hispanics constitute both a growing proportion of Pasadena's citizen-voting-age population and an increased proportion of the city council.

The suit arises in the context of a city where the Hispanic percentage of population has risen dramatically over the years.[48]  As discussed above, the most relevant measure of population

---

[45] App. 150.
[46] App. 76, 89.
[47] App. 32-33.
[48] App. 85-90.

in the voting-rights context is citizen-voting-age population since the protection of the Voting Rights Act extends only to citizens and protects only the right to vote—a right that can be exercised only by persons of voting age.[49]  In Pasadena, Hispanics constituted 18.7 percent of the citizen-voting-age population in 1990 but grew to 42.9 percent by 2010.[50]  By 2014, that number was approaching 50 percent.[51]

Although the city had elected a Hispanic councilman in the 1970s when all council positions were elected at large, the 8-0-1 system resulted in only one Hispanic councilmember serving on the council for ten of the first eighteen years of the single-member-district's existence and none in eight of those years.  In 2013, two Hispanic councilmembers were elected under the 8-0-1 plan.  Under the 6-2-1 system, which was implemented in the 2015 election, both of those individuals were re-elected and a third Hispanic was elected.[52]  Thus, rather than reducing Hispanic voting strength as alleged in paragraph 42 of the First Amended Complaint,[53] the replacement of the 8-0-1 system with the hybrid 6-2-1 plan had the immediate effect of increasing Hispanic representation on the city council by 50 percent.

### B.    Hispanics enjoy proportional representation since they can elect half the council through their control of four of the six single-member districts.

After the city charter amendment adopting the 6-2-1 system was approved by the city's voters in November 2013, the city council drew a six-district plan that had three heavily Hispanic districts, two predominantly non-Hispanic districts, and one that generally reflected the composition of the city as a whole.[54]  The Hispanic citizen-voting-age population (HCVAP) and

---

[49] 52 U.S.C. § 10301(a); *see also Valdespino v. Alamo Heights Ind. Sch. Dist.,* 168 F.3d 848, 853 (5th Cir. 1999).
[50] App. 85.
[51] App. 89.
[52] The sequence of election of Hispanic councilmembers under the different election systems is shown on page 18 of the Appendix.  See also App. 13-15.
[53] *See*, note 9, *supra.*
[54] App. 84.

Spanish-surname registered voters (SSRV) for the six districts and the city-wide totals are reflected in this table.

**Table I**

**Percentage of Hispanic-Citizen-Voting-Age Population (HCVAP) and
Spanish-Surname Registered Voters (SSRV) in Pasadena City Council Districts**

| District | HCVAP | SSRV |
|:---:|:---:|:---:|
| A | 71.5% | 70.33% |
| B | 58.0% | 57.06% |
| C | 61.4% | 54.70% |
| D | 45.3% | 42.53% |
| E | 35.2% | 29.67% |
| F | 22.3% | 15.16% |
| **City** | **45.8%** | **39.59%** |

Table Note:  SSRV from Harris County Election Department (March 2015) with addresses geo-coded.  HCVAP computed from 2009-2013 ACS.  While single-year ACS data are available for the city as a whole, data for the smaller geographic areas that must be used to obtain percentages for individual districts are available only from the five-year sample.  Thus, all Hispanic citizen-voting-age population percentages in this table are computed from the 2009-2013 five-year sample.[55]

    1.    **Hispanics constitute well over half of the registered voters in three single-member districts.**

Three of the single-member districts—Districts A, B, and C—are dominated by Hispanic voters.  In those three districts, between roughly 58 and 72 percent of the potentially eligible voters (*i.e.,* citizen-voting-age population) are Hispanic.  Looking to actual registered voters, between

---

[55] See App. 84.

approximately 55 percent and 70 percent are Hispanic.[56]  As the Fifth Circuit has pointed out, "It is undisputed that when the percentage of Hispanic registered voters exceeds 50 percent, Hispanics have a clear opportunity to elect candidates of their choice."[57]  In fact, in 2015, in the only election that has occurred under the 6-2-1 system, Hispanic candidates were elected in two (Districts A and C) of the three districts with Hispanic registered-voter majorities.  District A, where more than 70 percent of the registered voters are Hispanic, reelected the Hispanic councilman who has served the area since 2009.[58]  In District C, where about 55 percent of the registered voters are Hispanic, all the candidates were Hispanic, guaranteeing that the victor would be Hispanic.[59]  The only exception to the pattern of Hispanic electoral success in those three districts was in District B where 57 percent of the registered voters are Hispanic.  In that district Celestino Perez, a Hispanic, lost to Bruce Leamon, the Anglo incumbent, by 34 votes out of 562 votes cast in the race.[60]  There is reason to believe that Mr. Perez may not have been the strongest candidate.  According to the plaintiffs' political science expert, he received the lowest level of Latino support (82.0%) of any of the Hispanic candidates or Hispanic-supported measures studied.  Those other candidates and the Hispanic-backed position on the 2013 charter amendment changing the election system were estimated to have received 87.3 percent, 89.5 percent, 97 percent, and 99.6 percent support.[61]  Even with the low level of Hispanic support compared to other Hispanic candidates, Mr. Perez would have prevailed if Hispanic voters had turned out at higher levels.  In fact, if Hispanics, who

---

[56] The percentages are for the number of registered voters who have Spanish surnames.  The plaintiffs' expert indicates that Spanish-surname matching slightly underestimates the number of individuals who are Hispanic.  App. 26, ¶ 12.  Thus, the actual percentage of registered voters who are Hispanic may be slightly higher.
[57] *Rodriguez v. Bexar County,* 385 F.3d 853, 868 (5th Cir. 2004).
[58] App. 14-15, ¶¶ 8-10.
[59] App. 15, ¶ 10.
[60] App. 15, ¶ 11.
[61] App. 118-19.

constituted 57 percent of the district's registered voters, had made up only 29.7 percent or more of the turned out voters, Mr. Perez would have won.[62]

Without regard to the electoral strength of the specific District B candidate in 2015, the failure of the Hispanic candidate to be elected does not preclude a finding that the district is one in which Hispanic voters have the opportunity to elect their candidate of choice.  As the Fifth Circuit stated 24 years ago when analyzing a jurisdiction with a 53 percent Hispanic-registered-voter majority as compared to the 57 percent majority here, the lack of electoral success was not due to the absence of equal opportunity but rather was a function of a failure to take advantage of that opportunity.[63]  Or, as the Supreme Court teaches, "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."[64]  A three-judge court in the Northern District of Texas elaborated on this point by explaining that "where the absence of proportional representational results simply from the loss of elections rather than a 'built-in' bias against a minority group, that group's voting strength has not been 'cancelled out' in any constitutional sense."[65]  Obviously, there is no built-in bias where a district is constructed so that fully 57 percent of its registered voters are Hispanic. The opportunity for electoral success, which is all that section 2 guarantees, is clearly present.

---

[62] App. 153.  Although Dr. Alford, the city's expert, computes this percentage of Hispanic turn out that would have resulted in victory for the Hispanic candidate, his computation is based on the levels of Hispanic and non-Hispanic support for Mr. Perez reported by Dr. Engstrom, the plaintiffs' expert.  App. 118, 150.

[63] *Salas,* 964 F.2d at 1556.

[64] *De Grandy,* 512 U.S. at 1014, n. 11.  *See also Fairley v. Hattiesburg, Miss.*, __ F.Supp.3d __, 2015 WL 4744315, *22 (S.D. Miss. Aug. 11, 2015) ("The question is whether minority groups enjoy electoral opportunity in rough proportion to their share of the population, rather than whether they enjoy electoral success in proportion to their share of the population.")

[65] *Terrazas v. Clements,* 581 F.Supp. 1329, 1358-59 (N.D. Tex. 1984) (three-judge court); see also Whitcomb v. Chavis, 403 U.S. 124, 152-53 (1971).

2.      **Hispanics have demonstrated the ability to elect in a fourth district—District D.**

In addition to the three districts with Hispanic-registered-voter majorities, there is a fourth district with a history of electing Hispanic candidates.  As indicated above, District D and its predecessor district in the 8-0-1 plan (District E)[66] elected a Hispanic council member in 2013 and again in 2015.  That council member, Cody Ray Wheeler,[67] received 89.5 percent of the Hispanic vote and 55.1 percent of the non-Hispanic vote in 2015 according to the plaintiffs' expert.[68]  While Hispanics in that district constitute 45.3 percent of the citizen-voting-age population and 42.53 percent of the registered voters,[69] they have been able to elect their candidate of choice in the past two elections.  District D is the type of district the Supreme Court was talking about in *De Grandy* when it said that not all districts needed to be majority-minority districts to be effective because "there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups having no need to be a majority within a single district in order to elect candidates of their choice."[70]  While there may be differences in the tendency of Hispanics and non-Hispanics to vote for Hispanic candidates or for certain ballot measures, Pasadena is not a city in which virtually all the non-Hispanics vote against the Hispanic position.  To the contrary, in the five Pasadena races[71] analyzed by the plaintiffs' expert, Dr. Engstrom, he reported that

---

[66] *See* App. 6-12 for data demonstrating the relationship between the 2013 District E and the 2015 District D.

[67] Although he does not have a Spanish surname, Mr. Wheeler is Hispanic and is recognized as such by the plaintiffs. *See e.g.,* App. 115 ("The Latino candidates in Dists. A and D, Ornaldo Ybarra and Cody Ray Wheeler, who were already members of the council . . . .").

[68] App. 118.

[69] *See* Table I, *supra.*

[70] *De Grandy,* 512 U.S. at 1020.

[71] Dr. Engstrom also looked at selected Harris County races conducted in Pasadena precincts.  This type of election conducted by a different jurisdiction is known as an exogenous election.  All of those exogenous elections studied by Dr. Engstrom were either general election races where voters have the option of voting a straight-party ticket and, in any case, can follow party identification when voting or were primaries where the voters come from a single political party.  Dr. Alford explains why the primary and general election partisan races are not probative at App. 153-57 and at App. 195-202.  Importantly, in the recent section 2 case against the Pasadena Independent School District Judge Ellison considered the relevance of similar general election partisan races in the analysis of alleged polarization in non-partisan races.  While Judge Ellison noted that the exogenous elections might be well-suited in an analysis of

Pasadena non-Hispanic voters gave 28.3 (Del Toro), 36.3 (Perez), 39.8 (no vote on Proposition One), 54.4 (Ybarra), and 55.1 percent (Wheeler) of their votes to the position or Hispanic candidate favored by Hispanics.[72]  Where Hispanics can expect a minimum non-Hispanic cross-over vote of about 30 percent and more often approaching 40 percent or above,[73] it is not necessary to have a Hispanic majority to prevail.  The voters in District D demonstrate that Hispanics in that district, who constitute a 42.53 percent share of the registered voters, are able to elect the candidate of their choice.  While the sample of elections contains only one (2015) using the precise boundaries of District D in the current 6-2-1 plan and one (2013) in the predecessor district in the 8-0-1 plan adopted after the 2010 census, those are the only two elections available, and both resulted in Hispanic electoral success.

While *De Grandy* suggested that districts in which a minority group that does not reach a majority in a district but is able to "pull, haul, and trade to find common political ground" could be part of the proportionality analysis, the actual districts at issue there were in fact majority-minority districts.  In *Rural West Tennessee African-American Affairs Council v. McWherter*,[74] a case summarily affirmed by the Supreme Court, the three-judge court ruled that consideration of less-than-majority-minority districts or influence districts where the minority group was less than a majority but could work with white cross-over voters should be considered in the totality of the circumstances and proportionality analysis.[75]  In Pasadena, of course, we have electoral history

---

racial polarization in partisan elections, they were of limited probative value where, as here, the elections at issue were non-partisan.  *Cisneros v. Pasadena Ind. Sch. Dist.,* No. 4:12-CV-2579, 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014), at *22, *23.

[72] App. 118.

[73] App. 118-19.

[74] 877 F. Supp. 1096 (W.D. Tenn. 1995) (three-judge court), *summ. aff'd sub nom., Rural West Tennessee African-American Affairs Council v. Sundquist,* 516 U.S. 801 (1995).

[75] *Id.* at 1109.

demonstrating that District D is not only a "influence" district but is one where Hispanics can and have elected their candidate of choice.

## Conclusion

Hispanics have the opportunity to elect candidates of their choice in at least four of the eight city council seats—a percentage that is proportionate to the group's percentage of the city's citizen-voting-age population.  Hispanics currently occupy three of those four seats, and they have a clear opportunity to elect in the fourth district where almost three of every five registered voters are Hispanic.  As the Supreme Court determined in *DeGrandy*, this proportionality is inconsistent with a violation of section 2 of the Voting Rights Act.  Accordingly, this Court should grant summary judgment in favor of the defendant and deny all relief to the plaintiffs.

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-3956
Facsimile:  (713) 238-7294

Respectfully submitted,

By:    */s/ C. Robert Heath*
         C. ROBERT HEATH
         Texas State Bar No. 09347500
         Southern District No. 13381
         *bheath@bickerstaff.com*
         BICKERSTAFF HEATH
         DELGADO ACOSTA LLP
         3711 S. MoPac Expressway
         Building One, Suite 300
         Austin, Texas 78746
         Telephone: (512) 472-8021
         Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR
DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on July 1, 2016, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.

/s/ <i>C. Robert Heath</i>
C. Robert Heath