IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALBERTO PATINO, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:14-cv-03241-LHR |
| | § | |
| CITY OF PASADENA | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... iii

Nature and Stage of the Proceeding..............................................**Error! Bookmark not defined.**

Issues Before the Court ................................................................................................. 2

Factual Background…………………………………………………………………3

Argument…………………………………………………………………………5

   **A. The City's Proportionality Theory Does not Entitle it to Summary Judgment Under Section 2** .......................................................................................................**6**

      **1. Proportionality Turns on the Number of Majority Minority Districts in the Challenged Plan** ........................................................................................7

      **2. Proportionality Cannot Serve as the Basis for Summary Judgment Because it is Only one Factor in the Totality of Circumstances** ...............13

      **3. Proportionality is not a Safe Harbor and Does not Shift the Burden of Proof to Plaintiffs**………………………………………………...18

   **B. Genuine Factual Disputes Preclude Summary Judgment on the City's Proportionality Claim**.......................................................................................**19**

      **1. District D Does not Afford Latinos the Opportunity to Elect their Candidate of Choice**.....................................................................................20

      **2. Even if De Grandy proportionality Turned on "a History of Success" There are not Four Districts with a History of Success Electing Latino Preferred Candidates** .......................................................................**21**

   **C. The City is not Entitled to Summary Judgment on Plaintiffs' Intentional Discrimination Claims**................................................................................................23

Conclusion .....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*African Am. Voting Rights Legal Def. Fund, Inc. v. Villa,*
   54 F.3d 1345 (8th Cir. 1995) .......................................................................... 10

*Bartlett v. Strickland,*
   556 U.S. 1 (2009).......................................................................... 8, 11, 12, 13

*Campos v. City of Houston,*
   113 F.3d 544 (5th Cir. 1997) ............................................................................ 8

*Fairley v. Hattiesburg, Miss.,*
   584 F.3d 660 (5th Cir. 2009), ......................................................................... 10

*Garza v. Cty. of Los Angeles,*
   918 F.2d 763 (9th Cir. 1990) .......................................................................... 24

*Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs,*
   775 F.3d 1336 (11th Cir. 2015) ...................................................................... 15

*Growe v. Emison, ,*
   507 U.S. 25 (1993)........................................................................................... 11

*Johnson v. De Grandy,*
   512 U.S. 997 (1994)................................................................................. passim

*League of United Latin Am. Citizens v. Perry,*
   548 U.S. 399 (2006)................................................................................. passim

*McNeil v. Springfield Park Dist.,*
   851 F.2d 9370 (7th Cir. 1988) ....................................................................... 15

*Perez v. Pasadena Indep. Sch. Dist.,*
   165 F.3d 368 (5th Cir. 1999) .......................................................................... 10

*Ruiz v. City of Santa Maria,*
   160 F.3d 543 (9th Cir. 1998) .......................................................................... 22

*S. Ins. Co. v. Affiliated FM Ins. Co.; Univ. of S. Miss. Alumni Ass'n,*
   2016 WL 3947761 (5th Cir. July 21, 2016)...................................................... 2

*Thornburg v. Gingles,*
   478 U.S. 30 (1986),.................................................................................. passim

*Valdespino v. Alamo Heights Indep. Sch. Dist.,*
   168 F.3d 848 (5th Cir. 1999) ............................................................................ 8

*Voinovich v. Quilter,*
   507 U.S. 146 (1993)................................................................................. 11, 22

**Statutes**

42 U.S.C. § 1973(b) ............................................................................................ 9, 19

1965, 52 U.S.C. § 10301......................................................................................... 1

**Rules**

Fed.R.Civ.P. 56......................................................................................................... 2

**Legislative History**

S.Rep. No. 97–417 (1982), U.S.Code Cong. & Admin.News 1982................................16

iii

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALBERTO PATINO, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:14-cv-03241-LHR |
| | § | |
| CITY OF PASADENA | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now come Plaintiffs Alberto Patiño, Maria Mari, Patricia Gonzales, Maria Carmen Mendoza, Frank Borrego, Gabriel Rocha Barreto, Richard Serna, and Joseph John Marquez ("Plaintiffs") and file this Memorandum of Law in Response to Defendant's Motion for Summary Judgment.  For the reasons set out below, Defendant City of Pasadena's theory of "proportional representation" does not entitle it to judgment as a matter of law, and there are genuine issues of material fact that preclude summary judgment.

### NATURE AND STAGE OF THE PROCEEDING

Following the City of Pasadena's conversion from an election system of 8 single member districts to a mixed 6-2 system, Plaintiffs filed this action under the Fourteenth and Fifteenth Amendments to the United States Constitution and the Voting Rights Act of 1965, 52 U.S.C. §

1

10301.  Defendant City of Pasadena filed its motion for summary judgment on July 1, 2016.  The

Court has set the motion for argument on August 24, 2016.

## ISSUES BEFORE THE COURT

Defendant City of Pasadena ("the City") does not move for summary judgment on any of

the threshold requirements of a section 2 case:  whether the minority population is sufficiently

large and geographically compact to constitute the majority of four single member districts,

whether Latinos are politically cohesive, and whether Anglos vote sufficiently a bloc usually to

defeat the Latino preferred candidate.[1]  Instead, the City contends that Latino voters in Pasadena

have "proportional representation"[2] in the 6-2 system and thus the City is entitled to summary

judgment on all claims.

Summary judgment is proper if the movant shows no genuine dispute as to any material

fact and entitlement to judgment as a matter of law.[3]  "The evidence should be viewed in the

light most favorable to the non-moving party, and this court should refrain from making

credibility determinations or from weighing the evidence."[4]  A summary judgment is reviewed

*de novo*.[5]

---

[1] *See Thornburg v. Gingles*, 478 US 30, 50-51 (1986).
[2] Def. Br. at 2.
[3] Fed. R. Civ. P. 56(a).
[4] *S. Ins. Co. v. Affiliated FM Ins. Co.; Univ. of S. Miss. Alumni Ass'n,* 2016 WL 3947761 (5th Cir. July 21, 2016) (citing *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012) (internal quotation marks omitted)).
[5] *Id.*

The issues before the Court are whether the City is entitled to judgment as a matter of law under its theory of "proportional representation" and whether there are genuine issues of material fact as to the extent of Latino political opportunity in Pasadena.

## FACTUAL BACKGROUND

The parties agree on many of the facts surrounding the City's change in method of election from eight single member districts to a mixed system of six single member districts and two at large positions.[6]

The Pasadena City Council is comprised of a mayor, who is elected at-large, and eight council members.  Following the 2010 Census, the City of Pasadena redistricted its eight single member districts.  The 8-0 redistricting plan included four districts in which Latinos constituted the majority of registered voters.[7]  In the 8-0 redistricting plan, Latino voters had the opportunity to elect their preferred candidate in four of eight districts.[8]

In the first election following redistricting, held in May 2013, three Latino-preferred candidates were elected from the four Latino-majority districts.[9]  An Anglo-preferred candidate was elected in the fourth Latino majority district (District B).  *Id.*  In one additional district, which was Anglo-majority (District E), a candidate named Cody Ray Wheeler stepped forward

---

[6] For the Court's convenience, Plaintiffs provide a separate short statement of undisputed and disputed facts in an appendix to this Memorandum.
[7] Ex. 47.
[8] Ex. 42.
[9] Ex. 43.

to run.   Mayor Isbell ran negative campaign advertisements targeting Mr. Wheeler, but Mr. Wheeler won the race -- by a mere 33 votes.[10] Mr. Wheeler identifies as Latino.

As a result, by June 2013, Latino-preferred candidates held half of the seats on the City Council. There was also the strong possibility that Latino majority District B would elect a Latino-preferred candidate in 2015, raising the spectre of five out of eight Latino preferred candidates on the City council.

In June 2013, the U.S. Supreme Court decision in *Shelby County, Alabama v. Holder*, 133 S.Ct. 594 (2013) released Texas and its sub-jurisdictions from the requirement to preclear voting changes under section 5 of the federal Voting Rights Act.   Several weeks later, Mayor Isbell announced his plan to shift two seats on the council from single member districts to at-large positions, declaring that the U.S. Justice Department could no longer block the change.[11]

Mayor Isbell convened a Charter Review Committee which considered whether to place a on the ballot a proposal to change the City's election system from 8-0 to 6-2.[12]  After reviewing the proposal, the Charter Review Committee recommended against placing the question on the ballot.[13]  Mayor Isbell then turned to the City Council with his request.[14]   The four Latino-preferred council members opposed the change to a 6-2 system and voted against placing the question on the ballot.[15]   The Council deadlocked 4-4 and Mayor Isbell cast the tie-breaking

---

[10] Ex. 2 (91:15-92:2); Ex. 44; Ex. 43 at 14.
[11] Ex. 27 (26:11-23); *see also* Ex. 2 (121:20-122:7).
[12] Ex. 2 (109:20-110:24); Ex. 4.
[13] Ex. 5.
[14] Ex. 6.
[15] Ex. 13.

vote in favor.[16]   In a city-wide vote, the charter amendment passed.[17] In April 2014, the Council adopted its current 6-2 redistricting plan, again over the opposition of the four Latino-preferred councilmembers and with Mayor Isbell casting the tie-breaking vote.[18]

The 6-2 redistricting plan rolled back Latino voting strength in Pasadena.[19]   Latino-majority District D, located in the far north side of Pasadena, was eliminated – consumed by Latino majority Districts A, B, and C which were forced to take on territory to meet the new ideal population in a six-district plan.[20]   The District D identifier was assigned to an Anglo majority district farther south in Pasadena.[21]

Overall, the 6-2 plan reduced the number of Spanish surnamed voter registration (SSVR) majority districts from four to one.[22]   The two at-large positions were placed firmly in the control of Anglo voters who constituted 65% of the City's registered voters.[23]

Today, although the Latino population of Pasadena has continued to grow, as a result of the change to a 6-2 election system, Latino voters enjoy less than equal political opportunity. Only three City council districts contain a majority of Latino citizen voting age population

---

[16] *Id.*
[17] Ex. 45.
[18] Ex. 46.
[19] Def. App. at 34-35.
[20] Exs. 40 and 41.
[21] *Id.*
[22] Ex. 48.
[23] *Id.*

(CVAP).[24]   Under the 8-0 plan there were four districts containing a majority of Latino CVAP, which more closely approximates Latino CVAP in the City.[25]

## ARGUMENT

As an initial matter, Plaintiffs note that the City does not contend that Plaintiffs cannot fulfill the section 2 threshold test set out in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).[26] The City's 8-0 redistricting plan, which contained four Latino CVAP majority districts, makes it impossible for the City to claim that Latinos are not sufficiently large and geographically compact to constitute the majority of four out of eight single member districts.   The City also adopted Plaintiffs' election analysis, which forecloses the argument that there is no racially polarized voting in Pasadena.[27]

The City instead bases its summary judgment motion on the contention that "proportional representation"[28] for Latinos in the 6-2 system entitles the City to summary judgment on all claims.   The City's summary judgment motion thus relies entirely on one element of the "totality of the circumstances" inquiry in a section 2 case.

For a number of reasons, the City's motion fails.   First, the City's theory of proportionality does not, as a matter of law, entitle it to summary judgment.   Second, even if the City's legal theory was correct, genuine disputes as to material facts preclude summary judgment on the question of proportionality.   Third, the City is incorrect in arguing that proportionality

---

[24] Def. App. at 34.
[25] *Id.* at 35.
[26] *See* Def. Br. at 4.
[27] *See* Dkt. 71-1 at 5.
[28] Def. Br. at 2.

forecloses Plaintiffs' claims of intentional discrimination under the Fourteenth and Fifteenth Amendments.

### A. The City's Proportionality Theory Does not Entitle it to Summary Judgment Under Section 2

The City argues that Latinos in Pasadena enjoy "proportional representation" and that "proportional representation" leads to judgment as a matter of law for the City.  The City does not dispute that the challenged 6-2 plan includes only three Latino CVAP majority districts.[29] However, the City argues that the 2015 election of a Latino candidate in an Anglo majority district establishes "proportional representation" and provides the basis for summary judgment.

The case on which the City relies, *Johnson v. De Grandy*, makes clear that the City is wrong on two counts.  First, *De Grandy* held that "proportional representation" is not the same as equality of opportunity.[30]  Second, *De Grandy* held that equality of opportunity is measured in terms of minority majority districts, not Anglo majority districts.

### 1. Proportionality Turns on the Number of Majority Minority Districts in the Challenged Plan

In *De Grandy*, the Court held that a redistricting plan's creation of a number of "majority-minority districts in substantial proportion to the minority's share of voting-age population" should be considered in the totality of circumstances when weighing minority voters' section 2 claim.[31]

---

[29] Def. Summary of Facts, Dkt. 71-1 at 4.
[30] *See Johnson v. De Grandy*, 512 U.S. 997, 1014 n. 11 (1994).
[31] *See id.* at 1013-1014; *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 438 (2006) (counting only Latino CVAP majority districts in the proportionality analysis).

As an initial matter, it is important to note that the case at hand is somewhat different from the redistricting challenge at issue in *De Grandy*. In a typical redistricting case, plaintiffs challenge "the reasonableness of drawing a series of district lines in one combination of places rather than another[.]"[32] Here, Plaintiffs challenge the adoption of at-large voting for two seats on the City council that were previously elected by single member districts. The Court in *De Grandy*, which was a redistricting challenge, recognized that redistricting involved "closer calls" when compared to at-large challenges, which involved "total submergence" of minority voting strength.[33] The City's conversion from a system of single member districts to a mixed system of at-large voting and single member districts, with the accompanying reduction in the number of Latino opportunity districts, is not the 'close call' addressed by *De Grandy*.

Nevertheless, *De Grandy* supports Plaintiffs' claim of vote dilution. *De Grandy*'s instruction to courts is to consider, when assessing the totality of circumstances, whether there exists a number of "majority-minority districts in substantial proportion to the minority's share of voting-age population[.]"[34] The Court stated unequivocally:

> "Proportionality" as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population. The concept is distinct from the subject of the proportional representation clause of § 2, which provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the

---

[32] *See De Grandy*, 512 U.S. at 1013.

[33] *Id.* at 1012-13.

[34] *Id.* at 1013. In light of current standards, the rule would be to consider whether the number of Latino majority districts is in substantial proportion to the Hispanic *citizen* voting age population. *See Bartlett v. Strickland*, 556 U.S. 1, 12 (2009); *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997); *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848 (5th Cir. 1999).

population." 42 U.S.C. § 1973(b). This proviso speaks to the success of minority candidates, as distinct from the political or electoral power of minority voters.[35]

*De Grandy* repeatedly emphasized that the proportionality inquiry looks only at the number of majority-minority districts.[36]  In her concurring opinion, Justice O'Connor reiterated the Court's understanding of the requirement to use majority minority districts in the proportionality analysis:  "The opinion's central teaching is that proportionality—defined as the relationship between the number of majority-minority voting districts and the minority group's share of the relevant population—is *always* relevant evidence in determining vote dilution, but is *never* itself dispositive."[37]

The *De Grandy* Court purposefully excluded from the proportionality inquiry a district in which "black voters, although not close to a majority, are able to elect representatives of their choice with the aid of cross-over votes."[38]  Thus the Court recognized, and chose to treat differently, crossover districts when looking at proportionality.[39]  The City misreads *De Grandy*

---

[35] *De Grandy*, 512 U.S. at 1014 n. 11; *see also League of United Latin Am. Citizens*, 548 U.S. at 438 (considering only Latino majority districts in the proportionality inquiry).

[36] *See, e.g. De Grandy*, 512 U.S. at 1013 (explaining that proportionality test turns on the number of "majority-minority districts); 1014 (equating "supermajorities" of Hispanic population with "an effective voting majority"); 1020 (explaining that a proportionality safe harbor "would shield from § 2 challenge a districting scheme in which the number of majority-minority districts reflected the minority's share of the relevant population"); 1019-1020 (explaining that proportionality used as a safe harbor would encourage jurisdictions "to devise majority-minority districts even in circumstances where they may not be necessary[.]"); 1023 (conducting proportionality analysis in state Senate plan based on three districts with "Hispanic supermajorities of at least 64 percent, and one [district with] a clear majority of black voters[.]").

[37] *Id.* at 1025.

[38] *Id.* at 1023.

[39] The Court further recognized that "influence" districts provide a level of opportunity that is different from majority minority districts.  *Id.* at 1008-1009 (declining to decide "whether the first *Gingles* condition can be satisfied by proof that a so-called influence district may be created

9

when claiming that a district in which minority voters fall short of a majority and must "pull, haul, and trade to find common political ground" should be considered in the proportionality analysis.[40]  *De Grandy* stands for the opposite view.[41]

The other case on which the City relies for its "proportional representation" argument also used majority minority districts to conduct its proportionality analysis.  In *African Am. Voting Rights Legal Def. Fund, Inc. v. Villa*, the Eighth Circuit used a 60% Black eligible voter threshold for classifying opportunity districts in its proportionality analysis.[42]  The Fifth Circuit also follows *De Grandy*'s instruction to base the proportionality analysis on majority minority districts.[43]

---

(that is, by proof that plaintiffs can devise an additional district in which members of a minority group are a minority of the voters, but a potentially influential one).")
[40] Def. Br. at 19.
[41] The City's contention that the election of a Latino to the City council by itself demonstrates electoral opportunity is disingenuous.  Mot. at 18-20.  While evidence of electoral success "may inform the analysis as to whether a minority group comprises a majority of the voting-age citizens in a proposed district," the election of a preferred candidate does not prove that a district is an opportunity district. *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 373 (5th Cir. 1999) (analyzing *Gingles* prong one).  Furthermore, the election of a Latino-preferred Latino candidate to replace a Latino-preferred Anglo candidate in District C is not legally significant, even if, as the City claims, it "produced a 50 percent increase in the number of Hispanic members of the council."  Mot. at 3.  The parties agree that District C is Latino majority.  Whether the Latino voters of District C elect an Anglo or a Latino to represent them is not relevant to the section 2 analysis.
[42] *African Am. Voting Rights Legal Def. Fund, Inc. v. Villa*, 54 F.3d 1345, 1348 fn 4 (8th Cir. 1995) (referring to Black voting age population); *see also Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 358 (7th Cir. 1992) (affirming summary judgment under section 2 where "7 districts in which the black population approximates 60%" created proportionality in a county redistricting plan).
[43] *See, e.g. Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 674 (5th Cir. 2009) (affirming the district court's use of majority Black voting age population districts to evaluate proportionality).

In the proportionality inquiry, the concept of "opportunity to elect" is rooted in *Thornburg v. Gingles*, which established the requirement that a plaintiff group "demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."[44]  The requirement to constitute the majority of a district is intended to ensure an equal opportunity to elect minority-preferred candidates.[45]

In *Bartlett v. Strickland*, the U.S. Supreme Court rejected the argument that the *Gingles* prong one requirement can be satisfied with a proposed crossover district.[46]  The Court in *Bartlett* emphasized that an equal opportunity to elect requires presentation of a majority minority district, and noted "[t]here is a difference between a racial minority group's "own choice" and the choice made by a coalition."[47]

Here, the City's entire proportionality argument turns on District D in the 6-2 plan. However, the City concedes that in District D Latinos do not constitute the majority of the citizen voting age population.[48]  Latino voters may be able to influence the outcome of an election in District D, or "chime in" with the Anglo majority; Latino voters "cannot, however, elect that [preferred] candidate based on their own votes and without assistance from others."[49]

---

[44] *Gingles*, 478 U.S. at 50.
[45] *See id.* at 50, n. 17 ("[u]nless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.").
[46]  *Bartlett v. Strickland*, 556 U.S. 1*, 1.
[47] *Id.* at 15.
[48] Mot. at ¶ 8.
[49] *Bartlett*, 556 U.S. at 14.  *See also Voinovich v. Quilter,* 507 U.S. 146, 154, 113 S.Ct. 1149 (1993) ("Placing black voters in a district in which they constitute a sizeable and therefore 'safe' majority ensures that they are able to elect their candidate of choice"); *see also Growe v. Emison*,

11

Considering potential influence or crossover districts in the proportionality analysis "would place courts in the untenable position of predicting many political variables and tying them to race-based assumptions."[50]  In rejecting the idea that crossover and influence districts provide an opportunity to elect, the *Bartlett* Court noted the difficult questions that a court must answer when investigating opportunity to elect in a less-than-majority district.  These questions would drag the court into a similar legal morass with respect to proportionality:

> What percentage of white voters supported minority-preferred candidates in the past? How reliable would the crossover votes be in future elections? What types of candidates have white and minority voters supported together in the past and will those trends continue? Were past crossover votes based on incumbency and did that depend on race? What are the historical turnout rates among white and minority voters and will they stay the same? Those questions are speculative, and the answers (if they could be supposed) would prove elusive.[51]

Here, where Pasadena's elections are nonpartisan and influenced by complex local factors, considering less-than-majority districts in the proportionality analysis would prove an impossible task.  As explained in *Bartlett*, in local jurisdictions:

> courts would face the difficult task of discerning crossover patterns in nonpartisan contests for a city commission, a school board, or a local water authority. The political data necessary to make such determinations are nonexistent for elections in most of those jurisdictions. And predictions would be speculative at best given that, especially in the context of local elections, voters' personal affiliations with candidates and views on particular issues can play a large role.[52]

---

507 U.S. 25, 40 (1993) (majority status "establish[es] that the minority has the potential to elect a representative of its own choice in some single-member district.").

[50] *Bartlett*, 556 U.S. at 17.

[51] *Bartlett*, 556 U.S. at 17.

[52] *Id.* at 18.

12

The Supreme Court in *De Grandy*, and all other courts since, have looked to the number of majority minority districts when conducting the proportionality analysis. This eminently reasonable rule satisfies "the need for workable standards and sound judicial and legislative administration[.]"[53]

The City's argument that less-than-majority districts should be counted in the proportionality analysis not only presents a unworkable judicial standard, it also creates an 'I win, you lose' scenario for defendants. In the legal framework urged by the City, defendant jurisdictions can defeat a section 2 claim by arguing that crossover or influence districts should be *excluded* when evaluating opportunity to elect under *Gingles* prong one, and then turn around and argue that those same crossover or influence districts should be *included* when evaluating opportunity to elect for the purposes of proportionality. Contrary to the City's argument, opportunity to elect has a consistent meaning, and in both the assessment of *Gingles* prong one and proportionality, it is measured with majority minority districts.

### 2. Proportionality Cannot Serve as the Basis for Summary Judgment Because it is Only one Factor in the Totality of Circumstances

The City carefully limits its motion for summary judgment to the question of proportionality.[54] However, even if the City were able to establish proportionality between the number of Latino majority districts and the Latino share of the relevant population, the City would not be entitled to judgment as a matter of law. Proportionality is only one factor within

---

[53] *Id.* at 17.

[54] *See* Def. Br. at 2 ("the issue in the motion for summary judgment is whether Hispanics, who constitute roughly half of the city's citizen-voting-age population, have effective political majorities in four single-member districts.").

the totality of circumstances, and the City is incorrect in assuming that satisfaction of one element of the totality of circumstances leads to judgment.[55]

Courts evaluating a section 2 claim must conduct an "intensely local appraisal" of the challenged redistricting plan.[56]  When conducting this appraisal, "the trial court is to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters. This determination is peculiarly dependent upon the facts of each case."[57]

Proportionality is the last of nine factors that courts must consider in the totality of circumstances:

> "the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group ...; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction . . . evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area.[58]

---

[55] *See, e.g.* Def. Br.. at 5 ("Because. . . Hispanics enjoy political effectiveness in proportion to their share of the potential electorate, the election system provides equal political and electoral opportunity to Hispanics and, thus, precludes any finding of a violation of Section 2.").

[56] *League of United Latin Am. Citizens*, 548 U.S. at 437 (quoting *Gingles,* 478 U.S. at 79).

[57] *Gingles*, 478 U.S. at 79 (internal quotation marks and citations omitted).

[58] *League of United Latin Am. Citizens*, 548 U.S. at 426 (quoting *Gingles*, 478 U.S. at 44–45 (citing S. Rep. No. 97–417 (1982), U.S. Code Cong. & Admin. News 1982, pp. 177, 206).

Even if minority voters enjoy rough proportionality, the court must proceed to weigh that fact against others in the totality of circumstances analysis.  If other facts in the totality outweigh proportionality, the court must find a section 2 violation.[59]

The Courts of Appeals have followed the Supreme Court's directive to conduct a careful appraisal of the totality of circumstances, noting that "[s]ummary judgment in [section 2] cases presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court and our precedent."[60]  The argument that summary judgment is inappropriate in section 2 cases, "which generally call for substantial and complex factual determinations . . . finds support in the text and legislative history of section 2 and in Supreme Court precedent."[61]

Here, if the City seeks summary judgment on Plaintiffs' section 2 claim, it must present facts related to the remaining elements of the totality of circumstances.  The City's failure to address these other aspects of the totality of circumstances dooms its summary judgment motion.

---

[59] *See, e.g. League of United Latin Am. Citizens*, 548 U.S. at 438 (concluding that, even assuming proportionality for Latino voters, the challenged plan violated section 2, and explaining "[T]he degree of probative value assigned to proportionality may vary with other facts, and the other facts in these cases convince us that there is a § 2 violation.") (internal quotations omitted). *See also De Grandy*, 512 U.S. at 997 ("No single statistic provides courts with a shortcut to determine whether a set of single-member districts unlawfully dilutes minority voting strength.").

[60] *Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015).

[61] *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 940 (7th Cir. 1988) (affirming summary judgment on *Gingles* prong one and observing that summary judgment is inconsistent with requirement to conduct totality of circumstances analysis); *see also Anderson v. Mallamad*, 1997 WL 35024766 (S.D. Ind. 1997).

Although it is not Plaintiffs' obligation to dispute facts never presented by the City, Plaintiffs note that a number of "Senate factors"[62] present in Pasadena outweigh any proportionality claimed by the City and dictate a finding of vote dilution under the totality of circumstances. Voting in Pasadena is racially polarized.[63] In the context of this racially polarized voting, Pasadena employs a majority vote requirement in its new at-large city council seats which "tend[s] to enhance the opportunity for discrimination" against the Latino minority.[64] Pasadena elections are characterized by candidate slating from which Latinos are largely excluded.[65] "Racial appeals" are present in Pasadena elections.[66] Only one Latino has ever been elected to the City council in an at-large seat, and that was most recently in 1977.[67] There is a history in Harris County and Pasadena of voting-related racial discrimination and Latinos "bear the effects of past discrimination … which hinder their ability to participate effectively in the political process."[68] The Pasadena City Council has been "unresponsive to the particularized needs" of Latinos[69] and the reasons supporting conversion from an 8-0 election system to a 6-2 system were tenuous.[70]

---

[62] *See* S.Rep. No. 97–417 (1982), U.S.Code Cong. & Admin.News 1982, p. 206.
[63] Def. App. at 114 ¶ 15.
[64] Def. Br. at 9.
[65] Ex. 2 (69:18-71:25); Ex. 28; Ex. 29.
[66] Ex. 27 (43:1-44:7).
[67] Def. App. at 14 ¶ 5.
[68] Def. App. at 28-30; Expert Declaration of Andres Tijerina.
[69] Ex. 27 (34:7-18; 69:11-20; 74:12-13; 95:18-22); Ex. 30 (12:24-13:18; 14:14-18; 15:18-21); Ex. 31 (24:14-25:6; 25:18-25; 27:2-3); Ex. 33 (172:10-173:6); Ex. 34 (37:23-39:22; 47:18-24; 53:23-54:1); Ex. 35 (137:1-138:2; 141:9-20).
[70] Ex. 2 (77:14-24); Ex. 5; Ex. 13; Ex. 27 (26:11-23); *see also* Ex. 2 (121:20-122:7).

Furthermore, Mayor Isbell has used his own and the City's resources to encourage Anglo voters to turn out to vote, to run negative ads against Latino candidates of choice, and to slate and support almost exclusively Anglo candidates.  For example, Richard Scott, Pasadena Director of Community Relations, performed campaign work from his city email account, during work hours and at the direction of the Mayor, in the 2013 and 2015 elections for City council.[71] Mr. Scott further used city resources to develop a campaign mailing list for use in the 2013 municipal election.[72]

Richard Scott also did political work from his city email account, during work hours and at the direction of the Mayor, to run the campaign in favor of amending the City Charter to change the election system from 8-0 to 6-2.  From his City office, Mr. Scott oversaw a convening of homeowners association members from the predominantly Anglo South Side for a campaign "kick-off" event at which yard signs in favor of the charter change were distributed.[73]

The City specifically targeted Anglo voters to urge them to vote in favor of the change in election system from 8-0 to 6-2.  For example, one email from Richard Scott directed a campaign consultant to "pull out the Hispanic names" from a mailing list prior to mailing material urging voters to support the Charter amendment.[74]

In the 2015 municipal election, Richard Scott worked during office hours to place large signs saying "VOTE TODAY" at major thoroughfares on the predominantly Anglo South Side

---

[71] Ex. 38; Ex. 39.
[72] Ex. 7; Ex. 8; Ex. 9.
[73] Ex. 22 (132:6-7; 157:13-16);  Ex. 23;  Ex. 24;  Ex. 25.
[74] Ex. 22 (142:7-24);  Ex. 26.

17

of town urging passersby to vote.[75]  Mr. Scott worked alongside another City employee to place the signs.[76]

In single member districts, the City used its resources, and those of the Mayor, to advocate against Latino-preferred candidates.  For example, in the 2015 municipal election, Richard Scott worked from his desk in City Hall with a campaign consultant to prepare negative advertisements targeting Cody Ray Wheeler in District D.[77]

The City's effort to influence voter turnout in district and at-large elections, at a time when Latinos were poised to exercise significant political strength on the City council, weighs heavily towards a finding, under the totality of circumstances, that the 6-2 election system is dilutive.[78]

### 3. Proportionality is not a Safe Harbor and Does not Shift the Burden of Proof to Plaintiffs

The City mischaracterizes the issue of proportionality as "outcome determinative" when it is not.[79]  The U.S. Supreme Court in *De Grandy* rejected the idea that proportionality is a "safe harbor" in section 2 cases. The Court explained that proportionality does not mean "that that as a matter of law no dilution occurs" and further explained that making proportionality a safe harbor "would be in derogation of the statutory text and its considered purpose . . . and of the ideal that

---

[75] Ex. 10; Ex. 11; Ex. 22 (115:15-116:4); Ex. 27.
[76] Ex. 22 (116:5-116:14).
[77] Ex. 39; Ex. 32; Ex. 2 (197:18-199:11).
[78] *See, e.g. League of United Latin Am. Citizens*, 548 U.S. at 442 ("Even assuming Plan 1374C provides something close to proportional representation for Latinos, its troubling blend of politics and race—and the resulting vote dilution of a group that was beginning to achieve § 2's goal of overcoming prior electoral discrimination—cannot be sustained.").
[79] Def. Br. at 4.

18

the Voting Rights Act of 1965 attempts to foster."[80]   The Court warned that treating proportionality as a safe harbor "would run counter to the textual command of § 2, that the presence or absence of a violation be assessed 'based on the totality of circumstances.'"[81]

In the most recent Supreme Court case considering proportionality in the totality of circumstances, the Court concluded that the challenged plan violated section 2 even if the Court assumed proportionality because "the other facts in these cases convince us that there is a § 2 violation."[82]   Because vote dilution can "occur even in a jurisdiction with numerically demonstrable proportionality; the harbor safe for States would thus not be safe for voters."[83] Thus, jurisdictions may not escape section 2 liability simply by showing proportionality in a redistricting plan.   For these reasons, Pasadena's argument that "the existing 6-2-1 system provides the opportunity for proportionate representation and, thus, meets the requirements of section 2 of the Voting Rights Act" fails as a matter of law.[84]

Similarly, the City can find no legal support for its contention that "[i]f the fact of proportionality is established, the non-moving plaintiff would have the burden of presenting facts showing that the election system does not actually result in equal political opportunity."[85]   There is simply no burden shifting framework for the totality of circumstances inquiry in section 2 cases, and the City cites no case that discusses burden shifting in this context.   Once again, the City ignores the holistic nature of the totality of circumstances inquiry and suggests instead that a

---

[80] *De Grandy*, 512 U.S. at 1017.
[81] *Id.* at 1018 (quoting 42 U.S.C. § 1973(b)).
[82] *League of United Latin Am. Citizens*, 548 U.S. at 438.
[83] *De Grandy*, 512 U.S. at 1019.
[84] Def. Br. at 3.
[85] Def. Br. at 2.

finding of proportionality creates a presumption against section 2 liability that requires plaintiffs to "produce evidence to overcome the presumption[.]"[86]

### B. Genuine Factual Disputes Preclude Summary Judgment on the City's Proportionality Claim

The City concedes in its motion that proportionality for Latino voters in Pasadena is four seats on the City Council.[87]  In fact, there are not four districts in the current 6-2 plan that afford Latino voters the opportunity to elect their candidate of choice.

The parties agree that Districts A, B, and C contain majorities of Latino citizen voting age population.[88]  The parties further agree that District D does not.[89]  In addition to the fact that District D is not a Latino majority district, additional facts support Plaintiffs' contention that District D is not an opportunity district for the purposes of the proportionality analysis.

### 1. District D Does not Afford Latinos the Opportunity to Elect their Candidate of Choice

Members of the Pasadena City Council with experience running in City elections, including the current representative of District D, agree that District D is not a Latino opportunity district.[90]  Anglos constitute the majority of voters in District D and determine the outcome of elections.[91]  Although there is a substantial Latino population in District D, Anglos in

---

[86] Def. Br. at 8.
[87] Def. Br. at 2.
[88] *See* Def. Br. at 9.
[89] Def. App. at 84.
[90] Harrison Aff. ¶¶ 5-6; Wheeler Aff. ¶ 5; Ybarra Aff. ¶ 3.
[91] Harrison Aff. ¶ 5; Wheeler Aff. ¶ 5.

District D tend to be older and turn out at higher rates when compared to Latinos.[92]  In 2015, the only election in which District D was in effect, the successful candidate personally identified as Latino but had an Anglo name.[93]  Because of the reluctance of Anglo voters to support Latino candidates in Pasadena, Cody Ray Wheeler would not have been elected in District D but for his Anglo name.[94]

Election results drawn from the area of District D demonstrate that Latino voters in District D are unable to elect their candidate of choice unless Anglos also prefer that same candidate.  In 2010 Jack Morman won the majority of votes from the precincts in the area of District D in the race for Harris County Commissioners Court Precinct No. 2 over the Latina candidate Sylvia Garcia.[95]  Similarly, in 2012, Louis Guthrie won the majority of votes from the precincts in the area of District D in the race for Harris County Sheriff over the Latino candidate Adrian Garcia.[96]  Only in 2008, when Anglos shared the same preference as Latinos, Adrian Garcia won the majority of votes from the precincts in the area of District D for the office of Sheriff over the Anglo opponent Tommy Thomas.[97]

In order to divert attention away from the elimination of District D as a Latino majority district in the 8-0 plan, the City claims that new District D in the 6-2 plan is comparable to old

---

[92] Harrison Aff. ¶¶ 7-10; Ybarra Aff. ¶¶ 3-4.
[93] Wheeler Aff. ¶ 4; Ybarra Aff. ¶ 5
[94] Harrison Aff. ¶ 5; Wheeler Aff. ¶¶ 5-6; Ybarra Aff. ¶ 5.
[95] Ex. 50 (Harris County Nov 2010 Precinct Returns); Ex. 49 (Pasadena 2015 Election Results) The Pasadena 2015 Election Precinct Returns show which County Election Precincts are wholly or partially in council District D.
[96] Ex. 51 (2012 Sheriff Canvass); Ex. 49 (Pasadena 2015 Council Election Results).
[97] Ex. 1 (2008 Sheriff Canvass); Ex. 49 (Pasadena 2015 Council Election Results).

District E in the 8-0 plan.[98]  However, new District D is not similar at all to old District E.  First, new District D contains approximately 5,798 more people in it when compared to old District E.  Second, and more important, the majority of the "different" citizen voting age population between new District D and old District E is non-Latino.[99]

### 2. Even if De Grandy proportionality Turned on "a History of Success"  There are not Four Districts with a History of Success Electing Latino Preferred Candidates

The election of one Latino-preferred candidate in District D does not establish a "history of success," particularly in the unusual circumstance in which the Latino candidate has an Anglo name.[100]  Of note, another candidate in 2015, Oscar Del Toro, ran for office at-large in Pasadena.  In District D, Del Toro was preferred by Latinos but not preferred by Anglos and was soundly defeated.[101]  Because Anglo voters decide the outcome of elections in District D, the Latino minority does not have an equal opportunity to "elect its candidate of choice on an equal basis with other voters."[102]

Even if the City could successfully argue that "history of success" is the measure of opportunity instead of majority population, the City's motion fails again because there are not four districts in the 6-2 election system with a "history of success."  In the 2015 election, Latino

---

[98] Def. Br. at 18.

[99] Def. App. at 34-35.

[100] "The [Voting Rights] Act means more than securing minority voters' opportunity to elect whites."  *Ruiz v. City of Santa Maria*, 160 F.3d 543, 554 (9th Cir. 1998).  *See also Voinovich,* 507 U.S. at 153 ("To hold otherwise would doom any Section 2 claim in which white candidates, acceptable to minorities and non-minorities alike, are regularly elected but in which minority candidates, preferred by minorities but unfavored by whites, are consistently defeated.").

[101] Def. App. at 114 ¶ 15; Ex. 36 at 9-10.

[102] *Voinovich*, 507 U.S. at 153.

voters in District B supported a Latino candidate, Celestino Perez.  However, Mr. Perez was defeated by Anglo bloc voting for his opponent, Bruce Leamon.[103]

Although District B was a Latino majority district in 2015, it was a much larger version of its predecessor in terms of geography and population.  The change to a 6-2 system forced Latino majority District B to gain territory and suffer a decrease in its Latino registered voter population.  Despite the strong support of Latino voters,[104] Mr. Perez lost his race in 2015 by 34 votes.[105]  Mr. Perez testified in his deposition that he would have won in District B if it had not been modified from its version in the 8-0 plan.[106]

Thus, even if District D could be considered a district with a "history of success" sufficient to make it an opportunity district in the proportionality inquiry, District B's lack of success for the Latino preferred candidate means that there are still only three opportunity districts in the 6-2 redistricting plan.   The City cannot have its cake and eat it too.

### C.   The City is not Entitled to Summary Judgment on Plaintiffs' Intentional Discrimination Claims

---

[103] Def. App. at 115 ¶ 16; Ex. 36 at 2.
[104] Def. App. at 118.
[105] Ex. 36 at 2.
[106] Ex. 37 (68:14-21).

The City argues that a showing of proportionality under section 2 forecloses Plaintiffs' claims of intentional discrimination.[107]  However, the City is mistaken in its understanding of the discriminatory effects standard applied to claims of intentional vote dilution.  Although Plaintiffs must demonstrate discriminatory effects as an element of their intentional discrimination claims, "the showing of injury in cases involving discriminatory intent need not be as rigorous as in effects cases."[108]  In an intentional vote dilution case, a plaintiff must "show a practical effect on the minority group's ability to elect representatives of choice, [i.e.] that the ability of a minority community to elect representatives of choice is adversely affected."[109]

In Pasadena, the change from an 8-0 election system to a 6-2 system adversely affected Latino opportunity to elect:

·       District D, which was a Latino majority opportunity district in the 8-0 plan, was eliminated;[110]

·       The number of Latino CVAP majority districts declined from four to three;[111]

·       The districts in the 6-2 plan are larger, both in terms of geography and population, forcing Latino candidates of choice to spend more resources on city council races;[112]

·       In the new District B, the Latino preferred candidate lost by 34 votes and would have won if District B had not been redrawn to include a decreased percentage of Latino registered voters;[113]

---

[107] *See* Mot. at 1 fn 2 ("if the plaintiffs cannot establish the discriminatory effect required to prevail under the section 2 claim, they cannot prevail under the constitutional claims that require proof of both discriminatory effect and discriminatory intent.)
[108] *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990).
[109] *Cano v. Davis*, 211 F. Supp. 2d 1208, 1249-1250 (C.D. Cal. 2002), *aff'd*, 537 U.S. 1100 (2003).
[110] Ex. 40, 41.
[111] Def. App. at 35 ¶ 24.
[112] Wheeler Aff. ¶¶ 7-9.

·     The 6-2 redistricting plan paired two Latino preferred candidates, and there were no pairings of Anglo incumbents who could run again;[114]

Even if proportionality is a consideration in the effects portion of an intentional discrimination claim, a showing of proportionality cannot automatically override all other evidence of adverse effects on Latino opportunity to elect.  In light of the evidence of adverse effects created by the 6-2 plan, the City is not entitled to summary judgment on Plaintiffs' intentional discrimination claims.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request the Court deny Defendant's summary judgment motion.

DATED: July 29, 2016            Respectfully submitted,

Nina Perales
Attorney-in-charge
Texas Bar No. 24005046
SDTX Bar No. 21127
Ernest Herrera
Texas Bar No. 24094718
SDTX Bar No. 2462211
MEXICAN AMERICAN LEGAL DEFENSE AND
  EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Tel: (210)224-5476
Fax: (210)224-5382

*Counsel for Plaintiffs*

---

[113] Ex. 36 at 2; Def. App. at 34-35; Ex. 37 (68:14-21).
[114] Ex. 34 at 139:25-141:8, 142:18-143:19.

25

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 29th day of July, 2016.

<u>*/s/ Nina Perales*</u>
Nina Perales

26