REPORT of Dr. Andrés Tijerina
PASADENA, TEXAS

October 14, 2015

1.  I submit this report on the history of the violation of civil rights of Latinos in Texas with emphasis on the electoral process.  In writing this report, I have relied on my extensive knowledge and readings of archives and bibliography.  I am a member and fellow of the Texas State Historical Association, a member of the American Historical Association, and president of the Texas Institute of Letters.  I regularly attend professional conferences where I present formal papers for peer review and where I exchange the latest information on historical sources, methods, and data.   I draw my conclusions in the present report based on my extensive knowledge of Texas History and Mexican American History and from the readings and archival research that I have conducted for the better part of four decades.  From my broad professional experience, I have been able to use accepted methods of analysis to compare the Mexican American experience in Texas with other groups in history.  My conclusion is that they have a legacy of exploitation and abuse by Anglo-Americans who have used government, financial, and technological advantages to appropriate Mexican American lands, labor, and resources, and that Mexican Americans in Texas today bear the effects of this discrimination which hinders their ability to participate effectively in the democratic process.  I testified in as an expert witness in *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012) vacated and remanded, 133 S. Ct. 2886, 186 L. Ed. 2d 930 (2013) and *Perez v. Perry*, Civil Action No. 5:11-cv-360 (W.D.TX 2011).  I am compensated at the rate of $250.00 per hour.

2.  I have utilized my research and writing skills to produce new information and interpretations to critical areas of Texas history.  My Ph.D. is in U.S. history.  Indeed, I was the first Mexican American to receive a Ph.D. in U.S. History from the University of Texas at Austin in 1977.  My specialty is Tejano or Latino history in Texas.  I have written four books on Mexican American history, two of them published by a major university press.  One of my books won the three most prestigious awards in Texas History, and two national awards.  I am a Professor of history at Austin Community College, and I have taught at the University of Texas at Austin, the University of Texas at San Antonio, and Texas Tech University.  I have edited and published four books by other writers in order to spread knowledge of Tejano history.  My most widely read work is the publication of my combat memoirs as a USAF pilot with over 100 combat missions in the *Time/Life Books* series on the Vietnam War.  I have practical experience as a former military commander, a former corporate executive with Motorola, Inc., and as a former state agency executive director with the Texas state government.  As the only

Mexican American state agency director at the time, the position gave  me a rare glimpse into the workings of state agency administration.

3.  The facts and data that I considered to form my conclusions came from the materials in my bibliography.  These include documents in the categories of newspaper clippings from the Houston and Pasadena newspapers, federal and state government documents, archival documents from the libraries of the University of Texas, the University of Houston, and the State Archives of Texas. I have conducted years of research in the Spanish and Mexican archives, as well as in newspaper collections, personal collections, and government depositories of those libraries and archives as well as the Briscoe Center for American History and the Benson Latin American Collection, which also houses one of the most extensive Mexican-American collections in the United States.  I have also conducted extensive research in numerous county land records across Texas, as well as at the University of California at San Diego, the U.S. National Archives, the Library of Congress, the State Archives of Coahuila, and the National Archives of Mexico.

4.  I have been a consultant to historical museums across Texas, writing the text, and reviewing the accuracy of their displays.  I also once consulted a major federal archeological project in Texas.  I am a regular speaker and curriculum consultant to civic groups, universities, and independent school districts.  I have delivered keynote addresses to federal agencies in Washington, D.C. and in every major city in Texas, the largest of which was at Texas A&M University to over 3,000 in a special events center and a worldwide satellite TV audience.

5.  My expertise as a U.S. historian is in the social, cultural, economic, and political interaction of various groups in Texas history.  My specialty historical period is the nineteenth century and early 20th century.  I have used traditional historical archival documents like period newspapers, court records, city council minutes, state legislative committee proceedings, government documents, 18th century Spanish documents, 19th century Mexican archives, and personal collections.  I have been named as Series Editor for the Spencer Series of Texas A&M University Press for their history books on Texas and the Southwest.  Under my direction, the Spencer Series has won several book prizes for books for introducing new historical methods to access the unwritten historical transcripts of non-literate societies by referring to inter-disciplinary methods in archeology and anthropology.  I recently received the national Equity Award from the American Historical Association for my role in promoting diverse perspectives and minority historians in the field of American history.

6.  The summary of my findings of discrimination against Latinos  in Texas is that discrimination has been a pervasive and constant phenomenon since 1836, when Anglo-Americans took control of Texas government.  Anglo-American government control was expanded by the defeat of Mexico in the U.S.-Mexico War of 1846-1848, which ended in the taking of present-day South Texas as well.  The traumatic manner in which those Mexicans became U.S. citizens through defeat placed them at a great disadvantage in knowledge and access to the laws, economic power, and government.  Another theme in my conclusion is that racist and discriminatory treatment has been a major characteristic and a consistent thread in the relationship between Latinos and Anglo-Americans especially in Texas.  Another theme is that Anglo-Americans have consistently used Texas government agencies, police agencies, and laws to appropriate lands, labor, and cultural heritage from Latinos.  This phenomenon of domination has manifested itself since 1836 after which the bulk of the Mexican American lands throughout Texas were taken along with government control.  It was reinforced in South Texas when Anglo-Americans established large commercial farming estates which have used violence and labor controls to appropriate Mexican American labor until the mid-20th century.  During the period between 1900 and 1920 the state government established Anglo-controlled legislative districts and a statewide subtractive school system as major obstacles to Latino education and equal access to the democratic  process.  The subtractive schooling of Texas has made Latinos vulnerable in turn to another complete sphere of domination through political devices that are designed to disfranchise citizens with limited education, English-language skills, and literacy.  The state government has consistently and aggressively exploited these weaknesses to deprive Latinos of their voter and citizenship rights.  Although Latinos have challenged the political, economic, and educational subordination, they have done so at tremendous disadvantage, which is manifested in the persistent racism and their current subordinate status.

7.  My findings in this case are that Latinos in the city of Pasadena, Texas have experienced many of the same violations of civil rights cited in the above paragraph.  The political leadership of Pasadena, the educational leaders, and employers have employed many of the same discriminatory devices such as racial segregation, police intimidation, voter dilution, slating, restrictive covenants, and job discrimination to restrict the equal access of Latinos to fair treatment before the law, economic opportunity, and open democratic processes.  Documents cited in this report provide direct quotes in which employers and city officials openly admit that they systematically practiced dual-wage employment, discriminatory hiring, and ostracism of Latino fellow citizens and workers.  The lucrative economic incentives have attracted a major Latino population to the work sites in Pasadena, and they have asserted their demands for fair treatment and equal access to the electoral process, but Latinos continue to lag behind politically and economically in the face of persistent racial prejudice and a structure of discrimination.

4

Historical Background

The Spanish and Mexican pioneer ancestors of modern Mexican Americans were the founders of Texas under a European type of government.  These original Latino settlers are called Tejanos, which is simply the Spanish word for Texan. Tejanos had come initially under the flag of Spain, as Mexicans after Mexican independence, and they continued to settle in Texas under the Republic of Texas.  They claimed lands under the various land grant programs of the successive governments of Texas, and they were citizens of the successive republics.  They established large ranches, and several towns such as San Antonio, Victoria, Laredo, Nacogdoches, and Corpus Christi.  Over 2,000 Tejanos claimed headrights or land grants in Texas along with Sam Houston and Mirabeau B. Lamar as a reward for defending Texas from the Mexican government of President Santa Anna.  Even though thousands fought for Texas, incoming Anglo-Americans made no distinction between the Tejanos who were citizens of the Republic of Texas, and the Mexicans who fought against Texas.  As an example, Juan N. Seguin of San Antonio, had fought for Texas Independence.  He is the only Texan who fought against Mexican General Santa Anna at both the Alamo and at the Battle of San Jacinto.  Immediately after the Texan victory at San Jacinto, Seguin was the victim of several threats on his life in San Antonio by Anglo Americans because they made no distinction except their concept of the Mexican "race."   **TAB 1** (Williams and Barker 1943, IV, pp. 63, 64;  Friend 1969, pp. 66, 73)  Tejanos had established the legitimate government of Texas under Spain and Mexico, but they quickly found themselves isolated by the Anglo-American wave of settlers who greatly outnumbered them.  As Anglo-Americans entered Texas, they took a dominant position, isolating the Tejanos from any viable role in government and the economy.

An anti-Mexican sentiment spread after the Texas Revolution as other prominent Tejano leaders like Juan N. Seguin, Carlos de la Garza, and Vicente Cordova were eventually forced to defend themselves against raids and attacks by Anglo Texans. Tejano families began an evacuation of Texas.  Hundreds of Tejano families fled to Tamaulipas and Nuevo Leon, Mexico while others fled into Louisiana.  During these years, the Texas government played a direct role in dispossessing Tejanos from their lands.  In many cases, the Texas Army had actually ordered loyal Tejanos off their lands, ostensibly to preclude collusion with the enemy.  In 1842, Col. Clark L. Owen declared martial law in the Goliad-Victoria area, and ordered "all Mexicans" to move south of the Nueces.  Prominent and loyal Tejano families lost their ranches and lands as they left many of their settlements in what was called a "virtual state of abandonment." **TAB 2** (O'Connor 1966, pp. 10, 126, 253; Huson 1953, I, 471**;** Hammett, 1971), pp. 83-84)

As the 1840s progressed, Anglo and European immigrants flooded in and took many of the ranches, the livestock, and indeed the livelihood of many of the old Tejanos around Bexar, Goliad, and Nacogdoches.  By 1845, for example, 40 of the 45 Goliad Tejano ranches had passed into Anglo hands for a pittance of their value.  Many of these

emigree Tejanos returned years later to reclaim their lands after the revolution—some successfully, and some not. (Goliad County, Deed Records)  After the U.S.-Mexico War, the Treaty of Guadalupe Hidalgo in 1848 incorporated the land south of the Nueces into Texas, and guaranteed full citizenship to the Tejanos as Mexican Americans.  Historians like David Montejano and Walter Prescott Webb have suggested that South Texas counties like Nueces, Kleberg, Cameron, and Hidalgo experienced an economically driven pattern of Tejano land dispossession, which characterized the transfer of lands as one-way and irreversible.  These basic books of Texas history state that Tejanos lost their lands through  "ficticious suits," sheriff's auctions, and dubious transfers of title.  Anglo newcomers like Stephen Powers, Charles Stillman, Richard King, and Mifflin Kenedy remained after the U.S.-Mexico War, and, to use Webb's expression, "bamboozled" or deceived the Mexicans in South Texas.  Webb added that "The old landholding Mexican families found their titles in jeopardy and if they did not lose in the courts they lost to their American lawyers."  **TAB 3** (Montejano 1987, 74; Webb 1991, pp. 175-76)

Many historians have indicated the major role played by the racism of the incoming Anglo Texans during and after the Texas Revolution.  Anglo-Texans often cited a distorted version of Texas history to rationalize their economic claims against Tejanos.  For example, during the Texas Revolution, Edward Dwyer, an Irish merchant in San Antonio encouraged Texas Army Gen. Thomas Jefferson Green to expedite the army into Bexar.  ". . .the people [of San Antonio de Bexar] . . . are not sufficiently scared to make an advantigius [sic] sale of their Lands.  In case two or three hundred of our troops should be stationed there, I have no doubt but a man could make some good speculations with Gold and Silver.  Bank notes will not do to purchase Land from Mexicans," he added.  And in Victoria , John Linn described a similar situation during that same period in which "Fernando de Leon was subsequently persecuted by the presentation of unjust claims against him, and, owing to the prejudice then existing against the Mexicans, many illegal and unfair judgements were rendered against him."  De Leon, the largest landowner in Victoria County, lost about half of his lands to those judgements.  And during the U.S.-Mexico War, a U.S. Army officer, General William North boasted "our Anglo-Saxon race [have] been land stealers from time immemorial, and why shouldn't they [be]?"  **TAB 4** (Crisp 1976, 343;  Foley 1997, 21; Crimm 2003, 170)  Thus racism was an openly avowed motive and a justification for land theft.

In the mid- to late-1840s, however, incoming Anglo squatters openly began to use brutal atrocities against many Tejano families.  One specific case in 1843, was recorded in Karnes County, where according to the *The Kennedy Times*, the Carlos Martinez ranches were raided by "companies of white people, who came to the rancho from the Guadalupe and Colorado rivers, and killed the people at the rancho and stole their stock."  The newspaper added that no arrests were made as the murderers moved into the ranches.  Another murder on the nearby Becerra land grant also drove the Tejano families off their lands.  The Tejano families fled to Goliad after their livestock were killed and their barns

burned by mounted Anglo marauders.  Tejanos lost many relatives in the killings, and they lost their legitimate claims to the lands.  **TAB 5** (Crimm 2003, 141; Kenedy, Texas 1963, Sect. 1; Rubio 1986, 136)

The counties west of Karnes saw Anglo city and county officials begin a coordinated campaign to drive Mexican American citizen and Mexican immigrant settlers out of the counties from Austin to San Antonio.  The campaign took the form of vigilante raids incited by newspaper rhetoric and conducted by the town's most "excellent citizens."  In 1850, the Austin City Council established "city watch" authorizing a Vigilante Committee "to inflict punishments without resorting to trials. . ." on Negro slaves for violating the curfew or for associating with Mexican immigrants and Mexican American citizen residents.  Blaming the Mexican Americans for inciting runaway slaves by associating on an equal basis with them, local newspapers developed a rationale for not only persecuting the recalcitrant slaves, but also for punishing the Mexican American citizens in Austin.  The *State Gazette* referred to "the local Mexican residents who were permanent citizens" of Austin as "half-negro, half Indian greasers" and called for "exertion in clearing our country of rascally peons."  The newspaper rationalized that this "clearing" of the city was justified because Mexicans were peons "incapable of acquiring the rights of citizenship."  The City Council and the newspapers agreed that the Vigilante Committee should be comprised of Anglo-Saxon "excellent citizens" in order to legitimize the "clearing" campaign as had been done in Seguin County and eight other neighboring counties.  As a result, the Austin committee included elected officials, Democratic Party officials, veterans of the Texas Revolution, and members of the nativist Knownothing Party.  The Austin Vigilante Committee was led by the well-known Texas Ranger and Mayor of Austin, John S. "Rip" Ford, a Chief Justice, a city alderman, the city marshal, and the county sheriff.  After a few years of persecution, Austin had burned out all settlements of Mexican immigrants and local Mexican American citizens.  By the 1860 census, only 20 Spanish-surnamed residents were left in Travis County, and *State Gazette* rationalized the raids because Mexicans were "a bad element of society . . . [that] sooner or later would be extinguished."  The newspaper boasted that Mexicans had also been driven out by vigilante raids in Uvalde, Bexar, Austin, Colorado, Matagorda, and Guadalupe Counties.  **TAB 6** (Lack 1981, pp. 2 – 19)

According to historian David Montejano, native Tejanos eventually established a "Peace Structure" with incoming Anglo-Texans in order to escape the violence.  In the "Peace Structure," Anglos were allowed to dominate the government and economy, while Tejanos collaborated with them in exchange for protection from land theft and violence.  In many cases, these incoming Anglo-American and European immigrants nevertheless used the anti-Mexican sentiment to acquire Tejano lands.  Following the 1850s, in Hidalgo County, Judge Thaddeus Rhodes, Sheriff John Closner, and land lawyer Jim Wells began to press sheriff's auctions on Tejano land grants. The judge targeted the fertile lands of Spanish Porcion 69 land grant, owned by descendants of Juan Jose

Hinojosa along the Rio Grande.  In May of 1878, the sheriff sold over 7,000 acres of the grant for $17.75 to Anglo-Texans.  Also in 1878, Judge Rhodes personally bought 30 acres of Porcion 69, and then held a sheriff's auction on an additional 668 acres of the land grant.  **TAB 7** (Mexico 1875, pp. 30 - 32; Hidalgo County, A:149; Crimm 2003, 175; Rubel 1966, 36)

The period after Reconstruction and around the turn of the century also saw an attack on the Tejano landownership and socio-economic status, as Anglo-American commercial farmers from Midwestern states swept into South Texas. The incoming Anglo-American squatters launched large-scale vigilante raids against legitimate and prominent Tejano land grantees during the Reconstruction period after the Civil War.  One raid in 1874 swept from Victoria down to Refugio and another in the next year, the Peñascal Raid, swept from Corpus Christi down to present-day Raymondville.  The Victoria-Refugio region had also been the scene of racial and economic conflict between Anglo ranchers and Tejano landholders for years.  The conflict culminated in a vigilante raid in 1874 after a heinous crime against an Anglo rancher and his wife.  According to land lawyer and historian Hobart Huson, "Several hundred ranchmen and cowboys from Refugio and Goliad Counties met on Rosilla Prairie with the view of exterminating all Mexicans in the section, commencing at Goliad."   To begin with, they shot prominent Tejanos Marcelo and Antonio Moya, and slit the throat of their father, the Moya family patriarch.  In the dispossession, Huson reported a mass exodus of the surviving Tejano widows and children to Mexico after the incident, saying "The roads were lined with ox-carts and wagons headed west."  Goliad County Sheriff Phil Fulcrod, judges, and other militia and government officials were directly involved in the above mentioned raids.  The perpetrator of the initial murder was later identified and hanged, but the vigilantes admitted that they still "were desperate for revenge."  When they later heard another rumor that Mexicans had committed a murder a few miles south on the Nueces River, they rode overnight the sixty miles to Corpus Christi to enroll in that posse.  (Dobie 1929**,** pp. 73 – 80, 125; Huson 1953, I p. 471, II p. 214; U.S. Congress 1876, p. xviii)

In Corpus Christi a vigilante committee of about one hundred Anglos set out ostensibly to drive off the "Mexicans" on large land grants south of Corpus Christi.  For several months prior to the raids, famous rancher Richard King had stirred passions against several large neighboring Tejano ranches around the Peñascal Ranch, located about sixty miles south of Corpus Christi.  These ranches were home to about five hundred Tejano men, women, and children described by Texas Ranger N.A. Jennings, as "peaceful Mexican farmers and stockmen who had lived all their lives in Texas."  King instructed the vigilante posse to elect leaders—about twenty men—who should go first to Brownsville to be deputized.  With their instructions, and acting under color of law, the vigilantes then masked and painted themselves, and systematically killed all of the Tejano patriarchs and "every adult male that was present."  As the raiders burned one ranch after another, the women and children fled into the chaparral and hid throughout

the night.  Many of the men's bodies were never found, and were presumed to have been "dumped in the bay."  When Texas Ranger Captain L. H. McNelly arrived to investigate the raids, he wrote back to Austin, "The acts committed by Americans are horrible to relate; many ranches have been plundered and burned, and the people murdered or driven away; one of these parties confessed to me in Corpus Christi as having killed eleven men on their last raid."

Many of the Tejano lands involved in the Peñascal Raid were incorporated into the King and Kenedy ranch empires, as the women and children and other Tejano rancheros fled across the border to Mexico.  According to one account: "They departed taking their money and personal possessions with them, and often they were found dead along the way with their money missing." **TAB 8** (Taylor 1934, 57; Cheeseman 1998, 88; Mexico 1875, pp. 105, 106, 176; Hidalgo County, A, 149; Dunn 1932, pp. 9, 63; Villareal 1972, pp. 16-19)  In the Refugio raid and in the Corpus Christi raid, the Anglo vigilantes included law officers, and were acting under color of law.  The marauders were deputized before conducting the Peñascal raid, and some even claimed to be Texas Rangers.  In neither case, however, were there any arrests of the perpetrators. (Cheeseman 1998, 88)  In his book, *The Texas Rangers*, Walter Prescott Webb stated that the "reign of terror" reached its peak at the turn of the century, when between 500 and 5,000 Tejanos died, "many of them innocent, at the hands of the local posses , peace officers, and Texas Rangers." **TAB 9** (Webb 1991, 176n.)

After the Revolution and even after the U.S.-Mexico War, the state government continued to undermine Tejano land title claims.  The legislature passed Texas Land Relinquishment Law of 1852, for example, requiring that all unarchived lands granted before 1835 be surveyed and filed with the Texas General Land Office by 1853 or be declared null and void.  Later, the Texas Constitutions of 1869 and 1876 included the same requirements, placing the burden of proof on the Tejano title holders.  The state legislature imposed restrictions on Tejano rights to testify.  When Tejano appelants came to Austin to plead their land cases, they were told that a committee rule required that in order for Tejanos or other non-whites to testify, "their character for truth and veracity had to be established by the testimony of two white men."  (Rubio 1986, 114; Texas, *State Gazette,* Vol. II, No. 6.)

One of the most questionable government actions in the administering of Tejano lands was known as the Bourland-Miller Commission of 1850.  As Anglo-American capitalists and land speculators stimulated a growing demand for Tejano lands, the state legislature sent two commissioners across the Tejano ranching frontier to verify and record the titles to as many Tejano lands as possible. The state's interest was clearly to facilitate land transfers from the old Tejano land-holding fmailies into Anglo hands. After the commissioners collected the titles, and loaded them for sea transport from Brownsville to Austin through the Gulf of Mexico, the Steamship *Anson* caught fire and sank off the coast of Matagorda, destroying all the Tejano land titles.  (Greaser and de la

Teja 1992, pp. 455, 457n.)  The most questionable role of the state government was not so much in the coincidental fire, but in actively promoting the sale of the lands of a targeted class of citizens through legislation and a special commission.

In summary, the actual cases recorded in county and state land records verify the historical interpretations that the violence waged against Tejanos during Reconstruction was primarily used by Anglos in an effort to usurp their landholdings. It cannot be characterized—and it cannot be trivialized—as one short period of unfortunate but legal transfer of title from unwitting victims.  It involved mass murder of whole families, of whole ranch settlements, and of titled patriarchs of landholding families who were citizens of Texas.  In its various forms, the violence was perpetrated by the Army of the Republic of Texas, it was condoned by the Confederate State of Texas, it was actively promoted by the State of Texas, and it was knowingly permitted, contrived, and facilitated by the local governments.  And when the sheriffs' auctions, and the vigilante raids, and the legal trials covered up the atrocities, the theft of Hispanic lands was legitimized and shielded under the sanctity of the courts and the Texas General Land Office. **TAB 10**  (Tijerina, 2012, p. 322)

The end of the 19th century would find the Tejanos inundated not only by continuing Anglo-American immigration from the United States, but by a wave of emigrant Mexicans fleeing the violence of the Mexican Revolution.  Incoming Anglo-Americans continued to acquire Tejano lands in South Texas,  which they called "The Rio Grande Valley."  As immigrants themselves,  the Anglo Americans ironically made little distinction between the native Tejano citizens of Texas and the flood of immigrant Mexican nationals.  By taking control of the county government, Midwestern Anglo-American commercial farmers re-structured the county taxes, budgets, road and bridge construction, and education to suit the farmer at the expense of ranchers and the Mexican-American population.  Landless Tejanos and Mexican immigrants were all categorized by Anglo-Americans as "Mexicans" and seen as cheap labor with no distinction as to social status, education, or citizenship.  Just as they re-structured the county government to suit themselves, Anglo Americans re-structured Texas history and culture to rationalize their disfranchisement of the Mexican American as a laboring class with limited educational or political freedom.  In the period of 1900 to 1920, the Anglo-American commercial farmers began to claim economic and political power from Anglo ranchers and Mexican Americans alike.  Political power presupposed an attack and a control of Mexican American citizenship and voting rights.

20th Century

Throughout the 20th century, the racialization of politics and the economy had continued to the point that Texas had what amounted to a caste stratification with Anglo-Americans in dominant positions and Mexican Americans generally in subordinate positions.  One 1965 study of Texas racial relations stated that "Anglos have always been

on top . . and the Mexican Americans isolated on the bottom." (**APPENDIX 1:** U.S. Commission on Civil Rights:  Mexican American Education, 11)  The distorted historical transcript had been developed by 1900 that depicted the Anglo-American as the liberator of Texas from a heathen Mexican population.  The historical narrative was articulated by policy leaders and the public in order to rationalize the political and economic subordination of Mexican Americans.  As an example, in a 1911 state vote on prohibition, state leader Thomas Ball in Brownsville said he opposed ". . . the Mexican vote, which Texas in 1836 declared unfit to govern this country." **<u>TAB 11</u>**  (Anders 1982,, 101)  Even a poor Anglo cotton picker used history to elevate himself above Mexican Americans, saying "The study of the Alamo helps to make more hatred toward the Mexicans. . . if a man . . slaughters your kinsman. , , I am in favor of not letting Mexicans come over and take a white man's labor." (Montejano 1987, 224)

<u>Progressive Era</u>

During the 1900 and the 1920s Progressive Era, Anglo-Americans began to refine their political control over the Mexican Americans.  In Texas, "Progressive" meant anti-Mexican.  The term represented a new development in political philosophy.  By using a salutary term that implied positive progress, the Progressive politicians appropriated the mantle of reform.  Texas Progressives adopted a rhetoric of reform, naming their organizations with innocuous or benevolent names such as the Good Government League or the Ballot Purification League.  But their effect was to disfranchise and dilute minority voting power by political device and by intimidation and violence.  By the turn of the century, Mexican Americans sought refuge under the protection of political bosses.  The political bosses protected them from Texas Ranger violence and Anglo-American raids, and then controlled their voting for complicit state and federal politicians, who gave tacit consent.  The Progressives were middle-class Anglos.  As one authority said, "Most came from the ranks of the Anglo, Protestant majority and looked with contempt upon the social standing, life-styles, religion, and moral values of the Hispanic population. . ."  In order to strip the political bosses of their power, then, middle-class Anglo-American professionals blamed the Mexican American victims of the system, and made a concerted effort to disfranchise the Mexican Americans.   One of the most powerful political bosses was Archie Parr.  In 1908, Parr took a seat on Duval Co. Commissioner's Court after political assassinations eliminated his opposition.  Once in power, he used the County Treasury as "slush fund" and gave his constituents short-term work on road and bridge projects.  Then, he simply deducted their poll tax fees from their wages, and directed their voting.  Parr and other bosses like Jim Wells used a device called "Corraling voters" to deliver their minions by the "wagonloads."  One political boss could amass enough votes to elect state and federal officials.  The political machines under Parr, Jim Wells, and Robert Kleberg worked in close cooperation with state and federal officials who benefitted from their control of the South Texas votes such as Col. Edward M. House,

Lyndon B. Johnson, and John Nance Garner.  As presidential advisor to Woodrow Wilson, Col. House gave Jim Wells "a near monopoly over the distribution of state patronage" in the Valley, according to one historian. (Anders 1982, pp. 13, 103, 176) These slating and corralling devices were used by political bosses in many other cities of Texas as well.  As an example, San Antonio had the Callaghan political machine which reportedly paid the poll tax for Mexican Americans, and instructed them on voting.  More blatantly, the Good Government League of post-World War II San Antonio regularly slated the city council candidates.  Although it slated a middle-class Mexican American as a token, it limited the Mexican American representation to that one token position, which was far below their percentage of the electorate.  **TAB 12**  (Garcia 1981, 157; Rosales, 2000, 5 & 13.)

Gerrymandering developed as an alternate method used by Texas policy makers at the highest levels to dilute and manipulate Mexican American voter groups. This method was later used to segregate Mexican-American laborers and public school students as well.  In order to secure their Mexican American voting blocks, political bosses used gerrymandering of electoral districts and created whole counties.  Indeed, 13 of South Texas counties were created by these bosses for that purpose.  Some counties were created  by Progressive politicians to counter the political bosses.  As an example, Ed C. Lasater took Brooks County from "Mexican" Starr County in order to secure Brooks for his "thrifty and industrious farmers from Iowa, Kansas, Texas, Nebraska, Indiana, . ."  Likewise, D.W. Glasscock broke Jim Hogg County from Zapata County in order "to get out from under the domination of the Mexican vote."  Meanwhile, Parr and other bosses made other efforts to carve Duval, Nueces, Jim Wells, Kleberg counties to concentrate their Mexican American voting blocs.  Within a few years, the South Texas counties had increased from 7 to 13.  As an example, at the turn of the century, U.S. Congressman John N. Garner was a member of the House Committee on Congressional Districts and "the subcommittee that drafted the initial version of the reappointment bill. . . the House measure confirmed exactly to Garner's and Wells' specifications . . created a district that included Uvalde and the Trans-Nueces but excluded San Antonio." (Anders, Boss, 110; Montejano 1987, 131)  By the end of the century, gerrymandering of Mexican Americans had proven to be an effective and accepted practice by Anglo American policy makers at all levels of Texas government.

Throughout the Progressive Era, Anglo ideologues and politicians explicitly articulated their rationale of disfranchising what University of Texas professor called the "dangerous" Mexican vote.  And during the 1914 gubernatorial race, the *San Antonio Daily Express* quoted prohibitionist candidate Thomas Ball as supporting reforms to disfranchise Mexican Americans.  He publicly predicted that "liquor and Mexicans" would both "rest together forever in death."  And in the 1918 general election for Texas

Senator, candidate D.W. Glasscock stated that his campaign was "to get the Anglo Saxon on top." **TAB 13** (*San Antonio Express*, 1914, p. 4B; Montejano 1987, pp.131, 145-7)

One of the main devices created specifically to disfranchise Mexican Americans in Texas was the poll tax. The 1903 Terrell Election Law required payment of the poll tax between October and February on the assumption that Mexican Americans were too poor or forgetful to comply. The state reformer, Terrell, himself said the law was intended to close "the flood gates for illegal voting as one person could buy up the Mexican and Negro votes." His proponents said Mexican Americans could not afford the poll tax, would lose receipts, or not pay so far in advance. Using community organizations called the "Good Government League," the Progressive reformers articulated their intent. In 1913, for example, State Rep. Joseph O. Boehmer of Eagle Pass established the Ballot Purification League, and submitted a bill admitting his intent was "to disqualify the Mexicans of the Western and Lower Rio Grande Counties." Historian Evan Anders has argued that "The practical effect of most of these proposals would be to curtail the voting of impoverished, illiterate blacks and Mexican Americans." **TAB 14** (Dallas Morning News, 1913, p. 10; Anders 1982, 102; Montejano, 1987 , 143)

The Progressives also used restrictive laws, such as the 1918 state law to eliminate interpreters at the polls. They used the "White Man's Primary" to exclude Mexican American voting in the Democratic Primary elections, which in a one-party state, pre-empted the general election. In establishing the White Man's Primary Association (WMPA) in 1904, the State Democratic Executive Committee required an oath, declaring "I am a white person and a Democrat." The Dimmit Co. WMPA was so effective that *Carrizo Springs Javelin* in June 12, 1914 said it "absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards." The newspaper added that it was for labor and "race control" to protect the "purity of Anglo women." (Montejano, 1987 , pp. 143-4)

In many cases, violence was used by Anglo-American mobs and state and local officials against Mexican American voters. The Texas Rangers had traditionally intimidated Mexican Americans, and were used specifically to discourage their voting after 1900. As an example, Progressive Gov. Wm. Hobby in 1918 created the "Loyalty Ranger Force" of 1,000 special rangers, and 3 rangers in each county to supplement Texas Rangers. The Rangers gave "armed support" to Democrat machines in "partisan" conflicts. In the senatorial race that year, Texas Ranger William Hanson (former U.S. Marshall, and organizer of Loyalty Rangers) and several rangers discouraged Mexican American voters in Corpus Christi, "prior to the primary both there [Kingsville] and at Corpus Christi, giving out that word and calling at the homes of these Mexicans and telling them if they couldn't read and write they would be sent to the penitentiary if they voted." Hanson then sent several rangers to Duval County for "management of the primary election." One official reported that "only about sixty-odd Mexicans" voted in

Nueces County elections as a result.  A South Texas lawyer, Marshall Hicks, testified in *Glasscock v. Parr* (1919) in the minutes of the *Texas Senate Journal* that his opponent, D.W. Glasscock had the Texas Rangers selectively "investigate" Mexican American voters, and spread "a spirit of terrorism among those Mexican people."  The sworn testimony was that Glascock had a committee of henchmen who "tried in every legitimate way they could to keep the Mexicans out of the polls, . ." using circulars in which "the Mexican race was very bitterly denounced" as "Greasy Mexicans."  Or as Evan Anders said in his study, "the mere presence of armed Rangers at the polling stations had an intimidating effect on the Hispanic population" in Cameron, Duval, Nueces, Hidalgo, and Starr Counties. **TAB 15**  (*Glasscock v Parr*, 1919, pp. 551-552; Montejano 1987, 145-7; Anders, 1982, pp. 252, 257, 263)

In 1916, during the turmoil of the Mexican Revolution immigration, Anglo political leaders in the Valley held meetings, and stirred Anglo fears of Mexican American uprisings.  But, according to Anders, "the Anglos' suffering and hardships paled beside the horrors that they inflicted upon the Hispanic population."  Anglos used vigilante action, and "a bloodbath that claimed from two hundred to three hundred Hispanic lives ensued."  In widespread lynchings, Anglo gangs burning Mexican American houses, ranches, and hanged 15 in San Benito.  Local officials participated in lynchings.  "The most blatant abusers of police power were the Texas Rangers." according to a legislative committee report in 1919.  The Texas Rangers "confiscated the arms of Hispanic residents" in Cameron County, violating their Bill of Rights, and leaving them defenseless.   In one small town, the Rangers dragged 15 Mexican Americans  from their homes, and executed them in front of their families.  They reportedly killed 102 Mexican Americans in "cold-blooded murder."

A few years later, a momentous incident occurred called the "Hidalgo County Rebellion."  In this incident, crowds of Anglo reformers demonstrated and rioted against Mexican American voters at elections to supplement the Texas Ranger brutality.  In 1928, the Weslaco barrio election box was assailed by the Republican "Good Government League" which led the "Rebellion" cited in a U.S. Congressional investigation.  According to the federal report, a crowd of 3,000 to 4,000 Anglos at the polling place shouted "Don't let those Mexicans in to vote.  Throw them out" while men with shotguns protected the crowd.  An estimated 200 to 300 regular Mexican American voters "did not show up at all." One former Texas Ranger, Hidalgo County Sheriff A.Y. Baker, became the Democrat boss of the county, and was reputed to have committed election fraud and large-scale graft.  When State Rep. J.T. Canales protested the violence and the use of Loyalty Rangers in the 1919 legislature, he was given a death threat by Ranger Frank Hamer as he walked up to the capitol building in Austin.  In the legislature, Rep. Canales pressed his demands, accusing the Rangers of covering up their atrocities. (Anders, Boss, pp. 224-6, 239, 269; Montejano 1987, 147)

Years later, scholars and organization leaders would blame these widespread events for a disaffected Mexican American electorate.  Many years after the Progressive Era, Mexican Americans continued to live under the systematic discrimination established in Texas by the Progressive politicians.  The segregated schools, the poll tax and voting intimidation, and the job discrimination continued as the status quo in Texas from the 1920s through the 1960s.  The only major changes during the Depression Era were the federal programs of President Franklin D. Roosevelt's New Deal.  Ironically, even though the New Deal provided for jobs, farm price restabilization, and old-age pensions, the New Deal programs tended to exclude the Mexican Americans.  For example, the Civilian Conservation Corps often neglected Mexican American young men, the Agricultural Adjustment Act displaced the Mexican American sharecroppers by making it more profitable for land owners to leave their land fallow rather than employing sharecroppers, and the Social Security Act gave a guaranteed retirement to all Americans except agricultural labor and domestic workers, most of whom, in Texas, were Mexican Americans.

Labor Controls

Early in the 20th century, Texas state and local officials began to relate labor control over the Mexican American population to social and political control.  One South Texas superintendent explicitly stated that the state officials condoned minimal education of "the lower element" [Mexican Americans] specifically to control them in the labor force.  "We don't need skilled or white-collared Mexicans. . . There isn't a concerted effort against them but the white-collar man is not a common laborer."  Another school official said he complied with local growers to keep the Mexican American population out of school, saying ". . it is up to the white population to keep the Mexican on his knees. . . This does not mix very well with education." (Montejano 1987, pp. 192-3)

As Anglo-American businessmen and government officials sought to maximize their profits in using the Mexican Americans as a labor force, they developed a systematic web of formal and informal labor control devices.  Recruitment of foreign nationals and domestic workers helped to build a labor surplus to drive wages downward and to displace the risk factor of production onto the labor force itself.  As an example 6 major labor recruiting agencies working on the Texas-Mexico border in 1907-8 recruited 16,479 Mexicans for railroad construction alone.  Other agencies recruited Mexican and Mexican American workers for the cotton industry and mining in West Texas.  The railroads and agribusinesses made no distinction between citizen and foreign national.  Both classes of Mexican American were subjected to the same state and local labor controls. (Foley 1997,  44; Daniel, FEPC, 128)

Other labor controls included vagrancy laws, indebtedness, and county passes.  By 1927, Willacy County was implementing Vagrancy Laws enforced by the county sheriff, the Justice of the Peace, and the County Attorney.  They systematically arrested

Mexican American laborers traveling in search of higher wages for not having the approved "county passes" signed by an Anglo employer or county official. The Mexican American workers were convicted, and paroled as "convict labor" to Anglo-American growers. When asked about the legality of these controls, a U.S. Dept. of Justice agent rationalized it, saying it was necessary at harvest time. To support the growers, the state government coordinated the labor control devices with them and the South Texas chambers of commerce. In 1927, the state legislators pressed the Texas State Employment Division to assist the growers. The legislature passed the Emigrant Labor Agency Laws to keep the Mexican American labor force from being recruited by out-of-state recruiters. The state controls included requirements that out-of-state recruiters pay prohibitive bonds, fees, and taxes. And in 1934, the Texas Farm Placement Service began to maintain check points on highways in order to direct Mexican American labor to farmers. In so doing, the state government helped to create local labor surpluses to drive wages down, and ostensibly to prevent migrants from "aimless wandering" in search of higher wages. (Montejano 1987, pp. 205, 210-12)

South Texas agribusinessmen began to use Taylorism and professional management in their control of labor. In South Texas, Taylorism meant control of the Mexican American labor force. By 1930, Corpus Christi led the nation in cotton production and profits mainly through the complete control of the large Mexican American labor force. These commercial farmers established a system of controls that included racial stratification of labor, company towns and armed guards. In 1929, for example the Chapman Ranch had 18,000 acres in Nueces County. It gave Anglo-American farmers 160-acre plots to be worked by Mexican American workers, who comprised 97% of the labor force, but received no land plots. Chapman divided his workers by race, providing one Anglo school and one "Mexican School" for his Mexican American workers, separate churches, a hardware store, a grocery store, and a dry goods store where workers were required to pay with his company scrip as a condition of the oral employment agreement. Mexican American laborers were issued coupons which they had to use in ranch store, ostensibly for "salary advance," but in reality to keep them in debt as a further control device.

Even larger was the Taft Ranch near Corpus Christi. Around 1900, near Corpus, the 200,000-acre Taft Ranch comprised 39% of the San Patricio County population. Like the Chapman Ranch, owner Charles Phelps Taft kept his Mexican American laborers separate from Anglos, who were also given 160-acre farms. His workers were also kept in company towns, provided housing, grocery stores, dry good stores, separate schools, and separate churches. The Taft Ranch hired only Mexican Americans with a wife and children in order to maintain more stable workers. The Mexican American workers lived on the Taft Ranch under a shadow of armed intimidation. The Ranch sponsored "rifle clubs" consisting of its Anglo-American farmers and overseers. It also admittedly had a machine gun, and issued the Anglos .30-.30s and .38 caliber pistols. The Anglo

overseers held target practice on the ranch ostensibly to preclude any possibility of an "an uprising of some sort" among Mexican American  workers.  Charles Phelps Taft, the owner, was Pres. William Howard Taft's brother.  He kept his Mexican American workers in debt.  He periodically "rounded up" his Mexican American and black workers and voted them for President Wm. Howard Taft, and other selected candidates. (Foley 1997,  pp. 81, 119, 121-7, 132-3)  The Chapman Ranch and Taft Ranch developed models of labor control that were replicated in varying forms across the state.   In 1916, for example, the Commission on Industrial Relations reported that Mexican American agricultural workers were chained and guarded by armed men with shotguns.  One grower told the commission that Mexican Americans  were better labor because "you can treat them in any manner and not be bothered with lawsuits. . ."  Other industries also implemented a dual wage system for its Anglo and Mexican American workers as late as 1942 when the War Production Board reported that "the differentials between Mexican and American white workers is as high as $1 per shift." **TAB 16**  (Foley 1997,  49; Daniel, FEPC, 77)

In labor controls as in political control, the Texas Rangers played a prominent role by intimidating the Mexican American workers to preclude organization or protest.  In 1913, for example, Texas Rangers broke a strike in El Paso where Mexican Americans made up 60% of the work force.  The 650 smelter workers went on a strike, which was broken by Texas Rangers using violence and hired company henchmen.   Likewise, in 1966, when national civil rights leader Cesar Chavez came to the Rio Grande Valley to support a Mexican American farmworker strike, the Texas Rangers used intimidation, arrests, and violence to harass the strikers. (Gomez-Quinonez 1994, 79, 255; Daniel, FEPC, 128)  Throughout this period, government investigations continually reported discriminatory practices against Mexican American workers.  Even in World War II, the Fair Employment Practices Commission found a dual wage system in the Texas oil industry.

Even after the war, as Mexican Americans took 10,000 of the 35,000 jobs at Kelly A.F.B. in San Antonio, the U.S. Commission of Civil Rights reported that they "continued to be concentrated in the lower pay scales.. ." through a network of discriminatory devices. Typically, an Anglo manager would "Pass-Over" a Mexican American worker for an Anglo on hiring and promotions.  The personnel evaluation system was found to use a "Dummy Profile" for promoting and hiring pre-selected Anglos.  Many of the Mexican American workers were performing skilled jobs at lower rate of pay. (U.S. Com. Civ Rts, Employment, 3; Montejano 1987, 269) In agriculture, the farm ownership patterns had seen a replacement of the family farm by corporate agribusiness.  Likewise the Mexican American agricultural force changed to a migrant force.  The Mexican American farm labor force became an interstate migrant labor force which increased "from 95,000 in 1963 to 129,000 in 1966."  One study of the migrant force of 350,000 in the Lubbock area in 1939 was 85% Mexican American.  And

according to a recent study, conditions for Mexcican American migrant workers have not improved significantly. The Texas Office of Rural Health reported recently that their work is still "the highest of all industries in work-related deaths, with a rate of 52 deaths per 1,000,000 workers."  (Montejano 1987, 273; Tijerina 1979, 38; Richardson 1999, 33)

 Mexican Towns/ Barrios

      Another device promoted by business and local governments to keep Mexican American workers separate was the formation of an exclusively Mexican American town or neighborhood.  As Anglo-American farmers migrated into the Rio Grande Valley from midwestern states in the 1890s, they used race as a device to segregate not only their workers but whole  towns.  They were attracted by land promoters with promises of low labor wages and cheap agricultural lands, but they rejected the local Mexican American culture and population.  According to a study of the Valley counties, "Racially segregated schools and residential patterns emerged" at the turn of the century.  Many of these segregated or exclusively Mexican American towns were planned and developed by powerful growers specifically to isolate their labor force.  In 1910, for example, the Taft Ranch built Taft and Sinton on ranch land specifically to separate its Mexican American workers from its Anglos.  Likewise, other South Texas towns were developed by growers.  Asherton was built as a "Mexican Town" by a banker named Richardson.  Kingsville was segregated by the Kleberg Town & Improvement Company.  Weslaco was built as a segregated town in 1921 by municipal ordinance using the Missouri Pacific Railroad tracks.  McAllen was segregated by the formal policies of the Real Estate Board and the Delta Development Company. (Anders 1982, 142; Montejano 1987, 167)

      In the larger cities of the state, Mexican immigrants and native Mexican American citizens alike were simply not allowed to settle within the city limits.  Segregated into barrios, they were commonly denied access to business, to neighborhoods, to education, and to city services.  As the new Texas cities grew, they took the shape of a segregated community.  When Mexican Americans returned to Austin after the 1859 vigilante raids, for example, they were allowed to remain primarily as a disfranchised labor force living in the county dump.  Those in Dallas, Lubbock, and Houston settled across the railroad tracks near the railroad depots or stockyards.  In this racially and politically segregated barrio, the Mexican American citizenry of Texas developed an unequal status which lingers to the present day as a result of the decades of denial.   In general, the Texas barrios were described as deplorable, isolated from city services, and lacking political representation.

      The Dallas barrio, for example, developed along Mill Creek across the Trinity River from downtown Dallas after the Civil War.  Mexican immigrants were housed near the railroad depot and Mexican American citizens moved into the barrio called "Cement City" because of the cement works.  It was described as having dilapidated houses with "No sewage—no sanitation. . . worse conditions."  A newspaper report said in 1944 that

"Every such congested, overcrowded, unhealthful center is like a canker or eating sore on our fair city."   It added that the substandard housing was "little improved" through the decades of the 20th century, and were "hardly fit for housing livestock on a farm." Indeed "Little Mexico," as the Dallas barrio was later called, ranked first in tuberculosis deaths, pellagra deaths, and overall death rate for the city.  As stated above, these conditions would leave a lingering effect on the Mexican American community.  A report, U.S. Census Tract X of Dallas in 1970 showed that the barrio had the lowest education and income levels, and the highest infant mortality rate in Dallas as late as 1970.  (Achor 1978, pp. 34, 35, & 63)

Through the decades, Dallas continued to develop  a "sharp division between the Anglo and non-White population," the highest of thirty-five southwestern U.S. cities according to a report in 1960.  After urban renewal and school desegregation in the 1970s, statistics revealed that "Dallas has still maintained separate patterns of settlement."  As a result of the economic and racial segregation, one study reported in 1972 that "Minority access to political power is severely limited—in fact, it was almost nonexistent for many years."  The study indicated that from 1931 to the early 1970s, an informal council of Anglo political leaders called the Dallas Citizens Council used its political arm, the Citizens Charter Association (CCA) to influence local elections.  In so doing, the CCA denied Mexican American access to equitable representation in local elections, and virtually prohibited broader representation in state and federal legislation. The CCA typically slated pro-business Anglo candidates for all elections and never had a single Hispanic in any of the eighteen Texas legislative districts, three state senatorial districts, or six U.S. congressional districts in Dallas County.

The Mexican American community of Dallas began to organize for democratic activities, and was "radicalized" by a singularly revealing incident in 1972.  Barrio residents had long complained of police brutality, but little evidence could be found to verify it until a Dallas policeman shot a Mexican American child in an interrogation.  The police officer, Darrel Cain, used his .357 magnum revolver to force a confession from 12-year-old Santos Rodriguez (later found to be innocent) in a deadly game of Russian roulette.  The gruesome incident agitated Mexican Americans across the state, although it had no impact on the segregation or political representation for the Dallas barrio.  (Ibid., pp. 50, 59. 60, 148)  Indeed, Mexican American children were still attending segregated schools in Dallas in the 1950s.   Not only were they restricted to four segregated elementary schools, their only high school until 1960 was Crozier Tech, a vocational school.  A turbulent desegregation of schools in the 1960s seemed to exacerbate matters by leading to a massive "White Flight" out of the inner city schools. The Dallas Planning Department reported that 100,000 whites had fled Dallas to the suburbs between 1968 and 1973, leaving Dallas Independent School District about 50% African American and 20% Mexican American.  With the "White Flight" went the tax base as businesses followed the Anglos to Arlington, Plano, and Irving.  Later developments have tended to

transform the inner city area through gentrification, but none of the newer trends substantially increased Mexican American representation. (Phillips 2006, pp. 127 & 167)

Like Dallas, the first Mexican immigrants and Mexican American citizens in Houston moved in with the railroads in a segregated neighborhood called "El Crisol." By 1910 another barrio emerged near the railroad depot of the Southern Pacific called El Segundo Barrio. The Houston barrio, like other Texas barrios, was described as late as World War II as having "dismally poor housing conditions" with most residents living in "two, three room houses, very cheaply constructed of unpainted lumber." The barrio reportedly had little running water or heat, and many of its residents living in boxcars with no bedding. The Houston school district established Rusk Elementary School as the single segregated elementary school for Mexican Americans. Rusk was known as the "Mexican School." By the late 1920s and 1930s, new barrios grew up in Houston's Second Ward with the largest barrio, Magnolia, near the Houston ship channel. All of these barrios had segregated schools, that although lacking in physical and curriculum advantages, stressed Americanization and corporeal punishment for speaking Spanish. (Rosales 1981, pp. 224 – 248)

By 1875 when the Mexican American population of Austin began to recover from the vigilante raids, they were allowed to settle only at the edge of town. The Aursin barrio was in the city dump where the city garbage was dumped over the bluff into the Colorado River, presently located at the Congress Avenue bridge downtown. As the Mexican American population increased, only a few lived outside of the city dump grounds, some along the upper reaches of Waller Creek at present-day 25th Street. An analysis of segregation in Austin between 1875 and 1910 indicated that although other ethnic groups—even the Irish—had integrated into the city, "Not so the Mexicans who continued to live . . in other physically and socially marginal pockets." (Manaster 1986, 99) Nor were they allowed burial in the city cemetery, but outside the cemetery instead, in the pauper's burial ground labeled as the "Strangers' Ground." (Austin Oakwood Cemetery, Book I) Conditions in the city dump were described in a complaint by former city Alderman A.J. Zilker in 1899. Zilker reported that city dump had collected 10,000 loads of trash in the last 15 months alone, including dead animals and vegegable matter that created an "unbearable" stench for "a large number of people live near the dump. . ." (*Austin Daily Tribune* 1899, p. 4) A university sociologist, William B. Hamilton, conducted a social survey of Austin in 1913, in which he described the Mexican-American neighborhood in the city dump as living "in the 'Dark Ages' of civic sanitation." The Mexican-American residents lived in "small huts, one and two families in a one-room shanty, and little children are forced to play out in the dusty street on the filthy, dirty creek or river bank where their homes are located." **TAB 17** (Hamilton 1913, 9)

By the late 1920s, Austin policy makers had begun to realize that they had inadvertently forced the Mexican Americans to settle an area that became prime real

estate on Congress Avenue at the river.  Their response was to conduct a model of urban planning that not only created the first city-planned Texas barrio, but to invent the modern American model of a housing project.  They hired a consulting agency which proposed to move the Mexican Americans and African Americans out of the city dump and out of the Clarksville neighborhood, both along the north bank of the river. Specifically, it proposed moving them out of the now "desirable" area for construction of a proposed Waller Creek Driveway and a broad new Congress Avenue.  The report recognized that the property was "at present occupied by very unsightly and unsanitary shacks inhabited by negroes.  With these buildings removed for the trafficway, most of the remaining property will be of substantial and more desirable type."   Stating that the property "will increase its value many times. . ,"  the report used coded language to indicate that the Mexican-American "blighted district" was the reason for current low value, but "if the reason is removed, the value will increase."  The consultants advised the city planners to avoid "unconstitutional" attempts like the vigilante raids previously used. It suggested that they simply create "a negro district, as an incentive to draw the negro population to this area" in East Austin to avoid duplication of segregated parks, schools, and facilities.   It also included a suggested removal of the Mexican American neighborhood along with the Negro population.  (Austin 1928, pp. 46 - 57)

The City of Austin adopted the consultant report as a "Master Plan" in 1929 "as official city policy the goal of concentrating Blacks in East Austin."  It segregated municipal services, and in coordination with the city planners, "the school system promoted the City policy by building all segregated schools."   To provide for tacit enforcement of the removal, property restrictions in the private sector "prohibited Blacks, and in some cases Mexican-Americans from buying or renting . . outside East Austin." (Austin Human Relations Commission 1979)  Meanwhile, in order to entice the minorities to move into the East Austin barrio, Honorable U.S. Congressman Lyndon B. Johnson introduced a bill authorizing the U.S. Housing Authority to fund housing projects "enhance the value not only of the surrounding property but of all property in Austin."  (U.S. Congress 1933)  With the federal funds appropriated by Congressman Johnson, Austin boasted the "Nation's First Completed [Housing] Project" with three sites selected for "separate projects for white families, Mexican families, and negro families."  By 1940 and 1950, Austin had become the most segregated major city in Texas based on Index of Dissimilarity.  (Austin 1979, pp. 1-15; Austin Housing Authority 1948, p. 12)  As the 20th century progressed, Austin segregation became even more pronounced.  Even after WWII, when the returning veterans, Mexican American veterans included, the city continued forced segregation.  Texas Land Commissioner Bascom Giles developed two housing sub-divisions in north Austin which he promoted as the Duplex Nation and the Wilshire Historic District near the Austin Mueller Airport. Giles developed the sub-divisions specifically for the returning WWII veterans, but he included "restrictive covenant which prohbhited non-whites from owning or residing in

the neighborhood." Thus, even returning Mexican American veterans were restricted to the same barrio and excluded from the modern housing provided for Anglo American residents of Austin. (Texas 2006, pp. 15 & 16)

Although segregated from the earliest days of the barrio, Austin's Mexican Americans apparently always voted, though in significantly smaller percentages than Anglo Americans or even European immigrants. The 1867 voter registration records of Travis County indicate the 128 Mexican Americans registered among the total 4,838 other voters, mostly Anglo American, but many listed as immigrants from Germany, Prussia, England, Bavaria, Africa, Ireland, some of these listed as "Naturalized." Mexican Americans voted in small numbers, but perhaps the most deleterious effect was caused by the implementation of the poll tax. A case study of voting in 1933 Austin election illustrates the negative impact of the poll tax on Mexican American voting. Mexican Americans show significant decline in registration and even more decline in voting. Charts and tables in this study show less than 3% Mexican Americans voted after implementation of the poll tax. Analysis also shows that at the same time, according to the report that "whites augment their strength . . solely at the expense of the Mexican element." (Martin 1933, p. 929) After the poll tax was repealed, Austin eligible voter numbers went up from 42,300 to 71,300. The 1967 election was first election since the repeal, and according to the newspaper reports, "The turnout was the biggest ever for a city election—32,892. . ," although it still reflected a low percentage of eligible voters of only 46%. (*Austin American-Statesman* 1967, p. A-15) Mexican Americans had begun to actively campaign for only-Anglo candidates with a Mexican American advertising in the newspaper promoting their Anglo candidate, but after repeal of the poll tax they began to run their own candidates like S.J. "Buddy" Ruiz, the first local Mexican American candidate for an Austin elected post. (*Austin American-Statesman* 1969)

In order to achieve the residential segregation, many other Texas cities used restrictive covenants and deed restrictions, specifically directed at the Mexican American population. In 1977, one study reported that "real estate covenants along racial and ethnic lines continue to have substantial effect on housing patterns" in Corpus Christi and San Antonio. (**APPENDIX 1:** U.S. Commission on Civil Rights: Mexican American Education, 11) In 1947, later Congressman Henry B. Gonzalez organized the Pan American Progressive Association (PAPA) to document restrictive housing in San Antonio. He reported restrictive covenants in home mortgages which effectively prohibited Mexican American moving into the more affluent neighborhoods of the city. Many other cities created a segregated Mexican American section or "barrio" using subtle tactics like smaller lot sizes, lower home costs, and square footage covenants. These patterns quickly established a pattern that racist practices would later enforce. In 1920, for example, the Lockhart school superintendent said "If a Mexican bought a lot among the whites they would burn him out." Many towns openly posted signs that read "No lots sold to Mexicans" and "No Mexicans admitted." The practice of segregation led

to congestion and social problems such as infant mortality and disease.  As an example, San Antonio, had the highest rate of tuberculosis in the U.S. in the 1930s.  The denigration of the Mexican American as a second-class citizen in Texas eventually led to social practices and attitudes that were articulated and implemented socially.  As an example, the distinguished lawyer and State Rep. J.T. Canales was publicly referred to as the "greaser from Brownsville" in 1910 legislative session.  Across the state, Mexican Americans were denied service in restaurants, swimming pools, barber shops, and in public.  Even after World War II in 1946 two Mexican American veterans were refused service in Helotes, near San Antonio.  The Anglo merchant stated that their veteran status had no effect on the discriminatory practice.  Contemporary newspapers indicated that such treatment against Mexican American was common "throughout the entire state." (US Comsn. Civ. Rts., Unfinished, 185; San Miguel 1987, pp. 15, 68 115; Foley 1997, 42; Rosales 2000, 16)

### Official Education Policy

Education is one of the most vulnerable areas of democratic life to racial discrimination not only because it is subject to local prejudices, but also because it tends to perpetuate the racial polarization.  The political, economic, and social segregation in Texas during the 20th century had strong ramifications in education as well.  Indeed, education was to a great extent the primary racial advantage in those other spheres of life. The destructive restrictions against Mexican Americans in Texas began shortly after the government was taken over by Anglo-American power.  In 1841, the Republic of Texas Legislature passed a Joint Resolution that suspended printing laws in Spanish. Ironically, only three years later, it chartered a foreign-language German university.  In 1856, a law was passed allowing Spanish in the courts of Texas only if the J.P. and the primary party could not speak English

In an 1858 amendment to an 1856 school law, the state legislature made English the "Principle language" of instruction.  It strengthened this in 1870 by requiring English for instruction in all public schools.  In this racially divided social environment, Texas public education developed as an exclusive and segregated system at the state and local level.  The principle of racial segregation was formally established in the Texas, Constitution of 1876, which stated in Article 7 § 7 that "Separate schools shall be provided . ."  Many schools interpreted this to apply to the Mexican American as well as the Negro.  Throughout the state, schools excluded Mexican Americans until the 1890s. (Taylor 1934, p. 192)  When they did provide education for Mexican American students, many cities across Texas began to segregate their Mexican American students into separate schools called "Mexican Schools."   Houston, San Antonio, and El Paso had "Mexican Schools" by the turn of the century.  Mexican American attendance at these segregated schools became mandatory.   By 1921, the school board in Alice ordered that

"all Latin Americans attend Nayer . . Anglo Saxons attend Hobbs-Strickland School."
By the turn of century, Mexican American  students were forced by school board policies
to bypass neighboring Anglo schools to attend Mexican American segregated schools.
And many of these "Mexican Schools," offered schooling only to the 6th grade. (Garcia
1981, 110; Rangel 1972, pp. 315, 367)

By the 1920s, state officials began to issue statements of policy that singled out
the Mexican American culture and students for special restrictions.  One of these officials
was Annie Webb Blanton, the state superintendent of public instruction.  In the 1920s,
she promoted a policy to make Texas schools teach "Americanization," which was a
euphemism for Anglo-conformity.  In opposition to the Mexican American culture, she
proclaimed "if you wish to preserve, in our state, the language and the custom of another
land, you have no right to this."  In response to her policy, E.E. Davis and C.T. Gray
conducted "A Study of Rural Schools in Karnes County,"  which they published in the
University of Texas Bulletin #2246 in December, 1922.   In the report they stated "In
general, it should be stated that separate schools are preferable for both the Mexican and
the Americans."  Their reason was that Americans "do not like to go to school with the
dirty 'greaser' type of Mexican child." (Davis 1916, pp. 9, 10, 41-43 pp. 9, 10, 41-43)
This was followed by a report by George A. Works, Texas Education Survey Reports,
under the auspices of the Texas Educational Survey Commission in 1925.  In this
statewide survey, Works stated that "it is time to segregate, if it is done on educational
grounds. . ." (Works 1925, p. 213.)  Thus segregation received endorsement not only
from the Superintendent of Public Instruction and the state, but from University of Texas
scholars as well.

School boards then began to follow a widespread practice of neglecting Mexican
American student enrollment almost completely, condoned by Superintendent Blanton.
By 1920, 70% of Mexican American school-age children in Texas were not enrolled as
opposed to only 22% of the Anglo non-enrolled students, although mandatory school
attendance had been required by law since the 1880s in Texas.   In a classic study of
education in Texas, University of Texas Professor H.T. Manuel in 1928 found that 40%
of the Mexican American students were not enrolled at state level as compared to 9% of
the Anglo students.   Manuel found only 4% of the Mexican American students were
attending junior high and high school as opposed to 60% of the Anglo students.  During
this time period, many South Texas school officials and principals in Nueces County and
Dimmit County reported that they simply did not enforce Mexican American student
enrollment or attendance. (San Miguel 1987, pp. 6-7; 24, 32, 49; Garcia 1981, 110;
Rangel 1972, 315)  Much of the educational neglect was due to excluding the Mexican
American students, but much was due to segregation in the school district boundaries.

Segregated Districts

The "Mexican School" became a widespread phenomenon in Texas education. The various school districts segregated their Mexican American students, but they provided significantly poorer facilities for them.  The "Mexican School" segregation spread rapidly across the state.  In 1930, for example over 40 school districts had Mexican schools.  A 1942 study by Wilson Little found 50% of the Mexican American students segregated through the 6th grade in 122 districts in "widely distributed and representative counties" of the state.  Few Mexican American students went beyond the 6th grade.  A typical example of the racial stratification in housing, labor, and education was seen in Cotulla, where future President Lyndon B. Johnson taught at the "Mexican School."  In 1928, he taught in Welhausen Elementary School for Latin Americans. Across town, Amanda Burks Elementary was "limited to Anglo-Americans."  In a typical stratification, 80% of the population was Mexican American, and barrio segregated.  LBJ wrote about the racial situation, noting that his girlfriend in the neighboring town was in the Ku Klux Klan. By the 1940s, whole sections of the state had segregated "Mexican School" belts of towns, many of these developed specifically by the growers to isolate the Mexican Americans.   In the Lower Valley, Edinburg, Harlingen, and San Benito school systems were segregated, while on Hwy. 83, Mercedes, McAllen, Mission, Pharr, San Juan, Alamo, and Weslaco districts were completely segregated.  On the Gulf Coast in South Texas,  Raymondville, Kingsville, Robstown, Kenedy, and Taft schools districts were segregated, while in the Winter Garden, Crystal City, Carrizo Springs, Asherton, and Frio Town were segregated towns with segregated schools. (Montejano 1987, 168; Pycior 1997, 14; San Miguel 1987, 56; Civil Rts. Study, 13)

In the larger cities, the school board policy was to segregate whole school districts, or to segregate the Mexican American students into predominantly Mexican American schools.  In 1900 Rusk Elementary was established as Houston's first Mexican school.  Later, the Houston school board built Lorenzo de Zavala, Hawthorne, Dow, Elysian Street, Jones, and Lubbock exclusively for Mexican Americans.  These students were rarely encouraged to go beyond the 6th grade.  By 1940, however, Mexican Americans began to enter high schools, when about 3% of the high school students were Mexican American. (San Miguel 2001, pp. 12, 32)  A report for the school year 1942-43 reported that there were 260,759 "Latin" or Mexican American students in Texas or 20% of the white.  Much of the segregation was, of course, due to the initial segregation of the housing and "Mexican Towns," but much of it was due to outright gerrymandering of the district boundaries within a city.  A survey of superintendents revealed that "While many claimed that there was no segregation in their schools, some admitted that the drawing-up of district boundary lines was deliberately made to enclose areas predominantly Latin." (Kuhr 1971, 73)  In the study by Wilson Little, he stated that many superintendents surveyed were asked why they segregated their Latin students.  He reported that, "In laying out the attendance areas within a given school district, therefore, it is not at all uncommon to find that one school is attended only by Spanish-speaking children and that

another school in the same district is attended only by Anglo-American students." As a result, he found that "Separate housing for Spanish-speaking children is a fixed practice in many school systems in Texas." (Little 1994, 59)

After the 1920s, Mexican American students were put into "developmental" classes and vocational classes, ostensibly because they needed special attention. Unfortunately, students were mixed with a variety of other students who were blind, spoke Spanish-only, were delinquents, or were bright students who simply did not like school. The San Antonio schools were reported in 1934 to have similar segregation. In that year, Alonso Perales and Eleuterio Escobar founded the Liga Pro-Defensa Escolar or School Improvement League in San Antonio. In their study of Mexican American schools, they reported statistics comparing West Side Mexican schools to the Anglo schools. The Mexican American schools had 12,334 students compared to 12,224 Anglo students. But the Mexican American students were in only 11 schools compared to 28 Anglo schools. The Mexican American schools had 23 acres of space compared to 82 acres for the Anglo school grounds. The Mexican American schools had 48 students per room compared to 23 Anglo students per room. The school funding revealed similar contrast, as the school board spent $24.50 for each Mexican American student compared to $35.96 average spending per Anglo pupil. Similar discriminatory funding was revealed in Nueces and Dimmit Counties. In 1934, noted historian Paul S. Taylor interviewed a Nueces Co. superintendent, who openly admitted that 100% of the $18,000 property tax revenue "goes on the white school." (San Miguel 2001, pp. 12, 32; San Miguel 1987, 54; Garcia 1989, 66)

Gerrymandering of attendance zones within a district became widespread by the late 1940s. , Charles Ray Akin wrote his Master's thesis at the University of Texas at Austin in 1955 on "A Study of School Boundaries in East Austin, Texas" under the distinguished education scholar George I. Sanchez. Aiken compared the "Mexican School" Zavala and the Anglo school Metz in attendance. He stated that "there exists the possible basis for a charge of segregation, especially since Zavala is 100 per cent composed of Latins, although some Anglos live nearer here than to Metz where they attend; [and] 4) since Metz and Zavala are located within three blocks of each other. . ." (Aikin 1951, 28)

Later, in 1954, famed lawyer Gus Garcia led a group of Mexican American parents in a petition to Dr. J.W. Edgar, State Commissioner of Education on whether a "zone line" for the new Gillet Jr. High in Kingsville, Texas was legal. The line made the school 100% Mexican American in attendance. Although the Kingsville I.S.D. Supt. George W. Wier said "that the zoning boundaries were set up on the basis of student load and other factors" and that there was "no intention to segregate," Garcia argued otherwise. In a newspaper article, he stated that the line was "more crooked than a sick snake." ["*está mas chueca que una vívora enferma*"] In another article to the *Corpus Christi Caller*, Garcia accused the school of making the school "predominantly

'Mexican' either by virtue of gerrymandering or geographical location." (Garcia Papers, Box 1, Folders 1 & 10)

One of the most salient characteristics in discrimination of Mexican Americans in Texas is the formal role played by government and school officials. There is ample evidence that the state "embraced" segregation as a formal concept in education of its Mexican American citizens. A Texas Education Agency survey in 1921 reported overcrowded Mexican American schools and half-day sessions for Mexican American students. The state agency made no comment or suggestion that the practice was inadequate. And throughout the first half of the 20th century, the state Attorney General systematically approved construction bonds submitted as required by the various independent school districts for his approval. The bond packages frequently called for construction of segregated "Mexican" Schools, but received customary approval with no mention or state sanctions for the segregated facilities. In 1920, Gov. Wm. P. Hobby called a special session to pass education laws, including a 1922 law to make English the"medium of instruction"in public schools. Following the lead of the governor and attorney general, the Texas State Teachers Association (TSTA) at their 1922 convention, passed a resolution opposing any but the English language in school. The state's teachers proclaimed that "Respect for our Flag should carry with respect for our Language and loyalty to it." And in 1925, the legislature passed a law specifying that schools "shall use the English language exclusively" in public education. With the formal policy equating English with loyalty, Texas schools began exclusively to teach Mexican American students hygiene, English, drawing, and music with the assumption that they needed to be clean and divest themselves of their Spanish accent and "all things Mexican." (Rangel 1972, pp. 318-19; San Miguel, 1987 pp. 25, 35, 45)

Mexican American Challenge

As Mexican American parents and civic leaders began to pereive the official nature of discrimination in the mid-20th century, they initiated formal protests and legal challenges to the agencies and government. Limited in resources, the Mexican American challengers were also limited in their success to end discrimination, but they established a legal foundation for many advancements. The "first challenge" to segregated schools in Texas was in 1928 in Charlotte, Atascosa County. The parents of Amanda Vela protested to the school superintendent that she did not live in the predominantly Mexican American district, and she did not speak any Spanish; therefore, they wanted her to attend the Anglo school. The school board trustees resisted it, but the superintendent conceded that the Mexican Americans should not be segregated. The State School Board upheld the superintendent's decision to let her into the Anglo school, notwithstanding the trustee's resistance. The case revealed early on the consistent pattern of recalcitrance that local school officials would show toward integrated schools. This was evident in the school districts of Beeville, Sinton, Elgin, Bastrop, and Cotulla when

attorney Gus Garcia told Atty. Gen. Price Daniel that Texas schools were using "a subterfuge to practice segregation" after the 1947 Mendez v. Westminster case.  Gen. Daniel denied the subterfuge.

Then in 1948, Garcia filed a case against the Bastrop I.S.D., and the judge found that the district was illegally segregating the Mexican American students.  In its decision, the court added a proviso, however, that segregation was acceptable in 1st grade "solely for instruction purposes."   The Delgado "proviso" led to evasive tactics by many other school districts to segregate Mexican American students who had dubious need of segregation for instructional purposes.  In 1957, the League of United Latin American Citizens (LULAC) sued Driscoll I.S.D., which was using the Delgado proviso to evade the court's ruling.  In Driscoll, one little girl who was segregated for "instructional purposes" on the basis of language was found to be proficient only in English.  Moreover, the school system had failed to provide any "instructional" programs for the segregated students.  By the mid-1950s, other schools across the state used freedom of choice plans, selected student transfer and transportation plans, and classification systems based on language or scholastic ability to maintain segregation.  These programs did not enhance the education of Mexican Americans in any way, and served only to perpetuate and justify the segregation.

After the frustrating legal challenges met only with evasion and subterfuge, Mexican American civic leaders began a different approach to improving their schools.  One classic example was the development of an early school program called the "Little School of 400."   This pre-school program was funded personally by a Houston restauranteur, and president of LULAC, Felix Tijerina in 1955.  The Texas legislature later adopted Little School of 400 as Texas Pre-School Program, but by 1967, only 12% of eligible schools were offering it to their students.  In 1967 through 1970, Mexican American students took the initiative from their parents and civic leaders to conduct their own walk-outs and demonstrations to protest insensitive curriculum and discriminatory practices in high schools and colleges.  Mexican American students conducted school boycotts in Crystal City, Kingsville, and Edcouch-Elsa.  In Kingsville, the police arrested 110 Mexican American students, and the boycotts yielded minor concessions from the school boards, but the actions brought public attention to the segregation and discrimination.  Also, the boycotts spurred the federal government's Department of Health, Education, and Welfare (HEW) to take legal action against offending school districts.   By 1972, HEW gained compliance in many South Texas towns like Bishop, Lyford, Los Fresnos, Beeville, and Weslaco, and it put Del Rio under court order for compliance. (San Miguel 1987, pp. 76, 120, 123, 134; Rangel 1972, 369)

Latino Experience in Pasadena, Texas

In the Houston area, where Buffalo Bayou and Braes Bayou meet near Harrisburg and the site of the 1836 Battle of San Jacinto, incoming Anglo-Americans from the

United States and European immigrants quickly developed "an intense anti-Mexican sentiment."  Few original Tejanos lived in the Houston area before the Texas Revolution, and except for Texas Republic Vice President Lorenzo de Zavala, few lived in the area after 1836.  De Zavala was the Mexican government liberal who fled Mexico to come to Texas after General Antonio Lopez de Santa Anna ascended to the Mexican Presidency. De Zavala was a signer of the Texas Declaration of Independence whose land grant and family home were on Buffalo Bayou, near the famous battleground.  But the only other Mexicans in the area were a few of Santa Anna's captured Mexican soldiers who delayed their repatriation to work on local farms and public works in the area.  As a result, the Anglo and European immigrants accepted the image promoted by two newspapers, the Houston *Telegraph and Texas Register* and the Houston Morning Star, that Mexicans were a "mongrel race, inferior even to negroes."  As communities began to form around Houston, they continued to look upon all Mexicans "with ridicule and scorn."

Present-day Pasadena was founded nearest to the San Jacinto Battleground, initially employing Mexican laborers on ranches or on strawberry farms. Between 1875 and 1890, the railroad construction, cotton compresses began to attract larger numbers of Mexican immigrant laborers east of Houston in the area around Pasadena.  The Pasadena population accelerated after WWI and the 1920s with refineries along the Houston ship channel.  The early residents were constantly reminded of the narrative that developed around the battleground that Mexicans were a defeated race, unprepared for self-rule. **TAB 18** (Pomeroy 1993, pp. ix, 316-18; Kreneck 1989, pp. 19-22, 45)

As Pasadena grew and attracted a growing Latino population, the Anglo population continued to see them as Mexican immigrants, excluding them from access to city government.  Access to elected position was only by the traditional method of slating.  In the Pasadena ISD, which had never elected a Latino, the Citizens United for Better Schools  "tapped" Carmen Orozco to run on the slate for the Board.  Orozco had garnered their attention when she publicly declared in a newspaper article and on the radio that while Pasadena schools had "been avalanched with criticism," she believed "Pasadena has been doing a very fine job of educating its children."  Elevated to the School Board, she became the darling of the Anglo electorate.  Celestino Perez, a Latino witness, testified in a sworn deposition that Orozco thereby became the only Latino member of the Citizens United for Better Schools.  "She had the backing.  She had the money, and she had the votes to be elected for the first time." **TAB 19** (Pasadena Citizen, "One Parent Appreciates PISD" Sept. 10, 1984,Sec 1 Pg 1; *Perez vs Pasadena Independent School District*, Deposition)

The use of race also became pronounced in labor controls on the Texas Gulf Coast after the 1901 discovery at Spindletop.  Texas became "the world's largest concentration of petroleum refineries and chemical plants," from Beaumont/Port Arthur to New Orleans and down to Corpus Christi, and Pasadena, Texas was the center of that concentration.  As Shell, Sinclair and other petroleum companies moved into Pasadena,

the city was beset by crude oil tanks, distillation columns, fractionating towers, catalytic "crackers" and refineries that produced 36 percent of national refining capacity by 1976. But as they attracted labor, the refineries hired Mexicans, Mexican-American citizens, and Anglo-Americans in unequal segregated classifications. Latinos, whether citizens or not, were hired only in construction around the refinery but not in the refinery maintenance. Restricted to menial labor, Latinos even in the unions could expect no advancement. Latinos were relegated to inferior wage schedules and segregated facilities. Following the practice of the local construction industry, the refineries established "independent unions" by 1937, usually with separate African-American auxiliaries. The discriminatory practices were enforced informally by intimidation, spies, red smears, and "racist jeremiads." (Priest and Botson, 2012, pp. 100-110) Union members openly admitted that they, themselves, demanded segregated work spaces and a dual-wage system. In an interview with a University of Texas researcher, the Secretary of Workers' International Union (OWIU) #243 in Beaumont stated, "This organization had to be formed separately from the whites because of racial feelings in Beaumont." (Labor Movement, Dabney Interview, Box 2E308, File 2)

Texas companies, like Humble, Sinclair, and Shell hired Mexican Americans, though the unions like the CIO and other unions collaborated with the companies to establish the dual wage systems, segregated work areas, separate occupational categories, and restrictions of Mexican Americans in skilled work. John Crossland, an Anglo unionist with Shell Refinery Local 367 in Pasadena admitted about minorities, "A lot of white membership … didn't want them to have a line of progression." The Dallas office Director, Dr. Carlos Castaneda, found that Texas mining and oil companies used token Mexican American workers "to avoid an open charge of discrimination." His conclusion, however, was that "Discrimination against the Latin-American worker has not been eliminated." (Zamora 1992, 327; Daniel, FEPC, 150; Priest and Botson 2012)

In its neighborhood patterns, Pasadena experienced the same segregated growth as other major Texas cities, but its population increase greatly exceeded other cities. Pasadena grew by 161% between 1950 and 1960, but in the following decades, the entire region experienced a radical ethnic shift. The Latino population of Harris County grew 50% to 1.7 million even as the number of Anglo Americans declined by 6%. Two out of three Pasadena residents were Latino by the end of the century. The change in ethnicity was exacerbated by the cultural change, from an Anglo community to a Latino community. Culturally, Pasadena had strong markers of a conservative blue-collar Anglo city. Its congressman in the McCarthyism of the 1950s was Martin Dies, Chairman of the House Unamerican Affairs Committee, and by the 1980s, Pasadena was the state headquarters of the Ku Klux Klan, with a KKK bookstore in the middle of town. Its union-member workers were "quite militant and radical" as they promoted conformity to an Anglo-American Protestant culture. The Chamber of Commerce sponsored "Loyalty Parades," the school board enforced dress codes, and the City Council hosted an

"Obscenity Panel" to prohibit lewd movies at the theaters. The city had been incorporated with a city charter that complied with the state law that prescribed segregation and outlawed the teaching of Spanish, Bohemian, and German. This culture later clashed openly with the overwhelming Latino population that spoke Spanish, ate tacos, and danced at quinceañera debutante balls. (Houston Chronicle August 11, 1971 "Obscenity Panel;" Houston Post, May 1, 1955, p. 19 "Loyalty Week"; Jervis, Rick, "Hispanics Guide Huge Growth in Texas," *USA Today*, February 23, 2011.)

Instead of changing to single-member districts, the city council simply maintained the same at-large district system, exploiting the incumbency of the established Anglo political structure. As the city rapidly grew in population, and as the Latino demographic exploded after the 1980s, Pasadena retained its old order. The 1942 city charter had incorporated segregation in its Article VIII, Section 4 "Segregation of Races," taking advantage of the state's allowance for legal segregation of the races. The Pasadena Chamber of Commerce boasted a projected population increase which literally doubled from 103,281 in 1970 to 203,756 in the year 2000. It hardly noted that the Latino population, which had been roughly 15% in 1970, would rapidly become the majority of the population. As Latinos met with city leaders and the school board for adjustments to the precinct boundaries, they were met with indifference. One group of Latinos, the Pasadena Citizens for Equitable Representation met with the city council in 1991 to ask for two Latino districts. As a sincere gesture, they drew up a map to illustrate graphically the boundaries that would provide 14,000 Latino citizens in each of the two new districts, but were denied as well. **TAB 20** (Pasadena Citizens , MAP, 1991; Pasadena City Charter 1942, Article VIII, Section 4 "Segregation of Races; Texas Penal Code, Art. 288; Texas, General and Special Laws, 1927; Pasadena Chamber of Commerce, "Economic and Demographic Profile," n.p.")

In the area of education, many cultural and discriminatory practices were prevalent in the mid-twentieth century Pasadena, Texas. Pasadena was a legally segregated city that made minimal or no provisions for its minority students. African-American students had to go out of the city to attend school, and the Pasadena Independent School District (PISD) excluded the hiring of minority teachers and administrators until mid-century. The Findings of Fact in U.S. v. Pasadena Independent School District (1987) outlined a strong pattern of racial discrimination in the hiring practices of school teachers. (**APPENDIX 3:** U.S. v. Pasadena Independent School District, 1987)  When the school district finally began to hire minority teachers, it conflicted with the minority community in its curriculum and treatment of minority students and teachers. Academic studies of Pasadena schools consistently revealed a strong culture of condescension on Latino students due to their "slow" performance or "mental ability" which supposedly hindered the Anglo students. (Glasgow, 1931, p. 49; Davis, 1958)  Another federal case revealed that the Pasadena ISD was denying admission to the children of undocumented Latino immigrant residents of the city. The

court enjoined the school board "from refusing to permit any child . . to attend the public free schools. . ." because of their status as immigrants.  It also enjoined the board from refusing "to admit free of tuition" those Latino children.  (U. S. District Court, In Re Alien, 1980)  Despite the one Latino on the school board, Carmen Orozco, the growing Latino community repeatedly protested student treatment, corporeal punishment, and treatment of Latino teachers.  In 1990, the School Board was challenged by a Latino petition, charging that Latino principal Graciela Barrera Kavulla had been fired for promoting Hispanic students at Jackson Elementary School.  The Latino dissatisfaction increased until they launched a lawsuit to reform the board elections to single-member districts. TAB 22 (Kavulla Petition; Houston Chronicle April 18, 1992 "School Board Reform")

Along with the other patterns of alienation, police conflicts with Latino citizens emerged in the social and physical segregation in Pasadena, Texas.  By the mid-1980s, Latino *ad hoc* committees began to meet with the Pasadena Police Chief and city council to protest and discuss what they termed as police brutality and harassment of Latinos.  In a 1991 meeting with Pasadena Police Chief Floyd W. Daigle, the "Hispanic and Other Concerned Citizens Committee" addressed specific cases of police treatment of Latinos.  They also complained of the benign relationship between the Pasadena Police Department and the Ku Klux Klan which had its state headquarters and book store in Pasadena.  In KKK demonstrations, the newspaper regularly pictured the police and the KKK in close proximity.  The KKK had been known to have "penetrated the Houston Police Department," and Latinos complained of the same in Pasadena.  In 1986, the Federal Bureau of Investigation came into Pasadena to investigate the alleged beating of José Antonio Nuñez while in police custody.  And in 1994, Latinos again protested the alleged suicide of Sirilo Delao by hanging himself with a telephone cord in the Pasadena City Jail.  Latinos complained that the police intimidated Latino citizens, and did not represent the city's ethnic make-up.  When asked to explain why there were only three Latino policemen on the force, Police Sgt. J.C. Lyde stated that Anglo police officers were "'enforcers' of 'the white man's law,' and often minority members find themselves ostracized if they decide to become policemen."  The conflict between Latinos and police remained an accepted characteristic of the status quo in Pasadena. **TAB 23** (Greene, 1995, pp. 30, 41;Pasadena Citizen, Oct. 22, 1986 "FBI Investigates;" Nov. 26, 1994 "Inmate Hangs Himself;" May 17, 1980 "Minorities Missing;" April, 1980 "Klansmen, police 'stood up'")

Legacy of Segregation

The legacy of 150 years of multi-faceted government-condoned discrimination against Mexican Americans in Texas is a state educational system that maintains a high dropout rate and is still characterized by widespread segregation.  One of the vestiges of the years of "Mexican Schools" is the continued formation, construction, and

maintenance of schools and school districts that are imbalanced compared to the number of Mexican American students in the community or district.  Many Texas cities now have whole segregated districts that have replaced the old "Mexican Schools."  In Nueces County, for example, a 1968 federal agency study found racially separated contiguous districts.  The predominantly Mexican American school district in Robstown, which was established by Robert Kleberg as a segregated town for his Mexican American agricultural labor force, is adjoining the Callalen I.S.D., which is predominantly Anglo. In Val Verde County, the predominantly Mexican American San Felipe I.S.D. adjoins the all-white Del Rio I.S.D., and in Bexar County, the predominantly Mexican American districts of Edgewood and Harlandale are adjoining Anglo districts in San Antonio.   By the 1960s, 50% or more of Mexican American students in Texas were segregated. Worse, not only students but even Mexican American teachers were also segregated or neglected. In 1968, the Anglo/Mexican American teacher ratio was reported to be 17:1.  Mexican American teachers comprised only 4.9% of the teachers in Texas.  And in the Rio Grande Valley, where Mexican Americans comprised 64% of the student enrollment, only 7% of the teachers were Mexican American.  Likewise, Mexican American principals comprised only 3.4% of Texas principals.  These low statistics were found to be similar for Mexican American school board members and school administrative staff, with Mexican Americans overrepresented in the custodial staff numbers.  The latest studies reveal that even in the 1990s, the percentage of Mexican American high school administrators was only 65% for schools that were over 90% Mexican American in enrollment.  (Civil Rts. Study, 1971,  pp. 21, 23, 30, 42; Richardson 1999, 132)

The social and academic vestiges of systematic discrimination and segregation of Mexican Americans also continue to yield statistics that place Texas in an unenviable position among other states.  A 1977 report issued by the U.S. Commission on Civil Rights reported that 19% of the Mexican Americans over age 25 in Texas were illiterate. Mexican Americans had twice the Anglo unemployment rate, and 15% of them still lived in overcrowded housing with inadequate plumbing as compared to the Anglo 1.7%.   A clear holdover to the Texas "Mexican town" was the 70% of Mexican Americans in Texas who still lived in barrios.  In San Antonio, for example, a 1980 study concluded that the limited residential access of middle-class Mexican Americans to the three affluent northern census tracts tended also to limit their educational access.  (US Comsn. Civ. Rts., 1977, p. 184; Rosales 2001, 12)   In 1981, Judge William Wayne Justice found the state bilingual plan inadequate, and that measures had not been taken to fully "remove the disabling vestiges of past de jure discrimination."  He ordered corrections to train teachers, identify students in Limited English Proficiency (LEP), and to expand the program.  And in 1980, the Southwest Voter Registration and Education Project (SVREP) found that Mexican Americans were underrepresented on school boards in 92% of the 361 Texas school districts where Mexican Americans make up over 20% of the school population.In many other comparisons, Texas educational statistics show evidence

of past discrimination.  A nationally publicized report in 1984 by the National Commission on Secondary Schooling reported that in Texas, the majority of Mexican American students are still in "inferior and highly segregated schools."  (Gomez-Quinones 1994, pp. 155, 166, 172).They are "extremely overage" and "disproportionally enrolled in remedial English classes."  Texas Mexican American students still have an unacceptably "high dropout" rate, and receive poor preparation for college.

Legacy of Disfranchisement

Just as segregation has hindered Latino education, so has the history of disfranchisement reduced Latino voter participation.  Texas has been cited as having a distinct pattern of disfranchisement of minorities, including Latinos by a variety of devices—all intended to dilute or reduce voting strength.  A report by the U.S. House of Representatives in 1975 stated that "Texas has a long history of discriminating" against minorities using "myriad forms of discrimination."  The background of the report stated that "The cultural and language impediment conjoined with the poll tax  and the most restrictive voter registration procedures in the nation have operated to effectively deny Mexican Americans access to the political processes in Texas even longer than the Blacks were formally denied access by the white primary."  An example of the state's tenacious attack on minority voting rights is clearly demonstrated by its use of the White Primary.  As stated above, the White Primary was established in 1914, specifically to exclude the Latino voters.  When the Texas White Primary Law was struck down by the courts in 1926, the state legislature responded by passing a law that authorized state political parties to set their own voter credentials.  The state Democratic party then ruled that only whites could vote in the primary, which was struck down in 1923.  The Democratic party immediately restricted party membership to whites only, which was struck down in 1944.  These party exclusions were followed up by the poll tax until it was struck down.  (TSHA Handbook, "White Primary")

The Congressional Report added that most destructive was the fact that the state discriminatory laws combined with local governments and local officials to "frighten, discourage, frustrate, and otherwise inhibit" Latino voters.  (U.S. Congress, 1975, p. 17) The report cited several Texas cities such as Corpus Christi, Waco, and Lufkin in which a variety of "legal devices" were used to discourage Latino voting.  In some cases precinct or election districts have been re-drawn to dilute Latino voting populations; in other cases the lines have been drawn to concentrate an entire Latino community into a single district combined with at-large elections to limit their representation on elective boards and commissions.   Until the 1980s, 179 of the 214 large cities in Texas had at-large electoral systems, or 83%.  In general, the at-large non-partisan electoral system combined with the poll tax and other obstacles to hinder voter participation of Mexican Americans throughout most the twentieth century.  (San Miguel 1987, pp. xv, 201; Montejano 1987, 292; Rosales, 2000, 13; U.S. Commission on Civil Rights, Texas, 1980, p. 47)  The

Congressional Report stated that the same legal devices that hindered minority voting also hindered their running for office.  In Texas, for example, Mexican Americans were found to hold 2.5 percent of elective positions, substantially lower than their percentage of the state's population.  It concluded that this was "because of discrimination and economic dependence, and the fear that these have created."  Scholar Juan Gomez-Quiñones has stated that the absence of Mexican Americans at all levels of appointed positions before 1970 is major indicator of their exclusion from the democratic process in Texas.  And even though Mexican American voting had increased, Willie Velasquez of San Antonio, the founder of the Southwest Voter Registration Education Project (SVREP) stated that "Clearly, past discriminatory practices have hindered voting."  Velasquez began in 1974 to register Mexican American voters.  He found that he had to file several law suits in order to seek enforcement of the Voting Rights Act, and to re-structure local voting districts which had been Gerrymandered. (Gomez-Quinones 1994, pp. 155, 166, 172).  This mirrored the comments by the Congressional Report that  "In view of this overwhelming evidence of voting discrimination against language minorities, it is not surprising that the registration and voting statistics of language minorities are significantly below those of the Anglo majority.  In 1972, for example, only 44.4 percent of persons of Spanish origin were registered compared to 73.4 percent for Anglos."  The 1974 percentages indicated similar disparity of 34.9 percent for Mexican Americans to 63.5 percent registered Anglos.  As a result, the Mexican American voting rate was half of the voting rate for Anglos in 1974. (U.S. Congress, 1975, p. 22)

The 1975 Congressional Report by the U.S. House of Representatives was particularly clear in stating not only that Texas has an exceptionally strong record of abuses, but that the long train of abuses has left a legacy of voter alienation among its minority, especially Latino, voters.   The report added specifically stated that "In 1973, the Supreme Court upheld a lower court finding which noted that the Mexican American population in Texas has "historically suffered from, and continues to suffer from the results and effect of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others."  The report stated that Texas has "a history pock-marked by a pattern of racial discrimination that has stunted the electoral and economic participation of the black and brown communities in the life of the state."  An example of the persistent pressure put on Texas minority voters was the "voter purge" in 1975.  At that time, the U.S. Asst. Gen. wrote Texas Secretary of State Mark White to interpose an objection to the Texas voter purge.  Federal investigation revealed that the total purge could have a discriminatory effect on their voting rights "on the heels of registration difficulties in the past."  The investigation indicated that the purge could confuse a substantial number of minority voters and leave them unable to comply with the statutory registration requirements in the new Texas law.  (U.S. Attorney General, 1975) The Congressional Report found that such legal devices and "the practice of conducting registration and voting only in English does impede the political participation

of voters whose usual language is not English."  State and local election districts failure to provide adequate bilingual materials  "effectively excludes otherwise qualified voters from participating in elections."

All of the legal devices and discriminatory principles cited above are exemplified in the case of Crockett County, Texas as documented in a 1980 study by the United States Commission on Civil Rights.  Dr. Charles Cotrell, a member of the Texas Advisory Committee, prepared the report in conjunction with members and documentation provided by attorneys and the staff of the U.S. Department of Justice. The case involves a study of electoral practices to disfranchise Mexican American citizens in the town of Ozona, Texas, a typically segregated town with Mexican Americans at a distinct disadvantage in population, income level, education, and political power.  The study reveals that the Anglo minority were so accustomed to overt discrimination in employment, social interaction, and elections that their election officials were hardly aware that they were violating basic election laws and procedures.  For example, the Anglo election officials either gerrymandered the Mexican-American neighborhoods by diluting them into Anglo districts, or they gerrymandered them into one massive voter district.  Anglo non-residents then registered illegally to vote in that exclusively Mexican-American district to defeat the only Mexican-American candidate. The exclusively-Anglo Crockett County officials color coded the ballots to distinguish the Mexican-American ballots.   At the end of the election day, the wife of the Anglo candidate went to the Mexican-American district polls to collect the color-coded ballots. She and the Anglo County Clerk then discarded the color-coded Mexican-American ballots.  The County Clerk did not hesitate to reveal the system to federal investigators, nor to admit that she systematically challenged only the Mexican American voters who came in to vote legally in their own district.  Investigators asked her about the color of the Anglo ballots, saying "What do you mean by 'the white ones?'"  She replied, "Well, the white people."  She then added "American, not the Latins, the Americans." **APPENDIX 2** (U.S. Commission on Civil Rights,  Vol. 1 "Participation": 1980, p. 231)

The inherent legacy of these discriminatory practices is that the entire community of the state lives under the shadow of decades of unescapable social discrimination.  The Congressional Report underscored this by adding  that the dynamic in racial abuses was "the economic dependence of these minorities upon the Anglo power structure. Peoplewhose jobs, credit, or housing depend on someone who wishes to keep them politically powerless are not likely to risk retaliation."  And the report did document a variety of cases of such retaliation.  In one case, for example, "a loan officer at the bank went to each Mexican American who had loans with the bank and told them he expected their votes."  (citation). Another report indicated that Mexican Americans in Uvalde, Texas "are afraid their welfare checks will be reduced because of their political activity." (citation).I concluded the statement of legacy by stating the years of discriminatory

abuses cannot be dismissed simply because "The people in charge are frequently the same ones who so recently excluded minorities from the political process." (**APPENDIX 4:** U.S. Congress, Voting Rights Act 1975, pp. 18-22)

As a result of the historical discrimination against Mexican Americans in Texas, Latinos in Pasadena, Texas, still bear the effects of this discrimination which hinders their ability to participate effectively in the political process.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 14, 2015.

Andres Tijerina

BIBLIOGRAPHY

Achor, Shirley.  *Mexican Americans in a Dallas Barrio.*  Tucson: University of Arizona
        Press, 1978.

Akin, Charles Ray.  "A Study of School Boundaries in East Austin, Texas"
        (Unpublished M.A. Thesis, University of Texas at Austin, 1951).

Anders, Evan.  *Boss Rule in South Texas: The Progressive Era.*  Austin:  University of
        Texas, 1982.

 *Austin American-Statesman.*  (Sunday, April 9, 1967), p. A-15.

*Austin American-Statesman.*  "Adelante," (February 11, 1969).

Austin.  City Plan for Austin.  Koch and Fowler, 1928.  Austin History Center, Austin
        Public Library.

*Austin Daily Tribune* (Thursday, Sept. 1899, p. 4; Camacho Family Papers  (Box 10,
        Folder 4) Austin History Center.

Austin Housing Authority.  "Annual Reports, 1938-39," 1948.  Austin History Center.

Austin Human Relations Commission.  "Austin Housing Patterns Study" Summary,
        1979.  Civil Rights Folder.  Austin History Center, Austin Public Library.

Austin.  Oakwood Cemetery.  Original Cemetery Record Book I.  Austin History Center,
        Austin Public Library.

*Balli Heirs v. Gilbert Kerlin, North Central Oil Corporation, et. al.* filed in the 107th
        Judicial District, Cameron County, Texas.

Casstevens, Mary Anna.  "The Institution of the Spanish-Mexican Ranch and Its Culture
        in South Texas."  Unpublished M.A. Thesis.  Texas A&M University-Kingsville,
        1997.

Cheeseman, Bruce S.  "Richard King: Pioneering Market Capitalism on the Frontier," in
        Joe S. Graham, ed.  *Proceedings of "Ranching in South Texas: A Symposium."*
        Kingsville: Texas A&M University, Kingsville, 1994.

Crimm, Ana Carolina Castillo.  *De León:  A Tejano Family History*.  Austin:  University
        of Texas Press, 2003.

Crisp, James Ernest.  "Anglo-Texan Attitudes toward the Mexican, 1821-1845."
        Unpublished Ph.D. dissertation.  Yale University, 1976.

*Dallas Morning News*, 9 March 1913.

Daniel, Clete.  *Chicano Workers and the Politics of Fairness:  the FEPC in the
        Southwest, 1941-1945.* Austin:  University of Texas, 1991.

Davis, E. E., "A Study of Rural Schools in Travis County, Texas" *Bulletin of The
        University of Texas* No. 67 (December 1, 1916).

Davis, Peggy Jean, "A Study of Non-Promotion in the Pasadena, Texas Elementary
        Schools," (M.Ed.Thesis, University of Texas, 1958.

De Leon, Arnoldo.  *They Called them Greasers:  Anglo Attitudes Toward Mexicans in
        Texas, 1821-1900.*  Austin:  University of Texas Press, 1983.

Dobie, J. Frank.  *A Vaquero of the Brush Country:  Partly from the Reminiscences of John Young.*  Dallas:  The Southwest Press, 1929.

Dunn, J. B. (Red).  *Perilous Trails of Texas.*  ed. by Lilith Lorraine.  Dallas: Southwest Press, 1932.

Foley, Neil.  *The White Scourge:  Mexicans, Blacks, and Poor Whites in Texas Cotton Culture.*  Berkeley:  University of California Press, 1997.

Friend, Llerena.  *Sam Houston:  Great Designer.*  Austin:  University of Texas Press, 1969.

Gammel, H.P.N.  *The Laws of Texas, 1822-1897.*  4 Vols.  Austin:  The Gammel Book Company, 1898.

Garcia, Mario T.  *Desert Immigrants:  The Mexicans of El Paso, 1880-1920.*  New Haven:  Yale University Press, 1981.

Garcia, Mario T.  *Mexican Americans: Leadership, Ideology, & Identity, 1930-1960.*  New Haven:  Yale University Press, 1989.

Garcia Papers, Mexican American Library, University of Texas at Austin.

Glasgow, Roy Arthur, "A financial study of the Pasadena, Texas, Independent School District," M.A.Thesis, University of Texas, 1931.

Goliad County, County Clerk.  Deed Records.

Gomez-Quinones, Juan.  *Chicano Politics:  Reality and Promise, 1940-1990.*  Albuquerque:  University of New Mexico Press, 1990.

Gomez-Quinones, Juan.  *Mexican American Labor, 1790-1990.*  Albuquerque: University of New Mexico Press, 1994.

Greaser, Galen D. and Jesús de la Teja.  "Quieting Title to Spanish and Mexican Land Grants in the Trans-Nueces: The Bourland and Miller Commission, 1850-1852." *Southwestern Historical Quarterly* 95, no. 4 (Apr., 1992).

Greene, Casey Edward, "Apostles of Hate: The Ku Klux Klan in and Near Houston, Texas, 1920-1982"  MA Thesis, University of Houston, 1995.

Hamilton, William B.  "A Social Survey of Austin" *Bulletin of The University of Texas* No. 273 (No. 15, March 15, 1913).

Hammett, A.B.J.  *The Empresario Don Martín de Leon.*  Kerville, Tex.:  Braswell Printing Co., 1971.

Hidalgo County.  Court Record Book A.

Hill, Kate Adele.  *Lon C. Hill, 1862-1935:  Lower Rio Grande Valley Pioneer.*  San Antonio:  The Naylor Company, 1900.

Hinojosa, Gilberto Miguel.  *A Borderlands Town in Transition:  Laredo, 1755-1870.*  College Station:  Texas A&M university Press, 1983.

*Houston Chronicle* August 11, 1971 "Obscenity Panel;" April 18, 1992 "School Board Reform."

*Houston Post*, May 1, 1955, p. 19 "Loyalty Week."

Huson, Hobart.  *Refugio:  A Comprehensive History of Refugio County from Aboriginal Times to 1953*.  2 vols.  Woodsboro:  The Rooke Foundation, Inc., 1953.

Jervis, Rick, "Hispanics Guide Huge Growth in Texas," *USA Today*, February 23, 2011.

Kavulla Petition, PISD.

Kreneck, Thomas H., *Del Pueblo:  A History of Houston's Hispanic Community* (Houston:  Houston International University, 1989.

Kenedy, Texas.  *The Kennedy Times* (October 31, 1963), Sect. 1.

Kuhr, Nancy.  "Segregated Public Schools in Texas, 1876-1940" M.A. Thesis, University of Texas at Austin, 1971.

Labor Movement in Texas, Collection, 1845-1954, Briscoe Center for American History, Manuscripts, Box 2E308, File 2, Dabney Interview)

Lack, Paul D.  "Slavery and Vigilantism in Austin, Texas, 1840-1860."  *Southwestern Historical Quarterly* 85 (July 1981).

Lea, Tom.  *The King Ranch*.  Austin:  University of Texas Press, 1973. Little, Wilson. *Spanish-Speaking Children in Texas* (Austin:  University of Texas Press, 1944).

Manaster, Jane.  "The Ethnic Geography of Austin, Texas:  1875-1910."  Unpublished M.A. Thesis, University of Texas at Austin, 1986.

Martin, Roscoe C.  "The Municipal Electorate:  A Case Study" *Southwestern Social Science Quarterly* XIV (December 1933), pp. 890-936.

Mexico.  *Reports of the Committee of Investigation Sent in 1873 by the Mexican Government to the Frontier of Texas*.  Translated from the Official Edition Made in Mexico.  New York:  Baker & Godwin, Printers, 1875.

Montejano, David.  *Anglos and Mexicans in the Making of Texas, 1836-1886*. Austin: University of Texas, 1987.

Montejano, David.  *Anglos and Mexicans in the Making of Texas, 1836-1886.*  Austin: University of Texas Press, 1987.

O'Connor, Kathryn Stoner.  *Presidio La Bahia del Espiritu Santo de Zuniga, 1721 to 1846*.  Austin:  VonBoeckmann-Jones Co., 1966.

Pasadena Chamber of Commerce, "Economic and Demographic Profile,"  Booklet.

Pasadena Citizen. 1980 *passim.*

Phillips, Michael.  White Metropolis:  Race, Ethnicity, and Religion in Dallas, 1841-2001.  Austin:  University of Texas Press, 2006.

Pomeroy, C. David, Jr., *Pasadena:  The Early Years* (Pasadena, Tex.:  Pomerosa Press, 1993).

Priest, Tyler and Michael Botson, "Bucking the Odds:  Organized Labor in Gulf Coast Oil Refining" *Journal of American History* (2012) 99 (1): 100-110.

Pycior, Julie Leininger.  *LBJ & Mexican Americans:  The Paradox of Power*. Austin:
    University of Texa, 1997.

Rangel, Jorge C. and Carlos M. Alcala.  "Project Report:  De Jure Segregation of
    Chicanos in Texas Schools"  *Harvard Civil Rights-Civil Liberties Law Review* 7:2
    (March, 1972), pp. 307-91).

Richardson, Chad.  *Batos, Bolillos, Pochos, & Pelados:  Class & Culture on the South
    Texas Border*. Austin: University of Texas Press, 1999.

Rosales, F. Arturo.  "Mexicans in Houston:  The Struggle to Survive, 1908-1975" The
    Houston Review:  History and Culture of the Gulf Coast  A Journal of the
    Houston Metropolitan Research Center,  Vol. III, No. 2 (Summer, 1981), pp. 224
    – 248.

Rosales, Rodolfo.  *The Illusion of Inclusion:  The Untold Political Story of San Antonio*.
    Austin: University of Texas Press, 2000.

Rubel, Arthur J. *Across the Tracks: Mexican-Americans in a Texas City*.  Austin:
    University of Texas Press, 1966, 36.

Rubio, Abel G.  *Stolen Heritage:  A Mexican-American's Rediscovery of His Family's
    Lost Land Grant*.  Austin:  Eakin Press, 1986.

*San Antonio Express*, July 12, 1914, p. 4B.

San Miguel, Guadalupe, Jr. *Brown not White:  School Integration and the Chicano
    Movement in Houston*.  Austin:  University of Texas Press, 2001.

San Miguel, Guadalupe, Jr. *Let All of them Take Heed:  Mexican Americans and
    theCampaign for Educatinal Equality in Texas, 1910-1981*.  College Station:
    Texas A&M University Press, 1987.

Taylor, Paul Schuster.  *An American-Mexican Frontier:  Nueces County, Texas*.  Chapel
    Hill:  The University of North Carolina Press, 1934

Teja, Jesus F. de la.  *A Revolution Remembered:  The Memoirs and Selected
    Correspondence of Juan N. Seguin*.  Austin:  State House Press, 1991.

Texas, *General and Special Laws of the State of Texas Passed by the Fortieth Legislature
    at the Regular Session Convened at the City of Austin, January 11, 1927*.  (Jane
    Y. McCallum, Secretary of State, 1927)

Texas Historical Commission.  Duplex Nation Historic District.  Application for National
    Register of Historic Places , Nov. 10, 2006.

Texas Historical Commission.  Wilshire Historic District.  Application for National
    Register of Historic Places , Nov. 10, 2006.

Texas, *Penal Code of the State of Texas. Adopted at the Regular Session of the Thirty-
    Ninth Legislature*, 1925.

Texas, Secretary of State city charters and amendments.  Archives and Information
    Services Division, Texas State Library and Archives Commission.

Texas, *State Gazette Appendix,* Vol. II (1854-55) in Camacho Papers, Box 2 "Mexican
    American History" folder.  Austin History Center, Austin Public Library.

Texas.  General Land Office.  *Abstract of all Original Texas Land Titles comprising Grants and Locations to August 31, 1942.*  8 vols.  Austin:  State of Texas, 1942.

Texas Senate.  *D.W. Glasscock contestant vs. A. Parr contestee*, Supplement to the Senate Journal, 36th Legis., Reg. Sess., 1919.

Texas State Historical Association (TSHA).  Handbook of Texas Online URL:  http://www.tshaonline.org/handbook  "White Primary." [Accessed June 5, 2012].

Tijerina, Andrés, "Foreigners in Their Native Land: The Violent Struggle between Anglos and Tejanos for Land Titles in South Texas during Reconstruction" Chapter 11 in Kenneth W. Howell, Ed., *Still the Arena of Civil War: Violence and Turmoil in Reconstruction Texas, 1865-1874* University of North Texas Press, 2012.

Tijerina, Andrés.  *History of Mexican Americans in Lubbock*.  Lubbock:  Texas Tech University Press, 1979.

Travis County Voter Registration List, 1867, 1873, & 1892.  Austin History Center.

U.S. Commission on Civil Rights.  "Mexican American Education Study" *Report 1: Ethnic Isolation of Mexican Americans in the Public Schools of the Southwest*, 1971.

U.S. Commission on Civil Rights.  A Report of the Texas Advisory Committee to the U.S. Commission on Civil Rights.  *Employment Practices at Kelly Air Force Base, San Antonio, Texas*.  1977.

U.S. Commission on Civil Rights.  *The Unfinished Business:  Twenty Years Later*.  Washington, D.C., 1977.

U.S. Commission on Civil Rights.  *Texas:  The State of Civil Rights, Ten Years Later, 1968-1978*.  Washington, D.C., 1980.

U.S. Commission on Civil Rights.  Vol. 1:  *A Report on the Participation of Mexican-Americans, Blacks, and Females in the Political Institutions and Processes in Texas*.  1968-1878.  Prepared by Charles Cotrell.  Washington, D.C., 1980.

U.S. Congress, 44th Cong., 1st sess. House of Representatives. Report No. 343**,** Texas Frontier Troubles.  Washington, 1876.

U.S. Congress, 94th Cong., 1st sess. House of Representatives. Report No. 94-196**,** Voting Rights Act Extension.  Washington, 1975.

U.S. Congress.  Hon. Lyndon B. Johnson, Radio Address.  Congressional Record. 75 Cong., 3rd Sess., Jan. 23, 1933.  1-page reprint in HOUSING PROJECTS folder. Austin History Center.

U.S. Departmen of Justice.  J. Stanley Pottinger, Assistant U.S. Attorney General, to Mark White, Texas Secretary of State, 1975.

*U.S. v. Pasadena Independent School District*, 1987

U.S. District Court, Southern District of Texas, Houston Division , In Re Alien Children Education Litigation § Civil Action No. H-78-1862 , July 21, 1980.

Valenzuela, Angela.  *Subtractive Schooling:  U.S.-Mexican Youth and the Politics of*

*Caring*.  New York:  State University of New York Press, 1999.

Villareal, Roberto M. "The Mexican-American Vaqueros of the Kenedy Ranch: A Social
        History."  Master's thesis, Texas A&I University, 1972.

Webb, Walter Prescott.  *The Texas Rangers:  A Century of Frontier Defense*. 2d ed.
        Austin: University of Texasl, 1991.

Williams, Amelia W. and Eugene C. Barker, eds. *Writings of Sam Houston,1813-1863.*
        Austin:  University of Texas Press, 1943.

Works, George A. *Texas Education Survey Reports*, Vol. Viii (Austin:  Texas
        Educational Survey Commission, 1925).

Zamora, Emilio.  "The Failed Promise of Wartime Opportunity for Mexicans in the
        Texas Oil Industry" *Southwestern Historical Quarterly* 95 (January, 1992), pp.
        323-350.

INDEX OF FOOTNOTE TABS

REPORT OF DR. ANDRES TIJERINA

(PASADENA)

TAB #1 Williams, Amelia W. and Eugene C. Barker, eds. *Writings of Sam Houston,1813-1863.* Austin:  University of Texas Press, 1943.

TAB #2 (Houston:  Houston International University, 1989.

Huson, Hobart.  *Refugio:  A Comprehensive History of Refugio County from Aboriginal Times to 1953.*  2 vols.  Woodsboro:  The Rooke Foundation, Inc., 1953.

TAB #3 Montejano, David.  *Anglos and Mexicans in the Making of Texas, 1836-1886*. Austin: University of Texas, 1987.

TAB #4 Crimm, Ana Carolina Castillo.  *De León:  A Tejano Family History*.  Austin: University of Texas Press, 2003.

TAB #5 Kenedy, Texas.  *The Kennedy Times* (October 31, 1963), Sect. 1; Rubio, Abel G. *Stolen Heritage:  A Mexican-American's Rediscovery of His Family's Lost Land Grant*.  Austin: Eakin Press, 1986.

TAB #6 Lack, Paul D.  "Slavery and Vigilantism in Austin, Texas, 1840-1860."  *Southwestern Historical Quarterly* 85 (July 1981).

TAB #7 Mexico.  *Reports of the Committee of Investigation Sent in 1873 by the Mexican Government to the Frontier of Texas*.  Translated from the Oficial Edition Made in Mexico. New York:  Baker & Godwin, Printers, 1875.

TAB#8 Cheeseman, Bruce S.  "Richard King: Pioneering Market Capitalism on the Frontier," in Joe S. Graham, ed. *Proceedings of "Ranching in South Texas: A Symposium."*  Kingsville: Texas A&M University, Kingsville, 1994.

TAB #9 Webb, Walter Prescott.  *The Texas Rangers:  A Century of Frontier Defense*. 2d ed. Austin: University of Texasl, 1991.

TAB #10 Tijerina, Andrés, "Foreigners in Their Native Land: The Violent Struggle between Anglos and Tejanos for Land Titles in South Texas during Reconstruction" Chapter 11 in Kenneth W. Howell, Ed., *Still the Arena of Civil War: Violence and Turmoil in Reconstruction Texas, 1865-1874* University of North Texas Press, 2012.

TAB#11 Anders, Evan.  *Boss Rule in South Texas:  The Progressive Era*.  Austin:  University of Texas, 1982.

TAB #12 Rosales, F. Arturo.  "Mexicans in Houston:  The Struggle to Survive, 1908-1975" *The Houston Review:  History and Culture of the Gulf Coast  A Journal of the Houston Metropolitan Research Center*,  Vol. III, No. 2 (Summer, 1981), pp. 224 – 248.

TAB #13 *San Antonio Express*, July 12, 1914, p. 4B.

TAB #14 *Dallas Morning News*, 9 March 1913.

TAB #15 Texas Senate.  *D.W. Glasscock contestant vs. A. Parr contestee*, Supplement to the

TAB #16 Foley, Neil.  *The White Scourge:  Mexicans, Blacks, and Poor Whites in Texas Cotton Culture*.  Berkeley:  University of California Press, 1997.

TAB #17 Hamilton, William B.  "A Social Survey of Austin" *Bulletin of The University of Texas No. 273* (No. 15, March 15, 1913).
TAB #18 Pomeroy, C. David, Jr., Pasadena:  The Early Years (Pasadena, Tex.:  Pomerosa Press, 1993); Kreneck, Thomas H., Del Pueblo:  A History of Houston's Hispanic Community

TAB #19 ***Pasadena Citizen***,  Sept. 10, 1984, Sec 1 Pg 1; *Perez vs PISD*, Oral Deposition.

TAB #20  Pasadena Citizens , MAP, 1991; Pasadena City Charter 1942, Article VIII, Section 4 "Segregation of Races; Texas Penal Code, Art. 288; Texas, General and Special Laws, 1927; Pasadena Chamber of Commerce, "Economic and Demographic Profile," n.p."

TAB#21 Texas, *Penal Code of the State of Texas. Adopted at the Regular Session of the Thirty-Ninth Legislature*, 1925; Texas, Secretary of State city charters and amendments. Archives and Information Services Division, Texas State Library and Archives Commission; Texas, *General and Special Laws of the State of Texas Passed by the Fortieth Legislature at the Regular Session Convened at the City of Austin, January 11, 1927*.  (Jane Y. McCallum, Secretary of State, 1927)

TAB#22 Kavulla Petition; *Houston Chronicle* April 18, 1992 "School Board Reform"

TAB#23 Greene, Casey Edward, "Apostles of Hate: The Ku Klux Klan in and Near Houston, Texas, 1920-1982" MA Thesis, University of Houston, 1995, pp. 30, 41; *Pasadena Citizen*, Oct. 22, 1986 "FBI Investigates;" Nov. 26, 1994 "Inmate Hangs Himself;" May 17, 1980 "Minorities Missing;" April, 1980 "Klansmen, police 'stood up'"

APPENDIX 1   U.S. Commission on Civil Rights.  "Mexican American Education Study"
*Report 1:  Ethnic Isolation of Mexican Americans in the Public Schools of the Southwest*,
1971.

APPENDIX 2   U.S. Commission on Civil Rights.  Vol. 1:  *A Report on the Participation of
Mexican-Americans, Blacks, and Females in the Political Institutions and Processes in Texas*.
1968-1878.   Prepared by Charles Cotrell.  Washington, D.C., 1980.

APPENDIX 3   *U.S. v. Pasadena Independent School District*, 1987

APPENDIX 4   U.S. Congress, 94th Cong., 1st sess. House of Representatives. Report
No. 94-196, ***Voting Rights Act Extension.***  Washington, 1975.