UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **ALBERTO PATINO, et al.,** § | |
| *Plaintiffs*, § | |
| § | |
| **vs.** § | Civil Action No. 4:14-CV-03241-LHR |
| § | |
| **CITY OF PASADENA,** § | |
| *Defendant*. § | |

**<u>DEFENDANT CITY OF PASADENA'S REPLY BRIEF IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4181
Facsimile: (713) 238-7304

By: */s/ C. Robert Heath*
C. ROBERT HEATH
Texas State Bar No. 09347500
Southern District No. 13381
*bheath@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR
DEFENDANTS**

## TABLE OF CONTENTS

Table of Contents ........................................................................................................................... ii

Table of Authorities ..................................................................................................................... iii

I.  A district in which the minority group has an equal opportunity to be elected is appropriately considered in the proportionality analysis ....................................................... 1

    A.  The primary case the plaintiffs rely on to argue that District D—an effective but just short of a majority Hispanic district—should not be considered in the proportionality analysis is inapposite ................................................................. 3

    B.  Summary judgment is appropriate when proportionality is shown even though it is part of the totality of the circumstances analysis ................................... 5

II.  The existing districting plan does not injure the plaintiffs .................................................. 7

III.  The facts are not disputed ................................................................................................. 11

Conclusion .................................................................................................................................. 12

Certificate of Service .................................................................................................................. 14

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*African-American Legal Defense Fund v. Villa*,
   54 F.3d 1345 (8th Cir. 1995) ...................................................................................6, 7

*Bartlett v. Strickland*,
   556 U.S. 1 (2009) (plurality op.) ...........................................................................3, 4, 5

*Fairley v. Hattiesburg, Miss.*,
   122 F.Supp. 3d 553, 579 (S.D. Miss. 2015) ..................................................................11

*Garza v. County of Los Angeles*,
   918 F.2d 763 (9th Cir. 1990) .........................................................................................7

*Johnson v. De Grandy*,
   512 U.S. 997 (1994) ............................................................................................. *passim*

*League of United Latin American Citizens v. Perry*,
   548 U.S. 399 (2006) ................................................................................................5, 10

*Reno v. Bossier Parish School Bd.*,
   520 U.S. 471 (1997) ......................................................................................................10

*Roberts v. Wamser*,
   883 F.2d 617 (8th Cir. 1989) .........................................................................................9

*Rural West Tennessee African-American Affair Council v. McWherter*,
   877 F.Supp. 1096 (W.D. Tenn. 1995), *summ. aff'd sub nom, Rural West
   Tennessee African-American Affair Council v. Sundquist*, 516 U.S. 801 (1995) ................11

*Salas v. Southwest Texas Junior College Dist.*,
   964 F.2d 1542 (5th Cir. 1992) .......................................................................................6

*Steel Company v. Citizens for a Better Environment*,
   523 U.S. 83 (1998) ........................................................................................................8

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ....................................................................................................3, 4

*Tyus v. Bosley*,
   512 U.S. 1249 (1994) (mem.op.) ...................................................................................6

**Statutes**

52 U.S.C. § 10301(b) ..........................................................................................................7

**DEFENDANT CITY OF PASADENA'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

The plaintiffs' brief in response[1] to the city's motion for summary judgment illuminates the agreements and the disagreements of the parties and defines a fairly narrow issue for the Court's decision. The plaintiffs concede that they have the opportunity to elect candidates of their choice in Hispanic-registered-voter-majority districts—in this case, Districts A, B, and C.[2] Thus, the controlling question for the Court to decide is whether District D, where it is undisputed that Hispanics constitute 42.5 percent of the registered voters, 45.3 percent of the citizen-voting-age population,[3] and elect a Hispanic council member who received the support of roughly 90 percent of Hispanic voters[4] is one in which Hispanic candidates of choice have the opportunity to be elected for purposes of the proportionality analysis.[5] Because the answer to that question is yes, then there is proportionality, and the city has established its right to summary judgment.

**I.    A district in which the minority group has an equal opportunity to be elected is appropriately considered in the proportionality analysis.**

While it is true that *De Grandy* judged proportionality in terms of districts with a majority of the relevant minority population (*i.e.,* majority-minority districts), it is not correct, as plaintiffs contend[6], that the Court foreclosed consideration of districts that are equally effective in electing minority candidates preferred by minority residents despite being short of an absolute majority of

---

[1] Plaintiffs' Memorandum of Law in Response to Defendant's Motion for Summary Judgment ("Plaintiffs' Brief"), Doc. 75.
[2] *See e.g.,* Plaintiffs' Brief at 3 (stating that Latino voters had the opportunity to elect in districts in which they had a majority of registered voters), 10 n. 41 (arguing that the proportionality analysis is limited to majority-minority districts and suggesting that whomever is elected from a majority-minority district is the minority choice), 20 (agreeing that Districts A, B, and C are Hispanic-majority districts and posing the issue before the Court as whether District D is an opportunity district); Defendant's Disputed Facts (Doc. 75-1) at 3, ¶ 14(a) (admitting Hispanics have the opportunity to elect in three council districts).
[3] App. 12, 84. Citations to "App." are to the Appendix to the city's motion for summary judgment (Doc. 71-1 to 71-3).
[4] App. 118.
[5] Plaintiffs' Brief at 20.
[6] *E.g.,* Plaintiffs' Brief at 9-10.

1

minority voters. Under the facts of *De Grandy*, the districts at issue had a majority of minority-voting-age population, so the Court necessarily discussed proportionality in terms of majority-minority districts.[7] It went out of its way, though, to emphasize that it did not want to encourage "a tendency to promote and perpetuate efforts to devise majority-minority districts even in circumstances where they may not be necessary to achieve equal political and electoral opportunity."[8] The Court noted that no single statistic is dispositive in determining if minority voting strength is diluted.[9] It expressly recognized that "there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district to elect candidates of their choice."[10] In those circumstances, a jurisdiction can achieve proportionality with districts where the minority group constitutes an effective voting majority even though it may not be an absolute majority.

It would hardly be consistent with the *De Grandy* Court's clearly stated intent to not establish a rigid standard for determining proportionality and to not devise a test that encouraged the creation of majority-minority districts where they were not necessary to achieve political equality for us to read that opinion as limiting the proportionality test to those districts that have a majority of minority voters. For example, if the plaintiffs' hard-and-fast rule were the case, the Texas Ninth and Eighteenth congressional districts (represented by Rep. Al Green and Rep. Shelia Jackson Lee respectively), two undoubtedly "safe" African-American districts, would not be considered in a proportionality analysis arising from a section 2 claim brought by African-

---

[7] The plaintiffs suggest that "*De Grandy* purposefully excluded from the proportionality inquiry a district in which 'black voters, although not close to a majority, are able to elect representatives of their choice with the aid of cross-over votes.'" Plaintiffs' Brief at 9, *quoting, Johnson v. De Grandy,* 512 U.S. 997, 1023 (1994). Under the facts of *De Grandy,* though, African Americans had a proportionate number of Dade County state senate seats without considering the cross-over seat. *De Grandy,* 512 U.S. at 1023. Thus, there was no need for the Court to consider whether the cross-over district should be part of the analysis.
[8] *De Grandy,* 512 U.S. at 1019-20.
[9] *Id.* at 1020-21.
[10] *Id.* at 1020.

2

American voters because the two districts have only 39.6 percent and 41.4 percent African-American voting-age population[11] and no black-citizen-voting-age-population majority.[12]

    A.    **The primary case the plaintiffs rely on to argue that District D—an effective but just short of a majority Hispanic district—should not be considered in the proportionality analysis is inapposite.**

The plaintiffs rely heavily on *Bartlett v. Strickland*[13] to argue that District D, where 42.5 percent of the registered voters are Hispanic[14] and that elects a Hispanic councilmember who received 89.5 percent of the Hispanic vote,[15] cannot be considered in the proportionality analysis because it does not have a Hispanic-registered-voter majority.[16] *Bartlett*, though, does not control this question.

First, it is important to recognize that the language relied on by the plaintiffs represents the views of only three members of the Supreme Court—Chief Justice Roberts and Justices Kennedy and Alito.[17] The Court's judgment—but not its opinion—commanded a majority because Justices Thomas and Scalia concurred in the judgment only and made no comment on the issues discussed in the plurality opinion on which the plaintiffs rely. Justice Thomas and Scalia did not reach the issue of the type of majority required in the *Gingles* analysis because they contend section 2 of the Voting Rights Act does not authorize *any* vote dilution claim and they expressly disagree with the *Gingles* framework.[18] The four dissenting Justices—Souter, Stevens, Ginsburg, and Breyer—all

---

[11] Texas Legislative Council, *District Population Analysis with County Subtotals-Congressional Districts-Plan* C235; found at ftp://ftpgis1.tlc.state.tx.us/DistrictViewer/Congress/PlanC235r100.pdf.
[12] Texas Legislative Council, *American Community Survey Special Tabulation Using Census and American Community Survey Data-Congressional Districts-Plan C235;* found at ftp://ftpgis1.tlc.state.tx.us/CVAP_10_14/PlanC235/PlanC235_RED116_ACS_Special_Tabulation_2010-2014.pdf.
[13] 556 U.S. 1 (2009) (plurality op.).
[14] App. 12, 84.
[15] App. 118.
[16] Plaintiffs' Brief at 11-13.
[17] *Bartlett,* 556 U.S. at 5.
[18] *Id.* at 26 (Thomas, J. and Scalia, J., concurring in judgment).

3

believed that a crossover district[19] would satisfy the *Gingles* test.[20]  Thus, while the judgment in *Bartlett* unquestionably states the law on the specific, narrow issue presented in that case, the rationale set out in the plurality opinion and relied on by the plaintiffs reflected the views not only of a minority of the Court but also of a minority of the seven Justices who wrote on the issue.

The second problem with the plaintiffs' reliance on *Bartlett* is that that case did not address the issue for which they cite it.  *Bartlett* addressed the standard to be used in the first prong of the *Gingles* threshold analysis—*i.e.,* whether the minority group is sufficiently large and geographically compact to be able to constitute a majority in a single-member district.[21]  The purpose of the *Gingles* preconditions is to establish a causal link between the electoral system and the alleged injury.[22]  By linking the plaintiffs' alleged injury to the challenged election system, the plaintiffs establish standing so that satisfying the threshold test is essentially their ticket into the courtroom.  It is only when they have satisfied the three-part *Gingles* test that the plaintiffs can address the ultimate section 2 issue based on the totality of the circumstances.[23]  Even if the three-Justice plurality analysis states the governing legal standard for the threshold test, it does not necessarily, or even logically, apply to the proportionality issue and the totality analysis.  A court may very well be willing to devise a mechanical test for determining eligibility to proceed with a case while eschewing that type of test for the ultimate issue of dilution.[24]  Further, we know in regard to the proportionality analysis, that the Court majority in *De Grandy*, which, of course, *was* addressing the proportionality issue, rejected a strict mechanical application of the type later

---

[19] A crossover district is one "in which the minority makes up less than a majority of the [potential voters], but is large enough to elect the candidate of its choice with help from majority voters who cross over to support the minority's preferred candidate." *Bartlett,* 556 U.S. at 3.
[20] *Id.* at 26-48.
[21] *Thornburg v. Gingles,* 478 U.S. 30, 50 (1986).
[22] *Id.,* at 50 n. 17.
[23] *E.g., Bartlett,* 556 U.S. at 11-12.
[24] *E.g., De Grandy,* 512 U.S. at 1020-21 ("No single statistic provides courts with a shortcut to determine whether a set of single-member districts unlawfully dilutes minority voting strength.").

employed in a different context by the plurality in *Bartlett.* Instead, the *De Grandy* Court took the opposite position on the necessity for an absolute majority when it indicated that majority-minority districts "may not be necessary to achieve equal political and electoral opportunity." [25]

>	B.	**Summary judgment is appropriate when proportionality is shown even though it is part of the totality of the circumstances analysis.**

The plaintiffs suggest that summary judgment is inappropriate since proportionality is just one of several factors going into the totality of the circumstances analysis.[26] While the city does not dispute that the proportionality issue must be considered in the context of the totality of the circumstances, proportionality plays a much more dominant role than the plaintiffs suggest.

The plaintiffs' brief includes a quotation shown as a single paragraph listing proportionality merely as one of the standard factors in the totality analysis.[27] In the actual quotation, though, the Court lists the standard items, which are known as the Senate Report factors and are designed to guide to the totality review, while the reference to proportionality comes in a separate paragraph, suggesting it is something separate and more substantial than simply another Senate-Report-type factor.[28] In fact, it clearly is more substantial. The basic Senate Report factors—*e.g.,* history of discrimination, polarized voting, use of racial appeals in campaigns, etc.—are designed to allow the use of circumstantial evidence to lead the Court to a conclusion on the ultimate issue in the case—whether the minority group has an equal opportunity to participate in the political process and to elect candidates of its choice. Rather than being a puzzle piece, which, when added to other

---

[25] *De Grandy,* 512 U.S. at 1019-20.
[26] Plaintiffs' Brief at 13-18.
[27] *Id.* at 14.
[28] *Compare* Plaintiffs' Brief at 14 *with* League of United Latin American Citizens v. Perry, 548 U.S. 399, 426 (2006). The city does not suggest that the quotation, other than showing it as a single paragraph rather than two, is inaccurate or that there was any intent to mislead. It does believe, though, that the fact that the Court separated the proportionality reference from the list of the Senate Report factors provides some support for the idea that the proportionality analysis is of a different nature than the standard factors listed in the Senate Report. That thematic separation is not shown in the quotation in the plaintiffs' brief.

pieces, will lead to the ultimate conclusion, proportionality provides direct evidence and, except in unusual circumstances, answers that ultimate question. If the minority group has an effective voting majority in a number of districts proportionate to its share of the city's citizen-voting-age population, then, by definition, it has equal opportunity, and there can be no section 2 violation. Indeed, in *De Grandy* the Supreme Court ruled that proportionality resulted in equal opportunity "in spite of that history [of excluding Hispanics] and its legacy, including the racial cleavages that characterize Dade County politics today"—typical issues normally considered in the totality of the circumstances.[29]

Finally, the Eighth Circuit answered the question of whether summary judgment is appropriate in a proportionality/totality analysis when it affirmed the district court's grant of summary judgment on the basis of proportionality in *African-American Legal Defense Fund v. Villa*.[30] Notably, that ruling came after the Supreme Court vacated the Eighth Circuit's earlier judgment and remanded for reconsideration in light of *De Grandy*.[31] Among other things, that court, while recognizing that proportionality was not a safe harbor and was part of the totality analysis, determined that proportionality was entitled to extremely heavy weight even in the presence of evidence of continuing discrimination.[32] Just as the city's brief in support of this motion for summary judgment reviewed all of the types of situations the *De Grandy* Court listed as potentially being sufficient to overcome a finding of proportionality and found they did not

---

[29] *De Grandy,* 512 U.S. at 1014; *see also Salas v. Southwest Texas Junior College Dist.,* 964 F.2d 1542, 1556 (5th Cir. 1992) (finding district with Hispanic-registered-voter majority provided equal opportunity despite prior discrimination, including unemployment, illiteracy, and low income).
[30] 54 F.3d 1345 (8th Cir. 1995).
[31] *Tyus v. Bosley,* 512 U.S. 1249 (1994) (mem.op.).
[32] *African-American Voting Rights,* 54 F.3d at 1356.

apply here,[33] the Eighth Circuit relied on the fact that none of those scenarios listed by the *De Grandy* Court was present there.[34]

II.     **The existing districting plan does not injure the plaintiffs.**

Relying on *Garza v. County of Los Angeles*,[35] a Ninth Circuit case, the plaintiffs suggest that since they have alleged discriminatory intent, a less rigorous showing of actual injury is required.[36] Even if there is some difference between the level of injury a plaintiff is required to show in an intent case versus a results case, these plaintiffs do not meet even that minimal level. *Garza* was emphatic that a showing of injury was required even if there is a showing of discriminatory intent. Specifically, it said that the discriminatory intent must result in the "members [of the minority group] hav[ing] less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[37] The plaintiffs in *Garza* were able to make that showing, but, because Hispanic citizens in Pasadena have an effective electoral majority in a proportionate number of council districts, that is an injury these plaintiffs cannot establish. If you have the opportunity to elect in a proportionate number of districts, then you have equal electoral opportunity.

Because the existence of proportionality is incompatible with a finding of injury, it precludes relief on *any* discriminatory intent claim the plaintiffs might have. Apart from the obvious fact that if the city had intended to discriminate against its Hispanic citizens, it was clearly unsuccessful since the change resulted in increased Hispanic representation on the council and in effective Hispanic electoral majorities in four of the six single-member districts. Any intent claim

---

[33] Defendant's Brief in Support of Motion for Summary Judgment (Doc. 71-4) at 9-12.
[34] *African-American Voting Rights,* 54 F.3d at 1356.
[35] 918 F.2d 763 (9th Cir. 1990).
[36] Plaintiffs' Brief, at 24.
[37] *Garza,* 918 F.2d at 771, *quoting,* 42 U.S.C. § 1973(b) [now 52 U.S.C. § 10301(b)].

7

still must be associated with some injury. Here, the plaintiffs have suffered no injury. If there is no injury, there is no case or controversy, and the Court has no jurisdiction to hear the claim, whether it be one of discriminatory intent or discriminatory effect.[38]

While the issue before the Court boils down to whether District D is a Hispanic opportunity district, the undisputed fact is that it is represented by a Hispanic councilmember who, according to the plaintiffs' expert, is the candidate of choice of 89.5 percent of the District's Hispanic voters.[39] Admittedly, Mr. Wheeler does not have a Spanish surname, although all agree that he identifies as Hispanic.[40] The fact is, though, that he was elected to the predecessor district with 52 percent of the vote in 2013[41] and reelected in 2015 in the current district with 58 percent of the vote in a three-person race.[42] This was despite his opponents spending more than 3.5 times the cost of his entire campaign in an effort to defeat him.[43] The plaintiffs' argument is that Mr. Wheeler wins due only to Anglo votes and that another Hispanic would lose. While anyone who wins that district will have some non-Hispanic votes, the plaintiffs' expert analysis reflects that in every Pasadena non-partisan race he studied involving a Hispanic candidate or a clearly identified Hispanic-favored cause (*i.e.,* opposition to Proposition One adopting a 6-2-1 election system) the Hispanic candidate received a minimum of 28.3 percent of the non-Hispanic vote and sometimes (two out of five races analyzed), a majority of that vote.[44] The undisputed fact that Mr. Wheeler was the choice of almost 90 percent of the Hispanic voters in that district makes plaintiffs' claim that Anglos control the process ring hollow. Because Hispanic candidates can count on picking

---

[38] *E.g., Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998).
[39] App. 118.
[40] Wheeler Affidavit (Doc. 75-12) at 2, ¶4.
[41] Plaintiffs' Exhibit 43 (Doc. 75-9, at 22).
[42] App. 21.
[43] Wheeler Affidavit (Doc 75-12, at 2-3, ¶¶8, 11-13).
[44] App. 118-19.

up almost 30 percent of the non-Hispanic vote, Hispanic voters who constitute 42.5 percent of District D's registered voters, can and do elect the candidate of Hispanic choice.

Here, where plaintiffs admit they have the opportunity to elect in Districts A, B, and C[45] and they do elect their candidate of choice in District D, where is their immediate, currently existing injury? There is none. All the plaintiffs can argue is that a speculative Hispanic candidate, presumably in a future election, could not be elected.[46] In the absence of a currently existing injury and with the prospect only of a potential speculative and highly doubtful injury, the plaintiffs have shown no harm.

On pages 24-25 of their brief in response to the motion for summary judgment, the plaintiffs do list five bullet points that they claim "adversely affected Latino opportunity to elect."[47] In fact, though, none of the listed matters constitute harm in the context of a section 2 claim. In the last bullet, the plaintiffs complain that two Hispanic-preferred candidates were paired when the city went from eight to six single-member districts. Section 2 protects voters, not candidates,[48] but even if that were not the case, there would be no injury here. Although the plaintiffs do not name the paired members of the council, they were Ornaldo Ybarra and Pat Van Houte. Ms. Van Houte ran for an at-large position, and she won, as did Mr. Ybarra in District A.[49] Both continue to serve on the council.

Another of the bullet points complains that the Latino-preferred candidate who lost in the new 2015 District B by 34 votes would have won had the boundaries of the district remained as they were in 2013. While we know that Celestino Perez lost in District B by 34 votes after

---

[45] Defendant's Disputed Facts (Doc. 75-1) at 3, ¶ 14(a).
[46] *E.g.,* Ybarra Affidavit (Doc. 75-13) at 2, ¶5; Harrison Affidavit (Doc. 75-14) at 2, ¶5.
[47] Plaintiffs' Brief at 24-25.
[48] *Roberts v. Wamser*, 883 F.2d 617, 621-23 (8th Cir. 1989).
[49] Plaintiffs' Ex. 36 (Document 75-7) at 139-40.

receiving 47 percent of the total vote[50] and believed he could have won if he could have run before a differently configured electorate, that is nothing but speculation. Nor does the speculation take account of what impact a different configuration of District B would have on other Hispanic-majority districts that would have to be changed to accommodate any reconfiguration of District B. Further, it is hard for the plaintiffs to contend that Hispanic opportunity to elect diminished in District B with the post-2013 changes, since the Hispanic candidate in that district in 2013 received only 18 percent of the vote in a three-way race, missed making the run-off by 90 votes and trailed the leading candidate by 134 votes.[51] Clearly, the Hispanic candidate was much closer to being successful in the 2015 district than in the 2013 version the plaintiffs say they prefer.

The remaining bullet points—a Hispanic opportunity district was eliminated, the number of majority-HCVAP districts declined from four to three,[52] and the larger districts are more difficult for candidates—continue the theme that the replacement of the 8-0-1 system with the 6-2-1 system left plaintiffs in a less advantageous position. Those, however, are retrogression arguments that might have been cognizable under the now-inapplicable section 5, but not under section 2.[53]

Finally, it is interesting to note the plaintiffs' differing treatment of Ms. Van Houte's electoral success. When Ms. Van Houte was elected from the 2013 Hispanic-registered-voter-majority District D, the plaintiffs characterize her as the Hispanic-preferred candidate.[54] In 2015,

---

[50] *Id.* at 139.
[51] Plaintiffs' Exhibt 43 (Doc. 75-9 at 14).
[52] Elsewhere in their brief (Plaintiffs' Brief, Doc. 75, at 5), the plaintiffs, citing Exhibit 48 (Doc. 75-10 at 24), claim the change from the 8-0-1 system to the 6-2-1 system reduced the number of Hispanic-registered-voter-majority districts from four to one. That is incorrect, since it depends on using the 2011 voter list to determine in the districts drawn in 2014 to be used in 2015. When the 2015 voter list is used it shows the three districts have 70.3%, 57.0%, and 54.7% Hispanic-registered-voter majorities. App. 84.
[53] *Reno v. Bossier Parish School Bd.,* 520 U.S. 471 (1997) (discussing the different standards of sections 2 and 5).
[54] Plaintiffs' Brief (Doc. 75) at 3, 25. The brief does not identify the Hispanic-preferred candidates, but it is obvious Ms. Van Houte is among them. On page 25, they refer to two such candidates being paired, and the only two members of the council whom were paired were Ms. Van Houte and Mr. Ybarra. On page 3, the one candidate elected from a

when she is elected at large and is shown by expert testimony to have been supported by 70.6 percent of Hispanic voters, while garnering the votes of only 41.6 percent of non-Hispanic voters,[55] she seems to have become a non-person in the plaintiffs' eyes.  In fact, though, her election is evidence that a person recognized as a Hispanic-preferred candidate and who is not the preferred candidate of non-Hispanics can prevail in an at-large seat and can produce success for Hispanic voters in positions beyond the four that afford Hispanics with proportionality.

### III.  The facts are not disputed.

In a separate document addressing the city's summary of facts,[56] the plaintiffs claim the existence of a dispute in ten categories of facts.  Even a cursory reading of the plaintiffs' list of disputed facts, however, reveals the absence of any factual dispute.  Paragraphs 11 and 19 of that document relate to the issue of whether Hispanics constitute approximately 50 percent of Pasadena's citizen-voting-age population.  The plaintiffs' expert, using the average over the five-year period from 2009-13 computes 45.9 percent.[57]  The city's expert reports the most recent (2014) one-year estimate of 48.1 percent.[58]  There is no dispute that those are the totals reported by the two experts.  The plaintiffs' attempt to create a factual dispute over the issue of whether those totals are "approximately 50%" is simply to try to create a fact issue out of whole cloth, especially since, in the proportionality analysis, a higher percentage benefits the plaintiffs.[59]

---

Hispanic-majority district whom the plaintiffs characterize as not being the preferred candidate is apparently Mr. Leamon, meaning Ms. Van Houte was one of the preferred candidates.
[55] App. 105.
[56] Doc. 75-1.
[57] App. 32-33.
[58] App. 89.
[59] As the evidence reflects a Hispanic-citizen-voting-age population near, although slightly below, 50 percent, the city has used 50 percent as the standard for judging proportionality in Pasadena.  There are cases, however, that suggest all that is required to achieve proportionality is a number of districts that approaches, but does not exceed, the minority group's percentage of the population, *e.g., Rural West Tennessee African-American Affair Council v. McWherter*, 877 F.Supp. 1096, 1107 n. 12 (W.D. Tenn. 1995), *summ. aff'd sub nom, Rural West Tennessee African-American Affair Council v. Sundquist*, 516 U.S. 801 (1995) ("Substantial proportionality exists when a legislature has created the maximum number of majority-minority districts possible without exceeding proportionality."); *Fairley v. Hattiesburg, Miss.*, 122 F.Supp. 3d 553, 579 (S.D. Miss. 2015) (with population split roughly 50-50 and five council seats, strict

The remaining allegedly disputed facts relate to whether the plaintiffs have an equal ability to elect in four districts. They admit that they do in three.[60] Everything else in the allegedly disputed facts relates to the opportunity to elect in District D. There is no dispute that Hispanics currently elect a Hispanic candidate who is the overwhelming choice of Hispanic voters. Similarly, there is no dispute regarding the election returns or other facts. The only dispute is whether a district that contains a substantial, but not-quite-majority of Hispanic voters but that elects the minority candidate of the minority group's choice (*i.e.,* District D) can be considered in the proportionality analysis, and that is a question of law, not of fact.

## Conclusion

The city has established that the 6-2-1 election system provides proportionality. Its motion for summary judgment should be granted.

---

proportionality was not possible, so two seats (40%) would reflect substantial proportionality). While the city has consistently used 50 percent as the proportionality standard, if the plaintiffs want to insist that the Hispanic percentage of the city's citizen-voting-age population does not approximate 50 percent, then there is authority for finding that three seats, which is the undisputed number here, produce substantial proportionality.

[60] Doc. 75-1, at 2, ¶ 14(a).

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-3956
Facsimile: (713) 238-7294

Respectfully submitted,

By: */s/ C. Robert Heath*
    C. ROBERT HEATH
    Texas State Bar No. 09347500
    Southern District No. 13381
    *bheath@bickerstaff.com*
    BICKERSTAFF HEATH
    DELGADO ACOSTA LLP
    3711 S. MoPac Expressway
    Building One, Suite 300
    Austin, Texas 78746
    Telephone: (512) 472-8021
    Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

      This is to certify that on August 9, 2016, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.

                                             /s/ *C. Robert Heath*
                                             C. Robert Heath