1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF TEXAS
                   HOUSTON DIVISION

3   ALBERTO PATINO, et al          .  C.A. NO. H-14-3241
                                   .  HOUSTON, TEXAS
4   VS.                            .
                                   .  AUGUST 24, 2016
5   CITY OF PASADENA, et al        .  8:45 A.M. to 10:27 A.M.

6

7              TRANSCRIPT of MOTION HEARING
           BEFORE THE HONORABLE LEE H. ROSENTHAL
8              UNITED STATES DISTRICT JUDGE

9

10  APPEARANCES:

11  FOR THE PLAINTIFFS:        MR. ERNEST I. HERRERA
                               MS. NINA PERALES
12                             MALDEF
                               110 Broadway
13                             Suite 300
                               San Antonio, Texas  78205
14

15

    FOR THE DEFENDANTS:        MR. CLAUDE ROBERT HEATH
16                             Bickerstaff Heath Delgado
                                 Acosta LLP
17                             3711 S Mopac Expressway
                               Building One
18                             Suite 300
                               Austin, Texas  78746
19

                               MS. KELLY S. SANDILL
20                             MS. KATHRYN K. AHLRICH
                               Andrews Kurth LLP
21                             600 Travis
                               Suite 4200
22                             Houston, Texas  77002

23

24

    Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

1                    APPEARANCES CONTINUED

2

3   OFFICIAL COURT REPORTER:          MS. KATHY L. METZGER
                                      U.S. Courthouse
                                      515 Rusk
4                                     Room 8004
                                      Houston, Texas   77002
5                                     713-250-5208

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             P R O C E E D I N G S

2        *THE COURT:*  Good morning.

3        *MS. PERALES:*  Good morning.

4        *THE COURT:*  Go ahead and state your appearances, and

5   then you can be seated.

6        *MS. PERALES:*  For the plaintiffs, good morning, Your

7   Honor, Nina Perales.  With me is Mr. Ernest Herrera.  And also

8   I would like to introduce our summer law clerk, Ms. Carmel

9   Dooling, a student at the University of Chicago Law School.

10       *THE COURT:*  Oh, welcome, Ms. Dooling.  You're going to

11  be quite well-educated.  In fact, you already are.

12            Thank you.  You may be seated.

13       *MR. HEATH:*  Robert Heath for the City of Pasadena.

14  And with me are Kelly Sandill and Katie Ahlrich.

15       *THE COURT:*  All right.  Thank you.

16            All right.  We have before us the summary

17  judgment motion of the defendants, which I would like to

18  discuss as soon as we discuss a part of the issue -- a part of

19  the puzzle, if you will, that is not perhaps the largest issue,

20  but is going to determine in part what we consider in resolving

21  the larger issues, and that's the challenge to Ms. McCall's

22  information being included in what we consider.  She submitted

23  a declaration, which the defendants themselves say is not

24  essential to but is relevant to their motion particularly

25  relating to the proportionality defense, if you will, that they

1   have asserted under the Senate report factors.  And I propose,

2   therefore, to take up the challenge to her declaration as

3   primarily being untimely disclosed and having to -- or to the

4   extent that it utterly deprived the plaintiffs of any

5   opportunity to conduct any discovery into the basis of the

6   information and opinion statements contained in her

7   declaration.  So let's take that up first.

8                    That is your motion, Ms. Perales.

9            *MS. PERALES:*  Thank you, Your Honor.

10                   Expert disclosures in this case were due on

11  December 16th, 2015.  Discovery closed on May 31st.  The City

12  moved for summary judgment on July 1st, and the City disclosed

13  to the plaintiffs Ms. McCall's and Dr. Rives' geocoded database

14  on August 3rd, earlier this month.

15                   Ms. McCall's declaration is an expert report.  In

16  addition to listing her extensive qualifications, Ms. McCall

17  performed a very sophisticated analysis.  She, as part of her

18  work in database management, assigned citizen voting age

19  population from the U.S. Census from the census block level

20  down -- census block group level down into census blocks, which

21  required a mathematical methodology based on the presence of

22  voting age population.  So she attributed citizen voting age

23  population down into blocks where she did not have that data

24  based on existing voting age population, using a computer,

25  using, as she described in her report, ratios.

1              She also geocoded every registered voter's home

2    from the address listed in the registered voter list onto

3    essentially rooftops that she had present in another database

4    that she had of --

5          THE COURT:  May I ask a seemingly perhaps trivial

6    question?  Is "geocoding" a word unique to this lexicon?

7          MS. PERALES:  Honestly, I do not know, Your Honor.

8          THE COURT:  It's a very useful word.  I'm not

9    quarreling with its application here, but it does seem to be

10   kind of a idiosyncratic term, not exactly a word even.

11         MS. PERALES:  I haven't come across it in other

12   contexts, Your Honor.

13         THE COURT:  Nor have I.  It would be a crossword

14   stumper.

15         MS. PERALES:  And it's a fairly sophisticated thing

16   that you would do in a case like this, where county precinct

17   boundaries are cut by the City's redistricting plan, where you

18   cannot simply take existing data on the number of registered

19   voters or Spanish surname registered voters in a particular

20   precinct, because those folks may be in District A and District

21   B.  And so what Ms. McCall did, using very sophisticated

22   software, was physically map the addresses down onto a map,

23   figure out where the line was, and then figure out who was in

24   which district.

25             She also then proceeded to layer over all of this

1  information the City's old 8-0 redistricting plan.  She also

2  layered on top of this the City's new 6-2 redistricting plan,

3  and then performed what's known as a plan overlap analysis.

4  All of this is something that was done with data that she was

5  able to get ahold of, much of which was public, but which was

6  not clerical in any sense.  Although, as an attorney, I

7  understand what she describes as doing, it's not something that

8  I or any person --

9          *THE COURT:*  You're an attorney with particular

10 knowledge, expertise, and experience in this field.  That makes

11 you an expert able to understand what may be expert work on her

12 part.

13          *MS. PERALES:*  Yes, Your Honor, but I could not do that

14 work.

15          *THE COURT:*  I understand that.

16          *MS. PERALES:*  And so it is true that we knew that

17 Ms. McCall --

18          *THE COURT:*  You couldn't make the computers do that

19 work.

20          *MS. PERALES:*  I could not.  I can work an Excel

21 spreadsheet, but this is far beyond -- far beyond that.

22           Although the plaintiffs knew of Ms. McCall's

23 existence and her identity and we knew that she had some

24 knowledge of the facts of the case, she was not listed in the

25 initial disclosures by the City and she was never disclosed as

1  an expert witness.

2          Dr. Rives discussed Ms. McCall's work in his

3  deposition, and we took him at his word.  He said that she

4  prepared the database under his direction and that she gave it

5  to him for his analysis.  And he very clearly limited his

6  analysis with that data to the City's 6-2 redistricting plan

7  and citywide demographics.

8          We did not know that Ms. McCall would perform

9  additional analysis, including of the 8-0 redistricting plan

10  that existed before.  We did not know that she would do also a

11  plan overlap analysis on the dataset that she prepared for

12  Dr. Rives.  And we did not know that she would testify until

13  July 1 when we saw the declaration.

14          *THE COURT:*  How are you prejudiced by the untimely

15  surfacing of her declaration?

16          *MS. PERALES:*  Plaintiffs would want the opportunity to

17  respond to the conclusions that are presented by Ms. McCall.

18          *THE COURT:*  Would you need her deposition?

19          *MS. PERALES:*  We would need her deposition.  We would

20  need an opportunity for Mr. Ely to perform his own analysis on

21  the recently disclosed geocoded database; and then, in

22  fairness, the City would probably want an opportunity to depose

23  Mr. Ely on his conclusions or his rebuttal report.

24          *THE COURT:*  To the extent it was new?

25          *MS. PERALES:*  To the extent that he has a different

1  view of things.

2           THE COURT:  Right.

3           MS. PERALES:  The only issue in terms of a

4  continuance, and this is a second prejudice that was perhaps

5  not well-articulated in our original motion, is that the next

6  City election is coming up in May of 2017.  If we push the

7  trial into November, it will give the Court very little time to

8  rule.

9           THE COURT:  No, I appreciate that.  And when does

10 early voting in that election begin?

11          MS. PERALES:  More importantly, candidate filing

12 opens --

13          THE COURT:  Right.

14          MS. PERALES:  -- in January, I believe.  Is that --

15          THE COURT:  January?

16          MS. PERALES:  January.

17          THE COURT:  So we really have a hard stop of happy

18 new -- of January 1 --

19          MS. PERALES:  Yes.

20          THE COURT:  -- to resolve the map?

21          MS. PERALES:  Judgment and remedy.

22          THE COURT:  Right.  Okay.  Which mandates, if summary

23 judgment is denied, keeping the current trial schedule and

24 simply allowing some additional discovery, if I agree with your

25 position on Ms. McCall, between now and when the docket call is

1    set to occur.

2          *MS. PERALES:*  That is in about four weeks, Your Honor.

3    Docket call is September 26.  We're not sure that it's humanly

4    possible for Mr. Ely to receive the geocoded database --

5          *THE COURT:*  Even if we extended docket call two more

6    weeks and try to hold the trial in early November?  That would

7    probably work.

8          *MS. PERALES:*  Well, we would have to take Ms. McCall's

9    deposition almost immediately.

10         *THE COURT:*  Yes.

11         *MS. PERALES:*  And then Mr. Ely would have maybe --

12   well, without a transcript, I mean, we would be looking at

13   getting the transcript in two weeks.

14         *THE COURT:*  You can get a transcript on an expedited

15   basis, I suspect, and I don't mean to be facetious or suggest

16   that this would be necessary, but there's a reason they call it

17   Labor Day.

18         *MS. PERALES:*  Yes, Your Honor.  I've been there with

19   that.

20         *THE COURT:*  We may be working.

21         *MS. PERALES:*  Thank you, Your Honor.

22         *THE COURT:*  And I hope that's not necessary, but

23   clearly there will -- in order to meet -- unless summary

24   judgment is granted on all grounds, ending the case entirely,

25   everybody is going to have a significant amount of work to do

1   between now and happy new year.

2          *MS. PERALES:*  Thank you.

3          *THE COURT:*  Thank you, I think.

4              Your response on Ms. McCall, please.

5              It seems to me that your response is -- on the

6   written material, focuses on the fact that there was some

7   information about her involvement known to the plaintiffs

8   before you said anything -- your people said anything, because

9   they themselves disclosed the existence of Ms. McCall and the

10  fact that she had some relevant knowledge, although not

11  necessarily relevant to the particular conclusions she has

12  proffered, number one.  And, number two, that during the

13  depositions of other witnesses in this case, your witnesses,

14  the fact that Ms. McCall played a role in number crunching was

15  revealed.

16         *MR. HEATH:*  That's exactly correct, Your Honor.  They

17  revealed her as a witness with relevant knowledge.  They know

18  who Ms. McCall.  They --

19         *THE COURT:*  They being the plaintiffs?

20         *MR. HEATH:*  They being the plaintiffs.  We have

21  litigated.  They have known Ms. McCall for years, and they know

22  what her role is.  But it's -- and then in the deposition --

23  well, first, let me back up a second.  In their original motion

24  they said, Well, we knew who she was, but we thought that she

25  was going to testify about election returns.  And that was just

1  a misreading of their own document, because if you go and look

2  at their document on page -- well, whatever --

3          *THE COURT:*  Which document?

4          *MR. HEATH:*  -- it is, they describe the knowledge of

5  each person --

6          *THE COURT:*  All right.  The initial disclosure?

7          *MR. HEATH:*  The initial disclosures, that's right.

8  Thank you, Your Honor.  They describe the knowledge of each

9  person and they had Stan Stanart and another person from the

10 Election Division at the Harris County Clerk's Office, and they

11 said the above persons, Mr. Stanart and the other person, whose

12 name escapes me right now, have knowledge about election

13 returns.  The next person on the list -- that was Item G.  The

14 next person, Item H, was Ms. McCall.  And under her name it

15 says she knows about drafting redistricting plans.

16         So, in the original motion they said, "We thought

17 she was going to talk about election returns."  That's not what

18 they had originally said at all in their initial disclosures.

19 They knew she knew about the redistricting plans.  But they,

20 going back after the fact, just pulled the wrong thing out of

21 their disclosures.

22         Now, Mister -- when they deposed Dr. Rives, they

23 asked, "Did you do the geocoding?"  He said, "No, Ms. McCall

24 did."  He also said, "Did you do the Spanish surname match?"

25 He said, no, Ms. McCall did both of those under his direction.

1          So, she was disclosed.  First, they knew it.

2    Second, there was supplementation through the deposition, which

3    under the rule that is permissible supplementation of the

4    initial disclosure.  The big question, which really I think

5    developed more in their reply, is whether she is an expert.  I

6    don't think that she is an expert.  She does not offer any

7    opinion.  She's just presenting some facts.  In the initial

8    argument of their motion, they said she's an expert, and they

9    gave two opinions that she offered, both of them from the same

10   paragraph in her declaration.  And one was that almost all of

11   the former District E was now contained in District D.  And

12   that's because in the document -- or the data she presented,

13   92.4 percent of the people that live there ended up in the new

14   district.  So, she said almost all.  92.4, almost all.

15          The other opinion that they said she offered was

16   that the two districts, the former District E and new District

17   D are similar demographically.  And that's because the data

18   showed that they had similar percentages of Hispanic voting age

19   population, citizen voting age population, and Spanish surname

20   registered voters.  They were within about a percentage point

21   or so of each other on every one of those categories.  I don't

22   think that's an opinion.  That's just stating a fact, and a

23   fact that's borne out by the data she presented.

24          Now, is that a complicated process to present

25   that data?  There may be some complication to it, but it's not

1   something that requires expertise.  And I go back thinking to

2   the first time --

3          *THE COURT:*  What's the dividing line?

4          *MR. HEATH:*  I beg your pardon?

5          *THE COURT:*  What's the dividing line between a little

6   complicated but not complicated enough to be -- to be

7   considered the stuff of expert testimony?

8          *MR. HEATH:*  Well, I think the dividing line is whether

9   it requires --

10         *THE COURT:*  In this case what's the dividing line?

11         *MR. HEATH:*  -- some special expertise.  And when I say

12  it's a little complicated, there are a lot of numbers involved.

13  And in my response I mention what she's doing on what I think

14  is the most complicated part, which is matching the names to

15  the Spanish surname list and geocoding the addresses.  And

16  basically what that is, is you look at the list that the Harris

17  County registrar puts out.  It has the person's name and the

18  addresses, registered voter.  You look at the name.  Let's say

19  it's Gonzalez.  You look at the Spanish surname list, which is

20  published by the Census and it's in alphabetical order.  You go

21  down to the Gs, and Gonzalez, of course, is a Spanish surname

22  and you check it off as being a Spanish surname.  That requires

23  no expertise.  Now, it may be a little complicated, because

24  there are a lot of names on the list.  There are a lot of

25  registered voters, but it's an easy process.

1          The next thing you do is you look at the address

2     of the person, 123 Avenue D, whatever it happens to be.  And

3     you look at the map and see if avenue -- 123 Avenue D is in the

4     old District B or the old District E.  And if it is, you make a

5     mark.  And then you go down to the next name and do the same

6     thing.  And it requires no expertise to do that.

7          At the end of the day, you go back and you count

8     up all the Spanish surnames that are in the District D.  You

9     match, you locate on a map, and you count.  And that's what it

10    is.  Now, because it's so big and because the data are

11    available digitally, you end up doing it on a computer, but

12    that's all that's happening.  It's much the same sort of thing,

13    when I first got involved in redistricting, I was a legislative

14    aide, State Senate aide in 1971.  And the Harris County state

15    senators, Democratic state senators, one of whom I worked for,

16    their aides were instructed to get together and try and draw

17    some state Senate districts.  Of course, the real decision was

18    being made way above our pay grade, but we were doing that.

19    And it's the same sort of thing we were doing there, except we

20    were doing it with adding machines, not computers.  So it's not

21    something that --

22         *THE COURT:*  So this is just the abacus on steroids?

23         *MR. HEATH:*  It wasn't an abacus, but I think it was

24    one of those adding machines where you had a crank on it rather

25    than the --

1          *THE COURT:*  But what we're doing now, what you're
2    saying, is not different in kind, merely in -- not even
3    methodology, it is simply in the device used to accomplish it?
4          *MR. HEATH:*  That's correct.
5          *THE COURT:*  I'm not sure I agree.  It seems to me that
6    the computer and its not only speed of performing arithmetic
7    computations, but its ability to synthesize and through
8    logarithms make -- not exactly inferences, but put information
9    together that allows a picture to be drawn that simply adding
10   up numbers would not permit you to draw.  I think it is a
11   little bit different because of the use of algorithms to
12   predict outcomes and identify trends.
13         *MR. HEATH:*  All right.  With all due respect, Your
14   Honor --
15         *THE COURT:*  I've reached beyond the limits of my
16   expertise.  And it does seem to me that the kind of conclusions
17   she draws from the work she has asked the computer to do is
18   different from simply the computer equivalent of adding columns
19   of numbers and coming up with an arithmetic result.  And that's
20   my only point, a limited one.
21         *MR. HEATH:*  Right.  And I would --
22         *THE COURT:*  And it is not really specific to the issue
23   here.
24         *MR. HEATH:*  Right.
25         *THE COURT:*  It does bear on the nature of the

1  expertise as much as its existence.

2          *MR. HEATH:*  The particular task done here -- and let

3  me say that I do not pretend to be a computer expert either.

4  And I think all the things you mention can be done by computer;

5  and if we were talking about the political science experts, who

6  do all their work on the computer, what you say, I think, would

7  be exactly right.  But on this particular one, I think this is

8  just a matching program and the geocoding, I don't know how you

9  would describe that, but it takes -- the computer takes the

10 address and it sticks it on the map.  It essentially puts a

11 dot on -- a computerized dot on the map and then it counts.

12          Now, there is one other thing -- and I want to

13 make sure I didn't gloss over this, and Ms. Perales mentioned

14 it, is that it does assign -- there is an assignment of citizen

15 voting age population to census blocks, and that does involve a

16 ratio.  Again, it's a pure simple mathematical analysis -- it's

17 not an analysis.  That's too much.  Application.  If half the

18 voters in a census block -- half the Hispanic voting age

19 population in a census block resides in a particular block, you

20 assign half the citizen voting age population.  If 25 percent

21 do, you assign half -- 25 percent of the citizen voting age

22 population.  That's all that is.  So, that's all that's going

23 on here.

24          Now, as you mentioned -- or as I mentioned and

25 you mentioned at the beginning, we agree that this is not

1   essential to the case.  It's supportive.  It's helpful.  It's
2   relevant.  What it does in relation to the motion for summary
3   judgment is that it says that the old District E is very
4   similar to the new District D.  Most of the data for that, as
5   is reflected in the table that -- in my response, where I took
6   her table and then showed where elsewhere in the summary
7   judgment proof the same data exists, is already in the record.
8   There are a few things that aren't, but most everything is.
9   But it just says that the old district, which is 92 percent
10  contained in the new one, is pretty much the same as the new
11  one.  And that's relevant, because it shows that Mr. Wheeler,
12  who is Hispanic and is elected from District D, has been
13  elected twice.
14          *THE COURT:*  You're going in -- okay.  All right.
15          *MR. HEATH:*  And so that's the only reason that it's
16  relevant.
17          *THE COURT:*  Okay.  All right.
18          *MR. HEATH:*  But I don't believe this is expert
19  testimony.  I don't think there's any need for a continuance.
20  I think the Court could reach the same conclusion looking at
21  the record that's elsewhere in the summary judgment proof,
22  almost all of which comes in through their expert and their
23  expert report, which we put into evidence, or the various
24  exhibits that they put in, and can essentially look at the map.
25  And, again, on the map, Ms. McCall, the only thing she did is

1  took one map that's in evidence, took the other map that's in

2  evidence, put them to the same scale and put one over the other

3  to make it easier to see.  But you can just look at the map and

4  tell that they're essentially the same thing.  You can't tell

5  it's 92.5, but you can tell it's around 90 percent.

6          *THE COURT:*  Thank you.

7          *MR. HEATH:*  So I think that this is not expert

8  testimony.  She has been revealed, her existence, and what she

9  would testify to has been revealed at least through the

10 supplementation process, and we think that the evidence comes

11 in.

12         *THE COURT:*  All right.  Thank you.  Let me hear

13 briefly from Ms. Perales on this.

14         *MS. PERALES:*  Briefly, Your Honor.  The parties used

15 demographers in these types of cases and did here, to testify

16 to the facts related to population, voting age population,

17 citizen voting age population, and even Spanish surname voter

18 registration, whereas here those people must be found in

19 districts that cut precinct boundaries.  Mr. Ely and Dr. Rives

20 did this expert work in this case.  They produced reports in

21 December of last year.  They were deposed.

22         If Dr. Rives had included a plan overlap analysis

23 in his report in December of 2015, the plaintiffs would have

24 had notice and been able to talk with him about that and

25 provide a rebuttal report, if necessary.  But the exact

1 opposite happened here.  Dr. Rives said he wasn't going to look

2 at the 8-0 plan.  He would make no analysis of the Hispanic

3 citizen voting age population in the 8-0 plan and no analysis

4 of Spanish surname registered voters in the 8-0 plan.  That by

5 definition foreclosed a plan overlap analysis, and the

6 plaintiffs took him at his word.

7           The City does not address the fact that it didn't

8 disclose the geocoded database until August 3rd, after the

9 plaintiffs filed their response to the motion for summary

10 judgment.  We're not saying that this was intentional.  It just

11 happened.  Demographers use different techniques to estimate

12 population, as the City agrees in its response, without access

13 to the geocoded database, and nobody had it until it was

14 revealed to us on August 3rd.  We simply didn't have the same

15 information that the City had to even talk about plan overlap.

16 Thank you.

17           *THE COURT:*  Thank you.

18           All right.  I think I'm ready to rule on this

19 point.  I take the City at its word, that this is not essential

20 to its summary judgment motion and that there is no need for a

21 continuance of that motion in order to address it, even if I

22 exclude Ms. McCall's declaration.  And I do think that the

23 facts of the discovery that occurred, the timing of the

24 discovery that occurred and the extent of the discovery and

25 disclosures that occurred, not only warrant but almost require

1  exclusion, to avoid prejudice.

2            Again, I am not finding any kind of nefarious or

3  suspicious intent to withhold here at all.  Please do not take

4  what I say as indicating that in any way.  But the effect has

5  been to deprive the plaintiffs of information necessary to

6  fully understand what Ms. McCall did, the basis of it, and its

7  import for the case.  Her conclusion about the similar

8  demographic composition of the current District E and former

9  District D is not trivial by any means.  It does bear on some

10 of the most essential aspects of the argument that the

11 defendants have made, even if it is not essential to the

12 summary judgment motion.  It is certainly germane to the

13 proportionality determination that the defendants have asked us

14 to rely so heavily -- to make in their favor and then to rely

15 so heavily upon, to put such weight on.

16            The information that was available before the

17 disclosure of her declaration in the belated material about her

18 existence, what knowledge she did have, and what role she might

19 play in the case, was both indeterminate and sketchy, too

20 indeterminate and too sketchy to provide the plaintiffs with

21 sufficient information to be aware of the extent to which

22 Ms. McCall would perform work, including the geocoding, the

23 extent to which it implicated expert work as opposed to

24 clerical, and the extent to which it could bear on the issues

25 and arguments that have been presented in the case.

 1              So, I am going to grant the motion that the

 2     plaintiffs have filed, asking me not to consider it as part of

 3     the competent summary judgment record before me at this stage

 4     of the case.   That does not prevent the plaintiffs -- prevent

 5     the defendants from considering -- from presenting it again or

 6     presenting Ms. McCall a witness, if I deny summary judgment and

 7     there is a bench trial on the Section 2 allegations, the

 8     Fourteenth Amendment allegations, and the issue of a remedy.

 9     That's my ruling.   So the motion is granted to that extent.   I

10     would note that the defendants' own argument says that even if

11     I did consider -- that even without considering it, I should

12     reach the same outcome.

13              *MR. HEATH:*   Yes.

14              *THE COURT:*   And that considering it would not change

15     the outcome in any way.

16              And at this time I think we are ready to move to

17     the outcome issue, that is, the summary judgment motion.   And

18     this is the defendants' motion.

19              *MR. HEATH:*   I may at some point put something on the

20     Elmo.   Do you prefer where I stand or --

21              *THE COURT:*   I don't care, as long as everybody can see

22     and hear you.

23              *MR. HEATH:*   Let's see, is this --

24              *THE COURT:*   Got it?

25              *MR. HEATH:*   Thank you, Your Honor.   We bring this

1  motion for summary judgment.  Most --

2          THE COURT:  Thank you, Steven.

3      MR. HEATH:  -- voting right cases are typically pretty

4  fact intensive and have dueling experts and sometimes take a

5  lot of time, have demographic political science experts.  And

6  they also require the plaintiff to prove up the *Gingles*

7  three-point test about whether they can draw a district that

8  has a majority of the voting -- citizen voting age population,

9  whether the population is politically cohesive, whether white

10 majority votes as a bloc, usually to defeat the minority

11 choice.

12          But in this case it is relatively unique in that

13 the experts pretty much agree.  If you look at the two expert

14 reports or the expert reports from both sides, there's not a

15 lot of difference in them.  Certainly on the numbers, I think

16 the parties agree.

17      THE COURT:  Well, I think that the plaintiffs have

18 filed a helpful statement of where they don't agree that

19 certain things are undisputed.

20          MR. HEATH:  Well, that's correct.  We can --

21          THE COURT:  Do you disagree with their description?

22          MR. HEATH:  And we can certainly go through those.

23      THE COURT:  Well, at some point we need to, I agree

24 with you.  Do you disagree with any aspect of that description?

25          MR. HEATH:  Yes, I do.  And if you want, I can go

1  through those right now, each one.

2          THE COURT:  Okay.

3          MR. HEATH:  Let me --

4      (Judge conferring with law clerk.)

5          THE COURT:  I've got it.  I've got it.  So defendants'

6  undisputed facts are laid out.  Do you disagree that those are

7  undisputed?

8          MR. HEATH:  Or that they are particularly relevant.

9          THE COURT:  That's not the issue right now.  The issue

10 is whether they are disputed.

11         MR. HEATH:  I think that --

12         THE COURT:  We'll talk about the extent to which

13 they're important, but that's not what I'm focusing on right

14 now.

15         MR. HEATH:  Well, the first thing they mention is that

16 their expert says that 45.9 percent, I think it is, of the

17 population -- citizen voting age population is Hispanic, and we

18 say approximately half.  I don't think there's any dispute or

19 any difference between those.  The -- there is a question -- do

20 you want me to go through each of these?

21         THE COURT:  Well, I just need to know, there's a first

22 sort of tranche, one through ten, are they all undisputed?

23         MR. HEATH:  One through ten they say are undisputed --

24         THE COURT:  And you agree?

25         MR. HEATH:  -- and we agree they're undisputed.

1       THE COURT:  Okay.  Look at the disputed facts.

2       MR. HEATH:  Right.

3       THE COURT:  Do you think that any of those should, in

4  fact, be in the undisputed column?

5       MR. HEATH:  All right.  The first one, where the

6  45.9 percent is less than or is approximately half rather than

7  less than half, I don't think there's a dispute.  It's

8  approximately half.  It is less obviously.  We don't dispute

9  the number.

10          The next question, I don't dispute what they say,

11  that these were the people elected to the council.  I say that

12  two Hispanics were elected to the council before the new plan

13  went into effect and three after.  I don't think either of us

14  disagree with that.

15       THE COURT:  I think the question is, who is the -- is

16  what is -- here the issue is relevance.

17       MR. HEATH:  Right, the issue is relevance.

18       THE COURT:  Right.  Okay.  That sounds fine.

19       MR. HEATH:  And I think that's irrelevant.

20       THE COURT:  All right.  But there's no dispute as to

21  the statements of fact laid out, correct?

22       MR. HEATH:  Right.

23       THE COURT:  Do you disagree with that, Ms. Perales?

24       MS. PERALES:  Yes, Your Honor.

25       THE COURT:  Okay.  Very good.  13?

1          *MR. HEATH:*  Okay.

2          *THE COURT:*  Again, this goes to relevance.

3          *MR. HEATH:*  I think that's correct.  Well, let's

4     see --

5          *THE COURT:*  Well, no, actually --

6          *MR. HEATH:*  No, it --

7          *THE COURT:*  -- it's a proposition --

8          *MR. HEATH:*  I think we do have a dispute as to whether

9     there's a --

10          *THE COURT:*  No, I disagree, but --

11          *MR. HEATH:*  And that is the sole dispute really.

12          *THE COURT:*  It is, but it's mixed law and fact,

13     because it makes an assumption about what is the proper

14     comparison to make, that is, is it the opportunity to elect

15     candidates that is proportional or is it the number of

16     districts that are proportional that are majority-minority.

17          *MR. HEATH:*  Right.

18          *THE COURT:*  And I think that's the legal issue that's

19     intertwined with 13.

20          *MR. HEATH:*  That's right.

21          *THE COURT:*  It's a blended issue of law and fact.  All

22     right.  And there's a dispute as to the legal issue.

23          *MR. HEATH:*  Right.

24          *THE COURT:*  And therefore the conclusion.

25               All right.  14?

1              *MR. HEATH:*  In 14 they say that they do not have the

2    opportunity to elect in D.

3              *THE COURT:*  Right.

4              *MR. HEATH:*  We disagree with that.

5              *THE COURT:*  Because of the coalition.

6              *MR. HEATH:*  And we're going to argue about that.

7              *THE COURT:*  And your argument is the coalition?

8              *MR. HEATH:*  That's right.

9              *THE COURT:*  All right.  But not without the --

10             *MR. HEATH:*  And 15, let's see --

11             *THE COURT:*  15 is the same thing.

12             *MR. HEATH:*  I think this is irrelevant.

13             *THE COURT:*  It's the argument of the -- well, it's

14   relevant to the dilutive effect that the plaintiffs assert of

15   the change to District B.

16             *MR. HEATH:*  Well, except that they say that District B

17   is one -- they say in their response, that in those three

18   districts, A, B, and C --

19             *THE COURT:*  No, it's majority-minority, but it's

20   bigger --

21             *MR. HEATH:*  Right.  That they have an opportunity --

22             *THE COURT:*  Sure.

23             *MR. HEATH:*  -- in those.

24             *THE COURT:*  No, it's majority-minority, no question,

25   of Hispanic citizen voting adult population.

```
 1            MR. HEATH:  Right.
 2            THE COURT:  Nobody --
 3            MR. HEATH:  Nobody disputes that.
 4            THE COURT:  -- disputes that.  Okay.  Good.
 5            MR. HEATH:  Okay.  In 16 --
 6            THE COURT:  16.
 7            MR. HEATH:  -- District D is a district in which
 8  Hispanics will elect --
 9            THE COURT:  That's the coalition.
10            MR. HEATH:  That's a dispute.
11            THE COURT:  That's the dispute over the
12  coalition's role?
13            MR. HEATH:  That's right.  That's what we're --
14            THE COURT:  All right.
15            MR. HEATH:  -- going to talk about.
16            THE COURT:  17?
17            MR. HEATH:  17 --
18            THE COURT:  That's McCall.  That's not in the case.
19  That's gone.
20            MR. HEATH:  That's right.  You know, it's not
21  essential to the case.
22            THE COURT:  It's not the case at this time because her
23  declaration is not competent summary judgment evidence because
24  of the delay in disclosure and the prejudice that results.
25            MR. HEATH:  Right.  Although --
```

1           THE COURT:  It may be in the case later, but it's not

2     now.

3           MR. HEATH:  All right.  I don't think you need to

4     determine that.  I think you can determine much of that just by

5     looking at the stuff that is in the record, without looking at

6     her declaration, but still you don't have to decide that.

7           THE COURT:  Okay.

8           MR. HEATH:  18, let's see.  Well, again, I think we

9     have a dispute on that, as to whether District D is one where

10    there is a working coalition.  But that is the dispute in the

11    case.

12          THE COURT:  Right.

13          MR. HEATH:  19, again, they're making a point that

14    this is -- the experts say it's less than half.  I'm saying

15    approximately half.  Saying approximately half is beneficial to

16    them.  I'm happy to say it's less than half.  There's no

17    dispute of the facts.

18          THE COURT:  All right.

19          MR. HEATH:  20, they say they don't know what we're

20    talking about.  They're unable to respond, because it doesn't

21    state the facts.  They're not in dispute.  Basically the

22    relevant facts are census data, election returns, historical

23    fact.  I don't think that this is something where they have --

24    that they are saying there was a disputed fact there, the way I

25    read 20.

1          *THE COURT:*  All right.  Thank you.

2          *MR. HEATH:*  Okay.

3          *THE COURT:*  Response?

4          *MR. HEATH:*  All right.

5          *THE COURT:*  Oh, wait.  Okay.

6          *MR. HEATH:*  Were you --

7          *THE COURT:*  No.  Go ahead.

8          *MR. HEATH:*  Oh, I'm sorry.

9          *THE COURT:*  Any disagreement on any of that?

10          *MS. PERALES:*  Your Honor, only as to the very last

11    statement of fact, No. 20.  It was a statement of fact saying

12    that -- characterizing facts, and so we simply just weren't

13    able to understand it.  We couldn't agree to it or disagree

14    with it, so we just left it there.  If the assertion is that

15    the sum total of relevant facts are contained in this list, we

16    would disagree, because we believe that lay witness testimony

17    and expert witness testimony have an important role in the

18    case.

19          *THE COURT:*  All right.  Thank you.

20          *MR. HEATH:*  Well, in this case we are willing to

21    concede for the purpose of summary judgment here -- or the

22    summary judgment motion, not for the whole case, but for the

23    purpose of the summary judgment motion, that the plaintiffs can

24    prove the first -- the three elements of the *Gingles* threshold

25    test, which gets us into the courthouse and gets us to the

1 ultimate issue, which is does the plaintiff group, Hispanics in

2 this case, have an opportunity equal to the rest of the

3 electorate, to participate in the political process and to

4 elect candidates of their choice.  And that's the ultimate

5 issue that has to be decided, and that's the one that they

6 cannot meet.

7         In 1994 the Supreme Court in *Johnson versus*

8 *De Grandy* talked about that exact issue and came up with the

9 proportionality test.  In that case the lower court had found a

10 violation of Section 2.  But it got to the Supreme Court, and

11 the Supreme Court said, We don't see how it is possible if

12 you're looking at a set of districts, where the minority group

13 in that case is predominantly Hispanic -- actually there were

14 two groups there, but have effective voting majorities in a

15 number of districts that is proportionate to their percentage

16 in the voting age population.  And voting age population was

17 the measure they were using to consider.  So if you have a

18 proportionate number of districts where you have effective

19 voting majorities, then you have equal opportunity.

20         *THE COURT:*  Number of districts?

21         *MR. HEATH:*  Number of districts.

22         *THE COURT:*  Do you agree that that's the critical

23 basis for determination of proportionality?

24         *MR. HEATH:*  That's right.

25         *THE COURT:*  Okay.

1    *MR. HEATH:*  And --

2    *THE COURT:*  And it's not the number of candidates

3 elected.  It's the number of districts?

4    *MR. HEATH:*  That's exactly right, and that's the

5 difference between proportionality and --

6    *THE COURT:*  I don't think that's what you did in your

7 argument.  I think you did not focus on the number of

8 districts, unless you consider District D as a coalition

9 district to provide --

10    *MR. HEATH:*  Yeah, right.

11    *THE COURT:*  Okay.  And so --

12    *MR. HEATH:*  Certainly I do consider District D --

13    *THE COURT:*  -- I think the argument depends on

14 accepting that.

15    *MR. HEATH:*  That's exactly correct.

16    *THE COURT:*  So at this time I suggest you move to that

17 argument, without which you cannot succeed.

18    *MR. HEATH:*  Okay.  We go to District D.

19    *THE COURT:*  I'm at District D.

20    *MR. HEATH:*  And in District D -- well, let me just --

21 I'm going to throw -- just so that we can see -- and this is a

22 map that was in Dr. Rives' report.  It's in the summary

23 judgment proof.  Except that for convenience, I've overlaid the

24 district lines so you can see.  But A, B, and C have very

25 heavily Spanish -- Hispanic citizen voting age population

1   percentages.  District D does as well, not quite as much.  And
2   specifically if you look at the districts -- this is Table 1
3   from our report.  District D has 42.5 percent Hispanic citizen
4   voting age population.  And I will just mention here that I
5   will probably be talking about, and I suspect Ms. Perales will
6   be talking about, CVAP, which is the acronym for citizen voting
7   age population.
8           THE COURT:  Sure.  I think everybody understands that.
9           MR. HEATH:  It saves a lot of time.  It's a 43.5
10  percent CVAP district.  That district in 2015 elected a
11  Hispanic.  Now, it's a Hispanic without a Spanish surname, Cody
12  Ray Wheeler, but he is Hispanic.  He identifies as Hispanic.
13          THE COURT:  He was also the incumbent, correct, at
14  that --
15          MR. HEATH:  Well, he was the incumbent, but he was
16  elected the first time in 2013 and thereafter --
17          THE COURT:  But he was the incumbent at the time of
18  his election?
19          MR. HEATH:  That's correct.
20          THE COURT:  Okay.
21          MR. HEATH:  He had been elected --
22          THE COURT:  He was also targeted by --
23          MR. HEATH:  -- in a similar district in the past.
24          THE COURT:  He was also targeted my Mayor Isbell for
25  defeat, correct?

1           *MR. HEATH:*  He was targeted for defeat.  They spent

2    three and a half times as much as he did.

3           *THE COURT:*  Right.

4           *MR. HEATH:*  He --

5           *THE COURT:*  And some of it was what I would call -- it

6    was a campaign that was aimed at non-Hispanic surname voters?

7           *MR. HEATH:*  I don't know that the evidence shows that,

8    and that PAC --

9           *THE COURT:*  Well, I'll let Ms. Perales speak to that

10   as well.  Go ahead.

11          *MR. HEATH:*  -- supported Hispanic and non-Hispanic

12   candidates.

13          *THE COURT:*  I understand.  But I'm talking about this

14   particular campaign.

15          *MR. HEATH:*  But he -- he won.  They spent at least

16   three and a half times as much as he spent.  It was a three

17   person race.  He got 58 percent of the vote.  He got 55 percent

18   of the Anglo -- well, of the non-Hispanic vote.  Sometimes we

19   may slip and say "Anglo vote," but what the experts have done

20   is look at Hispanic versus non-Hispanic.  Most of that's going

21   to be Anglo, but it's the non-Hispanic.

22          *THE COURT:*  In this area is there a significant Asian

23   population, for example?

24          *MR. HEATH:*  No, or not a significant black population.

25          *THE COURT:*  So it is the Anglo vote?

1           *MR. HEATH:*  Right.  So, anyway, he actually carried

2      the Anglo vote.  But in Pasadena, of all the races studied by

3      the plaintiffs' expert, the Hispanic candidate or Hispanic

4      measure, identified measure, never got less than 28 point, I

5      think it's 3, a little under 30 percent of the non-Hispanic

6      vote in any election citywide.  So presumably a Hispanic

7      candidate can expect to get 30 percent or more of the vote.

8      Mr. Wheeler got 55.

9           *THE COURT:*  Of which vote?  The --

10          *MR. HEATH:*  Of the non-Hispanic vote.

11          *THE COURT:*  But it depends on that coalition?

12          *MR. HEATH:*  And that --

13          *THE COURT:*  Is that correct?

14          *MR. HEATH:*  And in that district, he got 55.

15          *THE COURT:*  But it depends on attracting that

16     coalition, correct?

17          *MR. HEATH:*  That's right.  But he did.  And he is a

18     Hispanic candidate of choice.  He got 89.5 percent of the

19     Hispanic vote.  There's no question --

20          *THE COURT:*  Would he have won absent the coalition

21     for -- that is, absent the crossover voters, the Anglo voters?

22     Can we tell --

23          *MR. HEATH:*  Well --

24          *THE COURT:*  -- or does that just require speculation?

25          *MR. HEATH:*  -- if every Anglo voted against him, he

1    probably would have lost.

2              *THE COURT:*  Right.  So it depended on their support?

3         *MR. HEATH:*  And I think that's true in any -- in

4    virtually any election and maybe in -- I would have to do the

5    math, in Mr. Ybarra's district, where there's 70 percent

6    Hispanic CVAP.  But it may have been that if he lost every

7    Anglo vote, he may not have won.  I don't know.  It depended on

8    the turnout.

9              *THE COURT:*  All right.

10         *MR. HEATH:*  But there is going to be some Hispanic

11   turnout.  And what the *De Grandy* court said when it talked

12   about proportionality -- and the districts there were all

13   majority Hispanic districts.  That's the way it was in Dade

14   County.  But they said, We don't want this opinion to be

15   understood as encouraging people to go out and draw just

16   majority-minority districts.  Because there are areas in the

17   country where you don't know a majority-minority district to

18   win.  And in those districts you have a coalition between

19   different races and ethnic groups.  And the Court made it

20   pretty clear that it felt that was better and it didn't want to

21   discourage that and it made sure that it didn't discourage

22   that.

23              And that's exactly what we have here.  We have a

24   coalition that has worked, that is working, that has elected an

25   Hispanic candidate, who is the Hispanic favorite candidate,

because as I said, he got about 90 percent of the Hispanic
vote, 89.5 percent, and he has done it in a district that is
very heavily Hispanic, but not quite majority Hispanic.  But
that is the kind of district *De Grandy* said we ought to be
looking at and we shouldn't discourage.

          Now, the plaintiffs have said that *De Grandy*
applies and proportionality applies only to majority-minority
districts.  I disagree.

    *THE COURT:*  What's your best authority for
disagreeing?

    *MR. HEATH:*  Well, I think the best authority is
*De Grandy* itself.  Because *De Grandy* has that discussion,
saying we don't want to encourage people to go out and draw
majority-minority districts.  And we may be getting into
semantics here, but *De Grandy* in its holding and in its
discussion didn't really talk about majority-minority
districts, except primarily where it was saying --

    *THE COURT:*  *Perry* did.

    *MR. HEATH:*  -- we don't want to encourage them.

    *THE COURT:*  *Perry* talked about it.

    *MR. HEATH:*  Who talks about it?

    *THE COURT:*  *LULAC versus Perry* talks about it.

    *MR. HEATH:*  *Perry*, it mentions there are
majority-minority districts.  But going back to *De Grandy* --

    *THE COURT:*  *Bartlett* talks about it.

1          *MR. HEATH:*  Pardon?

2          *THE COURT:*  *Bartlett* talks about it.

3          *MR. HEATH:*  Well, and I looked at *Bartlett* --

4          *THE COURT:*  Actually they looked at the

5    majority-majority districts.

6          *MR. HEATH:*  Right.

7          *THE COURT:*  In fact, *Bartlett* talks about how

8    important that bright-line is.

9          *MR. HEATH:*  Yeah.  Justice Souter when he in *De Grandy*

10   set out the holding of the case in the second sentence of the

11   opinion and again in the next to the last paragraph of the

12   opinion, the term he uses is not majority-minority.  It's

13   effective voting majority, where Hispanic have an effective

14   voting majority.  And I would say --

15         *THE COURT:*  Which opinion are you -- excuse me.

16   You're talking about *De Grandy*?

17         *MR. HEATH:*  And that's *De Grandy*.

18         *THE COURT:*  I'm talking about the later cases that

19   make this even more clear, I think.

20         *MR. HEATH:*  Well, let's talk specifically -- well --

21         *THE COURT:*  How do you deal with that one?

22         *MR. HEATH:*  -- in *Perry*, when you're talking about --

23   in *Perry*, the cases in *Perry* or the districts at issue in *Perry*

24   were the Hispanic districts.  Those were overwhelming Hispanic.

25   They were clearly majority Hispanic.  So the question of

1    whether it's just above, just below didn't come up in *Perry* --

2    or in *LULAC*.

3                But *Bartlett*, they talk about 50 percent plus 1

4    majority.  And I think there are two important takeaways from

5    *Bartlett*.  Number one, the discussion in *Bartlett* is joined by

6    three judges:  The Chief Justice, Justice Kennedy, Justice

7    Alito.  They have a majority for the judgment, because Justice

8    Thomas and Justice Scalia disagree with the whole premise that

9    the Voting Rights Act covers vote dilution.  They don't believe

10   it applies.  They don't believe -- and in *Bartlett*, which was

11   discussing the first prong of the *Gingles* framework, Justice

12   Thomas says, I disagree with the *Gingles* framework altogether.

13   And so they essentially divorce themselves from any of that

14   discussion.  They didn't have anything to do with it.  You've

15   got three judges.  You have four judges that go the other way.

16               Now, I have no doubt that on the decision that

17   was before *Bartlett*, those three were in the majority, because

18   they had those other two votes for the result.  But if we're

19   looking at the discussion and the reasoning, they didn't have a

20   majority of the court.  They had three judges.

21         *THE COURT:*  But what *Bartlett* says is -- in language

22   that is common across the opinions, is that what you are

23   looking to is the relationship of the number of

24   majority-minority districts to the population -- the CVAP

25   population, and that's what matters.

1          *MR. HEATH:*  And --

2          *THE COURT:*  That's consistent across the plurality,

3     the concurrences and the dissents.  What is different markedly,

4     I agree with you here, is the extent to which some of the Court

5     says you are required -- that you can require a city to

6     include -- to draw a coalition district to maximize voting

7     strength, but -- and the plurality says, no, you're not

8     required to do that.  We are not forbidding it in the

9     appropriate case, but you're not required to in order to

10    achieve compliance with Section 2, with the *Gingles* factors.

11         *MR. HEATH:*  I think the important thing about *Bartlett*

12    and on the other cases, we'll just have to go through those

13    individually to --

14         *THE COURT:*  Well, I don't think that's what --

15         *MR. HEATH:*  -- see, because I don't want to --

16         *THE COURT:*  Okay.  Go ahead.

17         *MR. HEATH:*  -- to characterize every single one of

18    those.  But on *Bartlett*, *Bartlett* was a *Gingles* one case.

19         *THE COURT:*  No, I agree with that.

20         *MR. HEATH:*  First prong of *Gingles*.

21         *THE COURT:*  I agree with that, and the issue there is

22    how you treat these coalition districts and whether you are

23    able to require that one be created even if it is not

24    majority-majority, in order to maximize Hispanic voting

25    strengths.

1          *MR. HEATH:*  My position is the *Gingles* one and the
2    ultimate issue --
3          *THE COURT:*  A proportionality.
4          *MR. HEATH:*  -- of equal opportunity --
5          *THE COURT:*  Right.
6          *MR. HEATH:*  -- are two different things.  To have
7    equal opportunity to participate in the political process and
8    to elect candidates of your choice is not the same as --
9          *THE COURT:*  I --
10         *MR. HEATH:*  -- the threshold test of whether you can
11   get into court in the first place.
12         *THE COURT:*  I don't disagree there is a difference
13   between the ultimate issue and the threshold hurdle.  I don't
14   disagree with that.
15         *MR. HEATH:*  And if you don't disagree with that --
16         *THE COURT:*  Because you're still comparing the same
17   things.
18         *MR. HEATH:*  Pardon?
19         *THE COURT:*  You're still comparing the same things.
20         *MR. HEATH:*  Well, you're comparing the same things as
21   Hispanic citizen voting age population --
22         *THE COURT:*  And the number of districts.
23         *MR. HEATH:*  -- percentages and so forth --
24         *THE COURT:*  Exactly.
25         *MR. HEATH:*  -- but --

1          *THE COURT:*  The question --

2          *MR. HEATH:*  -- you don't have to get to the same --

3    the point.

4          *THE COURT:*  Of course not.  And the question again

5    comes down to what we've already identified, is it proper to

6    consider the coalition district in this proportionality

7    calculus, number one, and what is the role of the

8    proportionality conclusion reached --

9          *MR. HEATH:*  Right.

10         *THE COURT:*  -- what weight does it get.  So why don't

11   we go, again, directly to those issues.

12         *MR. HEATH:*  Right.  And in that case, if you have a

13   district that may not have a majority but that is effective and

14   it works, that's giving you equal opportunity.  And I think the

15   best example of that is one -- and we're probably in the

16   district right now -- I mention it in my brief, two

17   districts --

18         *THE COURT:*  Yeah, you told me that --

19         *MR. HEATH:*  -- the 9th and the 18th.

20         *THE COURT:*  Right.

21         *MR. HEATH:*  Neither one of those has any

22   African-American majority.

23         *THE COURT:*  I seem to remember hearing about those

24   districts before.

25         *MR. HEATH:*  And, in fact, when I mentioned in 1971,

1    drawing districts on my hands and knees with those big maps on
2    the floor, Senator Jordan came in and said, You know, we need
3    to have the black majority district and said --
4              *THE COURT:*  There's something about --
5              *MR. HEATH:*  -- there doesn't need to be one.
6              *THE COURT:*  There's something about this area that
7    brings out the inner anecdote.  And I don't know what it is,
8    but war stories are just irresistible --
9              *MR. HEATH:*  Right.
10             *THE COURT:*  -- to those who have been through these
11   issues more than once.
12             *MR. HEATH:*  But to have proportionality, I don't think
13   you can say that Al Green's or Shelia Jackson Lee's districts
14   are not ones where African-Americans have an equal opportunity
15   to participate and to elect and are not ones that should be
16   considered in a proportionality analysis, because they don't
17   have a majority.  They have an effective voting majority, and
18   the people in D have an effective voting majority and they have
19   elected.
20             *THE COURT:*  I would like to give Ms. Perales and her
21   colleague an opportunity to respond, so let me know when it's
22   appropriate to do that, please.
23             *MR. HEATH:*  Okay.
24             *THE COURT:*  Is this a good time?  I mean, have you
25   laid our your argument?

1              *MR. HEATH:*  Oh, I was going to say a couple more

2    things, if --

3              *THE COURT:*  That's fine.  Why don't you go and do

4    that.

5              *MR. HEATH:*  -- I may.  One is on the totality, there's

6    a question about, well, since the totality test, is summary

7    judgment ever appropriate.  Yes, it is.  *African-American*

8    *Voting Rights Legal Defense Fund*, which is one of the cases

9    decided in the wake of *De Grandy*, summary judgment case,

10   proportionality analysis.

11              Finally, what we have here is we have three

12   districts that everybody agrees are equal opportunity

13   districts.  We have a fourth one where there's some

14   disagreement.  But that one has elected and is represented by a

15   Hispanic candidate, who is the Hispanic candidate of choice.

16   So the plaintiffs seem to be saying, well, sometime in the

17   future, two years, four years, six years from now, a

18   Hispanic -- a different Hispanic may not win.  And that's

19   hypothetical.  It's speculative.  We have districts now that

20   everybody agrees are equal opportunity districts or on the one

21   where there's some disagreement about, is represented by the

22   Hispanic, who is the Hispanic candidate of choice, and I would

23   suggest that they have no harm.

24              *THE COURT:*  All right.  I would like to --

25              *MR. HEATH:*  If there's no harm, there's no standing.

1              THE COURT:  All right.  Let me now hear from the
2    plaintiffs.
3              MS. PERALES:  Your Honor, I also have two
4    demonstrative exhibits, but --
5              THE COURT:  All right.  Would you hand copies to my
6    law clerk, please.
7              MS. PERALES:  -- we also have hard copies --
8              THE COURT:  Thank you.  Is there an extra copy for my
9    law clerk?  If you have two copies, that would be great.
10        (Judge conferring with law clerk.)
11             MS. PERALES:  Your Honor, we're going to give the
12   third copy to your law clerk.  Defendants received a copy
13   yesterday by PDF --
14             THE COURT:  They need one now --
15             MR. HEATH:  I can probably do without.
16             THE COURT:  All right.  Why don't you use it.  They
17   can share.
18             MR. HEATH:  I know what it is.
19             THE COURT:  One at a time.  They can share, unless you
20   have it to spare.  All right?
21             MS. PERALES:  Thank you.
22             THE COURT:  And let's go.  Ms. Perales.
23             MS. PERALES:  Thank you, Your Honor.
24             The plaintiffs agree that there are both legal
25   and factual issues --

1             *THE COURT:*  May I ask one question?

2             *MS. PERALES:*  Oh, yes, of course.

3             *THE COURT:*  Do you agree that we've identified the

4    right question, that is, the right one for the argument they

5    made -- it seems to me there are two questions.  The first is,

6    as we said, is it proper to include the new District D because

7    it is a coalition district, number one, or not, in determining

8    proportionality; and if it is proper, what is the weight to be

9    given to the proportionality conclusion that is appropriately

10   drawn?

11            *MS. PERALES:*  Yes, as to the second.  One of the legal

12   issues is the weight of proportionality.  The first legal issue

13   we would phrase is which districts count in the proportionality

14   analysis.

15            *THE COURT:*  I think it's the same question.

16            *MS. PERALES:*  Yes, Your Honor.

17            *THE COURT:*  And the sub-question is, is it appropriate

18   to include the fourth new district or in comparing it to the

19   former districts when it was an 8-0 system or not?

20            *MS. PERALES:*  Yes, Your Honor.  And we would contend

21   just off the bat, that District D in the new 6-2 plan is best

22   characterized as an influence district and not a coalition

23   district for reasons that I will hopefully get to during the

24   argument.

25            *THE COURT:*  I love these labels.  It's not an

 1   opportunity district, an influence district.

 2                *MS. PERALES:*  And if you survey --

 3                *THE COURT:*  Is that right?

 4                *MS. PERALES:*  If you survey Section 2 law --

 5                *THE COURT:*  Sure.

 6                *MS. PERALES:*  -- you'll see three very distinct kinds

 7   of districts:  Opportunity districts, coalition districts, and

 8   then influence districts.

 9                *THE COURT:*  Right.  And this one is somewhere between

10   2 and 3?

11                *MS. PERALES:*  We would say it's firmly an influence

12   district, Your Honor.

13                *THE COURT:*  All right.  Is it even a coalition

14   district?

15                *MS. PERALES:*  No, not at all.

16                *THE COURT:*  Why not?

17                *MS. PERALES:*  Because if you look at its performance,

18   it is a district in which the Anglo preferred candidate always

19   wins.

20                *THE COURT:*  And sometimes it happens to be an Hispanic

21   preferred --

22                *MS. PERALES:*  And sometimes --

23                *THE COURT:*  -- candidate --

24                *MS. PERALES:*  -- it happens to be a Hispanic

25   preferred --

1          *THE COURT:*  All right.

2          *MS. PERALES:*  -- candidate.  And the elections that we

3   look at that we put in our summary judgment response are the

4   one election that's been --

5          *THE COURT:*  Right.

6          *MS. PERALES:*  -- held in this district, 2015, in which

7   an Anglo surnamed -- and honestly, Cody Ray is also, I think,

8   an indicator of Anglo identity.  Cody Ray Wheeler wins the

9   district in the one election that's been held since it was

10  drawn.  At the same time there was an at-large race that we

11  look at that was racially contested.  Mr. Del Toro loses badly

12  in the district because he is not the preferred candidate of

13  Anglo voters, but he is a Hispanic.  And we had three exogenous

14  elections that we look at, 20 -- 2008, 2012, and I believe,

15  '14 -- '10 and '12.

16         *THE COURT:*  Right.  And is an influence district of a

17  lesser ranking, if you will --

18         *MS. PERALES:*  Yes.

19         *THE COURT:*  -- than the coalition district?

20         *MS. PERALES:*  Yes, Your Honor.  And the cases will

21  bear that out.

22         *THE COURT:*  I think that's correct.  I just wanted to

23  clarify.

24         *MS. PERALES:*  And so moving to the legal questions --

25  but before that, if the Court will bear with me, with expect to

1 the exhibits --

2      THE COURT:  I'll accept your clarification of the

3 proper question.

4      MS. PERALES:  Thank you.  The Court has two maps and

5 behind them dated tables --

6      THE COURT:  Yes.

7      MS. PERALES:  -- to assist in our discussion today.

8 The first map which we'll draw our attention to is the old 8-0

9 map adopted in 2011 and --

10      THE COURT:  This is the August 30 map?

11      MS. PERALES:  Yes, and that's the brighter colored

12 map.  And then the second map, which we've altered slightly to

13 give the district identifiers letters instead of numbers is the

14 new 6-2 map.

15      THE COURT:  Right.

16      MS. PERALES:  We wanted to point the Court's attention

17 to the 8-0 map, to look at the four districts on the north side

18 that at that time had a majority of citizen voting age

19 population and a majority of Spanish surname registered voters,

20 District A, in the northwest portion of the map.

21      THE COURT:  The one you put the red square around on

22 the first map?

23      MS. PERALES:  Yeah, the red square -- it is, but we're

24 pointing the Court to the bigger map, not the red square area.

25      THE COURT:  All right.  And I am going to -- you mean

1   the inset?

2          *MS. PERALES:*  We are not pointing to the inset.

3   We're -- I just wanted to talk with the Court about the

4   larger --

5          *THE COURT:*  All right.

6          *MS. PERALES:*  -- the city map.

7          *THE COURT:*  All right.  And I'm going to mark this as

8   Plaintiffs' Exhibit 1 and Plaintiffs' Exhibit 2 for the purpose

9   of this hearing.

10         *MS. PERALES:*  Thank you, Your Honor.

11         *THE COURT:*  They are admitted for the purpose of this

12  hearing, hearing no objection.

13         *MR. HEATH:*  No.

14         *THE COURT:*  All right.  Thank you.

15         *MS. PERALES:*  With respect to Exhibit 1, you will see

16  District A on the northwest side, Hispanic majority citizen

17  voting age population and Spanish surname voter registration.

18  District B on the far west side, also, majority Hispanic.

19  District C in the center of the north side, majority Hispanic.

20  And District D, on the northeast side of the city, is also

21  majority Hispanic.  Turn -- in both citizen voting age

22  population and registered voters.

23              Turning to the 6-2 map, which is Exhibit 2, you

24  will see that District D is no longer where it was.  It was

25  consumed by Districts A, B, and C.  The act of drawing the city

1  into six portions as opposed to eight necessarily required each

2  district to become larger in population and less territory.

3  District D was -- disappeared or eliminated.  Its district

4  identifier was moved down to a Hispanic minority, Anglo

5  majority district that sits roughly in the center of the city.

6          *THE COURT:*  Okay.  Say that again.  Where was it moved

7  to?

8          *MS. PERALES:*  So, D, which used to be in the northeast

9  portion, northeast portion of the city, was consumed by A, B,

10  and C.

11          *THE COURT:*  Right.

12          *MS. PERALES:*  And then the identifier D or the letter

13  D was given to a central city --

14          *THE COURT:*  Right.

15          *MS. PERALES:*  -- district that is majority Anglo.

16          *THE COURT:*  The turquoise triangle?

17          *MS. PERALES:*  Yes, that's right, Your Honor.

18          *THE COURT:*  All right.

19          *MS. PERALES:*  And so with those facts in mind and the

20  logical observations that Latinos still constitute just under

21  half the population in Pasadena, while it was possible to draw

22  four Hispanic majority districts in an eight district plan,

23  thus, providing rough proportionality.  In a six district plan,

24  it is only possible to draw three Hispanic majority districts.

25          *THE COURT:*  It is possible to also draw an influence

1  district?

2      *MS. PERALES:*  It is an influence district, yes, Your

3  Honor, and that is the center --

4      *THE COURT:*  And what is the role of the possibility of

5  doing that?

6      *MS. PERALES:*  I could not speak to the City's goal in

7  drawing District D in the new plan.

8      *THE COURT:*  What is its proper place in this analysis?

9      *MS. PERALES:*  In the proportionality analysis, none,

10  Your Honor, for reasons that I will explain immediately.

11      *THE COURT:*  Good.

12      *MS. PERALES:*  Under *De Grandy* and its progeny, the

13  quality of opportunity is measured in terms of

14  majority-minority districts, no Anglo majority districts.  In

15  *De Grandy* the Supreme Court asked whether there were, quote,

16  "majority-minority districts in substantial proportion to the

17  minority's share of the voting age population," unquote, at

18  page 1013, 1014.

19          There is no discussion in *De Grandy*, despite

20  repeated references to majority-minority districts, no

21  discussion of including minority-minority districts in the

22  proportionality analysis.  And, in fact, the Court excluded an

23  African-American minority district from its proportionality

24  analysis when it was looking at African-American districts.

25  *De Grandy* unequivocally measured Latino majority districts and

1  black majority districts and compared that to the relevant

2  voter population, which in that case was voting age population,

3  but which we now use as the standard citizen voting age

4  population.

5              In *LULAC versus Perry*, again, the U.S. Supreme

6  Court made clear that proportionality turns on

7  majority-minority districts, and the Court counted only Latino

8  CVAP majority districts in its proportionality analysis.

9              As a side note, I know that my friend, Mr. Heath,

10  has talked about African-American districts that are not

11  majority African-American.  That really doesn't bear on this

12  case, but I would like to point out to the Court that those

13  very same districts are around 35 percent Hispanic voting age

14  population, and nobody counts those as Hispanic opportunity

15  districts in the proportionality analysis.

16              So going back, proportionality does turn on

17  opportunity to elect, and opportunity to elect has been defined

18  time and time again in Section 2 cases as the majority of the

19  relevant population.  And if one understands the concept of

20  opportunity to elect to be the same, under the *Gingles* test and

21  under the proportionality test, and we know the Court has been

22  moving more firmly in the direction of giving a bright-line

23  test for opportunity, that's what the Court did in *Bartlett*,

24  but you will also see a discussion of opportunity to elect in

25  terms of majority status in *Voinovich versus Quilter* and *Growe*

1    *versus Emison*.    Just looking at the trajectory of Supreme Court

2    voting rights cases, you will only see opportunity to elect

3    defined as majority status.

4              *THE COURT:*   What is the impact of the context being

5    different with a procedural posture being different?   Here we

6    are not -- the *Gingles* factors have been assumed.

7              *MS. PERALES:*   Yes.

8              *THE COURT:*   We are on the Senate factors, the

9    proportionality analysis being one of them.   What is the impact

10   of the difference in procedural postures?

11             *MS. PERALES:*   The only guidance we have there, Your

12   Honor, is that the Supreme Court has only ever used majority

13   districts to analyze proportionality.   And every other court

14   that we've looked at has only ever used majority districts.   I

15   do not believe there's a reported case in which a less than

16   majority-minority district was used in the proportionality

17   analysis, including the case brought up by the City,

18   *African-American Voter Rights versus Villa*.   That case also

19   looked at majority black districts when it was conducting a

20   proportionality test.

21             We would posit, Your Honor, that there's simply

22   no legal basis to look at less than majority districts in the

23   proportionality analysis, because they do not reflect the

24   Court's concept of opportunity to elect and, in fact, draw the

25   Court into an impossible morass of trying to evaluate whether a

1    less than majority district is an opportunity district in the

2    context of extremely localized factors involved in

3    jurisdictions such as the City of Pasadena.

4          *THE COURT:*  So the bottom line is that -- in your

5    approach, is that it's not going to matter to using the

6    majority-majority districts as the relevant comparator, whether

7    we are in *Gingles* stage or Senate report stage?

8          *MS. PERALES:*  We would observe that, Your Honor.  But

9    I think the point is, is more that the Court has only used

10   majority -- majority-minority districts in its proportionality

11   analysis.

12         *THE COURT:*  Fair enough.  Fair enough.  Okay.

13         *MS. PERALES:*  Now, the City makes much of another part

14   of the *De Grandy* opinion, which talks about proportionality not

15   being a safe harbor.  And it is that very different part of the

16   opinion where the Supreme Court says that it doesn't want

17   proportionality to become a safe harbor, because it believes

18   that it would lead to maximization.

19              This is not a case about maximization.  The

20   plaintiffs are not asserting that a fourth majority Hispanic

21   district can be drawn in the 6-2 plan.  In fact, the entire

22   point of this case is that a fourth district cannot be drawn,

23   and that's why we need to go back to the 8-0 configuration.  So

24   when the Court talks about coalition districts and districts in

25   which minority voters are compromising with other groups, the

1  court is entirely confining that discussion to whether
2  proportionality should serve as a safe harbor.  The Court says,
3  no, we don't want to create even more problems of
4  gerrymandering by encouraging jurisdictions to go crazy drawing
5  majority districts.  That is a very separate discussion, we
6  would assert, from what counts in the proportionality analysis,
7  where you only hear from the Court that it's looking at
8  majority-minority districts.
9          And now as to the weight of proportionality, if
10 it's okay to move to the weight.
11         *THE COURT:*  Sure.  No, I think is it's a good time.
12         *MS. PERALES:*  *LULAC versus Perry* lists the Senate
13 factors and then right underneath that, as the City so
14 carefully points out after a paragraph break, lists
15 proportionality and it describes proportionality as another
16 relevant factor.  Proportionality has never been described
17 as the greatest factor.  It's never been described as
18 dispositive or somehow driving the ultimate outcome.  In fact,
19 *De Grandy* probably stands for the exact opposite, because it
20 was so careful to say that proportionality could not be a safe
21 harbor.
22         In *LULAC,* which is our best guiding case, it's
23 relatively recent, it involves Texas, the Court even assumes
24 proportionality and still finds a Section 2 violation, because
25 it goes ahead and looks at the other Senate factors that were

1   present.  And we would posit that Pasadena looks more like

2   Texas in *LULAC versus Perry* than St. Louis in *African-American*

3   *Voting Rights Fund versus Villa*.  If you look at *De Grandy* and

4   you look at *"Via"* -- or *Villa*, probably, you see there that the

5   Court is weighing proportionality, but doesn't find very much

6   to weigh against it.  In the St. Louis case, the Court only

7   found a splitting of blocks and a failure to maximize, weighing

8   against a finding of proportionality.  And in *De Grandy*, the

9   Court weighs proportionality, and proportionality wins, because

10  there's very little on the other side of the scale.

11  Allegations of cracking and packing, which the Court says,

12  Listen, the line has to go somewhere.  And so there's very

13  little there.

14              On the other hand, if you look at *LULAC*, you see

15  that the proportionality is outweighed by other factors,

16  because the Court saw a more deliberate attempt to change

17  district lines because of the impact that it would have on

18  minority voters.  The Court doesn't find intent, but finds

19  enough there.  And we believe that certainly there's enough in

20  the record here to create that kind of disputed fact on the

21  remaining Senate factors.  This is not a situation where even

22  if there were proportionality, the door would somehow be shut

23  in terms of liability.

24              *THE COURT:*  All right.

25              *MS. PERALES:*  And I'll point the Court to page 16 of

1   our response brief, Docket 75, where we talk about some of the

2   issues involving racial appeals with respect to Mr. Wheeler in

3   particular and others.

4           *THE COURT:*  Yes, I've read that.

5           *MS. PERALES:*  Finally, Your Honor, it didn't come up

6   before with Mr. Heath, but we would argue that proportionality,

7   even if it existed, does not foreclose an intentional

8   discrimination claim.  We do not believe that Section 2 is

9   somehow collapsed into the intentional discrimination analysis,

10  even though we agree that there has to be some kind of impact

11  in play in an intentional discrimination case.  We don't

12  believe that somehow proportionality drives an outcome here

13  that would then drive an outcome in the intentional

14  discrimination claim.

15          I believe I have already discussed the factual

16  differences.

17          *THE COURT:*  I think you have.

18          *MS. PERALES:*  The reason, just to conclude, Your

19  Honor, that if you look at Section 2 cases and you look at the

20  way coalition districts are described, they provide a

21  consistent positive outcome --

22          *THE COURT:*  Or influence districts?

23          *MS. PERALES:*  No.  Coalition districts.

24          *THE COURT:*  All right.

25          *MS. PERALES:*  Coalition districts provide a consistent

1    positive outcome for minority voters.  And you hear this

2    discussed in *Bartlett* which actually had to do with --

3          *THE COURT:*  Yes.

4          *MS. PERALES:*  -- coalition districts.

5          *THE COURT:*  Absolutely.

6          *MS. PERALES:*  And so --

7          *THE COURT:*  And still says you don't have to do it.

8          *MS. PERALES:*  Right.  They're not required.

9          *THE COURT:*  Right.

10         *MS. PERALES:*  But coalition districts, what makes them

11   different, is that they consistently perform for minority

12   voters.  There's some group of Anglo or other voters that are

13   voting with them --

14         *THE COURT:*  They have the opportunity to become --

15         *MS. PERALES:*  Yes, and they share the same

16   preferences.

17              Influence districts, which is what District D is,

18   is one in which minority voters are occasionally able to

19   exercise enough influence to get their candidate over the

20   finish line, but it's not consistent and it's not reliable.

21   And if we look at the elections here, one election cycle, Cody

22   Ray Wheeler wins, Oscar Del Toro loses.  And then of the three

23   exogenous elections, two losses, one win.  And the win was the

24   farthest back in history.  It was in 2008, which is considered

25   a somewhat extraordinary year for minority turnout.

1          So based on the facts that we have, there is no

2     history of performance by District D, that would lead us to

3     conclude that it was a coalition district.  And, thus, the fact

4     is very much disputed whether District D offers the kind of

5     opportunity to elect that would allow it to be counted in the

6     proportionality analysis.

7               THE COURT:  Thank you.

8               MS. PERALES:  Thank you.

9               THE COURT:  Mr. Heath, I'm going to give you one

10    opportunity to respond.  It will be brief, since you were

11    thorough in your initial presentation.

12              MR. HEATH:  I think the idea that D is simply an

13    influence district, that certainly understates the case.

14    Crossover, coalition, whatever you want to call it, I think

15    that it is at least there.

16              THE COURT:  It's not majority-minority, is it?

17              MR. HEATH:  It is not a majority Hispanic district.

18              THE COURT:  And there were four?

19              MR. HEATH:  Pardon?

20              THE COURT:  There were four majority-minority

21    districts before and now there are three.

22              MR. HEATH:  There were four, but if you look at those

23    four --

24              THE COURT:  And now there are three.

25              MR. HEATH:  -- if you look at the statistics --

1    *THE COURT:*  Hang on.  And now there are three?

2    *MR. HEATH:*  I'm sorry?

3    *THE COURT:*  And now there are three?

4    *MR. HEATH:*  And now there are three, that's right.

5    *THE COURT:*  All right.

6    *MR. HEATH:*  And let me say first, that going from four

7    to three, to the extent that's a retrogression argument, that's

8    not relevant in a Section 2 case.

9    *THE COURT:*  I know.  It's a Section 5 issue.

10   *MR. HEATH:*  So the question is, in the current plan do

11   they have equal opportunity, and you don't have to have a

12   majority-minority district to have equal opportunity.  And to

13   quote *De Grandy*, "It is enough to say that while

14   proportionality in the sense used here is obviously an

15   indication that minority voters have an equal opportunity in

16   spite of racial polarization to participate in the political

17   process and to elect representatives of their choice, the

18   degree of probative value assigned to proportionality may vary

19   with the facts.  No single statistic provides courts with a

20   shortcut to determine whether a set of single-member districts

21   unlawfully dilutes minority voting strength."

22              And I think that means -- and this is all in the

23   context of saying, We don't want to tell people that you have

24   to draw majority-minority districts, which is the entire

25   paragraph before, that it doesn't have to be majority-minority

1    districts.   There are districts where minorities can elect,

2    working with other racial and ethic groups, to elect the

3    candidates of Hispanic choice, and that's what happened here.

4    There is no doubt that Cody Ray Wheeler was the candidate of

5    Hispanic choice, much more so than he was the candidate of

6    Anglo choice.   And, so, it's a district that does work, that

7    does provide opportunity, and no one has suggested that he is

8    anything but the candidate of overwhelming Hispanic choice.

9             I want to just take off of one thing that

10   Ms. Perales said at the end, talking about the intentional

11   discrimination claim and says we agree that there has to be an

12   impact on the intentional claim.   And, of course, that's true

13   as well under the Section 2 claim.   And that's the question.

14   Where is the impact?   Where is the effect?   Where is the

15   discriminatory effect?   Because we know that in A, B, and C,

16   everybody agrees there is equal opportunity to -- for Hispanics

17   to elect in those districts.   And in D, Hispanics do elect.

18   They do elect the candidate of choice of 89.5 percent of

19   Hispanic voters.

20            Under the prior plan, in A, B, and C and D at

21   that time, all of which had 50 percent or better Spanish

22   surname voter registration, Hispanics elected one Hispanic

23   candidate.   Under the current plan, they elect two in the

24   Hispanic majority districts, three overall.   There was -- by

25   the way, Wheeler was elected in the last cycle under the eight

1    district plan.  But where is the impact?  Where is the

2    discriminatory impact in the current plan?  It provides equal

3    opportunity undisputed in A, B, and C and in D, as a practical

4    matter, it elects the candidate of Hispanic choice of 89.5.

5    Where is the impact?  Maybe there will be some impact six years

6    from now, in a different time, and by that time the districts

7    are probably going to be changed, because it will be a new

8    census.  But where is the current impact?  If there is no

9    current impact, where is the standing?

10              *THE COURT:*  All right.

11              *MR. HEATH:*  Thank you.

12              *THE COURT:*  Ms. Perales, did you want to address the

13   current impact argument and then I think I will be ready to

14   rule?

15              *MS. PERALES:*  Well, Your Honor, first, we would urge

16   the Court not to count brown faces, because that's not what

17   Section 2 asks.  Section 2 is about the election of Latino

18   candidates of choice, regardless of their race.  And so we

19   would ask the Court to put aside the repeated assertions that

20   the election of a Hispanic candidate who is Hispanic preferred

21   is somehow an improvement over the election of an Anglo

22   candidate who is Hispanic preferred.

23              *THE COURT:*  Particularly in the context of a factual

24   mix that includes a Hispanic identified Anglo surnamed

25   candidate.

1              *MS. PERALES:*  Yes, Your Honor.

2              *THE COURT:*  Mr. Cody Ray Wheeler.

3              *MS. PERALES:*  Yes.  And so putting aside how many

4    Hispanics serve on the council now or three years ago or four

5    years ago, the impact is that Latino voters comprise the

6    majority and had the opportunity to elect their preferred

7    candidate in four districts under the 8-0 plan.  They only have

8    the opportunity to elect their candidate of choice in three

9    districts in the 6-2 plan.  The district at issue, District D,

10   in one election has elected a candidate with an Anglo name.

11   There is no other surrounding evidence to suggest that it is an

12   opportunity district, neither its demographics nor its election

13   history.  If you look at exogenous elections in those

14   precincts, tells us that this is a district that allows

15   Hispanic voters to elect their preferred candidate.  So the

16   bottom line, once again, is we went from four to three, that's

17   the impact.  Thank you.

18             *THE COURT:*  All right.  I am ready to rule.

19             I am going to deny the defendants' summary

20   judgment motion.  I think that it is flawed in the argument it

21   presents in two ways.  One is that the application of the

22   proportionality analysis, the framing of it, is at odds with

23   how the Supreme Court has said it should be applied, comparing

24   the number of either Hispanic candidates or even giving the

25   defendants a somewhat forgiving read, number of Hispanic

1   preferred candidates to the citywide Hispanic citizen age

2   voting population does not appear to be consistent with the way

3   the Court has consistently defined the proportionality

4   comparison of the percentage of majority-minority districts

5   based on Hispanic CVAP to the citywide Hispanic CVAP

6   population -- CVAP, period.

7            So when you do that calculation, when you compare

8   the number of majority-minority districts to the citywide

9   Hispanic citizen voting age population numbers, you come up

10  short with three majority-minority districts in the 6-2 system,

11  unless you are also able to count the fourth district, which is

12  not minority-majority -- or not majority-minority.

13           The question then boils down to, as we have said,

14  whether you can appropriately include the new District D as an

15  opportunity district or whether it is less even than a

16  coalition district, but rather merely an influence district.

17  The first question is, is that what it is?  It's clearly not an

18  opportunity district.  It's clearly not majority-minority.  I

19  agree with the plaintiffs' assessment, that it is not even a

20  coalition district, because the election results that have

21  occurred in it and the way in which the numbers work makes it

22  clear that the only reason a Hispanic preferred candidate wins

23  is because it is the non-Hispanic voters preferred candidate.

24  And absent that, it would lose, that person would lose.  Now,

25  that may be true as well in a coalition district, but this is

1    not an instance in which there is a sufficient predictable

2    regularity of coalescence between the preferences of the

3    Hispanic voters and the preferences of the non-Hispanic voters

4    to warrant inclusion in that category.

5                    It therefore means that it's not

6    majority-minority.  It's not even coalition.  And even if it

7    was coalition as opposed to the lower influence district, it

8    still would not be appropriately included in this

9    proportionality analysis.  I think the case law makes that

10   clear.

11                   What is the harm?  There is dilution.  There is

12   dilution from two sources.  One is the sheer reduction in the

13   number of districts, from four to three.  The second is one

14   that gives rise not only to a strong inference of dilution and

15   prejudice, the impact generated from that, but is also part and

16   parcel of the intent analysis -- of the intent inference that

17   may arise from the facts that are presented here.

18                   There is dilution, because in addition to

19   reducing the number of majority-minority districts from four to

20   three, as I said, the Hispanic votes are submerged in two ways

21   under the new 6-2 system.  Number one, they are submerged by

22   being included in the at-large seats, which is a

23   well-recognized submergence in dilution technique.  Number two,

24   the expansion of the other three districts in size, while not

25   taking them out of the majority Hispanic CVAP category, makes

1   them harder to achieve electoral victories in.  So there is

2   somewhat of a submergence or at minimum a dilution there.  But

3   the more profound dilution is the submergence of the Hispanic

4   votes, not in the larger districts, but rather into the

5   at-large districts.

6           And, finally, because I -- I think that the

7   proportionality analysis is flawed on one other ground, and

8   that is, to assume that if you have substantial proportionality

9   between whatever components you're measuring, whether you're

10  measuring it number of majority-minority districts compared to

11  total population or number of seats achieved.  To assume, as

12  the defendants do, or to ask the Court to assume, that that is

13  the only important inquiry, the others having been assumed at

14  best, the *Gingles* threshold, not the Senator report factors,

15  that's the only important inquiry and once substantial

16  proportionality is achieved, you're done, nothing else needs to

17  be looked at, I think it's flawed.  A, we don't have

18  substantial proportionality here properly viewed; and, B, even

19  if we did, that is not the end of the line.  That is one of a

20  number of factors.  It must be viewed in context.  It is not

21  determinative.  It is entitled to weight, no question, when it

22  is properly measured, arrived at, and supported.  But it does

23  not get the privilege of being viewed outside the context of

24  and supported by the analysis necessary to determine history of

25  racially polarized voting, various barriers to participation in

1  the electoral process, all of the factors that the Senate
2  report identifies that may have application to the particular
3  facts.  And the plaintiffs either asks the Court, even though
4  they say they don't -- I'm sorry, the defendants, either ask
5  the Court, although they deny and dispute it, for a safe harbor
6  treatment of proportionality, which the case law makes clear is
7  not appropriate, or they make it the only determinative -- the
8  only factor and determinative factor, which is not appropriate.
9  They give it too much weight.
10            And, finally, once we find no basis for granting
11  judgment as a matter of law, based on undisputed facts to
12  conduct the inquiry that does need to be conducted to intent,
13  Fourteenth Amendment violations, and the rest of the Section 2
14  issues, requires a record not presently before the Court.  It
15  requires that some of the factual disputes material to these
16  findings and conclusions be explored through presentation of
17  evidence and that the necessary credibility determinations be
18  made and stated on the record.  Case law is replete with
19  appellate court admonitions to or admonishments to district
20  judges in these kinds of cases above all, be clear and fulsome
21  in your credibility choice determinations, in your findings,
22  and how they lead to your conclusions of law.  Show your work.
23  That's what we need to do.
24            We have a schedule.  I propose to extend it by
25  two -- by 14 days, to give you a little bit more time.  I can

1   extend it by 30 days, if you feel that that does not give you

2   too much time.  We will have the bench trial before the

3   holidays.  I'm happy to extend discovery for 30 days for the

4   limited purpose of having Ms. McCall's information made the

5   basis of her deposition presented to Mr. Ely, I think is the

6   person you wanted to present it to.

7        *MS. PERALES:*  Yes.

8        *THE COURT:*  Have a responsive report made by him, a

9   supplement based solely on that new information, and the

10   defendants may then depose him if they choose.  That would be

11   the only additional discovery that we would contemplate.  I

12   would think that 30 days might be enough for that to occur.

13         And what does that do to our joint pretrial order

14   due date?  That's currently September 26?  I'm looking at my

15   clerk.

16     *(Judge conferring with law clerk.)*

17        *THE COURT:*  All right.  So looking at the months,

18   September is Monday -- September 26 is Monday.  If we were to

19   add 30 days to get a window for this additional discovery,

20   limited as it may be to occur, then we could have the joint

21   pretrial order due on -- and this is not quite 30 days, but we

22   can live -- okay.  Joint pretrial order due October 21st.

23   Docket call October 26.

24        *MR. HEATH:*  October when?

25        *THE COURT:*  26, which is a Wednesday, 8:30 a.m.

1           *MR. HEATH:*  Your Honor, one thing, and I don't know if

2    it would be a problem with this, but if there's a way not to

3    have the trial during the week of the election.

4           *THE COURT:*  I think we can manage that.  That's fine.

5           *MR. HEATH:*  I think we would like to avoid that.

6           *THE COURT:*  That's fine.  I would not like this to

7    trump any proceedings.

8           *MR. HEATH:*  Right.

9           *THE COURT:*  How about having the trial the week -- and

10   this will be somewhat chopped up because of other commitments,

11   but what about the week of the 14th -- starting on the 15th, to

12   be precise?

13          *MR. HEATH:*  I think that probably works.

14          *THE COURT:*  Does that work?

15          *MS. PERALES:*  Yes, Your Honor.  November 15?

16          *THE COURT:*  Okay.

17          *MS. PERALES:*  Okay.  Yes.

18          *THE COURT:*  It's a great date.  And I propose that we

19   just churn on through that week until we get it done.  I would

20   assume it will not take past the 18th, but we have the 21st and

21   22nd available, if we need it.  And then we are on

22   Thanksgiving, and I assume that the parties will want to all

23   leave quickly on the 22nd, if not on the 23rd of November.  Do

24   we have a schedule that works?

25          *MS. PERALES:*  Yes, Your Honor.

```
 1            THE COURT:  All right.
 2            MR. HEATH:  I believe so.
 3            THE COURT:  All right.  Proposed findings and
 4    conclusions, I'm happy to receive them as part of the joint
 5    pretrial order, with particular focus on the remedy.  I do not
 6    foreclose needing refined or amended, so let's make them
 7    tentative before, and I will give each of you probably a week
 8    after -- Happy Thanksgiving, sorry -- or maybe a little bit
 9    longer to revise them in light of the evidence that may have
10    been presented.  If you can get them to me the first week in
11    December, then I will try to get you a result before the world
12    sort of leaves at the end of the second week of December.  But
13    it would have to be early that week.  So there may not need to
14    be extensive revisions, but sometime, like, November -- or,
15    like, December 1st is when I would need them, in order for me
16    to get it out in the next two weeks, which is what you need,
17    unless I extend that to within the Christmas holidays, but I'm
18    sure it would be better for you to have it before and if
19    possible, for me to get it out before.  That will be our goal.
20    All right?
21            MS. PERALES:  Thank you, Your Honor.
22            THE COURT:  Is there anything else we need to do
23    today?  Thank you very much for a very thorough presentation
24    and materials.  I'm going to be up here for a moment stacking,
25    but you are all free to leave.  Thank you.
```

1          *MS. PERALES:*  Thank you, Your Honor.

2          *MR. HEATH:*  Thank you.

3       *(Concluded at 10:27 a.m.)*

4                           * * *

5    I certify that the foregoing is a correct transcript from the

6    record of proceedings in the above-entitled cause, to the best

7    of my ability.

8

9    /s/ *Kathy L. Metzger*                    *8-30-2016*
     Kathy L. Metzger                    Date
10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25