IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALBERTO PATINO, *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:14-cv-03241 |
| | § | |
| CITY OF PASADENA, *et al.,* | § | |
| | § | |
| Defendants. | § | |

**JOINT PRETRIAL ORDER**

TO THE HONORABLE LEE H. ROSENTHAL:

**Appearance of Counsel**

Plaintiffs:

> Nina Perales
> Attorney-in-charge
> Ernest Herrera
> MEXICAN AMERICAN LEGAL DEFENSE AND
> EDUCATIONAL FUND
> 110 Broadway, Suite 300
> Tel: (210) 224-5476
> Fax: (210) 224-5382
> Emails: nperales@maldef.org; eherrera@maldef.org

Defendants:

> C. Robert Heath
> Attorney-in-charge
> Gunnar P. Seaquist
> BICKERSTAFF HEATH DELGADO ACOSTA, LLP
> 3711 S. MoPac Expressway
> Building One, Suite 300
> Austin, TX  78746
> Tel: (512) 472-8021
> Fax: (512) 320-5638
> Emails: bheath@bickerstaff.com; gseaquist@bickerstaff.com

> Kelly Sandill
> Kathryn K. Ahlrich
> ANDREWS KURTH KENYONLLP

600 Travis, Suite 4200
Houston, TX  77002
Tel: (713) 220-4181
Fax: (713) 220-4285
Emails: ksandill@andrewskurth.com; katieahlrich@andrewskurth.com

## Statement of the Case

Plaintiffs, Latino voters of the City of Pasadena, Texas, allege that the City's use of at-large voting to elect two members of the City Council violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, as well as the Fourteenth and Fifteenth Amendments to the United States Constitution.  Plaintiffs request a declaratory judgment that the City of Pasadena's election system dilutes the votes of its Hispanic citizens and seek an injunction against the system's continued use.

Pasadena, a city on the outskirts of Houston, Texas, has a population of roughly 150,000 people.  On November 5, 2013, a majority of Pasadena voters passed Proposition 1 which changed the City's method of electing members of the City Council.  From 1992 to 2013, Pasadena elected its Mayor at-large and elected the remaining eight members of the council from eight single member districts (8-0 system).  Proposition 1 reduced the number of single member districts from eight to six by shifting two seats from election by single member district to election at-large in numbered places (6-2 system).  In the Proposition 1 election, Latinos and non-Latinos cast a majority of their votes differently, with virtually all Latinos voting against the proposition and about 60 percent of non-Latinos voting in favor.

The 6-2 redistricting plan enacted by the Pasadena City Council reduced the number of single member districts with a majority of Hispanic citizen voting age population from four to three.  Similarly, the 6-2 redistricting plan reduced the number of

2

single member districts with a majority of Spanish Surnamed Registered Voters from four to three.  However, the one-year American Community Survey ("ACS") for both 2013 and 2015 showed that the two at-large places added in the 6-2 plan also had a Hispanic-citizen-voting-age population majority.  The one-year ACS for 2014 showed that the City had a Hispanic citizen voting age population of 48.1%.  Latinos constitute 41.97% of the voter registration of Pasadena.

In the election following the adoption of the 6-2 redistricting plan, a Latino candidate, Oscar Del Toro, ran for one of the new at-large seats against an Anglo opponent.  Voter turnout was extremely low, with only 4,142 persons (7.21% of registered voters) casting a vote in the race.  Oscar Del Toro received 1,619 votes, capturing 87.3% of the Latino vote and 26.3% of the non-Latino vote.  Del Toro's Anglo opponent won the election with 2,523 votes, capturing 71.7% of the non-Latino vote.

In the other at-large election, two Anglo candidates ran.  Turnout was again low, at 7.23% of the registered voter population.  Ms. Pat Van Houte won the seat with 2,148 votes, capturing 70.6% of the Latino vote and 41.6% of the non-Latino vote.

In that first election under the 6-2 system, the number of Latinos elected to the council increased from two under the prior 8-0 plan to three under the 6-2 plan.  The number of Latino candidates of choice who were elected remained constant at four.

The parties agree that Latinos in Pasadena are sufficiently numerous and compact to comprise the majority of citizen voting age population of four of eight single member districts and that Latinos vote cohesively in Pasadena.  The dispute in this case centers on whether there is legally significant racial bloc voting by non-Latinos in Pasadena and whether the change to the 6-2 system resulted in diminished electoral opportunity as the

Plaintiffs contend, or merely adopted a different electoral structure that still provides Hispanics with electoral opportunity equal to that afforded the non-Hispanic population, as the Defendant contends.

**The issues to be resolved at trial are:**

1. Whether, based on the totality of circumstances, it is shown that the political processes leading to election in the City of Pasadena are not equally open to participation by Latinos in that in that Latinos have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. (section 2 of the Voting Rights Act, 52 U.S.C. § 10301)

2. Whether the City of Pasadena's 6-2 system of electing members of the City Council intentionally discriminates against Latino voters on the basis of race in violation of the Fourteenth Amendment to the United States Constitution.

3. Whether the City of Pasadena's 6-2 system of electing members of the City Council intentionally discriminates against Latino voters on the basis of race in violation of the Fifteenth Amendment to the United States Constitution.

## Jurisdiction

The parties agree that this Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) & (4), §2201, and § 2202 for causes of action arising from 52 U.S.C. § 10301. Jurisdiction for Plaintiffs' claims under the Fourteenth and Fifteenth Amendments to the U.S. Constitution is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Jurisdiction for Plaintiffs' claim for attorney's fees is based on 52 U.S.C.A.

§10310(e) and 42 U.S.C. §1988. Venue is proper in this court under 28 U.S.C. § 1391(b) because Defendants reside in this district and the events giving rise to the claims occurred in this district. [Defendant's Original Answer, Dkt. 11 at ¶ 3]

## Motions

There are no pending motions.

## The Parties' Contentions

<u>Plaintiffs' Separate Contentions</u>

Plaintiffs contend that non-Latino voters in Pasadena (Anglos) vote sufficiently as a bloc to enable them usually defeat the Latino preferred candidate.  Plaintiffs contend that a number of factors point to the dilutive effect of the 6-2 system including the City's use, in the context of racially polarized voting, of a majority vote requirement for the at-large city council seats,  candidate slating from which Latinos are largely excluded, racial appeals in elections, a lack of Latino candidate success in at-large elections, a history in Harris County and Pasadena of voting-related racial discrimination and that Latinos "bear the effects of past discrimination … which hinder their ability to participate effectively in the political process."

Plaintiffs contend that under the totality of circumstances the challenged 6-2 election system dilutes Latino voting strength in violation of section 2.  Plaintiffs further contend that the challenged 6-2 election system purposefully discriminates against Latinos on the basis of race in violation of section 2 and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

Defendant's Separate Contentions

       The City of Pasadena, defendant in the case, disputes the plaintiffs' contentions and asserts that the 6-2 system and the implementing districting plan provides Latinos with equal electoral opportunity.  The City contends that equal opportunity exists because (i) three (50%) of the six single-member seats under the 6-2 system are elected from districts having greater than 50% Hispanic citizen voting age population and greater than 50% Spanish surname registered voters, (ii) a fourth single member district, though below 50% in Hispanic CVAP and SSRV, has successfully elected a Hispanic councilmember with 90% of the Hispanic vote and 55% of the Anglo vote, and (iii) the two at-large seats are elected from a populace of which greater than 50% of potentially eligible voters are Hispanic.  Thus, the City contends, the 6-2 system provides Latinos the opportunity to elect six of the eight council seats, which is more than proportional to the overall Hispanic share of 50.6% of the City's eligible voters.  Moreover, the City contends that, rather than legally significant racial bloc voting, there is instead consistent and significant crossover voting by roughly 30% or more of the City's Anglo population, which further enhances Hispanic electoral opportunity.  The City further contends that there is no evidence to support a finding of purposeful discrimination in connection with the adoption or implementation of the 6-2 system, which the City proposed to the voters in order to provide more and better representation than could be achieved in an all-single member system.

**Admissions of Fact**

1.  Plaintiffs are Hispanic U.S. citizens and registered voters of the City of Pasadena who challenge the recently-adopted hybrid election system for Pasadena City

Council. This is an action under the Fourteenth and Fifteenth Amendments to the
United States Constitution and the Voting Rights Act of 1965, 52 U.S.C. § 10301.

Pasadena Election Systems

2. The City of Pasadena is a Texas home rule city.

3. The municipal government provided by the Pasadena Charter is known as
"Mayor-Council Government." The powers of the City are vested in and exercised
by an elected Council comprised of a Mayor and eight Council members ("City
Council") which is empowered by the Charter to enact legislation, adopt budgets,
and determine policies of the City.  The mayor is authorized to vote on matters
coming before the council, including in order to resolve a tie vote among the other
eight members of the council.

4. Under the city charter adopted in 1964, the city was governed by a mayor and six
councilmembers elected at-large.  Although all members of the council were
elected at-large, four had to live in a designated district.

5. In 1992, the city charter was amended to increase the size of the council from six
to eight and to provide that all members would be elected from single-member
districts.

6. From 1992 to 2013, the City of Pasadena, Texas used a system of eight single
member districts to elect eight members of its City Council and elected its Mayor
at-large.

7. In Pasadena, nonpartisan elections are used to elect the nine members of the City
Council, with a majority vote required for election.

8.  In 2013, the voters, by a vote of 3,292 to 3,213 approved an amendment to the city charter providing that the city council would consist of six single-member districts and two at-large positions.

9.  The amendment to change the City's method of election was known as Proposition 1.

10. Prior to the adoption of Proposition 1, Pasadena elected its Mayor at large and elected the remaining eight council members from single member districts.

11. Proposition 1 reduced the number of single member districts in the city election system from eight to six. Two positions on the council were switched from being elected by single-member districts to being elected at-large.

12. Proposition 1 provided that the two new at large seats are elected through a place system with a majority vote requirement.

13. Under the place system used to fill the two at-large seats on the council, candidates for these seats do not all compete together for the seats.  Rather the two seats are contested separately. Candidates for an at-large position on the Council file for one of the particular places and compete only with the other candidates that file for that same place. Each voter may cast only one vote between or among the candidates for each place.

14. At large voting using numbered places precludes use of the single-shot voting strategy.

15. In an at-large system that does not use numbered places, all the candidates for at-large seats would be required to compete together, with voters allocated as many votes as at-large seats to be filled. The seats would then be awarded to a number

of candidates equal to the number of seats based on a plurality vote rule, i.e., the top N vote recipients among the candidates win the N seats.

16. In Pasadena, a candidate must also win a majority of the votes cast in order to win the seat.  If no candidate receives a majority of the votes in the initial election then a runoff election is held between the top two vote recipients.

17. Pasadena Demographics

18. The Hispanic population of the City of Pasadena is sufficiently large and geographically compact to constitute a majority of the citizen voting age population in four of eight single-member council districts.

19. The parties submitted testimony from their demographic experts that set out the population, voting-age population, and citizen-voting-age population for the various districts and for the city as a whole.  There are minor differences in some of the district totals for these three categories of population largely due to slight difference between the boundaries of the city used by the Census Bureau and the current city limits.  The differences are *de minimis*.

20. According to Plaintiffs, the total population of Pasadena based on the 2010 Census is 149,043 persons.

21. According to Defendants, the total population of Pasadena based on the 2010 Census is 149,335 persons.

22. Between 1990 and 2010 the Hispanic total population grew from 28.8 percent of the city's population to 62.2 percent.  In 1990, the U.S. Census reported that the Hispanic share of the city's citizen voting age population was 18.7%.  The U.S. Census American Community Survey (ACS) reported that the Hispanic share of

the city's citizen voting age population was 40.7 percent based on data gathered from 2006-2010 and 42.9 percent based on data gathered from 2008-2012. The 2010 one-year ACS estimate of Hispanic citizen voting age population was 43.5 percent.

23. Following the 2010 Census, Pasadena redistricted in 2011.

24. At the time the Pasadena City Council adopted its 8-0 redistricting plan in 2011, members of council were provided with the following information about voting age and registered voter population

### City of Pasadena
#### Composite Draft Adopted 8/30/11
#### 2010 Voting Age Population and 2011 Registered Voters-Spanish Surname Registered Voters

| District | Total VAP | All Registered Voters | SSRV | Percent SSRV |
|----------|-----------|------------------------|------|--------------|
| A | 11,827 | 4,849 | 2,868 | 59.15% |
| B | 11,882 | 5,519 | 2,796 | 50.66% |
| C | 11,907 | 5,212 | 2,610 | 50.08% |
| D | 12,040 | 6,720 | 3,376 | 50.24% |
| E | 13,188 | 7,087 | 2,461 | 34.73% |
| F | 14,452 | 9,142 | 2,036 | 22.27% |
| G | 13,691 | 6,172 | 2,130 | 34.51% |
| H | 14,070 | 12,255 | 1,390 | 11.34% |

# City of Pasadena

## Composite Draft Adopted 8/30/11

Summary 2010 Census Total and Voting Age Population

| District | Persons | Deviation | Hispanic % of Total Population | Non-Hispanic Anglo % of Total Population | Non-Hispanic Black % of Total Population | Non-Hispanic Asian % of Total Population | Non-Hispanic Other % of Total Population |
|---|---|---|---|---|---|---|---|
| A | 17,915 | -4.01% | 83.82% | 13.11% | 1.78% | 0.63% | 0.65% |
| B | 17,831 | -4.46% | 79.28% | 18.47% | 1.18% | 0.33% | 0.74% |
| C | 18,353 | -1.67% | 80.70% | 16.03% | 2.15% | 0.31% | 0.81% |
| D | 17,969 | -3.72% | 69.75% | 27.86% | 1.18% | 0.42% | 0.78% |
| E | 19,001 | 1.81% | 65.19% | 31.78% | 1.79% | 0.34% | 0.89% |
| F | 19,444 | 4.18% | 43.12% | 49.91% | 1.99% | 3.59% | 1.39% |
| G | 19,355 | 3.70% | 60.70% | 32.65% | 3.52% | 2.11% | 1.01% |
| H | 18,801 | 0.73% | 17.00% | 69.68% | 2.26% | 8.88% | 2.15% |
| **Totals** | **148,669** | | **62.03%** | **32.79%** | **2.00%** | **2.11%** | **1.06%** |

**Ideal Size = 148,669 / 8 = 18,664 per district.**

**Total Maximum Deviation = 4.18% - (-4.46%) = 8.64%**

Some percentages may be subject to rounding error.

| District | Total VAP* | | Hispanic % of Total VAP | Non-Hispanic Anglo % of Total VAP | Non-Hispanic Black % of Total VAP | Non-Hispanic Asian % of Total VAP | Non-Hispanic Other % of Total VAP |
|---|---|---|---|---|---|---|---|
| A | 11,827 | | 79.95% | 16.80% | 1.78% | 0.79% | 0.68% |
| B | 11,882 | | 73.58% | 23.89% | 1.33% | 0.40% | 0.80% |
| C | 11,907 | | 76.32% | 20.42% | 2.11% | 0.39% | 0.76% |
| D | 12,040 | | 64.12% | 33.47% | 1.14% | 0.53% | 0.75% |
| E | 13,188 | | 57.20% | 39.90% | 1.62% | 0.43% | 0.86% |
| F | 14,452 | | 37.08% | 55.86% | 2.00% | 3.80% | 1.26% |
| G | 13,691 | | 54.38% | 39.09% | 3.32% | 2.29% | 0.89% |
| H | 14,070 | | 14.71% | 72.79% | 1.90% | 8.91% | 1.69% |
| **Totals** | **103,057** | | **55.72%** | **39.02%** | **1.92%** | **2.35%** | **0.98%** |

*Voting Age Population

Some percentages may be subject to rounding error.

Composite 3 - 9/8/2011

*25.* The 8-0 redistricting plan adopted in 2011 contained four districts with a majority Spanish surname voter registration (SSVR).  SSVR in District A was 59.15%. *Id.* SSVR in District B was 50.66%. *Id.* SSVR in District C was 50.08%. *Id.* SSVR in District D was 50.24%. *Id.* SSVR in District E was 34.73%. *Id.*

26. In four districts in the 8-0 redistricting plan—A, B, C, and D—Latinos constituted the majority of citizen voting age population.  Latinos continue to constitute the majority of citizen voting age population in four districts in the 8-0 redistricting plan.

27. At the time the Pasadena City Council adopted its 6-2 redistricting plan in April 2014, members of council were provided with the following information about citizen voting age and registered voter population

| District | % HCVAP | % SSVR |
|---|---|---|
| A | 69.02% | 67.65% |
| B | 55.91% | 55.16% |
| C | 54.35% | 52.97% |
| D | 44.66% | 42.50% |
| E | not provided to Council | 31.91% |
| F | not provided to Council | 14.97% |

(2008-2012 5-Year ACS, as reported by City at PASADENA010128; SSVR reported by City in 2014 at PASADENA000201)

28. According to Defendants, the demographic data for the 6-2-1 election system that

is being challenged in this litigation shows the following characteristics according

to the sources indicated in parentheses:

| District | Population (2010 Census) | Percent Hispanic VAP (2010 Census) | Percent Hispanic CVAP (2009-2013 5-Year American Community Survey) | Percent Hispanic CVAP (2015 1-Year American Community Survey) | Percent SSRV September 24, 2016 |
|---|---|---|---|---|---|
| A | 24,607 | 82.85% | 71.5% | Not Available | 71.03% |
| B | 24,997 | 72.46% | 58.0% | Not Available | 59.51% |
| C | 24,719 | 65.21% | 61.4% | Not Available | 56.47% |
| D | 24,800 | 59.08% | 45.3% | Not Available | 45.87% |
| E | 24,752 | 41.215 | 35.2% | Not Available | 32.95% |
| F | 25,460 | 21.20% | 22.3% | Not Available | 16.70% |
| Total | 149,335 | 55.78% | 45.8% | 50.6 | 41.97% |

29. According to Plaintiffs, the demographic data for the 6-2 election system that is being challenged in this litigation shows the following characteristics according to the sources indicated in parentheses:

**City of Pasadena 6 Single Member City Council Districts**

| District | City of Pasadena | Current 1 | Current 2 | Current 3 | Current 4 | Current 5 | Current 6 |
|---|---|---|---|---|---|---|---|
| **Population** | 149043 | 24607 | 25013 | 24737 | 24800 | 24694 | 25192 |
| **Deviation from Ideal 8** | | 5977 | 6383 | 6107 | 6170 | 6064 | 6562 |
| **Deviation %** | | 32.08% | 34.26% | 32.78% | 33.12% | 32.55% | 35.22% |
| **Hispanic Population** | 92692 | 21263 | 19512 | 17470 | 16504 | 11705 | 6238 |
| **Hispanic % of Total Pop** | 62.19% | 86.41% | 78.01% | 70.62% | 66.55% | 47.40% | 24.76% |
| **Voting Age Population** | 103267 | 15962 | 16559 | 16611 | 17068 | 18417 | 18650 |
| **Hispanic VAP** | 57710 | 13224 | 12000 | 10830 | 10083 | 7588 | 3985 |
| **Hispanic % of VAP** | 55.88% | 82.85% | 72.47% | 65.20% | 59.08% | 41.20% | 21.37% |
| **Citizen Voting Age Population** | 79704.0 | 9840.5 | 11117.5 | 12719.5 | 12996.6 | 15599.7 | 17430.3 |
| **Hispanic CVAP** | 36561.1 | 7036.7 | 6450.7 | 7803.3 | 5889.2 | 5496.0 | 3885.1 |
| **Hispanic % of CVAP** | 45.87% | 71.51% | 58.02% | 61.35% | 45.31% | 35.23% | 22.29% |

(CVAP calculated using Census ACS 2009-2013 5-Year data; Population reported from 2010 Census data.)

30. According to Plaintiffs, if it was in effect today, the 8-0 redistricting plan adopted

by the City of Pasadena in 2011 would   show the following characteristics

according to the sources indicated in parentheses:

**City of Pasadena 8 Single Member City Council Districts**

| District | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| **Population** | 17915 | 18362 | 18353 | 17986 | 19002 | 19449 | 19426 | 18550 |
| **Deviation from Ideal 8** | -715 | -268 | -277 | -644 | 372 | 819 | 796 | -80 |
| | -3.84% | -1.44% | -1.49% | -3.46% | 2.00% | 4.40% | 4.27% | -0.43% |
| **Hispanic Population** | 15017 | 14585 | 14811 | 12541 | 12391 | 8386 | 11778 | 3183 |
| **Hispanic % of Pop** | 83.82% | 79.43% | 80.70% | 69.73% | 65.21% | 43.12% | 60.63% | 17.16% |
| **Voting Age Population** | 11827 | 12231 | 11907 | 12051 | 13189 | 14455 | 13733 | 13874 |
| **Hispanic VAP** | 9456 | 9017 | 9087 | 7723 | 7546 | 5360 | 7462 | 2059 |
| **Hispanic % of VAP** | 79.95% | 73.72% | 76.32% | 64.09% | 57.21% | 37.08% | 54.34% | 14.84% |
| **Citizen Voting Age Population** | 7367.0 | 8727.2 | 7859.6 | 9624.9 | 10031.3 | 12388.3 | 10143.6 | 13562.2 |
| **Hispanic CVAP** | 4823.1 | 5420.5 | 5108.0 | 5877.8 | 4597.0 | 4253.9 | 4043.3 | 2437.5 |
| **Hispanic % of CVAP** | 65.47% | 62.11% | 64.99% | 61.07% | 45.83% | 34.34% | 39.86% | 17.97% |

31. The ACS one-year estimate of the citywide Hispanic share of total CVAP for

2015 is 50.6% with a margin of error (MOE) of approximately 3.3%.   The MOE

is based on 90% statistical confidence, which is the Census Bureau standard for

ACS MOE estimates.  The 90% interval estimate for the citywide Hispanic share

of total CVAP runs from 47.3% (= 50.6 minus 3.3%) to 53.9% (= 50.6% plus

3.3%%).  The ACS five-year estimate of the Hispanic share of total CVAP for

2010-2014 is 47.3% with an MOE of approximately 1.4%.  This yields a 90%

interval estimate running from 45.9% (= 47.3% minus 1.4%) to 48.7% (= 47.3%

plus 1.4%).  The one-year 2015 interval is based on a smaller sample and more recent data; one-year data is from surveys collected in 2015 while five-year data is from surveys collected from 2010 to 2014.

32. As of September 2016, Latinos constitute 41.97% of the voter registration of Pasadena.

Enactment of Proposition 1

33. On June 25 2013, in *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013), the U.S. Supreme Court invalidated the geographic coverage formula of section 5 of the Voting Rights Act, codified at 52 U.S.C.§ 10304. Following the Supreme Court's decision in *Shelby*, Texas and its political subdivisions, including the City of Pasadena, were no longer required to secure federal approval before implementing changes to their voting systems.

34. In June 2013, Mayor Isbell called for the creation of a committee of Pasadena citizens to consider a potential bond election. Shortly thereafter the committee was charged with also considering amendments to the city charter.  Mayor Isbell appointed the members of the Committee after soliciting and receiving recommendations from all members of the City Council.

35. The Committee met and discussed whether to recommend a bond proposal for the upcoming November city election.

36. At the Committee's third meeting, Mayor Isbell proposed that the Committee recommend specific amendments to the City Charter. Mayor Isbell's proposed charter amendments included an amendment that would modify the city's election system by converting one or more of the eight existing single-member districts to at-large districts.

37. Mayor Isbell explained at the third meeting that the City could adopt the change in its election scheme without having to submit the change for federal review following the U.S Supreme Court decision one month earlier in *Shelby*.

38. The Mayor stated that his reason for recommending the change in the City's election scheme was to provide residents with more than one representative on council.

39. The Committee met for the fourth time on July 29, 2013. Following concerns raised by a Councilmember over whether proper public notice had been posted in accordance with the requirements of the City charter, t meeting was conducted as a closed meeting with only members of the committee permitted to attend.  The meeting was closed to the public and closed to members of the City Council.

40. Following its fourth meeting, the Committee recommended that the City submit four propositions to the voters in the upcoming November election for authority to sell bonds.

41. The Committee's Chairman issued a memo regarding  the Committee's recommendations.  The memo identified four changes to the City Charter that were recommended by the Committee.  Those changes concerned (i) documentation of candidate residency, (ii) the schedule City Council meetings, (iii) the procedures for electing a mayor pro tem, and (iv) an increase in candidate filing fees and candidate petition signatures.  The Committee did not make a recommendation regarding placing on the November ballot a change the City's election system.  Following its recitation of the Committee's recommended charter changes, the memo stated:  "After careful consideration of these issues,

the sense of the committee is that more time and research should be devoted to any changes in the City Charter and that to conduct an election addressing both the issuance of bonds and changes to the Charter would not be in the best interests of the people of Pasadena.  The committee believes that the City has many needs for improved infrastructure and that the City Council should focus on these needs at this time.  Changes to the Charter could be and should be addressed at another time."

42. On August 13, 2013, the Mayor asked the City Council to consider an ordinance placing four city bond propositions on the November ballot.

43. Also on August 13, the City engaged the law firm of Bickerstaff, Heath, Delgado, Acosta LLP to provide legal services relating to the charter changes and redistricting.

44. On August 15, 2013, the City Council voted on the four bond propositions.  There were 5 votes for the bonds, including the Mayor, and 3 votes against.

45. On August 15, 2013, Mayor Isbell circulated a memo to the City Council announcing that he had decided to withdraw the bond propositions recommended by the Committee, "as a result of opposition to the bond proposal by three Members of Council." Mayor Isbell wrote, "if the governing body is split on the issue, then voters become concerned about the real need for the projects proposed." Mayor Isbell proposed instead an election to amend the City Charter to make the four changes recommended by the Committee plus a fifth change recommended by the Mayor to change the voting system .

46. On August 20, 2013, at a public meeting and after receiving public comments, the City Council passed on first reading Ordinance 2013-126, calling a Special Election to be held on Tuesday, November 5, 2013, for the purpose of submitting to the voters of Pasadena various propositions for amending the City Charter, including Proposition 1 -- a change to the City's system of electing members of the City Council.

47. The vote was 4-4 among the eight members of the Council elected from single member districts.

48. The Mayor cast his vote in favor of placing Proposition 1 on the November ballot, making the vote 5-4 in favor. The four City Council members who voted against placing Proposition 1 on the ballot represented majority Hispanic voting age population districts. Three of the five affirmative votes were cast by persons who represented constituencies with a Hispanic voting-age-population majority.

49. During discussion of Proposition 1 at the August 20, 2013 Council meeting, Councilmember Don Harrison stated that he believed Proposition 1 violated the federal Voting Rights Act.

50. On August 22, 2013, at another public meeting and after again receiving public comment, the City Council passed Ordinance 2013-126 on final reading. The vote to place Proposition 1 on the November ballot was again 4-4 among the eight members of the Council elected from single member districts.  The Mayor cast his vote in favor of placing Proposition 1 on the November ballot, making the vote 5-4 in favor. The four City Council members who voted against placing Proposition 1 on the ballot represented majority Hispanic voting age population districts.

Three of the five affirmative votes were cast by persons who represented constituencies with a Hispanic voting-age-population majority.

51. On November 5, 2013, Pasadena voters by a vote of 3292 to 3213 approved Proposition 1, which provided that the city council would consist of six single-member districts and two at-large positions.  Hispanics and non-Hispanics exhibited different voting patterns in that election.

52. On March 4, 2014, the City Council held a council workshop at which Mayor Isbell presented three alternative redistricting plans for the new 6-2 hybrid election system for City Council.  Mayor Isbell favored Plan 2.

53. At a City Council public hearing on redistricting, held on March 18, 2014, Mayor Isbell indicated that he favored "Plan 2." At this meeting, Council members and members of the public raised concerns about the legality of the maps.

54. At the April 1, 2014City Council meeting, Council member Pat Van Houte expressed concerns over the legality of the redistricting plan. While discussing her concerns regarding the legality of Plan 2, Council member Van Houte exceeded her debate time limit of three minutes. Pursuant to the rules previously adopted by the city council, establishing time limits, the mayor extended Ms. Van Houte's time limit. Following both the extensions and multiple warnings by the Mayor to conclude her remarks, Council member Van Houte continued to speak and Mayor Isbell ordered armed police officers to remove her from the council chambers. When Council member Van Houte was removed from the chamber, three more council members departed in protest. Plan 2 was passed on first reading with four council members and the Mayor in attendance.

55. On April 15, 2014, at a public meeting and after receiving public comment, the City Council passed redistricting Plan 2 on final reading.

56. The change from eight single member districts to a hybrid system of six single member districts and two at-large seats reduced the number of single member districts in which Hispanics comprise the majority of the citizen voting age population from four to three; however, the one-year ACS for both 2013 and 2015 showed that the two at-large places also had a Hispanic-citizen-voting-age population majority. The one-year ACS for 2014 showed that the City had a Hispanic citizen voting age population of 48.1%.

Voting by Hispanics and Non-Hispanics in Pasadena

57. Hispanic voters give cohesive support to Hispanic and Hispanic-preferred candidates and policy positions in City of Pasadena elections.

58. Dr. Engstrom determined the candidate preferences of Latino and non-Latino voters by analyzing the numbers of votes cast for the various candidates in each of the precincts in Pasadena used in certain elections, and the racial composition of those precincts. Dr. Engstrom determined the racial composition of precincts by looking at the total number of voters receiving ballots and the number of Latinos among them.

59. In their analyses of the patterns of voting for Hispanics and Anglos in Pasadena, Plaintiffs' expert Dr. Richard Engstrom, and Defendant's expert Dr. John Alford, both relied on the statistical technique of Ecological Inference (EI), developed originally by Professor Gary King. EI is a more efficient technique developed

specifically to improve on ecological regression, the analysis technique previously used in VRA lawsuits to assess voter cohesion and polarization.

60. Dr. Alford replicated the EI analysis reported by Dr. Engstrom.  While there were the expected minor variations in estimated vote shares that are typically seen with these techniques, there were no substantive differences, with the single exception of a difference in the preferred candidate of Hispanic voters in the 2010 Republican primary contest for County Commissioner.

61. Dr. Alford used the vote share estimates that Professor Engstrom provided in his analysis for the election discussion in Dr. Alford's report.

62. Elections presenting voters with a choice between or among Latino and non-Latino candidates are generally considered the most probative for assessing RPV when Latinos are the minority at issue in a case.

Elections Featuring All of Pasadena

63. In the November 2013 election to change Pasadena's method of election (Proposition 1), Latino voters opposed Proposition 1 with an estimated 99.6% of their votes. Non-Latino voters supported Proposition 1 with an estimated 60.2% of their votes.  Proposition 1 prevailed.

64. In the May 2015 at-large election for Place H on the Pasadena City Council, the Latino candidate, Oscar Del Toro, received an estimated 39.1% of the citywide vote and lost to his Anglo opponent.   Latino voters supported Mr. Del Toro with an estimated 87.3% of their votes.  Non-Latino voters supported Mr. Del Toro's Anglo opponent with an estimated 71.7% of their vote and gave 28.3% of their vote to Mr. Del Toro.

65. In the May 2015 at-large election for Place G on the Pasadena City Council featured a race between two Anglo candidates:  Pat Van Houte and Steve Cote. Ms. Van Houte had previously represented Hispanic-majority single member District D where she was the Hispanic-preferred candidate.  Plaintiffs' Summary Judgment Brief at 3, 25.  Latino voters gave 70.6% of their votes to Ms. Van Houte.  Non-Latino voters gave Mr. Cote 58.4% of their votes and gave Ms. Van Houte 41.6% of their votes.  Ms. Van Houte won the seat.

66. An examination of the votes in Pasadena precincts in the 2012 General Election race for Sheriff featuring Adrian Garcia, the Democratic nominee, shows that Latino voters gave 95.9% of their support to Garcia and non-Latino voters gave 17.6% of their votes to Garcia.

67. An examination of the votes in Pasadena precincts in the 2010 General Election race for County Commissioner featuring Sylvia Garcia, the Democratic nominee, shows that Latino voters gave 98.4% of their support to Garcia and non-Latino voters gave 20.9% of their votes to Garcia.

68. An examination of the votes in Pasadena precincts in the 2008 General Election race for Sheriff featuring Adrian Garcia, the Democratic nominee, shows that Latino voters gave 98.2% of their support to Garcia and non-Latino voters gave 28.6% of their votes to Garcia.

69. An examination of the votes in Pasadena precincts in the 2010 General Election race for County Treasurer featuring Orlando Sanchez, the Republican nominee, shows that Latino voters gave Sanchez 17.8% of their support and non-Latino voters gave 79.9% of their votes to Sanchez.

70. An examination of the votes in Pasadena precincts in the 2008 Democratic Primary Election race for Sheriff featuring Adrian Garcia shows that Latino voters gave 88.4% of their support to Garcia and non-Latino voters gave 36.5% of their votes to Garcia.

71. An examination of the votes in Pasadena precincts in the multi-candidate 2012 Republican Primary Election race for Sheriff featuring Ruben Monzon shows that Latino voters gave 38.6% (a plurality) of their support to Monzon and spread 61.4% of their support across seven other non-Latino candidates.  Non-Latino voters gave 8.7% of their votes to Monzon.

72. An examination of the votes in Pasadena precincts in the 2012 Democratic Primary Election race for Sheriff featuring Adrian Garcia shows that Latino voters gave 86.7% of their support to Garcia and non-Latino voters gave 73.2% of their votes to Garcia.

73. If only votes cast by Pasadena residents had counted, none of the following candidates preferred by Latino voters would have obtained an office: Adrian Garcia (2012GE), Sylvia Garcia (2010GE), Adrian Garcia (2012GE), Adrian Garcia (DP2008), Ruben Monzon (2012RP).

74. Although the parties can agree on the estimated percentages of support for these candidates in partisan races, they do not agree on whether partisan races are relevant or probative in determining if there is racially polarized voting in a non-partisan election system.

Elections Featuring a Portion of Pasadena Geography

75. In the May 2015 election for City Council Dist. A, incumbent Ornaldo Ybarra was reelected with 97% of the Latino vote and 55.4% of the non-Latino vote.  The estimated HCVAP for Dist. A is 71.51%.

76. In the May 2015 election for City Council Dist. B, which was an open seat, the Latino candidate, Celestino Perez, was defeated.  Perez received 82% of the Latino vote and 36.3% of the non-Latino vote.  The estimated HCVAP for Dist. B is 58.02%.

77. In the May 2015 election for City Council Dist. D, incumbent Cody Ray Wheeler was reelected with 89.5% of the Latino vote and 55.1% of the non-Latino vote. The estimated HCVAP for Dist. D is 45.31%.

78. These CVAP estimates are based on a five-year sample of data collected between 2009 and 2013.

79. Between 1990 and 2010, the Hispanic population in Pasadena grew from 28.8 percent of the city's population to 62.2 percent.  During that same period, the Hispanic share of the city's citizen-voting-age population grew from 18.7 percent to 42.9 percent based on the 2008-2012 five-year ACS or 43.5 percent based on the 2010 one-year ACS.  The ACS one-year estimate of the citywide Hispanic share of total CVAP for 2015 is 50.6% with a margin of error (MOE) of approximately 3.3%.   The MOE is based on 90% statistical confidence, which is the Census Bureau standard for ACS MOE estimates.  The 90% interval estimate for the citywide Hispanic share of total CVAP runs from 47.3% (= 50.6 minus 3.3%) to 53.9% (= 50.6% plus 3.3%%).  The ACS five-year estimate of the Hispanic share of total CVAP for 2010-2014 is 47.3% with an MOE of

approximately 1.4%.  This yields a 90% interval estimate running from 45.9% (= 47.3% minus 1.4%) to 48.7% (= 47.3% plus 1.4%).  The one-year 2015 interval is based on a smaller sample and more recent data; one-year data is from surveys collected in 2015 while five-year data is from surveys collected from 2010 to 2014.

History of Election of Latinos to the Pasadena City Council

80. Prior to 1992, one Hispanic member of the council, Roy Ybarra was elected at-large.  Mr. Ybarra served three two-year terms beginning in 1973, 1975, and 1977.

81. Under the single member district system adopted in 1992, Mr. Emilio Carmona, a Hispanic, was elected to the council from District C, a single-member district, in 1993 and was reelected in 1995, 1997, and 1999.  In the 1999 election he was unopposed.

82. In 2009, Mr. Ornaldo Ybarra was elected to the council in District A.  He was reelected from that district in the eight-single-member district system in 2011 and 2013.

83. In 2013 a Hispanic, Mr. Cody Ray Wheeler, was elected to the council from District E.

84. In the May 2013 municipal election, an Hispanic candidate unsuccessfully challenged the incumbent Mayor Johnny Isbell.

85. In 2015, in the first election under the 6-2-1 system, Mr. Ybarra was elected from District A, Mr. Wheeler was elected from District D, and Mr. Sammy Casados

was elected from District C.  This marked the first time that three Hispanics had
served on the council at the same time.

86. District D, from which Councilman Wheeler was elected in 2015 under the 6-2-1
plan, contains 92.4 percent of the persons who resided in the former District E
that elected Mr. Wheeler under the 8-0-1 plan.  70.8 percent of the persons living
in the current District D were previously in the former District E.

Pasadena City Council Campaigns

87. In the 2015 election under the 6-2-1 plan, Pat Van Houte successfully running for
an at-large position spent less than $3,000 on her 2015 election effort, $2,250 of
which was reimbursed by the Area 5 Democrats.  Additionally, she received an
in-kind contribution of robo-calls.

88. In the 2015 election under the 6-2 plan, Oscar del  Toro ran unsuccessfully for an
at-large position and spent $5,065.13 on his election effort.

89. Johnny Isbell funded Citizens to Keep Pasadena Strong (CKPS), a Pasadena
political action committee, chose which candidate CKPS would oppose in the
May 2013 municipal elections, and reviewed and approved campaign materials
sent by CKPS.   (Isbell Dep. 69:15-71:25, May 27, 2016).  During the campaign
leading up to the May 2013 municipal election, all of the funding for CKPS came
from Mayor Isbell's campaign account.

90. CKPS spent $30,515.00 during the 2013 municipal election campaign.

91. Among other things, CKPS funded campaign efforts in opposition to Don Harrison in the May 2013 municipal election.  Don Harrison's opponent was Hispanic.

92. In the May 2015 Pasadena city council election, Johnny Isbell contributed $74,550.00—99.66% of all 2015 contributions—to CKPS.

93. CKPS spent $71,020.65 during the 2015 municipal election campaign.

94. CKPS funded campaign efforts in support of the following municipal candidates in 2015: Darrell Morrison, Steve Cote, Emilio Carmona, Cary Bass, Bruce Leamon, and John E. "Bear" Hebert.  Mr. Leamon, Mr. Bass, and Mr. Morrison were elected.

95. In the 2015 City election, the Area 5 Democrats expended approximately $ 11,659.95 in support of Pat Van Houte, Oscar Del Toro, Celestino Perez, Sammy Casados, Cody Ray Wheeler and Larry Peacock for city council.  Ms. Van Houte, Mr. Casados and Mr. Wheeler were elected.

96. When the City of Pasadena changed its council election system from 8 single-member districts to 6 single-member districts, the City reported that the ideal population size of each district increased by a third from 18,667 to 24,889, or from 12.5% of the city's population to 16.7%.

**Disputed Facts**

1. Whether the non-Latino majority votes as a bloc usually to defeat the Latino choice?

2. Whether the existing 6-2 election system denies Latinos an equal opportunity to participate in the political process and to elect candidates of their choice?

3.  Whether the current 6-2 election system was enacted for the purpose of discriminating against Latino voters?

**Agreed Applicable Propositions of Law**

1.  Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, applies nationwide and prohibits voting practices and procedures that result in the denial or abridgement of the right of any citizen to vote on account of race, color or membership in a language minority group. Section 2 is a permanent provision of the federal Voting Rights Act.

2.  In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the U.S. Supreme Court set out a framework for determining whether a districting plan dilutes minority voting strength in violation of Section 2. In *Gingles*, the Supreme Court established a two-step inquiry for analysis of vote dilution claims. *Id.* at 50-51. First, the minority group must be able to demonstrate: (1) "that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "that it is politically cohesive;" and (3) "that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate." *Id.*

3.  The second step of the inquiry requires the Court "to consider the 'totality of the circumstances' and to determine, based 'upon a searching practical evaluation of the 'past and present reality' whether the political process is equally open to minority voters.'" Id. at 79 (citations and internal quotation marks omitted). The Senate Judiciary Committee, in a report accompanying the 1982 amendments to the Voting Rights Act, provided a non-exclusive list of factors that a court should

consider in determining whether the challenged practice impermissibly impairs the ability of the minority group to elect their preferred representatives.

4. These 'totality of the circumstances' factors include, but are not limited to:

    a. the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

    b. the extent to which voting in government elections is racially polarized;

    c. the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting);

    d. exclusion of minorities from a candidate slating process;

    e. the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

    f. the use of overt or subtle racial appeals in political campaigns;

    g. the extent to which minorities have been elected to public office in the jurisdiction.

    h. Additional factors are: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy underlying the . . . use of

such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep. at 29; *see also Gingles*, 478 U.S. at 48 n.15.

    i.   Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area. *League of United Latin Am. Citizens*, 548 U.S. at 426.

5. Section 2 of the Voting Rights Act of 1965 also prohibits intentional racial discrimination in voting practices and procedures.

6. The Fourteenth Amendment to the U.S. Constitution provides, in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

7. The Fourteenth Amendment forbids intentional discrimination in voting, including in the use of at-large voting systems. C*ity of Mobile, Ala. v. Bolden*, 446 U.S. 55, 66 (1980) *superseded in part by statute on other grounds* by 42 U.S.C. § 1973. A claim of intentional discrimination in voting asserts that the jurisdiction "enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities'" *Miller v. Johnson*, 515 U.S. 900, 911 (1995).

8. The Fifteenth Amendment to the U.S. Constitution provides, in relevant part: "The right of citizens of the United States to vote shall not be denied or abridged

by the United States or by any State on account of race, color, or previous condition of servitude.

9. An intentional vote dilution under the Fifteenth Amendment is analyzed in the same manner as a claim under the Fourteenth Amendment. *See Rogers v. Lodge*, 458 U.S. 613, 621 (1982) (holding that district court demonstrated "understanding of the controlling standard by observing that a determination of discriminatory intent is 'a requisite to a finding of unconstitutional vote dilution' under the Fourteenth and Fifteenth Amendments."). *See also Gomillion v. Lightfoot*, 364 U.S. 339, 346 (1960) ("When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment.").

10. Section 3(c) of the Voting Rights Act of 1965, 52 U.S.C.A. § 10302 (c), authorizes a federal court, following a finding "that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision," to order a jurisdiction to obtain federal preclearance of its election changes pursuant to section 5 of the Voting Rights Act. Section 3(c) is a permanent provision of the federal Voting Rights Act.

### Contested Issues of Law

The parties dispute the legal standards governing the evaluation of proportionality under the totality of circumstances in a section 2 case.

The parties also contest whether, where there is opportunity to participate in the political process and to elect candidates of the minority group's choice that is

proportional to the group's percentage of the jurisdiction's citizen-voting-age population, there is no injury, and hence, no standing.

The parties further contest whether, where a plaintiff group is a majority of the citizen voting age population in a district, yet fails to elect its electoral choice, that circumstance represents a failure to take advantage of the opportunity rather than the absence of opportunity.

## Exhibits

See attached.

## Witnesses

See attached.

## Settlement

Settlement does not appear to be likely at this time. Among other issues, the city is governed by its charter and the Fifth Circuit has ruled that a charter-imposed election system cannot be changed based solely on the agreement of the parties to a lawsuit. *See Overton v,. City of Austin,* 748 F.2d 941, 955 n. 17, 956 (5th Cir. 1984).

## Trial

The trial will be nonjury.  The probable length of trial is six days.  Witnesses are available and the parties do not foresee any logistical problems.

### Additional Required Attachments

**For nonjury trials include:**

(a) Proposed findings of fact and conclusions of law.  See attached

(b) Memoranda of law.  See attached

_____          _____

Date                                                    LEE H. ROSENTHAL

                                                         UNITED STATES DISTRICT JUDGE

APPROVED:

_____          _____

Nina Perales                                        Date

Counsel for Plaintiffs

_____          _____

C. Robert Heath                                   Date

Counsel for Defendants