IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALBERTO PATINO, *et al.*, | § § § | |
| Plaintiffs, | § | |
| v. | § § | Civil Action No. 4:14-cv-03241 |
| CITY OF PASADENA, *et al.*, | § § § | |
| Defendants. | § | |

**PLAINTIFFS' PRE-TRIAL PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW**

**PROPOSED FINDINGS OF FACT**

**Admissions of Fact**

1. Plaintiffs incorporate by reference the Admissions of Facts from the Joint Pre-Trial Order.

**Additional Proposed Findings of Fact**

History of Section 5 Objections to Conversion from District to At-Large Voting

2. On December 21, 2012, the United States Department of Justice interposed an objection, pursuant to section 5 of the federal Voting Rights Act, to a proposal by the Beaumont Independent School District to change its method of election from seven single member districts to five single member districts and two seats elected at large. The Department of Justice noted that it had previously blocked a proposal by the Beaumont ISD to consolidate with another school district and employ at-large voting.

3. On October 3, 2011, the United States Department of Justice declined to withdraw its objection, pursuant to section 5 of the federal Voting Rights Act, to a proposal by the City of Galveston to change its method of election from six single member districts to

1

four single member districts and two seats elected at large. The Department of Justice noted that it had previously objected to a 6-2 method of election proposed by the City in 1992.

4. On August 12, 2002, the United States Department of Justice interposed an objection, pursuant to section 5 of the federal Voting Rights Act, to a proposal by the City of Freeport, Texas to change its method of election from four single member districts to at-large elections with numbered positions.

Racially Polarized Voting

5. Non-Latinos in Pasadena vote sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate.

6. Voting is racially polarized in Pasadena, especially elections in which all voters in Pasadena can participate.

7. Non-Latino voters across the city do not share the preference of Latino voters.

8. Analysis of exogenous Harris County elections supports the conclusion that non-Latinos bloc vote in Pasadena. If only votes cast by Pasadena residents had counted, none of the following candidates preferred by Latino voters would have obtained an office: Adrian Garcia (2012GE), Sylvia Garcia (2010GE), Adrian Garcia (2012GE), Adrian Garcia (DP2008), Ruben Monzon (2012RP).

9. The at-large elections now used in the 6-2 system in Pasadena will be dilutive of the Latino vote, especially given the place system and majority vote rule under which they are conducted.

10. Non-Latino voters have the ability to veto the election of Latino-preferred candidates, as has been demonstrated by the election to Place H on the council in 2015, by the votes cast

within the city for elections to Harris County offices in 2008, 2010, and 2012, and also by the result of the Proposition 1 vote in 2013.

11. The at-large elections now used in the 6-2 system in Pasadena serve to exacerbate that situation by enhancing the ability of the non-Latino voters to veto the Latino candidates preferred by Latino voters.

Effect of Adoption of the 6-2 System

12. The 6-2 redistricting plan reduced Latino voting strength in Pasadena. Latino-majority District D, located in the far north side of Pasadena, was eliminated – consumed by Latino majority Districts A, B, and C which were forced to take on territory to meet the new ideal population in a six-district plan. The District D identifier was assigned to an Anglo majority district farther south in Pasadena.

Totality of Circumstances

13. The legacy of official discrimination in voting has negatively affected the voter registration and participation of Latinos in Pasadena.

14. "Texas has a long, well-documented history of discrimination that has touched upon the rights of African–Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the State as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act." *League of United Latin Am. Citizens v. Perry*, 126 S. Ct. 2594, 2622 (2006).

15. The political, social, and economic legacy of past discrimination for Latinos in Texas, may well hinder their ability to participate effectively in the political process. *League of United Latin Am. Citizens v. Perry*, 126 S. Ct. 2594, 2622 (2006).

16. Texas enacted a law in 1918 to eliminate interpreters at the polls. [(Act of March 23, 1918, 35th Leg., 4th C.S. Ch. 30 (H.B. 104); Tijerina at 12]. The following year, Texas enacted a requirement that election officials could only communicate in English in the polling place. (Act of March 13, 1919, 36th Leg. Ch. 55 (S.B. 244), 1919 Tex. Gen. Laws p. 94)

17. The 1903 Terrell Election Law required payment of the poll tax in Texas between October and February. The state reformer, Terrell, said the law was intended to close "the flood gates for illegal voting as one person could buy up the Mexican and Negro votes." [Tijerina Rpt. at 12]

18. In establishing the White Man's Primary Association (WMPA) in 1904, the Texas State Democratic Executive Committee required an oath, declaring "I am a white person and a Democrat." [Tijerina Rpt. at 12]

19. In *Nixon v. Herndon*, 273 U.S. 536 (1927), the U.S. Supreme Court struck down the Texas white primary law because it violated the Fourteenth Amendment.

20. In 1927, after the Supreme Court struck down Texas' white primary law, the Texas Legislature passed a law authorizing political parties to set their own voter qualifications, and the Democratic Party simultaneously enacted a rule that only whites could vote in the primary. Nixon again filed suit, and this law was struck down in 1932. *Nixon v. Condon*, 286 U.S. 73 (1932).

21. That same year, the Texas Democratic party passed a new resolution limiting party membership to white citizens. A lower court permitted the state Democratic Party to exclude non-whites but that decision was reversed in the 1944 case *Smith v. Allwright,* 321 U.S. 649 (1944).  The Court later struck down the "Jaybird primary" for good in *Terry v. Adams*, 345 U.S. 461 (1953).

22. The poll tax was eliminated in its entirety as a prerequisite for voter participation in *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966).  In response, the first Senate bill of the first 1966 Texas legislative session required voters to register annually. The annual registration requirement was invalidated in 1971.  *Beare v. Smith*, 321 F. Supp. 1100, 1108 (S.D. Tex. 1971), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974)

23. In 1972, in *Graves v. Barnes*, 343 F. Supp. 704, 731 (W.D. Tex.), *aff'd sub nom. Archer v. Smith*, 409 U.S. 808, 93 S. Ct. 62, 34 L. Ed. 2d 68 (1972), *and aff'd in part, rev'd in part sub nom. White v. Regester*, 412 U.S. 755, 93 S. Ct. 2332, 37 L. Ed. 2d 314 (1973), the district court explained that a "cultural and language impediment, conjoined with the poll tax and the most restrictive voter registration procedures in the nation have operated to effectively deny Mexican-Americans access to the political processes in Texas even longer than the Blacks were formally denied access by the white primary."

24. In 1975, the U.S. House of Representatives Committee on the Judiciary report accompanying H.R. 6219 referred to "overwhelming evidence of voting discrimination against language minorities" and stated: "it is not surprising that the registration and voting statistics of language minorities are significantly below those of the Anglo majority. In 1972, for example, only 44.4 percent of persons of Spanish origin were

5

registered compared to 73.4 percent for Anglos." The 1974 percentages indicated similar disparity of 34.9 percent for Mexican Americans to 63.5 percent registered Anglos. As a result, the Mexican American voting rate was half of the voting rate for Anglos in 1974. *See* S.Rep. No. 295, 94th Cong., 1st Sess. 8 (1975) at 17, *reprinted in* 1975 U.S.C.C.A.N. 774.

25. The majority vote requirement and numbered place system prevent the Latino minority electorate in Pasadena from electing their candidate of choice through casting a plurality of votes and/or through single shot voting.

26. Pasadena's majority vote requirement, numbered place system, six larger city council election districts and two at-large seats tend to enhance the opportunity for discrimination against Latino voters.

27. The parties agree that Pasadena's conversion from eight to six single member districts enlarged the size city council election districts from 18,667 to 24,889 (+ 33.33%). See Joint Pre-Trial Order at ¶ 96.

28. The parties agree that Pasadena shifted two seats on the council from single member election districts with a population of 18,667 to seats elected by the city as a whole. See Joint Pre-Trial Order at ¶ 8, 96.

29. Pasadena elections are characterized by candidate slating from which Latinos are largely excluded.

30. The parties agree that Mayor Johnny Isbell created and funded a city political action committee named Citizens for Positive Change (CKPS) that campaigned against Latino candidates of choice including Cody Ray Wheeler and Don Harrison. CKPS also

supported candidates running in opposition to Latino candidates of choice. See Joint Pre-Trial Order at ¶ 89-94.

31. Latinos in Pasadena bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.

32. During the first half of the 20th century, many Mexican-American students were segregated into predominately Mexican-American schools throughout Texas, including in Houston.

33. In 1942, Pasadena, Texas, adopted a city charter that called for "Segregation of Races."

34. Refineries in and around Pasadena, Texas, hired Mexican Americans only in construction jobs and not in other positions such as refinery maintenance during the first half of the 20th Century.

35. Latinos and African-Americans experienced limited advancement and hiring in the oil refinery industry in and around Pasadena because of discriminatory labor union and employment practices.

36. The Klu Klux Klan maintained a bookstore and state headquarters on Red Bluff Road in Pasadena, Texas, until the 1980s.

37. According to 2009-2013 U.S. Census American Community Survey (ACS) data for Pasadena, the median household income was $55,896 for White Non-Hispanic residents and $39,354 for Hispanic residents.

38. As of the 2013 5-year ACS, 67.1% of White Non-Hispanic households are occupied by owners, and 49.5% of Hispanic households are occupied by owners in Pasadena.

39. According to 2009-2013 American Community Survey figures, 10.9% of White Non-Hispanic residents and 44.6% of Hispanic residents held less than a high school diploma.

40. According to the same figures, 21.5% of White Non-Hispanic residents and 5.5% of Hispanic residents held a bachelor's degree or higher.

41. The 12-month income in Pasadena as of the 2009-2013 ACS was below poverty level for 27.2% of Hispanic residents and for 11.1% of White Non-Hispanic residents.

42. There were 1.01 or more occupants per room in 16.1% of Hispanic households and 1.2% of White Non-Hispanic households in Pasadena as of the 2009-2013 ACS.

43. Racial appeals are present in Pasadena elections.

44. In 2015, Mayor Isbell's political action committee funded campaign mailers advocating against the election of Cody Ray Wheeler that featured photos of Mr. Wheeler and President Barack Obama and featured photos and references to ACORN.

45. Only one Latino has ever been elected to the City council in an at-large seat, and that was most recently in 1977.

46. The Pasadena City Council has been "unresponsive to the particularized needs" of Latinos and the reasons supporting conversion from an 8-0 election system to a 6-2 system were tenuous.

47. The City of Pasadena city council voted in 2012 to end its contract with Harris County Transit Services that provided a fixed-route service that ran through Pasadena. (Van Houte Dep. 197:23-199:25; Cayten, Phil Dep. 22:25-24:12).

48. The number of districts in which Latinos constitute a majority is not roughly proportional to the Latino share of Pasadena citizen voting age population.

49. Latinos have an equal opportunity to elect their candidate of choice to three of eight city council seats in the 6-2 plan.

50. Latinos do not have an equal opportunity to elect their candidate of choice in at-large elections in Pasadena.

51. Rough proportionality for Latinos in Pasadena would be Latino citizen voting age majorities in four of eight city council seats.

Intentional Racial Discrimination

1. The City's efforts to influence voter turnout in district and at-large elections, at a time when Latinos were poised to exercise significant political strength on the City council, weigh heavily towards a finding, under the totality of circumstances, that the 6-2 election system is dilutive.

2. The City specifically targeted Anglo voters to urge them to vote in favor of the change in election system from 8-0 to 6-2. For example, one email from Richard Scott directed a campaign consultant to "pull out the Hispanic names" from a mailing list prior to mailing material urging voters to support the Charter amendment.

3. Mayor Isbell has used his own and the City's resources to encourage Anglo voters to turn out to vote, to run negative ads against Latino candidates of choice, and to slate and support almost exclusively Anglo candidates.

4. Richard Scott, Pasadena Director of Community Relations, performed campaign work from his city email account, during work hours and at the direction of the Mayor, in the 2013 and 2015 elections for City council. Mr. Scott further used city resources to develop a campaign mailing list for use in the 2013 municipal election.

5. Richard Scott also did political work from his city email account, during work hours and at the direction of the Mayor, to run the 2013 campaign in favor of amending the City Charter to change the election system from 8-0 to 6-2. From his City office, Mr. Scott oversaw a convening of homeowners association members from the predominantly Anglo South Side for a campaign "kick-off" event at which yard signs in favor of the charter change were distributed.

6. In single member districts, the City used its resources, and those of the Mayor, to advocate against Latino-preferred candidates. For example, in the 2015 municipal election, Richard Scott worked from his desk in City Hall with a campaign consultant to prepare negative advertisements targeting Cody Ray Wheeler in District D.

7. Also in the 2015 municipal election, Richard Scott worked during office hours to place large signs saying "VOTE TODAY" at major thoroughfares on the predominantly Anglo South Side of town urging passersby to vote. Mr. Scott worked alongside another City employee to place the signs.

## PROPOSED CONCLUSIONS OF LAW

**Vote Dilution**

8. The 6-2 method of election dilutes Latino voting strength in violation of section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

**A. Gingles Prong 1: Numerosity and Compactness**

9. The parties agree that Latinos are sufficiently numerous and compact to constitute the citizen voting age majority in four of eight districts in a City redistricting plan. *See Gingles*, 487 U.S. at 50-51; *Johnson v. DeGrandy*, 512 U.S. 997, 1008 (1994).

10. In the City's previous 8-district redistricting plan, Latinos did and still do constitute the citizen voting age majority in four of eight districts.

11. Latinos are not the majority of Pasadena's citizen voting age population. When determining citizen voting age population, courts look to the most reliable data, which comes from the U.S. Census American Community Survey (ACS). The Southern District of Texas found that "[t]he ACS is at present the only reliable source of citizen-voting age population data." *Rodriguez v. Harris Cnty., Tex.*, 964 F.Supp.2d 686, 728 (S.D.Tex.2013).

12. Because the ACS is based on a sample, the most reliable data is drawn from the five-year report. See *Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *7 (N.D. Tex. Aug. 2, 2012) ("Moreover, the five-year ACS is the most reliable version of the ACS for analyzing small populations."). The ACS five-year estimate of the Hispanic share of total CVAP for 2010-2014 is 47.3% with an MOE of approximately 1.4%. This yields a 90% interval estimate running from 45.9% (= 47.3% minus 1.4%) to 48.7% (= 47.3% plus 1.4%).

13. Even if Latinos have reached bare 50% status in Pasadena, their 41.9% share of City voter registration and lower voter turnout rates make clear that they are not the majority of the electorate in the City. *See LULAC v. Perry*, 548 U.S. 399, 428 (2006) (recognizing that "it may be possible for a citizen voting-age majority to lack real electoral opportunity"). The City's expert Dr. Alford documented that Latinos made up only 23.5% of the voters in the 2015 municipal election.

**B. Gingles Prong 2 and 3: Racial Bloc Voting**

11

14. The parties agree that Latinos vote cohesively in Pasadena. *See Gingles*, 478 U.S. at 50-51.

15. Non-Latinos in Pasadena vote sufficiently as a bloc to enable them, in the absence of special circumstances, usually to defeat the Latino preferred candidate." *Gingles*, 478 U.S. at 50-51.

16. In the one racially-contested, at-large election for city office since adoption of the 6-2 system, the Latino-preferred candidate received an estimated 39.1% of the citywide vote and lost to his Anglo opponent. Latino voters supported Mr. Del Toro with an estimated 87.3% of their votes. Non-Latino voters supported Mr. Del Toro's Anglo opponent with an estimated 71.7% of their vote.

17. In the city-wide election on Proposition 1, Latino and non-Latino voters differed in their preferences. Latinos overwhelmingly opposed Proposition 1 but the measure passed with a majority of non-Latino votes.

18. Analysis of exogenous Harris County elections supports the conclusion that non-Latinos bloc vote in Pasadena. If only votes cast by Pasadena residents had counted, none of the following candidates preferred by Latino voters would have obtained an office: Adrian Garcia (2012GE), Sylvia Garcia (2010GE), Adrian Garcia (2012GE), Adrian Garcia (DP2008), Ruben Monzon (2012RP).

19. The absence of non-Latino bloc voting in Latino opportunity districts does not negate a finding of non-Latino bloc voting in the City at-large.

20. The degree of Latino cohesion and non-Latino bloc voting in Pasadena rises to the level of racial polarization. *See LULAC v. Perry*, 548 U.S. at 427 (*citing Session v. Perry*, 298 F. Supp. 2d 451, 496-497 (E.D. Tex. 2004)).

21. Racially polarized voting in Pasadena impedes the election of Latino-preferred candidates and satisfies the second and third prongs under *Gingles*. *See Gingles*, 478 U.S. at 50.

**C.  Totality of the Circumstances**

22. Under the totality of circumstances, the political processes leading to election in Pasadena are not equally open to participation by Latinos in that Latinos have less opportunity than other members of the Pasadena electorate to participate in the political process and elect representatives of their choice.

23. The Senate Factors support a finding that the 6-2 system violates section 2. In *LULAC v. Perry*, the Supreme Court noted that the "'the long history of discrimination against Latinos and Blacks in Texas' . . . may well 'hinder their ability to participate effectively in the political process'" and concluded the totality of the circumstances demonstrated a section 2 violation. *LULAC v. Perry*, 548 U.S. 399, 439-40, 442 (quoting *Session,* 298 F.Supp.2d, at 473, 492 and *Gingles,* 478 U.S., at 45).

24. Ten years later, the evidence supporting this conclusion has not changed much, including the history of official discrimination in voting, racially polarized voting, the extent to which Latinos in Pasadena bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process, and the extent to which minorities have been elected to public office in the jurisdiction. S. Rep. at 29; *see also Gingles*, 478 U.S. at 48 n.15.

25. Pasadena elections are also characterized by racially polarized voting, practices that enhance dilution such as majority vote and number place requirements, candidate slating from which Latinos are largely excluded, and racial appeals. Historically, few Latinos

were elected to the City Council under the at-large system. Only one Latino has ever been elected to the City council in an at-large seat, and that was most recently in 1977.

26. Having lost an election district in which Latinos constitute the majority, Latinos in Pasadena no longer enjoy rough proportionality between the number of Latino majority districts and their citizen voting age population. *League of United Latin Am. Citizens*, 548 U.S. at 426.

27. Furthermore, Plaintiffs' satisfaction of the Senate Factors, as well as the additional considerations under the totality of circumstances, outweigh any proportionality claimed by the City and dictate a finding of vote dilution under the totality of circumstances.

28. Under the totality of circumstances, and based on a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process" (*Gingles*, 478 U.S. at 45, *quoting* S. Rep. at 30 n. 120), the 6-2 method of election dilutes Latino voting strength in violation of section 2.

**Intentional Discrimination**

29. In enacting the 6-2 system, Pasadena purposefully discriminated against Latino voters on the basis of race in violation of section 2 of the Voting Rights Act and the Fourteenth Amendment and Fifteenth Amendment. C*ity of Mobile, Ala. v. Bolden*, 446 U.S. 55, 66 (1980) *superseded in part by statute on other grounds* by 42 U.S.C. § 1973.

30. The evidence demonstrates that Pasadena "enacted [the 6-2 system] as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities'" *See Miller v. Johnson*, 515 U.S. 900, 911 (1995); *see also Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (redistricting plan violates the Fourteenth Amendment if "'conceived or operated as purposeful device to further racial discrimination' by minimizing, canceling out or

diluting the voting strength of racial elements in the voting population.'") (quoting *Whitcomb v. Chavis*, 403 U.S., 124, 149 (1971)); *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) (same).

31. An intentional vote dilution under the Fifteenth Amendment is analyzed in the same manner as a claim under the Fourteenth Amendment. *See Rogers v. Lodge*, 458 U.S. 613, 621 (1982) (holding that district court demonstrated "understanding of the controlling standard by observing that a determination of discriminatory intent is 'a requisite to a finding of unconstitutional vote dilution' under the Fourteenth and Fifteenth Amendments."). *See also Gomillion v. Lightfoot*, 364 U.S. 339, 346 (1960) ("When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment.").

<u>Direct Evidence</u>

32. The circumstances surrounding the adoption of the 6-2 system provide direct evidence of intentional racial discrimination, including Mayor Isbell's declaration that he wanted to propose a conversion to a 6-2 system "because the Justice Department can longer tell us what to do," and the purposeful targeting of Anglo voters to turn out to vote in support of Proposition 1.

<u>Circumstantial Evidence</u>

**Arlington Heights Factors**

33. In *Arlington Heights*, the Supreme Court explained that when determining whether racially discriminatory intent or purpose is a motivating factor behind an official action, a court must make "a sensitive inquiry into such circumstantial and direct evidence as may be available." *Arlington Heights,* 429 U.S. at 266. The *Arlington Heights* factors,

including the 6-2 system's disparate impact, historical background, legislative history, and procedural and substantive departures, support a finding of intentional discrimination in this case.  *Arlington Heights,* 429 U.S. at 264-68.

### *LULAC v. Perry* Factors

34. In *LULAC v. Perry*, the Supreme Court observed that "the State took away Latinos' opportunity because Latinos were about to exercise it" and that the revision of CD23 "bears the mark of intentional discrimination that could give rise to an equal protection claim." *LULAC*, 548 U.S. at 440.  The factors identified by the Supreme Court in *LULAC v. Perry* as indicative of intentional discrimination are present in the City's conversion from an 8-0 to 6-2 system.

### "Bail-in" Under the Voting Rights Act

35. Section 3(c) of the Voting Rights Act of 1965, 52 U.S.C.A. § 10302 (c), authorizes a federal court, following a finding "that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision," to order a jurisdiction to obtain federal preclearance of its election changes pursuant to section 5 of the Voting Rights Act. Section 3(c) is a permanent provision of the federal Voting Rights Act.

36. The City of Pasadena has violated the Fourteenth and Fifteenth Amendments, and those violations justify equitable relief in the form of an order that Pasadena obtain federal preclearance of its election changes pursuant to section 5 of the Voting Rights Act.

DATED: October 21, 2016                    Respectfully submitted,

                                           Nina Perales
                                           Attorney-in-charge

        Texas Bar No. 24005046
        SDTX Bar No. 21127
        Ernest Herrera
        Texas Bar No. 24094718
        SDTX Bar No. 2462211
        Denise Hulett (*Pro Hac Vice*)
        California Bar No. 121553
        MEXICAN AMERICAN LEGAL DEFENSE AND
          EDUCATIONAL FUND
        110 Broadway, Suite 300
        San Antonio, TX 78205
        Tel: (210)224-5476
        Fax: (210)224-5382

        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 21nd day of October 2016.

        */s/ Nina Perales*
        Nina Perales