IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALBERTO PATINO, *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:14-cv-03241 |
| | § | |
| CITY OF PASADENA, *et al.,* | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' PRE-TRIAL MEMORANDUM OF LAW

**Table of Contents**

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................iii

Factual Background…………………………………………………………………………1

Argument…………………………………………………………………………………….2

    **A.  Vote Dilution in Violation of Section 2 of the Voting Rights Act……………………2**

        **1.   *Gingles* 1: Latinos are Sufficiently Numerous and Compact to Constitute the Majority of Four Districts in an Eight District Plan…4**

        **2.   *Gingles* 2 and 3: Racially Polarized Voting…………………………….5**

        **3.   Totality of the Circumstances…………………………………..…..….9**

    **B.  The 6-2 System Intentionally Discriminates Against Latinos in Violation of Section 2 and the Fourteenth and Fifteenth Amendments…………..………………….........13**

    **C.  Bail In Under the Voting Rights Act……………………………………………….18**

**Conclusion…..........................................................................................................19**

## Table of Authorities

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ........................................................................ 17, 18, 19
*Benavidez v. City of Irving, Tex.*,
  638 F.Supp.2d 709 (N.D. Tex. 2009) .................................................... 9
*City of Mobile v. Bolden*,
  446 U.S. 55 (1980) .......................................................................... 5, 16
*Clark v. Calhoun County, Miss.*,
  21 F.3d 92 (5th Cir. 1994) ...................................................................... 11
*Clark v. Calhoun County, Miss.*,
  88 F.3d 1393 (5th Cir. 1996) ............................................................ 8, 12
*E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*,
  926 F.2d 487 (5th Cir. 1991) ............................................................ 7, 10
*Fabela v. City of Farmers Branch, Tex.*,
  No. 3:10-CV-1425-D, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012) ...... 7, 9
*Garza v. County of L.A.*,
  756 F. Supp. 1298 (C.D. Cal. 1990) ........................................................ 18
*Garza v. County of Los Angeles*,
  918 F.2d 763 (9th Cir. 1990) .................................................................. 17
*Gomez v. City of Watsonville*,
  863 F.2d 1407 (9th Cir. 1988) ................................................................ 8
*Gomillion v. Lightfoot*,
  364 U.S. 339 (1960) .............................................................................. 17
*Jamison v. Tupelo, Mississippi*,
  471 F. Supp. 2d 706 (N.D. Miss. 2007) .................................................. 9
*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
  4 F.3d 1103 (3d Cir. 1993) .................................................................... 11
*Johnson v. DeGrandy*,
  507 U.S. 997 (1994) .............................................................................. 11
*Johnson v. DeGrandy*,
  512 U.S. 997 (1994) ...................................................................... 6, 14, 15
*Kirksey v. Bd. of Supervisors*,
  528 F.2d 139 (5th Cir. 1977) ................................................................ 12
*LULAC v. Clements*,
  999 F.2d 831 (5th Cir. 1993) ................................................................ 12
*LULAC v. Perry*,
  548 U.S. 399 ................................................................................. passim

*Magnolia Bar Ass'n v. Lee*,
    793 F. Supp. 1386 (S.D. Miss. 1992)................................................................ 10

*Magnolia Bar Ass'n, Inc. v. Lee*,
    994 F.2d 1143 (5th Cir. 1993)......................................................................... 9

*Miller v. Johnson*,
    515 U.S. 900 (1995) ............................................................................... 16, 17

*Rangel v. Morales*,
    8 F.3d 242 (5th Cir. 1993)............................................................................ 10

*Rodriguez v. Harris Cnty., Tex.*,
    964 F.Supp.2d 686 (S.D.Tex.2013) .............................................................. 7, 9

*Rogers v. Lodge*,
    458 U.S. 613 (1982) ............................................................................... 16, 17

*Session*,
    298 F.Supp.2d ............................................................................................. 13

*Shaw v. Reno*,
    509 U.S. 630 (1993) ............................................................................... 16, 17

*Shelby Cnty., Ala. v. Holder*,
    133 S. Ct. 2612 (2013) ................................................................................ 19

*Shelby County, Alabama v. Holder*,
    133 S.Ct. 594 (2013) ..................................................................................... 4

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ................................................................................ passim

*United States v. City of Euclid*,
    580 F.Supp.2d 584 (N.D. Ohio 2008) ............................................................ 9

*United States v. Village of Port Chester*,
    No. 06 Civ. 15173(SCR), 2008 WL 190502 (S.D.N.Y. Jan. 17, 2008).................... 9

*Vera v. Richards*,
    861 F. Supp. 1304 ....................................................................................... 13

*Westwego Citizens for Better Gov't v. City of Westwego*,
    872 F.2d 1201 (5th Cir.1989).......................................................................... 9

*Westwego Citizens for Better Government v. City of Westwego*,
    946 F.2d 1109 (5th Cir. 1991)................................................................... 8, 10

*Whitcomb v. Chavis*,
    403 U.S. 124 (1971) ..................................................................................... 17

*White v. Regester*,
    412 U.S. 755 (1973) ..................................................................................... 12

Statutes

42 U.S.C. § 1973(b) ........................................................................................... 14

52 U.S.C. § 10301............................................................................................... 17

52 U.S.C.A. § 10302 (c) ................................................................................................ 21

Other Authorities

1982 U.S.C.C.A.N. at .................................................................................................. 5
S. Rep. ................................................................................................................... 6, 12
S. Rep. n. 114 ............................................................................................................. 12
S. Rep. n. 120 ....................................................................................................... 12, 16
S. Rep. No. 97-417 ...................................................................................................... 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALBERTO PATINO, *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:14-cv-03241 |
| | § | |
| CITY OF PASADENA, *et al.,* | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' PRE-TRIAL MEMORANDUM OF LAW

Plaintiffs Alberto Patino, *et al.* file this pre-trial Memorandum of Law and show the Court the following:

## I.    FACT BACKGROUND

In June 2013, the U.S. Supreme Court decision in *Shelby County, Alabama v. Holder*, 133 S.Ct. 594 (2013) released Texas and its political subdivisions from the requirement to preclear voting changes under section 5 of the federal Voting Rights Act.  Several weeks later, Pasadena Mayor Johnny Isbell announced his plan to shift two seats on the council from single member districts to at-large positions, declaring that the U.S. Justice Department could no longer block the change.

Latino total population in Pasadena had grown rapidly from 1990 to 2010 – from 29% to 62%.  At the same time, Latinos were entering the city electorate in greater numbers.  By 2011, Latinos constituted 34.5% of the City's voter registration.

In 2013, the City's existing 8-district redistricting plan had elected four Latino candidates of choice to the City Council.  Those four Latino candidates of choice opposed the Mayor's bid to convert the City's method of election from eight single member districts (8-0) to six single

member districts and two at-large seats (6-2). Over the objections of the four Latino candidates of choice, the City Council voted to hold a city-wide referendum on the proposed change.

On November 5, 2013, a majority of Pasadena voters passed Proposition 1 which changed the City's method of electing members of the City Council from 8-0 to 6-2. An overwhelming majority of Latino voters opposed the change to a 6-2 system. A majority of non-Latino voters supported the measure.

The parties agree that the 6-2 redistricting plan enacted by the Pasadena City Council in April 2014 reduced the number of single member districts with a majority of Hispanic citizen voting age population from four to three and similarly reduced the number of single member districts with a majority of Spanish Surnamed Registered Voters from four to three. The parties agree that Latinos in Pasadena are sufficiently numerous and compact to comprise the majority of citizen voting age population of four of eight single member districts and that Latinos vote cohesively in Pasadena.

Although Latinos constitute just under 50% of the City's citizen voting age population, they are still only 41.9% of the City's registered voters and, according to the City, made up only 23.5% of the voters in the 2015 municipal election. In that 2015 municipal election, the at-large method of election, in combination with racially polarized voting, resulted in the loss of the only Latino candidate who was Latino-preferred.

## II. ARGUMENT

### A. Vote Dilution in Violation of Section 2 of the Voting Rights Act

In 1982, Congress amended the Voting Rights Act to reach discriminatory conduct that might otherwise evade liability under the more stringent intent standard established in *City of Mobile v. Bolden,* 446 U.S. 55 (1980). The 1982 amendment created a "results-based" test to analyze vote dilution claims. S. Rep. No. 97-417, at 40 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 218 ("S. Rep.")

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the U.S. Supreme Court set out a framework for determining whether a districting plan dilutes minority voting strength in violation of Section 2. In *Gingles*, the Supreme Court established a two-step inquiry for analysis of vote dilution claims. *Id.* at 50-51. First, the minority group must be able to demonstrate: (1) "that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "that it is politically cohesive;" and (3) "that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate." *Id.*

The second step of the inquiry requires the Court "to consider the 'totality of the circumstances' and to determine, based 'upon a searching practical evaluation of the 'past and present reality' whether the political process is equally open to minority voters.'" *Id.* at 79 (citations and internal quotation marks omitted). The Senate Judiciary Committee, in a report accompanying the 1982 amendments to the Voting Rights Act, provided a non-exclusive list of factors that a court should consider in determining whether the challenged practice impermissibly impairs the ability of the minority group to elect their preferred representatives.[1]

---

[1] These factors include, but are not limited to:

    (1)    the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

    (2)    the extent to which voting in government elections is racially polarized;

    (3)    the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting);

    (4)    exclusion of minorities from a candidate slating process;

    (5)    the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education,

1.    *Gingles* 1: Latinos are Sufficiently Numerous and Compact to Constitute the Majority of Four Districts in an Eight District Plan

The parties agree that Latinos are sufficiently numerous and compact to constitute the citizen voting age majority in four of eight districts in a City redistricting plan.  *See Gingles*, 487 U.S. at 50-51; *Johnson v. DeGrandy*, 512 U.S. 997, 1008 (1994).

Latinos are not, however, the majority of Pasadena's citizen voting age population. When determining citizen voting age population, courts look to the most reliable data, which comes from the U.S. Census American Community Survey (ACS).  The Southern District of Texas found that "[t]he ACS is at present the only reliable source of citizen-voting age population data." *Rodriguez v. Harris Cnty., Tex.*, 964 F.Supp.2d 686, 728 (S.D.Tex.2013).

Because the ACS is based on a sample, the most reliable data is drawn from the five-year report.  *See Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *7 (N.D. Tex. Aug. 2, 2012) ("Moreover, the five-year ACS is the most reliable version of the ACS for analyzing small populations.").  The ACS five-year estimate of the Hispanic share of total CVAP for 2010-2014 is 47.3% with an margin of error (MOE) of approximately 1.4%.  The MOE is based on 90% statistical confidence, which is the Census Bureau standard for ACS MOE estimates.  This yields a 90% interval estimate running from 45.9% (= 47.3% minus 1.4%) to 48.7% (= 47.3% plus 1.4%).

---

employment, and health, which hinder their ability to participate effectively in the political process;

(6)    the use of overt or subtle racial appeals in political campaigns;

(7)    the extent to which minorities have been elected to public office in the jurisdiction.

Additional factors are: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy underlying the . . . use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."  S. Rep. at 29.

The City's use of the smaller sample ACS for one year is not reliable and does not support the City's claim that Pasadena is now majority Hispanic citizen voting age population. The ACS one-year estimate of the citywide Hispanic share of total CVAP for 2015 is 50.6% with a MOE of approximately 3.3%.   The 90% interval estimate for the citywide Hispanic share of total CVAP runs from 47.3% (= 50.6 minus 3.3%) to 53.9% (= 50.6% plus 3.3%%).

### 2.    *Gingles* 2 and 3: Racially Polarized Voting

Prong two of the *Gingles* test requires plaintiffs to demonstrate that Latinos are politically cohesive, while *Gingles* prong three requires plaintiffs to demonstrate that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances such as the minority candidate running unopposed, usually to defeat the minority's preferred candidate.  *See Gingles*, 478 U.S. at 51.    In practice, the two inquiries merge into the concept of racially polarized voting.  *See, e.g. E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991).

Racially polarized voting is a practical inquiry into whether racial voting patterns impede the election of minority-preferred candidates.  Thus, the Supreme Court noted in *Gingles*, "[i]f the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests."  *Gingles*, 478 U.S. at 50.  Similarly, the standard for bloc voting is whether "the white majority votes *sufficiently as a bloc* to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, to defeat the minority's preferred candidate."  *Id.* (emphasis added) (internal citations omitted).

The parties agree that Latinos vote cohesively in Pasadena.  *See Gingles*, 478 U.S. at 50-51.  The dispute with respect to racially polarized voting is whether non-Latinos in Pasadena

vote sufficiently as a bloc to enable them, in the absence of special circumstances, usually to defeat the Latino preferred candidate." *See Gingles*, 478 U.S. at 50-51.

It is well-established that in order to be racially polarized, voting patterns need not be extreme. *See Thornburg*, 478 U.S. at 81 (Appendix A to Opinion of Brennan, J); *see also*, *Clark v. Calhoun County, Miss.*, 88 F.3d 1393 (5th Cir. 1996) (citing to 71% cohesive voting by Black voters); *Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109, 1191 (5th Cir. 1991).

In the *Gingles* analysis, polarized voting is judged "primarily on the basis of the voting preferences expressed in actual elections." *Gomez v. City of Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988). Because ballots are secret, experts estimate group voting behavior using statistical analyses. One such analysis is ecological inference. Plaintiffs' expert, Dr. Richard Engstrom, used ecological inference to measure the presence of racially polarized voting. "[Ecological inference] is similar to [ecological regression], but abandons the assumption of linearity that ER relies upon." *Benavidez v. City of Irving, Tex.*, 638 F.Supp.2d 709, 724 (N.D. Tex. 2009). "This methodology was developed subsequent to the *Gingles* decision, and was designed specifically for the purpose of arriving at estimates in this type of case." *Id.* (crediting testimony of Dr. Richard Engstrom). Ecological inference is an accepted method of analysis. *See e.g., Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 768 (S.D. Tex. 2013); *Fabela v. City of Farmers Branch, Tex.*, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012); *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 723 (N.D. Tex. 2009); *Jamison v. Tupelo, Mississippi*, 471 F. Supp. 2d 706, 713 (N.D. Miss. 2007); *United States v. Village of Port Chester,* No. 06 Civ. 15173(SCR), 2008 WL 190502, at *11 (S.D.N.Y. Jan. 17, 2008); *United States v. City of Euclid,* 580 F.Supp.2d 584, 596 (N.D. Ohio 2008).

The State's expert witness, Dr. John Alford, agrees with the methodology used by Dr. Engstrom and relied on Dr. Engstrom's EI analysis.  The parties also agree that elections presenting voters with a choice between or among Latino and non-Latino candidates are generally considered the most probative for assessing racially polarized voting when Latinos are the minority at issue in a case.  *See Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993) ("This court has repeatedly stated that, when statistical evidence is used to establish legally significant white bloc voting, the most probative elections are generally those in which a minority candidate runs against a white candidate." (citing *Westwego Citizens for Better Gov't v. City of Westwego,* 872 F.2d 1201, 1208 n. 7 (5th Cir.1989)).  Elections in which both candidates are Anglo do not reveal anything about the impact of voting on the basis of race, because Latinos cannot express an ethnic preference when there are two white candidates opposing each other.

In order to tailor his inquiry most closely to voter behavior, for his analysis of 2015 elections, Dr. Engstrom used data on voters who cast ballots derived from polling place sign-in sheets and matched to Spanish-surnamed voter lists.  For earlier years, Dr. Engstrom relied on data showing the number of Spanish-surnamed and non-Spanish-surnamed registered voters in each precinct.

For his study, Dr. Engstrom examined exogenous (Harris county-wide) and endogenous elections, both of which provide important information when determining whether voting is polarized along racial lines.  *See Magnolia Bar Ass'n v. Lee*, 793 F. Supp. 1386, 1399 (S.D. Miss. 1992), *aff'd*, 994 F.2d 1143 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 555 (1993); *Westwego Citizens for Better Gov't. v. Westwego*, 946 F.2d 1109, 1120 n.15 (5th Cir. 1991); *E. Jefferson Coalition for Leadership Dev. v. Parish of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991); *see also Rangel v. Morales*, 8 F.3d 242, 247 (5th Cir. 1993) (district court erred by failing to consider

exogenous elections "when it had only one endogenous election from which to consider the third *Gingles* factor"). The exogenous elections analyzed by Dr. Engstrom included racially contested county-wide elections held from 2008-2012.

With respect to exogenous elections, Dr. Engstrom concluded that Latinos voted cohesively in general and primary elections in Pasadena. In the Democratic primary elections, Latino preferences were not consistently shared by the rest of the primary voters.

Dr. Engstrom also examined 2013 and 2015 endogenous elections in Pasadena. He found that in the 2013 election on Proposition 1, and the 2015 municipal election featuring a Latino (Oscar Del Toro) running city-wide against a non-Latino candidate, voting was racially polarized. Although Latinos voted cohesively for their preferred candidate or proposition, their relatively lower presence in the city-wide electorate, combined with insufficient Anglo cross-over voting, resulted in the defeat of the Latino preference.

Dr. Engstrom found that in the 2015 municipal election featuring an Anglo running city-wide against another Anglo, Latinos and Anglos had different candidate preferences. The Anglo candidate who received a majority of Latino votes was elected with crossover votes by Anglos.

Dr. Engstrom further performed an analysis of racially-contested elections within three Latino-majority single member city council districts. One of these elections was racially polarized and the Latino-preferred candidate lost. In two other districts, both Latinos and Anglos preferred the Latino incumbents running for re-election and those Latino incumbents were successful.

Dr. Engstrom concluded that Latino voters are highly cohesive in their preference to be represented by people from within their own group, and the non-Latino voters in the city as a whole do not share that preference. He further concluded that the non-Latino voters have the

ability to veto the election of Latino-preferred candidates, as was demonstrated by the loss of Oscar Del Toro in 2015, by the votes cast within the city for elections to Harris County offices in 2008, 2010, and 2012, and also by the result of the Proposition 1 vote in 2013. Dr. Engstrom concluded that the 6-2 system serves to exacerbate that situation by enhancing the ability of the non-Latino voters to veto the Latino candidates preferred by Latino voters.

### 3. Totality of the Circumstances

Establishing the three *Gingles* preconditions is necessary but not sufficient to prove a section 2 effects violation. *See Johnson v. DeGrandy*, 507 U.S. 997, 1011 (1994).  However, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances."  *Clark v. Calhoun County, Miss.*, 21 F.3d 92, 97 (5th Cir. 1994)   (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)).

In addition to the *Gingles* preconditions, the court may also examine the Senate Factors enumerated in the Senate Judiciary Committee Report to Section 2 and adopted by the Supreme Court in *Gingles*, 473 U.S. at 36, 37, 44-45, to determine whether, under the totality of the circumstances, the challenged practice or structure results in a lack of equal opportunity for Latinos to participate in the political process and to elect candidates of their choice.

There is no requirement that all seven factors be met or that "any particular number of factors be proved, or that a majority of them point one way or the other."  S. Rep. at 29.   "The courts ordinarily have not used these factors . . . as a mechanical 'point counting' device . . . . Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns*, 'minimized or canceled out.'" *Id.* at 29

n. 118. The Court in *Gingles* explained that the Senate factors must be applied with an eye toward a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process." *Gingles*, 478 U.S. at 45, *quoting* S. Rep. at 30 n. 120.

Because "courts have recognized that disproportionate educational, employment, income levels and living conditions arising from past discrimination tend to depress minority political participation, . . . plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." S. Rep. at 29 n. 114 (citing *White v. Regester*, 412 U.S. 755, 768 (1973) and *Kirksey v. Bd. of Supervisors*, 528 F.2d 139,145 (5th Cir. 1977); *see also Clark*, 88 F.3d at 1399; and *LULAC v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993) (Senate Report does not "insist[] upon a causal nexus between socioeconomic status and depressed participation").

In *LULAC v. Perry*, the Supreme Court noted that the "'the long history of discrimination against Latinos and Blacks in Texas' . . . may well 'hinder their ability to participate effectively in the political process'" and found a section 2 violation under the totality of the circumstances. *LULAC v. Perry*, 548 U.S. 399, 439-40, 442 (quoting *Session v. Perry*, 298 F. Supp. 2d 451, 473 (E.D. Tex.), *vacated sub nom. Henderson v. Perry*, 543 U.S. 941, 125 S. Ct. 351, 160 L. Ed. 2d 252 (2004) and *Gingles,* 478 U.S., at 45).

The Supreme Court explained:

> Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and the restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the state as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act. Since Texas became a

> covered jurisdiction, the Department of Justice has frequently
> interposed objections against the State and its subdivisions.

*LULAC v. Perry*, 548 U.S. 399, 439-40 (2006), *quoting Vera v. Richards*, 861 F. Supp. 1304,

1317 S.D.Tex.1994).

Dr. Andres Tijerina, an historian and expert in Texas Mexican American history, concluded that there exists a long history of discrimination against Latinos in Texas, Harris County and the City of Pasadena and that Latinos bear the present effects of that discrimination in the form of lower rates of political participation.  Much of that discrimination in Texas, including the poll tax, refusal to register voters, segregated public facilities, segregated schools and employment discrimination, has been experienced by Latino voters still living today.

The legacy of historical discrimination persists today in the form of lower socio-economic status for Latinos in Pasadena.  Plaintiffs' expert David Ely documented Latinos' present-day lower socio-economic status and lower rates of voter registration in Pasadena.  The City's expert Dr. Alford documented that Latinos made up only 23.5% of the voters in the 2015 municipal election.

With respect to the remaining Senate Factors, Pasadena elections are characterized by racially polarized voting, practices that enhance dilution such as majority vote and numbered place requirements, candidate slating from which Latinos are largely excluded, and racial appeals.  Historically, few Latinos were elected to the City Council under the at-large system. Only one Latino has ever been elected to the City council in an at-large seat, and that was most recently in 1977.  The Pasadena City Council has been "unresponsive to the particularized needs" of Latinos and the reasons supporting conversion from an 8-0 election system to a 6-2 system were tenuous.

**Proportionality as a Factor in the Totality of Circumstances**

11

Whether or not Latinos constitute the citizen voting age majority in a number of districts proportional to their population "is a relevant fact in the totality of circumstances." *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

*De Grandy*'s instruction to courts is to consider, when assessing the totality of circumstances, whether there exists a number of "majority-minority districts in substantial proportion to the minority's share of voting-age population[.]"  The Court stated unequivocally:

"Proportionality" as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population. The concept is distinct from the subject of the proportional representation clause of § 2, which provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). This proviso speaks to the success of minority candidates, as distinct from the political or electoral power of minority voters. [1] *De Grandy*, 512 U.S. at 1014 n. 11; *see also LULAC v. Perry*, 548 U.S. at 438 (considering only Latino majority districts in the proportionality inquiry).

*De Grandy* repeatedly emphasized that the proportionality inquiry looks only at the number of majority-minority districts.  In her concurring opinion, Justice O'Connor reiterated the Court's understanding of the requirement to use majority minority districts in the proportionality analysis:  "The opinion's central teaching is that proportionality—defined as the relationship between the number of majority-minority voting districts and the minority group's share of the relevant population—is *always* relevant evidence in determining vote dilution, but is *never* itself dispositive."  *Id.* at 1025.

The *De Grandy* Court purposefully excluded from the proportionality inquiry a district in which "black voters, although not close to a majority, are able to elect representatives of their

choice with the aid of cross-over votes." *Id.* at 1023.  Here, where Pasadena's elections are nonpartisan and influenced by complex local factors, considering less-than-majority districts in the proportionality analysis would prove an impossible task.  As explained in *Bartlett*, in local jurisdictions:

> courts would face the difficult task of discerning crossover patterns in nonpartisan contests for a city commission, a school board, or a local water authority. The political data necessary to make such determinations are nonexistent for elections in most of those jurisdictions. And predictions would be speculative at best given that, especially in the context of local elections, voters' personal affiliations with candidates and views on particular issues can play a large role.

*Id.* at 18.

Rough proportionality for Latinos in Pasadena would be Latino citizen voting age majorities in four of eight city council districts.  The 6-2 redistricting plan includes only three districts in which Latinos constitute the majority of citizen voting age population.  Having lost an election district in which Latinos constitute the majority, Latinos in Pasadena no longer enjoy rough proportionality between the number of Latino majority districts and their citizen voting age population.  *League of United Latin Am. Citizens*, 548 U.S. at 426.

Furthermore, Plaintiffs' satisfaction of the Senate Factors, as well as the additional considerations under the totality of circumstances, outweigh any proportionality claimed by the City and dictate a finding of vote dilution under the totality of circumstances.

Under the totality of circumstances, and based on a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process" (*Gingles*, 478 U.S. at 45, *quoting* S. Rep. at 30 n. 120), the 6-2 method of election dilutes Latino voting strength in violation of section 2.

**B.**      **The 6-2 System Intentionally Discriminates Against Latinos in Violation of Section 2 and the Fourteenth and Fifteenth Amendments**

13

The Fourteenth Amendment forbids intentional discrimination in legislative line-drawing. *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 66 (1980) *superseded in part by statute on other grounds* by 42 U.S.C. § 1973.

There are two distinct claims of intentional discrimination in the creation of election boundaries. The first challenges the use of race as a basis for separating voters into districts and was first recognized in *Shaw v. Reno*, 509 U.S. 630 (1993). The second claim targets actions "disadvantaging voters of a particular race," and is "analytically distinct" from claims under the *Shaw v. Reno* line of cases. *See Miller v. Johnson*, 515 U.S. 900, 911 (1995) (explaining distinction between claims). A non-*Shaw* claim of intentional discrimination asserts that the jurisdiction "enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities'" *Id. See also City of Mobile v. Bolden*, 446 U.S. 55 (1980) *superseded in part by statute on other grounds* by 42 U.S.C. § 1973; *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (redistricting plan violates the Fourteenth Amendment if "'conceived or operated as purposeful device to further racial discrimination' by minimizing, canceling out or diluting the voting strength of racial elements in the voting population.'") (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)); *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) (same).[2]

An intentional vote dilution under the Fifteenth Amendment is analyzed in the same manner as a claim under the Fourteenth Amendment. *See Rogers v. Lodge*, 458 U.S. 613, 621 (1982) (holding that district court demonstrated "understanding of the controlling standard by observing that a determination of discriminatory intent is 'a requisite to a finding of unconstitutional vote dilution' under the Fourteenth and Fifteenth Amendments."). *See also*

---

[2] Both *Shaw* and *Miller* acknowledge these differences. *See Miller v. Johnson*, 515 U.S. 900, 911 (1995); *Shaw v. Reno*, 509 U.S. 630, 651-52 (1993).

*Gomillion v. Lightfoot*, 364 U.S. 339, 346 (1960) ("When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment.").  Section 2 of the Voting Rights also prohibits intentional discrimination in the creation of election boundaries.  52 U.S.C. § 10301.

Courts have long recognized that public decision making bodies, like the City of Pasadena, can have more than one motive when enacting a statute. *See Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977) ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one.").

The Court in *Arlington Heights* continued:

> In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

*Id* at 265-266.  Thus, Pasadena's actions can be unlawful even if the City can point to other, purportedly non-racial purposes.  *See LULAC v. Perry*, 548 U.S. at 441; *Garza v. County of L.A.*, 756 F. Supp. 1298, 1349 (C.D. Cal. 1990) *aff'd*, 918 F.2d 763 (9th Cir. 1990) ("racial discrimination is not just another competing consideration.") (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

In *Arlington Heights*, the Supreme Court explained that when determining whether racially discriminatory intent or purpose is a motivating factor behind an official action, a court must make "a sensitive inquiry into such circumstantial and direct evidence as may be available." *Arlington Heights,* 429 U.S. at 266.

15

The Court explained further that, in addition to direct evidence, circumstantial evidence of discriminatory intent includes:

- the impact of the official action, *i.e.* whether it "bears more heavily on one race than another" and whether "a clear pattern, unexplainable on grounds other than race emerges from the effect of the state action even when the governing legislation appears neutral on its face;"

- the historical background of the decision;

- the specific sequence of events leading up to the challenged decision;

- departures from the normal procedural sequence;

- substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" and

- The legislative or administrative history, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Arlington Heights,* 429 U.S. at 264-68.

Application of the Arlington Heights factors to this case demonstrates that the City of Pasadena's conversion from an 8-0 to 6-2 method of election was motivated by the intent to dilute Latino voting strength in violation of section 2 as well as the Fourteenth and Fifteenth Amendments.  First, the adoption of the 6-2 system resulted in the loss of a Latino-majority election district.  In the 8-0 system, Latinos constituted the citizen voting age majority in four of eight districts; in the 6-2 plan, Latinos constituted the citizen voting age majority in three of eight

districts. For this reason, the impact of the change to a 6-2 system "bears more heavily on one race than another."

The historical background of the decision to convert to a 6-2 system includes the rapid growth of Latino population and the Latino electorate in Pasadena and the removal of the requirement for Pasadena to preclear its election changes following *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013). The specific sequence of events leading up to the adoption of the 6-2 system includes: the election of four candidates preferred by Latino voters to the Pasadena City Council; the likelihood that a fifth position on the council would soon be filled by a Latino candidate of choice from District B; occasions on which votes on the Council resulted in a 4-4 tie among the eight members of the Council and on which the Mayor cast the fifth vote in favor a proposal; activities by the Mayor and City of Pasadena to increase support among Anglos for Proposition 1; and activities by the Mayor and others to fund campaign activities in opposition to Latino candidates of choice.

The conversion to a 6-2 system was characterized by procedural and substantive departures including: irregularities in the formation and meetings of the Citizens Committee, the Mayor's decision to push forward with a change to a 6-2 method of election after the Citizens Committee did not recommend such a change; and the lack of information provided to the public and members of the City Council regarding the Mayor's redistricting plan prior to April 2014. The legislative history of Pasadena's change in method of election includes failure to heed warning by Councilmembers that the change to a 6-2 system would be problematic under the Voting Rights Act, calling for removal by armed police of a member of the City Council who spoke beyond her time limit in opposition to the change to a 6-2 system, the Mayor explaining that he proposed to change to a 6-2 system because ""because the Justice Department can longer

tell us what to do," and the Mayor's statement in a public meeting that 70% of Hispanics in Pasadena were undocumented.

Additional factors related to racial intent weigh in favor of finding a violation here.  In *LULAC v. Perry*, the Supreme Court observed that in Congressional District 23 "the State took away Latinos' opportunity because Latinos were about to exercise it" and that the changes to that district "bears the mark of intentional discrimination that could give rise to an equal protection claim." *LULAC*, 548 U.S. at 440.  The factors identified by the Supreme Court in *LULAC v. Perry* as indicative of intentional discrimination are present in the change to a 6-2 system.

First, "District 23's Latino voters were poised to elect their candidate of choice." *LULAC*, 548 U.S. at 438.  In Pasadena, Latino voters were poised to elect a candidate of choice to a fifth seat on the City Council.  Second, Latinos in CD23 "were becoming more politically active."  *Id*.  Over time, Pasadena's Latino population had grown and more Latinos were registering to vote.  As a result of Latino growth and mobilization, CD23 had "an increasingly powerful Latino population that threatened to oust the incumbent[.]"  *LULAC*, 548 U.S. at 423-24 (2006).  In Pasadena, if Latinos elected a fifth candidate of choice to the Council, the Mayor could no longer cast a tie-breaking vote in favor of measures he supported.  Finally, the changes to CD23 reduced Latino voters' ability to elect their candidate of choice.  *LULAC*, 548 U.S. at 424-25, 427.  In Pasadena, the change to a 6-2 system reduced Latino voters' ability to elect their candidate of choice by reducing the number of Latino majority districts.

## C.  BAIL-IN UNDER THE VOTING RIGHTS ACT

Section 3(c) of the Voting Rights Act of 1965, 52 U.S.C.A. § 10302 (c), authorizes a federal court, following a finding "that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision," to order

a jurisdiction to obtain federal preclearance of its election changes pursuant to section 5 of the

Voting Rights Act. Section 3(c) is a permanent provision of the federal Voting Rights Act.  The

City's violation of the Fourteenth and Fifteenth Amendments justify equitable relief in the form

of an order that Pasadena obtain federal preclearance of its election changes pursuant to section 5

of the Voting Rights Act.

## III.    CONCLUSION

For the foregoing reasons, the 6-2 method of election in Pasadena discriminates against

Latinos in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution and

the Voting Rights Act of 1965.

DATED: October 21, 2016                    Respectfully submitted,

                                           Nina Perales
                                           Attorney-in-charge
                                           Texas Bar No. 24005046
                                           SDTX Bar No. 21127
                                           Ernest Herrera
                                           Texas Bar No. 24094718
                                           SDTX Bar No. 2462211
                                           Denise Hulett (*Pro Hac Vice*)
                                           California Bar No. 121553
                                           MEXICAN AMERICAN LEGAL DEFENSE AND
                                             EDUCATIONAL FUND
                                           110 Broadway, Suite 300
                                           San Antonio, TX 78205
                                           Tel: (210)224-5476
                                           Fax: (210)224-5382

                                           ***Counsel for Plaintiffs***

CERTIFICATE OF SERVICE

19

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 21st day of October 2016.

*/s/ Nina Perales*
Nina Perales
