UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:14-CV-03241-LHR** |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant*. | § | |

<u>**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

<u>**I.  FINDINGS OF FACT**</u>

**Adoption of the Charter Change**

1.  The City of Pasadena is a Texas home rule city.

2.  Home rule cities may amend their charter through a vote of the people.

3.  Under the city charter adopted in 1964, the city was governed by a mayor and six councilmembers elected at-large.  Although all members of the council were elected at-large, four had to live in a designated district.

4.  Under that city charter, the city, which had a much smaller Hispanic population at that time, elected a Hispanic councilmember, Roy Ybarra, in 1973, 1975, and 1977.

5.  In 1992 the city amended its charter to increase the size of the council to eight members and to elect all eight from single-member districts.  Pasadena's current mayor, Johnny Isbell, was a city council member at the time and voted in favor of the single-member districts.

6.   In 2009, one of the single-member districts elected a Hispanic, Ornaldo Ybarra, to city council.  Mr. Ybarra has continued to serve on council since that time.  In 2013, a second Hispanic, Cody Ray Wheeler, was elected to the council, this time from a district with a

less than majority Hispanic citizen-voting-age population. Mr. Wheeler garnered significant cross-over support from Anglo voters in his district.

7. In late June or early July 2013, the city established a bond and city charter review committee tasked with recommending a potential bond election and possible charter amendments.

8. The committee recommended some charter amendments but took no position on whether to change the existing system for electing the city council.

9. The committee did recommend that no charter changes be put on the same ballot as the bond election so that the potential charter amendments would not distract the voters' attention from the bonds.

10. Although a majority of the council supported the proposed bonds, at least three members of the council did not. Determining it would be difficult, if not impossible, to pass a bond issue in the absence of unanimous council support, the mayor pulled down the ordinance that would have called a bond election.

11. Once it was determined that the bonds would not be on the ballot, the council considered the charter changes recommended by the committee along with a proposal offered by the mayor to convert to an electoral system with six single-member districts and two at-large positions.

12. While there are legitimate arguments for different versions of election systems, including ones with only single-member districts, there are substantial public policy reasons for a city to have some at-large seats on its city council.

13. At-large council members are more likely to have a citywide perspective on issues rather than a parochial view that focuses only on the member's district.

14. In a 6-2 system voters can vote on three councilmembers (one single-member-district race and two at-large) while in an all single-member district race voters can vote on only one.

15. If a councilmember is inattentive to a constituent in a single-member district system, the voter has no other representative to approach, while in a 6-2 system they have three members of the council who represent them.

16. The existence of at-large positions can result in a greater quality of candidates, since in an all-single-member district plan only one person can be elected from the geography that constitutes a district. Among the persons who benefit from the opportunity to run at-large are those Hispanics who live outside of Hispanic-majority districts.

17. Other cities in the vicinity of Pasadena, including the City of Houston and the City of Pearland, have mixed single-member and at-large seats on their city councils.

**Demographics of the City**

18. Pasadena is a city that has had significant and rapid growth in Hispanic population, increasing from 28.8 percent of the city's population in 1990 to 62.2 percent in 2010.

19. Over that same period the Hispanic share of the citizen-voting-age population has increased from 18.7 percent to 42.9 percent.

20. Census data shows that the Pasadena Hispanic population has been growing while the non-Hispanic population has been declining. Between 1990 and 2000 the Hispanic citizen-voting-age population increased by 66.1 percent and between 2000 and 2010, it increased by 41.7 percent. By contrast, non-Hispanic citizen-voting-age population in Pasadena *decreased* from 1990 to 2000 by 13.1 percent and from 2000 to 2010 by 17.2 percent.

21. Hispanic growth has continued in recent years so that, according to the one-year American Community Survey ("ACS"), by 2015 50.6 percent of the city's citizen-voting-age population was Hispanic.

22. Since 2005, the ACS, conducted by the Census Bureau, has been the only source for determining citizen-voting-age population.

23. While for smaller areas the ACS relies on a five-year average of data, for jurisdictions of at least 65,000 population, it provides one-year results.

24. The one-year ACS reports are appropriate to use in determining citizen-voting–age population in a city as large as Pasadena and are particularly useful in revealing trends in population change.

25. While the ACS may show minor variations from year to year, it reveals a pattern of steady increase in the Hispanic percentage of the city's citizen-voting-age population.

26. In two of the last three years for which one-year ACS data is available, it shows Hispanic citizen-voting-age population exceeding 50 percent of the city's total citizen-voting-age population.

27. Hispanics now make up more than 50 percent of Pasadena's citizen-voting-age population.

28. Non-census data sources suggest that the Hispanic percentage of Pasadena's population will continue to increase.

29. More than 80 percent of the city's population resides in the Pasadena Independent School District.

30. More than 82 percent of the Pasadena ISD's enrollment is Hispanic.

31. Hispanic school children are more likely to be citizens than adults are.

32. Today's school students are tomorrow's voting-age citizens, so that as those students reach the age of eighteen they will continue to add to the Hispanic percentage of the city's citizen-voting-age population.

33. The other major school district that includes a portion of the City of Pasadena is the Deer Park ISD, which contains 14.6 percent of the city's population. That district has experienced a steady increase in the percentage of students who are Hispanic going from 18.5 percent in 1994 to 50.7 percent in 2014.

34. School enrollment figures are especially reliable since they are head counts.

35. Growth in the Hispanic percentage of the city's population is reasonably expected to continue. While city-level projections are not available, the State Data Center projects that Harris County will grow by more than a million Hispanic voting-age population in the next 20 years, while the voting-age population of non-Hispanics will increase by less than 200,000. This supports the conclusion that Pasadena's Hispanic percentages will continue to increase.

36. There is every reason to believe that Hispanics will constitute an even larger percentage of the city's citizen-voting-age population in the coming years.

37. While the largest part of the Hispanic population is concentrated in the northern portion of the city, the Hispanic population is spread throughout the city. Ninety-five percent of the occupied census blocks in the city have at least one Hispanic of voting age.

### Demographics of the Challenged Election System

38. The existing council plan has six single-member districts and two at-large places. The percentages of Hispanic-citizen-voting-age population in those districts and places are:

| District or Place | Hispanic CVAP |
|---|---|
| District A | 71.5% |
| District B | 58.0% |
| District C | 61.4% |
| District D | 45.3% |
| District E | 35.2% |
| District F | 22.3% |
| Place G | 50.6% |
| Place H | 50.6% |

39. The citizen-voting-age populations shown above for the six single-member districts are based on the 2009-13 five-year ACS, so the actual percentages are almost certainly higher today.  The two at-large places use the more current data from the 2015 ACS, which is only available for the city as a whole, but that data is still a year out of date.

40. Five of the eight districts or places are elected from election units where a majority of the citizen-voting-age population is Hispanic.

41. In determining Hispanic electoral opportunity, it is also relevant to examine the percentage of registered voters who are Hispanic.

42. The city-wide percentage of registered voters in Pasadena who are Hispanic has been increasing very rapidly.  It went from 34.57 percent of the city's registered voters in 2011, to 39.59 percent in 2015, to 41.97 percent in 2016.

43. Based on the most recently available voter registration list, Districts A, B, and C, have substantial majorities—*i.e.,* 71.03 percent, 59.51 percent, and 56.47 percent, respectively—of registered voters with Spanish surnames.

44. In District D, which elects a Hispanic council member, 45.87 percent of the registered voters on the September 2016 registration roll had Spanish surnames.  This represents an increase from the 35.76 percent who had Spanish surnames on the January 2011 roll.

45. While relying on surnames to determine Hispanic ethnicity will include some persons who are not Hispanic and omit some who are, studies have shown that the omissions and additions will roughly balance out.  Using Spanish surnames is a reasonable and the most accurate way of determining the number of registered voters who are Hispanics.

### Voting Behavior under the Challenged Plan

46. The political science experts who testified analyzed six elections that were held in 2013 and 2015.  Dr. Engstrom, the plaintiffs' expert, analyzed five of those elections, and the city's expert, Dr. Alford, agreed with the numbers Dr. Engstrom produced.  Dr. Alford analyzed one additional election, the 2015 Place G at-large council election.  Based on their analysis, the Court finds the following percentage of support given to the candidate or measure by Hispanic and non-Hispanic voters.

| Contest | Hispanic Voters | Non-Hispanic Voters |
|---|---|---|
| 2015 Place H-Del Toro | 87.3% | 28.3% |
| 2015 Place G-Van Houte | 70.6% | 41.6% |
| 2015 District A-Ybarra | 97.05 | 54.4% |
| 2015 District B-Perez | 82.0% | 36.3% |
| 2015 District D-Wheeler | 89.5% | 55.1% |
| 2013 Prop. 1- 'No" Vote | 99.6% | 39.8% |

47. These were the only city elections analyzed by the two experts. Each of them involved a non-partisan race.

7

48. Dr. Engstrom also presented evidence of Hispanic and non-Hispanic voting preferences in selected partisan elections.

49. Dr. Engstrom's analysis of four primary elections—two in the Democratic Primary and two in the Republican Primary—did not show a pattern of racially polarized voting.

50. Dr. Engstrom's analysis of general election races in which Hispanics ran reflected polarization, but it was primarily the result of straight-ticket partisan voting where roughly two-thirds of Harris County voters vote a straight ticket. This is apparent from the 2010 County Treasurer race in which Orlando Sanchez was the Republican nominee. While Hispanics running as the Democratic nominee typically received overwhelming Hispanic support and minimal non-Hispanic support, this pattern reverses when the Hispanic candidate is running on the Republican ticket.

51. The differing patterns of voting among Hispanics and non-Hispanics in partisan general elections is better explained by party preference rather than race or ethnicity.

52. The partisan elections are not analogous to the non-partisan city elections and offer little, if any, insight into voting patterns in the non-partisan city elections.

53. As Dr. Alford explained, "the factor driving the voting behavior in [partisan general elections] is partisanship; a feature built into the exogenous elections from the very start in the form of a party nomination system, incorporated into the ballot itself with party indications for each candidate, and ultimately mechanically connected to the majority of votes cast through the mechanism of straight-party ticket voting." Alford Report at 11.

54. Examining the only relevant elections analyzed by the parties, the result of the analysis does not establish legally significant racially polarized voting.

55. Two of the six races—the 2015 races in Districts A and D—showed no polarization as Hispanics and non-Hispanics both favored the Hispanic candidate.

56. In the 2015 District B race, the Hispanic candidate, Celestino Perez, received the support of 82 percent of Hispanic voters—a significant percentage of Hispanic cohesion although lower than that received by any other Hispanic candidate or Hispanic-favored measure studied.  Mr. Perez, who ran against an Anglo incumbent member of the council, received the support of 36.3 percent of the non-Hispanic vote.  Hispanics constituted more than 57 percent of the district's registered voters, but a low Hispanic turnout and a lower level of Hispanic support than that enjoyed by other Hispanic candidates resulted in Mr. Perez sustaining a loss by only 34 votes.  With a substantial Hispanic-registered-voter majority, District B is one in which Hispanics have the opportunity to be elected even though this particular candidate was unsuccessful in the 2015 election.

57. The plaintiffs concede that District B, along with Districts A and C, are ones in which Hispanics have an opportunity to elect their favored candidate.  *See* Plaintiffs' Memorandum of Law in Response to Defendant's Motion for Summary Judgment (Doc. 75) at 3, 10 n. 41, 20 and Doc. 75-1, ¶14(a).

58. One of the six races reviewed—2015 Place G—did not have a Hispanic candidate, although one candidate, Pat Van Houte, had deep ties to the Hispanic community, having represented a predominantly Hispanic council district.  In that race, Ms. Van Houte, who ran a very low-budget campaign and was dramatically outspent by her opponent, received the support of 70.6 percent of Hispanic voters but only 41.6 percent of non-Hispanics.  Nevertheless, she was elected.  While a race involving a Hispanic candidate might be more probative in a polarized voting analysis, this election dispels the idea that Hispanics cannot

elect their favored candidate in a citywide election over the opposition of non-Hispanic voters.

59. The 2013 Proposition One election on whether to replace the all single-member district city council system with one that had six single-member districts and two at-large positions is one in which virtually all Hispanic voters opposed the proposition. Although most non-Hispanics voted yes, 39.8 percent supported the Hispanic-favored position. The proposition passed by 79 votes out of 6,505 votes cast.

60. The result of the 2013 charter election does not suggest that whites vote as a bloc usually to defeat the Hispanic choice. First, the election was so close that it is difficult to make a sweeping conclusion one way or the other. Second, Hispanic turnout as a percentage of the total vote was lower than it is in candidate elections. If Hispanic turnout had been slightly higher so that it equaled the percentage Hispanics constituted of the total number of voters in the 2015 city election and there was the same level of Hispanic cohesion and non-Hispanic cross-over, the proposition would have been defeated with a no vote of approximately 54%. The dramatic increase between 2013 and today in the percentage of Pasadena's registered voters who are Hispanic suggests that Hispanics today would likely be on the prevailing side of this issue in a citywide election.

61. The 2015 Place H race is the only one of the six races studied where the Hispanic candidate was defeated by something other than a small margin. In that race, the Hispanic candidate, Oscar Del Toro, was a first-time candidate and was running against an incumbent city councilman. Mr. Del Toro received about 39 percent of the vote. As a first-time candidate, Mr. Del Toro believed he might get only 20-25 percent of the vote. In the end he received almost 40 percent and believed he made mistakes that cost him another six or seven

percentage points.  One campaign decision that likely caused him to receive fewer Hispanic votes than might be expected is that he focused his campaign more heavily on the predominantly Anglo south side rather than devoting more resources to encouraging turnout in the heavily Hispanic north side.

62. Of the six races studied by the two experts, the Hispanic candidate or, in the case of Ms. Van Houte, the Hispanic-favored candidate, won in three of the six.  In two of the six races, the Hispanic candidate or Hispanic-favored proposition lost in a very close race but could have won with a small increase in Hispanic turnout.  Thus, in five out of the six analyzed races, the Hispanic candidate or Hispanic-favored candidate or measure either won or could be expected to win with a minimal increase in Hispanic turnout.

63. Because the Hispanic percentage of citizen-voting-age population is steadily increasing along with a corresponding decrease in the non-Hispanic citizen-voting-age population, Hispanic vote totals are likely to increase even if the percentage of Hispanics who turn out does not change.

64. Given the high number of Hispanic voters and the substantial number of non-Hispanic crossover voters, the evidence does not support a conclusion that the white majority votes as a bloc usually to defeat the minority choice in Pasadena.

65. Hispanics currently represent a majority of Pasadena's citizen-voting-age population and are approaching a majority of the registered voters.

66. With a majority of citizen-voting-age population—*i.e.,* potentially eligible voters— Hispanics have an opportunity to elect in at-large races, even without the benefit of cross- over voting by non-Hispanics

67. However, there is significant, consistent cross-over voting by non-Hispanics in Pasadena that further enhances the Hispanic opportunity to elect in the at-large places and in District D.

68. The percentage of non-Hispanics who cross over to vote for Hispanic candidates is substantially higher than the percentage of Hispanic crossover voters who support non-Hispanic candidates.

69. Because of the differential cross-over rates, Hispanics have an opportunity to elect even without a majority of the electorate – *e.g.* in District D.

70. During the 2015 city council election there were two political groups that backed defined groups of candidates and widely distributed mailings endorsing their candidate picks. Both groups endorsed candidates of Hispanic ethnicity.

71. One group comprised the Texas Democratic Party and a political action committee known as the Area 5 Democrats.  All candidates regarded as Hispanic candidates of choice in the city elections received the backing of this group and were featured on its mailers.

72. A separate group of six other candidates was advanced by a political action committee known as Citizens to Keep Pasadena Strong, which received most of its contributions from the mayor's campaign coffers.

73. Both groups endorsed six candidates, and both saw three of their endorsed candidates elected.  Despite spending far more on mailers, the Citizens to Keep Pasadena Strong group fared no better than the Democratic Party group.  Each supported six candidates, and each saw three (two single-member and one at-large) of their endorsed candidates elected.

74. Hispanics in Pasadena have access to well-funded political organizations capable of impacting electoral success.  Those groups have a demonstrated abilty to succeed in

electing their endorsed candidates in Pasadena municipal elections, both in single-member districts and at large.

## Intent

75. There is no evidence of an intent to discriminate or dilute Hispanic voting power by adopting the 6-2-1 election system.

76. The circumstantial evidence does not support a conclusion of discriminatory intent.

77. As noted previously, there are legitimate public policy reasons to have an election system with at least some at-large positions. *See* Proposed Findings 13-17.

78. In the campaign on the charter amendment, the main argument advanced by the political action committee supporting the measure was that changing to a 6-2-1 system would give voters three representatives on the council rather than just one.

79. After the charter amendment was adopted by the voters, the council adopted district lines for the six single-member districts in the spring of 2014.  The implementation of the new election system by adopting this redistricting plan that provides equal electoral opportunity does not evidence a discriminatory intent.

80. The mayor's instructions to the consultants preparing proposed districts were to create the maximum possible number of districts with Spanish-surname-registered-voter majorities.

81. Three of the six single-member districts in the plan adopted by the council had Spanish-surname registered voter majorities.

82. While half of the single-member districts in the adopted 6-2-1 plan had Spanish-surname registered voter majorities, at the time the plan was adopted less than 40 percent of the city's registered voters had Spanish surnames.

83. In addition, the adopted plan's District D was very similar to District E in the prior 8-0-1 plan.  The Hispanic incumbent in that district, Cody Ray Wheeler, who is Hispanic and was the overwhelming choice of Hispanic voters, was reelected in the first election held under the 6-2-1 system.

84. In the only election held under the 6-2-1 plan there were three Hispanics elected compared to only two under the 8-0-1 plan.

85. In the last election under the 8-0-1 plan, "Latino-preferred candidates held half of the seats on the City Council." Plaintiffs' Memorandum of Law in Response to Defendant's Motion for Summary Judgment (Doc. 75) at 2.  This includes the two Hispanics who served on the council and two non-Hispanics who represented predominantly Hispanic districts.  One of these non-Hispanics was Pat Van Houte.

86. In the first election under the 6-2-1 system, Hispanics elected four Hispanic-preferred candidates.  The four comprise the three Hispanics and Ms. Van Houte, who was elected at-large.

87. Currently there are 50 percent more Hispanic members of the council than were ever concurrently serving on the council during the 20 years the all single-member district system was in effect.

88. In the one election under the 6-2-1 system, Hispanics elected the same number of Hispanic-preferred candidates as were serving on the council in the last year of the all single-member-district system.

89. Retrogression is not the legal standard under section 2 of the Voting Rights Act.  Even if retrogression were relevant in a Section 2 case, the 6-2-1 system as implemented in the City of Pasadena, is not retrogressive.

90. The 6-2-1 election system, as implemented in the City of Pasadena, has five positions elected from areas with Hispanic-citizen-voter-age population majorities—three single-member districts (A, B and C) and the two at-large places.  Those five positions constitute 62.5% of the total seats on council.  The three single member districts, which make up 50% of the single-member districts and 37.5% of the total seats on council, also have Spanish-surname registered-voter majorities.

91. In addition to the five seats elected from areas with majority Hispanic citizen-voter age populations, a sixth Hispanic electoral opportunity exists in District D, which has twice elected a Hispanic council member who is the choice of approximately 90 percent of Hispanic voters.

92. As roughly 50 percent of the city's citizen-voting-age population is Hispanic and about 42 percent of the city's registered voters have Spanish surnames, the current plan provides electoral opportunity for Hispanics that is at least equal to their potential voting strength.

93. Under the 6-2-1 plan used in the City of Pasadena, Hispanics have an opportunity to participate in the electoral process and to elect candidates of their choice that is at least equal to the rest of the electorate.

94. Pasadena's election system does not discriminate against Hispanics.

95. The adoption of the 6-2-1 system and of its implementing redistricting plan was not done with discriminatory intent.

## II. CONCLUSIONS OF LAW

1. Under section 2, the burden of proving that the electoral system operates to minimize or cancel the protected group's ability to elect their preferred candidates is on the plaintiff.

*See, e.g., Thornburg v. Gingles,* 478 U.S. 30, 48, 51 (1986); *see also, Voinovich v. Quilter,* 507 U.S. 146, 155-56 (1993).

2.   "[E]xperience and insight have not yet demonstrated that [election systems containing at-large seats] are inherently invidious and violative of the Fourteenth Amendment." *Whitcomb v. Chavis,* 403 U.S. 124, 159-60 (1971).   "[E]lectoral devices, such as at-large elections, may not be considered *per se* violative of § 2." *Thornburg v. Gingles,* 478 U.S. 30, 46 (1986).

3.   A plaintiff bringing a challenge under section 2 of the Voting Rights Act (52 U.S.C. § 10301) to the use of an at-large election system must satisfy a three-part threshold test. Specifically, (1) the minority group of which the plaintiff is a member must be able to demonstrate that it is sufficiently large and geographically compact to be able to constitute a majority in a single-member district, (2) the minority group must be able to show that it is politically cohesive, and (3) the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.   *Thornburg v. Gingles,* 478 U.S. 30, 50-51 (1986).

4.   The purpose of the *Gingles* threshold test is to establish a causal relationship between the alleged injury and the challenged election system.   *Thornburg v. Gingles,* 478 U.S. 30, 50 n. 17 (1986) (unless minority voters can establish the elements of the *Gingles* test "they cannot claim to have been injured by that [election] structure or practice").

5.   The protections provided by section 2 of the Voting Rights Act extend only to citizens of the United States. 52 U.S.C. § 10301; *Campos v. City of Houston,* 113 F.3d 544, 548 (5th Cir. 1997).

6.  In Texas, only persons who are in the citizen voting-age population (*i.e.,* persons who are at least eighteen years of age and citizens of the United States) are potentially eligible to vote.  TEX. ELEC. CODE § 11.002(1) & (2).

7.  In determining whether the group to which the plaintiff belongs is sufficiently large to constitute a majority in a single-member district, the court "must consider the citizen-voting-age population of the group challenging the electoral practice...." *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997); *see also, Valdespino v. Alamo Heights Ind. Sch. Dist.,* 168 F.3d 848, 853 (5th Cir. 1999) ("this court has already determined what factors limit the relevant population in the district [when analyzing the first *Gingles* factor]: voting-age and citizenship"); *Perez v. Pasadena Ind. Sch. Dist.,* 165 F.3d 368, 372 (5th Cir. 1999) ("We have unequivocally held, however, that courts 'must consider the *citizen* voting-age population of the group challenging the electoral practice when determining whether the minority group is sufficiently large and geographically compact to constitute a majority.' ...such a result is required by the plain language of Section 2.").

8.  The first *Gingles* threshold requirement is a bright-line test.  *Bartlett v. Strickland*, 129 S.Ct. 1231, 1246 1249 (2009); *Valdespino v. Alamo Heights Ind. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999).  That is, the minority group must be able to demonstrate that it can constitute more than 50 percent of the citizen-voting-age residents of a proposed district. *Valdespino*, 168 F.3d at 852-53.

9.  Whether legally significant racially polarized voting exists depends on the combined strength of a cohesive minority vote and the minority crossover vote.  It is only when that combined strength is insufficient to avoid the usual defeat of minority candidates that

racially polarized voting will be legally sufficient to support a finding of a section 2 violation. *Gingles,* 478 U.S. at 56.

10. "Because the loss of political power through vote dilution is distinct from the inability to win a particular election [citation omitted], a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than the results of a single election." *Gingles,* 478 U.S. at 57.

11. Failure to satisfy any one of the three threshold criteria is fatal to the plaintiff's case. *Campos v. City of Houston,* 113 F.3d 544, 547 (5th Cir. 1997).

12. Satisfaction of the threshold test is not sufficient to prove liability under section 2. If a plaintiff is able to satisfy the three-prong *Gingles* test, the court must then examine the totality of the circumstances to determine if the election system results in unequal electoral opportunity. *Johnson v. DeGrandy,* 512 U.S. 997, 1011 (1994).

13. The ultimate question under section 2 of the Voting Rights Act is whether

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of a [racial or language minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Voting Rights Act, § 2, 52 U.S.C. § 10301(b).

14. In determining whether vote dilution exists, the court must conduct an intensely local appraisal of the design and impact of the election system and base its decision on a practical evaluation of past and present reality. *Gingles,* 478 U.S. at 79.

15. The focus of the inquiry is equality of political opportunity. *Johnson v. DeGrandy,* 512 U.S. 997, 1011 (1994).

16. The failure of minority candidates to win elections does not resolve the issue of vote dilution.  Section 2 merely guarantees equality of opportunity and is not a guarantee of electoral success.  *League of United Latin American Citizens v. Perry,* 548 U.S. 399, 428 (2006); *Johnson v. DeGrandy,* 512 U.S. 997, 1014 n.11 (1994).

17. The choice of Hispanic voters need not necessarily be Hispanic.  It would be an affront to our constitutional traditions to assume that only minority candidates can be the preferred choice of minority voters.  *Johnson v. De Grandy,* 512 U.S. 997, 1027 (1994) (Kennedy, J., concurring).

18. While the standard *Gingles* threshold test requires the ability to create a single-member district with a Hispanic citizen-voting-age-population majority, section 2 does not require the creation of majority-minority districts, and a plan that does not have a majority-minority district, even though it may be possible to create one, does not necessarily violate section 2.  *Johnson v. DeGrandy,* 512 U.S. 997, 1019-20 (1994); *see also, Bartlett v. Strickland,* 556 U.S. 1, 23-24 (2009) (plurality opin.) ("Our holding also should not be interpreted to entrench majority-minority districts by statutory command, for that, too, could pose constitutional concerns.").

19. "States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts. Those can be evidence, for example, of diminished bloc voting under the third *Gingles* factor or of equal political opportunity under the § 2 totality-of-the-circumstances analysis." *Bartlett v. Strickland,* 556 U.S. 1, 24 (2009) (plurality opin.)

20. Where a plaintiff group has a majority in a district, yet fails to elect its electoral choice, it can represent a failure to take advantage of the opportunity rather than establishing the

19

absence of opportunity.  *Salas v. Southwest Texas Junior College Dist.,* 964 F.2d 1542, 1556 (5th Cir. 1992).

21. Section 2 does not impose an obligation to maximize minority voting strength.  As the Supreme Court explained, "reading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast. However prejudiced a society might be, it would be absurd to suggest that the failure of a districting scheme to provide a minority group with effective political power . . . above its numerical strength indicates a denial of equal participation in the political process. Failure to maximize cannot be the measure of § 2."  *Johnson v. De Grandy,* 512 U.S. 997, 1016-17 (1994).

22. A districting plan that provides political effectiveness in proportion to the relevant population measure does not deny political opportunity.  *Id.,* at 1014 ('Treating equal political opportunity as the focus of the enquiry, we do not see how these district lines, apparently providing political effectiveness in proportion to voting-age numbers, deny equal political opportunity").

23. Section 5 and section 2 of the Voting Rights Act "differ in structure, purpose, and application."  *Holder v. Hall,* 512 U.S. 874, 883 (1994) (plurality opin.).  Retrogression was the inquiry under section 5 but not in section 2 dilution cases.  *Id.,* at 884; S. Rep. 97-417, p. 68, n. 224 (1982) ("Plaintiffs could not establish a Section 2 violation merely by showing that a challenged reapportionment or annexation for example, involved a retrogressive effect on the political strength of a minority group").

24. "[T]he irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (internal citations omitted).

25. Here, where there is opportunity to participate in the political process and to elect candidates of the minority group's choice that is proportional to the group's percentage of the jurisdiction's citizen-voting-age population, there is no injury, and hence, there is no standing.

26. To determine if there was an intent to discriminate, courts have looked to five, nonexhaustive factors: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body."  *Veasey v. Abbott,* 830 F.3d 216, 231 (5th Cir. 2016 (en banc)*, quoting, Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267-68 (1977).

27. It is not enough that legislators are aware of a disparate impact on a protected group, "the law must be passed *because of* that disparate impact."  *Veasey,* 830 F.3d at 231.

28. The burden is on the plaintiffs to show that racial discrimination was a substantial or motivating factor behind the enactment, and if they meet that burden, the burden shifts to the law's defenders to show it would be enacted without the factor of racial discrimination. *Id.*

29. Non-contemporary evidence of voting discrimination is of little probative value.  The most relevant historical evidence is relatively recent history.  *Id.* at 232.

30. It is problematic to attempt to discern the motive of a legislative body from statements of individual legislators, since what motivates one member may not motivate others.  *Id.* at 233, *citing, United States v. O'Brien,* 391 U.S. 367, 383-84 (1968).   Conjecture by the opponents of a measure is not probative in determining the motivations of those supporting the enactment.  *Veasey,* 830 F.3d at 234.

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-4181
Facsimile:  (713) 238-7304

By:   */s/ C. Robert Heath*
        C. ROBERT HEATH
        Texas State Bar No. 09347500
        Southern District No. 13381
        *bheath@bickerstaff.com*
        BICKERSTAFF HEATH
        DELGADO ACOSTA LLP
        3711 S. MoPac Expressway
        Building One, Suite 300
        Austin, Texas 78746
        Telephone: (512) 472-8021
        Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR
DEFENDANTS**