# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:14-CV-03241-LHR** |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant*. | § | |

## DEFENDANT'S MEMORANDUM OF LAW

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4181
Facsimile: (713) 238-7304

By:    */s/ C. Robert Heath*
    C. ROBERT HEATH
    Texas State Bar No. 09347500
    Southern District No. 13381
    *bheath@bickerstaff.com*
    BICKERSTAFF HEATH
    DELGADO ACOSTA LLP
    3711 S. MoPac Expressway
    Building One, Suite 300
    Austin, Texas 78746
    Telephone: (512) 472-8021
    Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR
DEFENDANTS**

# TABLE OF CONTENTS

Table of Contents ............................................................................................................ ii

Table of Authorities ....................................................................................................... iii

I.      The basic legal standards under section 2 of the Voting Rights Act are firmly
        established ............................................................................................................1

        A.      The Voting Rights Acts guarantees opportunity, not success ..................2

        B.      Retrogression is not the test under section 2 ............................................2

        C.      There is no requirement to maximize political opportunity .....................4

        D.      While majority-minority districts generally provide electoral opportunity,
                they are not necessary to comply with section 2 ......................................5

                1.      The Supreme Court has recently given us given a glossary of terms
                        used to define the different types of districts .................................5

                2.      Crossover districts can provide equal opportunity; majority-
                        minority districts are not necessary to comply with section 2 ....6

        E.      The mere existence of racially polarized voting is not the test under section
                2...................................................................................................................8

        F.      The plaintiffs' reliance on exogenous partisan elections to demonstrate
                polarization in the City of Pasadena's non-partisan election system is
                misplaced .................................................................................................11

II.     There was no intent to discriminate by replacing the 8-0 election system with a 6-2
        system ..................................................................................................................16

        A.      A discriminatory intent is not actionable in the absence of a discriminatory
                effect ........................................................................................................16

        B.      The 6-2 plan does not have a discriminatory effect ...............................16

        C.      Even if there were a discriminatory effect, the city did not have a
                discriminatory purpose in adopting the 6-2 system ...............................17

Conclusion ......................................................................................................................19

Certificate of Service .....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bartlett v. Strickland,*
556 U.S. 1 (2009) (plurality op.)...................................................................................5, 6, 7, 8

*Campos v. City of Houston,*
113 F.3d 544 (5th Cir. 1997) ...................................................................................................1

*Cisneros v. Pasadena Ind. Sch. Dist.,* No. 4-12-CV-2579,
2014 WL 1668500 (S.D. Tex., April 25, 2014)......................................................................13

*Citizens for a Better Gretna v. City of Gretna, Louisiana,*
834 F.2d 496 (5th Cir. 1987) .................................................................................................12

*City of Richmond v. United States,*
422 U.S. 358 (1975)..................................................................................................................3

*Clark v. Putnam,*
293 F.3d 1261 (11th Cir. 2001) ...............................................................................................3

*Holder v. Hall,*
512 U.S. 874 (1994) (plurality opin.) ......................................................................................2

*Johnson v. DeGrandy,*
512 U.S. 997 (1994)........................................................................................................ *passim*

*League of United Latin American Citizens, Council No. 4434 v. Clements,*
999 F.2d 831 (5th Cir. 1993) (en banc) ...........................................................................14, 15

*League of United Latin Amreican Citizens v. Perry,*
548 U.S. 399 (2006)..................................................................................................................2

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)................................................................................................................16

*Miller v. Johnson,*
515 U.S. 900 (1995)................................................................................................................10

*Perez v. Pasadena Ind. Sch. Dist.,*
165 F.3d 368 (5th Cir. 1999) ...................................................................................................3

*Reyes v. City of Farmers Branch,*
586 F.3d 1019 (5th Cir. 2009) .................................................................................................5

*Salas v. Southwest Texas Junior College Dist.*,
   964 F.2d 1542 (5th Cir. 1992) ...................................................................2

*Shelby County, Ala. v.. Holder*,
   ___U.S.___, 133 S.Ct 2612 (2013) .............................................................2

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ...................................................................... *passim*

*Veasey v. Abbott*,
   830 F.3d 216 ....................................................................................17, 18

*Westwego Citizens for Better Government v. City of Westwego*,
   872 F.2d 1201 (5th Cir. 1989) ..................................................................12

**Statutes**

52 U.S.C. § 10301..........................................................................................1

52 U.S.C. § 10301(b) .....................................................................................2

52 U.S.C. § 10304..........................................................................................2

Tex. Local Gov't Code, §9.005.....................................................................18

**Other Authorities**

76 Fed. Reg. 7470, 7471 (Feb. 9, 2011) .......................................................3

43 Fla. St. U. L. Rev. 573, 590 (2016)..........................................................7

<u>**DEFENDANT'S MEMORANDUM OF LAW**</u>

I.      **The basic legal standards under section 2 of the Voting Rights Act are firmly established.**

The legal framework for a case brought under section 2 of the Voting Rights Act is well established.[1]  To prevail in a challenge to an at-large election system, a plaintiff must satisfy a three-part threshold test.  Specifically:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district . . . . Second, the minority group must be able to show that it is politically cohesive . . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—to defeat the minority's preferred candidate.[2]

The burden of proving all the elements of a Section 2 case is on the plaintiff.[3]  Failure to establish any one of the three threshold elements is fatal to the plaintiff's case.[4]  Simply establishing all three parts of the *Gingles* test is not enough, however, for the plaintiff to prevail. He or she must still establish, under the totality of the circumstances, that the at-large election system results in unequal electoral opportunity.[5]

In the case now before the Court, there is no real dispute regarding the first two elements of the threshold test.  The plaintiff group—Latinos—are numerous and geographically compact and they vote cohesively.[6]  The areas of dispute in this case will center on the third prong of the threshold test—*i.e.,* whether the majority group votes as a bloc usually to defeat the Latino

---

[1] 52 U.S.C. §10301.
[2] *Thornburg v. Gingles,* 478 U.S. 30, 50-51 (1986).
[3] *Id.,* 478 U.S. at 46, 48, 51.
[4] *Campos v. City of Houston,* 113 F.3d 544, 547 (5th Cir. 1997).
[5] *Johnson v. DeGrandy,* 512 U.S. 997, 1011 (1994).
[6] Although Pasadena Latinos vote cohesively, they may not always turn out to vote in large numbers.

choice—and on the issue of whether, under the totality of the circumstances, Latinos do not have an equal opportunity to participate in the electoral process and to elect candidates of their choice.[7]

A.      The Voting Rights Act guarantees opportunity, not success.

It is important to recognize that the standard is one of opportunity.[8]  The fact that one or more candidates may lose an election is not in-and-of-itself an indication that there is a lack of opportunity.   Section 2 merely guarantees an opportunity—it is not a guarantee of electoral success.[9]  Indeed, where a plaintiff group was a majority of potential voters but had not succeeded in electing candidates, the Fifth Circuit held that the facts demonstrated a failure to take advantage to of the opportunity that existed rather than the absence of opportunity.[10]   In light of the demographics and voting patterns in Pasadena, including significant Anglo cross-over, Latinos possess the opportunity to prevail in at least four seats, which would mirror their proportion of the city's citizen-voting-age-population, and even more if they mobilize and vote.

B.      Retrogression is not the test under section 2.

This case has attracted significant attention since it is one of the first cases brought after the Supreme Court's *Shelby County*[11] decision, which effectively made section 5 of the Act[12] unenforceable.  The section 5 standard was one of retrogression, which is not at issue in section 2 cases such as this one.[13]  Thus, while an argument may be made in this case that there were four majority-minority districts under the preexisting districting scheme with only three under the

---

[7] 52 U.S.C. § 10301(b) (the ultimate issue established by the statute that the plaintiffs must prove is "that the political processes . . . are not equally open to participation by members of a [racial or language minority group] in that the members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice").

[8] *DeGrandy*, 512 U.S. at 1011.

[9] *League of United Latin Amreican Citizens v. Perry*, 548 U.S. 399, 428 (2006); *De Grandy*, 512 U.S. at 1014 n. 11.

[10] *Salas v. Southwest Texas Junior College Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992).

[11] *Shelby County, Ala. v.. Holder*, ___U.S.___, 133 S.Ct 2612 (2013).

[12] 52 U.S.C. § 10304.

[13] *Holder v. Hall*, 512 U.S. 874, 883, 884 (1994) (plurality opin.)

districting plan now at issue, retrogression is not part of the section 2 standard.[14]  Rather, in a section 2 case, the court must determine if the election system fails to provide the minority group with equal opportunity or, to put it another way, if the group's vote is diluted.  The Supreme Court has held that equal opportunity exists when an election system provides political opportunity in proportion to the plaintiff group's percentage of the population.[15]  In the Fifth Circuit, though, the more relevant measure is citizen-voting-age population.[16]

Although proportionality must be considered as part of the overall totality of the circumstances analysis, it is to be given great weight, in light of the strong tie between proportionality and the ultimate issue of whether the minority group enjoys equal opportunity.  Once proportionality has been established, the primary purpose of the examination of other factors in the totality analysis is to determine whether equal opportunity—*i.e.,* proportionality—has somehow been rendered illusory or ineffective due to some conduct attributable to the governmental defendant.  It could be, for example, that a district plan contained a sufficient number of minority-majority districts but, for some reason, the districts were not effective.  Whatever factor contributed to the lack of effectiveness would be a relevant consideration in determining if the minority group actually enjoyed electoral strength in proportion to its population, and, if not, whether that fact can be laid at the feet of the defendant.

---

[14] The change from four to three predominantly minority single member districts would not be retrogressive in any event under the facts of this case.  Retrogression analysis is not a simple numerical exercise, but rather a "functional analysis of the electoral behavior within the particular jurisdiction or election district." *Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*; DOJ Notice, 76 Fed. Reg. 7470, 7471 (Feb. 9, 2011).  While the change in the number of majority-minority districts would always be something a court or the Attorney General would consider in a retrogression analysis, it would not necessarily establish a violation under section 5, given the addition of two at-large district where Latinos make up 50.6% of the citizen-voting-age population. *City of Richmond v. United States,* 422 U.S. 358, 372 (1975) (An annexation that reduced the African-American percentage in the city from 52% to 42% did not have the effect of denying or abridging the right to vote within the meaning of section 5 so long as the election system had a number of African-American-majority districts that approximated the post-annexation percentage of African-American population); *Clark v. Putnam,* 293 F.3d 1261, 1277 (11th Cir. 2001).

[15] *De Grandy,* 512 U.S. at 1014.

[16] *E.g., Perez v. Pasadena Ind. Sch. Dist.,* 165 F.3d 368, 372 (5th Cir. 1999).

### C.       There is no requirement to maximize political opportunity.

In earlier filings in this cause, the plaintiffs have implied that the city's change in the election system was designed to prevent Latino control of a fifth council seat, which, if achieved, would have given Latinos, who constitute about 50 percent of the city's citizen-voting-age population, control of 62.5 percent of the council seats.[17]  Of course, Latinos have the right to seek as many seats as possible, and there is, and should be, no barrier to their being elected in more seats than their proportion of the population. While that may be a permissible and desirable outcome, it is not one for which there is a legal entitlement.[18]  The Supreme Court has emphasized that section 2 does not require that minority voting strength be leveraged to the maximum possible point of power and that it is error to find dilution based on a failure to maximize.  As the Court said:

> Assume a hypothetical jurisdiction of 1,000 voters divided into 10 districts of 100 each, where members of a minority group make up 40 percent of the voting population and voting is totally polarized along racial lines. With the right geographic dispersion to satisfy the compactness requirement, and with careful manipulation of district lines, the minority voters might be placed in control of as many as 7 of the 10 districts. Each such district could be drawn with at least 51 members of the minority group, and whether the remaining minority voters were added to the groupings of 51 for safety or scattered in the other three districts, minority voters would be able to elect candidates of their choice in all seven districts. The point of the hypothetical is not, of course, that any given district is likely to be open to such extreme manipulation, or that bare majorities are likely to vote in full force and strictly along racial lines, but that reading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. *One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast. However prejudiced a society might be, it would be absurd to suggest that the failure of a districting scheme to provide a minority group with effective political power 75 percent above its numerical strength*

---

[17] Plaintiffs' Memorandum of Law in Response to Defendant's Motion for Summary Judgment (Doc. 75), at 4.
[18] *De Grandy*, 512 U.S. at 1016-17.

*indicates a denial of equal participation in the political process. Failure to maximize cannot be the measure of § 2.*[19]

**D.      While majority-minority districts generally provide electoral opportunity, they are not necessary to comply with section 2.**

This is a case where there are multiple Latino-majority districts, and plaintiffs suggest that there could and should be more.  However, while majority-minority districts certainly provide equal opportunity for a minority group, they are not the only type of district that can do so.  Crossover districts can be equally effective and in fact in some ways are more societally desirable in that they encourage coalitions between differing ethnic groups with like candidate preferences.

**1.      The Supreme Court has recently given us given a glossary of terms used to define the different types of districts.**

As the cases and litigants often categorize election districts with descriptive terms, it may be helpful to begin with definitions to ensure clarity.  Although not every court has used the terms consistently, we are fortunate that the Supreme Court has fairly recently given us definitions of the various types of districts that are generally at issue under the Voting Rights Act.  In *Bartlett v. Strickland*,[20] the Court defined majority-minority districts, crossover districts, and influence districts as follows:

**Majority-minority Districts** are ones where "a minority group composes a numerical, working majority of the voting-age population.[21]  Although the Court speaks of voting-age population, in the Fifth Circuit, and certainly where the majority and minority groups have different citizenship rates, the better measure is citizen-voting-age population.[22]  In Pasadena, Districts A, B, and C all have not only Hispanic-citizen-voting-

---

[19] *Id.* (emphasis added).
[20] 556 U.S. 1 (2009) (plurality op.)
[21] *Id.,* at 13.
[22] *Reyes v. City of Farmers Branch,* 586 F.3d 1019, 1021 (5th Cir. 2009) (rejecting the argument that *Bartlett* superseded the Fifth Circuit rule that citizen-voting-age population is the relevant measure).

age population majorities but also have majorities of at least 56.5 percent Latino registered voters.  In their brief opposing the motion for summary judgment, the plaintiffs concede that Districts A, B, and C are ones in which Latinos have the opportunity to elect the candidate of their choice.[23]  Those three districts are majority-minority districts and are opportunity districts.

**Crossover Districts** are ones in which the minority group does not have a majority, but does have a large enough concentration of voters "to elect the candidates of their choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate."[24]  Although the plaintiffs dispute the designation, the city believes the evidence shows that District D, where currently almost 46 percent of the registered voters are Latino, is a crossover district in which Latinos have the opportunity to elect the candidate of their choice.

**Influence Districts** fall at the other end of the spectrum from majority-minority districts.  The minority group does not constitute a majority but is able to influence the outcome of an election even though its preferred candidate may not be able to be elected.[25]

### 2.    Crossover districts can provide equal opportunity; majority-minority districts are not necessary to comply with section 2.

Although *Bartlett* establishes a consistent terminology, it then goes on to explain how these types of districts are relevant, first to the gatekeeping function of the *Gingles* threshold test and then to the ultimate issue of whether an election practice denies equal opportunity.  The basic holding in *Bartlett* related to defining "an objective, administrable rule" for conducting the first

---

[23] Plaintiffs' Memorandum of Law in Response to Defendant's Motion for Summary Judgment (Doc. 75), at 3; Defendant's Disputed Facts (Doc. 75-1), at 3, ¶ 14(a).

[24] *Bartlett,* 556 U.S. at 13.

[25] *Id.*

element of the *Gingles*[26] threshold test.[27]  While the ability to create a potential single-member district with a majority of the plaintiff group was necessary as a screening device to determine if the case could proceed, the Court makes it clear in regard to the ultimate issue of liability that majority-minority districts are not necessarily required and that the absence of such districts where it is possible to draw them need not signal a violation of section 2.  It emphasized that, "States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts."[28]

The concept discussed in *Bartlett* that crossover districts are not inconsistent with the requirements of section 2 simply reiterates the interpretation the Court gave fifteen years earlier where it said, "If the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice."[29]

Here, District D is such a district.  It has a large, but not quite majority, Latino citizen-voting-age (45.3%) and registered-voter population (45.9%).[30]  The evidence will show that there is a significant non-Latino crossover vote in the city and an even larger crossover in District D.  The Latino vote and the non-Latino crossover are more than sufficient together to elect the candidate of Latino choice.

---

[26] *Thornburg v. Gingles,* 478 U.S. 30 (1986).

[27] *Bartlett,* 556 at 22; Justin Levitt, *Quick and Dirty; The New Misreading of the Voting Rights Act,* 43 FLA. ST. U. L. REV. 573, 590 (2016) ("A 50.1% threshold, as one component of an initial screen for viable cases, serves a signaling and gatekeeping function.").

[28] *Bartlett,* 556 U.S. at 24.

[29] *De Grandy,* 512 U.S. at 1020.

[30] A reason the registered voter percentage slightly exceeds the citizen-voting-age population percentage is that the registered voter data comes from the September 2016 registration roll. The citizen-voting-age population is computed from a five-year average of data collected between 2009 and 2013.

One of the reasons that crossover districts such as District D do not violate section 2 is that they make it make it difficult, if not impossible, to meet the third prong of the *Gingles* threshold test—*i.e.,* "that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate."[31]  As the Court in *Bartlett* explained when speaking of crossover districts, "It is difficult to see how the majority-bloc-voting requirement [*i.e.,* the third-prong of the *Gingles* threshold test] could be met in a district where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate."[32] Certainly in District D, the evidence does not show that the non-Latino majority votes as a block usually to defeat the minority candidate.  In the only District D race for which there is expert testimony on voter preferences (the 2015 election), almost 90 percent of Latino voters favored the Latino candidate, Mr. Wheeler, as did about 55 percent of non-Latinos.  In 2013, when Mr. Wheeler ran the first time in a very similar district, we don't know the precise breakdown of the vote by racial and ethnic group, but we do know that Mr. Wheeler attracted enough non-Latino votes to be elected and, thus, that the white majority did not vote as a bloc to defeat the minority choice, which is the standard set out in *Gingles*.  Because District D is a performing crossover district where the Latino choice can be, and is, elected, it satisfies the requirements of section 2.

E.      **The mere existence of racially polarized voting is not the test under section 2.**

Dr. Engstrom—the plaintiffs' expert—and the plaintiffs often talk about racially polarized voting.  Dr. Engstrom defines racially polarized voting as when the two racial or ethnic groups vote differently.  That is a reasonable definition and is consistent with how the Supreme Court

---

[31] *Gingles,* 478 U.S. at 51.
[32] *Bartlett,* 556 U.S. at 16.

defined and used the term in *Gingles*.[33]  It is important to understand, though, that the existence of racially polarized voting, in and of itself, is not the relevant standard set forth in *Gingles* for determining if there is a violation of section 2.  Rather, the Supreme Court made clear that what was important was a specific type of racially polarized voting—specifically, *legally significant* racially polarized voting.

The Court explained that white block voting against minority candidates does not rise to the level of legal significance unless it "normally will defeat the combined strength of minority support plus white 'crossover' votes."[34]  Thus, it is the *combination* of cohesive voting by the minority group and crossover votes from the majority group, as weighed against voting by the rest of the majority group that determines if polarized voting rises to a level of legal significance to support a section 2 claim.

Further, the *Gingles* Court recognized that the degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will vary according to the circumstances, including varying from district to district.[35]  In this case, where Districts A, B, and C are clearly districts where Latinos have an opportunity to elect the candidate of their choice, the critical question is whether District D, although not a majority-minority district, is likewise an opportunity district.  The election analysis, which shows the majority of non-Latinos voting the same way as 90 percent of Latinos, and the election results where the Latino candidate was elected twice—once from District D and once from the very similar predecessor district—belie any assertion that District D is anything other than an opportunity district.

---

[33] *Gingles,* 478 U.S. at 54 n. 21.
[34] *Id.,* at 56.
[35] *Id.,* at 56 and 57-58.

Dr. Engstrom, the plaintiffs' political science expert, conducted an analysis of five city elections, and Dr. Alford, the defense expert, added an analysis of one additional race.[36]  The problem the plaintiffs face is that those six races do not demonstrate a consistent pattern of legally significant racially polarized voting.   Two of the races, District A (Ybarra) and District D (Wheeler), do not show polarization at all, since both Latinos and non-Latinos supported the same candidate.   One, Place G—at large (Van Houte), shows polarization since the two groups vote differently, but does not reflect legally significant racially polarized voting.   While the two groups supported different candidates, the Latino vote, combined with the non-Latino crossover, was sufficient to elect the Latino candidate of choice. Of the remaining three races, the Latino-supported candidate or position did not prevail, but in two of those, the 2013 Proposition One election and the 2015 District B election (Perez), the result was extremely close, and there is strong reason to believe that if election were held today it would not produce the same result.   In the first place, Latinos make up a larger percentage of registered voters than they did when those elections were held.   For example, the city's percentage of Spanish surname registered voters increased from 39.59 percent in March 2015[37] to 41.97 percent in September 2016—a 2.4 percentage point increase in just nineteen months.   As the relative strength of Latino voters increases, as it has dramatically since the last election, it is reasonable to expect that extremely close Latino losses will be victories given the current composition of the electorate.   Further, the Proposition One

---

[36] The sixth race that was analyzed by Dr. Alford did not involve a Latino candidate.   Rather, the candidate at issue was Pat Van Houte who had previously represented a Latino-majority district, was recognized then as a candidate of Latino choice, and was unquestionably the candidate of Latino choice in the 2015 at-large election that was analyzed. Although we may gain additional insight when able to analyze voting patterns when at least one candidate is, in fact, Latino, it is incorrect to assume that one must be Latino to be the Latino's chosen candidate or to assume that persons of the same race or ethnicity "think alike, share the same political interest, and will prefer the same candidates at the polls' merely because of a shared racial or ethnic identity. *Miller v. Johnson*, 515 U.S. 900, 920 (1995), *quoting, Shaw v. Reno*, 509 U.S. 630, 447 (1993).

[37] The Latino percentage of registered voters in November 2013, the date of the bond election, is not available, but it is almost certainly even lower than the 2015 percentage.

election was a special election in which Latino turnout was low.  The expert testimony will demonstrate that if Latinos had turned out merely at the level they turn out in city council elections, the proposition would have been defeated handily rather than narrowly passing.  This is also true of the District B race where even a slight increase in Latino turnout would have changed the result.

Thus, there is only one example, the 2015 at-large race involving Mr. Del Toro, where there is a fairly significant degree of racially polarized voting and even in that case the expert testimony will show that Mr. Del Toro could have won if Latinos had turned out at the same rate as non-Latinos.  Even disregarding the possibility of the effect of increased Latino turnout, Mr. Del Toro's defeat and the two other very close elections do not display the type of sustained and usual defeat necessary to establish legally significant racially polarized voting.[38]  And, of course, there is no evidence of defeat in District A or D, sustained or otherwise.

### F.   The plaintiffs' reliance on exogenous partisan elections to demonstrate polarization in the City of Pasadena's non-partisan election system is misplaced.

Presumably because of the meagerness of proof from the city elections, Dr. Engstrom analyzes and relies on Harris County partisan elections conducted in Pasadena election precincts. He picked four primary races—two in the Democratic primary and two in the Republican—and three general election races.  The testimony—at least from Dr. Alford—and the reported levels of Latino and non-Latino support should establish that these primary races, even if they are assumed to be relevant, do not demonstrate a pattern of polarization.

On the other hand, the three general election races Dr. Engstrom chose for analysis do demonstrate a consistently high level of Latino support for the three Latino candidates and a consistently low level of non-Latino support. The use of these general election contests, though,

---

[38] *Gingles,* 478 U.S. at 57.

raises an important legal question about the relevance and probative nature of exogenous elections. In addressing the second and third prongs of the *Gingles* analysis (*i.e.*, minority cohesiveness and white bloc voting), courts often receive evidence gleaned both from endogenous[39] and exogenous elections. An endogenous election is one that is of the same type and in the same jurisdiction that is at issue in the case. Thus, in this case, endogenous elections would be ones for the Pasadena city council. Obviously, they are the most probative because they present the identical electorate, the identical issues, and the identical offices that are at issue in the case.

The other type of elections that might be relevant for analysis consists of exogenous elections. Exogenous elections are ones for a different entity than the defendant in the case. Generally, they will be elections that occur in a larger jurisdiction but whose returns can be segregated so that only those voters from the geographic area of the defendant jurisdiction can be studied. Thus, for example, when looking at the question of whether there is legally significant polarized voting in the City of Pasadena, election returns for Harris County or the State of Texas arguably could be relevant as one should be able to isolate the results from those election precincts that together compose the city. In the Fifth Circuit, exogenous elections can be appropriately used to supplement evidence of racial bloc voting demonstrated by endogenous elections.[40]

Even if one looks to exogenous elections as supplemental evidence, it is important to be sure that the elections chosen are sufficiently similar to the ones at issue in the lawsuit to be probative. Here, Dr. Engstrom selected a very limited set of exclusively partisan elections. There are many reasons the exogenous elections chosen here are not comparable to City of Pasadena

---

[39] At least one opinion uses the term indigenous rather than endogenous. *Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1209 (5th Cir. 1989).

[40] *Citizens for a Better Gretna v. City of Gretna, Louisiana,* 834 F.2d 496, 502 (5th Cir. 1987) ("Although exogenous elections alone could not prove racially polarized voting in Gretna aldermanic elections, the district court properly considered them as additional evidence of bloc voting—particularly in light of the sparsity of availability data.").

elections.  The chief reason, though, is that the elections chosen by Dr. Engstrom are all partisan elections while Pasadena city elections are non-partisan.  As noted above, the three general election races show high levels of Latino support (above 90%) for the Latino candidates and comparatively low levels (18-29%) of support from non-Latino voters.  All the races chosen by Dr. Engstrom were ones in which the Latino candidate was a Democrat and the non-Latino candidate was a Republican.  However, if one adds one or more races to the equation where the Latino candidate is Republican, the pattern flips with Latinos giving high levels of support to the non-Latino Democrat while non-Latinos are heavily supporting the Latino Republican.  The obvious explanation is that persons in the partisan elections are polarized by party, not by race or ethnicity. As a result, the exogenous elections are not probative.  It was for precisely this reason—*i.e.,* the difficulty of applying partisan voting behavior to nonpartisan systems—that Judge Ellison rejected such evidence as nonprobative in testimony involving these same partisan elections and much the same geographic area.[41]

It is not clear exactly what argument the plaintiffs will advance to suggest that these partisan elections should be given consideration.  There are, however, two arguments that have been advanced in other cases to claim that partisan elections would be probative in a case involving nonpartisan elections.  Both have been firmly rejected by the en banc Fifth Circuit.

One argument is based on language in part III-C of Justice Brennan's opinion in *Gingles*, which is the only part of the Brennan opinion that does not command a majority.  There, he writes that "it is the difference between the choices made by black and white voters and not the reason for the difference that leads to blacks having less opportunity to elect their candidates of choice."[42]

---

[41] *Cisneros v. Pasadena Ind. Sch. Dist.,* No. 4-12-CV-2579, 2014 WL 1668500 (S.D. Tex., April 25, 2014), at *22, *23.

[42] *Gingles,* 478 U.S. at 63.

Justice Brennan in *Gingles* clearly rejects the idea that the cause of racially divergent voting patterns is relevant.  His views on that point, however, do not represent the views of the Supreme Court or of the Fifth Circuit.  In *League of United Latin American Citizens, Council No. 4434 v. Clements,*[43] the en banc Fifth Circuit extensively addresses the necessity of determining if partisan politics rather than considerations of race drives voting behavior when considering the third prong of the *Gingles* analysis.  In particular, the en banc court, in an opinion by Judge Higginbotham, recognized that Justice Brennan's formulation of the test that forms the basis of the of the view that the reason for divergent voting patterns is irrelevant does not command a majority of the Supreme Court and, in fact, the Supreme Court majority specifically rejects the Brennan view. The en banc Fifth Circuit said:

> As courts and commentators alike have noted, Justice White and Justice O'Connor [joined by Chief Justice Burger and Justices Powell and Rehnquist] were united in their fidelity to *Whitcomb*'s distinction between vote dilution and partisan politics and in their opposition to Justice Brennan's attempt to expunge this teaching from the bloc voting inquiry. . . .  Since these five Justices expressly rejected a test that would permit § 2 liability to attach upon a showing that white and black citizens generally gave their votes to different candidates in favor of an inquiry into the possible explanations of these divergent voting patterns, we believe that it is this view, not Justice Brennan's that commands our allegiance.[44]

Or, to put the matter more succinctly, "Electoral losses that are attributable to partisan politics do not implicate the protections of § 2."[45]

The second justification that is sometimes given for relying on partisan elections to establish the relevance of partisan voting in a polarized voting analysis is the argument that partisan

---

[43] 999 F.2d 831, 849-63 (5th Cir. 1993) (en banc) ("*LULAC*").
[44] *LULAC*, 999 F.2d at 857.
[45] *Id.* at 863.

affiliation is a proxy for race.  The en banc court in *LULAC* firmly and repeatedly rejected that argument.[46]

There simply is no legal basis on which to conclude that the voting behavior in these partisan races, which is best explained by partisan affiliation rather than race or ethnicity, demonstrates racially polarized voting, whether legally significant or not.

As a result, applying the *Gingles* framework and considering the relevant evidence that will be presented, it will be clear that

- Districts A, B, and C are all majority-minority districts in which Latinos have a clear opportunity to be elected,

- District D, which is not quite a majority-minority district, is also one where Latinos have a clear opportunity to be elected and where there is no evidence of legally significant racially polarized voting as would be necessary to satisfy the third prong of the *Gingles* threshold analysis,

- The two at-large places, while perhaps not providing the same level of Latino elective success as Districts A-D, are ones that have elected the Latinos' candidate of choice and there is a sufficient level of crossover voting from non-Latinos to provide Latinos with electoral wins so long as there is a moderate level of Latino turnout, and

---

[46] *LULAC*, 999 F.2d at 853-54 ("Courts must undertake the additional inquiry into the reasons for or causes of, these electoral losses in order to determine whether they were the product of 'partisan politics' *or* 'built-in bias.'"); 861 ("We do not agree, however, that a 'functional' and 'practical' review of Texas judicial elections exposes political parties as proxies for race or ethnicity."); 877 ("One thread runs throughout the plaintiffs' case in all of the counties— an insubstantiality of proof that the minority preferred candidates lost 'on account of race.' . . . The evidence in Dallas County clearly establishes that judicial elections are decided on the basis of partisan voting patterns.  We are left with the inescapable conclusion that the plaintiffs have failed to prove the minority-preferred judicial candidates in this county are consistently defeated by racial bloc voting."); 879 ("the minority preferred candidates were consistently defeated because they ran as members of the weaker of two partisan organizations.  We are not persuaded that this is racial bloc voting as required by *Gingles*. ... Section 2 protects black voters against defeat on account of race or color, not on account of political platform."); 880 ("the facts demonstrate that partisan affiliation, not race, was responsible for the defeat of the minority-preferred candidate in Dallas County.  The district court erred in finding racial vote dilution and a violation of § 2.").

15

- Given the significant and sustained growth in Latino citizen-voting-age population and Latino voter registration, the ability of Latinos to elect under this plan will only increase over time.

## II.   There was no intent to discriminate by replacing the 8-0 election system with a 6-2 system.

### A.   A discriminatory intent is not actionable in the absence of a discriminatory effect.

The plaintiffs allege claims under the Fourteenth and Fifteenth Amendments.  To establish a constitutional claim in a vote dilution case, the plaintiffs must prove both that the 6-2 system has a discriminatory impact[47] and that it was enacted with a discriminatory purpose.  Here they can do neither.

### B.   The 6-2 plan does not have a discriminatory effect.

As discussed above, so long as the election system provides the plaintiff group with political effectiveness in proportion to their share of the city's citizen-voting-age population, there is no injury under section 2.  All the plaintiffs have a statutory right to is an equal opportunity, not a maximized opportunity.

Here, the evidence will show that Latinos constitute half of the city's citizen-voting-age population and that they form an effective voting majority in half of the eight council seats, with the ability to elect as many as two more.  Further, in the 8-0 plan, Latinos elected the Latino-preferred candidate to four council seats.  In the first election under the 6-2 plan, they also elected four Latino-preferred candidates.

---

[47] The discriminatory impact establishes injury which is necessary if the claim is to constitute a case or controversy within the Court's article III jurisdiction. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

Additionally, when reviewing the plan under the totality of the circumstances, an important circumstance is the rapid growth of the Latino population. The four existing Latino opportunity districts will only become stronger, as will citywide Latino-voting strength, as Latino citizen-voting-age population and Latino-registered-voter numbers continue to increase. While winning at-large may not be as certain as prevailing in one of the four Latino-opportunity single-member districts, with non-Latino crossover votes ranging from a low of about 30 percent up to 50 percent or more, Latino candidates should be able to win in a citywide race. Of course, a Latino-preferred candidate, Ms. Van Houte, has already won an at-large race, and she prevailed despite receiving less than 40 percent of the non-Latino vote.

The plaintiffs simply cannot establish any discriminatory impact of the 6-2 plan.

### C.   Even if there were a discriminatory effect, the city did not have a discriminatory purpose in adopting the 6-2 system.

To prove a discriminatory intent, plaintiffs must establish that the 6-2 plan was adopted for the purpose of discriminating against Hispanics *qua* Hispanics.[48]  It is not enough to show that lawmakers were aware of a disparate impact on a protected group, "the law must be passed *because of* that disparate impact."[49]  To meet their burden, plaintiffs must show that discrimination against Hispanics was a "substantial" or "motivating" factor behind the 6-2 system.[50]

When determining if there was an intent to discriminate, courts look to five, nonexhaustive factors: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures,

---

[48] *Veasey,* 830 F.3d at 231.

[49] *Id.*

[50] *Id.*

and (5) legislative history, especially where there are contemporary statements by members of the decision-making body."[51]

In this case it is likely that the plaintiffs will attempt to show a history of discrimination in the state and the city as part of their effort to prove discriminatory purpose.  Most of that testimony will involve incidents that happened decades and, in some cases, a century or more ago.  The en banc Fifth Circuit has held that such non-contemporary evidence of discrimination has little probative value.[52]  Additionally, the plaintiffs may attempt to establish motive from testimony of councilmembers, especially those who opposed the charter amendment.  Determining the motive of the council from statements of individual members is problematic, as what motivates one member may not motivate another.[53]  Testimony from persons who opposed the measure is particularly of little value since their testimony as to the motivations of the enactment's supporters is necessarily speculative.[54]  Finally, it must be recalled that the actual and ultimate decision-maker was not the mayor or council but, instead, was the entire body of voters.[55]

The evidence will show that the change to a mixed system providing primarily single-member districts was one for which there were strong and legitimate governmental reasons.  One of the reasons is that the 6-2 system would let all voters have three representatives on the council rather than only one, and this was the primary argument used in the campaign.  Moreover, the evidence will show that the City received public comment on the proposed 6-2 change, considered the impact of the change on Latino voting populations, and engaged legal counsel to advise it on the charter changes and redistricting.

---

[51] *Veasey v. Abbott,* 830 F.3d 216, 231 (5th Cir. 2016 (en banc), *quoting,* *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267-68 (1977).

[52] *Id.* at 232.

[53] *Id.* at 233, *citing,* *United States v. O'Brien,* 391 U.S. 367, 383-84 (1968).

[54] *Veasey,* 830 F.3d at 234.

[55] TEX. LOCAL GOV'T CODE, §9.005.

Further, the sheer effectiveness of the 6-2 plan for Latinos  negates an interference of discriminatory intent.  In other words, if the City had a discriminatory purpose of reducing Latino voting strength, it failed miserably.  The first election under the new system resulted in the election of more Latinos than had ever served at one time under the 8-0 system.  The new system did not reduce the number of Latino-preferred candidates who were elected.  They constituted half the council in the last year of the 8-0 system and half the council under the 6-2.  All of this was foreseeable in light of population trends and none of it is surprising since the charge to the law firm drawing the proposed districts was to draw as many Spanish-surname-registered-voter districts as possible.  That is exactly what was done, and the plan also substantially preserved the district that did not quite have a Latino majority but that had been successful in electing a Latino.  Additionally, the first election under the new system demonstrated that a Latino-preferred candidate could win at-large even over the opposition of non-Latino voters and despite being dramatically outspent.

The ability to elect Latino and Latino-preferred candidates at-large will only increase given the dramatic and rapid increase in Latino population, a cohort that already consists of more than half the city's citizen-voting-age population.  Common sense dictates that a city intending to discriminate against Latinos would not have adopted the current plan that has operated to provide Latino voting strength commensurate with the group's percentage of the city's citizen-voting-age population and holds the promise of achieving even more.

## Conclusion

The plaintiffs in this case cannot establish a violation of either Section 2 or the Fourteenth or Fifteenth Amendments.  All their requests for relief should be denied.

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-4181
Facsimile:  (713) 238-7304

By:    */s/ C. Robert Heath*
     C. ROBERT HEATH
     Texas State Bar No. 09347500
     Southern District No. 13381
     *bheath@bickerstaff.com*
     BICKERSTAFF HEATH
     DELGADO ACOSTA LLP
     3711 S. MoPac Expressway
     Building One, Suite 300
     Austin, Texas 78746
     Telephone: (512) 472-8021
     Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR
DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 21, 2016, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.


 /s/ *C. Robert Heath*
C. Robert Heath