UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:14-CV-03241-LHR** |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant*. | § | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.  FINDINGS OF FACT

### Pasadena Demographics

1.  According to the 2010 Census, Pasadena had a population of 149,335.  Hispanics constituted 62.08 percent of the total population and 55.78 percent of the voting-age population.  Def. Ex. 39 (Rives expert report) at report exhibit 2.

2.  The Hispanic population in Pasadena is steadily growing, while the non-Hispanic population is steadily declining.  The Hispanic population exceeded the non-Hispanic population around the time of the 2000 census, and the gap between Hispanics and the less-numerous non-Hispanics has steadily widened since that time.  Hispanic-voting-age population exceeded non-Hispanic-voting-age population in Pasadena in mid-decade between 2000 and 2010 and, as with population, the gap between the voting-age population of the two groups has steadily widened.  The same trend is occurring with citizen-voting-age population, although the crossover occurs closer to 2015.  Tr., Dec. 1, 2016, Rives Testimony at 27:8-29:2; Def. Ex. 42.

3.  The trend of increasing Hispanic population and decreasing non-Hispanic population is reflected in changing voter registration numbers.  From 2011 to 2016 the number of registered voters in the City of Pasadena who have Spanish surnames increased by 6,255.

Over the same period, the number of registered voters who do not have Spanish surnames decreased by 1,434.  Tr., Dec. 1, 2016, Rives Testimony at 29:7-32:1; Def. Ex. 43.

4.      The concentration of Hispanic voting-age population and citizen-voting-age population has moved steadily from north to south in Pasadena.  Tr., Dec. 1, 2016, Rives Testimony at 39:19-40:19; Def. Ex. 44 and 45.

5.      Hispanics are integrated throughout the city.  According to the 2010 Census there was at least one voting-age-citizen Hispanic in 95 percent of the occupied census blocks in the City of Pasadena.  Tr., Dec. 1, 2016, Rives Testimony at 42:11-43:8; Def. Ex. 39 (Rives expert report) at 2.

6.      Hispanic growth in Pasadena is expected to continue.  Twenty years of data from school districts serving the city show a steady growth in the percentage of students who are Hispanic, with Hispanic students currently constituting over 82 percent of the student body in Pasadena I.S.D., which serves the bulk of the city.  Growth projections for Harris County show that Hispanics are expected to continue to constitute a larger and larger share of the area's population, which suggests that the current trend in Pasadena will continue.  Tr., Dec. 1, 2016, Rives Testimony at 49:24-53:5; Def. Ex. 50-52.

## Historical Background of the Charter Change

7.      The City of Pasadena is a Texas home rule city. Agreed Fact No. 2

8.      Home rule cities may amend their charter through a vote of the people. Tex. Loc. Gov't Code Ann. § 9.004.

9.      Under the city charter adopted in 1964, the City of Pasadena was governed by a mayor and six councilmembers elected at-large.  Although all members of the council were

elected at-large, four had to live in designated districts. Agreed Fact No. 4; Tr., Nov. 28, 2016, Isbell Testimony at 55:10-24.

10. Under that city charter, the city, which had a much smaller Hispanic population at that time, elected a Hispanic councilmember, Roy Ybarra, in 1973, 1975, and 1977. Tr., Nov. 28, 2016, Isbell Testimony at 56:21-57:4; Agreed Fact No. 80.

11. In 1992 the city amended its charter to increase the size of the council to eight members and to elect all eight from single-member districts.  Tr., Nov. 28, 2016, Isbell Testimony at 56:5-9. The change was presented to city council by then-mayor John Ray Harrison as something required by the Justice Department.  Tr., Nov. 28, 2016, Isbell Testimony at 56:14-20.

12. Pasadena's current mayor, Johnny Isbell, was a city council member at the time and voted in favor of the single-member districts. Tr., Nov. 28, 2016, Isbell Testimony at 56:8-12.  Then-councilmember Isbell did not voice any opposition to the change.  *Id.*

13. In 1993, one of the city's single-member districts elected a Hispanic, Emilio Carmona to City Council.  Agreed Fact No. 81.  Mr. Carmona was reelected in 1995, 1997, and 1999. *Id.*

14. In 2009, one of the city's single-member districts elected a Hispanic, Ornaldo Ybarra, to city council.  Agreed Fact No. 82.  Mr. Ybarra was reelected in the same district in 2011 and 2013.  *Id.*

15. In 2013, another Hispanic, Cody Ray Wheeler, was elected to the council, this time from a district with a less than majority Hispanic citizen-voting-age population.  Tr., Nov. 30, 2016, Wheeler Testimony at 118:22-23; *see* Agreed Fact No. 26. Mr. Wheeler garnered

significant cross-over support from Anglo voters in his district.  Tr., Dec. 1, 2016, Alford Testimony at 120:2-14.

16. Mayor Isbell believes that single member districts are valuable in that they allow citizens to be represented by persons who live in their communities.  Tr., Nov. 28, 2016, Isbell Testimony at 57:10-16.  He also believes that single member districts have drawbacks in that representatives elected from districted seats may be concerned only with their districts and not the needs of the city as a whole.  Tr., Nov. 28, 2016, Isbell Testimony at 57:17-22.

17. Mayor Isbell also believes that at-large representation is valuable in combination with single-member districts, because, in his opinion, a mixed system allows constituents to have more representatives with whom they can share their concerns and also encourages collaboration and cooperation between districted and at-large representatives, due to the overlap in their constituencies.  Tr., Nov. 28, 2016, Isbell Testimony at 57:23-58:12; Tr., Nov. 30, 2016, Helms Testimony at 42:17-22.

18. Mayor Isbell has long held the belief that a mixed system of at-large and single member council seats best serves the interests of the city's residents.  Tr., Nov. 28, 2016, Isbell Testimony at 63:21-64:8; Tr., Nov. 30, 2016, Helms Testimony at 25:25.

19. In 2007, at a time when he was not serving as mayor or on city council, Mayor Isbell spoke before a charter commission put together by then-mayor Manlove.  Tr., Nov. 28, 2016, Isbell Testimony at 64:3-5. He suggested that the city consider changing to a mixed single-member and at-large system. *Id.*

20. Mayor Isbell has never advocated for an all at-large council election system in Pasadena. Tr., Nov. 18, 2016, Isbell Testimony at 58:13-16.

4

21. Mixed systems are useful and to be recommended where they can be implemented without diluting the minority vote.  Tr., Dec. 1, 2016, Alford testimony at 161:7-12.

22. In addition to the benefits recognized by Mayor Isbell, the existence of at-large positions can result in a greater quality of candidates, because in an all-single-member district plan only one person can be elected from the geography that constitutes a district.  Tr., Dec. 1, 2016, Alford Testimony at 162:19-163:1. Among the persons who benefit from the opportunity to run at-large are those Hispanics who live outside of Hispanic-majority districts. *Id.*

23. Mixed systems produce council members who are cognizant of the needs of the entire city.  Tr., Dec. 1, 2016, Alford testimony at 161:10-12.

24. Mixed systems can provide a stepping stone for candidates to seek higher offices by developing relationships with a larger group of voters.   Tr., Dec. 1, 2016, Alford testimony at 161:13-22.

25. Mixed systems discourage distributive politics where, for example, bond funds would be distributed equally among council districts, which is an inefficient way to expend public resources and can avoid distributing funds to areas of greatest need.  Tr., Dec. 1, 2016, Alford testimony at 161:23-162:18.

26. The mayor's views on the benefits of a mixed system of representation are reasonable and reflect legitimate public policy concerns recognized by political science experts.  Tr., Dec. 1, 2016, Alford Testimony at 160:25-162:18; Def. Ex. 53 at 12.

27. In 2012 and 2013, a need had arisen to amend portions of the Pasadena city charter to fix problems with the way the Mayor Pro Tem was appointed and the way residency was established.  Tr., Nov. 30, 2016, Helms Testimony at 26:7-8; 43:11-22.

28. Under its city charter, Pasadena has a "strong mayor" form of government, and the mayor is vested with the power to recommend to council any ordinances that he deems worthy of consideration.   Tr., Nov. 28, 2016, Villarreal Testimony at 12:6-25; Plf. Ex. 216. There is no requirement that he convene a citizens committee to review proposed ordinances or otherwise consult with anyone before proposing a vote by city council.  *Id.*

29. Nevertheless, on June 27, 2013, Mayor Isbell announced his intention to form a bond review committee tasked with considering a potential bond election.  Tr., Nov. 18, 2016, Isbell Testimony at 219:14-16; Plfs. Ex. 8.   A potential bond election is something the mayor had been discussing prior to issuance of the memo.  Tr., Nov. 29, 2016, Van Houte Testimony at 111:4-10.

30. Mayor Isbell requested that each member of the city council suggest two names for membership on the committee.   Plf. Ex. 8; Tr., Nov. 18, 2016, Isbell Testimony at 222:12-16.   He then appointed one member suggested by each councilmember, with the exception of Councilman Don Harrison, whose suggested committee members the mayor found to be unacceptable. Tr., Nov. 18, 2016, Isbell Testimony at 222:17-23. Mayor Isbell requested that Mr. Harrison provide new names, but Mr. Harrison refused.   Tr., Nov. 18, 2016, Isbell Testimony at 222:24-223:7.

31. By July 16, 2013, the committee and council, as well as the public at large, had been informed that the committee's work would also include reviewing the city charter for recommended changes.   Def. Ex. 10; Plf. Ex. 9; Tr., Nov. 29, 2016, Van Houte Testimony at 114:19-115:5.

32. The committee was asked to complete its work on an expedited basis, because Harris County, which would prepare the ballots and provide the voting machines for a potential

November 2013 election, required that ballot language be submitted by August 22 or 23, 2013.  Plf. Ex. 8; Tr., Nov. 30, 2016, Helms Testimony at 37:17-20.

33.   Texas law provides for only two uniform election dates each year, one in May and one in November.  Tex. Elec. Code Ann. § 41.001.

34.   It was necessary to hold any election on bonds or charter changes in November of 2013, because Harris County did not have voting machines available in November of 2014 and the City did not want to combine a May city council election with a bond or charter election on the same ballot, in an effort to prevent candidates making their positions on the bond or charter election a part of their campaign platforms.  Tr., Nov. 30, 2016, Helms Testimony at 44:7-24.

35.   The committee met on July 18, July 23, July 25, and July 29, 2013.  Tr., Nov. 29, 2016, Van Houte Testimony at 31:7-9, 46:19-22.

36.   The United States Supreme Court decision in *Shelby Cnty. Alabama v. Holder*, which was issued on June 25, 2013, invalidated the geographic coverage formula of Section 5 of the Voting Rights Act.  The *Shelby County* decision had the effect of relieving Texas and its political subdivisions, including the City of Pasadena, of the obligation to secure federal approval before implementing changes to their voting systems.  Agreed Fact No. 33.

37.   On or about July 24, Mayor Isbell asked city staff to prepare several potential districting maps reflecting a mixed single member and at-large system.  Tr., Nov. 28, 2016, Isbell Testimony at 5:24-6:13.  The maps reflected a potential 4-2 system, a 7-1 system, and a 6-2 system. Plf. Ex. 246; Tr., Nov. 28, 2016, Isbell Testimony at 6:20-7:8.

38. On the afternoon of July 24, Mayor Isbell requested that city staff create a second version of the draft 6-2 system map, which lowered the overall percentage of deviation between the populations in each district, thereby better adhering to the "one man, one vote" principle. Plf. Ex. 247; Tr., Nov. 28, 2016, Isbell Testimony at 11:18-12:10. City staff prepared that revised 6-2 map and provided it to the mayor. *Id.*

39. Mayor Isbell attended only one meeting of the bond and charter review committee, on July 25, 2013.  Tr., Nov. 28, 2016, Isbell Testimony at 12:25-13:6.  At that meeting, he suggested several potential changes to the city charter, including a move to a city council structure comprised of six single-member seats and two at-large places.  Tr., Nov. 28, 2016, Isbell Testimony at 13:7-23.

40. At the meeting, Mayor Isbell expressed his belief that the mixed system would provide residents with more than one representative on council (Agreed Fact No. 38) and would balance the "fiefdom" mentality he believed could sometimes accompany single-member representation.  Plf. Ex. 217; Tr., Nov. 29, 2016, Van Houte Testimony at 116:22-117:22, 120:9-21.  Mayor Isbell also explained that he had not previously sought to switch to a mixed system because doing so would have required a "convoluted" process of obtaining preclearance from the Department of Justice ("DOJ").  Plf. Ex. 217; Tr., Nov. 29, 2016, Van Houte Testimony at 116:18-117:20, 122:8-12.   Mayor Isbell also noted that surrounding jurisdictions have mixed single-member and at-large seats on their city councils.  Plf. Ex. 217.

41. Mayor Isbell does not hide the fact that the Supreme Court's June 25, 2013 decision in *Shelby County v. Holder* had an impact on the timing of his decision to propose a citywide vote on moving to a mixed 6-2 council system.  He acknowledges his awareness

that the *Shelby County* decision relieved the city of the expense and uncertainty associated with attempting to obtain DOJ preclearance under Section 5. Tr., Nov. 18, 2016, Isbell Testimony at 217:23-218:9; 221:7-13. The mayor also acknowledges that he had in the past been told that DOJ was unlikely to approve a change under the retrogression standard of Section 5, which he understood to be related to possible concerns over the impact of at-large systems on minority voters. Tr., Nov. 28, 2016, Isbell Testimony at 61:19-23.

42. There is not, however, any evidence that Mayor Isbell himself believed that the DOJ would not have approved a mixed system for Pasadena in 2013 under the standards of Section 5. Tr., Nov. 28, 2016, Isbell Testimony at 62:13-20.   Indeed, it cannot be known how DOJ would have come out on that issue.

43. The DOJ objection letters for other jurisdictions (Galveston, Freeport and Beaumont ISD) that Plaintiffs have placed in evidence all demonstrate that, when considering changes from single member to mixed electoral systems under Section 5's retrogression standard, the DOJ did not adopt a rule that moves to at-large seats are per se retrogressive. Plf. Exs. 92, 103, and 104.

44. Instead, the DOJ focused on the practical question of whether the proposed mixed system would provide electoral opportunity equivalent to that in place under the existing or benchmark system. *Id.*  That answer largely depended on the minority demographics of the city, which in Pasadena have been steadily increasing, and the extent of crossover voting, which is relatively high in Pasadena compared to other jurisdictions. Id; Tr., Dec. 1, 2016, Rives Testimony at 26:7-23; Tr., Dec. 1, 2016, Alford Testimony at 135:20-136:4; Def. Ex. 123.

45. The mayor's recognition that *Shelby County* made it less bureaucratic and less expensive to move to a mixed single-member and at-large system by doing away with the preclearance process is not evidence that he intended to deprive Hispanics of electoral opportunity proportional to their share of the citizen voting age population.

46. Intent to discriminate is also not established by the mere fact that the mayor had been told that DOJ likely would not approve the change under Section 5, even if he understood that speculation to be premised on perceived DOJ concerns over the impact of at-large systems on minority voters. Evidence that a person took an action after having been told by a third party at a past point in time that the government might object under a different, no longer applicable, legal standard is not sufficient to establish that the action was taken with the intent to violate current law.

47. During the July 25th meeting of the bond charter review committee, Mayor Isbell noted that the city remained bound by Section 2 of the Voting Rights Act and could not dilute Hispanic voting opportunity. Plf. Ex. 217; Tr., Nov. 29, 2016, Van Houte Testimony 121:2-4. This statement was consistent with Mayor Isbell's understanding of the impact of the *Shelby County* decision. Tr., Nov. 28, 2016, Isbell Testimony at 63:6-20. Mayor Isbell later made the same observation in a late October or early November 2013 Scotusblog interview. Plf. Ex. 109.

48. During the July 25th meeting of the bond charter review committee, councilmember Ornaldo Ybarra commented that consideration should be given to maintaining what he considered an appropriate number of majority Hispanic districts, given that 62 percent of the population of Pasadena was at that time Hispanic. Plf. Ex. 217. Mayor Isbell

responded with a comment that 70 percent of the 62 percent were not citizens.  Plf. Ex. 217; Tr., Nov. 28, 2016, Isbell Testimony at 16:22-17:14.

49.   While he acknowledges that his 70 percent number was incorrect, the mayor, who was not speaking from a prepared speech at the time, intended to convey that citizen population, not raw population, controls for purposes of the Voting Rights Act.  Tr., Nov. 28, 2016, Isbell Testimony at 16:22-17:14.  He is correct in that belief.  Tr., Nov. 29, 2016, Van Houte Testimony at 123:13-124:1.

50.   The committee held its fourth and final meeting on July 29, 2013.  Following concerns raised by Councilwoman Pat Van Houte over whether proper public notice had been posted in accordance with the requirements of the city charter pertaining to public meetings, the meeting was conducted as a closed meeting with only members of the committee permitted to attend.  Agreed Fact No. 39.

51.   The committee, not the city, made the decision to close the July 29, 2013 meeting.  The mayor did not attend the meeting, nor did any city staff.  Tr., Nov. 28, 2016, Isbell Testimony at 98:9-99:5.

52.   The presence of police at the July 29, 2013, committee meeting was not unusual. Tr., Nov. 29, 2016, Van Houte Testimony at 126:23-25.  The meeting was initially noticed as a public meeting that could be attended by a quorum of councilmembers.  Plf. Ex. 230: Tr., Nov. 29, 2016, Van Houte Testimony at 125:25-126:2.  It is standard practice for city law enforcement officers to attend public meetings of Pasadena city council.  Tr., Nov. 29, 2016, Van Houte Testimony at 126:23-127:8.

53.   The bond projects proposed to the bond and charter review committee came from city department heads who proposed projects they thought needed to be done without any

limitations regarding the locations or costs of the projects. Tr., Nov. 30, 2016, Helms Testimony at 64:10-65:12.

54. In its signed recommendation letter to Mayor Isbell and council, the committee recommended certain bond proposals and some charter amendments but took no position on whether to change the existing system for electing the city council.  Plf. Ex. 21.

55. Further, the committee recommended no charter changes be put on the same ballot as the bond election so that the potential charter amendments would not distract the voters' attention from the bonds. Plf. Ex. 21.

56. Although members of the committee recalled differing levels of committee support for the change to the 6-2 system, the chairman of the committee, Roy Mease, told Mayor Isbell that 8 members of the committee supported the proposed change to a 6-2 system, and 3 members were opposed.  Tr., Nov. 28, 2016, Isbell Testimony at 107:23-108:6; Tr., Dec. 1, 2016, Villarreal Testimony at 6:19-24; Tr., Nov. 29, 2016, Bass Testimony at 263:15-19, 264:20-265:7.

57. Following receipt of the committee's recommendations, the mayor moved forward with a city council vote on the placement of a bond proposal only on the November 2013 general election ballot.  Tr., Nov. 28, 2016, Isbell Testimony at 22:19-23:4.

58. On August 13, 2013, city council held a regularly-scheduled meeting at which council voted on the first reading of an ordinance calling for a bond election.  Plf. Ex. 30.  The majority of the proposed bond projects were slated for streets located in the northern areas of the city.  Tr., Nov. 30, 2016, Helms Testimony at 65:16-67:5; Plf. Ex. 29 at 3, 10-14.

59. Although a majority of the council supported the proposed bonds, three members of the council did not.  Plf. Ex. 30. All three of the opposing councilmembers represented districts located in the northern parts of the city.  Plf. Ex. 30.

60. Determining it would be difficult, if not impossible, to pass a bond issue in the absence of unanimous council support and especially a lack of support from councilmembers residing in the areas where the majority of the bond proceeds would be spent, Mayor Isbell pulled down the ordinance that would have called a bond election.  Plf. Ex. 22; Tr., Nov. 28, 2016, Isbell Testimony at 23:7-24:6.

61. On the afternoon of August 13, 2013, following the city council meeting, Mayor Isbell asked city staff to send the 6-2 map he had previously given the committee to the law firm of Bickertsaff, Heath, Delgado and Acosta, LLP (the "Bickerstaff Firm").  Def. Ex. 14; Tr., Nov. 28, 2016, Isbell Testimony at 19:1-6.  Pursuant to an August 13 engagement agreement between the Bickerstaff Firm and the City of Pasadena (Def. Ex. 13), the city sought data on the SSRV percentages of the districts in the 6-2 map in order to confirm that the map would not dilute Hispanic voting opportunity in violation of Section 2 of the Voting Rights Act. Tr., Nov. 28, 2016, Isbell Testimony at 110:22-111:8, 111:18-112:5.

62. City staff did as instructed and emailed the 6-2 map to attorney Bob Heath of the Bickerstaff Firm on the afternoon of August 13.  Def. Ex. 15.

63. On August 19, 2013, Bob Heath responded to the city's request via an email to which he attached SSRV data on the city's draft 6-2 plan.  Def. Ex. 17.  The SSRV percentages Mr. Heath provided were based upon 2011 Harris County voter registration rolls, and thus were nearly two years stale.  Def. Ex. 17.

64. The email from Mr. Heath also included 2011 SSRV data for the then-existing 8 single-member districts.  Def. Ex. 17.  However, Mayor Isbell did not examine those numbers, as he was focused not on retrogression, but on whether sufficient Hispanic opportunity would exist in a 6-2 system. Tr., Nov. 28, 2016, Isbell Testimony at 20:12-19, 112:6-114:22.

65. At the time he was reviewing the SSRV data provided by Mr. Heath, Mayor Isbell believed that the Voting Rights Act required the city to provide three Hispanic majority council districts.  Tr., Nov. 28, 2016, Isbell Testimony at 67:11-12.  This belief was based upon advice received from the Bickerstaff firm during the city's 2011 redistricting process, in which there was disagreement among members of council as to whether to adopt a plan with four or three majority Hispanic districts.  Tr., Nov. 28, 2016, Isbell Testimony at 65:12-17, 67:7-68:3.

66. In the 2011 redistricting, Mayor Isbell favored (and council ultimately passed) a plan with four majority SSRV districts, although he understood from legal counsel that three were sufficient under the Voting Rights Act.  Tr., Nov. 28, 2016, Isbell Testimony at 67:7-68:3.

67. All three of the Hispanic candidates of choice then serving on council—Ornaldo Ybarra, Pat Van Houte, and Don Harrison—took the position in the 2011 redistricting that three majority SSRV districts was all that the law required.  Tr., Nov. 18, 2016, Ybarra Testimony at 160:16-25, 162:9-166:4; Tr. Nov. 29, 2016, Van Houte Testimony at 109:8-10; Tr. Nov. 29, 2016, Harrison Testimony at 202:18-203:11; Def. Ex. 111.

68. In 2011, Councilmembers Ybarra, Van Houte, and Harrison believed that Mayor Isbell was favoring four SSRV districts for political reasons, namely to disrupt the

constituencies in Mr. Don Harrison's and Ms. Pat Van Houte's districts by making them more Hispanic.  Tr., Nov. 18, 2016, Ybarra Testimony at 166:14-18, 167:2-6; Tr. Nov. 29, 2016, Van Houte Testimony at 107:21-109:10; Tr. Nov. 29, 2016, Harrison Testimony at 201:15-202:11, 202:25-203:11.  In an effort to protect Mr. Harrison's and Ms. Van Houte's incumbency, they unsuccessfully sought adoption of a plan with only three majority SSRV districts.  Def. Exs. 111 & 113; Tr., Nov. 18, 2016, Ybarra Testimony at 164:20-165:6, 167:2-6; Tr. Nov. 29, 2016, Van Houte Testimony at 107:16-20.

69.  On August 19 or 20, 2013, Mayor Isbell reviewed the 2011 SSRV data for the city's draft 6-2 plan, as provided by Mr. Heath, and determined that a 6-2 system would not dilute Hispanic voting opportunity.  Tr., Nov. 28, 2016, Isbell Testimony at 112:6-114:16.

70.  In reaching this conclusion, Mayor Isbell recognized that the outdated 2011 data did not account for the growth in Spanish-surname registered voters that had occurred since 2011.  Tr., Nov. 28, 2016, Isbell Testimony at 113:21-114:16.  Nevertheless, the outdated data already showed a Spanish-surname registered voter majority (over 61%) in one single member district (A), as well as near majorities (roughly 48% and 47%) in two other single member districts (B and C).  Def. Ex. 17; Tr., Nov. 28, 2016, Isbell Testimony at 113:25-114:3.

71.  The mayor also noted that a fourth single member district (D) in the draft 6-2 system was at 35.76% Spanish-surname registered voters and was very similar in geography and demographic makeup to the then-existing District E that had elected a Hispanic candidate of choice, Cody Ray Wheeler, in 2013. Def. Ex. 17; Tr., Nov. 28, 2016, Isbell Testimony at 114:4-7.

72.  The mayor also noted that city-wide percentage of Spanish-surname registered voters was shown to be 34.57%, similar to the percentage in the district that had elected Mr. Wheeler.  Def. Ex. 17; Tr., Nov. 28, 2016, Isbell Testimony at 114:7-16.

73.  Given the ever-increasing Hispanic population in Pasadena, Mayor Isbell concluded that all of the SSRV percentages provided by Mr. Heath were already higher than reflected in the 2011 numbers and would be even higher by the time of the next city council election that would be held in 2015.  Tr., Nov. 28, 2016, Isbell Testimony at 113:24-114:3.

74.  Based upon his knowledge of the ongoing demographic trends in the city, his awareness that four of the six single-member districts would be drawn in heavily (and often majority) Hispanic areas of the city, and his belief that only three SSRV majority districts were required by the Voting Rights Act, the mayor concluded that a 6-2 council structure would provide the legally required level of Hispanic voting opportunity.  Tr., Nov. 28, 2016, Isbell Testimony at 64:16-20.

75.  Mayor Isbell reasoned that a 6-2 plan could include three majority SSRV districts, as well as a fourth single member district similar to the existing district that had already elected a Hispanic candidate of choice in Cody Ray Wheeler.  Tr., Nov. 28, 2016, Isbell Testimony at 113:25-114:7.  The mayor also believed that the high level of cross-over voting by non-Hispanic voters in Pasadena would make the at-large seats winnable by a Hispanic candidate of choice.  Tr., Nov. 28, 2016, Isbell Testimony at 114:7-16.

76.  On August 20, 2013, the city council passed on first reading Ordinance 2013-126, calling a special election to be held on Tuesday, November 5, 2013, for the purpose of submitting to the voters of Pasadena various propositions for amending the city charter,

including Proposition 1 — a change to the city's system of electing members of the city council. Agreed Fact No. 46.

77.   On August 22, 2013, the city council passed Ordinance 2013-126 on final reading. Agreed Fact No. 50.

78.   On November 5, 2013, Pasadena voters by a vote of 3292 to 3213 approved Proposition 1, which provided that the city council would consist of six single-member districts and two at-large positions.  Agreed Fact No. 51.

79.   On January 7, 2014, Mayor Isbell sent the Bickerstaff firm a "Notice to Proceed" with the drawing of proposed districting maps for the six-single member districts under the system adopted by Pasadena's voters.  Def. Ex. 19.

80.   In the Notice to Proceed, Mayor Isbell instructed the Bickerstaff firm to "begin the process of drawing the district boundary lines with a focus on creating districts with a majority of minority voters," consistent with his desire that the city comply with Section 2 of the Voting Rights Act. Def. Ex. 19; Tr., November 28, 2016, Isbell Testimony at 115:19-116:23.  Bickerstaff complied with that directive.  Tr., November 28, 2016, Isbell Testimony at 116:24-117:3.

81.   On February 18, 2014, the Pasadena City Council passed an ordinance that limited individual councilmembers' remarks during debate at city council meetings to two minutes.  Plf. Ex. 191.  The ordinance was proposed by Councilman Darrell Morrison and supported by Mayor Isbell.  Tr., Nov. 28, 2016, Isbell Testimony at 118:13-16.  The ordinance was necessary due to growing tendencies by councilmembers to talk on issues not germane to those posted in city council meeting agendas.  Tr., Nov. 28, 2016, Isbell Testimony at 118:6-119:2.

82.   The ordinance adopting the two-minute rule provided the mayor with discretion to grant a
      speaker up to two one-minute extensions of time.  Tr., Nov. 28, 2016, Isbell Testimony at
      35:24-36:4.  The ordinance did not limit the amount of time a councilperson can speak at
      pre-council, which is open to the public.  Tr., Nov. 29, 2016, Van Houte Testimony at
      138:1-23.

83.   On March 4, 2014, the city council held a council workshop at which Mayor Isbell
      presented three alternative redistricting plans — Plan 1, Plan 2, and Plan 3 — for the new
      6-2 mixed election system for city council.  Plf. Ex. 179.

84.   Mayor Isbell favored Plan 2, which was the same 6-2 map the mayor had shared with the
      committee back on July 25, 2013.  Tr., Nov. 28, 2016, Isbell Testimony at 34:12-35:6.
      The other two plans were developed from scratch by the Bickerstaff firm.  *Id.*

85.   The SSRV data available for the maps at the time of the March 4, 2013 workshop was
      still limited to data from the 2011 voter registration rolls, because the Bickerstaff firm
      had requested, but not yet received, updated 2014 data from the Harris County voter
      registrar's office.  Plf. Exs. 179 & 188.

86.   During discussion at the March 4, 2013 workshop, Mayor Isbell advised council that the
      2011 SSRV percentages they were reviewing for the districts under each of Plan 1, Plan
      2, and Plan 3 were stale and would inevitably be higher once the 2014 SSRV data was
      received.  Plf. Ex. 188.  This is the same observation Mayor Isbell made in August of
      2013 when he initially reviewed the SSRV data for Plan 2 to confirm proportional
      Hispanic voting opportunity.  *See* FOF 61-65, 69-75, above.

87. 2014 SSRV data was obtained for each of the three maps and shared with council by March 10, 2013.  Plf. Ex. 27.  That data showed that each of the plans included three majority SSRV districts.  *Id.*

88. City council held a public hearing on redistricting on March 18, 2014, wherein the public was able to attend and comment on the proposed maps.  Agreed Fact No. 53.

89. At the close of the March 18, 2014 meeting, as the mayor and councilmembers were getting up from their seats to leave the dais, a broken pellet gun fell from Mayor Isbell's belt to the floor and was observed by at least one individual.  Tr., Nov. 28, 2016, Isbell Testimony at 37:10-14, 38:2-23,41:22-42:9, 39:19-24.  The gun was a prop that Mayor Isbell had brought with him after having received threats on his life and his family's life.  Tr., Nov. 28, 2016, Isbell Testimony at 38:1-24.  He believed that it might prove useful as a deterrent in the event of an attack during a council meeting in which the intruder shot the armed police officers.  *Id.*  No one knew about the gun during the meeting. Tr., Nov. 28, 2016, Isbell Testimony at 39:5-14.  Moreover, there is no evidence that anyone felt physically intimidated by the incident on March 18 or in subsequent council meetings.

90. Thereafter, the city council held two public city council meetings, on April 1 and April 15, to consider an ordinance calling for the adoption of Plan 2.  Def. Ex. 23; Plf. Exs. 184 & 185.  Both meetings were open to the public, and residents of Pasadena were able to attend and give their comments on the plan. *Id.*; Tr., Nov. 28, 2016, Isbell Testimony at 99:6-18.

91. At the April 1, 2014 city council meeting, Councilmember Pat Van Houte gave comments on her opposition to Plan 2 that exceeded her debate time limit.  Agreed Fact No. 54.  Pursuant to the rules previously adopted by the city council, the mayor extended

Ms. Van Houte's time limit.  *Id.*  Following both the extension and multiple warnings by the mayor to conclude her remarks, Councilmember Van Houte continued to speak and Mayor Isbell had her removed from the meeting by law enforcement officers. *Id.*

92.   On April 15, 2014, the city council passed redistricting Plan 2 on final reading. Agreed Fact No. 55.

93.   At the time the plan was adopted, less than 40 percent of the city's registered voters had Spanish surnames.  See Plf. Ex. 6.

94.   While the Bickerstaff firm did not provide CVAP data in the spring of 2014 when council considered Plan 2, Plaintiffs have offered evidence that the Hispanic citizen voting age population in Pasadena under the five-year ACS estimate for 2010 through the end of 2014 was 47.1%.  Plf. Ex. 195.  The one-year ACS data for 2014 showed that the Hispanic citizen voting age population in Pasadena was 48.1%.  Def. Ex. 40.

95.   In 2014, when Plan 2 was adopted, proportional representation for Hispanics, whether measured by SSRV or CVAP would have been between three and four districts.

96.   Three of the six single-member districts in the Plan 2 adopted by the city council had Spanish-surname registered voter majorities at the time the plan was passed. Plf. Ex. 6.

97.   In addition, the adopted plan's District D was very similar to District E in the prior 8-0 plan, which, though not a Hispanic majority district, exhibited considerable Anglo cross-over voting and had elected Cody Ray Wheeler, who is Hispanic and was the overwhelming choice of Hispanic voters.  Tr., Dec. 1, 2016, Alford Testimony at 120:4-14, 122:2-14, 134:11-17; Tr., Nov. 30, 2016, Wheeler Testimony at 159:1-6; Tr., Nov. 29, 2016, Van Houte Testimony at 119:7-14; *see* Agreed Fact No. 86.

98. District D under the 6-2 system contains 92.4 percent of the persons who resided in the former District E that elected Mr. Wheeler under the 8-0 plan.  70.8 percent of the persons living in the current District D were previously in the former District E. Agreed Fact No. 86.

99. In fact, District D in the 6-2 plan has a higher SSRV percentage (45.9%) than its predecessor District E (44.7%) in the 8-0 plan.  Pl. Ex. 195 (Ely Supplemental Report, tables 1 and 2).

100. Although Mayor Isbell did not support Mr. Wheeler, the plan he supported did not make it harder for an Hispanic to be elected; rather, it increased the percentage of Hispanic voters in the district.  *See* FOF 99, 122, 124-125.

101. There was no discriminatory motive in adopting the 6-2 system or the 6-2 map.  Tr., Nov. 29, 2016, Van Houte Testimony at 140:23-141:1, 141:14-18.

## City Council Political Campaigns

102. Mayor Isbell is 78 years old.  Tr., Nov. 28, 2016, Isbell Testimony at 51:19-20.  He moved to Pasadena, Texas as a toddler and has lived there his entire life, save a few years when he attended a private high school in San Antonio, Texas.  Tr., Nov. 28, 2016, Isbell Testimony at 52:16-54:2. He grew up in a World War II-era home located in the Pasadena Gardens neighborhood in what is now the northern part of the city. Tr., Nov. 28, 2016, Isbell Testimony at 52:21-53:8.

103. Mayor Isbell has thirty-four years in service to Pasadena government, having served as a council member or mayor of Pasadena numerous times since 1969. Tr., Nov. 18, 2016, Isbell Testimony at 196:13-197:6; Nov. 28, 2016 at 54:8-55:4.  He was most recently elected as mayor in 2009 and then re-elected in 2013 for an additional four-year term.  *Id.*

Mayor Isbell's current term will expire in 2017.  Tr., Nov. 28, 2016, Isbell Testimony at 54:16-20. He is term-limited and does not intend to run again for mayor in the future. Tr., Nov. 28, 2016, Isbell Testimony at 54:16-55:4.

104. The councilmembers who often disagree with the mayor, Pat Van Houte, Ornaldo Ybarra, Cody Ray Wheeler, Don Harrison, and Sammy Casados, identify as or are perceived as Democrats and support Democrats and Democratic groups. Tr., Nov. 29, 2016, Van Houte Testimony at 84:17-24, 85:21-24, 86:24-87:1, 88:2-8, 88:17-89:5.

105. Over the years, Mayor Isbell has supported and opposed both Hispanic and non-Hispanic candidates for city council.  Tr., Nov. 28, 2016, Isbell Testimony at 78:23-79:16. He considers politics his hobby.  Tr., Nov. 28, 2016, Isbell Testimony at 68:12-14.

106. In the 1970s, Mayor Isbell supported Hispanic council member Roy Ybarra in his multiple successful campaigns for election to an at-large seat on city council.  Tr., Nov. 28, 2016, Isbell Testimony at 68:24-25, 78:5-12.

107.  In 2009, Mayor Isbell supported Hispanic candidate Ornaldo Ybarra's successful campaign to defeat the Anglo incumbent councilmember, Roy Riggs, in District A.  Tr., Nov. 18, 2016, Ybarra Testimony at 22:13-23:16; Nov. 28, 2016, Isbell Testimony at 69:4-70:19.  The mayor ran a phone bank for Mr. Ybarra and, at Mr. Ybarra's suggestion, sent endorsement letters to senior Anglo voters in District A.  Tr., Nov. 18, 2016, Ybarra Testimony at 139:4-140:10; Nov. 28, 2016, Isbell Testimony at 69:21-24.

108. Mayor Isbell also encouraged members of his social circle to support Mr. Ybarra's 2009 race.  Tr., Nov. 28, 2016, Isbell Testimony at 69:25-70:5.  Mr. Ybarra received campaign contributions from several persons who have close ties to the mayor, including Jackie Welch, the Phelps family, the Bass family, and Richard Cansler.  Def. Exs. 3-9; Plf. Ex.

170; Tr., Nov. 18, 2016, Ybarra Testimony at 141:8-13, 142:3-5, 144:2-14, 145:17-18, 148:6-23.

109. Mayor Isbell has never supported any candidate, Anglo or otherwise, running against Ornaldo Ybarra.  Tr., Nov. 28, 2016, Isbell Testimony at 70:14-16.  Mr. Ybarra was successfully re-elected to council in 2011, 2013, and 2015.  Tr., Nov. 28, 2016, Isbell Testimony at 70:6-8; Plf. Exs. 237, 238, & 239.

110. Mayor Isbell's political campaign account has been the primary funding source for two political action committees involved in Pasadena municipal elections.  Tr., Nov. 18, 2016, Isbell Testimony at 204:15-206:11; Tr., Nov. 28, 2016, Isbell Testimony at 24:13-25:17, 44:5-17.  Those two PACS are Citizens to Keep Pasadena Strong and Citizens for Positive Change. *Id.*

111. Citizens to Keep Pasadena Strong ("CKPS") supported and opposed various candidates for city council in the 2013 and 2015 municipal elections.  Tr., Nov. 18, 2016, Isbell Testimony at 206:25-207:2; Tr., Nov. 28, 2016, Isbell Testimony at 44:24-45:8, 46:15-47:3, 76:15-77:11, 79:6-80:10. 80:22-81:2.

112. Citizens for Positive Change ("CPC") spearheaded a political campaign urging voters to support the charter changes that were placed on the November 2013 ballot.  Tr., Nov. 28, 2016, Isbell Testimony at 24:13-19.

113. Mayor Isbell and CKPS supported Hispanic candidate Rick Guerrero in his 2009, 2011, and 2013 challenges to Anglo incumbent Don Harrison in District C.  Tr., Nov. 28, 2016, Isbell Testimony at 70:20-71:15, 71:23-73:13.

114. The CKPS flyers distributed in support of Mr. Guerrero in 2013 included strong endorsements from Mayor Isbell and described Mr. Guerrero and the mayor as a "team"

for Pasadena. Plf. Ex. 233; Tr., Nov. 28, 2016, Isbell Testimony at 72:13-73:13. Mayor Isbell personally reviewed and approved those flyers.  Tr., Nov. 28, 2016, Isbell Testimony at 71:25-72:2.

115. The themes in CKPS's flyers supporting Mr. Guerrero were nearly identical to those used in flyers that CKPS sent out in favor of District E Anglo incumbent Leroy Stanley in his 2013 race against Hispanic candidate Cody Ray Wheeler.  Plf. Ex. 233; Tr., Nov. 28, 2016, Isbell Testimony at 73:14-74:22.

116. Mayor Isbell intended to convey the same level of support for Mr. Guerrero and he did for Mr. Stanley.  Tr., Nov. 28, 2016, Isbell Testimony at 73:14-74:22.

117. Both Mr. Guerrero and Mr. Stanley lost their races in 2013, despite the mayor's strong support.  Plf. Ex. 238.

118. CKPS and Mayor Isbell also supported and publicly endorsed Emilio Carmona, a Hispanic candidate for city council in the District C race in 2015.  Tr., Nov. 28, 2016, Isbell Testimony at 74:23-77:11.

119. Again, Mayor Isbell reviewed and approved flyers that CKPS sent out in support of Mr. Carmona's candidacy.  Def. Ex. 35; Tr., Nov. 28, 2016, Isbell Testimony at 76:22-23. Those flyers included endorsements and a personal, signed letter from the mayor asking voters to support Mr. Carmona.  Def. Ex. 35; Tr., Nov. 28, 2016, Isbell Testimony at 77:2-77:11.

120. Mr. Carmona lost the 2015 District C race to Sammy Casados, who also is Hispanic.  Tr., Nov. 28, 2016, Isbell Testimony at 76:8-10, 77:12-13. Mr. Casados currently serves on Pasadena city council, and he and Mayor Isbell have a positive working relationship. Tr., Nov. 28, 2016, Isbell Testimony at 77:14-78:4.

121. Mayor Isbell has been as colorblind in opposing city council candidates as he has been in supporting them.

122. In 2013, CKPS opposed the candidacy of Hispanic candidate Cody Ray Wheeler for District E because of Mayor Isbell's belief that Mr. Wheeler had lied about living in Pasadena on his application to run for public office.  Tr., Nov. 28, 2016, Isbell Testimony at 81:21-83:9.  CKPS put out one mailer in opposition to Mr. Wheeler in 2013, which was focused on residency concerns.  Plf. Ex. 107; Tr., Nov. 28, 2016, Isbell Testimony at 82:21-23.

123. During that same election, CKPS put out five mailers in opposition to Anglo incumbent Don Harrison, who was running against Rick Guerrero in District C.  Plf. Ex. 95-99; Tr., Nov. 28, 2016, Isbell Testimony at 87:3-89:19.  Those mailers focused on (a) Mr. Harrison's council voting history, (b) his violation of state law regarding the scope of council discussions, and (c) his past dishonesty in political campaigns.  *Id.*

124. In 2015, CKPS issued a set of mailers opposing Cody Ray Wheeler's re-election bid for District E.  Tr., Nov. 28, 2016, Isbell Testimony at 84:9-11.  Those mailers, like the ones opposing Don Harrison in 2013, focused on (a) Mr. Wheeler's council voting history, (b) his violation of state law regarding the scope of council discussions, and (c) his dishonesty in past political campaigns, particularly regarding his residency.  Plf. Exs. 126-128; Tr., Nov. 28, 2016, Isbell Testimony at 84:12-86:5.

125. CKPS also sent out one additional flyer against Mr. Wheeler which cast him as a liberal Democrat and highlighted his connections to the Texas Organizing Project and ACORN. Plf. Ex. 129.  The purpose of that mailer was to try to persuade Republicans in District E to vote against Mr. Wheeler. Tr., Nov. 28, 2016, Isbell Testimony at 86:11-18.

126. In Mayor Isbell's view, even though city council positions are non-partisan, the municipal elections in Pasadena started to become partisan in 2013, with the involvement of groups like Area 5 Democrats, Texas Organizing Project ("TOP"), and the Texas Democratic Party.  Tr., Nov. 28, 2016, Isbell Testimony at 86:16-20.

127. Mayor Isbell intended to convey the same level of opposition to Cody Ray Wheeler as he did to Don Harrison, and the flyers sent out against each were similar in message.  Tr., Nov. 28, 2016, Isbell Testimony at 89:20-90:1.

128. Mayor Isbell did not intend for any of CKPS's flyers to convey anything negative about Mr. Wheeler based on his ethnicity, nor do they.  Tr., Nov. 28, 2016, Isbell Testimony at 86:21-87:2.  Indeed, none of the political mailers supporting or opposing candidates for city office that have been presented in evidence in this case involve appeals to racial prejudices.

### The Political Campaigns Surrounding the Charter Change

129. The November 2013 campaign on the charter amendments likewise was not a racially charged campaign. Tr., Nov. 28, 2016, Isbell Testimony at 120:13-121:17.

130. The main argument advanced by CPC was the positive impact of each of the proposed amendments, including the fact that at changing to a 6-2 system would give individual voters three representatives on the council rather than just one. Plf. Ex. 47; Tr., Nov. 28, 2016, Isbell Testimony at 91:5-23.

131. In September of 2013, CPC, through its consultant Tom Langland, mailed more than 8,000 voters a flyer touting the increased representation provided by the proposed charter change. Plf. Ex. 47; Tr., Nov. 28, 2016, Isbell Testimony at 91:24-92:14.

132. The secretary of CPC, Richard Scott, initially sent Mr. Langland an email suggesting that one method for creating a mail list for the flyer might be to use past mayoral election voter lists and remove the Hispanic names.  Plf. Ex. 34; Tr., Nov. 29, 2016, Scott Testimony at 240:7-12.  Later in the same email, Mr. Scott asked Mr. Langland whether it would be possible to obtain a list of Republican voters to create the flyer mail list. Plf. Ex. 34; Tr., Nov. 29, 2016, Scott Testimony at 241:9-11.

133. Mr. Scott's suggestion of removing Hispanic names was premised on his belief that most Hispanics in Pasadena vote as Democrats and that Democratic groups were opposing the charter change.  Tr., Nov. 29, 2016, Scott Testimony at 240:13-241:15.

134. In the end, the flyer was mailed to voters with both Hispanics and non-Hispanic last names.  Tr., Nov. 28, 2016, Isbell Testimony at 91:24-92:14.  Even if the mailing been limited to non-Hispanics, however, that would not suggest a racially discriminatory motive.

135. The use of so-called identity politics in devising a universe of voters on whom to concentrate a particular campaign message is a common practice across the political spectrum.  Tr., Nov. 18, 2016, Ybarra Testimony at 139:24-140:10.  This is the very same practice that Councilmember Ybarra asked Mayor Isbell to utilize in targeting Anglo seniors in Mr. Ybarra's 2009 council race.  Tr., Nov. 18, 2016, Ybarra Testimony at 139:4-23.  Such a practice does not render racially charged an otherwise neutral message like the one advanced by CPC.

136. On October 3, 2013, CPC held a campaign kick-off dinner at Cullen's restaurant in which the Mayor touted the positive impacts of the charter changes.  Tr., Nov. 29, 2016, Bass Testimony at 277:8-11.  There is no credible evidence that anything racially charged was

said at that meeting or that the mayor or anyone from the city framed the charter changes

as a Hispanic vs. Anglo or North vs. South issue.

137. Democratic organizations like the TOP and Area 5 Democrats were active in opposing

the charter changes.  Tr., Nov. 28, 2016, Isbell Testimony at 92:15-94:4.

138. Together, TOP and Area 5 Democrats spent between $40,000 and $50,000 on a campaign

to defeat the charter changes.  Def. Exs. 101-109; Tr., Nov. 28, 2016, Isbell Testimony at

95:2-8.

139. TOP held a rally in front of City Hall, which was attended by several council members

who had voted against the proposed change to a 6-2 system.  Tr., Nov. 29, 2016, Van

Houte Testimony at 62:9-14; Tr., Nov. 28, 2016, Isbell Testimony at 93:13-22; Tr., Nov.

29, 2016, Scott Testimony at 238:2-239:5.

140. Area 5 Democrats sent out mailers opposing the change.  Def. Exs. 18; 100; Tr., Nov. 28,

2016, Isbell Testimony at 93:23-94:3; 95:13-96:23.

141. One of the Area 5 Democrats mailers characterized the proposed change to the 6-2

system as a political "power grab" by the mayor. Def. Ex. 18.  Quotes from each of the

councilmembers who opposed the 6-2 system were featured on that mailer.  *Id.*  None of

them said anything about a reduction in Hispanic voting opportunity or racial divisions.

*Id.*

142. Councilman Ybarra stated that at-large representatives would not provide the same level

of constituent services.  *Id.*

143. Councilman Don Harrison referred to a "power grab" and said that Mayor Isbell just did

not like the people who had been elected to council.  *Id.*

144. Councilwoman Van Houte stated that the proposal to change the council system was a "waste of our time and our taxpayer dollars." *Id.*

145. Councilman Wheeler warned that at-large districts might mean "someone from across town representing you at city hall." *Id.*

146. Another Area 5 Democrats mailer bore the picture and name of Congressman Gene Greene, a well-recognized Democrat.  Def. Ex. 100.  This confirmed for Mayor Isbell that Democrats were heavily involved in opposing the charter changes.  Tr., Nov. 28, 2016, Isbell Testimony at 96:11-16.

147. Based on a union stamp on one of the Area 5 mailers bearing the location "Tampa, Florida," Mayor Isbell became concerned that out-of-state interests were inserting themselves into Pasadena local elections. Tr., Nov. 28, 2016, Isbell Testimony at 92:21-93-1.

148. Mayor Isbell responded to the campaign being waged by Democrats by directing the campaign consultant for CPC to develop flyers encouraging Republican voters to support the charter changes.  Tr., Nov. 28, 2016, Isbell Testimony at 94:5-18. Those flyers focused on the involvement of the Democrats, including TOP and its association with ACORN, as well as the Mayor's belief that out-of-state interests in Florida were taking part in the charter change election.  Plf. Exs. 113, 114, 115, & 117.

149. Mayor Isbell considered TOP to be the same group as was formerly called ACORN.  Tr., Nov. 28, 2016, Isbell Testimony at 93:2-4. He considered it a "highly partisan and liberal organization" and remembered that there had been past allegations of ACORN having been involved in "registering voters for the Democrat Party fraudulently." Tr., Nov. 28, 2016, Isbell Testimony at 93:7-12.

150. In much the way that the Democratic groups tied their opposition to the charter changes to Mayor Isbell's perceived "power grab," Mayor Isbell believed the involvement of TOP and the Democrats in the charter change election would be a "hot button issue with Republicans," such that they would be motivated to vote in favor of the charter changes. Tr., Nov. 28, 2016, Isbell Testimony at 96:24-97:6.

151. Mayor Isbell did not intend for the CPC flyers focusing on the involvement of TOP, ACORN and the Democrats to appeal to racial prejudices, nor did they. Tr., Nov. 28, 2016, Isbell Testimony at 97:7-11.

152. On election day, CPC did not limit its pro-charter change initiatives to only one part of town, but instead placed voting signs at polling locations throughout the city.  Tr., Nov. 29, 2016, Scott Testimony at 235:5-18.

## Demographic Issues Relating to the Challenged Election System

### Hispanic share of the citizen-voting-age population in Pasadena

153. In 2015, according to the American Community Survey one-year report, Hispanics constituted 50.6 percent of Pasadena's citizen-voting-age population.  Def. Ex. 40 (Rives First Update to Expert Report) at updated report exhibit 5-A.

154. The conclusion that 50.6 percent of Pasadena's citizen-voting-age population is Hispanic is not just the opinion of an expert in the trial, but rather represents the opinion of the Census Bureau.  Tr., Dec. 1, 2016, Rives Testimony at 106:15-18.

155. Although, as with all statistical estimates, there is a margin of error, the point estimate, which here is 50.6 percent, is the most likely probability.  Tr., Nov. 17, 2016, Ely Testimony at 98:24-99:3.

156. Although the American Community Survey also prepares a five-year report, which must be used for determining citizen-voting-age population of small areas such as a single-member district, the one-year sample provides citizen-voting-age population data for jurisdictions of at least 65,000.  Tr., Nov. 17, 2016, Ely Testimony at 68:2-4, 92:15-23; Dec. 1, 2016, Rives Testimony at 21:5-24.

157. The data reported for the five-year sample does not represent the result for any particular time within the five-year period.  Tr., Nov. 17, 2016, Ely Testimony at 59:15-18; Dec. 1, 2016, Rives Testimony at 22:16-20.

158. The five-year report does not tell us the current level of citizen-voting-age population in Pasadena since all the data in it is at least one to six years old.  Tr., Dec. 1, 2016, Rives Testimony at 22:25-23:13.

159. The five-year report does not even represent the number for the last year of the period it covers.  Tr., Dec. 1, 2016, Rives Testimony at 23:20-24:2.

160. The Census Bureau recognizes that the issue of whether to use the one-year or the five-year file depends on whether statistical reliability or currency is more important.  Tr., Nov. 17, 2016, Ely Testimony at 68:21-69:13; Dec. 1, 2016, Rives Testimony at 21:25-22:4, 23:4-7.

161. Although Mr. Ely opted for statistical reliability and the use of the five-year file, he based his decision on what he said were Census Bureau instructions by which you compare the margins of error for two estimates and if the difference between the two estimates is smaller than the margin of error for the difference, then you cannot conclude that there has been a change between the two time periods.  Tr., Nov. 17, 2016, Ely Testimony at 69:2-13.

162. Mr. Ely conducted this comparison between what was the most recent five-year sample at the time of his testimony (2010-14) and the 2015 one-year sample and determined that the difference between the two numbers was within the margin of error, which caused him to rely on the five-year rather than the one-year sample. Tr., Nov. 17, 2016, Ely Testimony at 72:23-74:8.

163. Although Mr. Ely based his conclusion that it was more appropriate to use the five-year file on his comparison of the one- and five-year files, the Census Bureau specifically says it is not appropriate to compare single-year estimates with multi-year estimates and advises users against making such comparisons.  Rather, the type of procedure Mr. Ely employed is to be used when comparing one five-year file to another or one one-year file to another but not when comparing a one-year to a five-year file.  Tr., Dec. 1, 2016, Rives Testimony at 24:3-25:20, Plf. Ex. 319 (Census Bureau: A Compass for Understanding and Using American Community Survey Data) at p. A-19.

164. Over the last eleven years, which are the only years for which the one-year ACS data are available, the Hispanic share of Pasadena's citizen-voting-age population has increased from 39.5 percent to 50.6 percent.  Tr., Dec. 1, 2016, Rives Testimony at 26:7-18; Def. Ex. 40 (Rives First Update to Expert Report) at updated report exhibit 5-A.

165. There is a very statistically significant upward trend in the percentage of the Hispanic share of Pasadena's citizen-voting-age population.  Analysis of the eleven data points suggests that the city probably became majority Hispanic-citizen-voting-age population in late 2014.  Tr., Dec. 1, 2016, Rives Testimony at 26:19-23; 107:12-22.

166. That trend is mirrored in the five-year files even though they are based largely on less current data.  The 2009-13 file reported that Hispanics constituted 45.9 percent of the

city's citizen-voting-age population.  In the 2010-14 file the Hispanic share had increased to 47.1 percent, and in the 2011-15 file it was 48.2 percent.  Def. Ex. 123.

167. Even if the five-year sample may be more statistically reliable, that does not mean it is more accurate.  Tr., Dec. 1, 2016, Rives Testimony at 22:5-7.

168. In order to get an idea of the Hispanic share of citizen-voting-age population today, we can get that information only from the one-year file.  Tr., Dec. 1, 2016, Rives Testimony at 23:4-17.

**Demographic composition of the 6-2 districting plan**

169. The challenged 6-2 plan has the following demographics:

| District | Population | Hispanic % Population | Hispanic % VAP | Hispanic % CVAP | Hispanic % SSRV |
|----------|-----------|----------------------|----------------|-----------------|-----------------|
| A | 24,607 | 86.4 | 82.9 | 74.7 | 71.0 |
| B | 24,997 | 78.0 | 72.5 | 62.9 | 59.5 |
| C | 24,719 | 70.6 | 65.2 | 54.4 | 56.5 |
| D | 24,800 | 66.6 | 59.1 | 46.9 | 45.9 |
| E | 24,752 | 47.0 | 41.2 | 36.9 | 33.0 |
| F | 25,460 | 24.6 | 21.2 | 21.2 | 16.7 |
| G (AL) | 149,335 | 62.1 | 55.8 | 50.6 | 42.0 |
| H (AL) | 149,335 | 62.1 | 55.8 | 50.6 | 42.0 |

Population and VAP from 2010 census; Def. Ex. 41.

CVAP and SSRV from Plf. Ex. 195 (Ely Supplemental Report) Table 1 using 2010-14 ACS and September 2016 voter registration data.

170. Five districts or places (Districts A, B, and C and Places G and H) have Hispanic-citizen-voting-age population majorities.  *See* FOF 169.

171. Another district, District D, is very close to majority Hispanic citizen-voting-age population and, given the trend of growth in Hispanic-citizen-voting-age population and the fact that the data from which the CVAP percentages are calculated is between two

and seven years old, it may well exceed 50 percent Hispanic-citizen-voting-age population today. Tr., Dec. 1, 2016, Rives Testimony at 53:15-54:3.

172. Three districts (Districts A, B, and C) have Spanish-surname registered-voter majorities, and a fourth, District D, where 45.9 percent of the registered voters have Spanish surnames is approaching a majority. *See* FOF 169.

## Voting Behavior under the Challenged Plan

### Endogenous elections

173. With minor exceptions, Dr. Engstrom and Dr. Alford came up with the same substantive results in their analysis of city elections. Tr., Dec. 1, 2016, Alford Testimony at 116:4-7.

174. The 2015 city elections studied by the two experts—five by both Dr. Engstrom and Dr. Alford and a sixth by Dr. Alford, noted in brackets,—are set out below:

| Contest | Hispanic Voters | Non-Hispanic Voters |
|---|---|---|
| 2015 Place H – At Large - Del Toro | 87.3 | 28.3 |
| 2015 Place G – At Large – Van Houte | [70.6] | [41.6] |
| 2015 District A - Ybarra | 97.0 | 54.4 |
| 2015 District B - Perez | 82.0 | 36.3 |
| 2015 District D - Wheeler | 89.5 | 55.1 |
| 2013 Proposition 1 – 'No' Vote | 99.6 | 39.8 |

Def. Ex. 54.

175. The races in Districts A and D were not racially polarized since the Hispanic candidates in those two races received a majority from both Hispanic and from non-Hispanic voters. Tr., Dec. 2, 2016, Alford Testimony at 120: 2-4.

176. There was some suggestion that Mr. Wheeler's victory may have been abetted by the fact that he does not have a Spanish surname. The claim that Mr. Wheeler's election might be due to his having a non-Hispanic name is not borne out by the empirical evidence. Both Mr. Wheeler and Mr. Ybarra enjoyed similarly high levels of cohesive Hispanic support,

and Mr. Wheeler received essentially the same level of non-Hispanic crossover vote (55% vs 54%) as Mr. Ybarra.  Tr., Dec. 1, 2016, Alford Testimony at 120:4-21.

177. Citywide Hispanic and non-Hispanic cohesion is asymmetric, in that non-Hispanic voters are more likely to vote for Hispanic candidates than Hispanic voters are likely to vote for the non-Hispanic candidate.  Tr., Dec. 1, 2016, Alford Testimony at 125:17-23.

178. This means that Hispanic candidates can win at-large with substantial, but sub-majority levels of crossover votes or with substantial Hispanic turnout.  Tr., Dec. 1, 2016, Alford Testimony at 125:25-126:15.

179. The fact that a Hispanic candidate may need crossover votes to be elected does not mean that the election district is not one in which Hispanics do not have an opportunity to be elected.  Tr., Dec. 1, 2016, Alford Testimony at 125:25-126:6.

180. The at-large component of the mixed system encourages candidates like Ms. Van Houte to work to turn out Hispanic voters in the more Hispanic parts of the city, which results in increasing Hispanic influence.  Tr., Dec. 1, 2016, Alford Testimony at 128:15-18.

181. The higher the level of Hispanic cohesion and turnout, the lower the level of crossover votes needed to elect Hispanic candidates.   Tr., Dec. 1, 2016, Alford Testimony at 129:18-22; 130:6-8.

182. Mr. Ybarra correctly perceives that he has the opportunity to be elected at large in Pasadena.  Tr., Dec. 1, 2016, Alford Testimony at 130:16-18.

183. Pat Van Houte was able to be elected at-large with the support of incumbent Hispanic councilmen and by spending very little money.  Tr., Nov. 18, 2016, Ybarra Testimony at 169:14-171:8; Plf. Ex. 167.

184. In fact, Ornaldo Ybarra attributes Ms. Van Houte's success to her support from a coalition of Hispanics made up of himself, Cody Ray Wheeler, Sammy Casados, and Celestino Perez.  Tr., Nov.18, 2016, Ybarra Testimony at 170:10-171:8.

185. In the Proposition 1 election in 2013, if Hispanics had constituted the same percentage of the turned-out electorate as they did in the 2015 municipal election for council seats, their position, rather than narrowly losing, would have prevailed with roughly 54 percent of the vote.  Tr., Dec. 1, 2016, Alford Testimony at 131:18-132:2.

186. Given the increase in Hispanic registration, if the charter amendment election had been held in 2016, rather than 2013, the Hispanic position likely would have prevailed.  Tr., Dec. 1, 2016, Alford Testimony at 132:8-12.

187. While Mr. Del Toro is an inspirational individual, he did not evidence any political experience or knowledge of the city council.  Tr., Dec. 1, 2016, Alford Testimony at 133:2-11.

188. In his campaign, Mr. Del Toro campaigned on aspirational concepts rather than practical issues that encourage voters to support a candidate in a council race.  Tr., Dec. 1, 2016, Alford Testimony at 133:8-19.

189. Before deciding to run, Mr. Del Toro did not attempt to attract supporters and did not assess his chances of success.  Tr., Nov. 30, 2016, Del Toro Testimony at 186:5-7.

190. When Mr. Del Toro ran, he had no volunteers other than his family.  Tr., Nov. 30, 2016, Del Toro Testimony at 174:5-6.

191. Mr. Del Toro admits that he did not focus on seniors early enough in the campaign.  Tr., Nov. 30, 2016, Del Toro Testimony at 176:17-22.

192. Mr. Del Toro certainly could have run a better campaign.  Tr., Dec. 1, 2016, Alford Testimony at 133:18-19.

193. In the 2015 election there were two slating groups—a Democratic slate and one endorsed by CKPS, the PAC supported by the mayor.  Both endorsed both Hispanic and non-Hispanic candidates.  Three of the six candidates included on the Democratic slate, all of whom were Hispanic-preferred candidates, won, and the other three candidates on that slate lost.  Similarly, the CKPS slate had the same record with three wins and three losses.  Tr., Nov. 28, 2016, Isbell Testimony at 79:10-80:18; Plf. Ex. 88.

194. The Hispanic-preferred candidate can be of any race.  Tr., Nov. 29, 2016, Van Houte Testimony at 22:4-6.

195. In the five council elections studied, the Hispanic-favored candidate prevailed in three of the five and came very close to being elected in a fourth race.  Tr., Dec. 1, 2016, Alford Testimony at 136:9-14.

196. In that fourth council race where the Hispanic candidate came very close to being elected and in the city charter election where the Hispanic-favored position came very close to prevailing, the results would have been different with only very modest increases in Hispanic turnout.  Tr., Dec. 1, 2016, Alford Testimony at 138:22-139:3.

197. Compared to other jurisdictions examined by Dr. Alford, the level of Anglo crossover voting in Pasadena is relatively high.  Tr., Dec. 1, 2016, Alford Testimony at 135:20-136:4.

198. The six city elections studied by the experts reveal that Anglos do not vote as a bloc usually to defeat the Hispanic candidate of choice.  Tr., Dec. 1, 2016, Alford Testimony at 133:20-24.

199.  There is a very clear trend in increased Hispanic registration in Pasadena, in an increased proportion of the citizen-voting-age population that is Hispanic, and in an increased proportion of the turned-out electorate that has a Spanish surname.  Tr., Dec. 1, 2016, Alford Testimony at 158:15-18.

**Exogenous elections**

200.  Looking to partisan elections is problematic when the issue is potentially polarized voting in non-partisan elections.  Tr., Dec. 1, 2016, Alford Testimony at 141:22-142:12.

201.  In partisan elections in Harris County about two-thirds of the voters vote a straight ticket.  Tr., Dec. 1, 2016, Alford Testimony at 142:22-143:10; Def. Ex. 99.

202.  In the four primary elections analyzed by Dr. Engstrom, only one of the four was arguably polarized, and four years later in a race for the same office involving the same Hispanic candidate, 73 percent of the non-Hispanics voted for the Hispanic candidate.  Given that result, it is difficult to conclude that the candidate's earlier lack of success with non-Hispanic voters was motivated by any unwillingness they might have to vote for Hispanic candidates.  Tr., Dec. 1, 2016, Alford Testimony at 144:22-145:7.

203.  The primary elections studied by Dr. Engstrom tell us very little other than that they clearly do not show racially polarized voting.  Tr., Dec. 1, 2016, Alford Testimony at 145:22-146:3.

204.  In the partisan elections analyzed by Dr. Engstrom as well as in the hundreds of partisan elections analyzed by Dr. Alford throughout Texas, the decision to vote for or against a Hispanic candidate is governed by partisan choice rather than race or ethnicity.  Tr., Dec. 1, 2016, Alford Testimony at 149: 20-150: 9.

205. The partisan general elections analyzed by Dr. Engstrom do not give us any useful information on the issue of whether voting is polarized in the non-partisan Pasadena city elections. Tr., Dec. 1, 2016, Alford Testimony at 151:21-25.

206. Hispanic and Democratic are not proxies for each other. Tr., Dec. 1, 2016, Alford Testimony at 155:24-156:5.

**Electoral opportunity under the 6-2 plan**

207. Although dilution under section 2 is measured against a hypothetical undiluted practice rather than against the prior plan, as would be the case under section 5, *see* Defendant's Proposed Conclusion of Law 32, a comparison to the 8-0 plan shows no dimunition of Hispanic electoral opportunity under the current 6-2 plan. Specifically, there are:

    a. Five Hispanic CVAP majority districts or places in the 6-2 plan versus four in the 8-0 plan.

    b. Three SSRV majority districts in the 6-2 plan versus four in the 8-0 plan.

    c. Three Hispanics elected in the 6-2 plan versus two in the 8-0 plan.

    d. Four candidates of Hispanic choice elected in the 6-2 plan versus four candidates of Hispanic choice elected in the 8-0 plan. *See* FOF 174, Tr., Dec. 1, 2016, Alford Testimony at 163:5-19; Nov. 18, 2016, Ybarra Testimony at 172:4, 173:1-4.

208. Candidates of Hispanic choice were elected to Districts A, C, and D and to Place G (at-large) in the only election held under the 6-2 plan. FOF 174; Tr., Nov. 18, 2016, Ybarra Testimony at 172:4, 173:1-4.

209. Although the Hispanic candidate, who was preferred by Hispanic voters, did not win in District B in either the 6-2 or the earlier 8-0 plan, the 2015 election returns suggest that a

Hispanic candidate has a better opportunity to win in in District B under the 6-2 system than under the 8-0 system.  In the 6-2 plan, District B consisted of all or part of eight voting precincts.  Precinct 278, which is located on the western border of the city, was in District B in both the 6-2 and 8-0 plan.  Mr. Leamon, the Anglo incumbent carried that precinct in 2015 by 75 votes.  Mr. Perez, the Hispanic challenger, carried the remaining seven precincts by a net of 41 votes.  If the election had been held in the 8-0 plan, it would have been in a district that contained all of Mr. Leamon's stronghold while omitting part of Mr. Perez's.  Plf. Ex. 239 at 2 (Pasadena000764); Def. Ex. 120.

210. Districts A, C, and D in the 6-2 plan are districts where Hispanics have the opportunity to elect the candidates of their choice and have, in fact, elected the candidates of their choice.  In addition, District B is a district where Hispanic voters have the opportunity to elect the candidate of their choice.  There is a sufficient pool of Hispanic registered voters (almost 60%) and sufficient non-Hispanic crossover (36%) in District B for a Hispanic candidate to be elected.  Tr., Nov. 18, 2016, Ybarra Testimony at 172:4, 173:1-4; Dec. 1, 2016, Alford Testimony at 123:23-124:2; 163:20-24, 204:7-8; FOF 169 and 174.

211. Further, Hispanics have the opportunity to elect candidates of their choice in the at-large positions and did so in one of the two positions in 2015.  That opportunity will only increase over time.  Tr., Dec. 1, 2016, Alford Testimony at 166:20-167:1.

## Alleged Historical Discrimination

212. Plaintiff's expert, Dr. Andres Tijerina, failed to offer any credible evidence that citizens in Pasadena bear the effects of discrimination in education.

213. In compiling his report, Dr. Tijerina did not review any statistics or demographic information regarding educational levels or performance in the City of Pasadena.  Tr., Nov. 17, 2016, Tijerina Testimony at 197:21-198:1.

214. Although Dr. Tijerina points, both in his expert report and in his trial testimony, to a historical practice of segregating Latino students into so-called "Mexican Schools," he does not identify any example of such practices within the City of Pasadena.  Tr., Nov. 17, 2016, Tijerina Testimony at 177:24-178:6. Further, Dr. Tijerina acknowledges that these practices had largely ceased in Harris County by the 1950's.  Tr., Nov. 17, 2016, Tijerina Testimony at 178:9-19.

215. Dr. Tijerina also relies on the court's findings in *U.S. v. Pasadena Indep. Sch. Dist.*, Civ. A. No. H-83-5107, 1987 WL 9919 (S.D. Tex. 1987) as evidence "of a strong pattern of racial discrimination in the hiring practices of school teachers." Plf. Ex. 201 at 30; Tr., Nov. 17, 2016, Tijerina Testimony at 183:22-25. However, the allegations and findings in that case were limited to discriminatory practices against African-American teachers, and provide no evidence of the effects of discrimination in education borne by the population of Latino voters in the City of Pasadena during the time of the events at issue in this lawsuit.

216. In another example, Dr. Tijerina points to *In re Alien Children Ed. Litigation*, 501 F. Supp. 544 (S.D. Tex. 1980) ("*In Re Alien*"), as an instance where "Pasadena ISD was enjoined by the government…from preventing immigrants children to be enrolled." Plf. Ex. 201 at 30-31; Tr., Nov. 17, 2016, Tijerina Testimony at 184:1-4. In fact, that case was not against the City of Pasadena but was instead an equal protection challenge to a state statute prohibiting "the use of a state funds to educate persons who are not citizens of the

United States or legally admitted aliens." *Id.* at 549, citing Tex. Educ. Code Ann. Tit. 2, § 21.031 (Vernon 1980). The challenged state statute was adopted in 1975, and, even then, many school districts continued to admit undocumented students. *Id.* at 554-555.

217. *In re Alien* made no reference to the City of Pasadena, and Dr. Tijerina offered no testimony or evidence showing that the Pasadena Independent School District refused admission to any students under the challenged statutes. Significantly, the District Court for the Southern District of Texas declared the statute unconstitutional and permanently enjoined its enforcement in 1980—nearly forty years ago. *Id.* at 597. Dr. Tijerina offered no evidence to show what percentage, if any, of the population of Latino voters in Pasadena were affected by the statute at issue in *In Re Alien*, or whether any of those effects are still borne by Latino voters in the City of Pasadena.

218. Dr. Tijerina further opined in his expert report that "[i]n 1990, the School Board was challenged by a Latino petition, charging that Latino principal Graciela Barrera Kavulla had been fired for promoting Hispanic students at Jackson Elementary School." Plf. Ex. 201 at 31; Tr., Nov. 17, 2016, Tijerina Testimony at 184:4-6. However, a review of the petition, which is attached as Tab 22 to Dr. Tijerina's report, makes no mention of such a charge. Plf. Ex. 201, Tab 22. Ultimately, Plaintiffs have adduced no evidence as to the basis of the alleged termination of Ms. Kavulla, and this anecdotal account of an isolated employment action is not probative of alleged effects of discrimination borne by Latino voters in the City of Pasadena today.

219. Plaintiffs have not shown that Latinos in the City of Pasadena still bear the effects of discrimination in education in a way that hinders their ability to participate in the political process.

220. Plaintiffs' expert, Dr. Andres Tijerina, failed to offer any credible evidence that citizens in Pasadena bear the effects of discrimination in employment.

221. As evidence of the effects of discrimination in employment borne by Latino voters in the City of Pasadena today, Dr. Tijerina points to disparate wage and employment practices in the early to mid-20th Century in the oil industry along the Texas gulf coast.  Plf. Ex. 201 at 29; Tr., Nov. 17, 2016, Tijerina Testimony at 178:20-180:5. However, in compiling his report, Dr. Tijerina did not review any statistics or demographic information regarding current employment among voters in the City of Pasadena. Tr., Nov. 17, 2016, Tijerina Testimony at 197:7-10. Likewise, Dr. Tijerina offers no credible evidence or opinion that the effects of discriminatory employment practices occurring more than fifty years ago are still borne by Latino voters in the City of Pasadena today.

222. In fact, the only evidence of employment discrimination offered by Dr. Tijerina that is specific to Pasadena, is his recounting of a statement by a union official that "A lot of the white membership… didn't want them to have a line of progression." Plf. Ex. 201 at 29; Tr., Nov. 17, 2016, Tijerina Testimony at 179:8-15. Dr. Tijerina's report provides no citation for this alleged second-hand statement, and its source is not included in the report's supporting materials.

223. Thus, although Dr. Tijerina gives the timeframe for this statement as being between the 1930s and 1970s, the Court is unable to independently verify the substance, date, or context of the alleged statement.  *Id.* Further, Dr. Tijerina admitted in cross-examination that he did not conduct any analysis of union participation by modern-day Latino voters in Pasadena. In fact, the evidence in this case tends to show that the labor unions in Pasadena routinely support Hispanic-preferred candidates for election. Tr., Nov. 18,

2016, Ybarra Testimony at 134:5-17; Nov. 29, 2016, Van Houte Testimony at 104:9-13, 153:10-12. These isolated, second-hand comments do not present any probative evidence that Latino voters still bear the effects of employment discrimination.

224. Plaintiffs have not shown that Latinos in the City of Pasadena still bear the effects of discrimination in employment in a way that hinders their ability to participate in the political process.

225. Dr. Tijerina did not offer either evidence or opinion as to whether Latino voters in the City of Pasadena bear the effects of past discrimination in the area of health. Plaintiffs have not shown that Latinos in the City of Pasadena still bear the effects of discrimination in health in a way that hinders their ability to participate in the political process.

226. Dr. Tijerina, also failed to offer any credible evidence that citizens in Pasadena bear the effects of discrimination in land ownership or housing.

227. As evidence regarding housing, Dr. Tijerina first pointed to historical dispossession of land from Mexican-Americans following the Texas Revolution and lasting until the 1920s. Plf. Ex. 201 at 4-9; Tr., Nov. 17, 2016, Tijerina Testimony at 171:3-24. Dr. Tijerina did not opine that any such dispossession occurred in the City of Pasadena, but described actions that occurred over one hundred years ago in South Texas. Tr., Nov. 17, 2016, Tijerina Testimony at 171:10-18.

228. By contrast, Dr. Tijerina specifically noted that "as Latinos began –around—after the turn of the century and throughout the 20th century began to urbanize, they did buy lots in the cities that they moved into." Tr., Nov. 17, 2016, Tijerina Testimony at 173:6-9.

229. Although Dr. Tijerina points out that the City of Pasadena "accepted and implemented the state law that allowed for segregation in its 1942 charter," that provision was repealed in 1964. Tr., Nov. 17, 2016, Tijerina Testimony at 174:20-22; *U.S. v. Pasadena Indep. Sch. Dist.*, Civ. A. No. H-83-5107, 1987 WL 9919 at *1 (S.D. Tex. 1987).

230. Further, although Dr. Tijerina identified deed restrictions from the Pasadena Gardens and Deepwater Addition neighborhoods in the City of Pasadena, which by their terms would have prevented persons of any race other than the Caucasian race from using or occupying buildings in those subdivisions, those restrictions became unenforceable after the U.S. Supreme Court's decision in *Shelley v. Kraemer,* 334 U.S. 1 (1948).

231. Dr. Tijerina did not offer any analysis or opinion of whether historical segregation or the existence of deed restrictions had any effect on current housing patterns in the City of Pasadena.  Tr., Nov. 17, 2016, Tijerina Testimony at 207:8-14.

232. Pasadena Gardens is a neighborhood in North Pasadena, which was within District D under the 2011 redistricting, and District B under the 2013 redistricting. City council member Van Houte, who lives in Pasadena Gardens and who was the representative for single member District D under the 2011 redistricting, testified that Pasadena Gardens was a majority-Anglo neighborhood in 1980, but has since become a majority-Hispanic neighborhood.  Tr., Nov. 29, 2016, Van Houte Testimony at 5:21-6:3.

233. Plaintiffs admit that, during the time period for which segregation was legal and the restrictive covenants identified by Dr. Tijerina were enforceable, very few Hispanics lived in Pasadena. Tr., Nov. 17, 2016, Plaintiffs' Opening Statement at 12:15-18. Indeed, the Latino population in Pasadena in 1970 was reported by the U.S. Census to be less than ten percent. *Id.*  The evidence shows that Latinos were drawn to Pasadena because

of the quality of life and affordable housing supply.  Tr., Nov. 29, 2016, Van Houte Testimony at 6:7-9; Nov. 30, 2016, Gracia Testimony at 91:24-92:8.

234. Although Dr. Tijerina testified that, historically, real estate companies, mortgage companies, and banks would engage in discriminatory practices resulting in de facto segregation, neither his expert report nor his trial testimony contained any specific instances of such conduct in Pasadena. Tr., Nov. 17, 2016, Tijerina Testimony at 177:3-12.

235. Plaintiffs have not shown that Latinos in the City of Pasadena still bear the effects of discrimination in housing in a way that hinders their ability to participate in the political process.

236. In his trial testimony, Dr. Tijerina testified that the most explicit example discrimination against Latinos in Pasadena was the fact that the Ku Klux Klan had its state headquarters in Pasadena.  Tr., Nov. 17, 2016, Tijerina Testimony at 194:10-21. However, the evidence in this case shows that the Ku Klux Klan moved its office from Pasadena by at least the mid-1980s. Tr., Nov. 28, 2016, Isbell Testimony at 48:19-21.

237. Dr. Tijerina further testified that the Ku Klux Klan explicitly targeted "Mexican Americans, calling them Mexicans and doing the old very seriously intimidating practices of burning crosses in Pasadena..." Tr., Nov. 17, 2016, Tijerina Testimony at 184:10-21. However, Dr. Tijerina's expert report contains no reference to such activities, nor does it cite any sources indicating such actions were ever directed against Latinos in Pasadena. Moreover, none of the other witnesses testified to any incidents in which the Ku Klux Klan targeted or harassed Latinos in Pasadena.  Most importantly, no witness has testified that the city or its officials in any way sanctioned or supported the presence of the Ku

Klux Klan in Pasadena, and Dr. Tijerina made clear he was not suggesting that the Ku Klux Klan represented the leadership of Pasadena or the general population of the city. Tr., Nov. 17, 2016, Tijerina Testimony at 184:11-14.

238. Therefore, as odious and abhorrent as the Ku Klux Klan is, Plaintiffs have failed to show that Latino voters in Pasadena still bear the effects of discrimination occasioned by that group's presence in Pasadena in the 1980s.

## The City's Responsiveness to the Needs of Its Hispanic Population

239. Plaintiffs allege that the city neglects the northern, predominantly Hispanic portion of the city, which Plaintiffs define as the area north of Spencer Highway. The evidence does not support that assertion.

240. The area above Spencer Highway is considerably older than newer developments built as part of urban sprawl to the area south of Spencer Highway, as evidenced by the fact that in 1965, the majority of the portion of the city located north of Spencer Highway had been developed, while only three or four subdivisions had been developed in the area south of Spencer Highway. Tr., Nov. 30, 2016, Helms Testimony at 45:5-10.

241. Indeed, in 1965, the portion of the city south of Spencer Highway was primarily pastureland. Tr., Nov. 30, 2016, Helms Testimony at 45:21-23.

242. The majority of the development of the city north of Spencer Highway occurred between 1940 and 1960, with some development taking place as early as the 1920s and 1930s. Tr., Nov. 30, 2016, Helms Testimony at 45:24-46:9.

243. The original infrastructure of the portion of the city located north of Spencer Highway typically is 60-80 years old. Tr., Nov. 30, 2016, Helms Testimony at 46:10-17.

244. The original infrastructure of the portion of the city located south of Spencer Highway typically is much less than 50 years old.  Tr., Nov. 30, 2016, Helms Testimony at 46:18-20.

245. The portion of the city located north of Spencer Highway has more infrastructure issues because, as is typical with any city development, the infrastructure in the original part of the city is older.  Tr., Nov. 29, 2016, Van Houte Testimony at 98:13-99:3.

246. The city's municipal offices, library, and police building are located north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 47:6-16.

247. In the last 4-5 years, a new police building was constructed north of Spencer Highway at a cost of more than $20 million, and the most recent fire facility construction also has been located north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 54:10-23.

248. The city's three swimming pools, including the city-owned waterpark, are located north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 69:17-70:3.

249. The city's three splash pads are also located north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 70:4-9.

250. Strawberry Park, which is located north of Spencer Highway, is an approximately 50-acre park that is home to the city's tennis courts and tennis pro, the peewee baseball facility, a concession stand, little league fields, a walking path, a basketball court, a playground, and picnic facilities.  Tr., Nov. 30, 2016, Helms Testimony at 70:10-21.

251. In the last five years, the Strawberry Park pool has been upgraded to a water park, the peewee fields and concession stands were renovated, and the tennis courts were updated.

The facilities at Strawberry Park are in good working condition.  Tr., Nov. 30, 2016, Helms Testimony at 70:22-71:15.

252. It is the common practice of cities to charge admission to city-owned waterparks.  Tr., Nov. 30, 2016, Helms Testimony at 71:16-72:3.

253. The city participated with Harris County in the development of Partnership Park, a new park that includes a dog park and playground and which is located north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 72:4-13.

254. All of the city-owned athletic fields except for the girls' softball fields are located north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 72:14-18.

255. The city has built additional soccer fields in the area of the city located north of Spencer Highway.  Tr., Nov. 29, 2016, Van Houte Testimony at 100:10-12.

256. In the last several years, the city refurbished Memorial Park located north of Spencer Highway.  Tr., Nov. 29, 2016, Van Houte Testimony at 101:5-8.

257. Over the last ten years, new public school facilities have been built north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 48:12-15.

258. In 2010 or 2011, the city agreed to participate in a bus program sponsored by Harris County and funded by a grant through the county.  Tr., Nov. 30, 2016, Helms Testimony at 73:11-20.

259. For the second year of the bus program, the county asked the city to help fund the service, and the city through Second Century paid $150,000 to pay part of the cost of the bus service.  San Jacinto College and La Porte also helped fund the service.  Tr., Nov. 30, 2016, Helms Testimony at 73:20-74:4.

260. For the bus service to continue for a third year, the county asked the participants to contribute $500,000.  San Jacinto College decided to discontinue its participation in the bus service.  To determine whether continued participation in the bus service warranted more than $200,000 in investment, the city conducted a ridership study through which the city concluded that the level of ridership was too low to justify the cost.  Tr., Nov. 30, 2016, Helms Testimony at 74:4-75:4; Tr., Nov. 29, 2016, Van Houte Testimony at 99:19-100:1.  The debate surrounding the discontinuation of the bus service focused on the level of ridership.  Tr., Nov. 29, 2016, Van Houte Testimony at 100:3-9.

261. The City of Pasadena, like all of Harris County, is very flat, which leads to street flooding throughout the city during heavy rains.  Tr., Nov. 30, 2016, Helms Testimony at 48:13-22; Tr., Nov. 29, 2016, Van Houte Testimony at 97:5-13.

262. The city is addressing drainage issues by constructing detention ponds, working with FEMA to buy out flood-prone developments, and requiring developers to include detention facilities in new construction plans.  Tr., Nov. 30, 2016, Helms Testimony at 48:23-49:15.

263. The city has also performed drainage projects north of Spencer Highway on Alastair to address the Cotton Patch Bayou and in the Red Bluff area.  Tr., Nov. 29, 2016, Van Houte Testimony at 96:25-97:2, 97:17-98:5.

264. Detention ponds constructed south of Spencer Highway aid with drainage north of Spencer Highway by diverting water from the bayous that flow north, thereby leaving capacity in the bayous for runoff from the area north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 49:16-23.

265. The majority of capital improvements in the city are constructed north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 49:25-50:2.

266. The city is in the process of replacing all of the two-inch waterlines, which are located north of Spencer Highway, with six-inch waterlines.  Tr., Nov. 30, 2016, Helms Testimony at 50:7-9, 19-21; Tr., Nov. 29, 2016, Van Houte Testimony at 96:5-19.

267. The city is also replacing and enlarging sewer lines in the area of the city north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 50:13-16.

268. As of November 30, 2016, the city was in the process of reconstructing Randolph Street, Witter Street, Garner Street, and Tilden Street in the area of the city located north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 51:1-8; 52:18-21.

269. The city is partnering with Harris County to reconstruct Pasadena Boulevard at a cost of $12 million dollars, over $7 million of which is being contributed by the city through Second Century.  Tr., Nov. 30, 2016, Helms Testimony at 51:8-23.

270. Preston Street, located north of Spencer Highway, has some displaced concrete due to drainage from the trees in the median, but otherwise it is in a usable condition.  Tr., Nov. 30, 2016, Helms Testimony at 51:7-15.

271. Recent road construction by the city south of Spencer Highway has been limited to extending existing streets to facilitate mobility and participating with Harris County in the expansion of Fairmont Parkway to facilitate access to the surrounding commercial area and to generate increased sales tax revenue.  Tr., Nov. 30, 2016, Helms Testimony at 52:25-54:6.

272. The city prioritizes the street construction projects based on traffic volume.  Tr., Nov. 29, 2016, Van Houte Testimony at 94:12-15.

273. Almost all of the approximately $1.5 million the city applies for and receives in Community Block Development Grants is spent on projects north of Spencer Highway. Tr., Nov. 30, 2016, Helms Testimony at 55:1-18.

274. Second Century Corporation is an economic development corporation that provides a source of revenue for city infrastructure projects that would not otherwise exist.  Tr., Nov. 30, 2016, Helms Testimony at 55:21-56:8.

275. Second Century has contributed to job incentive programs to encourage businesses to locate and remain located north of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 56:11-57:1.

276. Although Second Century currently maintains a high fund balance, that money is already budgeted to be used to contribute to the improvement of Pasadena Boulevard north of Spencer Highway and to revitalize the convention center so that it will have the potential to generate more tax revenue for the city as a whole.  Tr., Nov. 30, 2016, Helms Testimony at 57:2-58:8.

277. In the absence of bond funds, the city will begin to spend the excess in its fund balance on capital improvement projects.  Tr., Nov. 30, 2016, Helms Testimony at 59:15-19.

278. The city is required to keep two months' worth of operating expenses in its general fund account.  Tr., Nov. 30, 2016, Helms Testimony at 61:3-6.  Two months' worth of operating expenses is approximately $16 million.  Tr., Nov. 30, 2016, Helms Testimony at 61:5-6.

279. In 2015 and 2016, the city spent between $11 million and $12 million from its general fund balance on projects located north of Spencer Highway.  Tr., Nov. 30, 2016, Helms

Testimony at 59:20-24.  That was between 60-70 percent of the total general funds spent in 2015 and 2016.  Tr., Nov. 30, 2016, Helms Testimony at 60:20-61:2.

280. Over the course of the three-year Capital Improvement Plan for fiscal years 2016-2018, the city expects to spend approximately $40 million on streets and drainage out of its general fund, from Second Century, and through Harris County partnerships.  Tr., Nov. 30, 2016, Helms Testimony at 61:24-62:7.

281. From 2013-2015, the city spent approximately 80 percent of the $1 million to $1.5 million sidewalk fund on improvements north of Spencer Highway. Tr., Nov. 30, 2016, Helms Testimony at 60:11-19.

282. Over the last ten years, the city spent approximately $288 million on capital improvements, $179 million of which was spent on projects exclusively north of Spencer Highway, $30 million of which was spent on citywide projects, and $76 million of which was spent south of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 62:8-24.

283. It is appropriate to spend public funds in the areas with the greatest need, rather than to spend an equal amount of money in each geographic city council district.  Tr., Nov. 30, 2016, Helms Testimony at 67:20-68:5.

284. In the last successful bond election, held in 2002, voters approved $102 million in bonds, 58-60 percent of which was spend on projects located north of Spencer Highway, $20 million of which was spent on citywide projects, and the remainder of which was spent on projects south of Spencer Highway.  Tr., Nov. 30, 2016, Helms Testimony at 69:1-16.

285. In addition maintenance and infrastructure spending, the city operates a Neighborhood Network Division that works in all geographic areas of the city.  Plf. Ex. 347, Hollon Depo. at 13:9-14.

286. The Neighborhood Network Division administers the matching grant program and the Industrial Community Network Program, facilitates festivals and events open to all residents of Pasadena, assists neighborhoods with formation of formal neighborhood groups, and assists neighborhood groups with fundraising.  Plf. Ex. 347, Hollon Depo. at 14:6-7, 9-23; 15:5-10; 26:18-28:18; 39:10-14; 39:25-41:13; 49:9-50:13.

287. In 2001, the Neighborhood Network division started the crime watch program, with pilot groups in a neighborhood in the north part of the city, the middle part of the city, and the south part of the city. Plf. Ex. 347, Hollon Depo. at 14:6-17.

288. The majority of the city is included in a neighborhood group or a homeowner's association. Plf. Ex. 347, Hollon Depo. at 110:16-21; 111:9-21; Plf. Ex. 31.

289. Both neighborhood groups and homeowner's associations can be part of the Neighborhood Network. Plf. Ex. 347, Hollon Depo. at 18:25-19:3.

290. The contact list used by the Neighborhood Network to invite people to Neighborhood Network events is largely dependent on self-reporting of contact information by the neighborhood and homeowner's groups.  Plf. Ex. 347, Hollon Depo. at 25:12-23; 56:23-25.

291. None of the non-neighborhood group specific meetings put on by the Neighborhood Network are ever limited to just neighborhood groups or homeowner's groups.  Plf. Ex. 347, Hollon Depo. at 26:14-17.

292. There are over 80 neighborhood groups in the city.  Plf. Exs. 311, 347, Hollon Depo. at 16:23-24.

293. In around 2008, when there was no funding for the matching grant program, the city partnered with industrial companies to form the Pasadena Industrial Community Network.  Plf. Ex. 347, Hollon Depo. at 27:9-14

294. Through the Industrial Community Network Program, the city augments its resources by obtaining labor and materials donations from local industrial companies to repair homes and perform beautification projects in the city.  Plf. Ex. 347, Hollon Depo. at 27:7-28:18; 29:6-20; 126:4-128:12.

295. Through the Industrial Community Network Program, LyondellBasell revitalized Memorial Park, located north of Spencer Highway.  Plf. Ex. 347, Hollon Depo. at 28:4-13.

296. The Industrial Community Network Program has completed 28 projects in the city. Def. Ex. 66; Plf. Ex. 347, Hollon Depo. at 29:19-20.

297. Industrial companies also donated money for the Neighborhood Network awards banquet in 2015.  Plf. Ex. 347, Hollon Depo. at 50:1-10.

298. The majority of the projects performed by the Industrial Community Network Program are located north of Spencer Highway. Def. Ex. 66.

299. The Industrial Community Network has done twelve projects in Council District A.  Plf. Ex. 347, Hollon Depo. at 127:1-4.

300. The Industrial Community Network has done three projects in Council District C.  Plf. Ex. 347, Hollon Depo. at 127:11-12.

301. The Industrial Community Network has done four projects in Council District D.  Plf. Ex. 347, Hollon Depo. at 128:2-4.

302. The Industrial Community Network has done three projects in Council District E.  Plf. Ex. 347, Hollon Depo. at 128:9-10.

303. Karen Hollon developed the matching grant program using guidelines from the American Planning Association.  Plf. Ex. 347, Hollon Depo. at 13:12-14.

304. The matching grant program is open to all neighborhood groups and homeowner's associations that have bylaws, a board, and have had Karen Hollon attend one board meeting and one general attendance meeting.  Plf. Ex. 347, Hollon Depo. at 61:11-19; Plf. Ex. 209-8.

305. The matching grant program can be used for physical improvements that the neighborhood groups feels would improve its quality of life, such as landscaping and signage, deed restriction renewal, security enhancements, and community events.  Plf. Ex. 347, Hollon Depo. at 41:4-13; 42:21-23.

306. The matching grant program typically has a grant budget of $75,000-$100,000 per year. Plf. Ex. 347, Hollon Depo. at 67:3-8.

307. Each year that the matching grant program is operating, the grant opening dates are established by the Neighborhood Network Division and posted on the Division's website. Plf. Ex. 347, Hollon Depo. at 43:13-16.

308. To obtain a matching grant, a neighborhood group must identify a project and obtain three bids for the project, apply during a grant opening, be awarded a grant by the matching grant board, complete the work described in its grant application, substantiate the performance of that work, and have the project inspected by the city. Plf. Ex. 347, Hollon Depo. at 43:13-44:12;  45:19-46:4; Plf. Ex. 209-8.

309. Prior to payment of a matching grant award, the city confirms that the specific project for which each grant was awarded has been completed, obtains documentation of the amount spent on the project, submits a purchase order to the city accounting department for review and approval, and obtains city council approval of the payment.  Each matching grant payment is voted on by city council.  Plf. Ex. 347, Hollon Depo. at 42:9-45:21; 46:4-21; 51:10-14; 68:22-69:2.

310. Mayor Isbell never approves matching grant payments on his own.  Plf. Ex. 347, Hollon Depo. at 49:2-4.

311. The city does not oversee the operations of neighborhood groups, and it is the responsibility of the neighborhood groups to remain active and to apply for the grant program.  Plf. Ex. 347, Hollon Depo. at 55:11-12, 19-24; 132:4-21.

312. The city does not have any control over whether a group is a voluntary neighborhood group or a mandatory homeowner's association.  Plf. Ex. 347, Hollon Depo. at 112:18-113:5; Tr., Nov. 29, 2016, Van Houte Testimony at 18:9-12

313. Once a group has bylaws and a structure formed, it is the responsibility of the group to remain active and participate in the Neighborhood Network.  Plf. Ex. 347, Hollon Depo. at 114:14-19.

314. Neighborhood groups can be formed and run without city assistance.  Plf. Ex. 347, Hollon Depo. at 114:9-19.

315. There is less interest in forming neighborhood groups in the area of city north of Spencer Highway.  Tr., Nov. 29, 2016, Van Houte Testimony at 159:18-21.

316. The city has assisted groups with holding fundraisers to raise money to match grant funding.  Plf. Ex. 347, Hollon Depo. at 115:23-25.

317. The Neighborhood Network Division arranged for Peter Piper Pizza to host pizza parties for neighborhood groups and give 10% back to the groups.  Plf. Ex. 347, Hollon Depo. at 49:10-19.   The Neighborhood Network announced the Peter Piper Pizza offer at city council and on TV.  Plf. Ex. 347, Hollon Depo. at 49:13-14.

318. The Neighborhood Network Division also arranged for neighborhood groups to sell Macy's discount coupons for $5 to raise money for their groups.  Plf. Ex. 347, Hollon Depo. at 49:20-25.

319. Volunteer labor can be used to match grant funds in lieu of money.  Plf. Ex. 347, Hollon Depo. at 116:1-20.

320. The city has worked to build neighborhood groups in areas north of Spencer Highway, working with Don Harrison to build the North Pasadena Neighborhood Association, working with Pat Van Houte to build Red Bluff Terrace, and working with the residents to build Sunset in Ornaldo Ybarra's district.  Plf. Ex. 347, Hollon Depo. at 117: 2-118:10; 119:10-19; 119:25-120:13.

321. The city recently facilitated the building of the new Deepwater neighborhood group in Council District C, which was awarded a $2000.00 grant for signage in the first opening of the 2016-2017 grant program.  Plf. Ex. 347, Hollon Depo. at 59:21-60:1; Def. Ex. 79.

322. The city assisted the Deepwater group in raising awareness of the group with residents, drafting bylaws, soliciting monetary donations, facilitating and supporting a neighborhood Thanksgiving dinner in 2015, a January 2016 dinner meeting, a February 2016 dinner meeting, a March 2016 Easter egg hunt, a March 2016 dinner meeting, a March 2016 BBQ fundraiser, an April 2016 meeting, a May 2016 meeting, and a June

2016 meeting.  The invitations to the meetings and events were provided in English and Spanish.  Plf. Ex. 347, Hollon Depo. at 59:21-60:1; Def. Ex. 38.

323.  When neighborhood groups located north of Spencer Highway apply for matching grants, they typically receive the requested grant funding.  *See* Plf. Ex. 211; Def. Ex. 79.

324.  In the 2016 grant program cycle the following neighborhood groups located north of Spencer Highway received grants:

- Deepwater was awarded $2,000.00;

- Mount Vernon Civic Club was awarded $7,500;

- Parkview Estates was awarded $700.00;

- Queens Neighborhood was awarded $1,000; and

- Willow Oaks Townhomes was awarded $8,175.00.

Def. Ex. 79.

325.  In the 2015 grant program cycle the following neighborhood groups located north of Spencer Highway received grants:

- Courtland Village was awarded $900.00;

- Golden Acres was awarded $3,488.50; and

- Willow Oaks was awarded $9,977.00.

Plf. Ex. 211-1, 2.

326.  In the 2014 grant program cycle, Golden Acres (located north of Spencer Highway) was awarded $2,750.  Plf. Ex. 211-11.

327.  In the 2013 grant program cycle, Willow Oaks (located north of Spencer Highway) was awarded $2,812.83. Plf. Ex. 211-7, 10.

328. For 2013, and subsequent years, the matching grant spreadsheets show that many groups were approved for grants for multiple projects.  *See* Plf. Ex. 211, Def. Ex. 79.

329. The 2013 awards are consistent with the amounts paid to neighborhood groups in November of 2013.  Plf. Ex. 89.

330. Although there is a $7,500 award limit per project, Plf. Ex. 347, Hollon Depo. at 65:21-24, neighborhood groups can apply for and be awarded grants for multiple projects.  Plf. Ex. 347, Hollon Depo. at 42:9-43:3; Tr., Nov. 29, 2016, Van Houte Testimony at 163:1-3.

331. Grant payments for multiple projects can be combined in one payment.  Plf. Ex. 347, Hollon Depo. at 66:1-21.

### Senate Report Factors

332. Applying the facts of this case to the Senate factors does not suggest a lack of equal opportunity.  Specifically:

**History of voting-related discrimination**

There was no evidence of voting-related discrimination.

**Racially polarized voting**

In the six municipal elections studied by the experts, there was evidence in four of the six that Hispanics and non-Hispanics voted differently, but in only three of the six did the difference in voting patterns lead to the defeat of the Hispanic-favored candidate or position.  Thus, any polarization was not legally significant in three of the six elections. Further, in two instances where the Hispanic candidate or position was defeated, the result was so close that the increase in Hispanic voter registration between those elections and the present day would likely produce a different result had those elections been

60

conducted today.  As a result, there was clear polarization in only one of the six elections, a result inconsistent with the legal standard requiring the polarization to be sufficient to produce the *usual* defeat of the Hispanic-preferred candidate.  While the plaintiffs submitted analysis of some partisan elections, voting there was polarized by party considerations, not race, and such elections are irrelevant to Pasadena's non-partisan elections.  FOF 174, 186, 195, 196, 197, 205.

**Voting practices that enhance the opportunity to discriminate**

The plaintiffs suggested that the inability to employ a single-shot voting strategy was an enhancing factor; however, the empirical studies, including one conducted by Dr. Engstrom who was the plaintiffs' political science expert, did not reveal that the enhancing factors, including the inability to use single-shot voting, had any negative impact on the ability of minority voters to elect candidates of their choice.  Tr., Dec. 1, 2016, Alford testimony, at 160: 4-13; *see also* Tr., Nov. 17, 2016, Engstrom testimony, at 133:11-137:13.

**Exclusion from candidate slating processes**

Hispanics had access to a candidate-slating process that enjoyed the same level of success as the other slating process in city elections.  FOF 193.

**Past discrimination in education, employment, and health that hinders the ability to participate in the political process**

Although there was testimony regarding past discrimination, the testimony was largely about practices that occurred fifty or more years ago and that were not localized to Pasadena.  The testimony offered by the plaintiffs did not link past discrimination to any hindrance in the ability to participate in the political process, and expert testimony offered by the defendant comparing educational and economic status of different groups

showed that there was no correlation with the groups' voting turnout.  FOF 212-238; Tr. December 1, 2016, Alford testimony, at 158:19-159:21.

**Racial appeals in political campaigns**

There was no evidence of racial appeals in political campaigns. FOF 128, 136, 141.

**The extent to which members of the minority group have been elected to public office**

When the city replaced the previous all single-member-district election system, the number of Hispanics elected to office—three—increased by 50 percent over the maximum of two Hispanics who had been elected under the prior system.  Further, looking solely to Hispanic-preferred candidates, four were elected, which represents half of the eight-member council and is proportionate to Hispanics' 50.6 percent share of the city's citizen-voting-age population.  FOF 207.

**Responsiveness to the needs of the minority group**

Although there was anecdotal evidence of less desirable infrastructure in the predominantly Hispanic northern portion of the city compared to the predominantly Anglo south, the difference was largely due to the fact that the northern portion of the city was much older while the southern portion had much newer infrastructure put in by the private developers.  Further, evidence of actual projects undertaken by the city revealed that the bulk of city spending for infrastructure and other amenities was directed to the north rather than the south.  FOF 239-284.

**Whether the policy underlying use of the mixed system is tenuous**

A mixed system, which preserves the benefits of single-member districts but also operates to produce councilmembers who have a more city-wide perspective provides real benefits, not the least of which is to discourage distributive politics where city

spending is distributed equally among council districts rather than being able to be directed to the area of greatest need.  While persons may disagree over which system is better, the policy underlying the use of a mixed system clearly is not tenuous.  FOF 21-26.

**Whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the relevant population**

Hispanics make up half of the city's citizen-voting-age population.  Four council seats would represent proportionality.

- The current 6-2 plan has five districts or places that have Hispanic-citizen-voting-age-population majorities—Districts A, B, and C and the at-large Places G and H. FOF 169.

- In the one election that has been conducted under the 6-2 plan, Hispanics have elected their candidate of choice to four council seats (Districts A, C, and D and Place G).  FOF 207, 208.

- District D, which is slightly below a Hispanic-citizen-voting-age-population majority using the five-year ACS report that is based on data that is between two and seven years old, very likely either currently has a Hispanic-citizen-voting-age population majority or soon will have.   It and its very similar predecessor district have elected a Hispanic, who is the overwhelming Hispanic candidate-of-choice, in the past two elections.  FOF 171, 174.

- Three districts (A, B, and C) have a Hispanic majority of registered voters, and in a fourth (District D) 45.9 percent of the registered voters are Hispanic and have been able with consistent non-Hispanic crossover voters to elect the candidate of their choice.  FOF 169, 174, 175.

Whether one looks strictly to citizen-voting-age population, to Hispanic registered voters, or to electoral performance, the existing 6-2 plan provides Pasadena's Hispanic citizens with the opportunity to participate in the political process and to elect candidates of their choice that is equal to or greater than their proportionate share of the relevant population.

333. Looking to the Senate Report factors as they have been applied and augmented by the courts, the totality of the circumstances analysis weighs heavily in establishing that the challenged mixed system with its 6-2 plan provides Hispanic citizens of Pasadena with an opportunity to participate in the political process and to elect candidates of their choice that is at least equal to that enjoyed by other members of the electorate. *See* FOF 332.

## II.  FINAL DETERMINATIONS

334. The change to the 6-2 system did not have the effect of depriving Hispanic voters of equal opportunity to participate in Pasadena elections.  As such, the 6-2 system does not violate the Voting Rights Act.

335. The 6-2 election system, as implemented in the City of Pasadena, has five positions elected from areas with Hispanic-citizen-voter-age population majorities—three single-member districts (A, B and C) and the two at-large places.  Those five positions constitute 62.5 percent of the total seats on council.  The three single-member districts, which make up 50 percent of the single-member districts and 37.5 percent of the total seats on council, also have Spanish-surname registered-voter majorities.

336. In addition to the five seats elected from areas with majority Hispanic citizen-voter age populations, a sixth Hispanic electoral opportunity exists in District D, which has twice elected a Hispanic council member who is the choice of approximately 90 percent of Hispanic voters.

337. As roughly 50 percent of the city's citizen-voting-age population is Hispanic and about 42 percent of the city's registered voters have Spanish surnames, the current plan provides electoral opportunity for Hispanics that is at least equal to their potential voting strength.

338. Under the 6-2 plan used in the City of Pasadena, Hispanics have an opportunity to participate in the electoral process and to elect candidates of their choice that is at least equal to the rest of the electorate.

339. Because there has been no denial of equal opportunity, Plaintiffs cannot succeed on — and the Court need not reach — the claims of intentional discrimination, whether cast as claims under section 2 or the Fourteenth or Fifteenth Amendments to the United States Constitution.

340. Even so, the evidence does not support a finding that purposeful discrimination against Hispanics was among the city's motives for adopting the 6-2 system.

341. The motive for proposing the 6-2 system and submitting it to the voters was to provide greater responsiveness and representation to all residents of Pasadena. Mayor Isbell has favored a mixed system for many years and has consistently touted the benefits of dual representation for the city. There is no credible evidence that he, or anyone affiliated with the city, ever suggested that deprivation of Hispanic voting was in any way a motive for the charter change.

342. Importantly, there is compelling evidence inconsistent with a discriminatory motive.

343. The mayor helped to get Councilman Ornaldo Ybarra elected to city council in 2009 and has never opposed his reelection bids. The Mayor has strongly supported a number of

other Hispanic candidates over the years, and his opposition to candidates he does not prefer has been color blind.

344. Moreover, before holding a council vote on the charter change in August of 2013, Mayor Isbell sought legal counsel to confirm and did confirm that a 6-2 plan could provide at least three Hispanic majority seats on council.

345. Three was the minimum number of seats the mayor understood to be required under section 2, based on legal advice provided to the city during the 2011 redistricting process. Three Hispanic majority districts was also consistent with the roughly 35 percent citywide SSRV percentage presented to the mayor at the time.

346. Mayor Isbell also believed that a 6-2 system would provide additional Hispanic electoral opportunity both in Cody Ray Wheeler's district and in the at-large seats, which though not majority Hispanic, were seen by the mayor as capable of electing a Hispanic candidate of choice with the aid of cross-over voting by non-Hispanics.  That is precisely what happened in the 2015 election under the 6-2 plan.

347. The mayor's actions in seeking to confirm Hispanic voting opportunity before moving forward with the charter change proposal, instructing counsel to maximize Hispanic districts when drawing maps, and providing past political support for Hispanic candidates of choice all are inconsistent with an intent to deprive Hispanics of proportional electoral opportunity.

### III. CONCLUSIONS OF LAW

### General Factors Affecting § 2 Cases

1. "'Legislative reapportionment is primarily a matter for legislative consideration and determination,' *Reynolds v. Sims,* 377 U.S. 533, 586 (1964), for a [legislative body] is the

institution that is far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality." _Connor v. Finch,_ 431 U.S. 407, 414-15 (1977).

2. Under section 2, the burden of proving that the electoral system operates to minimize or cancel the protected group's ability to elect their preferred candidates is on the plaintiff. _See, e.g., Thornburg v. Gingles,_ 478 U.S. 30, 48, 51 (1986); _see also, Voinovich v. Quilter,_ 507 U.S. 146, 155-56 (1999).

3. "[E]xperience and insight have not yet demonstrated that [election systems containing at-large seats] are inherently invidious and violative of the Fourteenth Amendment." _Whitcomb v. Chavis,_ 403 U.S. 124, 159-60 (1971). "[E]lectoral devices, such as at-large elections, may not be considered _per se_ violative of § 2." _Thornburg v. Gingles,_ 478 U.S. 30, 46 (1986).

**The Threshold Test**

4. A plaintiff bringing a challenge under section 2 of the Voting Rights Act (52 U.S.C. § 10301) to the use of an at-large election system must satisfy a three-part threshold test. Specifically, (1) the minority group of which the plaintiff is a member must be able to demonstrate that it is sufficiently large and geographically compact to be able to constitute a majority in a single-member district, (2) the minority group must be able to show that it is politically cohesive, and (3) the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed— usually to defeat the minority's preferred candidate. _Thornburg v. Gingles,_ 478 U.S. 30, 50-51 (1986).

5. "[U]nless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect.' § 2(b). . . . Consequently, if difficulty in electing and white bloc voting are not proved, minority voters have not established that the multimember structure interferes with their ability to elect their preferred candidates." *Thornburg v. Gingles,* 478 U.S. 30, 48-49, n. 15 (1986).

6. "Because the loss of political power through vote dilution is distinct from the inability to win a particular election [citation omitted], a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than the results of a single election." *Gingles,* 478 U.S. at 57.

7. The purpose of the *Gingles* threshold test is to establish a causal relationship between the alleged injury and the challenged election system. *Thornburg v. Gingles,* 478 U.S. 30, 50 n. 17 (1986) (unless minority voters can establish the elements of the *Gingles* test "they cannot claim to have been injured by that [election] structure or practice").

8. Failure to satisfy any one of the three threshold criteria is fatal to the plaintiff's case. *Campos v. City of Houston,* 113 F.3d 544, 547 (5th Cir. 1997).

**Relevance of the adult citizen population in the threshold test and in applying the Act generally**

9. The protections provided by section 2 of the Voting Rights Act extend only to citizens of the United States. 52 U.S.C. § 10301; *Campos v. City of Houston*, 133 F.3d 544, 548 (5th Cir. 1997).

10. In Texas, only persons who are in the citizen voting-age population (*i.e.,* persons who are at least eighteen years of age and citizens of the United States) are potentially eligible to vote. Tex. Elec. Code § 11.002(1) & (2).

68

11. In determining whether the group to which the plaintiff belongs is sufficiently large to constitute a majority in a single-member district, the court "must consider the citizen-voting-age population of the group challenging the electoral practice...." *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997); *see also Valdespino v. Alamo Heights Ind. Sch. Dist.,* 168 F.3d 848, 853 (5th Cir. 1999) ("this court has already determined what factors limit the relevant population in the district [when analyzing the first *Gingles* factor]: voting-age and citizenship"); *Perez v. Pasadena Ind. Sch. Dist.,* 165 F.3d 368, 372 (5th Cir. 1999) ("We have unequivocally held, however, that courts 'must consider the *citizen* voting-age population of the group challenging the electoral practice when determining whether the minority group is sufficiently large and geographically compact to constitute a majority.' ...such a result is required by the plain language of Section 2.").

**Lack of relevance of partisan elections in analyzing a non-partisan election system**

12. In analyzing whether voting is racially polarized for the purpose of the third prong of the *Gingles* threshold test, partisan exogenous elections offer little, if any, probative evidence when the issue is whether voting is polarized in non-partisan elections. *Cisneros v. Pasadena Ind. Sch. Dist.,* 2014 WL 1668500, *22-23 (S.D., Tex. April 25, 2014).

13. Where, as here, partisan affiliation, rather than race, best explains the divergent voting patterns in the partisan elections analyzed by Dr. Engstrom, it is inappropriate to conclude that those elections are evidence of racially polarized voting. *League of United Latin American Citizens, Council No. 4344 v. Clements,* 999 F.2d 831, 850 (5th Cir. 1993) (en banc).

14. It is inappropriate to consider political parties as proxies for race in Texas elections. *Id.* at 861.

**Crossover voting in the section 2 analysis**

15. Whether legally significant racially polarized voting exists depends on the combined strength of a cohesive minority vote and the minority crossover vote.  It is only when that combined strength is insufficient to avoid the usual defeat of minority candidates that racially polarized voting will be legally sufficient to support a finding of a section 2 violation.  *Gingles,* 478 U.S. at 56.

16. While the standard *Gingles* threshold test requires the ability to create a single-member district with a Hispanic citizen-voting-age-population majority, section 2 does not require the creation of majority-minority districts, and a plan that does not have a majority-minority district, even though it may be possible to create one, does not necessarily violate section 2.  *Johnson v. DeGrandy,* 512 U.S. 997, 1019-20 (1994); *see also, Bartlett v. Strickland,* 556 U.S. 1, 23-24 (2009) (plurality opin.) ("Our holding also should not be interpreted to entrench majority-minority districts by statutory command, for that, too, could pose constitutional concerns.").

17. "States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts. Those can be evidence, for example, of diminished bloc voting under the third *Gingles* factor or of equal political opportunity under the § 2 totality-of-the-circumstances analysis." *Bartlett v. Strickland,* 556 U.S. 1, 24 (2009) (plurality op.).

## Totality of the Circumstances and Equal Opportunity

18. Satisfaction of the threshold test is not sufficient to prove liability under section 2.  If a plaintiff is able to satisfy the three-prong *Gingles* test, the court must then examine the

totality of the circumstances to determine if the election system results in unequal electoral opportunity. *Johnson v. DeGrandy,* 512 U.S. 997, 1011 (1994).

19. The ultimate question under section 2 of the Voting Rights Act is whether

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of a [racial or language minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Voting Rights Act, § 2, 52 U.S.C. § 10301(b).

20. In determining whether vote dilution exists, the court must conduct an intensely local appraisal of the design and impact of the election system and base its decision on a practical evaluation of past and present reality. *Gingles,* 478 U.S. at 79.

21. The focus of the inquiry is equality of political opportunity. *Johnson v. DeGrandy,* 512 U.S. 997, 1011 (1994).

22. The failure of minority candidates to win elections does not resolve the issue of vote dilution. Section 2 merely guarantees equality of opportunity and is not a guarantee of electoral success. *League of United Latin American Citizens v. Perry,* 548 U.S. 399, 428 (2006); *Johnson v. DeGrandy,* 512 U.S. 997, 1014 n.11 (1994).

23. Where a plaintiff group has a majority in a district, yet fails to elect its electoral choice, it represents a failure to take advantage of the opportunity rather than establishing the absence of opportunity. *Salas v. Southwest Texas Junior College Dist.,* 964 F.2d 1542, 1556 (5th Cir. 1992).

**Proportional electoral strength as demonstration of equal political opportunity**

24. A districting plan that provides political effectiveness in proportion to the relevant population measure does not deny political opportunity. *Johnson v. De Grandy,* 512 U.S.

997, 1014 (1994). ('Treating equal political opportunity as the focus of the enquiry, we do not see how these district lines, apparently providing political effectiveness in proportion to voting-age numbers, deny equal political opportunity").

25. Proportionality, in the sense of having a number of districts in which the minority group had an effective voting majority that is proportionate to the group's share of the potential electorate, is not a safe harbor because (1) proportionality must be considered as part of the totality of the circumstances and (2) it is possible that the totality of the circumstances could include (a) practices such as "ballot box stuffing, outright violence, discretionary registration" and similar practices that could negate the apparent opportunity presented by a seemingly proportionate districting plan or (b) blatant racial gerrymandering by which the rights of some members of the minority group were traded against the rights of others.   Additionally, the Court felt that establishing a safe harbor would encourage jurisdictions to create majority-minority districts even in situations where they were not necessary to provide equal electoral opportunity.  *Id.,* at 1018-20.

26. Although it has been suggested that *League of United Latin American Citizens v. Perry* is a case where a court found a section 2 violation even in the face of assumed proportionality, in fact, the districting plan at issue in that case was, according to the Court, two districts short of proportionality.  The Court concluded that even if it were to deem the "two-district deficit" to represent insubstantial disproportionality, there was other evidence of a section 2 violation, namely the blatant gerrymandering by which the rights of Hispanics in Webb County were traded for rights of two non-compact groups of Hispanics with disparate interests located primarily in Travis and Hidalgo counties—*i.e.,* one of the specific situations the *DeGrandy* court noted as a reason not to consider

proportionality to be a safe harbor.  *League of United Latin American Citizens v. Perry,* 548 U.S. 399, 432-35, 438 (2006).

27. When an election system operates to provide proportional representation, it is inconsistent with a claim that there is a violation of section 2.  As Judge Posner of the Seventh Circuit noted, "A group that has electoral power, in the sense of power to elect the representatives of its choice, equal to its fraction of the electorate will be hard-pressed to demonstrate . . .   that its members nevertheless "have less opportunity than other members of the electorate . . . to elect representatives of their choice."  *Barnett v, City of Chicago,* 141 F3d 699, 705 (7th Cir. 1998).

28. "Defendants can generally defeat a § 2 claim by showing that the protected minority group has achieved or will achieve persistent proportional representation under the challenged districting plan.  Proportionality defeats a § 2 vote dilution claim because a parity of votes and representation is compelling evidence that opportunities for the minority class to participate in the electoral process equal those of other members of the electorate."  *Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F. Supp. 1022, 1045 (D. Md. 1994) (three-judge court).

**Relevance of success of non-Hispanic candidates who are nevertheless the preferred choice of Hispanic voters**

29. The choice of Hispanic voters need not necessarily be Hispanic.  It would be an affront to our constitutional traditions to assume that only minority candidates can be the preferred choice of minority voters.  *Johnson v. De Grandy,* 512 U.S. 997, 1027 (1994) (Kennedy, J., concurring).

30. An election in which two Anglos run against each other, such as the 2015 race between Ms. Van Houte and Mr. Cote, may not be as highly relevant to an analysis of racially

polarized voting, although "it is relevant to an assessment of minority electoral success if white minority-preferred candidates defeat other white non-minority-preferred candidates" as was the case in the Van Houte-Cote race. *Jenkins v. Manning,* 116 F.3d 685, 695 (3rd Cir. 1997).

31. Section 2 "does not focus on whether minorities are able to elect other minorities to office, but rather addresses whether minorities have an equal opportunity to elect representatives of their choice, whatever their race, to office." *Id.* at 695-96; *see also N.A.A.C.P. v. City of Niagara Falls, N.Y.,* 65 F.3d 1002, 1016 (2nd Cir. 1995) ("We decline to adopt an approach precluding the possibility that a white candidate can be the actual and legitimate choice of minority voters").

**Even if the election system may contain fewer majority-minority districts than the prior system, it does not equate to prohibited dilution**

32. Dilution under section 2 is measured against a hypothetical undiluted practice rather than against the section 5 benchmark of the prior practice. *Reno v. Bossier Parish School Bd.,* 520 U.S. 471, 480 (1997); *see also Little Rock School Dist. v. Pulaski County Special School Dist. No. 1,* 56 F.3d 904, 910 (8th Cir. 1995) (finding that the district court erred in a section 2 case by comparing a challenged districting plan to the prior plan, since the statute asks if minority voters have less political opportunity than other voters, not whether the challenged plan is retrogressive).

33. If an election system results in proportional representation for the minority group, then it does not dilute the group's voting strength. *See* Conclusions 24-28.

34. Section 5 and section 2 of the Voting Rights Act "differ in structure, purpose, and application." *Holder v. Hall,* 512 U.S. 874, 883 (1994) (plurality opin.). Retrogression was the inquiry under section 5 but not in section 2 dilution cases. *Id.,* at 884; S. Rep. 97-

417, p. 68, n. 224 (1982) ("Plaintiffs could not establish a Section 2 violation merely by showing that a challenged reapportionment or annexation for example, involved a retrogressive effect on the political strength of a minority group").

35. Even if retrogression were the issue in a section 2 case such as this, a plan that provides for representation that is proportional to the minority group's share of the city's relevant population would not be retrogressive even under section 5 standards. *City of Richmond v. United States,* 422 U.S. 358, 372 (1975).

**There is no requirement in the Voting Rights Act to maximize a protected group's electoral opportunity by ensuring greater than proportional representation**

36. Section 2 does not impose an obligation to maximize minority voting strength. As the Supreme Court explained, "reading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose. One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast. However prejudiced a society might be, it would be absurd to suggest that the failure of a districting scheme to provide a minority group with effective political power . . . above its numerical strength indicates a denial of equal participation in the political process. Failure to maximize cannot be the measure of § 2." *Johnson v. De Grandy,* 512 U.S. 997, 1016-17 (1994); *see also Little Rock School Dist. v. Pulaski County Special School Dist. No. 1,* 56 F.3d 904, 910-11 (8th Cir. 1995).

37. A requirement of maximization is inconsistent with the statutory standard of equal opportunity. "[T]he proportional representation defense constrains federal judicial power: in the above example [where a 40 percent African-American population had two majority-black districts in a five-district plan but where there was the possibility of

creating a third majority-black district], a federal court cannot force the city to draw more than two majority-black districts because doing so would result in unequal electoral opportunities for blacks and whites." *Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F. Supp. 1022, 1045, n. 17 (D. Md. 1994) (three-judge court).

**A districting plan that provides a protected group with proportionate representation does not injure the group's members**

38. "[T]he irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly .  .  . trace[able] to the challenged action of the defendant, and not .  .  . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (internal citations omitted).

39. Here, where there is opportunity to participate in the political process and to elect candidates of the minority group's choice that is proportional to the group's percentage of the jurisdiction's citizen-voting-age population, there is no injury, and hence, there is no standing.

**Relevance of Historical Discrimination and Socio-Economic Disparities**

40. Proof of socioeconomic disparities and history of discrimination, without more, does not demonstrate that a group of citizens has less opportunity to participate in the political process.  *Fairley v. Hattiesburg, Miss.,* ___ Fed Appx. ___ 2016 WL 6956660 at * 5 (5th Cir. 2016), citing *Clark v. Calhoun Cty.,* 88 F.3d 1393, 1399 (5th Cir. 1996).

41. Testimony regarding depressed political participation must be grounded in a *local* appraisal of the facts. *Fairley,* 2016 WL 6956660 at * 5, citing *N.A.A.C.P. v. Fordice,* 252 F.3d 361, 368 (5th Cir. 2001).

42. Plaintiffs have failed to establish that voters in the City of Pasadena still bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

**The Senate Report factors as a framework for analyzing the totality of the circumstances**

43. In analyzing the totality of the circumstances to determine if members of a minority group have an opportunity to participate in the political process and to elect candidates of their choice that is equal to that enjoyed by other members of the electorate, courts have referred to the Senate Report on the 1982 amendments to the Voting Rights Act, which identifies several relevant factors:

[1] the history of voting-related discrimination in the State or political subdivision;

[2] the extent to which voting in the elections of the State or political subdivision is racially polarized;

[3] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group . . .;

[4] the exclusion of members of the minority group from candidate slating processes;

[5] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

[6] the use of overt or subtle racial appeals in political campaigns; . . .

[7] the extent to which members of the minority group have been elected to public office in the jurisdiction . . .;

[8] evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group [may have probative value], and

[9] whether . . . the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may [also] have probative value.

*League of United Latin American Citizens v. Perry,* 548 U.S. 399, 426 (2006), *citing,* *Thornburg v. Gingles,* 478 U.S. 30, 44–45, 106 S.Ct. 2752 (citing S.Rep. No. 97–417 (1982), U.S. Code Cong. & Admin. News 1982, pp. 177, 206.

44. Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area. *Id., citing, Johnson v. De Grandy,* 512 U.S. 997, 1000 (1994).

45. "[T]he existence of polarized voting and the extent to which minorities are elected to public office remain the two most important factors considered in the totality-of-the-circumstances inquiry." *Fairley v. Hattiesburg, Miss.,* ___ Fed. Appx. ___, 2016 WL 6956660, *3 (5th Cir. Nov. 28, 2016), *quoting, Clark v. Calhoun County,* 88 F.3d 1393, 1397 (5th Cir. 1996).

### There Is No Probative Evidence of Discriminatory Intent

46. An equal protection claim requires proof of both a discriminatory effect and a discriminatory purpose. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264-66 (1977) (proceeding to the intent issue only after first determining that at least one plaintiff had suffered an injury—*i.e.,* that there

was a discriminatory effect); *see also Lewis v. Ascension Parish School Board,* 806 F.3d 344, 358 (5th Cir. 2015) (in the absence of discriminatory effect, intent is irrelevant).

47. To determine if there was an intent to discriminate, courts have looked to five, nonexhaustive factors: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey v. Abbott,* 830 F.3d 216, 231 (5th Cir. 2016 (en banc)*, quoting, Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267-68 (1977).

48. It is not enough that legislators are aware of a disparate impact on a protected group, "the law must be passed *because of* that disparate impact." *Veasey,* 830 F.3d at 231.

49. The burden is on the plaintiffs to show that racial discrimination was a substantial or motivating factor behind the enactment, and if they meet that burden, the burden shifts to the law's defenders to show it would be enacted without the factor of racial discrimination. *Id.*

50. Non-contemporary evidence of voting discrimination is of little probative value. The most relevant historical evidence is relatively recent history. *Id.* at 232; *see also N.A.A.C.P. Inc. v. City of Niagara Falls, N.Y.,* 65 F.3d 1002, 1020 (approving the district court's failure to credit testimony of history of official discrimination where the analysis involved actions no more recent than fifteen years earlier, relied on interviews of the plaintiffs or family and friends, and involved areas outside the city at issue).

51. It is problematic to attempt to discern the motive of a legislative body from statements of individual legislators, since what motivates one member may not motivate others. *Id.* at

233, *citing, United States v. O'Brien,* 391 U.S. 367, 383-84 (1968).  Discerning motive is particularly difficult here, since the ultimate decision-maker on the charter amendment is the entire electorate.  Tex. Local Gov't Code §9.005.

52. Conjecture by the opponents of a measure is not probative in determining the motivations of those supporting the enactment.  *Veasey,* 830 F.3d at 234.

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH KENYON LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-4181
Facsimile:  (713) 220-4285

By:    */s/ C. Robert Heath*
          C. ROBERT HEATH
          Texas State Bar No. 09347500
          Southern District No. 13381
          *bheath@bickerstaff.com*
          BICKERSTAFF HEATH
          DELGADO ACOSTA LLP
          3711 S. MoPac Expressway
          Building One, Suite 300
          Austin, Texas 78746
          Telephone: (512) 472-8021
          Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on December 14, 2016, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.

 /s/ *C. Robert Heath*                     
C. Robert Heath