IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALBERTO PATINO, *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 4:14-cv-03241 |
| | § | |
| CITY OF PASADENA, *et al.,* | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     THE LEGAL FRAMEWORK...............................................................................1

    A.      Vote Dilution ............................................................................................1

    B.      Intentional Racial Discrimination .............................................................5

    C.      Bail-in Under the Voting Rights Act .........................................................7

III.    FINDINGS OF FACT............................................................................................8

    The Parties .............................................................................................................8

    Background of this Lawsuit ....................................................................................8

    Section 2 Vote Dilution:  The Three *Gingles* Preconditions .................................12

        A.      The First *Gingles* Factor:  Are Hispanics Sufficiently Numerous
            and Compact ...........................................................................................13

        B.      The Second *Gingles* Factor: Are Hispanics Politically Cohesive.................13

        C.      The Third *Gingles* Factor:  Anglo Bloc Voting Usually to Defeat
            Hispanic Preferred Candidates....................................................................13

            1.   Anglo Bloc Voting Usually Defeats Latino-Preferred Candidates and
                Policy Positions in At-Large Elections…………………………………14
            2.   The 2013 And 2015 Citywide Elections Are the Most Probative
                Elections For Racially Polarized Voting Analysis…………………...16
            3.   Place H – Oscar Del Toro…………………………………………16
            4.   Proposition 1……………………………………………………18
            5.   Exogenous Elections are Supplemental and Probative of Anglo Bloc
                Voting………………………………………………………..…18
            6.   Anglo Bloc Voting Prevented the Election of Latino Preferred
                Candidate in Four Exogenous County Elections in Which Every
                Pasadena Voter Had the Same Choice………………………………19
            7.   Anglo Bloc Voting Must Be Analyzed Citywide in a Challenge to At-
                Large Elections……………………………………………………20

8. Higher Anglo Crossover Voting In Three Latino Majority Single Member Districts Provides Context to Understand Voting in Pasadena but Does Not Defeat a Finding of Anglo Bloc Voting Citywide…21

9. Anglo Bloc Voting Is Apparent From Voting Patterns in Actual Election, And Not Defeated by Predictions of Future or Theoretical Voting Behavior…………………………………………………22

10. Wheeler's District D Win In An Anglo Majority District Does Not Defeat a Finding of Anglo Bloc Voting Citywide………………25

11. Racially Contested Elections Are More Probative For Prong 3 Purposes Than Are Anglo vs. Anglo Elections…………………26

12. Latino Preferred Candidate Van Houte Depended On Relatively High Anglo Crossover Vote to Win…………………………………27

13. Anglo Bloc Voting Is A Descriptive Finding Of Ethnic Cohesion, Not A Causal Finding That Can Be Defeated By Speculation About Partisan Motivation………………………………………………27

14. The Pasadena Independent School District Is Geographically and Demographically Distinct from the City of Pasadena; PISD Elections are Not Probative of Anglo Bloc Voting in the City of Pasadena…29

D.  Dilutive Effect of the City's 6-2 Plan ……………………………………………30

1. The Previous 8-0 Plan ………………………………………………32

2. The Current 6-2 Plan………………………………………………38

3. District D is not a Hispanic Opportunity District in the 6-2 Plan …………………………………………………………40

4. The 2015 Election in the 6-2 Plan…………………………………41

5. Election of Pat Van Houte

E. Totality of the Circumstances…………………………………………………43

1. Historical Discrimination and its Legacy in Lower Hispanic Political Participation …………………………………………………………43

2.    The Historical Experience of Hispanics in Pasadena is similar to Harris County and Texas………………47

3.    Hispanic Socio-Economic Status in Pasadena…………57

4. Past and Present Conditions Depress Hispanic Voter Turnout in Pasadena…………………………………………………52

5.      Racially polarized voting  ......................................................55

6.      Use of voting practices or procedures that tend to
        enhance the opportunity for discrimination against
        the minority group (for example, unusually large  ...............55

7.      Exclusion of minorities from a candidate slating
        Process…………………………………………………………57

8.      Use of overt or subtle racial appeals in political
        Campaigns……………………………………………………58
9.      The extent to which minorities have been elected to
        public office in the jurisdiction ..............................................59

10.     Responsiveness .....................................................................60

        a.   Second Century Economic Development
             Corporation ....................................................................66

        b.   The City Holds a Surplus and Does not Spend
             Equally on the North Side ................................................66

11.     Tenuousness ..........................................................................69

12.     Proportionality .......................................................................71

13.     *LULAC v. Perry* additional factors Weigh in
        Favor of a Finding of Intentional Discrimination .................72

14.     Citywide Hispanic Population ...............................................73

        a    The U.S. Census American Community
             Survey is the Source of Data for U.S.
             Citizen Voting Age Population .................................74

        b    The U.S. Census American Community Survey
             five-year survey is more reliable to estimate
             city-wide HCVAP ....................................................75

        c    U.S. Census American Community Survey
             one-year survey is not as reliable to estimate
             city-wide HCVAP....................................................81

d      Dr. Rives did not offer a credible estimate of Hispanic Citizen Voting Age Population in Pasadena……………………………………………83

e      Dr. Rives did not perform the analysis he in the past to determine whether Hispanic self-reporting of U.S. citizenship contained errors sufficient to change his 50.6% estimate of HCVAP in Pasadena ..............................85

f      If Dr. Rives had Used his Methodology to Compensate for What he Believes is  Hispanic Over Reporting of U.S. Citizenship, he Would Have Concluded Pasadena HCVAP is Below Fifty Percent.............................................86

g      Dr. Rives Chose not to Rely on his Past Research  ...87

h      Dr. Rives Chose not to Perform his Past Analysis of Whether Hispanics Over Report U.S. Citizenship ........................................................88

i      Dr. Rives Chose not to Rely on his Past Opinion That SSVR is More Likely to Reflect an Accurate Rate of Hispanic U.S. Citizenship. ................................................................89

j      Dr.  Rives was Incorrect in his Prediction of HCVAP Growth in the ACS 2015 5-yr Estimate..89

k      Work not Performed by Dr. Rives ............................90

l      The Growth in Hispanic Citizen Voting Age Population in Pasadena has Slowed Since 2010.................................................................90

m      Even if the City Contained 50.6% HCVAP, Hispanics do not have an equal opportunity to elect their candidates of choice in citywide elections ..................................................................93

15      Relatively Lower Hispanic Voter Turnout Does not Defeat Plaintiffs' Section 2 Claim  .........................................95

16      Partisanship Was Used by the City as a Proxy for Race and Neither Explains nor Absolves the Discrimination Against Hispanic Voters ...................................95

iv

a.  Partisanship is not a Factor in City Elections………97
b.  Use of Partisan Words as a Proxy for Race………100
c.  Mayor Isbell's Claims of Partisanship in Pasadena are not Credible……………………………………102

Intentional Discrimination ..................................................................................104

A.  The City's Change to a 6-2 System was racially motivated…………106
B.  *Arlington Heights* Factors……………………………………………107

1.  *Arlington Heights* Factors: Direct Evidence of intentional discrimination……………………………………………107
2.  *Arlington Heights* Factors: Adverse Impact…………..109

a.  The Reduction in the Number of Hispanic Majority Districts from 4 to 3 Reduced Hispanic Opportunity to Elect……………………………………109

i.  At Large Seats do not Provide Hispanics the Opportunity to Elect Their Preferred Candidates…………………..……110

ii. Enlargement of the Remaining Single Member Districts Increases the Difficulty of Electing Hispanic Preferred Candidates in the Single Member Districts……..111

3.  *Arlington Heights* Factors:  Historical Background of the Decision…………………………………………..112

a.  Increase in the Pasadena Hispanic Population Over The Past Several Decades……………..112

b.  2011 Redistricting Process……………..113

4.  *Arlington Heights* Factors:  Specific Sequence of Events114

a.  2013 Municipal Elections……………..114

b.  Election of  Cody Ray Wheeler in  District E…..114

c.  After the 2013 Election, District B Appeared Likely to Elect the Hispanic Candidate of Choice………..116

       d.   Shelby Decision ……………..117

       e.   2013 Bond/Charter Review Committee………..118

       f.   July 25, 2013 Bond Review/Charter Revision Committee Public Meeting……………..119

       g.   Final Meeting and Recommendation of the Bond/Charter Review Committee…………121

       h.   Council Consideration of Ordinances Calling for Special Elections……………..123

       i.   Prop 1 Election……………..126

5.   *Arlington Heights* Factors: Departures From the Normal Procedural Sequence……………..127

       a.   Switch From Bond to Charter Review Committee..127

       b.   Mayor Isbell Announced a Procedure for Appointing Members of the Committee, Then Violated the Procedure for North Side Appointees……………..127

       c.   In the summer of 2013, Mayor Isbell prepared the 6-2 Plan that would be adopted in 2014 without consulting with or informing members of city council……………..129

       d.   In the summer of 2013, Mayor Isbell prepared the 6-2 Plan that would be adopted in 2014 without consulting with or informing members of city council……………..129

       e.   The Committee did not take enough time to review the charter……………..130

6.   *Arlington Heights* Factors: Substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached" ……………..130

vi

       a. The Mayor Pushed Forward With the 6-2 Proposal Despite Opposition from Councilmembers and the Public…..……………..130

       b. The Mayor Pushed Forward with the 6-2 Change Despite Opposition from the Bond/Charter  Review Committee. ……………..131

       c. The Mayor Pushed Forward With the 6-2 Proposal Despite Being Told it Would Dilute Hispanic Voting Strength……………..132

    7. *Arlington Heights* Factors: Legislative History……………..133

       a. 2014 Redistricting Process……………..133

    8. *Arlington Heights* Factors: Legislative History— Contemporary Statements by Members of the Decisionmaking Body……………..139

C. *LULAC  v. Perry* Intentional Discrimination Considerations:  Latino Electorate was Increasingly Mobilized…………………………139

    1. The City Council Normally Operated by Consensus but had Started to Divide on Issues Related to Resource Allocation………………………………………..139

       a. Nomination of Jackie Welch to the Second Century Economic Development Board……………..…141

       b. Trash Pick-up on the North Side…………...…..142

       c. 2012 Discontinuation of Public Bus Service…...142

       d. Lazy River in Strawberry Park…………..…...143

       e. Transparency in City Hiring……………………144

    2. Latino Voters Were Becoming More Politically Active in Recent Years………………………………….…….144

    3. The City Used Public Resources to Target, Mobilize and Turnout Voters from the South Side to Thwart the Increasingly Mobilized Latino Electorate……………..145

a.   The City Used the Neighborhood Network Grants Program to Target, Mobilize and Turnout Voters from the South Side to Thwart the Increasingly Mobilized Latino Electorate……………..146

    i.   *Neighborhood Network Background…146*
    ii.   *Northside neighborhoods are neglected in setting up and recognizing programs……………………………147*

    iii.   *Neighborhood Networks Sends the Vast Majority of its Funding to the South Side…………………………………149*

    iv.   *The Neighborhood Networks Program Functions as Part of the City's Political Machine to Mobilize Voters on the South Side………………………………………150*

4.   The City Worked to Thwart the Increasingly Mobilized Latino Electorate by Using its resources, employees, contacts, and communication systems in order to increase voter turnout in favor of Proposition 1 in 2013…………154

5.   The City Used Public Resources and its Machine to Support Isbell's Campaign for Mayor in 2013 and in Support of Candidates Favored by Johnny Isbell in May 2013 and 2015……………………………………………………158

6.   The Mayor Used his Resources to Campaign Against Latino Candidates of Choice in 2013 and 2015…………………159

IV.   CONCLUSIONS OF LAW……………………………………………………162

A.   Pasadena's 6-2 Method of Election Dilutes Hispanic Voting Strength in Violation of Section 2 ................................................................................................. 163

B.   Pasadena's 6-2 Method of Election Intentionally Discriminates Against Hispanics on the Basis of Race ...................................................................................164

C.      Bail-in Under the Voting Rights Act .........................................................................165

V.      CONCLUSION.........................................................................................................................172

# TABLE OF AUTHORITIES

Cases

*Adarand Constructors, Inc. v. Peña,*
    515 U.S. 200 (1995) ............................................................................ 169
*Bartlett v. Strickland,*
    556 U.S. 1 (2009) ............................................................................... 164
*Benavidez v. City of Irving, Tex.,*
    638 F. Supp. 2d 709 (N.D. Tex. 2009) ............................................ 74, 76
*Benavidez v. Irving Indep. Sch. Dist., Tex.,*
    690 F. Supp. 2d 451 (N.D. Tex. 2010) .................................................. 75
*Campos v. City of Houston,*
    113 F.3d 544 (5th Cir. 1997) ............................................................. 164
*Cisneros v. Pasadena Independent School District,*
    2014 WL 1668500 ................................................................... 29, 74, 76
*City of Mobile v. Bolden,*
    446 U.S. 55 (1980) ........................................................ 2, 5, 162, 168
*Clark v. Calhoun Cnty. Miss.,*
    88 F.3d 1393 (5th Cir. 1998) ....................................................... 95, 165
*David v. Garrison,*
    553 F.2d 923 (5th Cir. 1977) ............................................................... 60
*Garza v. County of L.A.,*
    756 F. Supp. 1298 (C.D. Cal. 1990) ....................................... 7, 168, 169
*Garza v. County of Los Angeles,*
    918 F.2d 763 (9th Cir. 1990) .................................................. 6, 105, 168
*Gomez v. City of Watsonville,*
    863 F.2d 1407 (9th Cir. 1988) ........................................................... 164
*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960) ............................................................................. 6
*In re Alien Children Ed. Litig.,*
    501 F. Supp. 544 (S.D. Tex. 1980) ...................................................... 47
*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,*
    4 F.3d 1103 (3d Cir. 1993) .................................................................. 43
*Johnson v. De Grandy,*
    512 U.S. 997 (1994) ..................................................................... passim
*Karcher v. Daggett,*
    462 U.S., 103 S.Ct. 2653 ................................................................... 105

x

*Miller v. Johnson,*
    515 U.S. 900 (1995) ..................................................................... 5, 6, 168, 169

*NAACP v. Fordice,*
    252 F.3d 361 (5th Cir. 2001) ................................................................. 43, 53

*Perez v. Pasadena Indep. Sch. Dist.,*
    958 F. Supp. 1196 (S.D. Tex. 1997) ..................................................... passim

*Perry* (LULAC v. Perry),
    548 U.S. 399 (2006) ............................................................................. passim

Proposition,
    1 in 2013 .......................................................................................... viii, 154

*Rodriguez v. Bexar Cty., Tex.,*
    385 F.3d 853 (5th Cir. 2004) ................................................................. 18, 19

*Rodriguez v. Harris Cty.,* Tex.,
    964 F. Supp. 2d 686 (S.D. Tex. 2013) ........................................................ 76

*Rogers v. Lodge,*
    458 U.S. 613 (1982) ............................................................... 6, 105, 168

*Ruiz v. City of Santa Maria,*
    160 F.3d 543 (9th Cir. 1998) ...................................................................... 36

*Salas v. Sw. Texas Jr. Coll. Dist.,*
    964 F.2d 1542 (5th Cir. 1992) .................................................................... 94

Session v. Perry,
    298 F. Supp. 2d 451 (E.D. Tex.) ....................................................... 45, 165

*Shaw v. Reno,*
    509 U.S. 630 (1993) ................................................................................. 5, 6

*Shelby Cnty., Ala. v. Holder,*
    133 S. Ct. 2612 (2013) ..................................................................... 10, 170

*Teague,* v. Attala Cty.,
    92 F.3d 283 (1996) ................................................................................ 42, 43

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ................................................................................ passim

*Valdespino v. Alamo Heights Indep. Sch. Dist.,*
    168 F.3d 848 (5th Cir. 1999) ............................................................. 76, 164

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) ....................................................... 45, 55, 69, 71

*Velasquez v. City of Abilene,*
    725 F.2d 1017 (5th Cir.1984) ....................................................................... 1

*Vera v. Richards,*
    861 F. Supp. 1304 ...................................................................................... 44

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp,*
    (*Arlington Heights*), 429 U.S. 252 (1977) .......................................... passim

*Voinovich v. Quilter*,
  507 U.S. 146 (1993) .................................................................................................. 162
*Westwego Citizens for Better Gov't v. City of Westwego*,
  872 F.2d 1201 (5th Cir.1989) .......................................................................... 1, 95, 165
*Whitcomb v. Chavis*,
  403 U.S. 124 (1971) ........................................................................................ 6, 105, 168

## Statutes

42 U.S.C. § 1973 ................................................................................................ 1, 5, 6, 168
42 U.S.C. § 1973(b) ...................................................................................................... 4
52 U.S.C. § 10301 .................................................................................................. 6, 163
52 U.S.C. § 10304 ...................................................................................................... 10
52 U.S.C.A. § 10302 (c) ........................................................................................ 8, 171
U.S.C. § 1973 .............................................................................................................. 2

## Other Authorities

1982 U.S.C.C.A.N. 177 .............................................................................................. 162
1982 U.S.C.C.A.N. at .................................................................................................. 2
204 ............................................................................................................... 129, 133
S. Rep. ........................................................................................................ 3, 4, 163, 166
S. Rep. n. 120 ......................................................................................... 5, 104, 165
S. Rep. No. 97-417 ...................................................................................... 2, 162
SB 14 ....................................................................................................... 45, 55, 69

# I.  INTRODUCTION

1.    In this voting rights case, plaintiffs challenge the City of Pasadena's conversion from eight single member districts to six single member districts and two at-large seats for electing members of the City Council. Plaintiffs contend that the current 6-2 system dilutes the voting strength of Hispanics in the City in violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973, *et seq*., and the Fourteenth and Fifteenth Amendments to the United States Constitution.

2.    "[T]he resolution of a voting dilution claim requires close analysis of unusually complex factual patterns, and because the decision of such a case has the potential for serious interference with state functions, ... district courts [must] explain with particularity their reasoning and the subsidiary factual conclusions underlying their reasoning." *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1203 (5th Cir.1989); *quoting Velasquez v. City of Abilene*, 725 F.2d 1017, 1020 (5th Cir.1984).

# II.  THE LEGAL FRAMEWORK

### A.    Vote Dilution

3.    The fundamental question in plaintiffs' section 2 vote dilution claim is whether, as a result of the City's conversion to a mixed system of six single member districts and two at-large seats, Hispanics in the City "do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 44–45 (1986).

4.    Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, as amended, provides that:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion of the population.

42 U.S.C. § 1973 (emphasis in original).

5.     In 1982, Congress amended the Voting Rights Act to reach discriminatory conduct that might otherwise evade liability under the more stringent intent standard established in *City of Mobile v. Bolden*, 446 U.S. 55 (1980). The 1982 amendment created a "results-based" test to analyze vote dilution claims. S. Rep. No. 97-417, at 40 (1982), reprinted in 1982 U.S.C.C.A.N. at 218 ("S. Rep.").

6.     Section 2 claims brought against at-large voting, or "multimember" election schemes, are governed by *Thornburg v. Gingles*, 478 U.S. 30 (1986).

7.     In *Gingles*, the Supreme Court established a two-step inquiry for analysis of vote dilution claims. *Id.* at 50-51. First, the minority group must be able to demonstrate: (1) "that it is sufficiently large and geographically compact to constitute a majority in a single- member district;" (2) "that it is politically cohesive;" and (3) "that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate." *Id. See also League of United Latin Am. Citizens v. Perry* (*LULAC v. Perry*), 548 U.S. 399, 425 (2006).

8.     The second step of the inquiry requires the Court "to consider the 'totality of the circumstances' and to determine, based 'upon a searching practical evaluation of the 'past and present reality' whether the political process is equally open to minority voters.'" *Id.* at

79 (citations and internal quotation marks omitted).  The Senate Judiciary Committee, in a

report accompanying the 1982 amendments to the Voting Rights Act, provided a non-

exclusive list of factors that a court should consider in determining whether the

challenged   practice impermissibly impairs the ability of the minority group to elect their

preferred representatives.

9.    These factors include, but are not limited to:

> (1)   the extent of any history of official discrimination in the state or political
> subdivision affecting the right of a member of a minority group to register, vote, or
> participate in the democratic process;
> (2)   the extent to which voting in government elections is racially polarized;
> (3)   the extent to which the state or political subdivision has used voting practices or
> procedures that tend to enhance the opportunity for discrimination against the minority
> group (for example, unusually large election districts, majority vote requirements,
> prohibitions against bullet voting);
> (4)   exclusion of minorities from a candidate slating process;
> (5)   the extent to which minority group members in the state or political subdivision
> bear the effects of past discrimination in areas such as education, employment, and
> health, which hinder their ability to participate effectively in the political process;
> (6)   the use of overt or subtle racial appeals in political campaigns;
> (7)   the extent to which minorities have been elected to public office in the
> jurisdiction.

10.   Additional Senate Factors include: "whether there is a significant lack of responsiveness

on the part of elected officials to the particularized needs" of the minority group and

"whether the policy underlying the . . . use of such voting qualification, prerequisite to

voting, or standard, practice or procedure is tenuous."  S. Rep. at 29.

11.   "Another relevant consideration is whether the number of districts in which the minority

group forms an effective majority is roughly proportional to its share of the population in

the relevant area." *LULAC v. Perry*, 548 U.S. at 426 (citing *Johnson v. De* Grandy, 512

U.S. 997, 1000 (1994)).

12. De Grandy's instruction to courts is to consider, when assessing the totality of circumstances, whether there exists a number of "*majority-minority districts* in substantial proportion to the minority's share of voting-age population[.]" (emphasis added). The Court stated unequivocally:

> "Proportionality" as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population. The concept is distinct from the subject of the proportional representation clause of § 2, which provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). This proviso speaks to the success of minority candidates, as distinct from the political or electoral power of minority voters.

*De Grandy*, 512 U.S. at 1014 n. 11; *see also LULAC v. Perry*, 548 U.S. at 438 (considering only Latino majority districts in the proportionality inquiry).

13. Thus, the proportionality test turns on the amount of opportunity provided to minority voters in a redistricting plan through majority minority districts and is not a snapshot of who is sitting on the jurisdiction's governing body at any particular moment.

14. In *LULAC v. Perry*, the U.S. Supreme Court discussed additional factors that the Court concluded weighed in favor of a section 2 violation finding.  Those factors include whether Hispanics were becoming increasingly politically active and whether the jurisdiction moved to dilute Latino voting strength just as Latinos were starting to exercise it.

15. There is no requirement that all factors be met or that "any particular number of factors be proved, or that a majority of them point one way or the other."  S. Rep. at 29.   "The courts ordinarily have not used these factors . . . as a mechanical 'point counting' device . . . . Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the

voting strength of minority voters is, in the language of Fortson and Burns, 'minimized or canceled out.'" Id. at 29 n. 118.  The Court in *Gingles* explained that the Senate factors must be applied with an eye toward a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process." *Gingles*, 478 U.S. at 45, quoting S. Rep. at 30 n. 120.

16. "[I]n evaluating a statutory claim of vote dilution through districting, the trial court is to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters. This determination is peculiarly dependent upon the facts of each case, and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms."  *Gingles*, 478 U.S. at 79 (internal quotation marks and citations omitted.

**B.  Intentional Racial Discrimination**

17. The Fourteenth Amendment forbids intentional discrimination in legislative line-drawing. *City of Mobile,* 446 U.S. at 66 *superseded in part by statute* 42 U.S.C. § 1973.

18. There are two distinct claims of intentional discrimination in the creation of election boundaries.  The first challenges the use of race as a basis for separating voters into districts and was first recognized in *Shaw v. Reno*, 509 U.S. 630 (1993).  The second claim targets actions "disadvantaging voters of a particular race," and is "analytically distinct" from claims under the *Shaw v. Reno* line of cases.  *See Miller v. Johnson*, 515 U.S. 900, 911 (1995) (explaining distinction between claims).  A non-Shaw claim of intentional discrimination asserts that the jurisdiction "enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities'" *Id.  See also City of Mobile*, 446 U.S. 55 (1980) superseded in part by statute

42 U.S.C. § 1973; *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (redistricting plan violates the Fourteenth Amendment if "'conceived or operated as purposeful device to further racial discrimination' by minimizing, canceling out or diluting the voting strength of racial elements in the voting population.'") (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)); *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) (same).[1]

19.   An intentional vote dilution under the Fifteenth Amendment is analyzed in the same manner as a claim under the Fourteenth Amendment. *See Rogers v. Lodge*, 458 U.S. 613, 621 (1982) (holding that district court demonstrated "understanding of the controlling standard by observing that a determination of discriminatory intent is 'a requisite to a finding of unconstitutional vote dilution' under the Fourteenth and Fifteenth Amendments."). *See also Gomillion v. Lightfoot*, 364 U.S. 339, 346 (1960) ("When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment.").  Section 2 of the Voting Rights also prohibits intentional discrimination in the creation of election boundaries.  52 U.S.C. § 10301.

20.   Courts have long recognized that public decision making bodies, like the City of Pasadena, can have more than one motive when enacting a statute. *See  Vill. of Arlington Heights v. Metro. Hous. Dev. Corp* (*Arlington Heights*), 429 U.S. 252, 265 (1977) ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one.").

---

[1] Both *Shaw* and *Miller* acknowledge these differences.  *See Miller v. Johnson*, 515 U.S. 900, 911 (1995); *Shaw v. Reno*, 509 U.S. 630, 651-52 (1993).

21.   If purposeful vote dilution is the means to an otherwise legitimate end (such as preserving incumbency), Pasadena's actions can be unlawful even if the City can point to other, purportedly non-racial purposes. *See LULAC v. Perry*, 548 U.S. at 441; *Garza v. County of L.A.*, 756 F. Supp. 1298, 1349 (C.D. Cal. 1990) *aff'd*, 918 F.2d 763 (9th Cir. 1990) ("racial discrimination is not just another competing consideration . . . When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.") (citing *Arlington Heights,*, 429 U.S. at 265.

22.   In *Arlington Heights*, the Supreme Court explained that when determining whether racially discriminatory intent or purpose is a motivating factor behind an official action, a court must make "a sensitive inquiry into such circumstantial and direct evidence as may be available." *Arlington Heights*, 429 U.S. at 266.

23.   The Court explained further that, in addition to direct evidence, circumstantial evidence of discriminatory intent includes:

   a.   the impact of the official action, i.e. whether it "bears more heavily on one race than another" and whether "a clear pattern, unexplainable on grounds other than race emerges from the effect of the state action even when the governing legislation appears neutral on its face;"

   b.   the historical background of the decision;

   c.   the specific sequence of events leading up to the challenged decision;

   d.   departures from the normal procedural sequence;

   e.   substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" and

   f.   The legislative or administrative history, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. *Arlington Heights*, 429 U.S. at 264-68.

   **C.     Bail-in Under the Voting Rights Act**

7

24.   Section 3(c) of the Voting Rights Act of 1965, 52 U.S.C.A. § 10302 (c), authorizes a federal court, following a finding "that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision," to order a jurisdiction to obtain federal preclearance of its election changes pursuant to section 5 of the Voting Rights Act. Section 3(c) is a permanent provision of the federal Voting Rights Act.

### III.  FINDINGS OF FACT

*The Parties*

25.   Plaintiffs are Hispanic residents and registered voters of the City of Pasadena. JTPO Admissions at ¶ 1. (Dkt. 94).

26.   The City of Pasadena is a Texas home rule city.  JTPO Admissions at ¶ 2.

27.   The municipal government provided by the Pasadena Charter is known as "Mayor-Council Government." The mayor is authorized to vote on matters coming before the council, including in order to resolve a tie vote among the other eight members of the council. JTPO Admissions at ¶ 3.

28.   The population of the City is approximately 149,335 persons.  JTPO Admissions at ¶ 21.

29.   The Hispanic citizen voting age population of the City has risen in recent decades.  In 1990, the U.S. Census reported that the Hispanic share of the city's citizen voting age population was 18.7%.  The U.S. Census American Community Survey (ACS) reported that the Hispanic share of the city's citizen voting age population was 48.2% for the period 2011-2015.  JTPO Admissions at ¶ 22; Pl. 124 (Ely).

*Background of this Lawsuit*

30. From 1993-2013, members of the city council were elected from eight single member districts. JTPO Admissions at ¶ 5, 6.

31. In 2013, the City converted its method of election from eight single member districts to six single member districts and two at-large positions. JTPO Admissions at ¶ 8.

32. The election system employs a majority vote requirement for each seat on the city council. JTPO Admissions at ¶ 7, 12.

33. The two at large positions on the city council are elected by numbered place. Candidates run at large for a specific position on the council. The numbered place system precludes single shot or bullet voting. JTPO Admissions at ¶ 12.

34. The elections for City Council are non-partisan. JTPO Admissions at ¶ 7

35. The north side of Pasadena is predominantly Hispanic. The infrastructure on the north side, including streets, sidewalks and drainage, is in poor condition. By contrast, on the City's south side, which is predominantly Anglo, the infrastructure is in good condition. *See* section III(E)(9) below.

36. The Pasadena city council normally votes in unison. Tr. 11/30/16 at 115:18-116:8 (Wheeler); Tr. 11/30/16 at 116:9-117:8 (Wheeler).

37. However, in recent years, as Hispanic voters elected their candidates of choice to council seats on Pasadena's north side, the council started to divide in its votes over issues of resource allocation. Tr. 11/30/16 at 116:9-117:8 (Wheeler)

38. Councilmembers cast divided votes between Hispanic-preferred candidates on the north side of Pasadena and the remainder of the counsel (including the mayor) on issues including the 2012 termination of bus service in Pasadena, the 2013 appointment of an ally of the Mayor to the City's economic development board and the construction of a 10

million dollar water feature in a public park for which residents would be charged a fee to use.  Tr. 11/30/16 at 116:9-117:4, 117:5-8 (Wheeler); Trial Tr. Nov. 18, 2016, pp. 68:14-69:12 (Ybarra); Trial Tr. Nov. 29, 2016, p. 78:7-20 (Van Houte); Trial Tr. Nov. 18, 2016, pp. 49:8-50:12 (Ybarra); Trial Tr. Nov. 29, 2016, pp. 77:23-78:2 (Van Houte), 180:18-181:18 (Harrison); Trial Tr. Nov. 18, 2016, pp. 65:18-66:8; Trial Tr. Nov. 29, 2016, pp. 185:11-19 (Harrison)

39. By 2013 Latinos in Pasadena were becoming more politically active and had elected Latino preferred candidates to the city council in three of the four existing Latino majority districts -- A, C and D.  The "serendipitous" election of a Latino with an Anglo surname in an Anglo-majority district raised the possibility that Latinos would elect a majority of council positions in the next election (to be held in 2015). *See Gingles,* 478 U.S. at 76. Pasadena's "Latino voters were poised to elect their candidate of choice" and "threatened to oust the incumbent" Bruce Leamon of District B and deprive the Mayor of a majority of votes on the city council.  *See  LULAC*, 548 U.S. at 438.

40. On June 25 2013, in *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013), the U.S. Supreme Court invalidated the geographic coverage formula of section 5 of the Voting Rights Act, codified at 52 U.S.C. § 10304. Following the Supreme Court's   decision     in *Shelby*, Texas and its political subdivisions, including the City of     Pasadena,   were   no longer required to secure federal approval before implementing changes to their voting systems. JTPO Admissions at ¶ 33.

41. Two days later, on June 27, 2013, Mayor Isbell called for a citizens' committee to review possible bonds for the City.  Pl. 348.

10

42. At the Committee's third meeting, Mayor Isbell proposed that the Committee recommend specific amendments to the City Charter. Mayor Isbell's proposed charter amendments included changing the city's election system by converting one or more of the eight existing single-member districts to at-large districts.  JTPO Admissions at ¶ 34-36.

43. The Committee's final recommendation document did not discuss or make a recommendation regarding placing on the November ballot a change the City's election system.  JTPO Admissions at ¶ 41.

44. Nevertheless, Mayor Isbell proposed a November election to amend the City Charter, including converting the City's election system to 6-2. Pl. 348, 22.

45. The City Council divided 5-4 when voting on whether to put the 6-2 system on the ballot. Mayor Isbell cast the fifth vote in support. JTPO Admissions at ¶ 46-48, 50.

46. In the campaign leading up to the charter amendment election, the City used city employee time and other city resources, as well as money from the Mayor's political action committee, to campaign and turn out votes in favor of Proposition 1.  *See* section below at page 145, "The City Used Public Resources to Target, Mobilize and Turnout Voters from the South Side to Thwart the Increasingly Mobilized Latino Electorate."

47. On November 5, 2013, Pasadena voters by a narrow margin approved Proposition 1, which provided that the city council would consist of six single-member districts and two at-large positions.  Hispanics and non-Hispanics exhibited different voting patterns in that election. JTPO Admissions at ¶ 51.

48. At a City Council public hearing on redistricting, held on March 18, 2014, Council members and members of the public raised concerns about the legality of the maps. JTPO Admissions at ¶ 53.

49. Mayor Isbell brought a pistol to that March 18, 2014 public hearing on redistricting. Councilman Cody Ray Wheeler saw the pistol when the Mayor dropped it to the ground. Trial Tr. Nov. 28, 2016, pp. 37:7-41:24 (Isbell); Tr. 11/30/16 at 132:23-135:1 (Wheeler); PL 181.

50. At the April 1, 2014 City Council meeting, Council member Pat Van Houte expressed concerns over the legality of the redistricting plan. While discussing her concerns regarding the legality of Plan 2, Council member Van Houte exceeded her debate time limit. Mayor Isbell ordered armed police officers to remove her from the council chambers. When Council member Van Houte was removed from the chamber, three more council members departed in protest. The 6-2 redistricting plan was passed on first reading with four council members and the Mayor in attendance. JTPO Admissions at ¶ 54.

51. On April 15, 2014, in a divided vote, the City Council passed the 6-2 redistricting plan on final reading. JTPO Admissions at ¶ 55.

52. On November 12, 2014, the plaintiffs filed this suit claiming that Hispanics do not have an equal opportunity to participate in the political process and to elect to the City Council candidates of their choice under the mixed 6-2 system.

53. With respect to expert witnesses, the court finds that Drs. Engstrom and Alford are experts in the field of statistical analysis; that Drs. Engstrom and Alford are experts in applying statistical analysis to issues raised by election districts; that Mr. Ely and Dr. Rives are experts in demography; and that Dr. Tijerina is an expert regarding Texas history and the historical experience of Hispanics in Texas.

*Section 2 Vote Dilution:  The Three Gingles Preconditions*

54. With respect to the three preconditions under *Thornburg v. Gingles*, 478 U.S. at 48-49 (1986), the parties stipulated to the satisfaction of preconditions one and two.  JTPO at ¶¶ 18, 57.

### A.  The First *Gingles* Factor:  Are Hispanics Sufficiently Numerous and Compact

55. The parties stipulated that Hispanics are sufficiently large and compact to constitute the citizen voting age majority in four of eight single member districts.  JTPO Admissions ¶ 18

### B. The Second *Gingles* Factor: Are Hispanics Politically Cohesive

56. The parties stipulated that Hispanic voters give cohesive support to Hispanic and Hispanic-preferred candidates and policy positions in City of Pasadena elections, and the experts agree. Joint Pre-Trial Order Admissions # 57; PL 198-10 (Engstrom); Tr. 12/1/2016, 171: 9-24 (Alford).

### C.  The Third *Gingles* Factor:  Anglo Bloc Voting Usually to Defeat Hispanic Preferred Candidates

57. In *Thornburg v. Gingles*, the U.S. Supreme Court explained that "in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Gingles*, 478 U.S. at 56.

58. The degree of white bloc voting found sufficient by the Supreme Court in *Gingles* was defined as "a substantial majority."   *Gingles*, 478 U.S. at 59.  The Supreme Court further concluded in *Gingles* that white voting against Black-preferred candidates was legally significant when it ranged between 28% and 49% in general elections. *Id*.

59. "The amount of white bloc voting that can generally "minimize or cancel," black voters' ability to elect representatives of their choice, however, will vary from district to district

according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; the percentage of registered voters in the district who are members of the minority group; the size of the district; and, in multimember districts, the number of seats open and the number of candidates in the field." *Gingles*, 478 U.S. at 56 (internal citations omitted).

### 1. *Anglo Bloc Voting Usually Defeats Latino-Preferred Candidates and Policy Positions in At-Large Elections*

60. Non-Hispanics in Pasadena (also referred to as Anglos) vote sufficiently as a bloc that they are able—in the absence of special circumstances—usually to defeat the Latino preferred candidate.

61. Both sides presented expert witness testimony relevant to *Gingles* third prong, whether the non-Latino bloc voting majority is usually able to defeat candidates supported by the politically cohesive Latino minority group in Pasadena.

62. In their analysis of the patterns of voting for Hispanics and Anglos in Pasadena, Plaintiffs' expert Dr. Richard Engstrom and Defendants' expert Dr. John Alford both relied on the statistical technique of Ecological Inference (EI), developed originally by Professor Gary King.  EI is a more efficient technique developed specifically to improve on ecological regression, the analytical technique previously used in Voting Rights Act lawsuits to assess voter cohesion and polarization. JTPO Admissions at ¶ 59;  Tr. 11/17/2016 At  112:24-115:20 (Engstrom).

63. Dr. Engstrom, Plaintiff's expert, used the EI methodology to determine the candidate preferences of Latino and non-Latino voters in racially contested elections by analyzing the

numbers of votes cast for the various candidates in each of the precincts in Pasadena, and the racial composition of those precincts. JTPO Admissions at ¶ 58;Tr. 11/17/2016 At 112:24-115:5 (Engstrom).

64. Dr. Engstrom chose the EI methodology because it is widely considered to be the superior procedure for capturing the true value of estimates of group-wide voting behavior. Tr. 11/17/2016 At 114:22-115:4 (Engstrom).

65. In order to triple the number of observations for each election, Dr. Engstrom utilized Spanish surname data prepared by Plaintiff's expert David Ely to capture, as separate data points, the number of ballots cast by Hispanics and non-Hispanics in every precinct in each of three ways: by early vote, by absentee ballot, and by votes cast on election day. Tr. 11/17/2016 At 112: 24 - 114:21 (Engstrom)

66. The parties' enumeration of Spanish surnamed individuals in Pasadena were nearly identical. Tr. 11/17/2016 At 56:4-13 (Ely)

67. Defendant's expert, Dr. Alford, replicated the EI analysis reported by Dr. Engstrom. While there were the expected minor variations in estimated vote shares that are typically seen with these techniques, there were no substantive differences, with the single exception of a difference in the preferred candidate of Hispanic voters in the 2010 Republican Primary contest for County Commissioner. JTPO Admissions at ¶ 60; Tr. 12/1/2016 At 116:1-117:20 (Alford)

68. Experts for both sides agree that racially contested elections, *i.e.,* those that present a choice to the voters between Latino and non-Latino candidates, are generally considered to be the most probative for assessing racially polarized voting when Latinos are the minority at issue in a case. JTPO Admissions at ¶ 62.

69.  Dr. Engstrom examined only racially contested elections. Tr. 11/17/2016 At 115:21-113:16 (Engstrom).

2.  ***The 2013 And 2015 Citywide Elections Are the Most Probative Elections For Racially Polarized Voting Analysis***

70.  The parties agree that *endogenous* elections held within the City of Pasadena are central to the case, and that *exogenous* elections are supplemental. Tr. 11/17/2016 At  116:14-117:12 (Engstrom); Tr. 12/1/2016 At  171:25-172:6 (Alford)

71.  The parties agree that Hispanic and non-Hispanic voters demonstrated different preferences in the 2015 at-large race for Place G, the 2015 at-large race for Place H, and the 2013 Proposition 1 race, all of which were held citywide.  Tr. 11/17/16 At 128:13-24 (Engstrom) Tr. 12/1/2016 At 175:2-175:20 (Alford)' Pl. 198 (Engstrom Report)

72.  The Proposition 1 election and the at-large and district elections in 2015 were the only Pasadena elections available to analyze. Tr. 12/1/16 At 136:15-18, 171:5-9 (Alford); R. 11/17/16 At 115:21-116:6 (Engstrom); Pl. 198-6 (Engstrom Report)

73.  Dr. Engstrom analyzed the only racially contested at-large Pasadena city council election held in two decades, as well as the Proposition 1 election and county elections in which Pasadena voters participated.          Tr. 11/17/2016 At 117:16-118:3, 121:25-122:7 (Engstrom); Pl. 255

74.  Dr. Engstrom testified that endogenous citywide races and exogenous county elections in which all Pasadena voters can participate are the most probative elections for studying the potentially dilutive effect of at-large elections. Tr. 11/17/2016 At  116:14-117:12 (Engstrom).

3.  ***Place H – Oscar Del Toro***

75. In the May 2015 at-large election for Place H on the Pasadena City Council, the Latino candidate, Oscar Del Toro, received an estimated 39.1% of the citywide vote and lost to his Anglo opponent. Latino voters supported Mr. Del Toro with an estimated 87.3% of their votes. Non-Latino voters supported Mr. Del Toro's Anglo opponent with an estimated 71.7% of their vote and gave 28.3% of their vote to Mr. Del Toro. JTPO Admissions # 64; Tr. 11/17/2016 At 118:9-119:20 (Engstrom); Pl. 255

76. Oscar Del Toro is a Pasadena businessman who ran for Pasadena City Council's new at-large Place H in 2015 against and Anglo opponent, Darrell Morrison. Mr. Del Toro performed a by precinct turnout analysis that informed him that the south side of Pasadena, and so he concentrated 70% of his door to door campaign on the south side of town. Trial Tr. Nov. 30, 2016, pp. 164:8-165:7, 171:7-10, 174:7-22 (Del Toro) On the north side, residents received him well, were proud that a Mexican immigrant was running for city council, and some asked him questions in Spanish. Trial Tr. Nov. 30, 2016, pp. 174:23-175:4 (Del Toro) On the south side he was not as well-received. On woman told him "I'm not going to vote for you. You know why." Another told him that Pasadena is a "good old boy town," and he had no chance here, asking him to drop his materials on the porch rather than hand them to her.. Trial Tr. Nov. 30, 2016, pp. 175:5-17 (Del Toro)

77. On multiple occasions while campaigning in 2009, Anglo residents of Pasadena slammed the door shut on Mr. Ybarra, telling him they would "not vote for a wetback" and that they would not vote for a Hispanic. Trial Tr. Rough Draft Nov. 18, 2016, pp. 22.

78. Dr. Engstrom found that the 2015 at-large race for Place H on the Pasadena city council was racially polarized, and that Oscar Del Toro lost the election as a consequence. Tr. 11/17/2016 At 119:17-119:20 (Engstrom); Pl. 255

17

### 4. *Proposition 1*

79. Dr. Engstrom examined the results of the November 2013 election to change Pasadena's method of election (Proposition 1), and found that Latino voters opposed Proposition 1 with an estimated 99.6% of their votes. Non-Latino voters supported Proposition 1 with an estimated 60.2% of their votes. Proposition 1 prevailed.  JTPO Admissions #  63; Tr. 11/17/2016 At 120:16-121:19 (Engstrom); Pl. 255

80. Dr. Engstrom concluded that the vote in the 2013 Proposition 1 election was racially polarized, and that as a result of Anglo bloc voting the Proposition was successful. Tr. 11/17/2016 At 121:20-121:24

### 5. *Exogenous Elections are Supplemental and Probative of Anglo Bloc Voting*

81. It is proper to consider the results of exogenous elections (also known as "reconstituted election analysis") in determining whether Anglos vote as a bloc usually to defeat the Hispanic preferred candidate.  *Rodriguez v. Bexar Cty., Tex.*, 385 F.3d 853, 863, 865 (5th Cir. 2004) ("Because they are not vulnerable to a special circumstances attack and were not otherwise disputed, the 2000 and 2002 election results, as properly reconstituted, have substantial probative value on the question whether the plaintiffs met the third Gingles precondition.")

82. "Reconstituted election analysis is a relatively simple method that extracts actual election results from a variety of statewide and local races that subsume the area being analyzed and determines, precinct-by-precinct within the new district, the racial composition of the vote and the "winner" within the new district. This method of aggregation allows a researcher to determine how an individual candidate performed within the boundaries of the target

district even though the actual election covered a different geographical area." *Rodriguez v. Bexar Cty., Tex.,* 385 F.3d 853, 861 (5th Cir. 2004)

### 6. *Anglo Bloc Voting Prevented the Election of Latino Preferred Candidate in Four Exogenous County Elections in Which Every Pasadena Voter Had the Same* Choice

83. Dr. Engstrom also analyzed the results of countywide elections, but confined his analysis to votes cast in precincts in Pasadena only.  Tr. 11/17/2016 At  121:25- 122:7 (Engstrom)

84. An examination of the votes in Pasadena precincts in the 2012 General election race for Sheriff featuring Adrian Garcia, the Democratic nominee, shows that Latino voters gave 95.9% of their support to Garcia and non-Latino voters gave 17.6% of their votes to Garcia. JTPO Admissions #  66; Pl. 255

85.  An examination of the votes in Pasadena precincts in the 2010 General Election race for County Commissioner featuring Sylvia Garcia, the Democratic nominee, shows that Latino voters gave 98.4% of their support to Garcia and non-Latino voters gave 20.9% of their votes to Garcia. JTPO Admissions # 67; Pl. 255

86.  An examination of the votes in Pasadena precincts in the 2008 General election race for Sheriff featuring Adrian Garcia, the Democratic nominee, shows that Latino voters gave 98.2% of their support to Garcia and non-Latino voters gave 28.6% of their votes to Garcia. JTPO Admissions # 68; Pl. 255

87. Relying on the results of an analysis done by Dr. Alford on an additional countywide General election, Dr. Engstrom found that the Latino-preferred candidate in the 2010 General election for County Treasurer was Billy Briscoe, who received 82.2% of the Latino votes cast, but only 20.1% of the non-Latino votes cast and lost to Orlando Sanchez.  Dr.

Engstrom concluded that the Latino-preferred candidate in this race was vetoed by Anglo bloc voting.  Tr. 11/17/2016 At  123:9-124:3 (Engstrom); Pl. 255

88.   Dr. Engstrom concluded that the countywide General elections he analyzed were polarized in Pasadena, and that none of the Latino-preferred candidates won their elections despite Latino cohesive support because Anglo crossover voting was so low.  Tr. 11/17/2016 At 122:8-122:20 (Engstrom)

89.   Dr. Engstrom testified that although Primary elections are an important step in the electoral process, they are not decisive elections except to the extent that Latino candidates may be filtered out of the race at the Primary stage.  Tr. 11/17/2016 At  124:4-124:25 (Engstrom).

### 7.  *Anglo Bloc Voting Must Be Analyzed Citywide in a Challenge to At-Large Elections*

90.   Dr. Engstrom considers the Primary elections to be less probative than the General elections for the purpose of detecting racially polarized voting in an at-large context in Pasadena because General elections present the same candidate pool to every voter in the jurisdiction, whereas in the Primary elections, voters must choose only one party's Primary and their choices are limited to one party's candidates. Tr. 11/17/16 At  127:17-128:11 (Engstrom).

91.   Dr. Engstrom examined two racially contested Democratic and two Republican primaries, and concluded that Latino-preferred candidates were eliminated only in the two Republican primaries.  Tr. 11/17/2016 At  124:20-124:25 (Engstrom); Pl. 255

92.   Dr. Engstrom examined the votes in Pasadena precincts in the multi-candidate 2012 Republican Primary election race for Sheriff featuring Ruben Monzon, and concluded that Latino voters gave 38.6% (a plurality) of their support to Monzon and spread 61.4% of their support across seven other non-Latino candidates. Non-Latino voters gave 8.7% of

their votes to Monzon. JTPO Admissions # 71; Tr. 11/17/2016 At   125:14-125:25 (Engstrom); Pl. 255

93. Dr. Engstrom also examined the 2010 Republican Primary for County Commission Precinct 2, in the Pasadena precincts, all of which are wholly contained within Commission Precinct 2, but found results uninformative because the confidence intervals around the estimates were very  large due to the small number of Latinos voting in the Republican Primary in that race.   Tr. 11/17/2016 1 At 126:1-127:16 (Engstrom); Pl. 255

94. Dr. Engstrom further found that in the two Democratic primaries, Anglo bloc voting did not defeat the Latino-preferred candidate in either the 2008 or 2012 Sheriff's races. Candidate Adrian Garcia emerged from both of those primaries, but lost to the Anglo preferred candidate in the General elections.  JTPO Admissions # 70, 72; Tr. 11/17/2016 At 125:1-126:25 (Engstrom). Pl. 255

95. Dr. Engstrom concluded that in Pasadena elections in which all Pasadena voters have a choice, the vote is racially polarized, and that in every such election he examined, the choice of Latino voters was eliminated as a result of bloc voting by non-Latinos. Tr. 11/17/2016 At 128:13-128:24 (Engstrom).

   8. ***Higher Anglo Crossover Voting In Three Latino Majority Single Member Districts Provides Context to Understand Voting in Pasadena but Does Not Defeat a Finding of Anglo Bloc Voting Citywide***

96. There were also three racially contested single-member district elections held in 2015, in Districts A, B, D.  Dr. Engstrom analyzed the three elections and found that only one of the three, the District B election where the Latino-preferred candidate, Mr. Perez, lost in 2015, to be racially polarized.  Tr. 11/17/2016 At  128:25-129:23; Pl. 255

97.    In the May 2015 election for City Council Dist. A, incumbent Ornaldo Ybarra was reelected with 97% of the Latino vote and 55.4% of the non-Latino vote. The estimated Latino CVAP for Dist. A is 71.5%.  JTPO Admissions # 75; Pl. 255

98.    In the May 2015 election for City Council Dist. B, which was an open seat, the Latino candidate, Celestino Perez, was defeated. Perez received 82% of the Latino vote and 36.3% of the non-Latino vote. The estimated Latino CVAP for Dist. B is 58%. JTPO Admissions # 76; Pl. 255

99.    In the May 2015 election for City Council Dist. D, incumbent Cody Ray Wheeler was elected with 89.5% of the Latino vote and 55.1% of the non-Latino vote. The estimated HCVAP for Dist. D is 45.3%. JTPO Admissions # 77; Pl. 255

100.   Because the districts each only represent one sixth of the population of Pasadena, the results of the analysis in the district elections do not diminish Dr. Engstrom's conclusion that the votes cast by the Pasadena electorate as a whole are racially polarized. Tr. 11/17/2016 At  128:25-129:23 (Engstrom).

### 9. *Anglo Bloc Voting Is Apparent From Voting Patterns in Actual Election, And Not Defeated by Predictions of Future or Theoretical Voting Behavior*

101.   Dr. Alford agreed that voting is either polarized or not regardless of the level of turnout of each group of voters. Tr. 12/01/2016 At 192:18-192:23 (Alford).

102.   Dr. Alford also agreed that a key to greater Hispanic success in Pasadena elections could be greater non-Hispanic crossover voting.  Tr. 12/01/2016 At  179:23-180:4 (Alford)

103.   Nonetheless, and despite his reliance on the analysis of Dr. Engstrom, Dr. Alford offered further and contrary conclusions based on his predictions of increased Latino voter participation in the future, without estimating a date when Latino registration might

increase to levels affording an equal opportunity to elect at-large.   Tr. 12/01/2016 At 124:6-124:15, 128:5-128:18, 166:20-167:1 (Alford)

104.   For example, Dr. Alford concluded that Proposition 1 would have been defeated if the Latino share of the turnout in 2013, 17.3%, had instead matched the 2015 Latino share of voters in 2015 - 23.5%.   Tr. 12/01/2016 124:16-25, 131:18-132:2 (Alford). However, Dr. Alford also conceded that it is equally true that Proposition 1 passed because 100 additional Anglo voters did not share the Hispanic preference on the measure.   Tr. 12/01/2016 At  183:11-183:14 (Alford).

105.   Despite conceding the numerical drop in Latino voter participation between 2013 and 2015, Dr. Alford further predicts that given the increase in Latino registration share since 2011, Proposition 1 would fail if the election were held today.   Tr. 12/01/2016 At  132:3-12, 157:23-158:18 (Alford)

106.   Similarly, Dr. Alford predicts that had Latino vote share reached 42%, Mr. Del Toro would have been elected at-large in 2015.   Tr. 12/01/2016 At 132:13-133:19, 157:23-158:9 (Alford).

107.   Dr. Alford conceded that his predictive win for Mr. Del Toro would have required Hispanics to almost double their vote share. Tr. 12/01/16 At  183:15-183:22 (Alford)

108.   Dr. Alford agreed that it was equally true that Mr. Del Toro could have won a majority of votes if the Anglo voters had crossed over for him at higher rates than they did in his actual election. Tr. 12/01/2016 At  183:23-184:1 (Alford)

109.   Dr. Alford also conceded that the 71.5% of Anglo bloc voting against Mr. Del Toro in 2015 was the most cohesive non-Hispanic vote in all of the contests analyzed in this case. Tr. 12/01/2016 At 172:16-172:20 (Alford).

110. Dr. Alford's observation that that Mr. Del Toro could have won had he had more political experience, run a better campaign, and been more practical was baseless and incorrect. Trial Tr. Dec. 1, 2016, pp.132:5-133:19 (Alford). Prior to running for city council, Mr. Del Toro was an ambassador who greeted every new business established in Pasadena on behalf of the Pasadena Chamber of Commerce, volunteered with the local school district, belonged to several local political organizations, had worked on several local political campaigns, participated in canvassing and media events, distributed signage, attended political meetings, assessed by-precinct turnout.  Trial Tr. Nov. 30, 2016, pp.165:15-166:8, 167:9-168:12, 169:24-14 (Del Toro) When Mr. Del Toro ran for Place H, he did extensive targeted door to door canvassing based on his extensive assessment of voter turnout by precinct, and printed and distributed, by mail to every Pasadena household, and in person, campaign materials designed to personalize his candidacy, Trial Tr. Nov. 30, 2016, pp. 171:13-173:5  (Del Toro) PL 341, PL 299, PL 300.  He spent $4,000  knocked on 2,000 doors, 7 days a week for two and a half months, and received endorsements from local political organizations and labor unions. Trial Tr. Nov. 30, 2016, pp. 176:23-177:20  (Del Toro)

111. Dr. Alford further testified that Mr. Del Toro would not have been successful had he run in a district that was substantially less Hispanic than the city as a whole, Tr. 12/01/2016 At 162:19-163:1 (Alford), an opinion that Dr. Engstrom noted, and Dr. Alford agreed, assumes Anglo bloc voting.  Tr. 11/17/16 At  161:9-13 (Engstrom) Tr. 12/01/2016 At 184:2-16 (Alford)

112. Dr. Engstrom rejected Dr. Alford's predictive guesses that do not reveal what Section 2 requires, *i.e.,* to examine what actually happened in actual elections.  Tr. 11/17/2016 At 130:4-19 (Engstrom)

113. Dr. Alford's comparison of Black, Latino and Asian voter participation cited in his report to argue against the connection between socioeconomic differences and voter turnout was not based on any analysis of voting in the city of Pasadena.  Tr. 12/01/2016 At  192:1-10 (Alford)

### 10. Wheeler's District D Win In An Anglo Majority District Does Not Defeat a Finding of Anglo Bloc Voting Citywide

114. In order to support his conclusion that Anglos do not normally defeat the choice of the Latino voters in reality (rather than as a predictive exercise), Dr. Alford admitted that he relies primarily on the 2015 elections of Cody Ray Wheeler in District D and Pat Van Houte at-large.  Tr. 12/01/2016 At  133:20-134:8 (Alford)

115. However, the voting patterns in the Wheeler 2015 race only occurred in District D.  District D is located north of Spencer Hwy. and does not include voters from the Pasadena's south side.  District D Anglo voters' willingness to vote for Mr. Wheeler in 2015 does not establish whether Anglos bloc vote citywide to defeat Latino preferred candidates.

116. Based on Mr. Wheeler's 2015 re-election, Dr. Alford finds that District D, containing 45.8% Latino CVAP, is a district in which Latinos have the opportunity to elect. Tr. 12/01/2016 At  121:17-19 (Alford)

117. However, Dr. Alford conceded that Mr. Wheeler benefitted in his initial 2013 election by the fact that Anglos split their vote between two Anglo candidates.  Tr. 12/01/2016 At 120:22-121:16 (Alford).

118. Dr. Alford conceded that Mr. Wheeler benefitted from Anglo crossover voting in his 2015 election.  Tr. 12/01/2016 At 134:9-134:22 (Alford).

119. Dr. Alford conceded that he had not done any study to determine the effect that Mr. Wheeler's name had in assisting him in his election.  Tr. 12/01/2016 At  171:1-171:4 (Alford)

120. Dr. Alford testified that contrary to Mr. Wheeler's testimony that an Anglo surname helped him get elected, voter confusion as to Mr. Wheeler's ethnicity was not an advantage because Mr. Wheeler received substantially the same Anglo crossover vote that Mr. Ybarra did in District A.  Tr. 12/01/2016 At  120:1-120:21 (Alford). However, Dr. Alford conceded that Mr. Ybarra's district is the most Hispanic district in Pasadena, that Anglo voters in that district represent at most 15% of the population and therefore are neighbors with, and go to school with Latinos, and that the Anglo voters in that district had experienced Mr. Ybarra as their representative for three terms.  Tr. 12/01/2016 At 169:7-170:9 (Alford); Pl. 241  In contrast, Mr. Wheeler's District D Latino population is 20% lower than Mr. Ybarra's District A population.  Tr. 12/01/2016 At 170:13-170:18 (Alford); Pl. 241

*11. Racially Contested Elections Are More Probative For Prong 3 Purposes Than Are Anglo vs. Anglo Elections*

121. Dr. Alford conceded that a race in which both candidates are Anglo is less probative in measuring racial polarization than a racially contested election.  Tr. 12/01/2016 At  118:5-118:20 (Alford). Dr. Alford also agreed that we might see lower non-Hispanic cohesion in a white-on-white race than we would see in a Hispanic versus Anglo race. Tr. 12/01/2016 At 180:10-13 (Alford).

122. Dr. Alford testified that he would not agree with the premise that no racially polarized voting exists in a system in which minority preferred candidates win but only when they are not minority.  Tr. 12/01/2016 At  182:22-183:2 (Alford)

   **12.** *Latino Preferred Candidate Van Houte Depended On Relatively High Anglo Crossover Vote to Win*

   123.     Dr. Alford analyzed the 2015 Anglo vs. Anglo at-large race and concluded that the winner, Pat Van Houte, was the Latino-preferred candidate, and won by 146 votes. Tr. 12/01/2016 At 118:5-119:13 (Alford); Pl. 239-8.  However, because the election was held at-large, Dr. Alford testified that Ms. Van Houte, the Latino-preferred Anglo candidate, would not have won without crossover support of non-Hispanic voters, and that she would necessarily need more Anglo crossover vote, "somewhere in the high 30's," than would a Hispanic candidate, because she is not as dominant a candidate among Hispanic voters as are Orlando Ybarra or Oscar Del Toro. Tr. 12/01/2016 At 124:12-125:23, 129:2-130:8 (Alford).  Dr. Alford agreed that Ms. Van Houte almost lost her election despite receiving 70% of the Hispanic vote, and could not have slipped much lower than the 41.6% Anglo support she received and still win.  Tr. 12/01/2016 At  138:7-139:7 (Alford).

124. Dr. Alford conceded that the single largest factor between Ms. Van Houte's at-large victory in Place G and Mr. Del Toro's at-large defeat in Place H was the level of crossover voting by non-Hispanic voters.  Tr. 12/01/2016 At  175:16-175:20 (Alford).

   **13.** *Anglo Bloc Voting Is A Descriptive Finding Of Ethnic Cohesion, Not A Causal Finding That Can Be Defeated By Speculation About Partisan Motivation*

125. Dr. Alford conceded that the four exogenous county General elections analyzed by Dr. Engstrom were polarized in the Pasadena electorate in terms of Hispanics and non-Hispanics supporting different candidates.  Tr. 12/01/2016 At  188:10-17 (Alford)

126. Dr. Alford agreed that a voter can prefer a candidate based on that candidate's policy positions. Tr. 12/1/16 At 189:5-7 (Alford)

127. Dr. Alford admitted that he made no analysis of the relevance of a candidate's policy positions to the voters. Tr. 12/1/16 At 189:8-22 (Alford)

128. Dr. Alford didn't perform any analysis of why Pasadena Hispanic and non-Hispanic voters supported the candidates that they supported in exogenous elections.  Dr. Alford only presented a table that showed Hispanic and non-Hispanic support for candidates who were also labeled as Democrat and Republican. Tr. 12/1/16 At 189:23-190:18 (Alford)

129. Dr. Alford agreed that it is possible for a Latino voter who strongly opposes abortion to support Republican candidates for offices that deal with women's healthcare policy and at the same time that voter could support Democratic candidates in offices that deal with criminal justice like a sheriff or a local judge. Tr. 12/1/16 At 190:19-191-6 (Alford)

130. Dr. Engstrom testified that a racially polarized voting analysis is not a causal analysis, and that Latino voters may prefer certain candidates because of shared policy positions rather than partisan considerations.  Tr. 11/17/16 At 153:23-154:7 (Engstrom)  Dr. Engstrom further testified that a vote for a particular party could be evidence of a racially driven vote. Tr. 11/17/16 At 155:3-156:12 (Engstrom)

131. Dr. Alford testified that two thirds of Harris County voters in the 2012 presidential election voted a straight party ticket. Tr. 12/1/16 At 142:18-143:10 (Alford)     However, Dr. Alford made no analysis of partisan straight ticket voting in Pasadena, and he conceded that the

Harris County data contains a much higher proportion of African-American voters than are present in Pasadena. Tr. 12/1/16 At 188:18-189:4(Alford)

132.  Dr. Alford also relied on prior work he performed in *Cisneros v. Pasadena Independent School District,* 2014 WL 1668500 to support his theory that partisanship drives voter behavior in the city of Pasadena, but conceded that neither the geography nor the quality of the data used in the analysis was comparable to this case. Tr. 12/1/16 At 152:1-15, 193:5-195:23(Alford)

**14. The Pasadena Independent School District Is Geographically and Demographically Distinct from the City of Pasadena; PISD Elections are Not Probative of Anglo Bloc Voting in the City of Pasadena**

133.  In support of his position that Anglo bloc voting does not impede the election of Latino-preferred candidates in Pasadena City Council elections, Dr. Alford offered prior work he performed in *Cisneros v. Pasadena Independent School District,* 2014 WL 1668500. Dr. Alford testified that the Pasadena Independent School District ["PISD"] elections generally did not show a consistent pattern of Hispanic and non-Hispanic voters voting differently. Tr. 12/1/16 At 139:10-141:21 (Alford)

134.  However, Dr. Alford conceded that the geographic boundaries of the Pasadena Independent School District and the City of Pasadena are not coterminous, and that the main area of overlap is the northern part of the city that is the Hispanic area. Tr. 12/1/16 At  140:23-141:12 (Alford)   Dr. Alford agreed that much of the City of Pasadena that lies outside the PISD lies in City Council District F, the most Anglo of all of the city council districts. Dr. Alford further agreed that there are more people in PISD that live outside the city of Pasadena than live inside the city of Pasadena, and that any analysis he did of PISD voting

29

would not have included voters of Pasadena who live outside PISD Tr. 12/1/16 At 193:5-195:6 (Alford).  Plaintiffs' expert demographer, Mr. Ely, agrees.  Tr. 11/17/2016 at 77:14-79:4 (Ely); Pl. 257.

135.  Dr. Alford further conceded that the PISD voting analysis he relied on did not utilize Spanish surname vote counts or even citizenship, but rather simple voting age population derived from the census, so the analysis is not comparable. Tr. 12/1/16 At 152:7-15 (Alford)

136.  Dr. Alford testified that Proposition 1 would have failed in the area of PISD contained within the City of Pasadena, and that the difference between Proposition 1 failing and Proposition 1 passing is the participation of the individuals in the area of Pasadena not contained in PISD, the 29,353 predominantly Anglo voters on Pasadena's south side. Tr. 12/1/16 At 198:9-199:6 (Alford)  Pl. 257

137.  Here, a number of additional factors are present that increase the dilutive effect of Anglo bloc voting.

    a.   Majority vote requirement

    b.   Designated posts which precludes bullet voting

    c.   There is a significant decrease between the number of Hispanics eligible to vote in Pasadena and the number of Hispanic registered voters, which leads to Hispanics being only 42% of the City's registered voters

    d.   The City's use of public resources, as well as the Mayor's use of his personal resources, to organize and mobilize Anglos to vote in support of the Mayor's preferred candidates and policy positions.

### D.  Dilutive Effect of the City's 6-2 Plan

138. The 6-2 method of election reduced the number of majority HCVAP and SSRV districts from 4 to 3.  In addition, each single member district remaining in the city was increased in population by over 6,000 individuals. JTPO Admissions at ¶ 24, 28; Pl. 195 at 3.

139. Mayor Isbell agrees that Anglos have higher turnout rates for voting when compared to Hispanics.  Trial Tr. Nov. 28, 2016, pp. 47:18-25 (Isbell).

140. There was a sense among council members that electing Latino candidates of choice at-large would be an uphill battle because of the concentration of voters in Districts H and F.  Trial Tr. Nov. 18, 2016, pp. 95:23-96:11 (Ybarra).

141. Districts H and F had the highest concentration of voters in the city and were likely going to control the outcome of at-large elections if Proposition 1 passed.  Trial Tr. Nov. 18, 2016, pp. 95:23-96:7 (Ybarra).

142. The majority of votes in at-large elections usually come from south side of Pasadena, and that side of Pasadena usually decides elections.  Trial Tr. Nov. 18, 2016, pp. 122:12-19 (Ybarra); Trial Tr. Nov. 29, 2016, pp. 187:21-188:8 (Harrison).

143. Oscar Del Toro, who lost his at-large race in 2015, testified that the south side voters did not trust him because of his heritage, and that the at-large election system will have the same effect of defeating other Latino candidates because Anglos vote at higher rates than Hispanics.  Trial Tr. Nov. 30, 2016, pp. 180:5-22 (Del Toro)

144. Former Councilman Harrison opposed adding at-large seats because single member district candidates do not have to run citywide and because Hispanics and minorities have a better opportunity to be elected to office.   Trial Tr. Nov. 29, 2016, pp. 188:20-190:19 (Harrison).

145. Before the adoption of single-member districts for city council, only one Hispanic was elected at-large to council. His name was Roy Ybarra. Trial Tr. Nov. 18, 2016, pp. 199:8-15 (Isbell).

146. Councilman Wheeler testified that if Hispanics were 50 percent of the citizen adults in Pasadena, that does not mean that they are 50 percent of the registered voters in Pasadena or 50 percent of the people who vote on Election Day. Tr. 11/30/16 at 148:15-148:21 (Wheeler)

147. Councilman Wheeler testified that if his old District E, which he won by 33 votes, had been 6,000 people larger, he would not have won his 2013 campaign. Tr. 11/30/16 at 122:13-122:19 (Wheeler)

148. Councilman Wheeler testified that he would not have won District D as the first-time candidate he was in 2013 because that required more money and without the power of incumbency "it would have been near impossible." Tr. 11/30/16 at 140:6-140:14 (Wheeler)

149. Council member Ybarra testified that the District B changes in the 6-2 redistricting plan were going to make it more difficult for a Hispanic candidate of choice to be elected. Trial Tr. Nov. 18, 2016, pp. 104:2-106:3 (Ybarra)

150. Councilmember Ybarra testified that he believes that Celestino Perez would have won if he had challenged Bruce Leamon in District B under the 8-0 system rather than the 6-2 system because Mr. Perez would have had enough time to target enough voters to make up for the small (34 votes) margin by which he lost. Trial Tr. Nov. 18, 2016, pp. 128:13-130:12.

*1.      The Previous 8-0 Plan*

32

151. In the City's previous 8-0 plan, Hispanic voters citywide had an equal opportunity to elect their candidates of choice to Pasadena City Council.

152. In the City's previous 8-0 plan, at the time of its adoption, Hispanics constituted the majority of CVAP and the majority of registered voters in four of eight districts.  JTPO ¶ 25, 26.

## City of Pasadena
### Composite Draft Adopted 8/30/11
#### 2010 Voting Age Population and 2011 Registered Voters- Spanish Surname Registered Voters

| District | Total VAP | All Registered Voters | SSRV | Percent SSRV |
|---|---|---|---|---|
| A | 11,827 | 4,849 | 2,868 | 59.15% |
| B | 11,882 | 5,519 | 2,796 | 50.66% |
| C | 11,907 | 5,212 | 2,610 | 50.08% |
| D | 12,040 | 6,720 | 3,376 | 50.24% |
| E | 13,188 | 7,087 | 2,461 | 34.73% |
| F | 14,452 | 9,142 | 2,036 | 22.27% |
| G | 13,691 | 6,172 | 2,130 | 34.51% |
| H | 14,070 | 12,255 | 1,390 | 11.34% |

JTPO Admissions at ¶ 24

153. Hispanics would constitute the majority of CVAP and the majority of registered voters in four of eight districts in the 8-0 plan today.  JTPO Admissions at ¶ 26; Pl. 195.

| Table 2 Benchmark 8-0 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **District** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** |
| **Population** | 17915 | 18384 | 18353 | 17986 | 19002 | 19449 | 19547 | 18649 |
| **Deviation** | -746 | -277 | -308 | -675 | 341 | 788 | 886 | -12 |
| **% Deviation** | -4.0% | -1.5% | -1.7% | -3.6% | 1.8% | 4.2% | 4.7% | -0.1% |
| | 15017 | 14598 | 14811 | 12541 | 12391 | 8386 | 11830 | 3187 |
| | 83.8% | 79.4% | 80.7% | 69.7% | 65.2% | 43.1% | 60.5% | 17.1% |
| **VAP** | 11827 | 12249 | 11907 | 12051 | 13189 | 14455 | 13821 | 13949 |
| | 9456 | 9026 | 9087 | 7723 | 7546 | 5360 | 7500 | 2061 |
| | 80.0% | 73.7% | 76.3% | 64.1% | 57.2% | 37.1% | 54.3% | 14.8% |
| **CVAP (2010-2014)** | 8110 | 8756 | 8069 | 9857 | 10504 | 12070 | 10584 | 14244 |
| | 5659 | 5797 | 5238 | 5886 | 4811 | 4208 | 4646 | 2498 |
| | 69.8% | 66.2% | 64.9% | 59.7% | 45.8% | 34.9% | 43.9% | 17.5% |
| **Registered Voters** | 5406 | 6175 | 5356 | 7415 | 7510 | 9778 | 7127 | 13232 |
| **Spanish    Surname** | 3705 | 3857 | 3402 | 4154 | 3351 | 2929 | 2882 | 1742 |
| | 68.5% | 62.5% | 63.5% | 56.0% | 44.6% | 30.0% | 40.4% | 13.2% |
| **Spanish    Surname** | 3708 | 3856 | 3403 | 4150 | 3355 | 2929 | 2887 | 1744 |
| | 68.6% | 62.4% | 63.5% | 56.0% | 44.7% | 30.0% | 40.5% | 13.2% |

Pl. 195-3

154.     The four Hispanic majority districts in the 8-0 plan were:  A, B, C, and D. Pl. 195-
3

155.  The City adopted its previous 8-0 redistricting plan in 2011 and held one election under
that plan – in May 2013.

156.  In the May 2013 municipal election, Hispanics elected their candidates of choice in three of
the Hispanic majority districts:  A (Ybarra), C (Harrison), and D (Van Houte).

157.  Also in the May 2013 municipal election, in Anglo-majority District E, an Hispanic
candidate with an Anglo surname, Cody Ray Wheeler, was elected by 33 votes.  Tr.
11/30/16 at 122:13-122:19 (Wheeler).

158. District E in the 8-0 plan was not a Hispanic opportunity district.  It was 45.8% HCVAP and 34.73% SSVR.  Pl. 195-3.  In his 2013 race for city council District E, Councilman Wheeler's campaign increased total voter turnout in the district to 837 from 458 (in the District E 2011 runoff election).  Tr. 11/30/16 at 107:20-108:10 (Wheeler); *see also* Pl. 237, 238 at 21.

159. As a candidate, Mr. Wheeler does not advertise his ethnicity or race.  Tr. 11/30/16 at 96:10-15 (Wheeler)

160. If Mr. Wheeler was talking to an Anglo homeowner who asked about his background, he would answer that he is a little bit of everything but would emphasize his military background and service to the country and service to the community to ease their concerns.  Mr. Wheeler further testified that "you don't want to get in an outright conversation about race with someone, but if they had some negative sentiments towards Hispanics, I tried to ease their concerns."  Tr. 11/30/16 at 96:21-97:24 (Wheeler)

161. Councilman Wheeler testified that it would have been difficult to be elected in old District E if he had been Spanish surnamed:  "In my first election, I won by 32 votes.  If my name was something other than Wheeler, if it was Ramirez or Sanchez, I don't believe that I would have won that election."  Tr. 11/30/16 at 138:15-138:19 (Wheeler)

162. Councilman Wheeler testified that his Anglo surname helped him with Anglo voters by easing any negative feelings that Anglo voters harbored towards Hispanics.  Tr. 11/30/16 at 110:3-11 (Wheeler).

163. Cody Ray Wheeler also worked to increase turnout among Hispanic and Anglo voters in District E in the 2013 election.  As a result, Councilman Wheeler's campaign increased

total voter turnout in the district to 837 from 458 (in the District E 2011 runoff election). Tr. 11/30/16 at 107:20-108:10 (Wheeler); *see also* Pl. 237, 238 at 21.

164. Other experienced politicians in Pasadena believe Wheeler's victory in 2013 was the result of his name. Tr. 11/17/16 at 124:7-126:6 (Ybarra); Trial Tr. Nov. 29, 2016 - Vol. I, 196:22-197:10 (Harrison).

165. From time to time, a Hispanic preferred candidate will be elected from a district that is not Hispanic majority and not a Hispanic opportunity district. The election of Cody Ray Wheeler is best characterized as "serendipitous" as that term is used in *Gingles*. *See Thornburg v. Gingles*, 478 U.S. at 76 ("Consequently, we hold that the District Court did not err, as a matter of law, in refusing to treat the fact that some black candidates have succeeded as dispositive of appellees' § 2 claim. Where multimember districting generally works to dilute the minority vote, it cannot be defended on the ground that it sporadically and serendipitously benefits minority voters."); *see also Ruiz v. City of Santa Maria*, 160 F.3d 543, 550 (9th Cir. 1998) (reversing district court dismissal of at-large challenge as moot and explaining "The 1994 election results, which plaintiffs allege 'sporadically and serendipitously benefit[ed] minority voters,' did not terminate the present, live controversy in this case.")(internal citation to *Gingles* omitted).

166. The four Hispanic preferred candidates seated on the City Council following the 2013 election were: Ornaldo Ybarra (District A), Don Harrison (District C), Pat Van Houte (District D) and Cody Ray Wheeler (District E).

167. In 2013, Hispanic majority District B elected an Anglo-preferred candidate, Bruce Leamon. Councilman Leamon typically voted with the Mayor and was supported by Mayor Isbell's political action committee. Tr. 11/30/16 at 118:13-16 (Wheeler)

168. Councilmembers Ybarra, Wheeler, and Van Houte, and former councilmember Harrison testified that, given its strong majority of Hispanic CVAP and SSVR, District B was likely to elect an Hispanic preferred candidate in the next election in 2015.

169. Councilmembers Ybarra, Wheeler, and Van Houte, and former councilmember Harrison also testified that, if all four Hispanic majority council districts elected an Hispanic preferred candidate in 2015, and Cody Ray Wheeler was able to achieve reelection in Anglo-majority District E, that Hispanic preferred candidates would hold a majority of seats on the Pasadena City Council.

### 2.    The Current 6-2 Plan

170. The City agrees that Plaintiffs' presentation of HCVAP for the period 2010-2014 are the proper numbers and the most up to date available.  Tr. 12/1/16 at 19:20-21:9.

171. In the 6-2 plan, Hispanics constitute the majority of CVAP and the majority of registered voters in three of eight districts. JTPO ¶ 29.

| Table 1 Current 6-2 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **District** | **1** | **2** | **3** | **4** | **5** | **6** | **City** |
| **Population** | 24607 | 25035 | 24737 | 24800 | 24815 | 25291 | 149285 |
| **Deviation** | -274 | 154 | -144 | -81 | -66 | 410 | |
| **% Deviation** | -1.1% | 0.6% | -0.6% | -0.3% | -0.3% | 1.6% | |
| | 21263 | 19525 | 17470 | 16504 | 11757 | 6242 | 92761 |
| | 86.4% | 78.0% | 70.6% | 66.5% | 47.4% | 24.7% | 62.1% |
| **VAP** | 15962 | 16577 | 16611 | 17068 | 18505 | 18725 | 103448 |
| | 13224 | 12009 | 10830 | 10083 | 7626 | 3987 | 57758 |
| | 82.8% | 72.4% | 65.2% | 59.1% | 41.2% | 21.3% | 55.8% |
| **CVAP (2010-2014)** | 10197 | 11796 | 13038 | 13747 | 15516 | 17901 | 82195 |
| | 7618 | 7421 | 7742 | 6448 | 5721 | 3793 | 38743 |
| | 74.7% | 62.9% | 59.4% | 46.9% | 36.9% | 21.2% | 47.1% |
| **Registered Voters** | 6745 | 8091 | 9819 | 9423 | 11608 | 16313 | 61999 |
| **Spanish** | 4791 | 4815 | 5545 | 4322 | 3825 | 2724 | 26022 |

| Surname | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Spanish    Surname** | 4792 | 4816 | 5543 | 4325 | 3831 | 2725 | 26032 |
| | 71.0% | 59.5% | 56.5% | 45.9% | 33.0% | 16.7% | 42.0% |

Pl. 195-3

172. The 6-2 plan eliminated District D as a Hispanic majority district and relocated the District D identifier to an Anglo majority district. Pl. 152, 153.

173. The 6-2 plan, because it divided the city's population into six instead of eight single member districts, enlarged each single member district by approximately 6,220 people. Pl. 195-3.

174. The City's expert Dr. Rives agreed that in the current 6-2 plan, there are three SSVR majority districts and a fourth, which is at about 46% SSVR. Dr. Rives further agreed that in the 8-0 plan, there are four SSVR majority districts and one more that is at approximately 45% SSVR. Tr. 12/1/16 at 57:25-58:10 (Rives)

175. In the City's current 6-2 plan, Hispanic voters do not have an equal opportunity to elect their candidates of choice to Pasadena City Council.

### 3.    *District D is not a Hispanic Opportunity District in the 6-2 Plan*

176. In the 6-2 plan, District D is not a Hispanic majority district. It contains 46.9% HCVAP and 45.9% SSVR. Pl. 195-3.

177. Although the majority of residents of current District D are Hispanic, the majority of voters are Anglo. Tr. 11/30/16 at 105:11-17 (Wheeler).

178. Anglos also turn out to vote at greater rates than Hispanics turn out to vote in current District D. Tr. 11/30/16 at 105:18-20 (Wheeler).

179. In 2015, only 19% of voters who cast ballots in District D were Spanish surnamed. Pl. 344

180. Oscar Del Toro, a Hispanic candidate with a Spanish last name, won a minority of votes in District D in 2015.  In his 2015 at-large election, Del Toro garnered 325 votes (38.8%) in District D compared to the 512 (61.2%) garnered by his Anglo opponent Morrison.  Pl. 344

181. Although Mr. Del Toro garnered some Anglo support in District D, he was unable to garner enough Anglo crossover support to defeat his Anglo opponent Morrison within that district.

182. Councilman Wheeler testified that if his old District E, which he won by 33 votes, had been 6,000 people larger, he would not have won his 2013 campaign.  Tr. 11/30/16 at 122:13-122:19 (Wheeler)

183. Councilman Wheeler testified that he would not have won District D as the first-time candidate he was in 2013 because the larger district would have required more money and without the power of incumbency "it would have been near impossible." Tr. 11/30/16 at 140:6-140:14 (Wheeler)

184. Although the majority of people living in the current District D are Hispanic, the majority of voters are Anglo.  Tr. 11/30/16 at 105:11-17 (Wheeler).

185. Anglos also turn out to vote at greater rates than Hispanics in current District D.  Tr. 11/30/16 at 105:18-20 (Wheeler).

186. Councilman Wheeler testified that Hispanic voters do not stand on a level playing field with Anglo voters in District D in their ability to elect their preferred candidate because Anglos turn out to vote at greater rates than Hispanics.  DAY FIVE - Vol. I, 138:20-138:24 (Wheeler)

187. Councilman Wheeler testified that in a district like District D, if a Hispanic candidate cannot get Anglo support, he or she cannot win in that district. Tr. 11/30/16 at 138:10-138:14 (Wheeler)(error in transcript, "any" should be "anglo")

188. In the 6-2 plan, District D is not a district in which Hispanic voters have an opportunity to elect their preferred candidate.

### 4.      The 2015 Election in the 6-2 Plan

189. In the 2015 municipal election, Hispanic majority District A elected Ornaldo Ybarra and Hispanic majority District C elected Sammy Casados.  Pl. 239.

190. Hispanic majority District B once again elected the Anglo-preferred candidate Bruce Leamon by 34 votes.  Pl. 239.

191. Anglo majority District D elected Cody Ray Wheeler who ran as an incumbent in those portions of the district that came from the old District E.  Pl. 239.

192. In the 2015 at-large race for Place G, Pat Van Houte defeated Steven Cote by 142 votes. Both candidates in the Place G race were Anglo.

193. In the 2015 at-large race for Place H, Oscar Del Toro was defeated by Darryl Morrison. Oscar Del Toro is Hispanic and Darryl Morrison is Anglo.  Pl. 239.

194. Following the City's change to the 6-2 system, the number of Hispanics voting in Pasadena elections from November 2013 to May 2015 decreased.  Despite rising registration rates, the number of Spanish Surnamed Registered Voters who cast ballots in 2013 was 1,161. The number of Spanish Surnamed Registered Voters who cast ballots in 2015 was 1,015. Pl. 344 and 345.

195. Councilman Wheeler testified that the change in election system to 6-2 has been disheartening to Pasadena Hispanics who are wary or distrustful of the system.  Although Wheeler campaigned to bring more services to the district, the Hispanic voters saw the Mayor redraw the lines and "unfortunately it confirms their fears that the system is rigged against us. We win an election, but, you know what, they move the field goal back and

move it back farther and farther and they don't have the same support."  Tr. 11/30/16 at

147:5-148:14 (Wheeler)

196.    Dr. Alford agreed that numerically fewer Latinos turned out to vote in 2015 than they did

in 2013.  Tr. 12/01/2016 At  185:16-185:17, 186:1-186:13 (Alford).

197.    Dr. Alford did not examine whether adding two at-large seats and changing the districting

system could have had a potentially depressive effect on Hispanic voter turnout in Pasadena.

Tr. 12/01/2016 At  186:18-186:23 (Alford)

### 5.    *Election of Pat Van Houte*

198.  Pat Van Houte, an Anglo, ran at large in 2015 in a race featuring two Anglo candidates.

Latino voters did not have a candidate from within their own group for whom to vote in

this election.  Similarly, Anglo voters were presented with two candidates who were both

Anglo.  Although Anglo voters preferred Councilwoman Van Houte's opponent, Ms. Van

Houte garnered 42% of Anglo support which enabled her to win the election.  Def. 54.

199.  Ms. Van Houte was able to secure much higher levels of Anglo support than Mr. Del Toro

who only garnered 28% of Anglo votes in his at-large race.  Def. 54.

200.  Councilman Wheeler testified that Councilwoman Van Houte was helped in her at large

race by being Anglo.  He noted that there were no policy differences between Ms. Van

Houte and Mr. Del Toro, who ran in the other at large seat, but they had different election

results, particularly on the south side.  Tr. 11/30/16 at 138:25-139:14 (Wheeler)

201.  Councilman Ybarra and former Councilman Harrison similarly testified that Ms. Van

Houte would not have won her bid for the at-large position in 2015 if she had a Spanish

surname or if she were Mexican-American, even if she had worked just as hard.  Trial Tr.

Nov. 18, 2016, pp. 122:20-124:1 (Ybarra); Trial Tr. Nov. 29, 2016, pp. 187:9-14 (Harrison).

202. Thus, in an election context that is normally characterized by Anglo bloc voting, Ms. Van Houte was able to secure a victory because Anglo voters were more willing to support her as an Anglo candidate.  In a jurisdiction where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting. *Thornburg v. Gingles*, 478 U.S. 30, 57, 106 S. Ct. 2752, 2770, 92 L. Ed. 2d 25 (U.S. 1986).

203. "Where multimember districting generally works to dilute the minority vote, it cannot be defended on the ground that it sporadically and serendipitously benefits minority voters." *Thornburg v. Gingles*, 478 U.S. 30, 76, 106 S. Ct. 2752, 2780, 92 L. Ed. 2d 25 (U.S. 1986); s*ee also Teague, v. Attala Cty.*, 92 F.3d 283, 288 (1996) ("[t]he Supreme Court in *Gingles* said that the results of a couple of elections do not discount the presence of racial bloc voting[;] ... a showing that bloc voting is not absolute does not preclude a finding of racial polarization"). *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1222 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999).

204. The Plaintiffs have demonstrated that Hispanic voters' "submergence in a white multimember district impedes [their] ability to elect [their] chosen representatives" in Pasadena.  *Gingles*, 478 U.S. at 51.

205. With respect to the third *Gingles* precondition, the Court finds  that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate."  *Id*. at 49.

### E. Totality of the Circumstances

206.  The Fifth Circuit has instructed, "we follow *Clark v. Calhoun Cty. (Clark I)*'s lodestar rule

that 'it will be only the very unusual case in which the plaintiffs can establish the existence

of the three *Gingles* factors but still have failed to establish a violation of § 2 under the

totality of the circumstances.' 21 F.3d 92, 97 (5th Cir. 1994) (citation omitted); *see also*

*NAACP v. Fordice*, 252 F.3d 361, 374 (5th Cir. 2001); *Teague*, 92 F.3d at 293. "In such

cases, the district court must explain with particularity" why it has reached such a

conclusion. Clark I, 21 F.3d at 97 (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of*

*Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993))."

### 1. *Historical Discrimination and its Legacy in Lower Hispanic Political Participation*

207. Two Senate factors touch on historical discrimination:  (1) history of official

discrimination affecting the right of a member of a minority group to participate in the

democratic process; and (5) the extent to which minority group members in the state or

political subdivision bear the effects of past discrimination in areas such as education,

employment, and health, which hinder their ability to participate effectively in the

political process.  Both factors weigh in favor of plaintiffs.

208.  In *LULAC v. Perry*, the Supreme Court explained:

Texas has a long, well-documented history of discrimination that has touched upon the rights
of African-Americans and Hispanics to register, to vote, or to participate otherwise in the
electoral process. Devices such as the poll tax, an all-white primary system, and the
restrictive voter registration time periods are an unfortunate part of this State's minority
voting rights history.  The history of official discrimination in the Texas election process—
stretching back to Reconstruction—led to the inclusion of the state as a covered jurisdiction
under Section 5 in the 1975 amendments to the Voting Rights Act.   Since Texas became a
covered jurisdiction, the Department of Justice has frequently interposed objections against
the State and its subdivisions.

*LULAC v. Perry*, 548 U.S. 399, 439-40 (2006), quoting *Vera v. Richards*, 861 F. Supp. 1304, 1317 S.D.Tex.1994).

209.  The history of discrimination in voting has not changed in Texas.  Its effects are borne today by Texas Hispanics, including those living in Pasadena.

210.  The history of voting discrimination against Latinos in Pasadena persisted as recently as the State's 2011 enactment of its redistricting plan for the Texas House of Representatives.

211.  In 2012 a three-judge panel of the U.S. District Court for the Western District of Texas ordered, as an interim remedy, the creation of a Hispanic majority House of Representatives district in Harris County that includes the northern portion of the City of Pasadena.  *Perez v. Perry*, No.  5:11-cv-00360 (W.D.TX Feb. 28, 2012) Dkt. 682. The district court created this district, HD 144, in order to remedy what it found to be a likely violation of section 2 by the State of Texas:

> In the enacted plan, the State adjusted HD 144 in a manner that reduced the HCVAP to 31%, thus likely making the district safer for its Republican incumbent, Representative Legler. The plaintiffs allege that Section 2 required the State instead to reconfigure HD 144 so that it would contain a majority HCVAP such that Hispanics will have the opportunity to elect the candidate of their choice.  The Court concludes that the plaintiffs have demonstrated a likelihood of success on the merits of their Section 2 claim in eastern Harris County.

*Perez v. Perry*, No.  5:11-cv-00360 (W.D.TX. March 19, 2012) Dkt. 690 at 8.

212.  The court-ordered HD 144 was later adopted by the State of Texas in the 2013 Legislative Session. *See* Plan H358, found at http://gis1.tlc.state.tx.us/?PlanHeader=PLANH358

213.  The southern boundary of HD144 in Pasadena is Spencer Highway.  As a result, the remedial HD144 captures the majority-Hispanic portion of Pasadena.

214. The Fifth Circuit noted this recent history of election-related discrimination (the 2011 Texas redistricting plans), when concluding that "this factor and other factors support the district court's finding that SB 14 has a discriminatory effect." *Veasey v. Abbott*, 830 F.3d 216, 258 (5th Cir. 2016).

215. Latinos in Pasadena also bear the effects of past discrimination in education, employment and housing that hinders their ability to participate in the political process.

216. In *LULAC v. Perry*, the Supreme Court noted that the "'the long history of discrimination against Latinos and Blacks in Texas' . . . may well 'hinder their ability to participate effectively in the political process'" and found a section 2 violation under the totality of the circumstances. *LULAC v. Perry*, 548 U.S. 399, 439-40, 442 (quoting *Session v. Perry*, 298 F. Supp. 2d 451, 473 (E.D. Tex.), *vacated sub nom. Henderson v. Perry*, 543 U.S. 941, 125 S. Ct. 351, 160 L. Ed. 2d 252 (2004) and *Gingles*, 478 U.S. at 45).

217. Plaintiffs' expert Dr. Tijerina reviewed the history of Mexican-Americans in Texas, focusing on Harris County and Pasadena with regard to their experience and any factors that may have hindered them in the electoral process. Dr. Tijerina also reviewed history of Mexican Americans with respect to employment, education, and housing. Tr. 11/17/16 at 168:10-17 (Tijerina).

218. Dr. Tijerina concluded that there is a long history of discrimination against Hispanics that has continued through the history of Texas and has generally denied Hispanics equal access to democratic processes, education, housing, government positions, education and economic equality. Tr. 11/17/16 at 170:6-21 (Tijerina).

219. Dr. Tijerina described in detail the land loss of Texas Hispanics beginning in 1836 and going into the 1920s which resulted in their transformation into a landless, lower income and to a greater extent migratory workforce.  Tr. 11/17/16 at 170:22-173:11 (Tijerina).

220. Dr. Tijerina described patterns of purposeful residential segregation of Hispanics into separate towns or neighborhoods within towns.  Tr. 12/1/16 at 173:12-174:12 (Tijerina).

221. With respect to public education, Dr. Tijerina testified to widespread racial school segregation of Hispanics in Texas and Harris County which started to end in Harris County in the 1950's.  Tr. 11/17/16 at 177:13-178:19 (Tijerina).

222. With respect to access to employment, Dr. Tijerina testified to labor segregation for Texas and Harris County Hispanics including a concentration in agricultural work.  In addition, when Hispanics were able to find employment in cities, it was a common practice to limit them to lower paying jobs regardless of industry, including construction, maintenance, janitors and landscaping.  Tr. 11/17/16 at 178:20-180:5 (Tijerina).

223. Dr. Tijerina further testified to a number of past election-related practices that prevented Texas Hispanics from voting, including the poll tax, white man's primary, English only ballots, and voter manipulation and intimidation.  Dr. Tijerina testified that these practices "had immediate effects on reducing the vote and they also had the long-lasting effect of intimidation and alienation."  Tr. 11/17/16 at 180:6-182:19 (Tijerina).

224. Dr. Tijerina testified that the history of discrimination in voting and segregation in housing, education and employment have left a "legacy of fear, alienation and a lower participation in voting and other practices of democracy."  Tr. 11/17/16 at 182:20-183:15 (Tijerina).

225. The City's expert Dr. Rives testified that Pasadena's Hispanic population has increased "primarily through net migration," *ie* most of the Hispanics moving to Pasadena are from

other parts of Texas.  Tr. 12/1/16 at 96:19-97:7 (Rives).  He further testified that most Hispanic immigrants moving to Pasadena are already U.S. citizens.  Tr. 11/17/16 at 96:19-97:7 (Rives).

### 2. *The Historical Experience of Hispanics in Pasadena is similar to Harris County and Texas*

226. Pasadena was incorporated with a city charter that complied with the state law that prescribed segregation and outlawed the teaching of Spanish, Bohemian, and German.  The 1942 city charter had incorporated segregation in its Article VIII, Section 4 "Segregation of Races," taking advantage of the state's allowance for legal segregation of the races.  Pl. 201 at 30.

227. Plaintiffs' expert Dr. Tijerina documented the use of restrictive covenants in housing in Pasadena into the late 1940's.  Tr. 11/17/16 at 174:13-176:24 (Tijerina); Pl. 203.

228. Dr. Tijerina also documented that as late as 1980 the Pasadena Independent School District excluded undocumented immigrant students from its schools.  *See* Pl. 203 at 30; *In re Alien Children Ed. Litig.*, 501 F. Supp. 544, 550 n. 6 (S.D. Tex. 1980); Diane I. Osifchok, "The Utilization of Intermediate Scrutiny in Establishing the Right to Education for Undocumented Alien Children: *Plyler v. Doe*," Pepperdine Law Review, Vol. 10 Issue 1 at p 142 n. 19.

229. The Pasadena Independent School District (PISD) was sued by the federal government for failing to hire minority teachers and administrators until mid-century. Pl. 201 at 30.

230. Dr. Tijerina testified that in the Gulf Coast petroleum industry, where Pasadena was at the center, Hispanics worked in separate work assignments, including maintenance, janitorial, landscape as opposed to the higher paying jobs within the refineries themselves. Tr. 11/17/16 at 178:20-180:5 (Tijerina); Pl. 201 at 28-29.

47

231. Even a lot of Anglo union members in Pasadena did not want their Hispanic union members and co-workers to have a line of progression to advancement on the job.  Pl. 201 at 29.

232. Former Councilman Harrison's brother, who served as Mayor after the 1985 election, hired as his chief of staff an Hispanic named Ascension Razo.  Mr. Razo was the former mayor of South Houston and John Ray Harrison's right hand man.  Former Councilman Harrison does not remember Hispanic employees holding leadership positions at Pasadena City Hall before Mr. Razo.  Trial Tr. Nov. 29, 2016, pp. 176:6-15 (Harrison).

233. Mr. Harrison recalled that there were not many Hispanics in Pasadena when he was growing up.  Trial Tr. Nov. 29, 2016, pp. 171:13-172:2 (Harrison).

234. Mr. Harrison testified that most of the Hispanics that did live in Pasadena when he was a young man were second generation and lived mostly in the neighborhood known as Satsuma Gardens, near the corner of Red Bluff and Preston.  Trial Tr. Nov. 29, 2016, pp. 173:1-12 (Harrison).

235. The Hispanics at Satsuma Gardens mainly were city employees working in water, sewer, and garbage collection.  Trial Tr. Nov. 29, 2016, pp. 173:16-23 (Harrison).

236. Dr. Tijerina also testified that Pasadena was the state headquarters of the Ku Klux Klan and the Ku Klux Klan in Pasadena targeted Mexican-Americans, calling them Mexicans, burning crosses in Pasadena, maintaining a library, carrying around high-powered rifles and maintaining a public presence.  Tr. 11/17/16 at 183:19-184:21 (Tijerina); Pl. 201 at 29.

237. Don Harrison recalls seeing the KKK at a building on Red Bluff Road near 225.  Trial Tr. Nov. 29, 2016, pp. 173:24-174:5 (Harrison).

238. In the late 80's, Councilmember Van Houte remembers she saw KKK members outside their headquarters at the intersection of Red Bluff and Thomas in Pasadena wearing their white robes and standing on each side of that intersection between the lanes.  Trial Tr. Nov. 29, 2016, pp. 6:10-11:9 (Van Houte).

239. Dr. Tijerina documented that a Latina former resident of Pasadena, who is now an Assistant Dean at the University of Houston, Clear Lake, remembered hearing about a sign in town saying 'No Mexicans or N....'"  This resident also reported seeing in the early 1970s "a handwritten sign on Richey Street that said 'No Blacks.' The sign was handwritten on paper and mounted on a stick by the side of the road and later disappeared. Pl. 202 at 1-2.

240. Councilmember Van Houte has heard Pasadena referred to as a "sundown city" for African Americans.  Trial Tr. Nov. 29, 2016, pp.10: 11-17.

241. Dr. Tijerina also documented through resident interviews that in past years in a Pasadena grocery store there were two signs over the water fountains. One said "White Only" and the other said "Colored." Pl. 202 at 2.

242. Discrimination against Hispanics by the City of Pasadena persists into current times. Councilman Ybarra testified that approximately three years ago, an Anglo Human Resources employee with the City of Pasadena made racist comments to the predominately Hispanic employees in the City Water Department related to "Mexicans making tacos" and "beer."  The Water Department employees were very upset and complained to Councilman Ybarra.  This Human Resources employee's duties were transferred away from working with the Water Department, but the City did not fire the employee.  Trial Tr. Nov. 18, 2016, pp. 185:3-186:11 (Ybarra).

243. Councilman Ybarra testified that he faced prejudice from the City while serving on the City Council.  Tr. 11/18/16 at 184:20-187:3 (Ybarra) ("I have been in Pasadena for 38 years. The whole time I have been there, I never experienced racism or prejudice to what I have seen in my time serving on council.")

244. With respect to Pasadena's relationship between Hispanic residents and the police, Dr. Tijerina documented that by the mid-1980s, Latino ad hoc committees began to meet with the Pasadena Police Chief and city council to protest and discuss what they termed as police brutality and harassment of Latinos. In 1986, the Federal Bureau of Investigation came into Pasadena to investigate the alleged beating of José Antonio Nuñez while in police custody.  In a 1991 meeting with Pasadena Police Chief Floyd W. Daigle, the "Hispanic and Other Concerned Citizens Committee" addressed specific cases of police treatment of Latinos. They also complained of the benign relationship between the Pasadena Police Department and the Ku Klux Klan. In 1994, Latinos again protested, this time against the alleged suicide of Sirilo Delao by hanging himself with a telephone cord in the Pasadena City Jail.  Pl. 201 at 31.

245. As recently as several years ago, residents on the north side of Pasadena complained to members of the city council that they are more likely to be targeted for traffic stops by police than residents in South Pasadena. Trial Tr. Rough Draft Nov. 18, 2016, pp. 12 (Ybarra); Trial Tr. Nov. 29, 2016, p. 9:18-24  (Van Houte)

246. After being elected again to the office of Mayor, in his 2008 State of the City address to the Pasadena Chamber of Commerce, Mayor Isbell told the audience that he was going to impound cars belonging to undocumented immigrants and then call Immigration Services. Tr. Nov. 30, 2016, pp. 166:19-167:2 (Del Toro).

247. Former Councilman Harrison recalled a conversation he had with Mayor Isbell in the hallway at council chambers shortly before his special mayoral election in 2008 during which the Mayor said that he told the Pasadena police department that if they find a Hispanic without car insurance, the police should impound that person's car.  Former Councilman Harrison asked Mayor Isbell what should be done if it were an Anglo driver without insurance, and the Mayor said it should be left to the officer's discretion about what to do with the car.  Former Councilman Harrison felt like the Mayor's comment was racial.  Trial Tr. Nov. 29, 2016, pp. 199:11-200:10 (Harrison).

248. None of the evidence described above was rebutted by the City.

249. Dr. Tijerina concluded that Hispanics in the city of Pasadena, Texas have experienced many of the same violations of civil rights that he described for Texas and Harris County. He further concluded that Hispanics in Pasadena continue to lag behind politically and economically in the face of persistent racial prejudice and a structure of discrimination.  Pl. 201 at 3-4.

### 3.   *Hispanic Socio-Economic Status in Pasadena*

250. In Pasadena, the median income is $39,354 for Latino households and $55,896 for Anglo households.  The Citywide household median income is $46,058.  Tr. 11/17/16 at 60:24-61:7 (Ely); Pl. 196.

251. With respect to per capita income, the differences are even greater between Latinos and Anglos, largely because Latino households tend to have more persons within an individual household.  The per capita income in Pasadena is $20,146.   The per capita income is $13,984 for Latinos and $32,051 for Anglos.  Tr. 11/17/16 at 60:24-61:12 (Ely); Pl. 196.

252. With respect to owning versus renting one's home, 51% of Latino households are renters, and 33% of Anglo households are renters.  Tr. 11/17/16 at 61:13-20 (Ely); Pl. 196.

253. In terms of educational attainment in Pasadena, only 6% of Latinos have a Bachelor's degree or higher but 22% of Anglos have a Bachelor's degree or higher.  At the other end of the spectrum, 11% of Anglos have less than a high school diploma and 45% of Latinos have less than a high school diploma.  Tr. 11/17/16 at 61:22-62:12 (Ely); Pl. 196.

254. With respect to persons living in poverty in Pasadena, 11% of Anglos live in poverty and 27% of Latinos live in poverty.  The poverty disparity between Anglos and Latinos persists across age groups.  Tr. 11/17/16 62:13-24 (Ely); Pl. 196.

255. With respect to the federal standard for overcrowded housing, in Pasadena only 1% of Anglos live in overcrowded housing versus 16% of Latinos.  Tr. 11/17/16 62:25-63:9 (Ely); Pl. 196.

256. Plaintiffs' expert David Ely presented information about the socio-economic status of Hispanics, the City of Pasadena as a whole and White non-Hispanics (Anglos).  He did not present information about the socio-economic status of other racial groups because in all probability most of the data would have been suppressed because the numbers of ACS surveys in those subgroups would have been too small. Tr. 11/17/16 82:6-22 (Ely).

### 4. *Past and Present Conditions Depress Hispanic Voter Turnout in Pasadena*

257. Councilmember Ybarra has a lot of contact with his constituents, including on weekends and holidays.   He also gives his personal cell phone number to constituents.  Councilmember Ybarra testified that the income level of residents of District A is lower than middle income and the average educational attainment level of residents of District A is a high school degree or less.  Rough Draft Nov. 18, 2016, pp. 10 – 11.

258. People living on the north side of Pasadena hold mostly blue collar jobs, such as those in refineries, construction, and the service industry.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 12 (Ybarra)

259. Businesses owned on the North side of Pasadena include Hispanic grocery stores, meat markets, tire shops, beer stores, and mechanic shops.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 12.

260. Testimony regarding depressed political participation relevant to a local election must be grounded in a local appraisal of the facts. *See  N.A.A.C.P. v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001).

261. Mayor Isbell agrees that Anglos have higher voter turnout rates when compared to Hispanics.  Trial Tr. Nov. 28, 2016, pp. 47:18-25 (Isbell).

262. The City's expert witness, Dr. John Alford, testified that Hispanic voter turnout is disproportionately lower than Anglo voter turnout in Pasadena elections. Tr. 12/01/2016 124:16-25, 131:18-132:2 (Alford).

263. The City's use of public resources to target, mobilize and turn out Anglo voters from the south side results in Anglo voters turning out to vote in municipal elections in even greater numbers than Hispanic voters.  *See* section below at page 145, "The City Used Public Resources to Target, Mobilize and Turnout Voters from the South Side to Thwart the Increasingly Mobilized Latino Electorate."

264. Councilman Wheeler testified that although all U.S. citizen adults are eligible to register and vote in Pasadena, "if the city is not doing the same to turn out those voters as they are on the south side, that creates an inherent disadvantage."  Tr. 11/30/16 at 160:6-160:17 (Wheeler)

265.  In addition, several witnesses with experience in Pasadena elections offered unrebutted testimony that Hispanic voters in Pasadena are less likely to be familiar with and participate in city elections.

266.  Because more north side residents are renters as opposed to homeowners, it is more difficult for candidates to contact voters who have moved and changed residence. Trial Tr. Nov. 18, 2016, pp. 102:22-103:13 (Ybarra);

267.  Based on his experience in his campaign, Mr. Del Toro believes that there is lower awareness of the rules connected with voting in Pasadena's Hispanic community and that there is fear, even among Latino citizens, that they will be challenged when they go to the polls. Trial Tr. Nov. 30, 2016, pp. 181:7-183:9  (Del Toro)

268.  Councilman Wheeler testified that the Hispanic voters in his district can be wary or distrustful of the system and they do not see Mayor Isbell in their neighborhoods. Although Wheeler campaigned to bring more services to the district, Hispanic voters harbor suspicions that "the system is rigged against us."  Tr. 11/30/16 at 147:5-148:14 (Wheeler)

269.  Council member Ybarra, who was born and raised in Pasadena, testified about conducting voter outreach to Hispanics in his campaign and seeing some of  his friends' parents vote in municipal elections for the first time in 2009.  He testified:

[They had] never voted before in a municipal election[,] had no idea what a municipal election was -- they didn't know who the council members were or who the mayor was. For the first time, you saw those parents going to vote. The first time to realize, I can call my council member. If I have an issue with a department head or a city department, I have a voice. And now those same people, who never got involved because there wasn't somebody like them up there, now get involved, now call you and tell you, Hey, there is an election coming up. Which candidates do you think we should vote for? It has had an effect, and I think that was, along with other issues, they like to see minority candidates get elected.

Trial Tr. Nov. 18, 2016, pp. 93:4-94:14 (Ybarra).

270.    As a result of the legacy of discrimination, Hispanic voters in Pasadena are hindered in their ability to participate effectively in the political process.  *See Veasey v. Abbott*, 830 F.3d at 261 ("In this case, the record contains evidence that minority voters generally turn out in lower numbers than non-minority voters and that State-sponsored discrimination created socioeconomic disparities, which hinder minority voters' general participation in the political process. Accordingly, the district court did not clearly err in determining that the impact of past and current discrimination on minorities in Texas favors finding that SB 14 has a discriminatory effect under Section 2.").

271.  The first and fifth Senate Factors weigh in favor of Plaintiffs.

> 5.   ***Racially polarized voting***

272.  As described above, voting between Hispanics and non-Hispanics in Pasadena is racially polarized.  This factor weighs in favor of Plaintiffs.

> 6.   ***Use of voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting***

273.  The two new at-large seats are elected through a place system with a majority vote requirement.  JTPO Admissions ¶7, 12.

274.  A majority vote requirement means that a candidate must win a majority of the votes cast in citywide elections in order to win.  If no candidate receives a majority of the votes in the initial election then a runoff election is held between the top two vote recipients.  Dr. Engstrom testified that a majority vote requirement advantages the majority group of Anglo voters in Pasadena.  Pl. 198, Richard Engstrom Expert Report p. 4; Tr. 11/17/16 at 112:13-23 (Engstrom)

275. Under the numbered place system used to fill the two at-large seats on the council, candidates for two seats do not all compete together. Rather the two seats are contested separately. Candidates for an at-large position on the Council file for one of the particular places and compete only with the other candidates that file for that same place. Each voter may cast only one vote between or among the candidates for each place. JTPO Admissions ¶13.

276. At-large voting using numbered places precludes the use of single-shot voting strategy. JTPO Admissions ¶14; Tr. 11/17/16 at 111:15-18 (Engstrom). Single-shot voting entails group members casting one vote, if they wish, for the candidate favored by the group, and not casting any of their remaining votes for any other candidate. By withholding their remaining votes from the candidates competing with their preferred choice, their representative of choice has a better chance to finish among the top candidates and win one of the seats. Tr. 11/17/16 at 111:19-112:12(Engstrom); Pl. 198, Richard Engstrom Expert Report p. 4.

277. Dr. Engstrom testified that the majority vote requirement and the numbered place system are considered enhancing factors that exacerbate the effects of racially polarized voting on the ability of Latino voters to elect candidates of choice. Tr. 11/17/16 at 110:1-112:23, 130:20-131:9 (Engstrom)

278. In addition, the new single member districts in the 6-2 election system are more than 6,000 persons larger than the previous single member districts in the 8 district system. Pl. 195.

279. Councilman Wheeler testified that if his old District E, which he won by 33 votes, had been 6,000 people larger, he would not have won his 2013 campaign. Tr. 11/30/16 at 122:13-122:19 (Wheeler)

280. Councilman Wheeler testified that he would not have won District D as the first-time candidate he was in 2013 because new District D required more money and without the power of incumbency "it would have been near impossible." Tr. 11/30/16 at 140:6-140:14 (Wheeler)

281. Council member Ybarra testified that the District B changes in the 6-2 redistricting plan were going to make it more difficult for a Hispanic candidate of choice to be elected. Trial Tr. Nov. 18, 2016, pp. 104:2-106:3 (Ybarra)

282. Councilmember Ybarra testified that he believes that Celestino Perez would have won if he had challenged Bruce Leamon in District B under the 8-0 system rather than the 6-2 system because Mr. Perez would have had enough time to target enough voters to make up for the small (34 votes) margin by which he lost.  Trial Tr. Nov. 18, 2016, pp. 128:13-130:12.

283. The Court finds that Pasadena's 6-2 election system uses voting practices, including unusually large election districts (both at-large and expanded single member districts), a majority vote requirement, and a prohibition against bullet voting that tend to enhance the opportunity for discrimination against Latinos.  This factor weighs in favor of Plaintiffs.

### 7. *Exclusion of minorities from a candidate slating process*

284.   Mayor Isbell, through his PAC Citizens to Keep Pasadena Strong, slates candidates for City Council, including in 2013 and 2015) Leroy Stanley, Darrell Morrison, Steve Cote, Emilio Carmona, Rick Guerrero, Cary Bass, Bear Hebert, and Bruce Leamon.  Only 2 of 8 candidates slated by Mayor Isbell were Hispanic.  Trial Tr. Nov. 18, 2016, pp. 48:14-49:7 (Ybarra); Trial Tr. Nov. 18, 2016, pp. 214:19-22, 215:8-216:24 (Isbell); Trial Tr. Nov. 29, 2016 p. 229:5-230:11, 230:12-231:2 (Scott); PL 105, 213, 337, 338, 339.

285.   In the 2015 City Council race, Cary Bass received financial support from the PAC funded by Mayor Isbell's campaign account, Citizens to Keep Pasadena Strong.   Trial Tr. Nov. 30, 2016, pp. 7:19-9:16, 13:23-14:18(Bass)  Mr. Bass had not asked for the PAC's contribution, did not know who was running or funding the PAC, did not know what kind of materials issued from the PAC on his behalf,  and did not pay for any of the activities of the PAC.   Trial Tr. Nov. 30, 2016, pp.  9:17-11:12, 15:16-18:2 (Bass) PL 154.

286.   This factor weighs in favor of Plaintiffs.

### 8.   *Use of overt or subtle racial appeals in political campaigns*

287.   The Anglo opponent of Cody Ray Wheeler used racial appeals in 2013, calling Mr. Wheeler a "Mexican" and saying "Don't be fooled by his name."  Tr. 11/30/16 at 110:12-111:14 (Wheeler)

288.   After Wheeler won the 2013 election in District E, his Anglo opponent Leroy Stanley filed an election contest and stated publicly that Mr. Wheeler had won because of "illegal votes."  The lawsuit was later dismissed by Mr. Stanley.  Mr. Wheeler understood Mr. Stanley's comments about illegal voting to be a reference to votes cast by illegal immigrants.  Tr. 11/30/16 at 114:1-25 (Wheeler)

289.   Noting a news article in which Leroy Stanley accused his campaign of illegally bringing in people from outside Pasadena to vote, Councilman Wheeler testified that the allegation of ineligible and outside voters, in conjunction with the fact that "he was going around telling people that I was Mexican, making sure that people knew that.  It kind of gave me insight into his mentality and that's what I believe, yes."  Tr. 11/30/16 at 152:2-152:12 (Wheeler)

290. In 2015, one of the mailers urging voters to vote against Cody Ray Wheeler featured a photograph of Cody Ray Wheeler next to a photograph of President Barack Obama and a photograph of an acorn.  Trial Tr. Nov. 28, 2016, pp. 47:1-17 (Isbell); PL 192.

291. Richard Scott worked with political consultant Jeff Yates and Mayor Isbell to design mailers that attacked the campaign in opposition to Proposition 1 as aligned with ACORN because Mr. Scott thought that it would be helpful in turning out voters.  Mr. Scott provided a photo of mostly Hispanic and African-American demonstrators to include in the mailer.  Trial Tr. Nov. 29, 2016 p. 227:6-228:10, 228:11-229:4 (Scott); PL 47 50.

292. This factor weighs in favor of Plaintiffs.

### 9. *The extent to which minorities have been elected to public office in the jurisdiction*

293. There have been relatively few Hispanics elected to Pasadena City Council in the City's history.

294. Before the adoption of single-member districts for city council, only one Hispanic was elected at-large to council.  His name was Roy Ybarra.  Trial Tr. Nov. 18, 2016, pp. 199:8-15 (Isbell).

295. From 1993 to 2009, only one Hispanic, Emilio Carmona, was elected to the city council and re-elected 3 times.  JTPO Admissions ¶ 81.

296. In 2009, Ornaldo Ybarra was the first Hispanic elected to the city council in almost two decades. He has been re-elected and is termed out in 2017.  JTPO Admissions ¶ 82.

297. In 2013, Mr. Ybarra was joined on the council by Mr. Wheeler, an Hispanic with an Anglo surname.   JTPO Admissions ¶ 83. In 2015, Sammy Casados was elected in District C. JTPO Admissions ¶ 85.

298. This factor weighs in favor of Plaintiffs.

10. *Responsiveness*

299. The Pasadena City Council has been "unresponsive to the particularized needs" of Latinos.

300. The "provision of municipal services to neighborhoods populated by minority group members" is relevant to whether the Pasadena city council is responsive to the particularized needs of Latinos. *David v. Garrison*, 553 F.2d 923, 929 (5th Cir. 1977)

301. Councilmember Ybarra helped resolve an issue for a Spanish-speaking constituent with the City permitting department when the constituent was unable to convince the department to help him. Mr. Ybarra, whose constituents speak to him in Spanish, testified that he did not think the issue would have been resolved if he had not been there to help, perhaps because of the homeowner's language or the side of town in which he lives. Trial Tr. Nov. 18, 2016, pp. 94:15-95:23.

302. Witnesses testified at trial as to the starkly different physical conditions of the north side of Pasadena, which is majority Hispanic, and the south side of Pasadena, which is majority Anglo.

303. Spencer Highway is the dividing line between North and South Pasadena. Trial Tr. Rough Draft Nov. 18, 2016, pp. 5 (Ybarra); Trial Tr. Nov. 29, 2016, pp. 176:15-23 (Harrison); 11/30/16 at 100:13-21 (Wheeler)

304. Spencer Highway is also the dividing line between the heavily Hispanic portion of Pasadena and the heavily Anglo portion of Pasadena.

305. Infrastructure is in need of repair and the needs are similar in terms of sewer, street, sidewalk and water lines across the districts north of Spencer Hwy. Rough Draft Nov.

18, 2016, pp. 9 – 10 (Ybarra); Trial Tr. Nov. 29, 2016, p. 13:4-14  (Van Houte), Trial Tr. Nov. 29, 2016, pp. 178:20-179:1 (Harrison). Tr. 11/30/16 at 101:13-105:10 (Wheeler).

### *Streets and Sidewalks*

306. On the north side, the streets are aging.  There has not been an effort by the City to maintain the streets.  The streets have been neglected over a 30-yr period and problems with the streets on the north side did not happen overnight. Infrastructure needs in terms of sewer, street, sidewalk and water line are similar in Districts A, B and C.   Rough Draft Nov. 18, 2016, pp. 9 – 10 (Ybarra); Trial Tr. Nov. 29, 2016, p. 13:4-14  (Van Houte), Trial Tr. Nov. 29, 2016, pp. 178:20-179:1 (Harrison).

307. On the north side, the streets have a lot of potholes.  When potholes are patched with asphalt it creates a bumpy ride with patchwork roads.  Tr. 11/30/16 at 100:22-101:12 (Wheeler); Trial Tr. Nov. 29, 2016, p.11:17-21; 12:1017; 13:8-14   (Van Houte), 177:7-178:12 (Harrison).

308. Oscar Del Toro testified that the streets and the sidewalks on the north side of Spencer are in poor condition. Trial Tr. Nov. 30, 2016, pp. 163:1-9, 164:1-3 (Del Toro)

309. On the north side, the sidewalks are older and uneven and some areas of the north side do not have sidewalks.  Tr. 11/30/16 at 103:3-21 (Wheeler).

310. The working people who make up the Hispanic population in District C mainly want roads, infrastructure, and sidewalks.   Trial  Tr.  Nov.  29,  2016,  pp.  182:17-183:7 (Harrison).

311. Streets and sidewalks in District A are old and need repair.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 6 – 7 (Ybarra);

312. Councilman Wheeler testified that current District D would greatly benefit from new roads projects on Burke, Marlen, and Austin streets and that there are a lot of roads that need to be redone.  Tr. 11/30/16 at 101:18-102:2 (Wheeler).

313. When Mr. Del Toro campaigned in the north side of town in 2015, residents told him they needed sidewalks for the children to walk to and from school, needed to improve the quality of streets, and improved drainage to prevent flooding with every rain, concerns not shared by the residents on the south side of town. Trial Tr. Nov. 30, 2016, pp. 173:6-18, 175:18-22 (Del Toro)

### *Drainage Problems on the North Side*

314. Water and sewer lines in District A are in need of repair.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 7 (Ybarra);

315. Councilman Wheeler testified that he was surprised to learning while campaigning in District E in the 8-0 plan that one of the most common complaints from voters was that when it rains, toilets don't flush or toilets back up. Tr. 11/30/16 at 103:22-6 (Wheeler).

316. Councilman Wheeler still receives calls from voters in current District D reporting that they can't flush the commode when it rains or their yards are backing up with water.  Drainage is one of the big issues for current District D.  Tr. 11/30/16 at 103:22-6 (Wheeler)

317. Drainage is bad in some areas of District A, and north of Spencer generally, which leads to flooding.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 7 (Ybarra); Trial Tr. Nov. 29, 2016, p. 12:18-13:3  (Van Houte)

318.  Former Councilman Harrison testified that since Mr. Isbell has been Mayor, there has been hardly any work on the north side, except for work by outside funders like Harris County.  Trial Tr. Nov. 29, 2016, pp. 176:24-177:8 (Harrison).

319.  Councilmember Ybarra characterizes housing in District A as old and in need of repair.  He says that there is decay on some of the homes in the district.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 6.

320.  Councilman Wheeler testified that getting the City to fix streets on the north side "is always a fight. It is always a large effort [and] When you call work orders in, things don't get done as quickly on that side of town."  Tr. 11/30/16 at 101:18-102:2 (Wheeler).

321.  With respect to the north side of Pasadena, Councilman Wheeler testified "you don't see the distribution of funds going to that side of town."  Tr. 11/30/16 at 102:3-16 (Wheeler).

322.  Councilman Wheeler testified regarding an instance in which the students attending Keller Middle School were forced to walk in the street to get to and from school.  The teachers from the school came a number of times to city council meetings to ask for sidewalks at the school but the city did not respond.  After the issue received media coverage, the City built sidewalks at the school. Keller Middle School is located in the area between District D and District C.  Tr. 11/30/16 at 103:3-21 (Wheeler).

323.  Councilman Wheeler further testified that a street project on Pasadena Boulevard was planned for the first year he served on the City Council but it "has yet to be done because the funding always gets moved or another project comes up."  Tr. 11/30/16 at 101:18-102:2 (Wheeler).

324. Council Member Van Houte attempted to implement a project to overlay streets in her district several years ago, and the residents are still complaining because the project is incomplete and the drainage lines are inefficiently placed.  Trial Tr. Nov. 29, 2016, pp. 11:22-12:9   (Van Houte)

325. The most frequent requests that Councilmember Ybarra receives from constituents have to do with infrastructure and police-community relations.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 11.

326. Councilman Wheeler testified that current District D would benefit from having neighborhood associations because they are a good tool for communication among neighborhood residents and because there is a disparity between the number of neighborhood associations on the north side and the south side.  Councilman Wheeler further testified that although he had reached out in the past to try to get assistance from the City in helping to start neighborhood associations, it has never come to fruition. Tr. 11/30/16 at 101:18-102:2 (Wheeler).

327. Councilman Wheeler further testified that the sentiment among voters in his district in 2013 was "a feeling that they were left behind, a feeling that our district wasn't a concern, a feeling like you just see -- you look at Fairmont and see new roads, new streets. You see neighborhood associations. You see so many things over there and you look at our district and we weren't getting those things. And so I think that was -- that was my message too, like they kind of forgot about north Pasadena where Pasadena started. I felt like they had forgotten about it. They had moved down to the south. The city expanded southward and they kind of left behind District E.  Tr. 11/30/16 at 112:1-13 (Wheeler).

***The  South Side Infrastructure Receives Better and More Responsive Service***

328. On the south side of Pasadena, the streets are smooth to drive on. Street lights are more dense.  The road signs change on the south side.  The sidewalks on both sides of the street are nice and neat.  Neighborhood associations help maintain the infrastructure.  Councilman Wheeler testified "it is almost another way of life in those parts of town." Tr. 11/30/16 at 104:7-17 (Wheeler).

329. City infrastructure, including streets and sidewalks, on the south side of Pasadena is nicer and newer than on the north side of Pasadena.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 14; Trial Tr. Nov. 29, 2016, p. 20:13=21:17 (Van Houte)

330. Public nuisances are handled more quickly on the south side of Pasadena than on the north side.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 14 (Ybarra)

331. Oscar Del Toro testified that in south Pasadena, where he currently lives, there are better neighborhoods, better infrastructure, better houses, better streets and better sidewalks. Trial Tr. Nov. 30, 2016, p. 165:8-14  (Del Toro)

332. One year, a $1 million construction project involving turn lanes at Fairmont on the south side right before Christmas went forward with no aid from the county, contrary to what Mayor Isbell said.  Trial Tr. Nov. 29, 2016, pp. 179:24-180:15 (Harrison).

333. Former Councilman Harrison did not think that district C was getting its fair share of city resources when he served it.  Rather, under Mayor Isbell, the bulk of resources went to south side streets like Crenshaw and Preston.  In the previous administration of Mayor Manlove, Pasadena had construction projects distributed more evenly, with bond money allocated evenly among districts. Trial Tr. Nov. 29, 2016, pp. 179:2-4, 179:9-23 (Harrison).

334. Council Member Van Houte testified that she would like to see the city implement a program to address abandoned buildings on the north side. Trial Tr. Nov. 29, 2016, p. 13:15-21 (Van Houte)

### a.   Second Century Economic Development Corporation

335. The Second Century Economic Development Corporation is an economic development board that receives one half of one percent of sales tax in Pasadena.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 15 (Ybarra);

336. Second Century's spending is decided by city council after a board, whose members are nominated by the Mayor and confirmed by city council, makes recommendations to city council.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 16-17 (Ybarra)

337. Second Century's budget during the four years preceding 2016 has been used mostly for a convention center, a hotel, studies for expanding the rodeo arena, and traffic mobility improvement.  Except for the traffic mobility improvement, these projects have occurred on the south side.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 16 (Ybarra).

### b. The City Holds a Surplus and Does not Spend Equally on the North Side

338. The City points to City spending on infrastructure on the north side of Pasadena as evidence of responsiveness.  *See* generally, Andy Helms testimony, Trial Tr. Nov. 30, 2016, pp. 48-61.  However, many of the expenditures in the north side of Pasadena described his testimony are from outside funding sources. The City receives Community Development Block grants from the federal government to be used on infrastructure in low to moderate income communities according to federal guidelines.  Trial Tr. Nov. 30, 2016, pp. 75:10-76:1  (Helms)  The City also receives infrastructure grants from Harris County  and from the Texas Highway Department, and received fund from the General

Land Office.  Trial Tr. Nov. 30, 2016, pp. 76:22-23  (Helms)  Nearly all of the federal, state and county administered grants are expended north of Spencer, because that area qualifies for the grants and support from those agencies. Trial Tr. Nov. 30, 2016, p. 77:21-25  (Helms)  On the other hand, the city expended $2-$3 million dollars of city funds on improvements South of Spencer on  Fairmont between Beltway and Pansy. Trial Tr. Nov. 30, 2016, p. 78:1-16 (Helms)

339. Many of the beautification projects on the north side are funded by the private sector, in the form of corporate employee volunteers, and not funded by the Neighborhood Network or other city grant programs.  PL 342; 347 (Depo. of Hollon, Karen, Jan. 12, 2016 p. 27:7-27:17, 27:21-28:13, 29:6-29:20, 149:4-151:11).

340. Mr. Helms, who is Pasadena's Director of Finance, conceded that the city council could agree to allocate expenditures differently on infrastructure projects than it currently does. Trial Tr. Nov. 30, 2016, p. 80:8-14.  (Helms)

341. Councilman Ybarra testified that the City is only required by law to carry a two-month balance and other cities put the people's money to work. Ybarra testified that there is no reason, with the needs that Pasadena has, for the City to carry $40 million in surplus as well as $20 million in surplus in the economic development corporation and $26 million in surplus in the city's water fund. Tr. 11/18/16 at 56:6-57:6 (Ybarra)

342. Councilwoman Van Houte calculated that most of the 2013 proposed bond projects would benefit Councilmembers that agree with the mayor (B, F, G, H) and the majority of the funds would go to the south side and not the north side.  Trial Tr. Nov. 29, 2016, p. 56:22-24 (Van Houte).

343. The Neighborhood Networks program sends most of its funding to beautification projects to the south side.  From November 4-8, 2013, the Neighborhood Grants Program issued checks labeled as "Neighborhood Grants" for $99,532.22 to neighborhood associations south of Spencer Street, and $776.23 to neighborhood associations north of Spencer Street. PL 89, PL 346 p. 10. Trial Tr. Nov. 29, 2016, pp. 63:17-69:25 (Van Houte).  Issuance of the checks requires prior approval by the grant review board, and approval by the City Council. Trial Tr. Nov. 29, 2016, p. 164:3-20 (Van Houte)

344. There are no payments described as "Neighborhood Grants" in the City's online check registry in the twelve months prior to the November 4-8, 2013 period.  Docket No. 147.

345. This Court is not required to resolve the question of the precise number of dollars spent by the City of Pasadena on north side neighborhoods.  It is sufficient to find that inequitable conditions persist on the north side, the city is not as responsive to requests to make repairs on the north side, the 2013 bond proposal benefitted the south side more than the north side, and the Neighborhood Networks program sends most of its funding to beautification projects to the south side.

346. A further indication of the City's lack of responsiveness to minority concerns lies in the City's failure to respond to strong opposition by minority officeholders and others concerned about the dilutive impact on minority voting strength of a conversion to a 6-2 election system. Tr 11/30/16 at 120:7-120:16; 122:20-122:25 (Wheeler); Trial Tr. Nov. 29, 2016, p. 62:6-8, 62:19-25  (Van Houte). Trial Tr. Nov. 18, 2016, pp. 85:5-86:3 (Ybarra); Trial Tr. Nov. 29, 2016, pp. 194:1-6 (Harrison).

347. In a series of meetings, including the meeting of the Bond/Charter Committee at which Mayor Isbell announced his proposal for a 6-2 system, the Mayor offered no response to the arguments that a 6-2 system would be dilutive of minority voting strength other than to claim that 75% of Hispanics in Pasadena were illegal aliens and thus could not vote anyway.  Tr. 11/30/16 at 120:7-120:16 (Wheeler); Trial Tr. Nov. 18, 2016, pp. 72:3-23 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 17:10-12, 16:22-24 (Isbell) ("70 percent"), ; Trial Tr. Nov. 29, 2016, pp.39:22-40:10, 43:20-25 (Van Houte).  *See Veasey v. Abbott*, 830 F.3d at 262 ("The district court noted that minority legislators and constituents testified about the likely disparate impact of SB 14, yet their amendments to ameliorate that impact were rejected without explanation. . . While this does not necessarily prove improper intent on the part of those legislators, it nonetheless supports a conclusion of lack of responsiveness.") (internal citations omitted).

348. This factor weighs in favor of Plaintiffs.

### 11. *Tenuousness*

349. This Senate Factor requires the Court to consider whether the reasons supporting the City's conversion from an 8-0 election system to a 6-2 system were tenuous.

350. The City presented testimony by Mayor Isbell that he had a long interest in the at-large system of electing city council members because this was the system under which he first served on the Pasadena city council and because it encouraged city council members to keep in mind the interests of the city as a whole.

351. The City also presented testimony by its expert political scientist John Alford that there are benefits to electing council members in a mixed system of at large seats and single member districts.  Tr. 12/1/16 At 161:25-163:1 (Alford)

352. Although it is a legitimate interest to want councilmembers to keep in mind the interests of the city as a whole, the City presented no evidence that at-large elections in Pasadena ensured a better quality of council member or ensured councilmembers who were more considerate of city-wide interests.

353. Dr. Alford conceded that the discussion in his report about the benefits of mixed election systems did not relate directly to the City of Pasadena. Tr. 12/1/16 at 199:14-18 (Alford).

354. Dr. Alford further conceded that he didn't perform any analysis of whether Pasadena's new at-large council members, when compared to council members elected from districts, are more impartial, more or less likely to trade their votes, or more qualified. Tr. 12/1/16 at 199:19-200:2 (Alford).

355. Finally, Dr. Alford conceded that he did no study of whether adding two at-large seats and changing the redistricting system could have had a potentially depressive effect on Hispanic voter turnout in Pasadena. Tr. 12/1/16 at 186:18-23 (Alford).

356. Conversion from district elections to at-large voting in jurisdictions with substantial minority populations was often blocked by the U.S. Department of Justice under section 5 of the Voting Rights Act because of its tendency to reduce the ability of minority voters to elect their candidate of choice. *See, e.g.* December 21, 2012 Objection Letter from US DOJ Civil Rights Division to Beaumont Independent School District, available at   https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_121221.pdf   and March 5, 2012 Objection Letter from US DOJ Civil Rights Division to Galveston County,                                available                                at https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_120305.pdf

357. In Pasadena, the change from 8 single member districts to a mixed 6-2 system had the predictable effect of reducing the number of Hispanic majority districts from 4 to 3.

358. Considering all the evidence, the Senate Factor of tenuousness tips in favor of Plaintiffs. *See, e.g. Veasey v. Abbott*, 830 F.3d at 262 ("We do not deny that the State's articulated objectives are legitimate state interests, as the Supreme Court has made clear. . . Yet, the articulation of a legitimate interest is not a magic incantation a state can utter to avoid a finding of disparate impact. Even under the least searching standard of review we employ for these types of challenges, there cannot be a total disconnect between the State's announced interests and the statute enacted.")

### 12. *Proportionality*

359. Finally, whether or not Latinos constitute the citizen voting age majority in a number of districts proportional to their population "is a relevant fact in the totality of circumstances." *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

360. De Grandy's instruction to courts is to consider, when assessing the totality of circumstances, whether there exists a number of "majority-minority districts in substantial proportion to the minority's share of voting-age population [.]"

361. In Pasadena, the change from 8 single member districts to a mixed 6-2 system reduced the number of Hispanic majority districts from 4 to 3.  Four Hispanic majority districts out of eight is proportional to Hispanic CVAP.  The 6-2 system falls one district short of proportionality.

362. Dr. Alford conceded that because there is no analysis to identify who were the Latino-preferred candidates prior to 2015 city council elections, he cannot offer an opinion about whether the eight single member district system elected more or less Latino-

preferred candidates when compared to the 6-2 system.  Tr. 12/1/16 At 200:25-201:11 (Alford)

363. This factor weighs in favor of Plaintiffs.

### 13. LULAC v. Perry additional factors Weigh in Favor of a Finding of Intentional Discrimination

364. In *LULAC v. Perry*, the Supreme Court observed that in Congressional District 23 "Latino voters were poised to elect their candidate of choice" and "the State took away Latinos' opportunity because Latinos were about to exercise it."  *LULAC*, 548 U.S. at 438.  The factors identified by the Supreme Court in *LULAC v. Perry* as indicative of intentional discrimination are present in the change to a 6-2 system.

365. First, in Pasadena, Latino voters were poised to elect a candidate of choice to a fifth seat on the City Council.  Second, Latinos in Pasaena "were becoming more politically active."  *Id*.  As a result of Latino growth and mobilization, Pasadena had "an increasingly powerful Latino population that threatened to oust the incumbent" of District B.  *LULAC*, 548 U.S. at 423-24 (2006).  In Pasadena, if Latinos elected a fifth candidate of choice to the council, the Mayor could no longer cast a tie-breaking vote in favor of measures he supported.  Finally, the changes in Pasadena reduced Latino voters' ability to elect their candidate of choice.  *LULAC*, 548 U.S. at 424-25, 427.  In Pasadena, the change to a 6-2 system reduced Latino voters' ability to elect their candidate of choice by reducing the number of Latino majority districts and enlarging the size of the remaining single member districts which new require greater time and resources in which to run.

366. Additional factors related to racial intent weigh in favor of finding a violation here.  In *LULAC v. Perry*, the Supreme Court observed that in Congressional District 23 "the

State took away Latinos' opportunity because Latinos were about to exercise it" and that the changes to that district "bears the mark of intentional discrimination that could give rise to an equal protection claim." LULAC, 548 U.S. at 440.  The factors identified by the Supreme Court in *LULAC v. Perry* as indicative of intentional discrimination are present in the change to the 6-2 system.

367. These additional considerations provided by *LULAC v. Perry* weigh in favor of Plaintiffs.

### 14. Citywide Hispanic Population

368. According to the 2010 Census, the City of Pasadena is 62.1% Hispanic. Pl. 195.

369. According to the 2010 Census, the City of Pasadena's Hispanic voting age population is 55.78%.  JTPO ¶ 28.

370. The City's Spanish surnamed voter registration is 41.97% as of September 2016.  JTPO ¶32; Pl. 241.

371. When using Spanish surnamed voter registration to estimate Hispanic voter registration, errors of omission and commission balance each other out reasonably well particularly in jurisdictions with a significant Hispanic population. Tr. 11/17/16 at 55:18-56:3 (Ely).

372. Spanish surnamed voter registration is a reliable proxy for Hispanic registered voters in Pasadena because of the significant number of Hispanics in Pasadena. Tr. 11/17/16 at 55:12-56:14 (Ely).

373. Because the SSRV enumerations for city council districts were based on the City's geo-coding individual registered voters' addresses to a point on the map of Pasadena, there is no possible error caused by estimating SSVR at the block level based on data from a larger geography such as a precinct.  Tr. 12/1/16 at 18:13-19:1.

374. The parties differ on whether the Hispanic citizen voting age population in Pasadena is 48.2% or 50.6%.

375. The City argues that Hispanics now constitute a bare majority of the City's citizen voting age population and as a result the at-large seats are Hispanic opportunity districts.

### a. *The U.S. Census American Community Survey is the Source of Data for U.S. Citizen Voting Age Population*

376. The decennial Census does not include a question on citizenship. Tr. 11/17/16 at 65:4-8 (Ely).

377. The citizenship question is only on the American Community Survey form. Tr. 11/17/16 at 65:9-11 (Ely).  As a result, "[t]he sole source of citizenship data published by the Census Bureau now comes from the American Community Survey ('ACS')."  *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *5 (S.D. Tex. Apr. 25, 2014).

378. As explained by the district court in *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 729 (N.D. Tex. 2009):  "ACS data is Census data. It is produced and promulgated by the Census Bureau, and it is intended to replace the long form in the decennial Census. . . . ACS data can be—and eventually must be—relied upon; the Census Bureau will be utilizing ACS data in lieu of long form survey data beginning in 2010."

379. The American Community Survey is an extensive survey sent by the U.S. Census Bureau to two percent of households annually in the United States.  Tr. 11/17/16 at 58:8-60:7 (Ely).

380. The U.S. Census prepares a special tabulation of the American Community Survey taken over a five year period for the U.S. Department of Justice.  This information was used by

the parties to create estimates of citizen voting age population in city council districts in Pasadena. Tr. 11/17/16 at 65:22-67:8 (Ely).

381. The 5-yr special tabulation of ACS data for 2010-2014 is the only data available to analyze city council districts in Pasadena.  Tr. 11/17/16 at 67:17-68:19 (Ely).

382. With respect to the City of Pasadena as a whole, the U.S. Census provides two estimates of the 2015 Hispanic citizen voting age population.

383. The first estimate provided by the Census is an HCVAP of 48.2% and is based on U.S. Census American Community Survey (ACS) five-year survey for the years 2011-2015.

384. The second estimate provided by the Census is an HCVAP of 50.6% and is based on the ACS one-year survey for the year 2015.

*b. The U.S. Census American Community Survey five-year survey is more reliable to estimate city-wide HCVAP*

385. The plaintiffs contend that the most reliable estimate of HCVAP is provided by the ACS five-year survey.

386. The ACS five-year estimate provides a high degree of reliability.   Tr. 11/17/16 at 58:8-60:7 (Ely).

387. The statistical reliability of the ACS 5-yr data is significantly greater than ACS 1-yr data. The margin of error for the 5-yr data is less than half the size of the 1-yr data. Tr. 11/17/16 at 72:5-22 (Ely).

388. "Larger margins of error do not indicate that the data are unreliable for all purposes, but the margins of error must be taken into account nonetheless, and the purposes for which the data may be used must be limited accordingly." *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 458 (N.D. Tex. 2010).

389. Similar to decennial Census estimates of CVAP, the ACS 5-yr estimate, because it more statistically reliable, is presumptively correct unless it can be shown to have changed by later data that are "thoroughly documented, have a high degree of accuracy, and [are] clear, cogent and convincing to override the presumptive correctness of the prior [data product]." *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853–54 (5th Cir. 1999).

390. The district court in the most recent section 2 challenge against the Pasadena Independent School District relied on ACS 5-yr estimates of Hispanic citizen voting age population. *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *9 (S.D. Tex. 2014) ("ACS's five-year estimates of CVAP are reliable for the purposes of a Section 2 analysis.").

391. The district court in a recent section 2 challenge to redistricting in Harris County relied on ACS 5-yr estimates of Hispanic citizen voting age population. *Rodriguez v. Harris Cty*., Tex., 964 F. Supp. 2d 686, 728 (S.D. Tex. 2013), aff'd sub nom. *Gonzalez v. Harris Cty*., Tex., 601 F. App'x 255 (5th Cir. 2015) ("On this record, the Court concludes that the five-year aggregated ACS citizenship data is sufficiently probative on the issue of citizen voting age population and Plaintiffs may rely upon this data in establishing the first *Gingles* precondition.").

392. Similarly, in a section 2 challenge to the City of Irving, Texas, the Court relied on 3-yr ACS data to determine Hispanic citizen voting age population when 1-yr data was unstable. *See Benavidez v. City of Irving, Tex*., 638 F. Supp. 2d at 720–21 (N.D. Tex. 2009) ("the Court finds that the 3–year averages disperse any doubts surrounding the significant change between 2006–2007.").

393. The ACS five-year estimate provides a number value applicable to all years in the five-year period it covers.  Pl. 319 at Appendix A-2 ("ACS multiyear estimates describe the population and characteristics of an area for the full 3- or 5-year period, not for any specific day, period, or year within the multiyear time period.").

394. In other words, the ACS five-year estimate does not apply simply to the middle year in the five-year period.  Tr. 11/17/16 at 58:8-60:7 (Ely).

395. The parties agree that the ACS five-year estimate is statistically more reliable than the one-year estimate.  The parties also agree that the ACS one-year estimate is more current than the five-year estimate. Tr. 11/17/16 at 68:20-69:13 (Ely); Tr. 12/1/16 at 21:25-22-4; 23:3-17 (Rives).  *See also* Pl. 319 ("Multiyear estimates are based on larger sample sizes and will therefore be more reliable.").

396. The way to balance the need for reliability and currency in creating an estimate is to apply the procedure recommended by the U.S. Census itself to determine whether a more recent data product shows a statistically different result from an earlier more statistically reliable product.  Tr. 11/17/16 at 93:5-20 (Ely).

397. According to the Census published guidelines, if the difference between the 1-yr point estimate and the 5-yr point estimate is smaller than the margin of error for the difference between them, then one cannot use the 1-yr data to say that there has been a change between these two time periods. A higher 1-yr point estimate provides some evidence of a change, but not evidence that reaches the level of statistical significance. Tr. 11/17/16 at 68:20-69:13 (Ely); Pl. 319.

398. Thus, when the difference between the 1-yr and 5-yr point estimates is within the margin of error of the difference, the balance between statistical reliability and currency tips in favor of statistical reliability and use of the 5-yr data.  Tr. 11/17/16 at 68:20-69:13 (Ely); Pl. 319.

399. In other words, Census Bureau directs the user of Census data to use a more recent less reliable estimator instead of a previous, more reliable estimator only when the difference between the point estimates is less than the margin of error of the difference between them. Tr. 11/17/16 at 101:5-102:1 (Ely).

400. If the more recent data cannot be said to be statistically significantly different from the longer time period, one cannot say that the real numbers have changed.  Tr. 11/17/16 at 94:1-10 (Ely).

401. In Pasadena, the ACS five-year estimate of the Hispanic share of total CVAP for 2010-2014 is 47.3% with a margin of error of approximately 1.4%.  The margin of error is based on 90% statistical confidence, which is the Census Bureau standard for ACS margin of error estimates.  This yields a 90% interval estimate running from 45.9% to 48.7%. JTPO at ¶ 31.

402. The ACS one-year estimate of the citywide Hispanic share of total CVAP for 2015 is 50.6% with a margin of error of approximately 3.3%.  The 90% interval estimate for the citywide Hispanic share of total CVAP runs from 47.3% to 53.9%.  JTPO at ¶ 31.

403. Mr. Ely performed the Census-mandated procedure to evaluate whether the difference between the ACS 1-yr (2015) and 5-yr (2010-2014) estimates was statistically significant and determined that the difference between the margins of error was larger than the difference between the point estimates.  As a result, the two estimates were not statistically significantly different.  For that reason, he concluded the more statistically reliable 5-yr

estimate was the best source for Pasadena's citywide HCVAP. Tr. 11/17/16 at 68:15-69:13; 72:23-74:8 (Ely).

404. Because of the slight differences in their computed margins of error, Ely used his margins of error, Dr. Rives' margins of error and the compromise that they agreed on for the Admissions in the Proposed Joint Pre-Trial Order. Using any of those measures, the margin of error for the difference in the margins of error was bigger than the difference in the point estimates.  Tr. 11/17/16 at 96:22-97:5 (Ely).

405. Thus, when the difference between the 1-yr and 5-yr estimates is within the margin of error of the differences, the balance between statistical reliability and currency tips in favor of statistical reliability and use of the 5-yr data.  Tr. 11/17/16 at 68:20-69:13 (Ely); Pl. 319.

406. Thus even if it were appropriate to rely on 1-yr data to estimate citywide HCVAP, because the differences between the 1-yr and the 5-yr are not statistically significant, there is no reason in this case to rely on 1-yr data to estimate citywide HCVAP.

407. Mr. Ely articulated a second reason to rely on 5-yr data instead of 1-yr data.  Because only the ACS five-year estimate is available for estimating HCVAP in individual city council districts, using the ACS five-year estimate of citywide HCVAP  ensures consistency across analyzing single member districts and at-large voting, thus avoiding the problem of comparing 'apples to oranges.' Tr. 11/17/16 at 67:17-68:19 (Ely).

408. The City agrees that the ACS 5-yr data is the only data available to estimate CVAP and HVCAP in Pasadena's single member districts.  Tr. 12/1/16 at 20:25-21:15 (Rives).

409. The City did not refute either of Ely's reasons to choose the ACS 5-yr estimate as the best and most reliable estimate of citywide HCVAP in Pasadena.

410. First, as to the argument by Dr. Rives that one should not compare ACS 1-yr and 5-yr data products to determine whether there is a statistically significant difference, the argument by Dr. Rives is negated by the Census Compass document itself, which contemplates comparing ACS data to Census 2000 long form data.  ACS data and Census 2000 long form data are different Census data products but the Census Guidance recommends special procedures for comparing the two.  *See* Pl. 319 at A-20 (providing guidance on comparing 2000 Census and later ACS data products and advising:  "When *comparing ACS and decennial census sample estimates*, the user must remember that the decennial census sample estimates have sampling error associated with them and that the standard errors for both ACS and census estimates must be incorporated when performing tests of statistical significance.") (emphasis added).  Ely followed the Census Compass procedures in his analysis and he incorporated the standard errors for both ACS 1-yr and 5-yr data products in his analysis.  Tr. 11/17/16 at 68:20-69:13 (Ely).

411. Ely simply examined the margins of error to conclude that the 1-yr estimate for 2015 was not statistically significantly different from the 5-yr estimate for 2010-2014.  Ely assumed the data products were different and did not treat them as equal.  Most importantly, Ely followed the Census Compass guidance to take into account the margins of error associated with each separate data product when making comparisons.

412. Second, the  City did not respond to the fact that the only way to avoid the problem of comparing 'apples to oranges' when looking at Hispanic CVAP in the City of Pasadena and its council districts is to use ACS 5-yr data.

413. On December 8, 2016, the U.S. Census Bureau released the new 5-yr estimate of HCVAP for 2015.  This estimate covers the years 2011-2015. The new ACS five-year estimate of

the Hispanic share of total CVAP is 48.23% with a margin of error of approximately 1.63%. This yields a 90% interval estimate that runs from 46.57% to 49.8%. *See also* Dkt 124-1 (Supplemental Evidence Filed Pursuant to Court Order).

414. Because the new ACS 5-yr estimate is an estimate for the year 2015, and it is more statistically reliable, the best estimate of HCVAP in Pasadena is 48.2%.

415. The 50% mark is not within the margin of error for the ACS 5-yr estimate for Pasadena HCVAP.

*c. U.S. Census American Community Survey one-year survey is not as reliable to estimate city-wide HCVAP*

416. The City contends that a more accurate estimate of HCVAP is provided by the most recent U.S. Census American Community Survey one-year survey.

417. The parties agree that the ACS 1-yr estimate is less statistically reliable than the five-year estimate. Tr. 11/17/16 at 72:5-22 (Ely) Tr. 12/1/16 at 62:5-16, 64:17-21 (Rives); s*ee also* Pl. 319 at A-2 ("Multiyear estimates are based on larger sample sizes and will therefore be more reliable.").

418. Dr. Rives wrote in his report that the ACS 3-yr estimate of HCVAP provides "a somewhat clearer picture of change" when compared to the ACS 1-yr estimate and testified that "this was a good way of stating it." Tr. 12/1/16 at 64:22-65:15 (Rives).

419. The ACS 1-yr sample for 2015 for the City of Pasadena contains more than a three-point margin of error and it is only half a percentage point away from 50 percent. Tr. 11/17/16 at 92:9-14 (Ely); *see also* JTPO ¶ 31.

420. The one-year data has a tendency to jump around quite a lot up and down. Looking at the most recent 1-yr estimates for Pasadena HCVAP (2013-2015), it is unlikely that the actual

number changed that way from one year to the next in each of those years. Tr. 11/17/16 at 72:5-22 (Ely).

421. Dr. Rives described some of the year to year changes in the ACS 1-yr estimate to be the result of "random fluctuation." Tr. 12/1/16 at 65:16-22 (Rives); Def. 47.

422. Dr. Rives further testified that "random fluctuation" caused the five percent rise in the 2008-2009 ACS 1-yr point estimate. Tr. 12/1/16 at 66:4-11 (Rives); Def 47.

423. Dr. Rives testified that, looking at the change in ACS 1-yr point estimates from 2009-2011, that he thought possibly all the change was sampling error and the shares were probably flat over that period. Tr. 12/1/16 at 77:2-78:5 (Rives); Def 47.

424. Dr. Rives also testified that, looking at the drop in ACS 1-yr point estimates from 2013-2014, that sampling error or other data issues caused the decrease. Tr. 12/1/16 at 78:6-21 (Rives); Def 47.

425. Although the ACS 1-yr point estimate shows an increase over time, Dr. Rives conceded that the year-to-year changes in the point estimate typically occur within the margin of error, and that the point estimates drop from one year to the next about 40% of the time. Tr. 12/1/16 at 68:5-20, 68:21-69:1 (Rives); Def. 47.

426. Dr. Rives conceded that if he had only looked at the 1-yr estimates for 2012 and 2013, he would have predicted that the point estimate would most likely have gone up in 2014, but instead the 2014 point estimate dropped below 50% and point estimates "can do that." 69:9-24 (Rives).

427. Dr. Rives also testified that, looking at the change in Pasadena HCVAP ACS 1-yr point estimates since 2011 or 2012, the changes are so minor that all of this could be occurring

within the margin of error and "sampling error is definitely there."  Tr. 12/1/16 at 79:22-80:6 (Rives); Def 47.

428. The ACS 1-yr point estimate of 50.6% HCVAP is not a more reliable indicator of Pasadena HCVAP in 2015 when the difference between that and the more reliable 5-yr ACS is not statistically significant.  Tr. 11/17/16 at 94:20-95:22 (Ely).

429. Ely noted that if the 2015 ACS 1-yr point estimate was 53% HCVAP, he would agree that the HCVAP was likely to be over 50%.  But because the 2015 ACS 1-yr point estimate is 50.6% and the margin of error for the difference from the 5-yr estimate is 3.5% points, then one cannot say that the 2015 ACS 1-yr point estimate is a more reliable estimate than the 5-yr estimate. Tr. 11/17/16 at 94:20-95:22 (Ely).

430. In other words, the point estimate from the smaller sample size is not a more reliable indicator when the difference between that and the more reliable 5-yr estimate is not statistically significant.  Tr. 11/17/16 at 94:20-95:22 (Ely).

431. Although in a previous litigation Ely relied on ACS 1-yr data to estimate HCVAP, he did so only after concluding that the difference between the 2000 Census data and the 2006 1-yr data was approximately seven percentage points.  Because the margin of error was only three percentage points, Ely concluded, using the same Census Compass guidelines he applied in this case, that the 1-yr data was the best available data to use in that case.  Tr. 11/17/16 at 103:3-104:3.

### d. Dr. Rives did not offer a credible estimate of  Hispanic Citizen Voting Age Population in Pasadena

432. Dr. Rives was incorrect when he testified, regarding the tradeoff between the greater statistical reliability of the ACS 5-yr data and the currency of the ACS 1-yr data, that "the bureau discusses the tradeoff and just says it depends on what you value." Tr. 12/1/16 at

23:3-17.   In fact, the Census Bureau advises that "Estimates for large geographic areas benefit from the increased sample [of multiyear estimates] resulting in more precise estimates of population and housing characteristics, especially for subpopulations within those areas."  Pl. 319 at A-3; *see also id*. (noting "While single-year estimates offer more current estimates, they also have higher sampling variability.").

433. The Census Bureau further advises users, when comparing estimates, to "take[] into account the sampling error associated with each estimate, thus determining whether the observed differences between estimates are statistically significant."  Pl. 319 at A-18.

434. If the difference between two estimates "is not statistically significant . . . A rough interpretation of the result is that the user cannot be certain to any sufficient degree that the observed difference in the estimates was not due to chance."  Pl. 319 at A-19.

435. Dr. Rives testified that he had never seen the procedure for determining the statistical significance of the difference between two Census estimates when he was shown "A Compass for Understanding and Using American Community Survey Data:  What State and Local Governments Need to Know," U.S. Census Bureau, February 2009. (Pl. 319)  Tr. 12/1/16 at 24:3-25:14 (Rives).

436. Dr. Rives presented no margins of error for any of the data he discussed in his report, including no margins of error for the ACS one-yr estimates of HCVAP.   Tr. 12/1/16 at 59:13-23 (Rives).

437. Dr. Rives also did not perform any test to determine if the 2015 ACS 1-yr estimate of HCVAP was statistically significantly different from the 2012 ACS 5-yr estimate of HCVAP.  Tr. 12/1/16 at 72:7-10 (Rives).

438. Dr. Rives further testified that he "wasn't interested" in whether the difference between the 2012 and the 2015 one-year estimates falls within the range that tells us that these differences are not statistically significant. Tr. 12/1/16 at 72:11-16 (Rives).

***e. Dr. Rives did not perform the analysis he performed in the past to determine whether Hispanic self-reporting of U.S. citizenship contained errors sufficient to change his 50.6% estimate of HCVAP in Pasadena***

439. Dr. Rives conceded that in this case he did not report, as he did in his past work, whether Census data on HCVAP in Pasadena might be inflated because Hispanics over reported their U.S. citizenship.  Tr. 12/1/16 at 87:1-3 (Rives).

440. Dr. Rives explained that in his past work he made arguments about over reporting of U.S. citizenship by Hispanics because his goal was to show that a majority wasn't there, and "That's what I was tasked to do."  Tr. 12/1/16 at 94:9-17 (Rives).

441. Dr. Rives further agreed that in a past case, where he wanted to show that the Hispanic citizen voting age population in particular districts was not yet at 50%, he brought up the issues of over reporting of U.S. citizenship by Mexicans and also problems with voter registration records.  Tr. 12/1/16 at 94:18-24 (Rives).

442. Dr. Rives explained that he performed this analysis of Hispanic over reporting of U.S. citizenship in the past because "I'm not on the side that's trying to establish a majority."  Tr. 12/1/16 at 94:9-17 (Rives).

443. Dr. Rives' failure to perform an analysis consistent with his past work, because in this case he was not "tasked" to find HCVAP below 50%, reveals an inconsistency in his methodology and undermines his credibility in this case.

444. Dr. Rives testified that he has reported in his past work that there is a likelihood of misreporting of U.S. citizenship among adult Hispanics, particularly Hispanics from El Salvador and Mexico.  Tr. 12/1/16 at 88:10-21 (Rives).

445. Dr. Rives also testified that he has reported in his past work that there is a 65% over reporting error rate on citizenship for Hispanics from Mexico. Tr. 12/1/16 at 88:22-89:3 (Rives).

446. Dr. Rives testified that he raised issues of Hispanic over reporting of U.S. citizenship in a past voting rights case in which he offered an opinion about whether Hispanics had reached the 50% mark for CVAP under *Gingles* prong 1.  Tr. 12/1/16 at 87:1-8, 88:3-9 (Rives).

447. Dr. Rives testified that he opined in his past work that correcting Hispanic citizen voting age population for seriously inflated levels of naturalization would reduce Hispanic citizen voting age population possibly to a significant degree.  Tr. 12/1/16 at 90:3-18 (Rives).

448. Dr. Rives testified that in his past work as an expert demographer, he offered the opinion that correcting for Hispanic over reporting of citizenship could make a small voting age majority evaporate. Tr. 12/1/16 at 92:7-17 (Rives).

449. Dr. Rives explained:  "And so, you know, you are coming up on 50 percent and the question is if you are relying on naturalization to get there and there is a problem with the reporting of it, if you can document that in any way, there may be -- may be a basis for correction. And certainly if you did correct, you would be correcting down."  Tr. 12/1/16 at 92:7-17 (Rives).

> ***f. If Dr. Rives had Used his Methodology to Compensate for What he Believes is Hispanic Over Reporting of U.S. Citizenship, he Would Have Concluded Pasadena HCVAP is Below Fifty Percent***

450. If Dr. Rives had applied his past methodology to Pasadena, and subtracted 60% of naturalized Hispanics from the ACS 1-yr HCVAP estimate, the Pasadena HCVAP would have dropped four percentage points, well below his estimate of 50.6%. Pl. 301.

451. Dr. Rives' testimony that Pasadena contains a relatively smaller population of naturalized Hispanics does not salvage his failure to apply his methodology consistently across cases. There are 8,645 foreign born Hispanic U.S. citizens in Pasadena, according to the 5-yr ACS for 2010-2014. Pl. 301. If Dr. Rives had applied his past methodology of estimating HCVAP to this case, and discounted even some Hispanic U.S. citizenship as over reported, Dr. Rives would not have been able to testify that Pasadena's HCVAP is 50.6%.

452. Dr. Rives conceded that if Hispanic over reporting of U.S. citizenship "[is] a question that appears to have some empirical basis, you really need to look into it. If naturalization is a bigger part of citizenship, then -- and if you are worried about if there is an incentive possibly to misreport your citizenship status, you really need to look into these things. It is not always easy to do, but you need to look into these things."

### g. Dr. Rives Chose not to Rely on his Past Research Suggesting Hispanic Over Reporting of U.S. Citizenship

453. Dr. Rives testified that in the past, he based his claims about Hispanic over reporting of U.S. citizenship on a report by the Pew Research Center identifying "potentially serious problems with the reporting of U.S. citizen naturalization among foreign-born adult Hispanics." Tr. 12/1/16 at 86:7-87:3 (Rives).

454. Dr. Rives testified that in his opinion the Pew Research report is "quite a good study and Pew is well-known in the field." Tr. 12/1/16 at 89:1-3 (Rives).

455. Dr. Rives testified that the findings of the Pew Research report were not tied to the City of Farmers Branch, Texas, where he used the Pew Research report to opine that Hispanics were over reporting their citizenship.  Tr. 12/1/16 at 91:9-23 (Rives).

456. Dr. Rives also testified that the Pew Report on which he had relied on in the past stated that the problems of over reporting citizenship appear most serious among Hispanic immigrants from Mexico.  Tr. 12/1/16 at 86:21-25 (Rives).

457. Dr. Rives testified that in his past work he offered the opinion that there is no evidence to indicate that patterns of over reporting of naturalization first uncovered by the Pew report a decade ago have abated over time. Tr. 12/1/16 at 89:9-90:2 (Rives).

458. Dr. Rives further testified that he was unaware of any change in ACS that would eliminate the self-reporting characteristic of citizenship.  Tr. 12/1/16 at 99:16-21 (Rives).

459. Dr. Rives also testified that as an expert demographer he has noted that census interviewers in the Houston, Texas area were asked about over reporting of citizenship by Hispanics and they said that Hispanics were likely to over report citizenship.  Tr. 12/1/16 at 99:22-100:12 (Rives).

### h. Dr. Rives Chose not to Perform his Past Analysis of Whether Hispanics Over Report U.S. Citizenship

460. Dr.  Rives testified that in his past work he performed an analysis, which he did not perform in this case, that examined discrepancies between foreign born Hispanics' self-reported citizenship and residence in the U.S. and concluded that the naturalization claims of 67% of foreign born adult Hispanics were not likely to be valid.  Tr. 12/1/16 at 95:15-96:18 (Rives).

461. Dr. Rives testified that, in the past, he offered the expert opinion that there is no easy way to dismiss the possibility that some adult Hispanics may also claim U.S. citizenship directly

on the ACS by checking that they were native born on the questionnaire.  Tr. 12/1/16 at 92:18-25, 93:14-20 (Rives).

### i. Dr. Rives Chose not to Rely on his Past Opinion That SSVR is More Likely to Reflect an Accurate Rate of Hispanic U.S. Citizenship

462. Dr. Rives also testified that in the past he offered the opinion that Hispanic over reporting of U.S. citizenship suggests that even using Spanish surname voter registration as a rough estimate of Hispanic citizen voting age population could potentially overstate Hispanic citizen voting age population.  Tr. 12/1/16 at 94:3-8 (Rives).

463. Dr. Rives testified that it is possible that numbers SSRV in Pasadena are closer to true HCVAP and the higher HCVAP that we are seeing on ACS is a result of over reporting of citizenship by Hispanics.  Tr. 12/1/16 at 100:13-101:6 (Rives).

### j. Dr.  Rives was Incorrect in his Prediction of HCVAP Growth in the ACS 2015 5-yr Estimate

464. Dr. Rives was incorrect when he predicted that the ACS 5-yr estimate of HCVAP for 2011-2015 "will definitely see something moving into the 49 percent range given where we are [and] it could very well be that the five-year file rolls over to 50 percent."  Tr. 12/1/16 at 44:21-45:11 (Rives).  In fact, the City agrees that the ACS 5-yr estimate of HCVAP for 2011-2015, which was released on December 8, 2015, is only 48.2%.  Def. 123.

465. Dr. Rives' erroneously high prediction of an ACS 5-yr estimate of HCVAP for 2011-2015 in the 49% to over 50% range suggests that he has failed to take into account the data showing that growth in HCVAP in Pasadena has slowed since 2010.

466. It is not reliable to make a straight line projection from any Census estimate forward to 2016 or 2017.  The City's expert, Dr. John Alford testified previously that straight line projections are overly simplified and wholly unreliable as a measure of the current CVAP

population.  *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1211 (S.D. Tex. 1997), aff'd, 165 F.3d 368 (5th Cir. 1999).  Dr. Alford further noted that other factors must also be taken into account, such as age cohorts, birth and death rates, in- and out-migration, and absolute limiting factors, such as housing availability in a particular geographic area. *Id*.

### k. Work not Performed by Dr. Rives

467.  Dr. Rives did not offer any opinions in the case about whether minority voters have the opportunity to elect their candidate of choice in either a particular district or the city at-large.  Tr. 12/1/16 at 54:12-19 (Rives).

468.  Dr. Rives also did no analysis of the city's previous eight single member district election plan, including how many of those eight single member districts were or are today majority Hispanic citizen voting age population or majority Spanish surname voter registration. Tr. 12/1/16 at 54:20-55:2 (Rives).

469.  Dr. Rives also did no analysis of how many of the districts in the eight single member district plan offer Hispanic voters the opportunity to elect their candidate of choice.  Tr. 12/1/16 at 55:3-7 (Rives).

470.  Dr. Rives also did no analysis of whether any of the eight single member districts, when they turn into the six-district plan, become more or less Hispanic.  Tr. 12/1/16 at 55:12-15 (Rives).

471.  Dr. Rives also did no analysis of whether it was possible to more evenly distribute the Hispanic citizen voting age population between districts in the 6-2 plan, for example, between District A and District D.  Tr. 12/1/16 at 55:24-56:4 (Rives).

### l. The Growth in Hispanic Citizen Voting Age Population in Pasadena has Slowed Since 2010

472. Dr. Rives testified that the decrease in the 2013-2014 ACS 1 yr estimates of Pasadena Hispanic CVAP, combined with the slowing growth of Hispanic student enrollment in PISD, and the 2009 to 2011 decline in Hispanic share of CVAP, provides some suggestion that HCVAP growth in Pasadena may have slowed and "that fits with everything else we're seeing here in the data."  Tr. 12/1/16 at 84:17-85:8 (Rives).

473. Dr. Rives testified that Hispanic growth in Pasadena is steady but it's leveling because the city is filling up.  Tr. 12/1/16 at 83:8-14 (Rives).

474. Dr. Rives testified that the Hispanic student population in PISD schools is leveling off and he didn't do a study to learn the causes of the leveling off.   Tr. 12/1/16 at 82:14-83:7 (Rives).

475. Dr. Rives testified that in the Pasadena ISD, the increase in Hispanic enrollment from 2011 to 2014 is only half a percentage point. Tr. 12/1/16 at 83:15-21 (Rives).

476. Dr. Rives testified that as Hispanic population in Pasadena grows, it begins to level off because in any city, it can bump up against housing capacity and school district capacity. Tr. 12/1/16 at 80:16-20 (Rives).

477. Dr. Rives' analysis of Hispanic growth in the Houston-Galveston Area Council, which he characterized as "a pretty good indication of what might be happening for Hispanic populations wherever they are in the county," showed that there is slowing growth in Pasadena household population, number of households and the number of jobs.  Tr. 12/1/16 at 104:19-105:21 (Rives); Def. 39 at Tables 11A, 11B.

478. Dr. Rives testified that an economic downturn can affect the rate of growth of Hispanic CVAP.  Tr. 12/1/16 at 81:10-14 (Rives).

479. Ely testified that there is a lot more stability in the Hispanic citizen voting age population since 2010.  The Census data on Hispanic citizen voting age population in Pasadena shows a very significant increase in Latino citizen voting age for time periods before 2010 when compared to time periods since 2010. The statistical significance of differences between non-overlapping time periods since 2010 has gone away. Tr. 11/17/16 at 87:7-22 (Ely); Pl. 197.

480. Dr. Rives agreed that looking at the number of Hispanic persons in Pasadena, that the growth was much more dramatic from 1990 to 2000 than it was from 2000 to 2010. Tr. 12/1/16 at 80:10-15 (Rives).

481. Ely observed that there is not a statistically significant difference between the ACS 3-yr estimate (2011-2013) and the non-overlapping ACS 1-yr estimate for 2014, suggesting that Hispanic CVAP growth has slowed when compared to the period before 2010.  Tr. 11/17/16 at 87:23-88:21 (Ely).

482. The number of Hispanics voting in Pasadena elections from 2013 to 2015 did not rise, suggesting that HCVAP rates are also not rising in the City.  The number of Spanish Surnamed Registered Voters who cast ballots in 2013 was 1,161.  The number of Spanish Surnamed Registered Voters who cast ballots in 2015 was slightly smaller at 1,015.  Pl. 344 and 345.  *See Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1212 (S.D. Tex. 1997), aff'd, 165 F.3d 368 (5th Cir. 1999) (noting "If the plaintiffs' population growth projections were accurate, the percentage of Hispanics voting in the PISD and exogenous elections would have increased; instead, the percentage remained essentially unchanged.")

483. The City as a whole is neither majority Hispanic citizen voting age population nor majority Hispanic voter registration.  Pl. 195 and Dkt. 124-1.

484. The two city council seats that were converted to at-large voting are not seats in which Hispanic voters have an equal opportunity to elect their preferred candidate.

485. Even if the Hispanic citizen voting age population of Pasadena were slightly above 50%, Hispanic voters would not have an equal opportunity to elect their preferred candidates in the city at-large.   Additional factors including the citywide SSVR of 42% and the enhancing factors discussed below, including the City's use of city resources to mobilize Anglo voters in support of the Mayor's preferred candidates and policy proposals, establish that Hispanic voters do not have an equal opportunity to elect their preferred candidates in the city at-large.

486. For example, the City's expert Dr. Rives reported that in heavily Anglo District E and District F, there are more registered voters than in the three majority Hispanic District A, B, and C combined.  Tr. 12/1/16 at 105:22-106:5; Def. 39 at Exhibit 9.

*m. Even if the City Contained 50.6% HCVAP, Hispanics do not have an equal opportunity to  elect their candidates of choice in citywide elections*

487. Hispanics are the minority of registered voters in Pasadena. JTPO ¶ 32 and Tr. 12/1/16 at 37:23-39:8 (colloquy between Court and Dr. Rives)

488. Hispanics are the minority of actual voters in Pasadena.  The Latino share of the turnout in November 2013 was 17.3% and the May 2015 Latino share of voters was 23.5%.  Tr. 12/01/2016 124:16-25, 131:18-132:2 (Alford).

489. Because of disparities in voter registration and turnout between Hispanics and non-Hispanics, even if Pasadena contained 50.6% HCVAP, such a bare majority would not offer Hispanics an equal opportunity to elect their candidates of choice in citywide elections.

490. The Fifth Circuit has "rejected a per se rule that population majority groups cannot experience vote dilution through use of an at-large system. *Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1550 (5th Cir. 1992).

491. Similarly, the Fifth Circuit has held "that a protected class that is also a registered voter majority is not foreclosed, as a matter of law, from raising a vote dilution claim. *Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1550 (5th Cir. 1992).

492. The totality of circumstances analysis requires courts to look beyond whether a minority group constitutes a bare majority of CVAP in the jurisdiction at large. *Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1551 (5th Cir. 1992) ("The [Supreme] Court's instruction to employ a case-by-case approach counsels against a per se rule that a protected class, that is also a registered voter majority, cannot experience vote dilution through use of an at-large district.").

493. The U.S. Supreme Court specifically identified "the percentage of registered voters in the district who are members of the minority group" as a factor in determining whether white bloc voting is sufficient to impair minority voters' ability to elect representatives of their choice. *Gingles*, 478 U.S. at 56. Thus, although plaintiffs in a vote dilution case may satisfy the first *Gingles* precondition by showing that Hispanics can constitute more than 50% of the CVAP of a single member district, a bare majority of HCVAP in Pasadena does not establish that Hispanics have equal opportunity to elect in the jurisdiction as a whole. A number of factors, including the fact that Hispanic registered voters are in the citywide minority, the greater resource demands on at-large candidates, the severity of Anglo bloc voting on Pasadena's south side, and additional Senate Factors tip the scales against a

finding that a bare 50.6% HCVAP offers Hispanics an equal opportunity to elect their preferred candidates citywide.

### 15. *Relatively Lower Hispanic Voter Turnout Does Not Defeat Plaintiffs' Section 2 Claims*

494. Defendant's assertion that Latino preferred candidates could be predicted to win with higher Latino turnout is unavailing.   "The very low turnout among Hispanics [is] part of the problem[.]"  *Perez v. Pasadena Indep. Sch. Dist*., 958 F. Supp. 1196, 1220–21 (S.D. Tex. 1997), aff'd, 165 F.3d 368 (5th Cir. 1999).   "To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove." *Id., citing  Clark v. Calhoun Cnty. Miss.*, 88 F.3d 1393, 1398 (5ᵗʰ Cir. 1998) (the fact that "few or no black citizens ha[d] sought public office in the challenged electoral system d [id] not preclude a claim of vote dilution"); *citing Westwego Citizens for Better Government v. Westwego*, 872 F.2d 1201, 1208, n. 9 (5ᵗʰ Cir. 1989).

### 16. *Partisanship Was Used by the City as a Proxy for Race and Neither Explains nor Absolves the Discrimination Against Hispanic Voters*

495. The City argues that exogenous elections are not probative of racially polarized voting because partisanship, not race, drives candidate preferences in partisan elections.

496. The court rejects that argument.   "For purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates."  *Gingles*, 478 U.S. at 62; s*ee also id.* at 74 ("In sum, we would hold that the legal concept of racially polarized voting, as it relates to claims of vote dilution, refers only

to the existence of a correlation between the race of voters and the selection of certain candidates. Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent.").

497. "[T]he reasons black and white voters vote differently have no relevance to the central inquiry of § 2." *Thornburg v. Gingles*, 478 U.S. at 63.

498. "As we explained, . . .  multimember districts may impair the ability of blacks to elect representatives of their choice where blacks vote sufficiently as a bloc as to be able to elect their preferred candidates in a black majority, single-member district and where a white majority votes sufficiently as a bloc usually to defeat the candidates chosen by blacks. It is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, we conclude that under the "results test" of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." *Thornburg v. Gingles*, 478 U.S. at 63.

499. The Supreme Court further recognized in *Gingles* that importing an intent requirement into the test for racially polarized voting would require plaintiffs "to prove that most of the white community is racist in order to obtain judicial relief. It is difficult to imagine a more racially divisive requirement." *Thornburg v. Gingles*, 478 U.S. 30, 72, 106 S. Ct. 2752, 2777, 92 L. Ed. 2d 25 (U.S. 1986).

500. "Focusing on the discriminatory intent of the voters, rather than the behavior of the voters, also asks the wrong question. All that matters under § 2 and under a functional theory of

vote dilution is voter behavior, not its explanations." *Thornburg v. Gingles*, 478 U.S. 30, 73, 106 S. Ct. 2752, 2778, 92 L. Ed. 2d 25 (U.S. 1986).

501. Furthermore, the City's expert, Dr. Alford, performed no analysis to support his conclusion that racially polarized voting was caused by partisanship instead of race.  Tr. 12/1/16 At 189:23-190:18 (Alford)

### a. *Partisanship is not a Factor in City Elections*

502. City of Pasadena municipal elections are non-partisan. JTPO Admissions at parag. 7.  *See also* Trial Tr. Rough Draft Nov. 18, 2016, pp. 21 – 22 (Ybarra); Tr. 11/30/16 at 112:14-17 (Wheeler)

503. All members of the city council who testified at trial agreed that city infrastructure, including streets and drainage, is not a partisan issue.  Tr. 11/30/16 at 112:18-25 (Wheeler) Trial Tr. Nov. 18, 2016, pp. 63:23:64:3 (Ybarra); Trial Tr. Nov. 29, 2016, pp. 184:16-21 (Harrison); Trial Tr. Nov. 29, 2016, p. 9:1-8, 87:13-18 (Van Houte); Trial Tr. Nov. 30, 2016, p. 18:6-14 (Bass); Trial Tr. Nov. 28, 2016, pp. 45:17-46:14 (Isbell).

504. Mayor Isbell identified as a Democrat years ago, like his father.  Trial Tr. Nov. 18, 2016, pp. 197:10-24 (Isbell).

505.  Mr. Isbell has also worked on Democratic political campaigns.  Trial Tr. Nov. 18, 2016, pp. 197:25-198:1 (Isbell).

506. Mayor Isbell evolved into more of a Republican, including running for county commissioner as a Republican.  His political philosophy has remained the same throughout his life—independent or conservative—and values and issues are more important to him than partisanship.  Trial Tr. Nov. 18, 2016, pp. 198:2-20 (Isbell).

507. Mayor Isbell does not vote straight-ticket for a party but rather votes for people based on whether they share his values.  Trial Tr. Nov. 18, 2016, pp. 198:21-199:4 (Isbell).

508. The fact that the Conservative Citizens Club made occasional donations in city council elections did not bother the Mayor.  Trial Tr. Nov. 18, 2016, pp. 217:5-21 (Isbell)

509. Councilmember Ybarra is not active with any political party, thinks of himself as neither a Democrat nor a Republican, and has only voted in two primaries in the 20 years preceding 2016.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 21.

510. Councilmember Ybarra did not present himself as a Democrat or Republican during his first campaign for city council in 2009.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 22.

511. Councilmember Ybarra receives political donations from both Democrats and Republicans.  Trial Tr. Nov. 18, 2016, pp. 133:23-134:15 (Ybarra).

512. Councilman Wheeler never labeled himself as a Democrat or Republican in his municipal races.  Tr. 11/30/16 at 11214-17 (Wheeler)

513. Councilman Wheeler received support from Republicans and Democrats in his city council campaigns, including Republicans Pastor Fisher and Richard Lovell.  Councilman Wheeler further testified that "you cannot win a city council election, especially in District E, by trying to play partisan politics."  Tr. 11/30/16 at 113:1-17 (Wheeler); *see also* Tr. 11/30/16 at 113:18-19 (Wheeler) (testifying that the same is true for current District D).

514. Councilman Wheeler received no monetary support from any Democratic organizations in his 2013 run for city council. Tr. 11/30/16 at 113:20-22 (Wheeler).

515. Councilman Wheeler testified that in his campaign literature he never stated that he was a Democrat or a Republican.  He never used that as a tactic going door to door.  In his time

on city council, he never said, This is a Democrat issue or a Republican issue.  He always kept things very issue based.  Tr. 11/30/16 at 154:25-156:4 (Wheeler)

516. Former Councilman Harrison's campaign materials were paid for through contributions he solicited; he did not receive money from partisan organizations for his campaign or its materials.  Trial Tr. Nov. 29, 2016, pp. 183:16-184:7 (Harrison).

517. Council Member Van Houte previously worked on the Jack Douglass and Leroy Stanley campaigns for city council, where her support was based on issues rather than on partisan loyalties. Trial Tr. Nov. 29, 2016, p. 8:12-22  (Van Houte)

518. Councilman Ybarra received support from Republicans and Democrats in his city council campaigns, including Jackie Welch, Steve Phelps, Cary Bass and Richard Cansler.  Trial Tr. Nov. 18, 2016, pp. 140:11-141:22; Trial Tr. Nov. 18, 2016, pp. 144:12-15.  Trial Tr. Nov. 18, 2016, pp. 145:17-146:19; Trial Tr. Nov. 18, 2016, pp. 148:12-20**.**

519. In the Prop 1 election in November 2013, Republican Richard Lovell opposed the measure.  Mr. Artemio Muniz, who is a Republican and the head of the Republican Hispanic Federation, also opposed Prop 1.  Tr. 11/30/16 at 127:22-128:13, 129:18-25 (Wheeler).  In the Prop 1 election in November 2013, Councilman Wheeler did not target  Democrats or Republicans while campaigning against the measure because Prop 1 was not a partisan issue.  Tr. 11/30/16 at 127:8-21 (Wheeler).

520. Councilman Wheeler testified that the Prop 1 campaign received help from a lot of people, Democrat and Republican, and the Texas Organizing Project (TOP) which is a nonpartisan organization.  Councilman Wheeler testified that he felt it was his obligation to garner as much support as he could from whoever was willing to help.   In his view, "If the Area Five Democrats say we are going to stand up for Hispanics, I'm not going to tell them not

to.  So if they wanted to help that effort, if they wanted to help me in my effort to stand up for the citizens of Pasadena, I'm not going to stop them, but I have never sent anything partisan out or made any partisan comments on council."   Councilman Wheeler further testified "I will accept help from Republicans, Democrats, the green party, libertarian party, it doesn't matter.  But those were the ones that were willing to help, and I didn't turn down their assistance."  Tr. 11/30/16 at 154:25-156:4 (Wheeler)

521. Councilman Wheeler does attend meetings of the Area Five Democrats and he does not hide from the fact that he is a council member.  However, he never brings partisanship to council.   What he does outside of council campaigns and city business is separate.  Councilman Wheeler did take a position in a Harris County race for Precinct Commissioner but it was not a city council issue.  Tr. 11/30/16 at 156:19-157:12 (Wheeler)

522. Councilman Wheeler was endorsed by Area 5 Democrats but was not involved in the endorsement process.  Similarly, he allowed the Texas Democratic Party to send out a mailer with his name on it but did not review or approve the mailer.  Tr. 11/30/16 at 158:1-158:13 (Wheeler)

523. Council Member Van Houte is a member of Area 5 Democrats, although she has Republican supporters as well, and keeps her personal partisan affiliation separate from her decision-making as a member of city council and the projects she works on as a councilmember.  Trial Tr. Nov. 29, 2016, p. 9:1-1,87:13-18   (Van Houte)

524. When Oscar Del Toro ran at large for Place H in 2015, he campaigned in a non-partisan manner, he did not ask for partisan endorsement, and was included without his permission on a Democratic mailer. Trial Tr. Nov. 30, 2016, pp. 178:4-122  (Del Toro)

*b. Use of Partisan Words as a Proxy for Race*

525. Pasadena City officials used partisan terms as proxies for race.  In preparing a mailing list to target voters with campaign materials in favor of the change to 6-2, Richard Scott wrote a campaign vendor and asked him to "pull out Hispanic names" from the list. Pl. 34.

526. At trial Mr. Scott testified that when he wrote "pull out Hispanic names" he meant to say Democratic voters.  When asked by the Court why he said "Hispanics" if he meant "Democrats," Mr. Scott testified that he did not know.  Richard Scott further testified that thought of Hispanics as a proxy for Democratic voters and Anglos as a proxy for Republican voters.  Mr. Scott testified that he did not know how many Hispanics received the mailers he sent through the PAC. Trial Tr. Nov. 29, 2016 p. 240:13-240:24, 241:18-242:21 (Scott).

527. Although Mayor Isbell agreed that streets and garbage pickup are not partisan issues, he testified that he targeted people in political campaigns whom he identified as Republicans.  Mayor Isbell further testified that the people he identified as Republicans as more concentrated in south Pasadena.  Mayor Isbell included Texas Organizing Project (TOP) among those he perceived as "Democrats" organizing voters in Pasadena.  Trial Tr. Nov. 28, 2016, pp. 45:17-46:14 (Isbell); PL 120.

528. The Texas Organizing Project is a non-partisan organization.  Tr. 11/30/16 at 154:25-156:4 (Wheeler).  Richard Scott, Pasadena's Director of Community Relations, testified that a photo of the Texas Organizing Project that he chose for a campaign flyer features mostly Hispanic and African American people. Pl. 47 at 4.

529. Mayor Isbell testified that he does not know how many or in which council districts in Pasadena Hispanic people vote in Republican primaries.  Trial Tr. Nov. 28, 2016, pp. 122:8-18 (Isbell).

530. Richard Scott emailed a Houston Chronicle article from another city employee to a PAC vendor on September 6, 2013, and suggested that the Prop 1 campaign "could use [the article] in one of our brochures, Republicans will really like."   The Houston Chronicle article attached to the email prominently featured a photo of Councilman Ybarra and reported on opposition to Pasadena's change in election system as dilutive of Hispanic voting strength.  The article did not contain the words "Democrat" or "Republican."  Trial Tr. Nov. 29, 2016 p. 217:2-218:8 (Scott); PL 35.

531. When Bianca Gracia, an HOA board member from the south side, attended the October 3, 2013 meeting at Cullen's, Mayor Isbell, Darryl Morrison, Phil Cayten and Steve Cote were asking the attendees to support Proposition 1, take yard signs to display and hand out, talk to neighbors to promote the vote yes for Prop 1 campaign. Trial Tr. Nov. 30, 2016, pp.86:24-87:15, 88:18-99:2  (Gracia)

532. Ms. Gracia was offended when she heard Steve Cote say that if the city did not vote for Prop 1, Pasadena "would turn blue," because she understood it to be a reference to Hispanics, and she was the only Hispanic in the room. Trial Tr. Nov. 30, 2016, pp. 87:15-88:9, 91:2-11 (Gracia)

### c. Mayor Isbell's Claims of Partisanship in Pasadena are not Credible

533. Mayor Isbell asserted various rationales for campaigning against Latino-preferred candidates and policy positions, including partisanship, but these explanations were not credible.   Instead, the goal of preventing Latino voters from electing their preferred candidates is the most believable explanation for the Mayor's negative campaigning.

534. In the 2013 municipal election, when Mayor Isbell targeted Cody Ray Wheeler and Don Harrison with negative campaign ads, there were no donations by any groups of Democrats

for Wheeler or Harrison.   Tr. 11/30/16 at 113:20-22 (Wheeler); Trial Tr. Nov. 29, 2016, pp. 183:16-184:7 (Harrison).   Thus, the Mayor's claims that he targeted Wheeler and Harrison to fend off Democrats is not credible.

535. For example, Mayor Isbell claimed that he opposed the candidacy of Cody Ray Wheeler in 2013 because he heard "street talk" that Mr. Wheeler did not live in Pasadena.  Mayor Isbell admitted he had no other information on which to base his opposition to Mr. Wheeler.  Trial Tr. Nov. 18, 2016, pp. 214:12-18 (Isbell).  Mr. Wheeler testified that he lived in Pasadena when he ran for office in 2013 and had never stated otherwise.  Tr. 11/30/16 at 107:11-19 (Wheeler)

536. Although Mayor Isbell also claimed that Mr. Wheeler was recruited to run for office by Don Harrison and others, both Mr. Wheeler and Mr. Harrison testified that they had never met each other before Mr. Wheeler decided to run for office.  Trial Tr. Nov. 18, 2016, pp. 212:16-214:10 (Isbell); Tr. 11/30/16 at 107:6-7 (Wheeler); Trial Tr. Nov. 29, 2016, pp. 191:17-21 (Harrison).  Mr. Harrison further testified that he did not lead a group that recruited Cody Ray Wheeler to run for council.  Trial Tr. Nov. 29, 2016, pp. 191:17-21 (Harrison).

537. Mayor Isbell claimed that in 2013 Don Harrison intimidated Hispanic and other voters to win reelection.  Trial Tr. Nov. 18, 2016, pp. 211:12-212:15 (Isbell).  Mayor Isbell also claimed that he heard that Mr. Harrison led voters to believe that he could find out whether they voted for him.  Trial Tr. Nov. 18, 2016, pp. 212:16-214:10 (Isbell).

538. Contrary to the claims by Mayor Isbell at trial, Mr. Harrison testified that he did not threaten or intimidate voters in 2013; that he did not tell voters that city hall would know how they voted and that he would retaliate against those who did not support him; and that

he did not put yard signs into the yards of people whose permission he did not have.  Trial Tr. Nov. 29, 2016, pp. 183:8-18 (Harrison)

539.  Mayor Isbell testified claimed that a labor union from Florida was involved in te Prop 1 campaign then admitted on cross examination that the union symbol on the mailer he was simply showed that the mailer had been printed by a union shop.  Trial Tr. Nov. 28, 2016, pp. 95:9-96:9, 125:4-126:1 (Isbell); D.Ex. 18.

540.  Mayor Isbell has not done a study of Pasadena Hispanic residents to determine the extent to which they vote Republican or Democrat.  Trial Tr. Nov. 28, 2016, pp. 134:6-9 (Isbell).

541.  Under the totality of circumstances, based on a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process" (*Gingles*, 478 U.S. at 45, *quoting* S. Rep. at 30 n. 120), the 6-2 mixed electoral system for electing members of Pasadena's city council has a dilutive effect on Latino voting strength in Pasadena.

## Intentional Discrimination in Violation of Section 2 and the 14th and 15th Amendments to the U.S. Constitution

542.    After performing "a sensitive inquiry into such circumstantial and direct evidence as may be available," it is readily apparent that the City of Pasadena intentionally discriminated on the basis of race in enacting the 6-2 method of election.  *See Arlington Heights*, 429 U.S. at 266.

543.    Latinos in Pasadena "were becoming more politically active" and by 2013 had elected Latino preferred candidates to the city council in three of the four existing Latino majority districts -- A, C and D.  See *LULAC*, 548 U.S. at 440.  The "serendipitous" election of a Latino with an Anglo surname in an  Anglo-majority district raised the possibility that Latinos would be able to elect a majority of council positions in the next election (to be held

in 2015). Pasadena's "Latino voters were poised to elect their candidate of choice" to a majority of the city council. *LULAC*, 548 U.S. at 438. Pasadena Latinos constituted "an increasingly powerful Latino population that threatened to oust the incumbent" of District B and deprive the Mayor of a majority of votes on the city council.

544.    These circumstances led the City to change its method of election and redraw the city council district lines. "Since the redistricting prevented the immediate success of the emergent Latino majority [. . . ] there was a denial of opportunity in the real sense of that term." *LULAC*, 548 U.S. at 428-29. As explained by the U.S. Supreme Court, such discrimination against a growing Latino electorate "bears the mark of intentional discrimination that could give rise to an equal protection claim." *LULAC*, 548 U.S. at 440.

545.    The City cannot justify its actions by claiming that it changed to a 6-2 system to protect the current council majority, or protect members of a particular political party:

The Court has noted that incumbency protection can be a legitimate factor in districting, see *Karcher v. Daggett,* 462 U.S., at 740, 103 S.Ct. 2653, but experience teaches that incumbency protection can take various forms, not all of them in the interests of the constituents. If . . . incumbency protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters. . . . This policy, whatever its validity in the realm of politics, cannot justify the effect on Latino voters.

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440–41, 126 S. Ct. 2594, 2622–23, 165 L. Ed. 2d 609 (2006)

546.    The evidence demonstrates that Pasadena's change to a 6-2 election system was "'conceived or operated as purposeful device to further racial discrimination' by minimizing, canceling out or diluting the voting strength of racial elements in the voting population.'" *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)); *see also Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990).

A. *The City's Change to a 6-2 System was racially motivated*

547.   Mayor Isbell revealed his racial purpose when he directly referenced Hispanics while proposing that Pasadena convert to a 6-2 election system at a public meeting of the Bond/Charter Review Committee.  Tr. 11/30/16 at 120:7-120:16 (Wheeler); Trial Tr. Nov. 18, 2016, pp. 72:3-23 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 17:10-12, 16:22-24 (Isbell) ("70 percent"), ; Trial Tr. Nov. 29, 2016, pp.39:22-40:10, 43:20-25 (Van Houte)

548.   Councilman Wheeler testified that in 2013 he was not expected to win in Anglo majority District E and once he did, the Mayor proposed changing the City to a 6-2 election system to prevent five Hispanic preferred candidates from being elected to the council in 2015.  Tr. 11/30/16 at 120:17-121:8 (Wheeler).

549.   Councilman Wheeler testified that when Mayor Isbell saw Wheeler's election and he saw the rise in Hispanic voters around the city and in District E, Mayor Isbell knew that if the trend continued and District B elected a Hispanic preferred candidate, the Mayor would have to disenfranchise Hispanics and relegate the Hispanic population to a minority on the city council. Tr. 11/30/16 at 146:20-147:4 (Wheeler).

550.   Councilmember Van Houte testified that the Mayor's purpose in changing the electoral system was to maintain five votes on the city council (including himself), and thus maintain his power.  Ms. Van Houte testified that she believed that the Mayor was not opposed to serving alongside Hispanic members of council "as long as they agreed with him."  Ms. Van Houte testified that it is closer to say that members from Hispanic majority districts tended to vote against the Mayor.  Ms. Van Houte testified that the Mayor accomplished his goal of maintaining control over the city council by reducing the number of Hispanic majority districts.  She further testified that that there was no doubt, in her mind and the minds of

other councilmembers that the effect of the 6-2 plan was to dilute Hispanic voting strength. Trial Tr. Nov. 29, 2016, pp. 140:11-144:8, 166:16-169:16  (Van Houte).

551.    Councilman Ybarra testified that the Mayor intended the 6-2 redistricting proposal as a "power grab" and an attempt to take away his representation.  Ybarra further testified, "This charter election, the messaging, the behavior, the actions was clearly racially motivated, along with it also being politically motivated."  Tr. Nov. 18, 2016, pp. 73:12-20, 184:20-187:3.

552.    Former councilman Harrison testified that there was a racial undertone to the move to 6-2 and that the change reduced the number of Latino districts in favor of a wealthier south side. Trial Tr. Nov. 29, 2016, pp. 188:20-190:19 (Harrison).

553.    Mayor Isbell proposed the 6-2 redistricting in order to secure a majority on council that would not question or oppose him on his project proposals.  Trial Tr. Nov. 18, 2016, pp. 73:12-24 (Ybarra)

**B. Arlington Heights Factors**

    **1) Arlington Heights Factors: Direct Evidence of intentional discrimination**

554.    In the July 25, 2013 meeting at which Mayor Isbell announced his proposal for the City to convert to a 6-2 system, he stated to the assembled members of the city council, members of the Bond/Charter Committee and the public that seventy-five percent of Pasadena's Hispanic population are illegal aliens.  Trial Tr. Nov. 18, 2016, pp. 72:3-23 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 17:10-12, 16:22-24 (Isbell) ("70 percent"); Trial Tr. Nov. 29, 2016, pp.39:22-40:10, 43:20-25 (Van Houte) Tr. 11/30/16 at   120:7-120:16 (Wheeler).  The deeply offensive nature of this statement is rooted in the aspiration of Hispanic U.S. citizens to be treated equally with respect to the rights of citizenship, including voting.  Only 25% of

Pasadena's Hispanic population is non-citizen (Pl. 301); a smaller portion of the non-citizen population is comprised of unauthorized immigrants.  By branding the majority of Pasadena's Hispanic citizens as "illegal aliens," Mayor Isbell characterized those Hispanic citizens, because of their race, as lacking the right to vote and lacking legitimate presence in the United States.

555.    In September 2013, while working on the campaign in favor of Prop 1 and other proposed charter changes, Richard Scott sent an email to a political consultant suggesting that the Prop 1 campaign use the voters lists that the Mayor used for his last race and "pull out the Hispanic names"  or "look at each precinct and do the same. "  Mr. Scott and the consultant deleted precincts to pinpoint areas of town where they wanted to send the campaign mailers.  Trial Tr. Nov. 29, 2016 p. 216:2-217:1 (Scott); PL 34.  Richard Scott, a longtime friend of Mayor Isbell, has served as the Director of Community Relations--a position appointed by Mayor Isbell--since Mayor Isbell returned to office in 2007.  Trial Tr. Nov. 29, 2016, pp. 212:4-214:10 (Scott).

556.    In 2008, in his State of the City address to the Pasadena Chamber of Commerce, Mayor Isbell told the audience that he was going to impound cars belonging to undocumented immigrants and then call Immigration Services. Tr. Nov. 30, 2016, pp. 166:19-167:2 (Del Toro).

557.    Mayor Isbell told Mr. Ybarra in 2009: "you know you can't have that black lady there pushing push cards."  The Mayor was referring to an African-American campaign volunteer who Mr. Ybarra recruited to hand out campaign materials in front of City Hall.  The Mayor said that Mr. Ybarra would lose votes if Anglos saw a black lady distributing Mr. Ybarra's campaign materials.  The Mayor further explained that he believed that the woman was

perhaps a "Katrina refugee" because the Mayor had observed Louisiana license plates on the woman's car.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 22-24.

558.    Former Councilman Harrison recalled a conversation he had with Mayor Isbell in the hallway at council chambers shortly before his special mayoral election in 2008 during which the Mayor said that he told the Pasadena police department that if they find a Hispanic without car insurance, the police should impound that person's car.  Former Councilman Harrison asked Mayor Isbell what should be done if it were an Anglo driver without insurance, and the Mayor said it should be left to the officer's discretion about what to do with the car.  Former Councilman Harrison felt like the Mayor's comment was racial.  Trial Tr. Nov. 29, 2016, pp. 199:11-200:10 (Harrison).

559.    El Jardin Park was acquired by the City in the 1980s and it became a public park with a beach that people could enter for free.  It is now located in the farthest eastern part of Pasadena in District H.  Trial Tr. Nov. 29, 2016, pp. 186:9-187:5 (Harrison).

560.    When the City was considering whether to charge a fee at El Jardin Park, Former Councilman Harrison asked Richard Scott, the City's Community Relations Director, why the City wanted to do that.  Mr. Scott, while in his office, told former Councilman Harrison that they wanted to charge the fee "because the Mexicans are throwing their diapers there." Trial Tr. Nov. 29, 2016, pp. 187:6-20 (Harrison).

561.    Mr. Scott testified at trial that people were coming down to El Jardin and taking over a subdivision.  Trial Tr. Nov. 29, 2016 p. 231:3-231:17 (Scott); PL 320.

  2)   *Arlington Heights* **Factors:  Adverse Impact**

   a.   **The Reduction in the Number of Hispanic Majority Districts from 4 to 3 Reduced Hispanic Opportunity to Elect**

> i. *At Large Seats do not Provide Hispanics the Opportunity to Elect Their Preferred Candidates*

562.　　Mayor Isbell agrees that Anglos have higher turnout rates for voting when compared to Hispanics.  Trial Tr. Nov. 28, 2016, pp. 47:18-25 (Isbell).

563.　　　There was a sense among council members that electing Latino candidates of choice at-large would be an uphill battle because of the concentration of voters in Districts H and F.  Trial Tr. Nov. 18, 2016, pp. 95:23-96:11 (Ybarra).

564.　　The majority of votes in at-large elections usually come from south side of Pasadena, and that side of Pasadena usually decides elections.  Trial Tr. Nov. 18, 2016, pp. 122:12-19 (Ybarra); Trial Tr. Nov. 29, 2016, pp. 187:21-188:8 (Harrison)

565.　　Oscar Del Toro, who lost his at-large race in 2015, testified that the south side voters did not trust him because of his heritage, and that the at-large election system will have the same effect of defeating other Latino candidates because Anglos vote at higher rates than Hispanics.  Trial Tr. Nov. 30, 2016, pp. 180:5-22 (Del Toro)

566.　　Former Councilman Harrison opposed adding at-large seats because in a single member system candidates do not have to run citywide and because Hispanics and minorities have a better opportunity to be elected to office.   Trial Tr. Nov. 29, 2016, pp. 188:20-190:19 (Harrison).

567.　　Before the adoption of single-member districts for city council, only one Hispanic was elected at-large to council.  His name was Roy Ybarra.  Trial Tr. Nov. 18, 2016, pp. 199:8-15 (Isbell).

568.    Districts H and F had the highest concentration of voters in the city and were likely going to control the outcome of at-large elections if Proposition 1 passed.  Trial Tr. Nov. 18, 2016, pp. 95:23-96:7 (Ybarra).

> ii.    *Enlargement of the Remaining Single Member Districts Increases the Difficulty of Electing Hispanic Preferred Candidates in the Single Member Districts*

569.    Councilman Wheeler testified that if his old District E, which he won by 33 votes, had been 6,000 people larger, he would not have won his 2013 campaign.  Tr. 11/30/16 at 122:13-122:19 (Wheeler)

570.     Councilman Wheeler testified that he would not have won District D as the first-time candidate he was in 2013 because the larger district would have required more money and without the power of incumbency "it would have been near impossible." Tr. 11/30/16 at 140:6-140:14 (Wheeler)

571.    The changes to District B in the 6-2 redistricting plan were going to make it more difficult for a Hispanic candidate of choice to be elected. Trial Tr. Nov. 18, 2016, pp. 104:2-106:3 (Ybarra).

572.    The larger single-member districts resulting from the change to 6-2 means that candidates for those districts have to raise more money and spend more resources on their campaigns. Trial Tr. Nov. 18, 2016, pp. 128:2-12 (Ybarra).

573.    Councilmember Ybarra testified that he believes that Celestino Perez would have won if he had challenged Bruce Leamon in District B under the 8-0 system rather than the 6-2 system because Mr. Perez would have had enough time to target enough voters to make up for the small (34 votes) margin by which he lost.  Trial Tr. Nov. 18, 2016, pp. 128:13-130:12.

574.    Councilman Wheeler testified that the change in election system to 6-2 has been disheartening to Pasadena Hispanics who are wary or distrustful of the system.  Although Wheeler campaigned to bring more services to the district, the Hispanic voters saw the Mayor redraw the lines and "unfortunately it confirms their fears that the system is rigged against us. We win an election, but, you know what, they move the field goal back and move it back farther and farther and they don't have the same support."  Tr. 11/30/16 at 147:5-148:14 (Wheeler)

### 3) *Arlington Heights* Factors:  Historical Background of the Decision
#### a.    Increase in the Pasadena Hispanic Population Over The Past Several Decades

575.    The Latino population in Pasadena in 1970 was reported by the U.S. Census to be less than 10 percent. PL 307 (p. 25-26).

576.    The Hispanic population has grown over the last several decades, spreading from the north to approximately Spencer Highway.  The Hispanic population filled in behind the southward movement of the main commercial street in Pasadena as housing stock in the north got older.  Trial Tr. Nov. 29, 2016, pp. 174:6-175:4 (Harrison).

577.    Since Former Councilman Harrison was young, the main commercial street in Pasadena has changed from Shaw Street in north Pasadena, further south to Harris Street, then further south to Southmore, and then further south to Spencer Highway.  It then moved south to Fairmont Parkway.  Trial Tr. Nov. 29, 2016, pp. 172:3-10 (Harrison).

578.    Councilmember Ybarra, who has lived most of his life in the area encompassed by District A, says that Pasadena was a mixture of Hispanics and Anglos before he graduated high school in 1992, but that Anglos moved to the center and south sides of town.  Hispanics

moved into the northern part of the City.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 4 – 5'
Trial Tr. Nov. 29, 2016, pp. 5:21- 6:6 (Van Houte)

579.  Today, the concentration of the Hispanic population in Pasadena is in the north, central
and west areas of the city.  Trial Tr. Nov. 18, 2016, pp. 200:1-11 (Isbell); PL 94.

580.  Councilmember Ybarra was the first Latino elected to city council since Emilio Carmona
served in the 1990s in a single-member district.  Trial Tr. Nov. 18, 2016, pp. 199:12-25
(Isbell).

581.  Councilmember Ybarra usually has voted with the Mayor during his service on council.
Trial Tr. Rough Draft Nov. 18, 2016, pp. 27.  Mr. Ybarra did not vote with the Mayor during
his first city council term when Ybarra opposed a pilot program for large trash containers
favored by the Mayor that would have only been applied to the north side and would have
entailed one trash pick-up a week for north side residents.  North side residents opposed the
large trash containers because the once-a-week service would have led to north side
neighborhoods smelling badly, and the south side was going to enjoy more frequent pick-up.
Trial Tr. Rough Draft Nov. 18, 2016, pp. 27-28.

582.  After the 2011 election, Councilmember Ybarra voted independently on the council,
opposing the Mayor on issues when he thought it was in the best interest of the City and his
constituents. Trial Tr. Rough Draft Nov. 18, 2016, pp. 28 – 29 (Ybarra).

### b.  2011 Redistricting Process

583.  Work by council on the 2011 redistricting of city council districts began in August of that
year.  Trial Tr. Nov. 18, 2016, pp. 35:9-14.

584.  The plan that the Mayor successfully proposed for adoption included 4 majority Latino
districts.  However, in three of those districts, Latinos cnstituted between 50-51% of the
registered voters. PL 3. Trial Tr. Nov. 29, 2016, pp.24:11-17, 26:4-8

585.    Council member Van Houte opposed the mayor's plan because it divided some

neighborhoods in her district, and although the plan contained four majority Hispanic

districts, she was concerned because bare majority districts were not likely to be effective

due to lower turnout among Latinos. Trial Tr. Nov. 29, 2016, pp.23:20- 26:8, 107:24-109:4

(Van Houte)

586.    Councilmember Ybarra opposed the 2011 redistricting plan because the process was not

transparent and because one of the Mayor's other proposed plans bypassed a neighborhood

adjacent to the benchmark District A and paired Mr. Ybarra with Councilmember Don

Harrison. Trial Tr. Rough Draft Nov. 18, 2016, pp. 35:8-38:8.

587.    The Mayor, without discussion with the rest of the city council, sought to pair Ybarra and

Harrison because the councilmembers, along with Van Houte, had been voting together

against the Mayor on certain issues coming before the council.  Trial Tr. Nov. 18, 2016, pp.

43:12-44:11, 39:8-43:10 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 67:13-25 (Isbell).

### 4)    *Arlington Heights* Factors:  Specific Sequence of Events

### a.  2013 Municipal Elections

588.    In 2013, Councilmember Ybarra faced an Anglo challenger in his bid for reelection.

Trial Tr. Nov. 18, 2016, pp. 52:23-53:21.  The issue that Mr. Ybarra ran on in 2013 was the

completion of infrastructure and street projects on the north side that had been promised for

20 years.  Trial Tr. Nov. 18, 2016, pp. 53:23 – 54:19.

### b.   Election of  Cody Ray Wheeler in  District E

589.    Cody Ray Wheeler, an Hispanic with an Anglo surname, ran and won in Anglo-majority

District E. Tr. 11/30/16 at 100:2-6 (Wheeler)

590.    Councilman Wheeler decided to run for city council in part to address the disparity in city

services between the north and south sides of Pasadena.  Tr. 11/30/16 at 106:14-107:5

(Wheeler).

591.    Mr. Wheeler's first interaction with Mayor Isbell after the May 2013 election was in the

Mayor's office.  Instead of the productive meeting that Councilman Wheeler was expecting,

Mayor Isbell described himself as the person who makes decisions for the City.  Mayor Isbell

showed Councilman Wheeler a copy of the city charter and, according to Councilman

Wheeler, "he showed me where he could have me removed from the council meeting and he

showed me state law and how he could have me thrown out of the meeting. And then three

weeks later, a lawsuit was filed by Mr. Stanley. It was a tumultuous start, to say the least."

Tr. 11/30/16 at 115:1-17 (Wheeler)

592.     In his 2013 race for city council District E, Councilman Wheeler's campaign increased

total voter turnout in the district to 837 from 458 (in the District E 2011 runoff election).  Tr.

11/30/16 at 107:20-108:10 (Wheeler); *see also* Pl. 237, 238 at 21.

593.    When Mr. Wheeler campaigned in 2013, his "message was being an independent voice,

not just being a vote that is going to send our money to pet projects or down Fairmont or the

rodeo grounds. We need basic things in our district: Streets, drainage, lights, neighborhood

associations. . . "  Tr. 11/30/16 at 109:16-110:2 (Wheeler)

594.    Mr. Wheeler identifies as Hispanic. Tr. 11/30/16 at 96:3-4. His mother is Mexican

American and his father is a mix of Mexican, Native American and Irish descent. 95:3-11.

Mr. Wheeler's parents both speak Spanish and he grew up hearing Spanish spoken at home.

Tr. 11/30/16 at 95:22-96:2 (Wheeler).  Mr. Wheeler speaks a little bit of Spanish and brushes

up on his Spanish when campaigning door to door.

115

595.     As a candidate, Mr. Wheeler does not advertise his ethnicity or race.  Tr. 11/30/16 at 96:10-15 (Wheeler)

596.     If Mr. Wheeler was talking to an Anglo homeowner who asked about his background, in response, Mr. Wheeler would answer that he is a little bit of everything but would emphasize his military background and service to the country and service to the community to ease their concerns.  Mr. Wheeler further testified that "you don't want to get in an outright conversation about race with someone, but if they had some negative sentiments towards Hispanics, I tried to ease their concerns."  Tr. 11/30/16 at 96:21-97:24 (Wheeler)

597.     Councilman Wheeler testified that his Anglo surname helped him with Anglo voters by easing any negative feelings that Anglo voters harbored towards Hispanics.   Tr. 11/30/16 at 110:3-11 (Wheeler).

### c. After the 2013 Election, District B Appeared Likely to Elect the Hispanic Candidate of Choice

598.     The demographics of District B are very similar to those of District A.  Trial Tr. Nov. 18, 2016, pp. 102:4-10 (Ybarra);

599.     In the May 2013 election, Anglo incumbent Bruce Leamon had been re-elected in District B.

600.     Councilman Leamon typically voted with the Mayor and was supported by Mayor Isbell's political action committee. Tr. 11/30/16 at 118:13-16 (Wheeler)

601.     Many council members believed that District B was likely to elect a Latino preferred candidate in the next election in May 2015.  Tr. 11/30/16 at 117:9-117:17 (Wheeler); Trial Tr. Nov. 18, 2016, pp. 106:24-107:24 (Ybarra).

602.     Councilman Wheeler testified that after he won in District E in 2013, and District B was likely to elect a Hispanic preferred candidate in 2015, "I think the writing was on the wall

that voters from the north side would be able to get to -- to elect a majority of the council members." Tr. 11/30/16 at 117:9-117:17 (Wheeler).

603.         Councilman Wheeler further testified "And I had won in District E, a district that was majority Anglo.  So with me winning District E, that left four other districts that were majority Hispanic, meaning that north side voters would then elect the majority of the council members.  I think that's what the mayor saw; that he was very vulnerable to losing control of not having his people on council."  Tr. 11/30/16 at  118:22-119:3 (Wheeler)

604.         Councilmember Ybarra testified that it appeared that in District B under the 8-0 plan a Latino would be able to unseat Bruce Leamon in the future, which would have resulted in Mayor Isbell being unable to cast his vote to carry measures he preferred.  Trial Tr. Nov. 18, 2016, pp. 106:24-107:24 (Ybarra)

### d. *Shelby* Decision

605.    The Supreme Court of the United States decided *Shelby County, Alabama v. Holder* on June 25, 2013. Following the Supreme Court's decision, Texas and its sub-jurisdictions, including the City of Pasadena, were no longer required to secure federal approval before implementing changes to their voting system.

606.    The *Shelby* decision played a role in Mayor Isbell's decision to propose the change to 6-2. Trial Tr. Nov. 18, 2016, pp. 221:7-9 (Isbell).

607.    Mayor Isbell believed that the *Shelby* decision, by removing preclearance requirements, also meant that the DOJ could not block the City's change to the 6-2 system.  Trial Tr. Nov. 18, 2016, pp. 222:4-11 (Isbell).Mayor Isbell heard about the decision in *Shelby County, Alabama v. Holder* from the Supreme Court of the United States the day it came down.  Trial Tr. Nov. 18, 2016, pp. 217:22-218:2 (Isbell).

608.    Prior to the decision in *Shelby*, the Mayor had not proposed that the City convert to six single-member districts and two at large because he believed making submissions for preclearance was expensive and it was not worth trying to gain preclearance from an appointee of President Barack Obama.  Trial Tr. Nov. 18, 2016, pp. 218:3-25 (Isbell).

609.    Mayor Isbell was aware that DOJ had made objections to preclearance in a Beaumont jurisdiction.  Trial Tr. Nov. 18, 2016, pp. 219:4-16 (Isbell).

### e.  2013 Bond/Charter Review Committee

610.    Two days after the *Shelby* decision, on June 27, 2013, Mayor Isbell sent a memorandum to city council calling for the formation of a committee to consider bond proposals for a November 2013 special election and asked each council member to submit two names for consideration for appointment to the committee.  PL 8.

611.    Mayor Isbell testified he does not remember whether he had redistricting in mind at the time he called for a Bond/Charter Review Committee in 2013.   Trial Tr. Nov. 18, 2016, pp. 219:17-220:23 (Isbell).

612.    The Mayor suggested Roy Mease serve as chair of the Bond Committee.  Trial Tr. Nov. 28, 2016, pp. 5:8-12 (Isbell).  Mr. Mease is also chair of the Pasadena Second Century Economic Development Corporation and was nominated by the Mayor to sit on its Board, He was also nominated by the Mayor to replace the term-limited Port Commissioner and is a close ally of the mayor.  Trial Tr. Nov. 28, 2016, pp. 48:23-49:10 (Isbell); Trial Tr. Nov. 29, 2016, pp.47:9-48:10  (Van Houte);

613.    The Bond/Charter Review Committee held its first meeting, which was public, on July 18, 2013, one month following the U.S. Supreme Court's decision in *Shelby County*.  PL 10.

118

614.    At some point before July 24, 2013, Mayor Isbell asked city staff to draw some maps so that he could see how a six-district map might come out.  The maps Mayor Isbell requested also included a four-district map and a seven-district map.  Trial Tr. Nov. 28, 2016, pp. 5:13-6:13, 6:24-7:1, 7:6-8 (Isbell).

615.    The Bond/Charter Review Committee held its second meeting, at which it discusses bond proposals, on July 23, 2013; the meeting was public.  PL 11    .

616.    By July 24, 2013, the Mayor had already drawn a 6-2 map (known as 62-2) that would become the 6-2 plan adopted in 2014 by the city council.  Trial Tr. Nov. 28, 2016, pp. 5:17-23 (Isbell); PL 245; PL 246; Trial Tr. Nov. 28, 2016, pp. 6:20-23 (Isbell); PL 247.


### f.   July 25, 2013 Bond Review/Charter Revision Committee Public Meeting

617.    The Bond/Charter Review Committee held its third meeting on July 25, 2013, at which it discussed charter amendment proposals.  The meeting was public.  The Mayor handed out to Committee members the 62-2 version of the 6-2 map. The Mayor did not give copies of his map to members of the city council or the public. Trial Tr. Nov. 28, 2016, pp. 13:15-14:1 (Isbell); Trial Tr. Nov. 29, 2016, pp. 34:6-35:8, 41:22-42:1 (Van Houte);  PL 12.

618.    At the July 25, 2013, Committee meeting, the Mayor introduced his proposal to amend the charter so that Pasadena would have a city council elected by six single-member districts and two at-large positions.  Trial Tr. Nov. 18, 2016, pp. 72:3-23 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 12:16-13:14 (Isbell); Trial Tr. Nov. 29, 2016, pp. 34:6-35:15 (Van Houte); PL 12.

619.    In presenting his proposal, the Mayor stated that Pasadena no longer had to seek approval from the Justice Department. Trial Tr. Nov. 29, 2016, p. 35:16-18, 43:20-25 (Van Houte)

620.    Mayor Isbell explained that there were pairings in the map, but they would not present a problem because of term limitations.  He specifically explained that Phil Cayten, who could not run again, was paired with Steve Cote on the south side. The mayor did not mention that the map also paired Pat Van Houte and Ornaldo Ybarra, neither of whom were termed out, on the north side. ; Trial Tr. Nov. 29, 2016, p. 35:23-37:15  (Van Houte);  Trial Tr. Nov. 18, 2016, pp. 78:2-4 (Ybarra).

621.    Several member of the public spoke in opposition to the 6-2 proposal. Trial Tr. Nov. 29, 2016, p. 42:5-7 (Van Houte).

622.    Council member Ybarra stated that the map would represent the loss of a Hispanic district and that although Section 5 was no longer in effect, the city still had to comply with Section 2. Trial Tr. Nov. 29, 2016, p. 39:3-21  (Van Houte) One committee member, Victor Villareal, spoke against the 6-2 plan and in favor of maintaining the 8-0 plan.  Another committee member, Bill Welch, objected that the 6-2 plan "dilutes," and pointed out that the south side of town turns out more. Trial Tr. Nov. 29, 2016, pp. 40:21- 41:21, 42:2-7 (Van Houte).

623.    Mayor Isbell responded that seventy-five percent of Pasadena's Hispanic population were illegal aliens.  Trial Tr. Nov. 18, 2016, pp. 72:3-23 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 16:22-24 ("70 percent"), 17:10-12 (Isbell); Trial Tr. Nov. 29, 2016, pp.39:22-40:10, 43:20-25 (Van Houte)

624.    Mayor Isbell claimed he learned after the meeting that the numbers he spoke about at the July 25 meeting regarding the Pasadena Hispanic population were not correct.  Trial Tr. Nov. 28, 2016, pp. 17:6-9 (Isbell).

### g.  Final Meeting and Recommendation of the Bond/Charter Review Committee

625.    Four days later, the Bond/Charter Review Committee held its fourth and final meeting on July 29, 2013.  The meeting was closed to everyone except committee members.  Police officers were posted at the door to ensure that no one entered the closed meeting other than Committee members.  Members of the public who had first heard and were surprised by the Charter revision proposal at the July 25, 2013 meeting came prepared to speak but were not allowed into the July 29 meeting.  Trial Tr. Nov. 29, 2016, pp. 44: 1-45:23 (Van Houte); PL 14.

626.    Cary Bass served on the 2013 Bond/Charter Review Committee.  Bass is a Pasadena businessman who has business dealings with the mayor, whose family has made financial contributions to the mayor's campaigns, has contracts with the City of Pasadena, and who was asked by the mayor to sit on the board of the Second Century Economic Development Corporation until his election to the Pasadena City Council in 2015. Trial Tr. Nov. 29, 2016, pp. 252:2-253:12, 253:19-254:13 (Bass).

627.    Cary Bass has very little recollection of the committee meetings, the opinions expressed by committee members or councilmembers or even the chair of the committee, or of any votes taken.  He does not remember whether the public was in attendance at any meetings, does not remember any discussion about the possible impact of a change to 6-2 system on Hispanic voters, and does not remember receiving the materials passed to the members by the mayor.  Mr. Bass does remember the mayor speaking in favor of the 6-2 system.  Bass claimed that generally no one had a strong opinion about the charter revision, and he does not remember much dissent.  Trial Tr. Nov. 29, 2016, pp.257:20-265:10  (Bass).

628.     Mr. Bass only knows that "it made common sense to me and probably one other that might have been in there," but that's all that he remembers.  Trial Tr. Nov. 30, 2016, p. 20:23-21:15 (Bass).  In light of his failure to remember the discussion of the Committee about the conversion to a 6-2 system, and his failure to remember what any member specifically said, Mr. Bass's testimony that the Committee was in favor of the proposal is not credible.  Compare Trial Tr. Nov. 29, 2016, p. 263:15-265:3 (Bass) to Trial Tr. Nov. 30, 2016, p. 20:23-21:15 (Bass)

629.     The Committee voted 10-1 against recommending the 6-2 charter amendment proposal. Only Chairman Roy Mease supported the 6-2 redistricting proposal.   Trial Tr. Nov. 18, 2016, pp. 78:17-79:5 (Ybarra); Trial Tr. Dec. 1, 2016, pp. 6:16-7:1 (Villareal);  Tr. 11/30/16 at 123:22-124:12 (Wheeler).

630.     Mayor Isbell testified at trial that Mr. Mease told him that the Bond/Charter Review Committee supported the change to the 6-2 system in its final meeting; and that everybody expressed their opinion and eight were for the changes and three against.  However, in his deposition, Mayor Isbell testified that he did not recall whether somebody had told him about and was therefore unaware of the committee's deliberations and decision regarding whether to recommend the 6-2 system.  Because the Mayor did not attempt to correct his testimony until trial and because he answered truthfully in his deposition, the more credible testimony is that he did not recall what the committee's deliberations or decision were .  Trial Tr. Nov. 28, 2016, pp. 129:9-133:5 (Isbell).

631.     The Committee's Final Recommendations Document, which was sent to the Mayor and councilmembers, listed the Committees' recommended bond projects and amounts for each project.  The document also discussed several proposed city charter changes that might be

taken up at a later date but did not discuss or recommend the 6-2 redistricting proposal. Trial Tr. Nov. 18, 2016, pp. 79:6-80:5 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 17:20-18:24 (Isbell); Trial Tr. Nov. 29, 2016, pp. 51:19-52:13 (Van Houte); PL 21.

### h.  Council Consideration of Ordinances Calling for Special Elections

632.    At a city council meeting on August 13, 2013, Mayor Isbell introduced an ordinance calling for a November 2013 election on bonds.  Council voted 5-3 on first reading in favor of putting bonds on the November ballot.  Councilmember Ybarra was not present.  PL 30.

Council member Van Houte examined the bond projects, and concluded that the four districts represented by Councilmembers that do not agree with the mayor (A,C,D,E), all above Spencer, would be receiving only 42.6% of the bond money, approximately 45 million dollars.  The Districts represented by councilmembers that always agree with the Mayor, (B,F,G,H) would receive the remaining majority of the bond money, approximately 60 million dollars.  Trial Tr. Nov. 29, 2016, pp. 58:6-59:4  (Van Houte)  Council member Van Houte voted against the bond proposal.  Trial Tr. Nov. 29, 2016, p. 56:22-24  (Van Houte).

633.    Former Councilman Harrison voted against the bond proposal because he thought that the City could use its budget surplus for basic needs like streets, water, sewer lines, sidewalks and public safety.  Trial Tr. Nov. 29, 2016, pp. 192:17-193:16 (Harrison).

634.    Councilman Wheeler voted in support of an amendment by Councilwoman Van Houte to trim the bond proposal but the amendment failed.  Ultimately Councilman Wheeler voted against the bond proposal.  Tr. 11/30/16 at 124:13-125:16 (Wheeler)

635.    Councilman Wheeler testified that following the bond vote, Mayor Isbell turned to Councilman Wheeler and said "Who are you to vote against me?"  Tr. 11/30/16 at 125:17-125:23 (Wheeler).

636.   Following the divided bond vote at the August 13, 2013 meeting, Councilwoman Van Houte heard Mayor Isbell express, under his breath, his intent to pull the bond measures from the agenda. Trial Tr. Nov. 29, 2016, pp. 59:23:60:2  (Van Houte).

637.   Mayor Isbell issued a memorandum to city council dated August 15, 2013, explaining that he was withdrawing the bond ordinance because he believed that the absence of unanimous support for the bonds by council would result in a failed bond election and that he instead proposed an ordinance that would place the redistricting charter amendment and others on Nov 2013 ballot.  PL 22.

638.   Shortly after the Mayor announced he would seek to put conversion to a 6-2 system on the November ballot, a member of the Bond/Charter Review Committee named Larry Peacock emailed the Mayor to say that the Committee had decided against the redistricting proposal.  Pl. 23.

639.   By August 19, 2013, the Mayor had a 6-2 redistricting plan--the same 62-2 finished on July 24, 2013--finalized and reviewed by the Bickerstaff Heath firm.  Trial Tr. Nov. 28, 2016, pp. 18:25-19:6 (Isbell); PL 248, 249, and 250.

640.   The agenda for the next city council meeting, August 20, 2013, did not include an item regarding bonds, but did contain an item for first reading on the charter changes. Trial PL 172.

641.   At the August 20, 2013, city council meeting, the city council passed on first reading Ordinance 2013-126, which called for a charter amendment election including the 6-2 redistricting proposal as a ballot measure.  The vote was split 5-4, with Mayor Isbell, Steve Cote, Phil Cayten, Bruce Leamon, and Darrell Morrison voting in favor of the ordinance. Councilmembers Van Houte, Harrison, Wheeler, and Ybarra voted against the ordinance.

Trial Tr. Nov. 18, 2016, pp. 84:10-85:3 (Ybarra); Trial Tr. Nov. 29, 2016, p. 62:9-14 (Van

Houte); Tr. 11/30/16 at 126:16-23 (Wheeler); PL 172.

642.   The discussion by city council and members of the public at the August 20, 2013, city

council meeting focused on how the 6-2 system was intended to make it harder for Hispanic

candidates to get elected.  Trial Tr. Nov. 18, 2016, pp. 85:5-86:3 (Ybarra)

643.   Council member Van Houte thought the change to a 6-2 system was potentially illegal.

Trial Tr. Nov. 29, 2016, p. 62:6-8  (Van Houte).

644.   Bond/Charter Review Committee member Victor Villarreal spoke against the Charter

revision at the August 20, 2013 City Council meeting, calling it divisive for the community

and reporting the 10-1 vote against the Charter revision. Trial Tr. Dec. 1, 2016, pp. 7:18-8:19

(Villareal);Trial Tr. Nov. 29, 2016, pp.60:18-61:23  (Van Houte)

645.   Victor Villarreal is a Pasadena businessman and conservative who sat on the

Bond/Charter Committee. Trial Tr. Dec. 1, 2016, pp. 4:22-5:23  (Villareal).  Councilmember

Ybarra nominated Victor Villarreal from District A to serve on the Bond/Charter Review

Committee that the Mayor formed in 2013.  Trial Tr. Nov. 18, 2016, pp. 70:17-22; Trial Tr.

Dec. 1, 2016, pp. 4:22-5:23  (Villareal)

646.   Councilmember Ybarra opposed adding at-large seats to city council because it is bad for

representation and because it was a waste of time and energy.  Trial Tr. Nov. 18, 2016, pp.

126:7-15.

647.   Council member Van Houte recorded in her notes of the August 20, 2013 city council

meeting that all of the comments by members of the public on the charter were opposed to

the revision. Trial Tr. Nov. 29, 2016, pp. 60:18-61:23 (Van Houte)

648.    Mayor Isbell testified that he decided not to move forward with bonds because he had some no votes on August 13, 2013, but he did decide to move forward with the change to a 6-2 redistricting system even though he had no votes on that issue as well.  Trial Tr. Nov. 28, 2016, pp. 23:19-24:9 (Isbell); PL 172.

649.    Former Councilman Harrison voted against putting on the ballot the conversion to a 6-2 system, and stated in a council meeting during one of the votes that he thought the change would be in violation of the Voting Rights Act.  Trial Tr. Nov. 29, 2016, pp. 194:1-6 (Harrison).

650.    At the August 22, 2013, city council meeting, the city council passed on second reading Ordinance 2013-126, which called for a charter amendment election including the 6-2 redistricting proposal as a ballot measure.  The vote was split 5-4, with Mayor Isbell, Steve Cote, Phil Cayten, Bruce Leamon, and Darrell Morrison voting in favor of the ordinance. Councilmembers Van Houte, Harrison, Wheeler, and Ybarra voted against the ordinance. Trial Tr. Nov. 18, 2016, pp. 86:14-21 (Ybarra); PL 173.

### i.    Prop 1 Election

651.    Councilmember Ybarra campaigned against the 6-2 redistricting ballot measure—known as Proposition 1 or "Prop 1"—by working to make sure voters in his district turned out to vote and were informed about Proposition 1.  Council member Van Houte campaigned against Prop 1 as well.  Trial Tr. Nov. 29, 2016, p. 63:1-6 (Van Houte).

652.    Proposition 1 passed on November 5, 2013, by a margin of 79 votes.  The Proposition 1 vote was racially polarized.  PL 198 (p. 2), 200, 308.

653.    Councilman Wheeler was at City Hall on election night for a city council meeting.  He saw an Anglo poll worker from the south side come in to deliver vote returns.  The poll

worker was in favor of changing to a 6-2 system and Mr. Wheeler asked why he supported

the measure.  The poll worker responded "Well, we have got to keep Pasadena Pasadena."

Mr. Wheeler felt that the statement was a dog whistle and was probably rhetoric that was

being passed around on the south side. Tr. 11/30/16 at 128:17-129:18 (Wheeler)

### 5) *Arlington Heights* Factors: Departures From the Normal Procedural Sequence

#### a.      Switch From Bond to Charter Review Committee

654.    When the Bond/Charter Review Committee was assembled, councilmembers were told

that the committee would consider bond proposals and did not expect the committee to take

up charter amendment proposals.  Trial Tr. Nov. 18, 2016, pp. 70:17-71:3. (Ybarra)  Mayor

Isbell's June 27, 2013 memo contained no mention of the proposed Charter revision.  Trial

Tr. Nov. 29, 2016, p.29:25-30:14  (Van Houte); PL 8.

655.    Committee member Victor Villarreal testified that he did not learn that the Bond/Charter

Committee would take up the Charter Revision proposal until the first meeting of the

Committee. Trial Tr. Dec. 1, 2016, pp. 6:9-15  (Villarreal).

656.    Councilman Wheeler expected the citizens' committee to deal with the subject of bonds

but then learned on July 25, 2013 that Mayor Isbell had added charter review to the

Committee's tasks.  Tr. 11/30/16 at 119:16-120:6 (Wheeler).

657.    Councilmember Van Houte found out about the July 25, 2013, Bond Committee meeting,

from a committee member.  Councilmember Ybarra attended after finding out about the

meeting and heard about the possibility of discussions of charter amendments because of the

*Shelby County, AL v. Holder* decision.  Trial Tr. Nov. 18, 2016, pp. 71:10-72:2 (Ybarra).

#### b.      Mayor Isbell Announced a Procedure for Appointing Members of the Committee, Then Violated the Procedure for North Side Appointees

658.    After asking each member of the city council to submit names for placement on the

citizens committee, Mayor Isbell initially chose not to place a representative from District C

on the committee and he placed additional members of his choosing on the committee.  Trial

Tr. Nov. 18, 2016, pp. 222:12-223:9 (Isbell);Trial Tr. Nov. 29, 2016, p. 28:2-4  (Van Houte).

659.    Seven of the members were nominated by city councilmembers and approved by the

Mayor.  However, the Mayor then appointed four additional members of his own choosing,

including the chair, Roy Mease. Trial Tr. Nov. 28, 2016, pp. 5:8-12 (Isbell); Trial Tr. Nov.

29, 2016, pp.28:20-29:30  (Van Houte)  Thus, the Mayor did not follow the method of

composing the committee that he had announced in his June 27, 2013 memo.  Trial Tr. Nov.

29, 2016, pp. 29:19-24  (Van Houte).

660.    Council member Van Houte testified that it would be fairer for each member of council

to have at least one person on the citizens committee.  Trial Tr. Nov. 29, 2016 p. 29:9-29:12

(Van Houte).

661.    During the time of the Bond/Charter Review Committee, the city was paying Mr. Mease,

who used to be a Pasadena municipal judge and owns a private law office in Pasadena, as a

vendor doing collections work.  From July 30, 2013 to April 15, 2014, including the period

during which he served as chair of the Bond/Charter Committee, Mr. Mease was paid a total

of $181,402.05 by the City under his collections contract.  He continues to receive payments

currently. Trial Tr. Nov. 28, 2016, pp. 49:11-21 (Isbell); Trial Tr. Nov. 29, 2016, pp. 48:11-

49:12  (Van Houte)48:11-51:5;  PL 221-228.

662.    Mr. Mease has a close relationship with Mayor Isbell.  Trial Tr. Nov. 29, 2016, pp.

192:1-8 (Harrison).

### c. In the summer of 2013, Mayor Isbell prepared the 6-2 Plan that would be adopted in 2014 without consulting with or informing members of city council

663.   In the summer of 2013 Mayor Isbell worked with City Planning Department employees to create possible redistricting maps.  Trial Tr. Nov. 28, 2016, pp. 6:14-19, 8:4-9:21 (Isbell).

664.   The Mayor did not hand out copies of the 6-2 map to members of the city council or the public audience at the July 25, 2013, Bond/Charter Review meeting.  Trial Tr. Nov. 28, 2016, pp. 14:2-8 (Isbell).

665.   Before the August 20, 2013, city council vote on the ordinance calling for an election on the 6-2 redistricting measure, Mayor Isbell did not give a redistricting plan showing a 6-2 system or any associated data to council members.  The map was completed in August of 2013, but he did not show it to councilmembers until February 2014.  Trial Tr. Nov. 18, 2016, pp. 86:4-13 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 21:3-11 (Isbell); Trial Tr. Nov. 29, 2016, pp. 61:24-62:5 (Van Houte); Tr. 11/30/16 at 126:24-127:1, 132:7-132:14 (Wheeler); PL 25, 204, 205, 206.

### d. The final meeting of the Bond/Charter Review Committee was closed to the public and to members of council

666.   On the day of the closed Bond/Charter Review Committee meeting on July 29, 2013, Richard Scott asked the police to tell council members that the committee meeting would be a closed meeting and that they would not be allowed in the room where the committee was meeting.  Trial Tr. Nov. 18, 2016, pp. 75:24-76:21 (Ybarra);Trial Tr. Nov. 29, 2016, pp.45:24-47:7  (Van Houte).

667.   Councilmembers Van Houte, Harrison, Wheeler, and Ybarra, as well as several Pasadena residents, were present in City Hall to attend the July 29, 2013, committee meeting but were

not allowed inside the conference room to attend.  Police Officers were posted in the meeting

room and at the door.  The people who were prevented from attending the meeting were not

unruly.  Trial Tr. Nov. 18, 2016, pp. 76:23-77:6 (Ybarra). Trial Tr. Nov. 29, 2016, pp.45:24-

47:7  (Van Houte)  Tr. 11/30/16 at 123:1-21 (Wheeler)

668.   The Mayor, Richard Scott, Sarah Benavides, and other department heads were in the July

29, 2013, committee meeting room at different times during their meeting.  Trial Tr. Nov. 18,

2016, pp. 77:7-15 (Ybarra)

   **e.     The Committee did not take enough time to review the charter**

669.   Councilmember Van Houte testified that prior procedure for a Charter Review

Committee was to review the entire charter over a period of several months.  The 2013

Charter Review Committee only made recommendations on charter changes proposed by the

mayor, and the Committee met and concluded its work in less than two weeks.  Trial Tr.

Nov. 29, 2016, pp. 53:20-55:13  (Van Houte).

   **6)  *Arlington Heights* Factors: Substantive departures, "particularly if the factors
   usually considered important by the decisionmaker strongly favor a decision
   contrary to the one reached"**

   **a.  The Mayor Pushed Forward With the 6-2 Proposal Despite Opposition from
   Councilmembers and the Public**

670.   Councilmember Ybarra reacted to Mayor Isbell's proposal for a charter amendment

changing the city council to a 6-2 hybrid system with disappointment and disgust because it

came soon after the 2011 redistricting and the end of preclearance.  Trial Tr. Nov. 18, 2016,

pp. 72:24 – 73:11.

671.   Councilman Wheeler testified that he and others spoke out against the 6-2 proposal on

July 25, 2013.  Tr. 11/30/16 at 120:7-120:16; 122:20-122:25 (Wheeler).

672.    During the public comment period, no member of the public spoke in favor of converting to a 6- electoral system. Trial Tr. Nov. 29, 2016, p. 62:19-25   (Van Houte).


**b.  The Mayor Pushed Forward with the 6-2 Change Despite Opposition from the Bond/Charter  Review Committee.**

673.    The committee final recommendation document did not mention a change in method of election even though it discussed other charter changes proposed by the Mayor that could be taken up at a later date.  Trial Tr. Nov. 18, 2016, pp. 79:6-80:5 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 17:20-18:24 (Isbell); Trial Tr. Nov. 29, 2016, pp. 51:19-52:13 (Van Houte); PL 21.

674.    Mr. Villarreal told Councilmember Ybarra that the vote in the committee was 10-1 against changing the election system to 6-2.  Trial Tr. Nov. 18, 2016, pp. 78:17-79:5 (Ybarra);

675.     Bond/Charter Committee member Rosemary Matthews told Councilman Wheeler that the committee members were against the proposal to change to a 6-2 election system excerpt for the Chairman Roy Mease, who supported the proposal.  Tr. 11/30/16 at 123:22-124:12 (Wheeler)

676.    Although the Mayor claimed he was told the committee voted in favor of the 6-2 proposal, he would have known immediately that his information was wrong because Victor Villarreal spoke at the council meeting of August 20, 2013, that the vote was 10-1 against and Larry Peacock wrote an email to the Mayor saying the committee voted against the proposal.

677.    The Mayor retained the Bickerstaff Heath law firm to work on maps without seeking a vote from the rest of the council to retain the firm.  Trial Tr. Nov. 30, 2016 p. 132:7-132:14 (Wheeler); PL 248, 249, 250.

### c.   The Mayor Pushed Forward With the 6-2 Proposal Despite Being Told it Would Dilute Hispanic Voting Strength

678.    Despite the fact that the Mayor advocated for 4 SSVR-majority districts in 2011, he advanced a plan with only 3 SSVR-majority districts in 2014.Trial Tr. Nov. 18, 2016, pp. 44:12-45:21, 165:10-167:16, 201:4-12, 202:17-22;  Trial Tr. Nov. 28, 2016, pp. 7:9-2; PL 152; PL 3 3 (Isbell).

679.    Councilman Wheeler testified that he and others spoke out against the 6-2 proposal on July 25, 2013.  Tr 11/30/16 at 120:7-120:16; 122:20-122:25 (Wheeler).

680.    Councilman Wheeler spoke out against the 6-2 proposal and argued it would dilute Hispanic voting strength.  First he explained that making single member districts larger in size, as well as creating the at-large seats would make it harder to campaign.  He described that when he ran in District E, his campaign only had to target a few thousand voters and "That is doable for a family and some friends to go out and do.   When you start talking about running at-large districts, you need big money.  We have never had big money."  Second, he explained that the change would be dilutive because "it gave the voting power to the majority voters, which is Anglos in the south."  Tr. 11/30/16 at 121:10-122:4 (Wheeler).

681.    Council member Ybarra said he believed that the 6-2 plan may present Section 2 compliance issues, and at least two Bond/Review Committee members shared concerns about

potential dilution.   Trial Tr. Nov. 29, 2016, p. 39:3-21  (Van Houte); Trial Tr. Nov. 29, 2016, pp. 40:21- 41:21, 42:2-7 (Van Houte); Trial Tr. Nov. 18, 2016, pp. 85:5-86:3 (Ybarra).

682.    Former Councilman Harrison voted against putting on the ballot a charter change involving the 6-2 system, and stated in a council meeting during one of the votes that he thought the change would be in violation of the Voting Rights Act.  Trial Tr. Nov. 29, 2016, pp. 194:1-6 (Harrison).

683.    Council member Van Houte recorded in her notes of the August 20, 2013 city council meeting that all of the comments by members of the public on the charter were opposed to the revision. Trial Tr. Nov. 29, 2016, pp. 60:18-61:23 (Van Houte).

684.    A month after the  meeting, Councilmember Van Houte wrote an email to Allan Jamail complaining that the new plan meant that the mayor, one single member district council member and both at large seats could be elected by the relatively higher turnout south Pasadena.  Trial Tr. Nov. 29, 2016, pp. 42:8-43:19  (Van Houte); PL 318.

### 7)    *Arlington Heights* Factors: Legislative History

#### a.    2014 Redistricting Process

685.    Because the Mayor had already drawn the ultimate 6-2 map the preceding August, but did not share the map with members of the city council, the city council's redistricting process in the spring of 2014 was a sham.  Trial Tr. Nov. 18, 2016, pp. 86:4-13 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 21:3-11 (Isbell); Trial Tr. Nov. 29, 2016, pp. 61:24-62:5 (Van Houte); Tr. 11/30/16 at 126:24-127:1, 132:7-132:14 (Wheeler); PL 25, 204, 205, 206.

686.     On February 18, 2014 the City Council passed on second reading the proposal to amend City ordinances to limit debate time in council meetings to two minutes per Councilmember on each issue.   PL 191.

687.     Mayor Isbell initiated the policy to limit councilmembers' debate time and the measure passed on a 5-4 vote with the Mayor casting the tie-breaking vote in favor.  Tr. 11/30/16 at 130:7-131:1 (Wheeler)

688.     Councilman Wheeler voted against the limit on councilmember debate time because although council members can discuss agenda items in pre-council meetings, those meetings are only 30 minutes long and are not televised to the public.  Councilman Wheeler believed that there should be public debate and council members should be able to explain their votes to the public.  Tr. 11/30/16 at 131:2-20 (Wheeler)

689.     Councilman Wheeler testified that he believed the Mayor spearheaded the limit on debate time because "council members [we]re making some very good arguments that were in opposition to the mayor's policies.  And often they went over two minutes and I think the mayor did not like hearing opposition to him.  I also think that he was about to propose a plan that was very controversial, very complex and required a lot of information, so I think he wanted to muffle council members and also reduce the amount of speech that we had during public comment."  Tr. 11/30/16 at 131:21-132:6 (Wheeler)

690.     Councilmembers Van Houte, Harrison, Ibarra and Wheeler all voted against the proposal to limit debate time to two minutes when the mayor introduced the proposal in February of 2014.  The measure passed 5-4 when the Mayor broke the tie vote. Council member Van Houte was the first person removed from a council meeting for over-speaking the limit,  Trial Tr. Nov. 29, 2016, p. 72:3-10, 76:1-8  (Van Houte), 194:19-195:22 (Harrison).

691.    On February 26, 2014, Mayor Isbell sent an email to council members with information on three draft 6-2 redistricting plans, one of which was the 62-2 plan previously prepared by the City and shared with the Bond/Charter Revision Committee and the other two of which were drawn by the Bickerstaff firm.  Example Plan 2, which was the 62-2 plan from 2013, eventually is adopted by council.  PL 25, 205; Trial Tr. Nov. 28, 2016, pp. 33:12-30:3 (Isbell).

692.    On March 4, 2014, the City Council held a public "Redistricting Workshop"  at which the council discuss the three draft redistricting plans generated by the Bickerstaff firm at the Mayor's request. PL 187

693.    Council member Van Houte would have liked to, but was not allowed to work with the consultants for the city on the 6-2 map. Trial Tr. Nov. 29, 2016, p. 70:1-8  (Van Houte).

694.    On March 18, 2014, City Council held a meeting to take public testimony on proposed redistricting plans.  PL 181.

695.    At the council meeting on March 18, 2014, at which members of the public were invited to speak about the redistricting plans, Mayor Isbell had a gun tucked into his belt at the dias. He dropped the gun on the floor at the end of the meeting.  Trial Tr. Nov. 28, 2016, pp. 37:7-41:24 (Isbell); PL 181.

696.    Councilman Cody Ray Wheeler saw the pistol fall out of the mayor's belongings on to the ground. Councilman Wheeler believes that the City Secretary Linda Rorick saw the gun as well.  The pistol was a 9-millimeter Beretta.  Tr. 11/30/16 at 132:23-135:1 (Wheeler).

697.     Councilman Wheeler is familiar with the pistol because he grew up around weapons and the 9-millimeter Beretta is the standard issue for the Marine Corps, in which he served for four years.  Councilman Wheeler has shot a 9-millimeter Beretta and worked as a Marine in

the armory where he saw hundreds of those weapons.  Tr. 11/30/16 at 132:23-135:1
(Wheeler).

698.     Councilman Wheeler testified that the pistol was not a pellet gun and there is no
mistaking an actual firearm and a pellet rifle. The barrel of a pellet gun is very small and the
pellet is very small.  A 9-millimeter Beretta is a good size caliber weapon and you can see
the difference in the barrel.  Also, a Beretta is made out of metal and when dropped on the
ground it makes a very metallic audible clunk, unlike a pellet gun. Tr. 11/30/16 at 132:23-
135:1 (Wheeler)

699.     City rules do not allow members of council to bring guns to council meetings.  Tr.
11/30/16 at 132:23-135:1 (Wheeler)

700.     After he dropped the gun the Mayor quickly picked it up and left the room.   Councilman
Wheeler testified that he was in shock that Mayor Isbell brought a weapon to the meeting and
felt that the gun "escalated the situation."  Mr. Wheeler was unsettled and did not understand
why the Mayor felt that he needed to bring a weapon to a council meeting, especially when
there are armed police officers at council meetings.  Tr. 11/30/16 at 132:23-135:1 (Wheeler)

701.     Councilman Wheeler thought it was likely that Mayor Isbell brought a weapon to this
particular meeting because the topic was redistricting.  Councilman Wheeler testified "It is
my personal belief that it was, that he knew what he was proposing was controversial [and]
he had altered city rules."  Tr. 11/30/16 at 135:2-135:8 (Wheeler)

702.     Mayor Isbell claimed at trial, variously, that the gun was a pellet gun, that the gun was a
pellet gun that was broken, and that a threatening message was received at his company
Apache Oil as a recorded message by a lady against the Mayor and his family.  However, in
his deposition, the Mayor testified that the threats that caused him to carry a gun on March 18

were anonymous.  Because Mayor Isbell's deposition testimony was not corrected except to supplement the description of guns he owns, his trial testimony that he was threatened by a lady is not credible .  Trial Tr. Nov. 28, 2016, pp. 37:13-23, 38:1-43:2 (Isbell).

703.    At the city council meeting held on April 1, 2014, at which the council would vote on the redistricting plan, Mayor Isbell ordered armed police officers to remove Councilmember Van Houte after she exceeded her allotted debate time speaking against the proposed 6-2 redistricting plan.  Mayor Isbell refused to accept Councilmember Harrison's and Council member Ybarra's offer to cede their debate time to Van Houte.  Trial Tr. Nov. 18, 2016, pp. 110:25-112:6 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 35:7-23 (Isbell);Trial Tr. Nov. 29, 2016, pp. 71:10-72:2, 74:16-18, 72:24-73:1 (Van Houte), 195:23-196:9 (Harrison); Tr. 11/30/16 at 135:2-136:5 (Wheeler); PL 184 (video), PL 228

704.    Former Councilman Harrison testified that he never received an extension of the two-minute speaking limit after the rule went into effect.  Trial Tr. Nov. 29, 2016, pp. 195:2-6 (Harrison).

705.    Council member Van Houte had carefully prepared notes to guide her in her remarks which included her opinion that a 6-2 plan would create problems for Hispanic voters, would decrease the number of Hispanic majority districts, that the south side would have more influence on the at-large districts than would the north side,  that some councilmembers would be negatively affected, and that the councilmembers had not been allowed to have input on the map because it had been drawn before the issue ever went to the ballot.  Trial Tr. Nov. 29, 2016, pp. 72:11-74:8  (Van Houte)

706.    After Councilmember Van Houte was removed, Councilmember Ybarra walked out of the April 1 meeting in protest because he felt that Mayor Isbell had granted additional time to

councilmembers and other people speaking at meetings before.  Trial Tr. Nov. 18, 2016, pp. 112:1-22 (Ybarra);

707.   Councilmembers Harrison and Wheeler also walked out of the meeting after Ms. Van Houte was removed on April 1, leaving the Mayor and four councilmembers present to pass the redistricting plan on first reading.  Trial Tr. Nov. 18, 2016, pp. 112:23-113:6 (Ybarra); Trial Tr. Nov. 29, 2016, pp. 196:3-13 (Harrison); Tr. 11/30/16 at 136:6-19 (Wheeler)

708.   Councilman Wheeler explained that he followed Councilwoman Van Houte out of the April 1 council meeting because:  " I felt that everything up to this point, the [election contest] lawsuit, the negative campaigning, the proposal for the redistricting, the weapon being brought, the way that we are limited in speech and then he kicks her out of the meeting, the whole process felt like a sham.  And the fact that even the charter committee voted against it, everything felt like it was a sham.  And it didn't matter what anybody did or what the people wanted, the mayor was going to get his way.  And I walked out in support of Van Houte and walked out in protest of the whole process." 11/30/16 at 136:6-136:19 (Wheeler)

709.   The April 15, 2014, second reading vote of city council on the 6-2 plan was 5-4, with Mayor Isbell and Councilmembers Leamon, Morrison, Cayten, and Cote voting "aye;" and Councilmembers Ybarra, Wheeler, Van Houte and Harrison voting "nay."  Trial Tr. Nov. 18, 2016, pp. 113:7-24 (Ybarra); PL 185.

710.   The 6-2 redistricting plan--Example Plan 2--that passed on as Ordinance 2014-73 on second reading on April 15, 2014, was attached to the ordinance.  PL 6; Trial Tr. Nov. 28, 2016, pp. 43:3-21 (Isbell).

711.    Mayor Isbell did not ask members of council to submit their own draft redistricting plans prior to passage of the 6-2 plan on April 15, 2014.  Trial Tr. Nov. 28, 2016, pp. 43:3-21 (Isbell).

### 8)  *Arlington Heights* Factors: Legislative History—Contemporary Statements by Members of the Decisionmaking Body

712.    Mayor Isbell gave an interview at some point in 2013 to SCOTUSblog in which he stated that he proposed the change to a 6-2 redistricting system when he did because the Justice Department could no longer tell Pasadena what to do.  Trial Tr. Nov. 28, 2016, pp. 33:4-9 (Isbell).

713.    Mayor Isbell thought that the Department of Justice would not have precleared a change to a 6-2 system because the DOJ wanted to protect the minority voters and that in the eyes of the DOJ, the change in system would decrease the voting power of Hispanic voters.  Trial Tr. Nov. 28, 2016, pp. 61:12-62:1 (Isbell).

714.    Mayor Isbell thought that there was a good possibility that under preclearance the DOJ would have rejected the 6-2 system as diluting the voting strength of Hispanic voters.  Trial Tr. Nov. 28, 2016, pp. 62:13-20 (Isbell).

### C.  LULAC  v. Perry Intentional Discrimination Considerations:  Latino Electorate was Increasingly Mobilized

### 1)   The City Council Normally Operated by Consensus but had Started to Divide on Issues Related to Resource Allocation

715.    The Pasadena city council normally votes in unison. Tr. 11/30/16 at 115:18-116:8 (Wheeler).

716.    Former Councilman Harrison testified that members of the council vote together 95-98 percent of the time, mostly on paying the bills.  From time to time, council divides on its votes.  Trial Tr. Nov. 29, 2016, pp. 185:2-7 (Harrison).

717.    During 2012, Councilmember Ybarra maintained a cordial relationship with Mayor Isbell and voted with him 99% of the time.  Trial Tr. Nov. 18, 2016, pp. 52:4-11.

718.    Councilmember Bruce Leamon tends to vote 100% of the time with Mayor Isbell.  Trial Tr. Nov. 18, 2016, pp. 60:14-22.

719.    Councilmembers Wheeler, Van Houte, and Harrison sometimes joined Councilmember Ybarra in votes independent of the Mayor, but usually voted with the Mayor.  Trial Tr. Nov. 18, 2016, pp. 60:23-61:23.

720.    In recent years, the city council began to cast divided votes on issues related to resource allocation between the north and south sides of the city. 1.      Tr. 11/30/16 at 116:9-117:8 (Wheeler)

721.    Van Houte, Ybarra, Harrison, and Wheeler opposed road projects on Fairmont, Space Center, and Genoa Red Bluff were done out of the general fund with the rationale that it would aid traffic flow to the commercial area around Fairmont Parkway.  Trial Tr. Nov. 18, 2016, pp. 63:1-22.

722.    Councilman Ybarra testified that the City is only required by law to carry a two-month balance and other cities put the people's money to work. Ybarra testified that there is no reason, with the needs that Pasadena has, for the City to carry $40 million in surplus as well as $20 million in surplus in the economic development corporation and $26 million in surplus in the city's water fund.  Trial Tr. Nov. 18, 2016, pp. 56:6-57:6 (Ybarra).

723.    Councilmember Wheeler votes with Councilmember Ybarra on issues that are viewed as consistent with Hispanic interests.  Trial Tr. Nov. 18, 2016, pp. 68:2-6.

724.    The flow of city money to projects in District A slowed as Mr. Ybarra became more independent in his votes on city council.  Trial Tr. Nov. 18, 2016, pp. 54:20-55:8.

### a. Nomination of Jackie Welch to the Second Century Economic Development Board

725.    Following the 2013 election, the city council members cast a divided 5-4 vote regarding the nomination of Mrs. Jackie Welch to the city's economic development board.   Mayor Isbell nominated Mrs. Welch.  Mr. Wheeler voted against the nomination because he believed that the economic development board was powerful, had a large budget and could bring a lot of good to the city. Mrs. Welch had just finished an eight-year term on council and her husband had finished an eight-year term before that.  In Councilman Wheeler's opinion, "the same 10 people get appointed to every board, every position.  And they do whatever the mayor wants."  Councilman Wheeler voted against the nomination of Mrs.  Welch because he thought the economic development board "needed someone that hadn't been in the system, part of the machine this whole time."  Tr. 11/30/16 at 116:9-117:4 (Wheeler).

726.    The nomination of Mrs. Welch carried 5-4 with Mayor Isbell casting the tie-breaking vote. Tr. 11/30/16 at 117:5-8 (Wheeler).

727.    Councilmembers Van Houte, Wheeler, Harrison and Ybarra voted against the appointment of Jackie Welch to the Second Century Economic Development Board because they felt that she was unqualified for the position and feared she would only vote for what the Mayor wanted to do with Second Century funds.   Trial Tr. Nov. 18, 2016, pp. 68:14-69:12 (Ybarra); Trial Tr. Nov. 29, 2016, p. 78:7-20 (Van Houte)

### b.   Trash Pick-up on the North Side

728.    Councilmember Ybarra usually has voted with the Mayor during his service on council.

Trial Tr. Rough Draft Nov. 18, 2016, pp. 27.  Mr. Ybarra did not vote with the Mayor during

his first city council term when Ybarra opposed a pilot program for large trash containers

favored by the Mayor that would have only been applied to the north side and would have

entailed one trash pick-up a week for north side residents.  North side residents opposed the

large trash containers because they would have been heavier for north side residents to carry,

the once-a-week service would have led to north side neighborhoods smelling badly, and the

south side was going to enjoy more frequent pick-up.  Trial Tr. Rough Draft Nov. 18, 2016,

pp. 27-28.

### c.   2012 Discontinuation of Public Bus Service

729.    In 2012, a recommendation by Second Century came before city council to stop the

payment of $150,000 annually from Second Century's budget to Harris County for a public

bus line serving mostly low-income residents and students on the north side of Pasadena.

Trial Tr. Nov. 18, 2016, pp. 49:8-50:12 (Ybarra).

730.    The ordinance effectively ending the bus service in Pasadena passed in 2012, with

Councilmembers Van Houte, Harrison, and Ybarra voting against it.  Trial Tr. Nov. 18, 2016,

pp. 49:8-50:12 (Ybarra); Trial Tr. Nov. 29, 2016, pp. 77:23-78:2 (Van Houte), 180:18-

181:18 (Harrison).

731.   Most of the bus ridership was Hispanic and used the bus line to travel to the commercial area in the south side of Pasadena.  Trial Tr. Nov. 18, 2016, pp. 50:13-51:1 (Ybarra).Trial Tr. Nov. 29, 2016, pp. 76:10-77:22 (Van Houte)

732.   Councilmember Ybarra voted to keep bus service because he felt that there was a need for such a service and that it was worth the cost to Second Century and the City.  Trial Tr. Nov. 18, 2016, pp. 51:2-11.

733.   Phil Cayten, a councilmember in 2012, told Councilmember Ybarra that the bus line was too close to Pasadena on Richey Street and was bringing too many poor people and black people into Pasadena.  Mr. Ybarra did not agree with that perspective.  Trial Tr. Nov. 18, 2016, pp. 51:12-52:3.

### d.  Lazy River in Strawberry Park

734.   Councilmember Steve Cote proposed building a lazy river water feature in Strawberry Park in 2013.  The lazy river was estimated to cost $7 million and, once complete, would entail a $10 admission fee for all visitors.  Former Councilman Harrison opposed the lazy river because he thought that if a park project is built by city funds for the citizens, then it should be free to enter the park.  Trial Tr. Nov. 18, 2016, pp. 65:2-25; Trial Tr. Nov. 29, 2016, pp. 185:7-10, 20-25 (Harrison).

735.   Councilmember Ybarra voted against the lazy river project because he thought money should be spent on other infrastructure needs in the City and because the rest of Strawberry Park was "falling apart."  Former Councilman Harrison voted against it because he thought it was not a good use of city money.  Trial Tr. Nov. 18, 2016, pp. 65:18-66:8; Trial Tr. Nov. 29, 2016, pp. 185:11-19 (Harrison).

736.   The Strawberry Park lazy river project final costs were close to $10 million.  Trial Tr. Nov. 18, 2016, pp. 65:13-19

737.   Councilmembers Van Houte, Wheeler, Ybarra, and Harrison opposed the Strawberry Park lazy river project and voted against it.  Trial Tr. Nov. 18, 2016, pp. 66:9-12; Trial Tr. Nov. 29, 2016, pp. 185:7-10 (Harrison).

### e.  Transparency in City Hiring

738.   The City Council was also divided in its votes on the question of whether to approve a proposed hire of a city employee that was the husband of the city planning director. Trial Tr. Nov. 29, 2016, p. 78:3-6  (Van Houte).  Council member Van Houte testified that transparency was lacking on city appointments, and that sometimes the councilmembers were asked to vote without know the qualifications of the potential appointee, leaving open the possibility that appointees are selected not because of their qualifications but because of their political affiliation with the mayor. Trial Tr. Nov. 29, 2016, pp. 79:7-80:4 (Van Houte)

### 2)  Latino Voters Were Becoming More Politically Active in Recent Years

739.   Councilmember Ybarra has made efforts to increase Latino voter registration, including helping facilitate a citizenship workshop with the National Association of Latino Elected Officials in 2011.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 30.

740.   In general, the cost to file a naturalization application is $680 (including the biometric fee).  On December 23, 2016, the cost of submitting an Application for Naturalization will rise to $725.  The fee for Form N-600, Application for Certificate of Citizenship, and N-600K, Application for Citizenship and Issuance of Certificate Under Section 322, will

increase from $550 or 600 to $1,170.  See U.S. Citizenship and Immigration Services, "Our Fees" found at https://www.uscis.gov/forms/our-fees.

741.    Councilmember Ybarra believes that his campaign in 2009 brought more Hispanics out to vote in District A than previously had turned out for city elections.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 31 – 32.33

742.    Councilman Wheeler decided to run for city council in part to address the disparity in city services between the north and south sides of Pasadena.  Tr. 11/30/16 at 106:14-107:5 (Wheeler).

743.    In his 2013 race for city council District E, Councilman Wheeler's campaign increased total voter turnout in the district to 837 from 458 (in the District E 2011 runoff election).  Tr. 11/30/16 at 107:20-108:10 (Wheeler); *see also* Pl. 237, 238 at 21.

744.    District A's demographics in 2009 were heavily Hispanic and changing and played a role in Mr. Ybarra's decision to run for office.  He thought that if one could turn out Hispanic voters, one could win the district.  Trial Tr. Rough Draft Nov. 18, 2016, pp. 17-18 (Ybarra).

745.    Mr. Ybarra thought that he would "get blown away" with the Anglo vote in his first election, and he therefore focused his campaign on Hispanic voter turnout while also attempting to turn out Anglo voters.  Trial Tr. Nov. 18, 2016, pp. 136:21-137:2 (Ybarra).

### 3)    The City Used Public Resources to Target, Mobilize and Turnout Voters from the South Side to Thwart the Increasingly Mobilized Latino Electorate

746.    The City used its own resources, in combination with the resources of Mayor Isbell's political action committees, to turn out Anglo voters on the south side in support of candidates and policies favored by the City.

   **a. The City Used the Neighborhood Network Grants Program to Target, Mobilize and Turnout Voters from the South Side to Thwart the Increasingly Mobilized Latino Electorate**

   *i.    Neighborhood Network Background*

747.   The Neighborhood Network Division is a department within the city that helps neighborhoods form associations, helps neighborhoods with deed restrictions, and distributes grants to neighborhoods.  Trial Tr. Nov. 18, 2016, pp. 113:25-114:8 (Ybarra); PL 347 (Depo. of Hollon, Karen (1_12_2016), 32:24-35:5).

748.   Council Member Van Houte testified that the Neighborhood Networks Program is supposed to assist in setting up neighborhood associations because they are a good thing for the neighborhoods, and that to be eligible for the Neighborhood Networks Program matching grant, the association has to be recognized by the program. Trial Tr. Nov. 29, 2016, p. 13:18-14:9, 80:12-81:7 (Van Houte)

749.   Neighborhood Network Matching Grants are given to neighborhood groups for projects that include neighborhood centers, pools, basketball courts, and beautification projects.  Trial Tr. Nov. 18, 2016, pp. 114:9-17 (Ybarra); PL 347 (Depo. of Hollon, Karen (1_12_2016), 32:17-35:5, Jan. 12, 2016).

750.   The Neighborhood Network's matching grant program matches amounts up to $7,500 to approved neighborhood associations for individual neighborhood improvements, and neighborhoods can do multiple projects. Trial Tr. Nov. 29, 2016, p. 14:18-15:2  (Van Houte); PL 347 (Depo. of Hollon, Karen (1_12_2016), 42:9-44:16, Jan. 12, 2016).

751.   The average annual budget for Neighborhood Network Matching Grants is between $75,000 and $100,000.  PL 347 (Depo. of Hollon, Karen (1_12_2016), 66:1-67:15, Jan. 12, 2016).

*ii.        Northside neighborhoods are neglected in setting up and recognizing programs*

752.    Karen Hollon, the Director of the Program, functions as the gatekeeper of the Neighborhood Networks Program, in charge of administering the numerous administrative steps necessary to gain recognition as a neighborhood association.  Trial Tr. Nov. 29, 2016, p. 16:13-17:18 (Van Houte); Trial Tr. Nov. 18, 2016, pp. 119:5-21 (Ybarra); PL 120, Pl. 342.

753.    Karen Hollon inspects Neighborhood Network Matching Grant applications and sends them for approval to a board that includes Richard Scott.  PL 347 (Depo. of Hollon, Karen (1_12_2016), 45:17-48:4, Jan. 12, 2016).

754.    Most of the Neighborhood Network neighborhood and homeowner associations are on the south side of Pasadena.  Trial Tr. Nov. 18, 2016, pp. 115:7-10 (Ybarra); PL 31.

755.    Councilmember Van Houte testified that she is aware of several north side groups that are having difficulties obtaining recognition from the city that is necessary to qualify for the matching grants program, as a result of inconsistent attention from Karen Hollon, the Director of the Neighborhood Networks Program. Trial Tr. Nov. 29, 2016, p. 15:12-16:12, 157:16-158:19 (Van Houte).

756.    Former Councilman Harrison testified that he tried to help the Northeast Pasadena Association get recognized by Neighborhood Network Division.  However, Karen Hollon dropped out of sight after the City initially helped get neighborhood residents to attend a meeting.  The association was not ultimately recognized by Neighborhood Network.  Trial Tr. Nov. 29, 2016, pp. 197:24-198:20 (Harrison); PL 31.

757.   Councilman Wheeler testified that there are only two active neighborhood associations in current District D and that most of the homeowners associations in Pasadena are located south of Spencer Hwy.  Tr. 11/30/16 at 141:1-141:10 (Wheeler).

758.   Councilman Wheeler testified that after he was first elected, he contacted Karen Hollon and asked for help forming neighborhood associations in his district.  Ms. Hollon met with Councilman Wheeler in her office and offered to send letters out to the community, designate an area to be organized and buy food for a meeting of residents.  However, Councilman Wheeler never heard from Ms. Hollon again and to this day there is no new neighborhood association in the district.  Tr. 11/30/16 at 141:11-142:3 (Wheeler).

759.   Pasadena has a large budget to help establish neighborhood associations, which makes it much easier on the residents.  When it helps a neighborhood, the City sends letters out to all the residents in that neighborhood announcing that the City want to help start a neighborhood association.  The City hosts a gathering with refreshments or food.  Council members can attend and talk to residents about the neighborhood's needs and how a neighborhood association can receive money through the Neighborhood Network grant program.  Tr. 11/30/16 at 142:4-143:25 (Wheeler).

760.   Councilman Wheeler testified that it's not impossible for a north side neighborhood to organize by itself, but neighborhoods on the south side receive assistance from the City.  Tr. 11/30/16 at 142:4-143:25 (Wheeler).

761.   Councilman Wheeler testified at trial that in the past few months of council meetings, several neighborhood associations from the south side (only one from the north side) have come in and thanked the city for giving them support and money and have praised Karen Hollon for her assistance.  The groups said "We would not be here without the help of the

city.  We would not have our neighborhood association."  Tr. 11/30/16 at 142:4-143:25 (Wheeler).

762.    The most recent neighborhood association formed was one in District C.  It was formed after Plaintiffs filed this suit and propounded discovery regarding neighborhood associations in Pasadena.  Trial Tr. Nov. 28, 2016, pp. 127:11-23 (Isbell); Trial Tr. Nov. 30, 2016, pp. 142:4-143:25 (Wheeler); PL 242.

763.    Council member Van Houte testified that she believes city employees are also recruited to do some of the beautification work, and has observed city employees doing landscaping at Baywood Shadows, where Mayor Isbell lives.  Trial Tr. Nov. 29, 2016, p. 156:3-13  (Van Houte).

### iii.    Neighborhood Networks Sends the Vast Majority of its Funding to the South Side

764.    Council Member Van Houte testified that funding from the Neighborhood Networks does not flow in equal amounts to the north side and the south side of Pasadena, and that the south side of Pasadena has more programs recognized by the city and therefore those programs receive more grants.  Trial Tr. Nov. 29, 2016, p. 15:4-1 (Van Houte) ;Trial Tr. Nov. 18, 2016, pp. 115:11-14 (Ybarra)

765.    From November 4-8, 2013, the Neighborhood Grants Program issued checks labeled as "Neighborhood Grants" for $99,532.22 to neighborhood associations south of Spencer Street, and $776.23 to neighborhood associations north of Spencer Street. PL 89, PL 346 p. 10. Trial Tr. Nov. 29, 2016, pp. 63:17-69:25 (Van Houte).  The issuance of the checks requires prior approval by the grant review board, and approval by the City Council. Trial Tr. Nov. 29, 2016, p. 164:3-20  (Van Houte)

766.    There are no payments described as "Neighborhood Grants" in the City's online check

registry in the twelve months prior to the November 4-8, 2013, period.  Docket No. 147.  The

election was held on November 5, 2013. PL 308.

767.    Former Councilman Harrison believes that people in his former District C on the north

side of Pasadena do not have equal access to the matching grant Neighborhood Network

funds because of the fact that there are dues-paying homeowners associations on the south

side that are not present on the north side of Pasadena.  Trial Tr. Nov. 29, 2016, pp. 198:21-

199:10 (Harrison).

768.    Many of the improvement projects on the north side are funded by the private sector, in

the form of corporate employee volunteers, and not funded by the Neighborhood Network or

other city grant programs.  PL 342; 347 (Depo. of Hollon, Karen, Jan. 12, 2016 p. 27:7-

27:17, 27:21-28:13, 29:6-29:20, 149:4-151:11).

### iv.    The Neighborhood Networks Program Functions as Part of the City's Political Machine to Mobilize Voters on the  South Side

769.    The Neighborhood Network program is a political machine that holds certain functions

right before elections in particular areas of town where candidates and Mayor Isbell discuss

their favored candidates. Trial Tr. Nov. 18, 2016, pp. 115:15-22 (Ybarra).

770.    The Neighborhood Network Division gathers data and information from people involved

in the Neighborhood Network to use for political purposes.  Trial Tr. Nov. 18, 2016, pp.

115:15-25(Ybarra)

771.    Councilman Wheeler testified that neighborhood associations "really work well to galvanize a community. It is a good tool for communication[.]"  Tr. 11/30/16 at 101:18-102:2 (Wheeler).

772.    Most of the people who get turned out to vote in elections because of organizing by the Neighborhood Network Division are Anglo voters in south Pasadena.  Trial Tr. Nov. 18, 2016, pp. 116:8-14 (Ybarra).

773.    Richard Scott and Karen Hollon, both city employees, are involved both in running Neighborhood Network Division and tend to be involved in political campaigns in Pasadena.  Trial Tr. Nov. 18, 2016, pp. 116:1-7 (Ybarra).

774.    The effect of Neighborhood Network organizing is substantial in low-turnout municipal elections, including at-large elections, because of the concentration of voters in the southern part of Pasadena.  Trial Tr. Nov. 18, 2016, pp. 116:19-117:2 (Ybarra);

775.    Homeowners associations are told at Neighborhood Network meetings and events which candidates and positions they should support.  Trial Tr. Nov. 30, 2016, pp.86:24-87:15, 88:18-99:2  (Gracia); Trial Tr. Nov. 29, 2016 p. 226:21-226:23 (Scott).

776.    At a meeting on October 3, 2013, at Cullen's Restaurant, Mayor Isbell spoke in favor of Proposition 1 before members of neighborhood associations from the south side of Pasadena.  Trial Tr. Nov. 18, 2016, pp. 88:12-89:5 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 29:1-4 (Isbell).

777.    Bianca Gracia is an HOA president from the south side of Pasadena.  Trial Tr. Nov. 30, 2016, pp. 84;19-85:3 (Gracia) She attended the meeting at Cullen's at the invitation of Karen Hollon, the Director of the Neighborhood Network.

778.    Ms. Hollon said in her invitation that the event was an HOA Board of Directors appreciation social.  Trial Tr. Nov. 30, 2016, pp. 85:18-86:23 (Gracia).

779.   When she arrived at the meeting, Mayor Isbell, Darryl Morrison, Phil Cayten and Steve Cote were asking the attendees to support Proposition 1, take yard signs to display and hand out, talk to neighbors to promote the vote yes for Prop 1 campaign. Trial Tr. Nov. 30, 2016, pp.86:24-87:15, 88:18-99:2  (Gracia).

780.   Ms. Gracia was offended when Steve Cote said that if the voters did not vote for Prop 1, Pasadena would turn blue, because she understood it to mean Hispanics, and she was the only Hispanic in the room. Trial Tr. Nov. 30, 2016, pp. 87:15-88:9, 91:2-11 (Gracia).

781.    Ms. Gracia also believed that it was inappropriate to improperly represent the purpose of the meeting, and she voiced her concerns at the next City Council meeting and at subsequent conversations with Ornaldo Ybarra and Cody Wheeler. Trial Tr. Nov. 30, 2016 p. 88:10-17, 89:5-21; Trial Tr. Nov. 18, 2016, pp. 120:6-121:16 (Ybarra).

782.   At the City Council meeting, the mayor called her to his seat and asked her repeatedly "who sent you here?"   In response to the mayor's question, Ms. Gracia pulled up her sleeve, pointed to her skin and asked the Mayor whether he thought, because of the color of her skin, she had no voice and could not come to city council and speak?  Trial Tr. Nov. 30, 2016, pp. 89:8-90:16 (Gracia) She later met with Steve Cote who apologized for making the remark at the Cullen event. Trial Tr. Nov. 30, 2016, pp.90:16-91:6  (Gracia)

783.   Bianca Gracia attended a city council meeting to express that she was upset about the political nature of the Neighborhood Network meeting.   Trial Tr. Nov. 18, 2016, pp. 121:17-23.

784.   Only Councilmembers Morrison, Cote, Cayten, and Leamon were invited to the meeting at Cullen's on October 3, 2013.  Councilmembers Ybarra, Wheeler, Harrison and Van Houte

were not invited.  Trial Tr. Nov. 18, 2016, pp. 120:18-20 (Ybarra); Trial Tr. Nov. 29, 2016, p. 63:7-9 (Van Houte), 194:13-172:2 (Harrison); Tr. 11/30/16 at 128:14-16 (Wheeler).

785.    The City was distributing campaign yard signs in favor of Proposition 1 at the Cullen's meeting on October 3, 2013.  Trial Tr. Nov. 29, 2016 p. 226:21-226:23 (Scott).

786.    The City's Neighborhood Network hosted a banquet at the Pasadena convention center in 2014 with over 700 attendees.  Almost all of the attendees were south side residents, including members of the Parkgate, Baywood Shadows and Baywood Oaks Homeowner's Associations.  The banquet featured awards presented to Karen Hollon, her son, and Mayor Isbell.  Tr. 11/30/16 at 144:1-145:25 (Wheeler); Trial Tr. Nov. 18, 2016, pp. 117:3-118:19 (Ybarra); PL 342, 347 (Depo. of Hollon, Karen Jan. 12, 2016, pp. 49:5-50:14).

787.    Councilman Wheeler testified that the Neighborhood Network is used as a campaign tool. For example, during the Prop 1 campaign, the mayor invited members of neighborhood associations to meetings he turned into political events and a messaging platform for his political views on redistricting.  The Neighborhood Network program has the email addresses of individuals in the leadership of associations and can send them emails.  The Neighborhood Network hosts award ceremonies and has the ability to give neighborhoods money.  Councilman Wheeler testified that the message to south side residents is "We have $10,000 for you right here.  You raise this money and we are going to match it, but we need you to keep electing us."  Councilman Wheeler testified that the Neighborhood Network matching grants are used as a campaign device.  Tr. 11/30/16 at 144:1-145:25 (Wheeler); Pl. 342

788.    The Neighborhood Network's funds are not required to be distributed equally across the city council districts.  Tr. 11/30/16 at 146:1-146:19 (Wheeler)

789.    As a result, Neighborhood Network matching grant funds go primarily to the south side

of Pasadena.  Councilman Wheeler testified that the relatively wealthier residents of the

south side are more able to raise matching grant money than working-class people on the

north side of town.  Councilman Wheeler testified that he wished neighborhood associations

would receive a direct grant to spend at a community level, but that effort by the City does

not make that effort.  Tr. 11/30/16 at 146:1-146:19 (Wheeler).

**4)    The City Worked to Thwart the Increasingly Mobilized Latino Electorate by Using its resources, employees, contacts, and communication systems in order to increase voter turnout in favor of Proposition 1 in 2013.**

790.    The City used its resources, in combination with resources from the Mayor, to advocate

for Prop 1.  Trial Tr. Nov. 29, 2016 p. 215:15-216:1, 218:9-219:17, 223:6-223:13, 249:23-

250:3 (Scott); PL 33, 34, 35, 36, 38, 40, 41, 44, 327, 328, 329, 330, 331, 332, 333, 334, 335,

336, 42, 143, 51.

791.    Ms. Hollon used city time and city resources to make phone calls and send emails

encouraging people to attend an October 3rd Cullen's meeting, and kept Mr. Scott apprised of

her work.  Ms. Hollon also invited homeowner's associations to the Cullen's meeting.  Mr.

Scott viewed Neighborhood Network meetings as a good way to get information out to

people, but also knew that such gatherings could not be legally used for political purposes.

Trial Tr. Nov. 29, 2016 p. 218:9-219:17, 223:6-223:13 (Scott); PL 40, 41, 42.

792.    Richard Scott, Pasadena Director of Community Relations, assisted in the Mayor's

Citizens for Positive Change PAC activities in favor of the charter amendments.  Trial Tr.

Nov. 28, 2016, pp. 30:4-20 (Isbell); Trial Tr. Nov. 29, 2016 p. 215:15-216:1, 249:23-250:3

(Scott); PL 44.

793.   Mayor Isbell testified that he recalls that Richard Scott, Pasadena Director of Community

Relations, handled the invitations to the meeting at Cullen's Restaurant on October 3, 2013.

Trial Tr. Nov. 28, 2016, pp. 29:25-30:3 (Isbell).

794.   The City used its resources to organize a meeting at Cullen's on October 30, 2013 for the

purpose of promoting Prop 1, and the Mayor's PAC paid the bill for the food and drink..

Trial Tr. Nov. 29, 2016 p. 224:18-225:6 (Scott); Trial Tr. Nov. 29, 2016, pp. 276:2-277:17

(Bass)

795.   Mr. Scott sent a letter on City work time and using his City email address to Frank

Marino, who was in a leadership position for a city contractor called HR Green Engineering,

in order to invite Mr. Marino to the October 3 Cullen's meeting and solicit donations for the

Mayor's political action committee Citizens for Positive Change.   Scott called the October 3

Cullen's meeting a "kick-off" event for the Prop 1 campaign.   Trial Tr. Nov. 29, 2016 p.

220:17-222:6 (Scott); PL 329.

796.   Mr. Scott used his city email during work hours on September 30, 2013, to send a

Proposition 1 mailer to Sherry Trainer to be distributed to members of the Pasadena Chamber

of Commerce.   Trial Tr. Nov. 29, 2016 p. 219:18-220:12 (Scott); PL 44.

797.   Mr. Scott used his City of Pasadena email account to work on the Citizens for Positive

Change PAC in support of Proposition 1.   Scott worked during City of Pasadena work hours

on the campaign in support of Proposition 1, and Scott used City of Pasadena employees

working on city time to assist him in tasks related to the campaign in support of Proposition

1.   Trial Tr. Nov. 29, 2016 p. 215:15-216:1, 249:23-250:3 (Scott); PL 33, 34, 35, 36, 38, 40,

41, 44, 327, 328, 329, 330, 331, 332, 333, 334, 335, 336, 42, 143, 51.

798.    Mr. Scott forwarded a Houston Chronicle article from another city employee, to a PAC

vendor on September 6, 2013, and said that the campaign "could use [the article] in one of

our brochures, Republicans will really like."   The Houston Chronicle article attached to the

email discussed opposition to the change in election system as diluting Hispanic

representation.  The article did not contain the words "Democrat" or "Republican."  Trial Tr.

Nov. 29, 2016 p. 217:2-218:8 (Scott); PL 35.

799.    Mr. Scott reviewed a draft of a yard sign used by the Citizens for Positive Change

campaign on city time and used his City email address to send it to people.  Trial Tr. Nov.

28, 2016, pp. , 31:3-12 (Isbell); Trial Tr. Nov. 29, 2016 - Vol. I, 214:11-214:16 (Scott); PL

38.

800.    Mr. Scott emailed a mailer from Citizens for Positive Change to Karol Fletcher, a person

involved with the Pasadena Rotary Club and San Jacinto Republican Women who mentioned

that Mayor Isbell was speaking at the San Jacinto Republican Women on October 21, 2013.

Trial Tr. Nov. 29, 2016 p. 222:18-223:5 (Scott); PL 330.

801.    Mayor Isbell met personally with members from different organizations, including the

Rotary Club, to urge them to vote for Proposition 1 during the campaign.  Trial Tr. Nov. 28,

2016, pp. 30:21-31:2 (Isbell); PL 38.

802.    Andy Helms is Director of Finance and Planning for the City of Pasadena, has held a

number of previous positions with the city.  Trial Tr. Nov. 30, 2016, p. 22:16-21, 23:6-21

(Helms).  Mr.  Helms is the mayor's chief advisor and personal friend, and has worked on the

mayor's campaigns for many years.   Trial Tr. Nov. 30, 2016, pp. 23:22-24:15, 24:16-25:9

(Helms) Andy Helms had  a number of conversations and email exchanges with Richard

Scott concerning the campaign in favor of Proposition 1.  Trial Tr. Nov. 30, 2016, pp. 37:9-38:4 (Helms) PL 340.

803.    The City Campaigned for Proposition 1 Using the Mayor's Political Action Committees and Primarily Targeted Anglo Voters

804.    Mayor Isbell funded a specific-purpose political committee known as Citizens for Positive Change that urged voter to yes on Proposition 1 in the November 2013 charter amendment election.  Trial Tr. Nov. 18, 2016, pp. 88:12-22 (Ybarra); Trial Tr. Nov. 28, 2016, pp. 24:10-19 (Isbell).

805.    Bank documents for Citizens for Positive Change with Mr. Scott's and Mr. Bass's signatures showed Mr. Scott as the secretary of the political committee and Cary Bass as the treasurer of the political committee.  Trial Tr. Nov. 29, 2016 p. 222:7-222:17 (Scott); PL 7.

806.    Cary Bass was asked by Richard Scott to be the treasurer for Citizens for Positive Change political action committee in 2013.  As treasurer, Bass was in charge of receiving all donations and depositing them, and writing checks to pay the invoices billed to the PAC. Trial Tr. Nov. 29, 2016, pp. 267:13-269:15 (Bass).  However, Mr. Bass  did not inform himself about any fundraising activities or donor solicitations of any kind performed by the PAC.   Mr. Bass did not ask where the money was coming from, did not initially know was coming from the mayor, did not know what a PAC was, did not research applicable laws or regulations, did not know any of the donors other than the mayor, did not have a sense of who was directing the activities of the PAC, and relied on Richard Scott's assurances that there would be sufficient money to cover expenses. Trial Tr. Nov. 29, 2016, pp. 270:9-276:1; 279:21-25 (Bass) Mr. Bass did not raise money for the PAC and never informed himself of

specific activities being conducted by the PAC. Trial Tr. Nov. 29, 2016, pp. 270:9-272:15, 273:19-274:7 (Bass)

807.    On the same day the Citizens for Positive Change PAC received a vendor invoice for $39,000, Mayor Isbell's campaign PAC transferred the same amount of money to the Citizens for Positive Change PAC so it could pay the bill. Trial Tr. Nov. 29, 2016, pp. 269:19-270:8, 274:8-274:25 (Bass); PL 32 pp. 23-34. The treasurer of the PAC, Cary Bass, did not know the vendor or that the vendor was doing work for the PAC until he received the invoice. Trial Tr. Nov. 29, 2016, pp. 279:25-280:5 (Bass)

808.    Mr. Bass was in attendance at the October 3, 2013 event at Cullens Restaurant because he was the treasurer of the PAC that was paying for the event, and recalls that the mayor spoke in support of the proposed charter revisions. Trial Tr. Nov. 29, 2016, pp. 276:2-277:17 (Bass)

809.    The expenditures reported by Mayor Isbell's campaign account between July 16, 2013, and January 15, 2014, total $39,500, and comprise all of the spending by his account for that period. Trial Tr. Nov. 28, 2016, pp. 24:20-:25:14 (Isbell).

810.    Mayor Isbell gave input regarding and approved drafts of campaign materials, including mailers, yard signs, and robo-call scripts, for Citizens for Positive Change.  Trial Tr. Nov. 28, 2016, pp. 25:18-28:23 (Isbell); PL 113, 114, 115, 116.

### 5)    The City Used Public Resources and its Machine to Support Isbell's Campaign for Mayor in 2013 and in Support of Candidates Favored by Johnny Isbell in May 2013 and 2015

811.    During the 2013 and 2015 Pasadena municipal elections, the Mayor used his resources to support his favored candidates against Latino candidates of choice.  Trial Tr. Nov. 29, 2016 p. 214:17-215:9 (Scott) ); PL 213, 322, 323, 324, 325, 326.

812.    In 2013, Mr. Scott helped run Mayor Isbell's campaign for Mayor.  Scott used his City of

Pasadena email account, worked during City of Pasadena work hours, and used City of

Pasadena employees while they were working on city time to assist Mr. Scott with work on

Mayor Isbell's 2013 campaign.  Trial Tr. Nov. 29, 2016 p. 214:17-215:9 (Scott); PL 213,

322, 323, 324, 325, 326.

813.    In 2015, Mr. Scott worked for the Mayor's Citizen to Keep Pasadena Strong PAC in

support of council candidates Bear Hebert, Emilio Carmona, Cary Bass, Steve Cote, Bruce

Leamon, and Darrell Morrison.  Scott used his City of Pasadena email account, worked

during City of Pasadena work hours, and used City of Pasadena employees while they were

working on City time to assist Mr. Scott with work on the Citizens to Keep Pasadena Strong

2015 campaign activities.  Trial Tr. Nov. 29, 2016 p. 229:5-230:11, 230:12-231:2 (Scott); PL

213, 337, 338, 339.

814.    On Election Day in May 2015, Mr. Scott put up "vote today" signs on the south side of

Pasadena with another City employee, Kirby Cardenas.  Trial Tr. Nov. 29, 2016 p. 230:12-

231:2 (Scott); PL 213.  Kirby Cardenas is a city employee who works on the Mayor's

political campaigns.  Trial Tr. Nov. 18, 2016, pp. 119:22-120:5 (Ybarra).

815.    The City did not place "Vote Today" signs on the north side of Pasadena on Election Day

in May 2015.  Tr. 11/30/15 at 140:18-140:25 (Wheeler)

### 6)  The Mayor Used his Resources to Campaign Against Latino Candidates of Choice in 2013 and 2015

816.    Citizens to Keep Pasadena Strong is a political action committee in Pasadena.  Trial Tr.

Nov. 18, 2016, pp. 204:5-17 (Isbell); PL 193.

817.    All of the funding for Citizens to Keep Pasadena Strong came from Mayor Isbell during

the 2013 election cycle.  Trial Tr. Nov. 18, 2016, pp. 204:18-206:11 (Isbell); PL 193.

818.    Mayor Isbell directed which candidates would be opposed through the Citizens to Keep
        Pasadena Strong PAC.  Trial Tr. Nov. 18, 2016, pp. 206:12-15 (Isbell).

819.    Mayor Isbell approved final drafts of Citizens to Keep Pasadena Strong PAC campaign
        materials like mailers.  Trial Tr. Nov. 18, 2016, pp. 206:16-18 (Isbell).

820.    Mayor Isbell approved recommendations made by Jeff Yates, who carried out the day-to-
        day activities of the Citizens to Keep Pasadena Strong PAC.  Trial Tr. Nov. 18, 2016, pp.
        206:19-21 (Isbell).

821.    Jeff Yates would run his ideas by Mayor Isbell, and Mayor Isbell would say whether he
        liked the ideas or not.  Trial Tr. Nov. 18, 2016, pp. 215:4-7 (Isbell)

822.    J.J. Isbell, Mayor Isbell's son, also helped make decisions for the Citizens to Keep
        Pasadena Strong PAC. Trial Tr. Nov. 18, 2016, pp. 206:22-24 (Isbell).

823.    During the 2013 municipal election cycle, the Citizens to Keep Pasadena Strong PAC
        advocated against candidates Cody Ray Wheeler and Don Harrison.  Trial Tr. Nov. 18, 2016,
        pp. 206:25-207:3 (Isbell).

824.    The campaign account of Mayor Johnny Isbell reflected two payments in 2013 totaling
        $30,500 in contributions to the Citizens to Keep Pasadena Strong PAC.  Trial Tr. Nov. 18,
        2016, pp. 207:4-18 (Isbell); PL 312. The campaign account of Mayor Johnny Isbell reflected
        a balance of $401,920.30 around May 2013.  Trial Tr. Nov. 18, 2016, pp. 207:19-24 (Isbell);
        PL 312.

825.    The Citizens to Keep Pasadena Strong PAC paid to have four mailers sent out opposing
        Councilmember Don Harrison in his re-election bid in 2013.  Trial Tr. Nov. 18, 2016, pp.
        207:25-209:25 (Isbell); PL 95, 96, 97, 98.

826.    Don Harrison opposed Mayor Isbell in votes on city council for certain issues where he had a difference of opinion with the Mayor, but he joined the Mayor for most votes.  Trial Tr. Nov. 18, 2016, pp. 210:1-12 (Isbell).

827.    Citizens to Keep Pasadena Strong PAC did work in opposition to the candidacy of Cody Ray Wheeler for District D during the 2015 Pasadena city council election cycle.  Trial Tr. Nov. 28, 2016, pp. 45:4-8, 46:23-25 (Isbell); PL 120, 124, 126.

828.    Cody Ray Wheeler ran against Leroy Stanley in 2013 for city council District E.  Trial Tr. Nov. 18, 2016, pp. 214:19-22 (Isbell).

829.    The Mayor approved and the Citizens to Keep Pasadena Strong PAC sent out a mailer that opposed Cody Ray Wheeler in his 2013 bid for city council District E.  PL 105.  Trial Tr. Nov. 18, 2016, pp. 215:8-216:4 (Isbell).

830.    The Mayor also approved and funded a mailer that supported Leroy Stanley.  Trial Tr. Nov. 18, 2016, pp. 216:5-24 (Isbell).

831.    Citizens to Keep Pasadena Strong PAC received a contribution of $35,000 and another of $31,000 from the Johnny Isbell Campaign account during the 2015 Pasadena city council election cycle.  Trial Tr. Nov. 28, 2016, pp. 43:25-44:17 (Isbell); PL 193.

832.    In 2015, Citizens to Keep Pasadena Strong PAC paid for get-out-the-vote (GOTV) efforts and campaign materials in support of council candidates Emilio Carmona, "Bear" Hebert, and Cary Bass.  Trial Tr. Nov. 28, 2016, pp. 44:18-45:3, 46:15-22 (Isbell); PL 120, 123, 124.

833.    One of the mailers urging voters to vote against Cody Ray Wheeler featured a photograph of Cody Ray Wheeler next to a photograph of President Barack Obama and a photograph of an acorn.  The acorn photograph was meant to symbolize the organization known as ACORN

and therefore stir up the Republican element.    Trial Tr. Nov. 28, 2016, pp. 47:1-17 (Isbell);

PL 192.

542.

## IV.  CONCLUSIONS OF LAW

### A.    *Pasadena's 6-2 Method of Election Dilutes Hispanic Voting Strength in Violation of Section 2*

543.  In 1982, Congress amended the Voting Rights Act to reach discriminatory conduct that might otherwise evade liability under the more stringent intent standard established in *City of Mobile v. Bolden*, 446 U.S. 55 (1980).   The Section 2 amendment created a "results-based" test to analyze vote dilution claims.  S. Rep. No. 97-417, at 40 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 218.

544.  *Gingles* provides the framework for determining whether a redistricting plan impairs the ability of Latinos to elect representatives of their choice in violation of Section 2.   In *Gingles*, the Supreme Court established a two-step inquiry for analysis of vote dilution claims.  478 U.S. at 50-51.  First, the minority group must be able to demonstrate: (1) "that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "that it is politically cohesive;" and (3) "that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate."  *Id.*  This first step – the *Gingles* prongs – "cannot be applied mechanically and without regard for the nature of the claim."  *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

545.  The second step of the inquiry requires the Court "to consider the totality of the circumstances and to determine, based upon a searching practical evaluation of the past

and present reality whether the political process is equally open to minority voters." *Gingles*, 487 U.S. at 79 (citations and internal quotation marks omitted). The Senate Judiciary Committee, in a report accompanying the 1982 amendments to the Voting Rights Act, provided a non-exclusive list of factors that a court may consider in determining whether the challenged practice impermissibly impairs the ability of the minority group to elect their preferred representatives. [2] The Senate Report's "list of typical factors is neither comprehensive nor exclusive" and "there is no requirement that a particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 487 U.S. at 45.

546. Pasadena's conversion from an 8-0 single member districting plan to a 6-1 mixed system for the election of City Council members dilutes Latino voting strength in violation of section 2 of the Voting Rights Act of 1965, 52 U.S.C §10301, *et. seq. Thornburg v. Gingles*, 478 U.S. 30 (1986).

### A. *Gingles* Prong 1: Numerosity and Compactness

---

[2] These factors include, but are not limited to:

    (1)    the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

    (2)    the extent to which voting in government elections is racially polarized;

    (3)    the extent to which the state or political subdivision has used voting practices or procedures that end to enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting);

    (4)    exclusion of minorities from a candidate slating process;

    (5)    the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

    (6)    the use of overt or subtle racial appeals in political campaigns;

    (7)    the extent to which minorities have been elected to public office in the jurisdiction.

    Additional factors are "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy underlying the . . . use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. Rep. at 29; *see also Gingles*, 478 U.S. at 48 n.15.

547. Latinos are sufficiently numerous and compact to comprise the citizen voting age majority in four districts in the prior 8-0 single member districting plan, but only three districts in the 6-2 plan. *See Gingles*, 487 U.S. at 50-51; *Johnson v. DeGrandy*, 512 U.S. 997, 1008 (1994); *see also Bartlett v. Strickland*, 556 U.S. 1, 12 (2009); *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997); *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848 (5th Cir. 1999).

### B. *Gingles* Prong 2 and 3: Racial Bloc Voting

548. Defendants do not contest that Latino voters are politically cohesive in Pasadena elections. *Gingles*, 478 U.S. at 50-51. Non-Latino voters vote sufficiently as a bloc to enable them, in the absence of special circumstances usually to defeat the Latino preferred candidate." *Gingles*, 478 U.S. at 50-51.

549. The analysis conducted by the experts in this case establishes that Latino and non-Latino voters express markedly different preferences in their electoral choices in Pasadena, and that because Latino voters are in the minority of voters in the city, in order to win a Latino-preferred candidate requires very high crossover vote from Anglos. In Pasadena, high Anglo crossover voting in citywide elections seldom occurred, and then only occurred in races where there are no Latino candidates, or where the Latino candidate does not have a Spanish surname. Otherwise, Anglo bloc voting prevents the election of Latino-preferred candidates and policy positions in citywide and in county races.

550. Polarized voting is judged "primarily on the basis of the voting preferences expressed in actual elections." *Gomez v. City of Watsonville,* 863 F.2d 1407, 1415 (9th Cir. 1988) Therefore, Defendants' assertion that Latino preferred candidates could be predicted to win with higher Latino turnout is unavailing. "The very low turnout among Hispanics

[is] part of the problem[.]" *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1220–21 (S.D. Tex. 1997), aff'd, 165 F.3d 368 (5th Cir. 1999).   "To hold otherwise would allow voting rights cases to be defeated at the outset by the very barriers to political participation that Congress has sought to remove." *Id., citing  Clark v. Calhoun Cnty. Miss.*, 88 F.3d 1393, 1398 (5th Cir. 1998) (the fact that "few or no black citizens ha[d] sought public office in the challenged electoral system d [id] not preclude a claim of vote dilution"); *citing Westwego Citizens for Better Government v. Westwego*, 872 F.2d 1201, 1208, n. 9 (5th Cir. 1989).

551. Racially polarized voting in Pasadena impedes the election of Latino-preferred candidates and satisfies the second and third prongs under *Gingles*. *See Gingles*, 478 U.S. at 50.

### C.    Totality of the Circumstances

552. Under the totality of circumstances, based on a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process" (*Gingles*, 478 U.S. at 45, *quoting* S. Rep. at 30 n. 120), the 6-2 mixed electoral system for electing members of Pasadena's city council dilutes Latino voting strength in violation of section 2.

### 1.    Senate Factors

553. The Senate Factors support a finding that Pasadena's 6-2 mixed electoral system violates section 2.  In *LULAC v. Perry*, the Supreme Court noted that the "'the long history of discrimination against Latinos and Blacks in Texas' . . . may well 'hinder their ability to participate effectively in the political process'" and concluded the totality of the circumstances demonstrated a section 2 violation.  *LULAC v. Perry*, 548 U.S. 399, 439-40, 442 (quoting *Session,* 298 F.Supp.2d, at 473, 492 and *Gingles,* 478 U.S. at 45).

554.  Ten years later, the evidence supporting this conclusion has not changed much, and it is equally pertinent to Pasadena, including the history of official discrimination in voting, racially polarized voting, the extent to which Latinos in Pasadena bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process, and the extent to which minorities have been elected to public office in the Pasadena.  S. Rep. at 29; *See also Gingles*, 478 U.S. at 48 n.15.  Much of the discrimination in Texas, including the poll tax, refusal to register voters, segregated public facilities, segregated schools and employment discrimination, has been experienced by Latino voters still living today.

### 2.    Proportionality

555.  Latinos do not comprise the citizen voting age majority in the city of Pasadena, and Latino voters do not currently have the ability to elect candidates of choice in the two new at-large districts.

556.  According to the most recent 5-year ACS survey, Latinos currently comprise 48% of the Pasadena's citizen voting age population.  Under this measure, proportionality would require four single member districts out of eight. The previous 8-0 plan provided proportionality.  The 6-2 plan creates only three Latino opportunity districts, well below the proportionality threshold, which weighs in favor of a finding, under the totality of circumstances, that the 6-2 electoral system violates section 2.  *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

557.  Even if this court were to find proportionality under the 6-2 districting plan, "that consideration would not overcome the other evidence of vote dilution for Latinos" in Pasadena. *LULAC v. Perry*, 548 U. S. at 438.   "[T]he degree of probative value assigned

to proportionality may vary with other facts," citing *DeGrandy*, 512 U.S. at 1020, "and the other facts in these cases convince us that there is a § 2 violation." *LULAC v. Perry,* 548 U.S. at 438.

558. The factors set out in *LULAC v. Perry* further support a finding of vote dilution under section 2. In *LULAC v. Perry*, the Supreme Court observed that in Congressional District 23 "the State took away Latinos' opportunity because Latinos were about to exercise it" and that the revision of Congressional District "bears the mark of intentional discrimination that could give rise to an equal protection claim." *LULAC*, 548 U.S. at 440. The factors identified by the Supreme Court in *LULAC v. Perry* as indicative of intentional discrimination are present in Pasadena's conversion to the 6-2 plan.

559. First, "Latino voters were poised to elect their candidate of choice" in a fifth councilmanic district that would have stripped the Mayor of control over a majority of votes council. *LULAC*, 548 U.S. at 438.

560. Second, Latinos in Pasadena "were becoming more politically active" and political conditions in 2013 suggested they would be able to elect a Latino-preferred candidate in Latino-majority District B in 2015. *Id.* As a result of Latino growth and mobilization, District B had "an increasingly powerful Latino population that threatened to oust the incumbent[.]" *LULAC*, 548 U.S. at 423-24 (2006).

561. Third, as described above, the change to a 6-2 plan reduced Latino voters' ability to elect their candidate of choice. *LULAC*, 548 U.S. at 424-25, 427.

### B. Pasadena's 6-2 Method of Election Intentionally Discriminates Against Hispanics on the Basis of Race

562.    In enacting the 6-2 mixed electoral system, Pasadena purposefully discriminated against Latino voters on the basis of race in violation of section 2 of the Voting Rights Act and the Fourteenth Amendment.  *City of Mobile,* 446 U.S. at 66 (1980) *superseded in part by statute on other grounds* by 52 U.S.C. § 10301 (formerly 42 U.S.C. § 1973)

563. The 6-2 plan intentionally dilutes Latino voting strength.  The evidence demonstrates that beginning with the Mayor's formation of a Bond/Charter Review Committee and ending with the passage of Proposition 1, Pasadena "enacted [the 6-2 plan] as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities'"  *See Miller v. Johnson*, 515 U.S. 900, 911 (1995);

564. Just as Latino voters were poised to gain a majority of Latino-preferred candidates on the Pasadena City council, Mayor Isbell set in motion a series of events that led to the implementation of a 6-2 districting plan for the purpose of reversing that shift in power by  dilute the voting strength of Latino voters. *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (redistricting plan violates the Fourteenth Amendment if "'conceived or operated as purposeful device to further racial discrimination' by minimizing, canceling out or diluting the voting strength of racial elements in the voting population.'") (quoting *Whitcomb v. Chavis*, 403 U.S., 124, 149 (1971)); *Garza v. County of Los Angeles*, 918 F.2d 763.

565. Pasadena's actions can be unlawful even if the City can point to other, purportedly non-racial purposes.  *See LULAC v. Perry*, 548 U.S. at 441; *Garza v. County of Los Angeles*, 756 F. Supp. at 1349, ("racial discrimination is not just another competing consideration.")(citing *Arlington Heights*, 429 U.S. at 265.

566. In this case, although typically courts defer to legislative decision-making in redistricting cases, that deference is overcome by the evidence of race-based decision making by the Mayor and the Committee members and Council members influenced by the mayor. *Miller v. Johnson,* 515 U.S. 900, 915 (1995) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 218 (1995)), *Garza v. County of Los Angeles*, 756 F. Supp. at 1349.

**Direct Evidence**

567. Pasadena's conversion to a 6-2 districting plan provides substantial direct evidence of intentional racial discrimination, including explicit and offensive racially-charged statements by the mayor, including those made in the course of advocating for the conversion, campaign literature targeted at non-Hispanics and intended to incite racial sentiments, and failure to heed councilmembers' warnings that the 6-2 method of election would discriminate against Hispanic voters.

**Arlington Heights Factors**

568. When determining whether racially discriminatory intent or purpose is a motivating factor behind an official action, a court must make "a sensitive inquiry into such circumstantial and direct evidence as may be available." *Arlington Heights,* 429 U.S. at 266.  The *Arlington Heights* factors, including the reduction of the number of Latino opportunity districts in the 6-2 plan, historical background, legislative history, and procedural and substantive deviations, support a finding of intentional discrimination in this case.  *Arlington Heights,* 429 U.S. at 264-68. Facts relevant to the *Arlington Heights* factors are abundant in this case.

569. The impact of the conversion is clear. The adoption of the 6-2 plan resulted in the loss of a Latino-majority district.  Latinos do not have the opportunity to elect their preferred candidates in the at-large seats.  Furthermore, the enlargement of the 6 remaining single member districts make it more difficult for Latino-preferred candidates to win because the larger districts require greater time and resources to campaign.

570. The historical background and specific sequence of events leading to the adoption of the 6-2 plan includes: the initiation of the process leading to conversion two days after *Shelby,* 133 S. Ct. 2612, the assumption by the Mayor that the DOJ would not have granted preclearance of such a plan prior to the *Shelby* decision and his declaration that he was initiating the conversion process because "the Justice Department can no longer tell us what to do," the  election of four candidates preferred by Latino voters to the Pasadena City Council; the likelihood that a fifth position on the council would soon be filled by a Latino candidate of choice; occasions on which votes on the Council resulted in a 4-4 tie among the eight members of the Council and on which the Mayor cast the fifth vote in favor; activities by the Mayor and City of Pasadena to increase support among Anglos for Proposition 1; and activities by the Mayor and others to fund campaign activities in opposition to Latino candidates of choice.

571. In addition to the events above, the legislative history of Pasadena's change in method of election includes failure to heed warnings by Councilmembers that the change to a 6-2 plan would be problematic under the Voting Rights Act, and calling for removal by armed police of a member of the City Council who spoke beyond her time limit in opposition to the change to a 6-2 plan, and the Mayor's statement in a public meeting that 75% of Hispanics in Pasadena were undocumented.\

572. The conversion to a 6-2 plan was characterized by procedural and substantive departures including: irregularities in the formation and meetings of the Citizens Committee, the Mayor's decision to push forward with a change to a 6-2 method of election after the Citizens Committee voted against such a change; the lack of information provided to the public and members of the City Council regarding the Mayor's redistricting plan prior to April 2014; and the Mayor bringing a pistol to a public council meeting at which redistricting was discussed.

### *LULAC v. Perry* Factors

573. As described above with respect to section 2 "effects" vote dilution, Pasadena "took away Latinos' opportunity because Latinos were about to exercise it" and adoption of the 6-2 plan "bears the mark of intentional discrimination that could give rise to an equal protection claim." *LULAC*, 548 U.S. at 440.  The factors identified by the Supreme Court in *LULAC v. Perry* as indicative of intentional discrimination are present in Pasadena's conversion to the 6-2 plan

574. Latino voters Pasadena "were poised to elect their candidate of choice" in a fifth councilmanic district, and "were becoming more politically active."  *LULAC*, 548 U.S. at 438.  The conversion to a 6-2 plan reduced Latino voters' ability to elect their candidate of choice.  *LULAC*, 548 U.S. at 424-25, 427.

### C.  Bail-in Under the Voting Rights Act

575. Section 3 (c) of the Voting Rights Act of 1965, 52 U.S.C.A. § 10302 (c), authorizes this court, following a finding "that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, to order the City of Pasadena to obtain federal preclearance of its election

changes pursuant to section 5 of the Voting Rights Act.  Section 3 (c) is a permanent

provision of the federal Voting Rights Act.  The City's violation of the Fourteenth and

Fifteen Amendments justify equitable relief in the form of an order that Pasadena obtain

federal preclearance of its election changes pursuant to section 5 of the Voting Rights

Act.

## V.  CONCLUSION

For the reasons set out above, the challenged 6-2 method of election violates section 2 of

the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

DATED: December 14, 2016                    Respectfully submitted,

                                            Nina Perales
                                            Attorney-in-charge
                                            Texas Bar No. 24005046
                                            SDTX Bar No. 21127
                                            Ernest Herrera
                                            Texas Bar No. 24094718
                                            SDTX Bar No. 2462211
                                            Denise Hulett (*Pro Hac Vice*)
                                            California Bar No. 121553
                                            MEXICAN AMERICAN LEGAL DEFENSE AND
                                               EDUCATIONAL FUND
                                            110 Broadway, Suite 300
                                            San Antonio, TX 78205
                                            Tel: (210)224-5476
                                            Fax: (210)224-5382

                                            *Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 14th day of December 2016.

*/s/ Nina Perales*
Nina Perales
