UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALBERTO PATINO, et al., | § | |
|    *Plaintiffs*, | § | |
| | § | |
| vs. | § | Civil Action No. 4:14-CV-03241-LHR |
| | § | |
| CITY OF PASADENA, | § | |
|    *Defendant*. | § | |

### City of Pasadena's Advisory to the Court on the Form of Injunction

The court has directed the parties to submit proposals for the form of the injunction and for the period for retained jurisdiction by January 13, 2017. Slip op. at 106-07, 108. Defendant, City of Pasadena, strongly disagrees with the court's findings of a section 2 violation and a constitutional violation. Without waiving its ability to contest the court's findings and conclusions on appeal, the city, in response to the court's directive, submits its comments on what an injunction, were one appropriate, should say.

**I.  The Section 2 Remedy.**

    **A.  It is possible to devise a remedy that more closely achieves the goals outlined in the court's memorandum opinion and required by the body of redistricting case law.**

In its memorandum opinion, the court says

> The court must balance the requirement to give as much force as possible to the legislature's legitimate intentions with the requirement to rectify the § 2 violation without over-intruding on the legislature's province and prerogatives.  The use of at-large seats to encourage responsiveness to city-wide interests among elected officials is a legitimate government policy.  *Although, there may be remedies available that would correct the dilution of Latino voting strength while preserving one or more at-large places on the City Council—perhaps by redrawing the maps or restructuring the place system to permit single-shot voting and elective victory by plurality—none has been suggested.*  And devising these remedies requires hard and delicate work and expertise that cannot be done in the time available.  This work is better left to the legislative process, subject to court review if invoked.

Slip op. at 105 (emphasis added).

As the court correctly notes, its charge, when drafting a remedy, is to correct the section 2 violation while, to the extent possible, respecting the legislative body's policy objectives. Slip op. at 104. Or, as the Supreme Court recently directed, "a district court should take guidance from the [legislative body's] recently enacted plan in drafting an interim plan." *Perry v. Perez*, 132 S.Ct 934, 941 (2012). The existing plan must serve "as a starting point for the district court," and in the absence of a legal flaw, as, for example, if a plan containing at-large seats were inherently discriminatory, "the District Court [has] no basis to modify that plan." *Id.* at 941, 943. Here, the legislative body's recently enacted plan embodying its policy objectives is the 6-2 plan, which to the extent it provides for some at-large representation, embodies the policy objectives of the city's ultimate repository of legislative and political authority—its voters. TEX. CONST., art. I, § 2. This court's opinion recognizes that the use of at-large seats is a legitimate governmental policy and that a remedy containing an at-large component may be capable of addressing the violation the court found. Slip op. at 105. However, the court noted that no remedy of that type had yet been suggested to it. *Id*.

Of course, the time for suggesting a potential remedy is in the period between the court's identification of a violation and the deadline for providing proposals on the form of an injunction. The city, without waiving its disagreement with the court's findings or its right to challenge those findings on appeal, now submits a plan that addresses the court's specific identification of a violation and that is consistent with the Supreme Court's requirement of deference to the policy judgments of the legislative body. Exhibit A to this advisory reflects a plan that is based on the existing 6-2 plan and, with relatively slight revisions, provides four single-member districts having both a Hispanic citizen-voting-age-population (CVAP) majority and a Spanish-surname registered voter (SSRV) majority. For comparison, Exhibit B provides

the CVAP and SSRV data for the current 6-2 plan. Because of the growth in Hispanic population and in the percentage of registered voters who have Spanish surnames after the original plan was adopted in 2014, it is now possible to draw four districts in a 6-2 plan that have a majority of both Hispanic CVAP and SSRV.

### 1. The city's proposed remedy is based on data relied on in the trial by both the plaintiffs and the defendant.

The CVAP data comes from the 2010-14 ACS five-year file that includes block-group data and, thus, is based on the most recent CVAP data that can be used in connection with geographic areas as small as a single-member district. Since the five-year ACS is reported for units no larger than a block group, the block-group data must be assigned to individual blocks within the block group.

The CVAP numbers reflected in Exhibit A are based on the block assignments of the 2010-14 data made by David Ely, the plaintiffs' expert, and provided to the city during the trial. They constitute the raw data for Mr. Ely's supplemental report found at Plaintiffs' Exhibits 195 and 241. The SSRV data comes from the geocoded September 2016 voter registration list that was used during the trial. Tr. 1:70 at *ll.* 19-25 (Ely). That geocoded registration list was the source of the SSRV numbers reported by Mr. Ely in Plaintiffs' Exhibit 241.[1] Thus, the data reflecting CVAP and SSRV in the plan set out in Exhibit A is the same data used in the trial by both the plaintiffs and the defendant.

---

[1] Mr. Ely's SSRV numbers show ten more Spanish surname registered voters than the city does out of a total of more than 26,000. As Mr. Ely testified in response to the court's question, the Spanish surname numbers used by the two parties to the litigation are "virtually identical." Tr. 1:56 at *ll.* 10-13 (Ely).

## 2. The potential remedy district addresses the section 2 violation found by the court.

Although the city does not agree with the court's finding of a section 2 violation or with the court's standard for measuring dilution, adoption of the potential remedy district set out in Exhibit A would remedy the violation identified by the court. The court concluded that

> Under the 8-0 map and plan, Latinos had that opportunity [to elect Latino candidates of choice] because they made up a clear majority of citizen voting-age population in four of the eight district. Under the 6-2 map and plan, they have similar opportunities—because of similar majorities—in only three out of eight districts.

Slip op. at 74. Because of the failure to have four Hispanic-CVAP districts in the 6-2 plan, the court found impermissible dilution. *Id.* Also, the court said

> The parties agree that under the 8-0 single-member district map and plan in place from 2011 to 2014, Latinos made up, and today would make up, the majority of citizen voting-age population and the majority of Spanish-surnamed registered voters in four districts—Districts A, B, C, and D. The parties and experts agree that under the current 6-2 map and plan, Districts A, B, and C are Latino-majority and –opportunity districts. That is one fewer than under the single-member district plan, and that is dilution.

Slip op. at 69-70 (citation omitted).

The court concludes that the dilution is caused by having only three, rather than four, districts with either Hispanic-CVAP majorities (*see,* slip op. at 74) or with a majority of both Hispanic CVAP and SSRV (*see,* slip op. at 69-70). Accordingly, a plan with four districts that have both Hispanic-CVAP and SSRV majorities should provide a remedy. The plan set out in Exhibit A does that.

## 3. The city's proposed remedy more closely adheres to the requirements of case law and the goals set out in this court's opinion than would reversion to the 8-0 system.

As the Supreme Court noted in *Perry v. Perez*, discussed above, the district court should use the existing legislative plan as the starting point in devising a remedy and should take

4

guidance from that plan as it reflects the legislative body's policy judgment. The plan set out in Exhibit A more closely conforms to the teaching of the Supreme Court because

- The Exhibit A plan closely adheres to the existing plan adopted by the city, including the policy judgment of the electorate to have two at-large seats, while the 8-0 plan, although adopted by the council in 2011, was superseded by the 2013 vote adopting the charter amendment and the 2014 council vote adopting the 6-2 plan.

- The Exhibit A plan provides four districts with majorities of both Hispanic CVAP and SSRV and, thus, cures the defect perceived by the court.

- Because District B did not elect the Hispanic-preferred candidate in 2015, the city took care in preparing the Exhibit A plan to avoid adversely affecting Latino opportunity in that district. It was, however, necessary to make some changes to District B in order for District D to reach an SSRV majority. Even after those changes, District B has 61.2 percent Hispanic CVAP and 56.3 percent SSRV. While this represents a slight drop from the most current District B numbers for SSRV and CVAP in the existing 6-2 plan, the SSRV percentage for District B as drawn in Exhibit A is still slightly higher (57.41% vs. 57.06%) than it was in the district as it existed at the time of the May 2015 election, and the Hispanic CVAP percentage is very likely higher.[2] Further, the Exhibit A District B is likely more favorable to a Hispanic candidate than District B would be in the 8-0 plan. Under the court's proposed remedy of reverting to the 8-0 plan, District B will lose parts

---

[2] Since we must rely on the five-year ACS file and it is not released for more than a year after the most recent of the five years, we cannot say with certainty what either the 2015 percentage was or what the percentage is today. The most recent file we have is for 2010-2014. It shows that District B in the Exhibit A plan has 61.21 percent Hispanic CVAP. Looking to the five-year file released one year earlier, which formed the basis of the CVAP determination for the expert reports filed late in 2015, District B in the original 6-2 plan had 58.0 percent Hispanic CVAP. Defendant's Exhibit 41. The high rate of recent growth in Hispanic CVAP in District B suggests that it is highly likely that the 2017 Exhibit A District B has a higher Hispanic CVAP percentage than the 2015 District B.

of precincts 277 and 785, which Mr. Perez carried by 30 and 14 votes respectively.[3] By contrast, the Exhibit A plan keeps precincts 277 and 285 in District B and moves a precinct in which Mr. Perez had a much smaller margin of victory of only two votes ― precinct 188 ― from District B to District A.  In sum, the Exhibit A plan makes District B slightly better for Hispanics in terms of demographics (CVAP) and registered voters (SSRV) than the district was at the time Mr. Perez lost by 34 votes, and it removes territory that Mr. Perez carried by only two votes.  Reinstating the 8-0 plan, on the other hand, would remove parts of precincts that Mr. Perez carried by a total of 44 votes.

- Although court-imposed plans should generally prefer single-member districts, the Supreme Court recognizes that that is not a hard and fast rule where there is persuasive justification to the contrary.  *Wise v. Lipscomb,* 437 U.S. 535, 540 (1978).  This court suggests as much in the passage on page 105 of its opinion noting that there may be potential remedies that preserve the at-large component of the election system.  Indeed, the seminal case on the preference for single-member districts when a district court is forced to fashion its own plan merely stated that they are preferable as a general matter.  *Connor v. Johnson,* 402 U.S. 690, 692 (1972).  Here the Exhibit A plan preserves the policy adopted both by the legislative body and by a vote of the citizens on the charter change.  The plan remedies the specific defect that the court found and provides a number of Hispanic-CVAP-majority and SSRV-majority districts that is proportionate to Hispanics' percentage of the city's CVAP, even without considering the existence of the at-large districts where a Hispanic-preferred candidate prevailed in 2015 even though she

---

[3] Because vote totals are reported by precinct, it is not possible to know how many Perez voters would be transferred when parts of a precinct are moved to a different district.  It is likely, though, that any votes that are moved would be primarily Mr. Perez's votes since he received 62.9 percent of the votes in precinct 277 and 93.8 percent in precinct 785.  Plaintiffs' Exhibit 239 at 2 (Pasadena000764); Defendant's Exhibit 120.

was not the preferred candidate of non-Hispanics. All of these factors provide a compelling justification for the inclusion of the two at-large positions in a remedial plan.

**B.     The court should adopt the plan that reflects the city's policy judgments or, alternatively, should defer to the city's legislative body.**

Redistricting is a legislative task, and whenever practicable a court should afford the legislative body a reasonable opportunity to adopt a substitute measure. *Wise v. Lipscomb,* 437 U.S. 535, 539-40 (1978) (citing multiple Supreme Court cases). When it is not practicable to afford the legislative body the opportunity to meet, the court must begin with the legislative plan as a starting point and defer to the legislative body's policy judgments. *Perez,* 132 S.Ct. at 941.

Here, the court is concerned with the imminence of the coming election. Slip op. at 107. The critical date is the February 17 filing deadline for the May 6 election. TEX. ELEC. CODE, § 144.005(d). If there were not sufficient time for the city council to meet and devise a remedy in time to permit filing before the February 17 deadline, then the court would be required to use the existing 6-2 plan adopted by the council as a starting point for the court's preparation of a remedy. Because there is a way to make minimal alterations to that plan that will cure the defect the court perceived while preserving the legislative body's policy judgments, that is the remedy the court should adopt.

On the other hand, if time exists to await council action, the court can and should afford the council an opportunity to make its own proposal. Unlike the legislature, the council meets regularly and can meet in a specially called session. While it was not possible to prepare a plan and present it to the council prior to the January 13 deadline for this submission, if the court desires to permit the council to express its views on a plan, the city can call a special session of the council and present the plan reflected in Exhibit A, as well as any other plan that might be proposed, for council's approval or rejection as a proposal to the court.

7

Accordingly, the court should either give the city council the opportunity to present a plan to it by January 25 or such other date as the court determines would be appropriate,[4] Failing an opportunity for the council to present a plan, the court should adopt the plan set out in Exhibit A, which reflects the policy judgments of the city and its voters.

## II. The Proposed Period for Continued Jurisdiction.

As noted above, the city disagrees with the court's finding of intentional discrimination. Without waiving its disagreement with that finding or its right to challenge it on appeal, the city provides these comments pursuant to the court's request.

The court suggests a period of five years or through the 2021 election.[5] Slip op. at 106. For ease of administration, it may make sense to put a date certain on which continued jurisdiction will end. An end date of June 30, 2021, would be an appropriate firm date reaching beyond the election and potential run-off. The May 2021 election will be held on May 1, 2021, the first Saturday in May. TEX. ELEC. CODE, § 41.001(a)(1). If there is a run-off, it must be held no later than June 26. TEX. ELEC. CODE, §§ 2.025(a) (run-off date not later than the 45th day after canvass of first election); 67.003(b) (canvass to be held not later than the 11th day after election day). Thus, a termination date of June 30, 2021 would be beyond the May 2021 election and any possible run-off.

---

[4] The Supreme Court has suggested that it would be appropriate to submit a statewide redistricting plan for court approval 14 days before the filing deadline. *Connor v. Johnson,* 402 U.S. 690, 692 (1971). When the district court did not meet that date, it instructed the district court to impose a plan within eleven days and to extend the filing deadline as necessary. *Id.* at 693. Here there is sufficient time before the February 17 filing deadline either to adopt Exhibit A or to request the council to submit a plan, which may well be Exhibit A.

[5] The court's choice of a five-year time period was driven in part by its anticipation that by that time the demographic trends would overcome concerns about dilution from redistricting. A regression analysis of the Hispanic share of Pasadena's CVAP using the data from 2005 through 2015 suggests that by 2021, Hispanics will constitute 57.9 percent of the city's CVAP.

8

**III.     Scope of Preclearance Requirement.**

In its memorandum opinion the court says

The court retains jurisdiction under 52 U.S.C. § 10302(c) to review before enforcement any voting qualification, prerequisite, practice, or procedure different from the map and plan in use in May 2013. Any new City Council voting map, plan, or procedure may be enforced before court review only if it has first been submitted to the United States Attorney General and the Attorney General has not interposed an objection within 60 days after submission.

Slip op. at 108.

The city understands the court's intent as requiring review of any change to the voting map or plan or matters relating to the map or plan. The language, which mirrors the statute, could, however, be interpreted as referring to any election qualification or practice rather than just those relating to the May 2013 maps or plan. The immediate concern is the charter change approved in November 2013, six months following the May 2013 election, that changed the length of residency required for election to the council from six to twelve months and set out proof of residence that needs to be submitted upon filing. The residency requirement of the charter was not an issue in the trial and, while a voting qualification or procedure, is unrelated to the map or plan in place in May 2013. Although the residency requirement is a practice that likely could be routinely precleared given enough time to submit it for review, the city secretary will be faced with the necessity of applying the residency requirements as soon as she receives applications for a place on the ballot—something that can happen as soon as this court enters its judgment. We are bringing this to the court's attention so that the issue can be addressed in any injunction or order and any ambiguity avoided.

The city suggests that any injunction or order make clear that the preclearance requirement applies only to changes to the map or plan set out by the court and not to other election practices, such as the residency requirement. Alternatively, if the court intends a

9

broader requirement that would include review of any election practice or qualification, it could order use of a particular plan, and require review of any changes to that plan and to any election practices or qualifications different from those in use on a designated benchmark date, which could be the date of the court's judgment or some earlier date subsequent to the November 2013 adoption of the changes to the residency requirement.

## CONCLUSION

The court should adopt the plan attached as Exhibit A, which conforms to the policy judgments of the city, as its remedy or, alternatively, should give the city council an opportunity to submit a proposed remedy. Any requirement for continued preclearance should be structured to apply only to the districting map or plan.

Respectfully submitted,

OF COUNSEL:

GUNNAR P. SEAQUIST  
Texas State Bar No: 24043358  
Southern District No: 1140733  
*gseaquist@bickerstaff.com*  
BICKERSTAFF HEATH  
DELGADO ACOSTA LLP  
3711 S. MoPac Expressway  
Building One, Suite 300  
Austin, Texas 78746  
Telephone: (512) 472-8021  
Facsimile: (512) 320-5638

KELLY SANDILL  
State Bar No. 24033094  
Southern District No. 38594  
*ksandill@andrewskurth.com*  
KATHRYN K. AHLRICH  
State Bar No. 24063686  
Southern District No. 1242003  
*katieahlrich@andrewskurth.com*  
ANDREWS KURTH KENYON LLP  
600 Travis, Suite 4200  
Houston, Texas 77002  
Telephone:  (713) 220-4181  
Facsimile:  (713) 220-4285

By:   */s/ C. Robert Heath*  
        C. ROBERT HEATH  
        Texas State Bar No. 09347500  
        Southern District No. 13381  
        *bheath@bickerstaff.com*  
        BICKERSTAFF HEATH  
        DELGADO ACOSTA LLP  
        3711 S. MoPac Expressway  
        Building One, Suite 300  
        Austin, Texas 78746  
        Telephone: (512) 472-8021  
        Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR DEFENDANTS**

## **CERTIFICATE OF SERVICE**

This is to certify that on January 13, 2017, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.

        /s/ *C. Robert Heath*
        C. Robert Heath

# EXHIBIT A



# City of Pasadena
## Modified 6-2 Plan
## January 10, 2017

### 2010-2014 Citizenship and 2016 Spanish Surname Registered Voter Report

| 2010-2014 5-Year ACS Citizenship Special Tabulation* ||||||
|---|---|---|---|---|---|
| DISTRICT | Total CVAP | Hispanic CVAP | Percent Hispanic CVAP | NonHispanic CVAP | Percent NonHispanic CVAP |
| A | 12,786 | 9,496 | 74.27% | 3,295 | 25.77% |
| B | 14,258 | 8,727 | 61.21% | 5,537 | 38.84% |
| C | 15,046 | 8,922 | 59.30% | 6,122 | 40.69% |
| D | 15,236 | 7,940 | 52.11% | 7,305 | 47.94% |
| E | 20,522 | 7,367 | 35.90% | 13,160 | 64.12% |
| F | 18,393 | 4,031 | 21.92% | 14,344 | 77.99% |

| September 2016 Voters (Geocoded) ||||
|---|---|---|---|
| District | Total Voters | Spanish Surname Registered Voters (SSRV) | Percent SSRV |
| A | 7,280 | 5,106 | 70.14% |
| B | 8,311 | 4,771 | 57.41% |
| C | 9,595 | 5,402 | 56.30% |
| D | 8,120 | 4,070 | 50.12% |
| E | 12,314 | 3,935 | 31.96% |
| F | 16,379 | 2,738 | 16.72% |

*2010-2014 5-Year Citizenship Special Tabulation data obtained from Plaintiffs' expert, D. Ely.

# City of Pasadena

## Modifed 6-2 Plan

Summary 2010 Census Total and Voting Age Population

| District | Persons | Deviation | Hispanic % of Total Population | Non-Hispanic Anglo % of Total Population | Non-Hispanic Black % of Total Population | Non-Hispanic Asian % of Total Population | Non-Hispanic Other % of Total Population |
|---|---|---|---|---|---|---|---|
| A | 24,096 | -3.19% | 84.96% | 12.57% | 1.38% | 0.46% | 0.62% |
| B | 25,587 | 2.80% | 76.70% | 20.20% | 1.87% | 0.47% | 0.76% |
| C | 24,143 | -3.00% | 70.51% | 26.58% | 1.65% | 0.42% | 0.83% |
| D | 23,902 | -3.97% | 72.58% | 24.21% | 2.06% | 0.33% | 0.82% |
| E | 25,926 | 4.17% | 45.70% | 46.98% | 2.57% | 3.44% | 1.31% |
| F | 25,681 | 3.18% | 24.89% | 63.55% | 2.39% | 7.18% | 1.97% |
| **Totals** | **149,335** | | **62.08%** | **32.75%** | **2.00%** | **2.11%** | **1.06%** |

**Ideal Size = 149,335 / 0 = 24,889 per district.**

**Total Maximum Deviation = 4.17% - (-3.97%) = 8.13%**

Some percentages may be subject to rounding error.

| District | Total VAP* | | Hispanic % of Total VAP | Non-Hispanic Anglo % of Total VAP | Non-Hispanic Black % of Total VAP | Non-Hispanic Asian % of Total VAP | Non-Hispanic Other % of Total VAP |
|---|---|---|---|---|---|---|---|
| A | 15,766 | | 81.08% | 16.35% | 1.37% | 0.58% | 0.63% |
| B | 16,989 | | 71.12% | 25.61% | 1.92% | 0.55% | 0.79% |
| C | 16,220 | | 65.06% | 32.05% | 1.60% | 0.51% | 0.81% |
| D | 15,998 | | 65.78% | 31.10% | 1.89% | 0.45% | 0.78% |
| E | 19,544 | | 39.50% | 53.33% | 2.50% | 3.53% | 1.13% |
| F | 18,983 | | 21.43% | 67.47% | 2.10% | 7.38% | 1.61% |
| **Totals** | **103,500** | | **55.78%** | **38.97%** | **1.92%** | **2.35%** | **0.98%** |

*Voting Age Population

Some percentages may be subject to rounding error.

1/10/2017

# City of Pasadena
## Modified 6-2 Plan

Detailed 2010 Census Total and Voting Age Population

| District | Persons | Ideal Size | Deviation | Hispanic | % of Total Hispanic Population | Anglo | % of Total Anglo Population | Black | % of Total Black Population | American Indian | % of Total American Indian Population | Asian | % of Total Asian Population | Hawaiian-Pacific Islander | % of Total Hawaiian-Pacific Islander Population | Other | % of Total Other Population | Two or More | % of Total Two or More Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 24,096 | 24,889 | -3.19% | 20,472 | 84.96% | 3,029 | 12.57% | 333 | 1.38% | 28 | 0.12% | 111 | 0.46% | 12 | 0.05% | 21 | 0.09% | 89 | 0.37% |
| B | 25,587 | 24,889 | 2.80% | 19,626 | 76.70% | 5,169 | 20.20% | 478 | 1.87% | 44 | 0.17% | 120 | 0.47% | 7 | 0.03% | 16 | 0.06% | 128 | 0.50% |
| C | 24,143 | 24,889 | -3.00% | 17,024 | 70.51% | 6,418 | 26.58% | 398 | 1.65% | 47 | 0.19% | 101 | 0.42% | 8 | 0.03% | 21 | 0.09% | 125 | 0.52% |
| D | 23,902 | 24,889 | -3.97% | 17,349 | 72.58% | 5,787 | 24.21% | 492 | 2.06% | 40 | 0.17% | 79 | 0.33% | 3 | 0.01% | 19 | 0.08% | 133 | 0.56% |
| E | 25,926 | 24,889 | 4.17% | 11,848 | 45.70% | 12,179 | 46.98% | 666 | 2.57% | 78 | 0.30% | 892 | 3.44% | 9 | 0.03% | 39 | 0.15% | 214 | 0.83% |
| F | 25,681 | 24,889 | 3.18% | 6,393 | 24.89% | 16,319 | 63.55% | 614 | 2.39% | 75 | 0.29% | 1,845 | 7.18% | 29 | 0.11% | 54 | 0.21% | 349 | 1.36% |
| Totals | 149,335 | | | 92,712 | 62.08% | 48,901 | 32.75% | 2,981 | 2.00% | 312 | 0.21% | 3,148 | 2.11% | 68 | 0.05% | 170 | 0.11% | 1,038 | 0.70% |

Ideal Size = 149,335 / 0 = 24,889 per district.

Some percentages may be subject to rounding error.

| District | Total VAP* | Hispanic VAP | % of Total Hispanic VAP | Anglo VAP | % of Total Anglo VAP | Black VAP | % of Total Black VAP | American Indian VAP | % of Total American Indian VAP | Asian VAP | % of Total Asian VAP | Hawaiian-Pacific Islander VAP | % of Total Hawaiian-Pacific Islander VAP | Other VAP | % of Total Other VAP | Two or More VAP | % of Total Two or More VAP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 15,766 | 12,783 | 81.08% | 2,578 | 16.35% | 216 | 1.37% | 25 | 0.16% | 91 | 0.58% | 6 | 0.04% | 12 | 0.08% | 56 | 0.36% |
| B | 16,989 | 12,083 | 71.12% | 4,351 | 25.61% | 326 | 1.92% | 37 | 0.22% | 94 | 0.55% | 7 | 0.04% | 13 | 0.08% | 78 | 0.46% |
| C | 16,220 | 10,552 | 65.06% | 5,198 | 32.05% | 259 | 1.60% | 38 | 0.23% | 82 | 0.51% | 7 | 0.04% | 13 | 0.08% | 73 | 0.45% |
| D | 15,998 | 10,524 | 65.78% | 4,975 | 31.10% | 302 | 1.89% | 31 | 0.19% | 72 | 0.45% | 3 | 0.02% | 13 | 0.08% | 78 | 0.49% |
| E | 19,544 | 7,720 | 39.50% | 10,422 | 53.33% | 489 | 2.50% | 58 | 0.30% | 689 | 3.53% | 8 | 0.04% | 26 | 0.13% | 129 | 0.66% |
| F | 18,983 | 4,069 | 21.43% | 12,807 | 67.47% | 398 | 2.10% | 60 | 0.32% | 1,400 | 7.38% | 14 | 0.07% | 25 | 0.13% | 207 | 1.09% |
| Totals | 103,500 | 57,731 | 55.78% | 40,331 | 38.97% | 1,990 | 1.92% | 249 | 0.24% | 2,428 | 2.35% | 45 | 0.04% | 102 | 0.10% | 621 | 0.60% |

*Voting Age Population

Some percentages may be subject to rounding error.

# EXHIBIT B

# City of Pasadena
# Current 6-2 Plan
# Adopted April 1, 2014

### 2010-2014 Citizenship and 2016 Spanish Surname Registered Voter Report

| 2010-2014 5-Year ACS Citizenship Special Tabulation* ||||||
|---|---|---|---|---|---|
| DISTRICT | Total CVAP | Hispanic CVAP | Percent Hispanic CVAP | NonHispanic CVAP | Percent NonHispanic CVAP |
| A | 10,197 | 7,618 | 74.71% | 2,579 | 25.29% |
| B | 11,796 | 7,421 | 62.91% | 4,375 | 37.09% |
| C | 13,038 | 7,742 | 59.38% | 5,296 | 40.62% |
| D | 13,747 | 6,448 | 46.90% | 7,299 | 53.10% |
| E | 15,516 | 5,721 | 36.87% | 9,795 | 63.13% |
| F | 17,901 | 3,793 | 21.19% | 14,108 | 78.81% |

| September 2016 Voters (Geocoded) ||||
|---|---|---|---|
| District | Total Voters | Spanish Surname Registered Voters (SSRV) | Percent SSRV |
| A | 6,745 | 4,791 | 71.03% |
| B | 8,091 | 4,815 | 59.51% |
| C | 9,819 | 5,545 | 56.47% |
| D | 9,423 | 4,322 | 45.87% |
| E | 11,608 | 3,825 | 32.95% |
| F | 16,313 | 2,724 | 16.70% |

*2010-2014 5-Year Citizenship Special Tabulation data obtained from Plaintiffs' expert, D. Ely.