**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:14-CV-03241-LHR** |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant*. | § | |

**CITY OF PASADENA'S APPLICATION FOR A STAY
OF JUDGMENT AND ORDER OF INJUNCTION PENDING APPEAL**

OF COUNSEL:

GUNNAR P. SEAQUIST
Texas State Bar No: 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*
BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

KELLY SANDILL
State Bar No. 24033094
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH KENYON LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-4181
Facsimile:  (713) 220-4285

By:    */s/ C. Robert Heath*
          C. ROBERT HEATH
          Texas State Bar No. 09347500
          Southern District No. 13381
          *bheath@bickerstaff.com*
          BICKERSTAFF HEATH
          DELGADO ACOSTA LLP
          3711 S. MoPac Expressway
          Building One, Suite 300
          Austin, Texas 78746
          Telephone: (512) 472-8021
          Facsimile: (512) 320-5638

**ATTORNEY-IN-CHARGE FOR
DEFENDANTS**

# TABLE OF CONTENTS

Table of Contents ............................................................................................. ii

Table of Authorities ......................................................................................... iv

Nature and Stage of the Proceedings ...............................................................1

The Issue and the Standard of Review.............................................................1

Summary of the Argument................................................................................1

Argument ..........................................................................................................3

      I.     The appeal of this case presents a serious legal issue, and the city has a substantial case on the merits..........................................................3

              A.     Whether an election system can be dilutive when it results in minority electoral success that is proportional to the group's percentage of the citizen-voting-age population..........................................3

              B.     Whether the district court erred by measuring dilution by a fixed demographic standard—*i.e.,* by the number of districts with a Hispanic CVAP majority—rather than by the ability of Hispanics to elect the candidate of their choice?..........................................5

              C.     Whether the court's decision is based on a failure to maximize the minority group's electoral opportunity. .....................................6

              D.     Whether the district court properly found intentional discrimination. ..........................................................................7

      II.    The city will be irreparably injured absent a stay. .................................11

      III.   Issuance of a stay will not substantially injure the plaintiffs. ...............11

      IV.   The public interest would be served by granting the stay.......................13

Time is of the Essence .....................................................................................14

Conclusion ......................................................................................................14

Certificate of Conference ...............................................................................16

Certificate of Service ......................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Legislative Black Caucus v. Alabama*,
    135 S. Ct. 1257 (2015) ..................................................................................5

*Bartlett v. Strickland*,
    556 U.S. 1 ...............................................................................................6, 7

*De Grandy v. Weatherell*,
    815 F. Supp. 1550 (N.D. Fla. 1992) ...............................................................4

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ........................................................................................1

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ...............................................................................4, 6, 12

*League of United Latin American Citizens v. Clements*,
    999 F.2d. 831 (5th Cir. 1993) (en banc) ........................................................7

*New Motor Vehicle Board v. Orrin W. Fox Co.*,
    434 U.S. 1345 (1977) ....................................................................................11

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................................13

*Perez v. Pasadena Ind. Sch. Dist.*,
    165 F.3d 368 (5th Cir. 1999) ........................................................................12

*Planned Parenthood of Greater Texas Surgical Health Services,* 734 F.3d 406,
    419 (5th Cir. 2013) ......................................................................................11

*Reno v. Bossier Parish School Board*,
    520 U.S. 471 (1997) ......................................................................................10

*Ruiz v. Estelle*,
    650 F.2d 555 (5th Cir. 1981) ..........................................................................1

*Shelby County, Ala. v. Holder*,
    133 S.Ct. 2612 (2013) ....................................................................................3

*Veasey v. Abbott*,
    830 F. 3d 216 (5th Cir. 2016) (en banc) .....................................................7, 8

*Veasey v. Perry*,
    769 F.3d 890 (5th Cir. 2014) ...............................................................................11

*Virginian Ry. Co. v. System Federation No. 40*,
    300 U.S. 515 (1937)..............................................................................................14

**Statutes**

52 U.S.C. § 10301(b) ..............................................................................................5

52 U.S.C. § 10302(c) ..............................................................................................3

52 U.S.C. § 10304(d) ..............................................................................................5

**Other Authorities**

28 CFR § 51.55(b)(2)............................................................................................10

16A Charles Alan Wright, et al., Federal Practice and Procedure § 3954
    (4th ed. 2008) ........................................................................................................1

52 Fed. Reg. 498 (Jan. 6, 1987) ...........................................................................10

63 Fed. Reg. 24108 (May 1, 1998) .......................................................................10

Justin Levitt, *Quick and Dirty: The New Misreading of the Voting Rights Act,* 43
    Fla. St. U. L. Rev 573 (2016). ..............................................................................5

Federal Rules of Civil Procedure 62(c) ..................................................................1

## **Nature and Stage of the Proceedings**

The court has entered its injunction and order requiring the City of Pasadena to conduct its coming election using the 8-0 single-member district plan in use in May 2013.  The city's notice of appeal has been filed contemporaneously with this motion.

## **The Issue and the Standard of Review**

The issue is whether the court should stay its order pending the resolution of the appeal as permitted by Rule 62(c) of the Federal Rules of Civil Procedure.  The factors governing the issuance of a stay, which are the same in the district and appellate courts, are:

1. whether the stay applicant has made a strong showing that it is likely to succeed on the merits;

2. whether the applicant will be irreparably injured absent a stay;

3. whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

4. where the public interest lies.

*Hilton v. Braunskill,* 481 U.S. 770, 776 (1987); 16A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3954 (4th ed. 2008).  In the Fifth Circuit it is well established that an applicant need not show a probability of success on the merits but instead must only show that there is "a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay."  *Ruiz v. Estelle,* 650 F.2d 555, 565 (5th Cir. 1981).

## **Summary of the Argument**

The application for a stay of the court's injunction pending appeal satisfies all the factors that govern consideration of requests for a stay.

1

First, the city must show that it has a substantial case on the merits and that a serious legal question is involved.  Here, the appeal will present the question of whether there can be a section 2 violation when the challenged districting plan has operated to produce actual electoral success in proportion to the plaintiff group's percentage of the city's citizen-voting-age population.  It also raises the important question of whether dilution can be established by fixed demographic standards imposing a requirement for a numerical majority.  These are issues on which the city has a high probability of success as proportionate representation  has been recognized by the Supreme Court as inconsistent with the notion of a section 2 violation, and fixed numerical standards of the type used in the memorandum opinion have been rejected by the Supreme Court and by recent scholarship.  Also, to the extent the court's opinion finds dilution based on a reduction in the opportunity of Hispanics to elect in a fifth council position, it raises the important issue of whether the opinion imposes a prohibited requirement of maximization. Finally, the court's finding of intentional discrimination is based on equating partisan politics with racial bias, on a reliance on speculation by the plan's opponents as to the motives of its proponents, on a misreading of the testimony, and on an incorrect legal premise that assumed dilution was part of the Department of Justice review process.  All of these involve serious legal issues, and the city has a substantial case on the merits of each.

The balance of equities, which are subsumed in the remaining three factors, strongly favor the city.  Preventing the city from enforcing its policy adopted by action of the city council and by a vote of the people in approving a charter amendment is irreparable injury as a matter of law.  The stay will not harm plaintiffs who have achieved actual equal electoral opportunity under the existing plan by having elected their preferred representatives to half the council—a fraction that is equal to the Hispanic percentage of the city's citizen-voting-age population.

Because there are important legal questions to be resolved on appeal, because failing to grant a stay will irreparably harm the city, and because granting a stay will not harm the plaintiff group, which has achieved proportional electoral success under the plan that will remain in effect if the stay is granted, the public interest favors a stay.

<u>**Argument**</u>

I.    **The appeal of this case presents a serious legal issue, and the city has a substantial case on the merits.**

Although the city strongly believes it is likely to prevail on the merits of its appeal, it recognizes that the district court obviously expects its judgment will be affirmed. There should be little doubt, though, that serious legal issues are involved and that the city has a substantial case on the merits. Further, this case raises especially important and serious legal issues, as it is apparently the first post-*Shelby*[1] case where a court has ordered section 3 (52 U.S.C. § 10302(c)) relief against a local jurisdiction. Accordingly, it poses significant legal issues both because of the seminal nature of the case and because of the unique factual posture where a violation was found notwithstanding the actual election results that produced representation in proportion to the Hispanic percentage of the city's citizen-voting- population. This application for a stay does not set out all issues that may be raised on appeal or include extensive discussion of the issues that are presented; however, among the significant legal issues presented by the appeal are:

A.    **Whether an election system can be dilutive when it results in minority electoral success that is proportional to the group's percentage of the citizen-voting-age population.**

It is undisputed that the 6-2 plan resulted in the election of four Hispanic-preferred candidates. Thus, in the only election in which it was in effect, the challenged plan resulted in Hispanics attaining half of the seats on the eight-position council—a proportion of the council

---

[1] *Shelby County, Ala. v. Holder,* 133 S.Ct. 2612 (2013).

equivalent to the Hispanic percentage of the city's citizen-voting-age population.  This presents two significant legal issues.  First, has the plaintiff group even been injured by the 6-2 plan?  If Hispanics, with roughly 50 percent of the Hispanic CVAP enjoy electoral success in 50 percent of the contests, where is the injury, and, in the absence of any injury, is there an article III case or controversy?

The second issue is whether actual proportionate success precludes a finding of section 2 dilution.  The district court has concluded that proportionality is measured by the number of majority-minority districts, not the number of districts that actually elect Hispanic-favored candidates.  *E.g.,* slip op. at 84.  While it is correct that the seminal proportionality case, *Johnson v. De Grandy,* 512 U.S. 997 (1994), measured proportionality by the number of majority-minority districts, it is also true that *De Grandy,* as is the case in most cases challenging a redistricting, involved a districting plan that had never been used in an election.  *De Grandy v. Weatherell,* 815 F. Supp. 1550 (N.D. Fla. 1992) (three-judge court) (trial court opinion in the district court was dated July 17, 1992, and related to a redistricting plan to be first used later that year).  In that situation, the primary way to judge potential minority success was to examine the demographic composition of the districts.  Here, though, the challenged plan was used in the 2015 election, and the court had evidence of how the plan actually worked in providing not only Hispanic opportunity but Hispanic electoral success.  There is a substantial case that this plan, which has provided actual electoral success in proportion to the plaintiff group's percentage of the city's citizen-voting-age population, is not dilutive.

**B.**     **Whether the district court erred by measuring dilution by a fixed demographic standard—*i.e.,* by the number of districts with a Hispanic CVAP majority—rather than by the ability of Hispanics to elect the candidate of their choice?**

Closely related to the question of whether the court was justified in failing to credit the plaintiff group's actual electoral success under the challenged plan, is the court's use of an essentially, if not purely, demographic standard of determining dilution.  The court's opinion measures dilution by the number of Hispanic-CVAP-majority districts.  *E.g.,* slip op. at 69-70 (measuring Hispanic opportunity by the number of Hispanic-CVAP-majority districts and finding the existence of one fewer Hispanic-CVAP majority district under the 6-2 plan constitutes dilution), 74 (measuring electoral opportunity in a district by the existence of a Hispanic-CVAP majority).   The Supreme Court, however, recently stated that it is "misperception of the law" to measure compliance with maintenance of "a particular numerical majority" rather than by the minority group's "ability to elect a preferred candidate of choice."  *Alabama Legislative Black Caucus v. Alabama,* 135 S. Ct. 1257, 1272 (2015).  The Court in *Alabama Black Legislative Caucus* was interpreting section 5, but the same analysis applies to section 2, which contains statutory language that is substantively the same as the language relied on in that case.[2]   In a recent law review article, Justin Levitt, one of the nation's leading professors of election law, discusses at length how reliance on a few census statistics to measure compliance with the Voting Rights Act "betrays the central statutory insight" and is inconsistent with the language and intent of the Act.  Justin Levitt, *Quick and Dirty:  The New Misreading of*

---

[2] The section 5 language cited by the Court in *Alabama Black Legislative Caucus* related to avoiding diminishing the ability of members of a minority group "to elect their preferred candidate of choice." *Alabama Black Legislative Caucus,* 135 S. Ct. at 1272, *citing,* 52 U.S.C. § 10304(b), *see also,* 52 U.S.C. § 10304(d) (the "purpose of subsection (b) .  .  . is to protect the ability of such citizens to elect their preferred candidates of choice").  The comparable language of section 2 measures a violation by whether members of a protected group have an equal opportunity "to elect representatives of their choice").  52 U.S.C. § 10301(b).

*the Voting Rights Act,* 43 FLA. ST. U. L. REV. 573, 576 (2016); *see also, Bartlett v. Strickland,* 556 U.S. 1, 24 (plurality opin.)* (effective crossover districts, which by definition do not contain a majority of minority voting-age population, are a defense against § 2 violations).  The issue of whether section 2 compliance can be measured by the failure to achieve a fixed demographic standard such as a Hispanic CVAP majority is unquestionably a serious legal issue and is one on which the city has a substantial case on the merits.

C.      **Whether the court's decision is based on a failure to maximize the minority group's electoral opportunity.**

The court's finding of dilution is based, at least in part, on the fact that the 6-2 election system has the effect of consigning Hispanics to four council seats, rather than the five seats that would constitute an electoral majority.  Slip op. at 63-64 ("unless the district lines were changed, a majority of the City Council members would be Latino-preferred candidates by 2015 or shortly thereafter"); 74 ("At a minimum, the change [to 6-2] delayed the emergence of a Latino-preferred Council majority in Pasadena"); 85 ("Latinos in Pasadena were poised to elect a majority of the City Council for the first time in history").  There is no dispute that Latinos constitute approximately half of the city's citizen-voting-age population.  Similarly, there is no question that Latino-preferred candidates won four of the eight council seats in the one election that has been conducted under the 6-2 plan.  By finding dilution based on a perceived denial of an opportunity to elect a Latino-preferred candidate to a fifth seat, the court is employing a maximization standard.  Yet, the Supreme Court has said, "However prejudiced a society might be, it would be absurd to suggest that the failure of a districting scheme to provide a minority group with effective political power  .  .  .  above its numerical strength indicates a denial of equal participation in the political process.  Failure to maximize cannot be the measure of § 2." *Johnson v. De Grandy,* 512 U.S. 997, 1016-17 (1994); *see also, Bartlett v. Strickland,* 556 U.S.

6

1, 23 (2009) (plurality opin.) ("§ 2 . . . is not concerned with maximizing minority voting strength"). There is a substantial legal case that the district court's finding of dilution in a districting plan that resulted in actual representation in proportion to the minority group's percentage of the citizen-voting-age population, but that arguably diminished the opportunity to elect to an additional seat, represents a finding that section 2 requires maximization—a standard that is contrary to the language of the statute and to Supreme Court teaching.

**D.       Whether the district court properly found intentional discrimination.**

As is apparent from the en banc opinion in _Veasey_,[3] any finding of intentional discrimination is subject to careful scrutiny by the appellate court. The city believes that several aspects of the district court's interpretation of the record regarding the finding of discriminatory intent are flawed. This application for a stay does not purport to cover all questions and flaws that exist in the finding of discriminatory intent. This limited discussion of the issue demonstrates, though, that there is a serious legal issue and a substantial case on the merits.

One of the reasons the court gave for finding an intent to discriminate is its finding that "[b]y clearly and explicitly intending to diminish Latinos' voting power for partisan ends, Pasadena officials intentionally discriminated on the basis of race." Slip op. at 102. The court concluded that Pasadena officials "understood race and party as interchangeable proxies." _Id._ The city disagrees with the court's conclusion of fact relating to the city officials' understanding and actions, but even if one accepts the factual premise that the city acted for partisan reasons, partisan politics do not equate to racial bias. _League of United Latin American Citizens v. Clements_, 999 F.2d. 831, 853-54, 861, 977, 879, 880 (5th Cir. 1993) (en banc). The evidence does reflect that supporters of the city charter change targeted some of their campaign mailings and arguments to Republican voters, which was not surprising since campaign literature

---

[3] _Veasey v. Abbott_, 830 F. 3d 216 (5th Cir. 2016) (en banc).

opposing the measure was identified as coming from Democratic Party groups. Under well-established Fifth Circuit law that does not equate to racial bias.

The district court also found that the mayor and city officials believed that a failure to change the 8-0 election system would result in Latino-preferred candidates being elected to five city council seats in 2015 and that the city officials acted with the specific intent to avoid that result. Slip op. at 97. ("The intent was to delay the day when Latinos would make up enough of Pasadena's voters to have an equal opportunity to elect Latino-preferred candidates to a majority of City Council seats"). The court found that the mayor had this belief based on the testimony of councilmembers Wheeler, Ybarra, and Van Houte. Slip op. at 63, *citing* Tr. 5: 118-19, 2: 128-130, and 4:141. In his cited testimony, Mr. Wheeler says that he thought that the north-side voters (*i.e.,* Hispanics) would elect a majority of the council, and "I think that's what the mayor saw; that he was very vulnerable to losing control of not having his people on the council." Tr. 5:118-19. The cited testimony from Mr. Ybarra is merely that he thought Mr. Perez might win in District B in 2015. Tr. 2: 128-30. Ms. Van Houte testified that she thought that the mayor was concerned about holding onto four council votes in the 2015 election and that he was trying to change things so that it would be more likely that he would hold on to those votes. Tr. 4:141. She said a reduction in the number of Hispanic districts was the result of the change, but she did not think it was the purpose or the main purpose. *Id.* Also, she said that the mayor's motive was not racial. Tr. 4:140-41. All three of the cited portions of the opinion are based on the speculation of opponents of the challenged districting plan. Only one of the three—Mr. Wheeler's testimony—directly addresses the mayor's motive. That testimony is purely speculative, and *Veasey* expressly notes that speculation by a proposal's opponents about the motives of the proposal's proponents is not probative. *Veasey,* 830 F.3d at 233-34.

8

The opinion, in setting out its conclusion on intent, states

> Mayor Isbell testified that he understood the purpose of preclearance was to prevent the dilution of minority voting strength and the Department of Justice likely would not have precleared Pasadena's proposed change for that reason.  This evidence supports not only the Mayor's and the Council's knowledge of the dilutive impact, but of their intent to achieve it.

Slip op. at 93 (footnote omitted.  The footnote cites to Part II.F.2 of the district court opinion, which, in turn, cites to the mayor's testimony at Tr. 3:62).

The cited portion of the transcript does not, however, support the opinion's conclusion that the mayor knew of, and intended, a dilutive outcome.  In the transcript, the court twice asked the mayor to admit that the Department of Justice would have rejected the 6-2 system as dilutive.  The mayor, however, admitted that he thought that the Department might have rejected the change, but he never said that he understood that the Department would have acted because of dilution.  In fact, he testified that he could not have defined the legal concept of dilution.[4]

---

[4] The specific exchange in the transcript is:

THE COURT: So you understood that by moving to the 6-2 system as soon as Justice, the Department of Justice was out of the preclearance picture, you were taking a step that had the Department of Justice been in the picture would have been viewed as diluting the voting strength of Hispanics?

THE WITNESS: I had understood that Section 5 is the one that was done away with, right? And I was happy about that at the time when I heard that because –

THE COURT: That's not really responsive to my question.

THE WITNESS: I'm sorry.

THE COURT: You understood that by moving to the 6-2 system as soon as the Department of Justice was out of the preclearance picture, you were moving to a system that the Department of Justice would have rejected as diluting the voting strengths of Hispanics in Pasadena?

THE WITNESS: I don't know, Your Honor, that I thought they might totally reject it, but I knew it was a good possibility that they might.

THE COURT: All right. Thank you.  Go ahead, please.

BY MS. SANDILL:

Further, the suggestion in the memorandum opinion and in the court's questions to Mayor Isbell that the Department of Justice, had section 5 been in effect, would have rejected the change to the 6-2 system as dilutive is not correct.  Dilution was not an issue in the Department's section 5 review process.  It is true that in 1987, the Department adopted a regulation (28 CFR § 51.55(b)(2)) that said it would "withhold Section 5 preclearance" if "a bar to implementation of the change is necessary to prevent a clear violation of amended Section 2."  52 Fed. Reg. 498 (Jan. 6, 1987).  Thus, when that regulation was in effect, the Department did consider dilution— *i.e.,* the section 2 standard—when conducting its section 5 analysis.  In 1998, however, in response to *Reno v. Bossier Parish School Board,* 520 U.S. 471 (1997), which held that dilution under section 2 would not justify the withholding of preclearance under section 5, the Department amended the regulation to delete section 51.55(b)(2).  63 Fed. Reg. 24108 (May 1, 1998).  Thus, the district court's factual conclusion that the mayor knew that the change to the 6-2 system was dilutive is not supported by his responses to the court's questions regarding what action DOJ might have taken in performance of its Section 5 preclearance duties.  Indeed, the premise of the court's questions—*i.e.,* that dilution is part of the Department of Justice section 5 review process—is inconsistent with both Supreme Court authority and the Department of Justice's review process set out in its regulations.  The finding of intent is infected with errors of

---

Q Mr. Mayor, do you understand any difference between the concepts of retrogression and dilution in the context of the Voting Rights Act?

A I know you can't go backwards. I mean, no. Retrogression and what?

Q Dilution.

A I couldn't tell you what it is today.

Tr. 3: 62-63.

both fact and law.  The city is likely to prevail on the merits of its appeal and, at a minimum, has shown that it has a substantial case on the merits involving a serious legal question.

## II.    The city will be irreparably injured absent a stay.

The immediate implementation of this court's judgment would prevent continued use of the election plan adopted by its city council that was designed to implement the charter change approved by the electorate.  When a city ordinance is enjoined, the city "necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Planned Parenthood of Greater Texas Surgical Health Services,* 734 F.3d 406, 419 (5th Cir. 2013); *see also, New Motor Vehicle Board v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, Circuit Justice, in chambers)* ("any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

Or, as the Fifth Circuit recently ruled in granting a stay pending appeal of a district court judgment invalidating an election statute found in a 100-plus-page opinion to have been enacted with discriminatory intent:

> The State will be irreparably harmed if the stay is not issued.  .  .  .  If the district court judgment is ultimately reversed, the State cannot run the election over again, this time applying SB 14.  Moreover, the State has a significant interest in ensuring the proper and consistent running of its election machinery, and this interest is severely hampered by the injunction .  . ..

*Veasey v. Perry,* 769 F.3d 890, 895-96 (5th Cir. 2014).

Under Fifth Circuit and Supreme Court authority, the city will be irreparably injured if a stay is not granted.

## III.    Issuance of a stay will not substantially injure the plaintiffs.

The plaintiffs obviously would prefer not to have a stay issued.  However, the 6-2 plan, the use of which has been enjoined by the court's judgment, resulted in the election of four

11

Hispanic-preferred candidates to the eight-district council.  As the Supreme Court stated in the context of section 2, "Treating equal political opportunity as the focus of the enquiry, we do not see how these district lines, apparently providing political effectiveness in proportion to voting-age numbers, deny equal political opportunity."  *Johnson v. De Grandy,* 512 U.S. 997, 1014 (1994).  In this case, the relevant measure is citizen-voting-age population, *e.g., Perez v. Pasadena Ind. Sch. Dist.,* 165 F.3d 368, 372 (5ᵗʰ Cir. 1999), and using that measure, the plaintiff group enjoys actual political effectiveness in proportion to their relevant numbers and has not been denied the equal political opportunity guaranteed by statute.  Use of a plan for the 2017 elections that produced actual equal electoral opportunity for Hispanics in the 2015 election will not injure the plaintiffs.  Thus, issuance of a stay pending appeal will not injure—much less, substantially injure—the plaintiffs.

Under the 6-2 plan, there are three single-member districts with Spanish-surname registered voter majorities of 56.5 percent or higher and an additional single-member district where 45.9 percent of its registered voters have Spanish surnames, and the two-term incumbent is Hispanic.  Thus, if the 6-2 plan is utilized for the 2017 election, there will be four single-member districts where Hispanics have a clear opportunity to prevail and there will be a Hispanic-preferred candidate running at-large who has previously been elected at-large with Hispanic support and over non-Hispanic opposition.

District A will be an open seat due to term limits, but it is a seat with an overwhelming (71.03%) Hispanic registered-voter majority.  Districts C (56.5% SSRV) and D (45.9% SSRV) are both represented by Hispanics who are eligible to run again, and the representative in District D has twice been elected by a populace with a similar percentage of SSRV.Ms. Van Houte, the Hispanic-preferred candidate who was elected at-large in 2015 is term limited, but she has

announced that she will run for mayor.  Having won at-large due to Hispanic support, there is every opportunity that she will win again, especially since the citywide percentage of registered voters who are Hispanic has increased from 40 percent in 2015 to 42 percent in 2016.  Defs. Exhs. 41 and 42.  Finally, in District B, which has not yet elected a Hispanic, 59.5 percent of the registered voters are Hispanic, Def. Exh. 41, and there is every opportunity for a Hispanic to be elected in that district.  .

This is not a situation where the plaintiff group faces a system where the decks are stacked against it.  To the contrary, it is one where Hispanics have every opportunity to prevail and historically have prevailed in numbers at least equal to their percentage of the citizen-voting-age population.  It is difficult to imagine how Hispanics can be said to be substantially injured by having to utilize a system that actually resulted in proportionate representation when it was last used in 2015.

## IV.    The public interest would be served by granting the stay.

The Supreme Court has held that the factors of assessing harm to the opposing party and weighing the public interest merge when, as here, the opposing party is the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  If the government would be substantially harmed in the absence of a stay, then granting the stay is in the public interest.  Logically, the same rationale applies when a failure to grant the stay will result in irreparable harm to the government.  Irreparable harm to the government, which is the representative of the public, is not in the public interest.  That is especially so where, as here, the plaintiff will not be harmed.  Further, the injunction here is against enforcement of an ordinance adopted by the city council in furtherance of a city charter provision adopted by a vote of the people.  The fact that the people have spoken, both through their elected representatives and through their own voices expressed at an election,

acts as a declaration of the public interest and policy.  *Virginian Ry. Co. v. System Federation No. 40,* 300 U.S. 515, 552 (1937).  Staying enforcement of the court's order will serve the public interest by preserving enforcement of the city council's and the public's policy directives pending review of the important questions raised in the appeal.

### Time is of the Essence

Filing begins on January 18 and ends February 17.  Any decision on a stay, whether by the district court or the court of appeals, needs to be made well in advance of the February 17 filing deadline.  Accordingly, the city requests expedited consideration for this application for a stay.

### Conclusion

The city has met the standards required for a stay of the court's injunction pending appeal.  The court should grant the application for a stay.

Respectfully submitted,

OF COUNSEL:

By:     /s/ C. Robert Heath

GUNNAR P. SEAQUIST                          C. ROBERT HEATH
Texas State Bar No: 24043358                Texas State Bar No. 09347500
Southern District No: 1140733               Southern District No. 13381
*gseaquist@bickerstaff.com*                 *bheath@bickerstaff.com*
BICKERSTAFF HEATH                           BICKERSTAFF HEATH
DELGADO ACOSTA LLP                          DELGADO ACOSTA LLP
3711 S. MoPac Expressway                    3711 S. MoPac Expressway
Building One, Suite 300                     Building One, Suite 300
Austin, Texas 78746                         Austin, Texas 78746
Telephone: (512) 472-8021                   Telephone: (512) 472-8021
Facsimile: (512) 320-5638                   Facsimile: (512) 320-5638

KELLY SANDILL                               **ATTORNEY-IN-CHARGE FOR**
State Bar No. 24033094                      **DEFENDANTS**
Southern District No. 38594
*ksandill@andrewskurth.com*
KATHRYN K. AHLRICH
State Bar No. 24063686
Southern District No. 1242003
*katieahlrich@andrewskurth.com*
ANDREWS KURTH KENYON LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone:  (713) 220-4181
Facsimile:  (713) 220-4285

15

## **CERTIFICATE OF CONFERENCE**

The undersigned counsel conferred with counsel for Plaintiffs on January 17, 2017. Counsel for Plaintiffs stated that Plaintiffs oppose this application.

/s/ *C. Robert Heath*
C. Robert Heath

## **CERTIFICATE OF SERVICE**

This is to certify that on January 17, 2017, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.

/s/ *C. Robert Heath*
C. Robert Heath

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **ALBERTO PATINO, et al.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:14-CV-03241-LHR** |
| | § | |
| **CITY OF PASADENA,** | § | |
| *Defendant*. | § | |

## PROPOSED ORDER GRANTING STAY PENDING APPEAL

The court this day considered the City of Pasadena's application for a stay of judgment and injunction pending appeal.  The city has demonstrated (1) that it has a substantial case on the merits involving serious legal questions, (2) that the city will be irreparably injured absent a stay, (3) the plaintiffs will not be substantially injured absent a stay, and (4) the public interest lies in granting a stay until the city's appeal is completed.

Accordingly, the city's application for a stay is GRANTED and the court's final judgment and injunction entered January 16, 2017, be, and hereby is STAYED pending resolution of the appeal in this cause.

Entered this ___ day of January, 2017.

_____
Lee H. Rosenthal
Chief United States District Judge