# UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| Alberto Patino, et al., | ) | |
| | ) | |
| _____ | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | H-14-3241 |
| City of Pasadena | ) | |
| _____ | ) | |
| Defendant(s). | ) | |

**UNOPPOSED MOTION TO APPROVE CITY OF PASADENA'S CITY COUNCIL
REDISTRICTING PLAN PURSUANT TO SECTION 3 OF THE VOTING RIGHTS ACT**

In its opinion, *Patino v. City of Pasadena,* 230 F.Supp.3d 667 (S.D. Tex. 2017), and

judgment [Dkt. 162] overturning the city's replacement of its single-member-district election

system with a mixed system with six single-member districts and two at-large positions, this court

directed the city to conduct its future council elections using the eight single-member districts that

had been adopted by the city following the 2010 census and precleared by the Department of

Justice. The city held its elections in 2017, 2019, and 2021 under that plan.

**I.     The 2020 Census revealed that the court-ordered plan is no longer in population
balance, and the city initiated the redistricting process.**

With the publication of each decade's federal census, jurisdictions with single-member

districts typically examine those districts to see if they are still in population balance. To assist it

in the redistricting process the city retained this firm, which prepared an initial assessment applying the 2020 census to the existing districts. The firm prepared a 41-page document showing how the new census applied to the eight-district council plan, discussing the legal principles affecting redistricting, including the city's obligations under the *Patino* judgment, and recommending a process to be followed. That document is attached as Exhibit A. The analysis revealed that the districts were no longer in population balance. Specifically, the total deviation between the largest (District H) and smallest (District A) was 20.81 per cent, well above the ten precent total maximum deviation that is generally recognized as the maximum permissible variance. *E.g., Voinovich v. Quilter,* 507 U.S. 146,161 (1993), *quoting Brown v. Thompson,* 462 U.S. 835, 842-43 (1983).

The city provided counsel for MALDEF, who represented the plaintiff in *Patino,* with the same document (i.e., Exhibit A) that was presented to the city council along with the proposed schedule for hearings and an invitation for MALDEF to participate in the process. The city also indicated that it would be pleased to answer any questions MALDEF had and to provide it with shapefiles[1] and similar materials that it might request. Over the course of the process, the city provided MALDEF with shapefiles for the existing districts and for the plan that the council ultimately voted to approve. Although MALDEF did not make a formal presentation to the city council, the attorneys for the city and MADEF did discuss some issues, and the city responded to at least one question posed by the MALDEF counsel.

The city adopted a resolution, Exhibit B, providing criteria that the council would consider when devising a plan. This included following legal requirements as well as traditional districting principles such as drawing districts that are compact and contiguous, that avoid, where possible,

---

[1] A shapefile is an electronic description of a map. With it someone with mapping software can import the map into its computer, can verify its accuracy, and can explore possible changes.

splitting neighborhoods and communities of interest, and recognizing existing relationships between incumbent councilmembers and their constituents.  It also adopted guidelines for persons submitting plans for the council's consideration, although no citizen-created plans were ultimately received.

All council meetings on redistricting were open to the public.  The consultant prepared a plan with the goal of changing the existing, court-ordered plan as little as possible while bringing it into legally required population balance.  The council then used this "least-change" plan as a starting point at a drawing session in a work session that was open to the public.  In that session, the council made minor changes and reached general agreement on what was then labelled as an illustrative plan.  The council set this illustrative plan for a public hearing, but there was no public comment.  The council approved this plan on first reading and then on second and final reading on August 16.  The vote was 7-1.  The adopted plan, which is presented in the motion for the court's review and approval, is found at Exhibit C.

**II.     The issue before the court is whether the adopted plan has the purpose or will have the effect of denying or abridging the right to vote on account of race, color, or language-minority status.**

Review under section 3 of the Voting Rights Act (52 U.S.C § 10302(c)), which is the statute at issue here, is a rare occurrence without a large body of law.  There is, however, a well-developed and long-standing body of law regarding the standard under section 5 (52 U.S.C. § 10304(a)).  The statutory language of the scope of review under both section 3 and section 5—"does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 4(f)(2) [52 U.S.C. §

10303(f)(2)"—is substantively[2] identical.  In construing that language in the section 5 contest, the Supreme Court held that its purpose was 'to ensure that no voting procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 141 (1976); *see also, Reno v. Bossier Parish School Board,* 520 U.S. 471 (1997) (section 5 preclearance inquiry is limited to retrogression and does not extend to dilution issues posed by section 2 of the Act); *City of Lockhart v. United States*, 460 U.S. 125, 134 (1983) (section 5 relates to retrogression and preclearance cannot be denied due to a failure to enhance minority electoral opportunity).  Based on the *Beer* holding, the Attorney General set out the standards for section 5 review in the Department of Justice, 28 C.F.R. § 51.54., and provided that the same standard would apply to his review under section 3.  28 C.F.R. § 51.8.  Although the Attorney General's regulations relating to administration of section 3 and section 5 review do not control this court, they are based on multiple Supreme Court decisions interpreting the statutory language that appears in both sections 3 and 5, reflect the Department's broad experience in making tens of thousands of decisions under section 5, and provide a helpful template.

Basically, the issue is whether the new plan results in the protected minority group being worse off than they were before the change in regard to their effective exercise of the electoral franchise.  28 C.F.R. §51.54(b).  This is determined by comparing the newly adopted plan to the benchmark, which in this case is the districting plan that was ordered by this court in 2017 as a remedy to the section 2 violation it found in *Patino.*  The comparison is made on the basis of the

---

[2] The only difference in the two sections is that section 5 says "neither has the purpose nor will have the effect" while section 3 says, "does not have the purpose and will not have the effect."  Otherwise, the description of what a court or the Attorney General must find is the same.  Section 4(f)(2), which is referenced in both sections, refers to members of a language-minority group and is the provision of the Act that extends its benefits to Hispanics.

conditions existing today—*i.e.,* on the demographic composition of the districts as reflected in the 2020 census rather than as it might have been in 2017 or when the plan was initially drawn following the 2010 census.  28 C.F.R. §51.54(c)(2).

### III.    The benchmark plan contains five districts with effective Hispanic electoral majorities.

Under the benchmark plan, five council districts (Districts A-E), all of which are located in the northern part of the city have effective Hispanic electoral majorities.  In each of the five, the percentage of the district's registered voters who have Spanish-surnames exceeded 50 percent. Three of the five districts are represented by councilmembers who have Spanish surnames (Councilmembers Ybarra in District A, Valerio in District B, and Estrada in District E).  The other two districts are represented by Anglos who this court has previously found to be candidates of Hispanic choice (Councilmembers Harrison-District C and Van Houte-District D).  *Patino,* 230 F.Supp.3d at 703, 706.

As shown in Table I, the 2020 census revealed that districts A, B, and C, all located in the northern sector, were significantly underpopulated and would need to be redrawn to acquire additional population to comply with one-person, one-vote requirements.  Districts G and H, both located in the southern part of the city were overpopulated and would need to give up population. The remaining districts—Districts D, E, and F—were fairly close to being in population balance, but, as they were generally located between the overpopulated districts in the south and the underpopulated districts in the north, some or all would likely need to be redrawn as the geography necessitated that they receive the excess population from the south and give up constituents to bolster the population in the northern districts.

| TABLE I | | | | | |
| Total Population | | | | | |
| | | Benchmark | | Adopted Plan | |
| | Ideal Size | Population | Deviation | Population | Deviation |
| A | 18,988 | 17,447 | -8.12% | 18,733 | -1.34% |
| B | 18,988 | 17,965 | -5.39% | 18,921 | -0.35% |
| C | 18,988 | 17,606 | -7.28% | 18,537 | -2.38% |
| D | 18,988 | 18,590 | -2.10% | 18,590 | -2.10% |
| E | 18,988 | 19,387 | 2.10% | 19,246 | 1.36% |
| F | 18,988 | 19,315 | 1.72% | 18,760 | -1.20% |
| G | 18,988 | 20,196 | 6.36% | 19,579 | 3.11% |
| H | 18,988 | 21,399 | 12.70% | 19,539 | 2.90% |
| | | | | | |
| Total Deviation | | | 20.81% | | 5.49% |

The table reflects that the three southernmost, more heavily Anglo districts gave up a total of 3,032 persons as the map was redrawn to decrease the size of the over-populated southern districts while bringing the under-populated northern, largely Hispanic, districts into population balance. The five northern districts gained a net of 3,032 persons with Districts A, B, and C adding 3,173 persons while District E gave up 141 persons and District D remained unchanged. In correcting the population imbalance by moving population from the largely Anglo south to the largely Hispanic north, the city's task was to do this while not undermining the status of the northern districts as ones where Hispanics have an effective electoral majority.

IV.    **The adopted plan does not result in retrogression in the ability of Hispanics to elect candidates of their choice and, thus, satisfies the section 3 effect standard.**

Table II addresses how the adopted plan affects the ability of Pasadena Hispanics to elect candidates of their choice. The table shows the Hispanic citizen-voting-age population (HCVAP) for the various districts in the benchmark plan and the adopted plan. Similarly, it shows the Spanish-surname registered voter (SSRV) numbers for the districts in the two plans. This court has found that the Spanish-surname measure is a reliable proxy for Latino registered voters in Pasadena. *Patino,* 230 F.Supp.3d at 687. While both HCVAP and SSRV are helpful in gauging

political strength, SSRV may be more probative. First, registration numbers are a measure of the actual number of Hispanics eligible to turn out in an election. HCVAP is more of a measure of the number who could register. It is not a number to be disregarded, but it is not as good a measure of immediate electoral strength as SSRV is. Second, SSRV is likely a more accurate number. It is an actual count from the registration rolls at a point in time. HCVAP, on the other hand, is a statistical sample composed of inquiries made over a five-year period ending in 2020, so it is more dated and does not reflect the percentage at any particular time.

| TABLE II | | | | | |
|---|---|---|---|---|---|
| | **Hispanic Citizen Voting Age Population** | | | **Spanish Surnamed Registered Voters** | |
| | **Bench Mark** | **Adopted Plan** | | **Bench Mark** | **Adopted Plan** |
| A | 78.87% | 78.13% | A | 71.14% | 71.03% |
| B | 77.87% | 77.89% | B | 68.25% | 67.12% |
| C | 72.38% | 73.08% | C | 61.64% | 61.62% |
| D | 69.50% | 69.50% | D | 61.94% | 61.94% |
| E | 63.92% | 63.32% | E | 53.95% | 53.72% |
| F | 44.65% | 45.08% | F | 35.95% | 35.67% |
| G | 54.80% | 49.78% | G | 47.96% | 44.33% |
| H | 19.92% | 17.90% | H | 17.82% | 16.95% |
| Total | | 56.58% | | | 47.06% |

The five districts where Hispanics constitute an effective electoral majority are bounded in the table by a heavily bolded line. All elect a Hispanic councilmember or a candidate of Hispanic choice. Looking first to SSRV, all had SSRV majorities in the benchmark plan with one at almost 54 percent SSRV and the other four above 60 percent. In the adopted plan, those percentages experience de minimis change. Percentages in District D, of course, are unchanged as its boundaries, alone among the eight single-member districts, remained the same as in the benchmark, court-ordered plan. The SSRV percentages in the other four experienced slight drops—District A-0.09%, District B-1.13%, District C-0.02%, and District E-0.23%. While the

drop in SSRV in District B slightly exceeded a percentage point, over two-thirds of its registered voters have Spanish surnames. The changes do not affect its status as a district with an effective Hispanic electoral majority.

The same minimal impact exists when one looks at the effect of the change on HCVAP percentage. Districts A and E had a decrease in HCVAP percentage, while Districts B and C showed an increase. In every case, though, the change was less than a percentage point.

Whether one looks and SSRV or HCVAP, the adopted plan is not retrogressive. The adopted plan follows the court-ordered benchmark to the extend possible while achieving the constitutionally required population balance. The benchmark plan had five districts in which Hispanics constitute an effective electoral majority. In the adopted plan, all five of those districts retain their effective Hispanic electoral majority.

## V. The plan was not adopted with a discriminatory intent.

There is nothing to suggest that the plan was adopted with discriminatory intent. Of course, since the effect of the plan is to preserve Hispanic effective electoral strength that is inconsistent with the city's having an intent to discriminate. Further, the facts overwhelmingly suggest the absence of discriminatory intent. The adopted plan was based on the court-ordered remedy plan with changes necessary to bring it into population balance. It was adopted by a council with a majority of members who were Hispanic or candidates of Hispanic choice. Four of the five representatives of the Hispanic-majority districts voted for the plan. There was no suggestion during the process that it was designed to discriminate against Hispanics and there were no suggestions from the council or public of alternatives that would be more favorable to Hispanic voters. This is in stark contrast to the adoption of the 6-2 mixed system that the court found in *Patino* to have had a discriminatory intent. There the challenged system was opposed by the

Hispanic members of the council, the non-Hispanic members who were candidates of Hispanic choice, and by Hispanic voters.  In this 2022 process, the city sought the participation of MALDEF, the group that brought the *Patino* suit, and that organization does not object to the adopted plan.

### Conclusion and Prayer

The City of Pasadena redistricting plan adopted following the 2020 census does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or language-minority status.  The city requests that the court make that finding.

### Certificate of Conference

Throughout the redistricting process, counsel for the city conferred by email and telephone with Ms. Nina Perales, counsel for the plaintiff.  Ms. Perales has reviewed the adopted plan and the motion and by email September 6, 2022, has authorized me to represent that "Patino plaintiffs are not opposed to the motion for preclearance."

Respectfully submitted,

By: /s/  C. Robert Heath
C. ROBERT HEATH
State Bar No. 09347500
BICKERSTAFF HEATH DELGADO ACOSTA LLP
3711 S. Mopac Expressway
Building One, Suite 330
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile:  (512) 320-5638
bheath@bickerstaff.com

Attorneys for the City of Pasadena

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing document has been served via electronic filing service provider, email, facsimile, and/or Certified Mail Return Receipt Requested to all parties of record listed below on this the 7th day of September, 2022.

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
and Educational Fund, Inc. (MALDEF)
110 Broadway Suite 300
San Antonio, TX 78205
ph. (210) 224-5476
fax (210) 224-5382
www.maldef.org

_/s/ C. Robert Heath_____
C. Robert Heath

# Exhibit A



June 10, 2022

Mayor Jeff Wagner
Councilmembers Ybarra, Valerio, Harrison, Van Houte,
Estrada, Cayten, Bass, and Schoenbein
City of Pasadena, Texas
P.O. Box 672
Pasadena, TX 77501

      Re:    *Initial Assessment considering 2020 Census data*

Dear Mayor Wagner and City Councilmembers:

      This is the Initial Assessment letter for the City of Pasadena. It replaces the earlier letter dated May 26, 2022, that was based on an incorrect map. Our review of the recently released 2020 Census population and demographic data for the City shows that the City's councilmember districts are sufficiently out of population balance that you should redistrict. We are prepared to meet with the City at your convenience to review the Initial Assessment and to advise the City on how to proceed to redistrict the districts to bring them into population balance for use in the 2022 election cycle. If the City Council desires it, we are prepared to meet with the Council at a time mutually agreeable to discuss the Initial Assessment and the redistricting process.

      This letter presents a brief overview of basic redistricting principles to assist you in preparing for our presentation on the Initial Assessment. We also set out in the attachments (Attachment H) suggested posting language for the meeting at which the Initial Assessment will be presented. Note that this posting language includes agenda items for the adoption of redistricting criteria and guidelines. These are matters that should be addressed early in the redistricting process to enable us to proceed efficiently. We will be working with you to develop the appropriate language for your adoption of redistricting criteria and guidelines.

      In redistricting the councilmember districts, the City will need to be aware of the legal standards that apply. We will review these principles in detail with the City Council at the presentation on the Initial Assessment. There are four basic legal principles that govern the redistricting process: (i) the "one person-one vote" (equal population) principle; (ii) the non-discrimination standard of Section 2 of the Voting Rights Act; (iii) the *Shaw v. Reno* limitations on the use of race as a factor in redistricting; and (iv) the City's responsibilities under section 3 of the Voting Rights Act. These principles are discussed in detail in the attachments to this letter.

      The process we have outlined for the redistricting process and the policies and procedures that we are recommending the Council adopt will ensure that the City adheres to these important legal principles and that the rights of protected minority voters in the political subdivision are accorded due weight and consideration.

3711 S. MoPac Expressway, Building One, Suite 300, Austin, TX 78746 | Phone: 512-472-8021 | Fax: 512-320-5638 | www.bickerstaff.com

Austin     El Paso     Rio Grande Valley

## The "One Person – One Vote" Requirement:  Why You Should Redistrict

The "one person-one vote" requirement of the United States Constitution requires that members of an elected body be chosen from districts of substantially equal population and apples to city councils. Exact equality of population is not required, but a "total maximum deviation" of no more than ten percent in total population between the most populated and the least populated city councilmember districts based on the most recent census should be achieved. This maximum deviation of ten percent constitutes a rebuttable presumption of compliance with the one person-one vote requirement. If a City's councilmember districts do not fall within the ten percent maximum deviation, the entity is at substantial risk of being sued for violation of one person-one vote standards.

The population and demographics of all the current director precincts are presented in Attachment A. The tables show that the total population of the City on April 1, 2020, was 151,905 persons. The ideal district should now contain 18,988 persons (total population / 8 single-member precincts).

Councilmember District H has the largest population, which is approximately 12.70 percent above the size of the ideal district (about 2,411 people). Councilmember District A has the smallest population, which is approximately 8.12 percent below the size of the ideal district (about 1,541 people). The total maximum deviation between the eight existing councilmember districts for the City, therefore, is 20.81% percent. This total maximum deviation exceeds the standard of ten percent that generally has been recognized by the courts as the maximum permissible deviation. Accordingly, the City should redistrict to bring its councilmember districts within the ten percent range permitted by law.

## Section 2 of the Voting Rights Act:  Avoiding discrimination claims

Section 2 of the federal Voting Rights Act prohibits any voting standard, practice, or procedure – including new redistricting plans – that have the effect of discriminating against a protected minority group. The principles of Section 2's nondiscrimination mandate are discussed in Attachment C.

The data in the Population Tables in Attachment A as well as the data in the maps in Attachment B, which show the geographic distribution of the primary minority groups in the Authority, will also be important in assessing the potential for Voting Rights Act Section 2 liability. (See Attachment C for a discussion of Section 2.)

## Shaw v Reno:  Additional equal protection considerations

As noted above, in order to comply with Section 2, the City must consider race when drawing councilmember districts. The 1993 Supreme Court case *Shaw v. Reno*, however, limits how and when race can be a factor in the districting decisions. Thus, local governments must walk a legal tightrope, where the competing legal standards must all be met. The *Shaw v. Reno* standard requires that there be a showing that (1) the race-based factors were used in furtherance of a "compelling state interest" and (2) their application be "narrowly tailored," that is, they must be used only to the minimum extent necessary to accomplish the compelling state interest. (*Shaw v. Reno* is discussed in Attachment C.) We will guide the Authority through proper application of this principle.

## Section 3 of the Voting Rights Act:  Special Preclearance Requirement

While the general preclearance preclearance requirements of section 5 of the Voting Rights are no longer applicable following the Supreme Court's decision in *Shelby County v. Holder* in 2013, a court may order that a jurisdiction receive preclearance of changes in election practices, including any redistricting plan, under section 3 of the Act.  The federal district court imposed such a requirement on Pasadena in its judgment in *Patino v. City of Pasadena,* No. H-14-3241 (S.D. Tex. Jan. 16, 2017).  As a result, Pasadena will need to submit any change in its council districts either to the *Patino* court or to the United States Attorney General before the plan can be implemented.  The court or Attorney General will review the plan to ensure it is not retrogressive, that is, that the new plan does not result in a diminution of a protected minority group's ability to participate in the political process and to elect candidates of its choice.

## Adoption of redistricting criteria and public participation guidelines

At the presentation of the Initial Assessment we will recommend certain "traditional" redistricting criteria that the City may require all redistricting plans to follow. These criteria track the legal principles that the courts and the Department of Justice have found to be appropriate elements in sound redistricting plans. We will also recommend certain public participation guidelines that the City may wish to adopt to ensure fair and adequate public participation in the redistricting process, and that any comments or proposed plans submitted by members of the public are written, clear, and complete, and the submitter provide the City of Pasadena contact information.

Once redistricting guidelines and criteria are adopted and the City gives instructions about how it would like plans to be developed considering this Initial Assessment and the applicable legal standards, we can begin to assist the City in the development of plans for consideration.

We hope this Initial Assessment discussion is helpful to the you and that it will guide the City as it executes the redistricting process. We look forward to meeting with the City to review this Initial Assessment and to answer any questions you may have concerning any aspect of that

process.  Please feel free to call me in the interim as we prepare for the presentation and let me know if there is any additional information you may require.

Sincerely,

C. Robert Heath

Encl.

# ATTACHMENT A

## INITIAL ASSESSMENT POPULATION TABLES

# Pasadena City Council Districts: 2022 Initial Assessment



## Demographics Report - Summary 2020 Census Total Population
Plan Last Edited on: 6/10/2022 12:54:15 PM

| District | Persons | Ideal Size | Deviation | Hispanic % of Total Population | Non-Hispanic White % of Total Population | Non-Hispanic Black % of Total Population | Non-Hispanic Asian % of Total Population | Non-Hispanic Other % of Total Population |
|---|---|---|---|---|---|---|---|---|
| A | 17,447 | 18,988 | -8.12% | 86.42% | 9.25% | 2.34% | 0.61% | 1.38% |
| B | 17,965 | 18,988 | -5.39% | 86.47% | 10.23% | 1.99% | 0.33% | 0.98% |
| C | 17,606 | 18,988 | -7.28% | 81.76% | 12.61% | 3.70% | 0.30% | 1.63% |
| D | 18,590 | 18,988 | -2.10% | 76.91% | 19.14% | 1.87% | 0.49% | 1.57% |
| E | 19,387 | 18,988 | 2.10% | 73.34% | 21.13% | 3.01% | 0.44% | 2.08% |
| F | 19,315 | 18,988 | 1.72% | 54.04% | 36.28% | 3.08% | 3.56% | 3.04% |
| G | 20,196 | 18,988 | 6.36% | 66.67% | 21.74% | 6.86% | 2.73% | 2.04% |
| H | 21,399 | 18,988 | 12.70% | 25.77% | 59.14% | 3.11% | 8.07% | 3.94% |
| **TOTAL:** | 151,905 | | | 67.77% | 24.61% | 3.29% | 2.21% | 2.13% |

**Ideal Size:   151905 / 8 = 18988**

**Total Population:  151,905**

**Overall Deviation:** 20.81%                    *Some percentages may be subject to rounding errors.*





## Demographics Report - Summary 2020 Census Voting Age Population
Plan Last Edited on: 6/10/2022 12:54:15 PM

| District | Total VAP* | | Hispanic % of Total VAP | Non-Hispanic Anglo % of Total VAP | Non-Hispanic Black % of Total VAP | Non-Hispanic Asian % of Total VAP | Non-Hispanic Other % of Total VAP |
|---|---|---|---|---|---|---|---|
| A | 12,281 | | 84.87% | 10.78% | 2.21% | 0.72% | 1.42% |
| B | 12,612 | | 83.78% | 12.62% | 2.11% | 0.40% | 1.07% |
| C | 12,260 | | 79.14% | 15.13% | 3.47% | 0.39% | 1.87% |
| D | 13,324 | | 73.88% | 22.24% | 1.73% | 0.58% | 1.57% |
| E | 14,029 | | 68.72% | 25.81% | 2.77% | 0.45% | 2.25% |
| F | 14,803 | | 49.20% | 41.28% | 3.05% | 3.84% | 2.62% |
| G | 14,575 | | 62.79% | 26.19% | 6.13% | 2.94% | 1.97% |
| H | 17,192 | | 22.91% | 61.98% | 3.32% | 8.14% | 3.65% |
| | 111,076 | | 63.52% | 28.75% | 3.15% | 2.45% | 2.13% |

\* VAP - Voting Age Population

*Some percentages may be subject to rounding errors.*



## Pasadena City Council Districts: 2022 Initial Assessment

## Demographics Report - Detailed 2020 Census Total Population

Plan Last Edited on: 6/10/2022 12:54:15 PM

| District | Persons | Ideal Size | Deviation | Hispanic | Hispanic % of Total Population | ANGLO | Non-Hispanic Anglo % of Total Population | Black | Black % of Total Population | Asian | Asian % of Total Population | AM Indian Native | IND / NAT % TOT Pop. | Haw Pac. Isl. | HAW/ PAC % of Tota Pop. | Other | Other % of Total Pop. | Two or More Races | Two or More Races % Tot Pop |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 17,447 | 18,988 | -8.12% | 15,077 | 86.42% | 1,614 | 9.25% | 409 | 2.34% | 106 | 0.61% | 12 | 0.07% | 6 | 0.03% | 66 | 0.38% | 157 | 0.90% |
| B | 17,965 | 18,988 | -5.39% | 15,535 | 86.47% | 1,837 | 10.23% | 357 | 1.99% | 59 | 0.33% | 17 | 0.09% | 2 | 0.01% | 24 | 0.13% | 133 | 0.74% |
| C | 17,606 | 18,988 | -7.28% | 14,395 | 81.76% | 2,220 | 12.61% | 652 | 3.70% | 52 | 0.30% | 27 | 0.15% | 9 | 0.05% | 78 | 0.44% | 173 | 0.98% |
| D | 18,590 | 18,988 | -2.10% | 14,298 | 76.91% | 3,558 | 19.14% | 348 | 1.87% | 92 | 0.49% | 15 | 0.08% | 2 | 0.01% | 33 | 0.18% | 242 | 1.30% |
| E | 19,387 | 18,988 | 2.10% | 14,219 | 73.34% | 4,096 | 21.13% | 583 | 3.01% | 86 | 0.44% | 46 | 0.24% | 11 | 0.06% | 63 | 0.32% | 283 | 1.46% |
| F | 19,315 | 18,988 | 1.72% | 10,438 | 54.04% | 7,007 | 36.28% | 594 | 3.08% | 687 | 3.56% | 47 | 0.24% | 7 | 0.04% | 61 | 0.32% | 473 | 2.45% |
| G | 20,196 | 18,988 | 6.36% | 13,464 | 66.67% | 4,390 | 21.74% | 1,386 | 6.86% | 552 | 2.73% | 58 | 0.29% | 12 | 0.06% | 61 | 0.30% | 280 | 1.39% |
| H | 21,399 | 18,988 | 12.70% | 5,515 | 25.77% | 12,655 | 59.14% | 665 | 3.11% | 1,726 | 8.07% | 38 | 0.18% | 10 | 0.05% | 79 | 0.37% | 716 | 3.35% |
| TOTAL: | 151,905 | | | 102,941 | 67.77% | 37,377 | 24.61% | 4,994 | 3.29% | 3,360 | 2.21% | 260 | 0.17% | 59 | 0.04% | 465 | 0.31% | 2,457 | 1.62% |

**Ideal Size: 151905 / 8 = 18988**

**Total Population: 151,905**

**Overall Deviation: 20.81%**          *Some percentages may be subject to rounding errors.*





| District | Total VAP | Hispanic VAP | % Hispanic VAP | Anglo VAP | % Anglo VAP | Black VAP | % Black VAP | Asian VAP | % Asian VAP | AM IND NATIVE VAP | % AM IND NATIVE VAP | HAW/PAC VAP | % HAW/PAC VAP | Other VAP | % Other VAP | Two or More Races VAP | % Two or more VAP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 12,281 | 10,423 | 84.87% | 1,324 | 10.78% | 271 | 2.21% | 89 | 0.72% | 11 | 0.09% | 2 | 0.02% | 45 | 0.37% | 117 | 0.95% |
| B | 12,612 | 10,566 | 83.78% | 1,592 | 12.62% | 266 | 2.11% | 51 | 0.40% | 15 | 0.12% | 2 | 0.02% | 18 | 0.14% | 100 | 0.79% |
| C | 12,260 | 9,703 | 79.14% | 1,855 | 15.13% | 425 | 3.47% | 48 | 0.39% | 15 | 0.12% | 9 | 0.07% | 60 | 0.49% | 145 | 1.18% |
| D | 13,324 | 9,844 | 73.88% | 2,963 | 22.24% | 230 | 1.73% | 77 | 0.58% | 13 | 0.10% | 2 | 0.02% | 15 | 0.11% | 179 | 1.34% |
| E | 14,029 | 9,641 | 68.72% | 3,621 | 25.81% | 388 | 2.77% | 63 | 0.45% | 39 | 0.28% | 4 | 0.03% | 45 | 0.32% | 228 | 1.63% |
| F | 14,803 | 7,283 | 49.20% | 6,111 | 41.28% | 451 | 3.05% | 569 | 3.84% | 44 | 0.30% | 2 | 0.01% | 41 | 0.28% | 301 | 2.03% |
| G | 14,575 | 9,152 | 62.79% | 3,817 | 26.19% | 894 | 6.13% | 429 | 2.94% | 37 | 0.25% | 6 | 0.04% | 39 | 0.27% | 205 | 1.41% |
| H | 17,192 | 3,939 | 22.91% | 10,655 | 61.98% | 570 | 3.32% | 1,399 | 8.14% | 35 | 0.20% | 9 | 0.05% | 62 | 0.36% | 521 | 3.03% |
| **TOTALS:** | 111,076 | 70,551 | 63.52% | 31,938 | 28.75% | 3,495 | 3.15% | 2,725 | 2.45% | 209 | 0.19% | 36 | 0.03% | 325 | 0.29% | 1,796 | 1.62% |

* VAP - Voting Age Population

*Some percentages may be subject to rounding errors.*



# ATTACHMENT B

## MAPS



## Pasadena City Council Districts
## 2022 Initial Assessment

**Legend**

▭ Benchmark District Lines

**2022 Initial Assessment**

A B C D E F G H

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other features obtained from the 2020 Tiger/line files, U.S. Census Bureau





# Pasadena City Council Districts
## 2022 Initial Assessment
*District A*

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau

**Legend**

| | |
|---|---|
| ▬▬ | Benchmark District Lines |
| ▬▬ | 2022 Election Precincts |
| ── | Streets |

**2022 Initial Assessment**

A  B  C  D  E  F  G  H



# Pasadena City Council Districts
## 2022 Initial Assessment
### District B

**Legend**

⬛ Benchmark District Lines
⬛ 2022 Election Precincts
— Streets

**2022 Initial Assessment**

A B C D E F G H

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other features obtained from the 2020 Tiger/line files, U.S. Census Bureau

0   0.125   0.25   0.5 Miles



**Pasadena City Council Districts**
**2022 Initial Assessment**
*District C*

Legend

— Benchmark District Lines
— 2022 Election Precincts
— Streets

**2022 Initial Assessment**

A B C D E F G H

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau

0   0.125   0.25        0.5
Miles



**Pasadena City Council Districts**
**2022 Initial Assessment**

*District D*

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/lines files, U.S. Census Bureau

**Legend**

— Benchmark District Lines
— 2022 Election Precincts
  Streets

**2022 Initial Assessment**

A  B  C  D  E  F  G  H



# Pasadena City Council Districts
## 2022 Initial Assessment
*District E*

**Legend**

🔲 Benchmark District Lines
🔲 2022 Election Precincts
— Streets

**2022 Initial Assessment**

A  B  C  D  E  F  G  H

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other features obtained from the 2020 Tiger/line files, U.S. Census Bureau





**Pasadena City Council Districts**
**2022 Initial Assessment**
*District F*

Legend

— Benchmark District Lines

— 2022 Election Precincts

— Streets

2022 Initial Assessment

A  B  C  D  E  F  G  H

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau

0   0.25   0.5   1 Miles



# Pasadena City Council Districts
## 2022 Initial Assessment
*District G*

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other features obtained from the 2020 Tiger/line files, U.S. Census Bureau

## Legend

— Benchmark District Lines
— 2022 Election Precincts
— Streets

**2022 Initial Assessment**

| A | B | C | D | E | F | G | H |





## Pasadena City Council Districts
## 2022 Initial Assessment
*District H*

**Legend**

Benchmark District Lines
2022 Election Precincts
Streets

**2022 Initial Assessment**

A  B  C  D  E  F  G  H



0  0.5  1  2 Miles

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other features obtained from the 2020 Tiger/line files, U.S. Census Bureau



**Legend**

— Benchmark District Lines

**Percent Black**

- 0% - 20%
- 21% - 40
- 41% - 50%
- 51% - 60
- Over 60%

**Full Extent**

**Pasadena City Council Districts - 2022 Initial Assessment**
**Percent Black by 2020 Census Block**

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau





## Legend

**Benchmark District Lines**

**Percent Hispanic**
- 0% - 20%
- 21% - 40%
- 41% - 60%
- 61% - 80%
- Over 80%

**Pasadena City Council Districts - 2022 Initial Assessment**
**Percent Hispanic by 2020 Census Block**

Created: 6/10/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau



# ATTACHMENT C

## LEGAL PRINCIPLES

# LEGAL PRINCIPLES GOVERNING THE REDISTRICTING PROCESS

There are three basic legal principles that govern the redistricting process: (i) the "one person-one vote" (equal population) principle; (ii) the non-discrimination standard of Section 2 of the Voting Rights Act; and (iii) the *Shaw v. Reno* limitations on the use of race as a factor in redistricting. In addition, although it will not apply to the 2021 redistricting, Section 5 of the Voting Rights Act, which applied a "retrogression" standard to minority group populations in specific districts, may be helpful as a tool to analyze potential Section 2 issues regarding a proposed new plan.

The terminology of redistricting is very specialized and includes terms that may not be familiar, so we have included as Attachment D to this Initial Assessment letter a brief glossary of many of the commonly-used redistricting terms.

## The "One Person – One Vote" Requirement:  Why You Redistrict

The "one person-one vote" requirement of the United States Constitution requires that members of an elected body be drawn from districts of substantially equal population. This requirement applies to the single-member districts of "legislative" bodies such as commissioners courts and other entities with single-member districts such as school boards or city councils.

Exact equality of population is not required for local political subdivisions. However, they should strive to create districts that have a total population deviation of no more than 10 percent between their most populated district and the least populated district. This 10 percent deviation is usually referred to as the "total maximum deviation." It is measured against the "ideal" or target population for the governmental entity based on the most recent census. The 10 percent standard is a rebuttable presumption of compliance with the one person-one vote requirement.

A governing body is therefore required to determine whether the populations of its single-member districts (including school board trustee districts) are within this 10 percent balance based on 2020 Census population data. If the population deviation among the districts exceeds the permissible 10 percent total maximum deviation, the entity must redistrict, that is, redraw the boundaries of the individual districts so that the total populations of all the new districts are within the permissible 10 percent limit. A hypothetical example of how deviation is calculated is given in Attachment E.

Generally, redistricting will use the Census Bureau's recently released population data for the 2020 Census in drawing new redistricting plans – the so-called "PL 94-171" data.  In any legal challenge to a new plan, it is this data that likely would be applied. Although several types of population data are provided in the PL 94-171 files, redistricting typically is based upon total population.

Official Census data should be used unless the governmental entity can show that better data exists. The court cases that have dealt with the question have made it clear that the showing

required to justify use of data other than Census data is a very high one – impossibly high at a time so close to the release of new Census data. As a practical matter, therefore, we recommend that entities use the 2020 Census data in their redistricting processes. We have based the Initial Assessment on PL 94-171 total population data; the relevant data are summarized in Attachment A.

In the redistricting process, each governmental entity will use a broad spectrum of demographic and administrative information to accomplish the rebalancing of population required by the one person-one vote principle. The charts provided with this report not only show the total population of the entity but also give breakdowns of population by various racial and ethnic categories for the entity as a whole and for each single-member district.

## Census geography

These single-member population data are themselves derived from population data based on smaller geographical units. The Census Bureau divides geography into much smaller units called "census blocks." In urban areas, these correspond roughly to city blocks. In more rural areas, census blocks may be quite large. Census blocks are also aggregated into larger sets called "voting tabulation districts" or "VTDs," which often correspond to county election precincts.

For reasons concerning reducing the potential for *Shaw v. Reno*-type liability, discussed below, we recommend using VTDs as the redistricting building blocks where and to the extent feasible. In many counties this may not be feasible.

## Census racial and ethnic categories

For the 2020 Census, the Census Bureau recognized over 100 combinations of racial and ethnic categories and collected and reported data based on all of them. Many of these categories include very few persons, however, and will not therefore have a significant impact on the redistricting process. The charts that accompany this report include only eight racial and ethnic categories that were consolidated from the larger set. The entire population of the entity is represented in these charts. These eight categories are the ones most likely to be important in the redistricting process.

The 2020 Census listed 6 racial categories. Individuals were able to choose a single race or any combination of races that might apply. Additionally, the Census asks persons to designate whether they are or are not Hispanic. When the Hispanic status response is overlaid on the different possible racial responses, there are over 100 possible different combinations. The Census tabulates each one separately.

If this information is to be usable, it must be combined into a smaller number of categories (of course, having the same overall population total). For purposes of analyzing Voting Rights Act Section 2 issues, discussed below, DOJ indicated in a guidance document issued on September 1, 2021, that it would use the following rules for determining Hispanic and race population numbers from the 2020 Census data:

- persons who selected "Hispanic" are categorized as Hispanic, no matter what race or races they have designated; all others will be classified as non-Hispanic of one or more races; *e.g.*, Hispanic-White and Hispanic-African-American are both classified as Hispanic;

- persons who did not select "Hispanic" and who designated a single race will be classified as members of that race; *e.g.*, White, African-American, Asian, etc.;

- persons who did not select "Hispanic" and who designated themselves as belonging to a single minority race and as White will be classified as members of the minority race; *e.g.*, Asian+White will be classified as Asian; and

- persons who did not select "Hispanic" and who designated themselves as belonging to more than one minority race will be classified as "other multiple race;" *e.g.*, White+Asian+Hawaiian or African-American+Asian. This category is expected to be small.

We will also consider data called "voting age population" (or "VAP") data. It is similarly classified in eight racial and ethnic categories. This information is provided for the limited purpose of addressing some of the specific legal inquires under the Voting Rights Act that are discussed below. Voting age population is the Census Bureau's count of persons who identified themselves as being eighteen years of age or older at the time the census was taken (*i.e.*, as of April 1, 2020).

In addition to this population and demographic data, the entity will have access to additional information that may bear on the redistricting process, such as county road miles, facility locations, registered voter information, incumbent residence addresses, etc.

## <u>Section 2 of the Voting Rights Act – No Discrimination Against Minority Groups</u>

Section 2 of the Voting Rights Act, 52 U.S.C. §10301, forbids a voting standard, practice, or procedure from having the effect of reducing the opportunity of members of a covered minority to participate in the political process and to elect representatives of their choice. In practical terms, this non-discrimination provision prohibits districting practices that, among other things, result in "packing" minorities into a single district in an effort to limit their voting strength. Similarly, "fracturing" or "cracking" minority populations into small groups in a number of districts, so that their overall voting strength is diminished, can be discrimination under Section 2. There is no magic number that designates the threshold of packing or cracking. Each plan must be judged on a case-by-case basis. Failure to adhere to such Section 2 standards could invite a challenge in court by a protected minority group or even by the Department of Justice.

In previous redistricting cycles, "preclearance" was required under Section 5 of the Voting Rights Act before a new plan (or any other change of any kind to voting standards, practices or procedures) could be implemented. Section 5 will not apply in the 2021

redistricting cycle, but as we discuss below, the Section 5 "retrogression" standard can be a useful tool to identify potential Section 2 issues with a proposed new plan.

The Supreme Court has defined the minimum requirements for a minority plaintiff to bring a Section 2 lawsuit. There is a three-pronged legal test the minority plaintiff must satisfy – a showing that: (1) the minority group's voting age population is numerically large enough and geographically compact enough so that a district with a numerical majority of the minority group can be drawn (a "majority minority district"); (2) the minority group is politically cohesive, that is, it usually votes and acts politically in concert on major issues; and (3) there is "polarized voting" such that the Anglo majority usually votes to defeat candidates of the minority group's preference. *Thornburg v. Gingles*, 478 U.S. 30 (1986). In the federal appellate Fifth Circuit, which includes Texas, the minority population to be considered is *citizen* voting age population. In certain cases, a minority group may assert that Section 2 requires that the governmental body draw a new majority minority district. The governing body must be sensitive to these Section 2 standards as it redistricts.

In considering changes to existing boundaries, a governmental entity must be aware of the location of protected minority populations within its single-member districts for the purpose of ensuring that changes are not made that may be asserted to have resulted in "packing," or in "fracturing" or "cracking" the minority population for purposes or having effects that are unlawful under Section 2. The thematic maps included in Attachment B depict the locations of Hispanic and African-American (and if applicable, Asian) population concentrations by census block; they are useful in addressing this issue. Voting age population (VAP) data is useful in measuring potential electoral strength of minority groups in individual districts.

## *Shaw v. Reno* Standards – Avoid Using Race
## as the Predominant Redistricting Factor

The modern era of redistricting began in the 1960's when the Supreme Court determined that districting plans were subject to judicial review and that they must conform to one-person, one-vote principles. This was followed in short order by the passage of the Voting Rights Act in 1965, which along with the Fourteenth Amendment, required jurisdictions to ensure that districts were not racially discriminatory. Accordingly, to avoid liability in voting rights suits, governments were highly conscious of race when drawing districts and fashioned districts to reflect racial and ethnic housing patterns.

In 1993, the United States Supreme Court decided *Shaw v. Reno,* a case that contained a district that was so extremely irregular on its face that race was the predominant consideration in its creation to the exclusion of traditional districting principles and without sufficiently compelling justification. The Court held that the district was a racial gerrymander that violated the Equal Protection Clause of the Fourteenth Amendment.

The *Shaw* opinion subjects governmental bodies undertaking the redistricting process to a delicate balancing act. The governmental body must consider race when drawing districts if it is to comply with the requirements of the Voting Rights Act; however, if race is the

predominant consideration in the process, the governmental body may be subject to a racial gerrymandering claim.

Where racial considerations predominate in the redistricting process to the subordination of traditional (non-race-based) factors, the use of race-based factors is subject to the "strict scrutiny" test. To pass this test requires that there be a showing that (1) the race-based factors were used in furtherance of a "compelling state interest" and (2) their application be "narrowly tailored," that is, they must be used only to the minimum extent necessary to accomplish the compelling state interest. Compliance with the anti-discrimination requirements of section 2 of the Voting Rights Act is a compelling state interest.

The following principles have emerged in the post-*Shaw* environment to guide the redistricting process:

- race may be considered;

- but race may not be the predominant factor in the redistricting process to the subordination of traditional redistricting principles;

- bizarrely-shaped districts are not unconstitutional *per se*, but the bizarre shape may be evidence that race was the predominant consideration in the redistricting process;

- if race is the predominant consideration, the plan may still be constitutional if it is "narrowly tailored" to address compelling governmental interest such as compliance with the Voting Rights Act; and

- if a plan is narrowly tailored, it will use race no more than is necessary to address the compelling governmental interest.

While race will almost always be a consideration, he better course, if possible under the circumstances, is that racial considerations not predominate to the subordination of traditional redistricting criteria, so that the difficult strict scrutiny test is avoided.

Adherence to the *Shaw v. Reno* standards will be an important consideration during the redistricting process. One way to minimize the potential for *Shaw v. Reno* liability is to adopt redistricting criteria that include traditional redistricting principles and that do not elevate race-based factors to predominance.

## Sections 3 and 5 of the Voting Rights Act – Preclearance and Retrogression

## Preclearance will not be required

In prior redistricting cycles, Section 5 of the Voting Rights Act, 52 U.S.C. § 10304, required all "covered jurisdictions" identified in the applicable Department of Justice (DOJ) regulations to "preclear" any changes to voting standards, practices, or procedures before they

may become legally effective. Texas was a "covered jurisdiction," so all local governments in the state, as well as the State itself, were required to preclear any voting change, including their redistricting plans. This included changes to any single-member district lines (including city council district lines). Section 5 applied not only to changes in single-member district lines, but also to changes in election precincts and in the location of polling places.

In the 2013 case *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), the U.S. Supreme Court invalidated Section 4 of the Voting Rights Act until Congress corrected some deficiencies. This is the section that, in effect, defines which states and local jurisdictions are subject to Section 5 preclearance requirements. Congress has not made the required corrections, so Section 5 will not apply to any jurisdiction this redistricting cycle. A similar preclearance requirement can be imposed by a court under Section 3 of the Act, and the district court imposed that requirement on Pasadena in its judgment in *Patino v. City of Pasadena*. The requirement will continue to apply until June 30, 2023, and will apply to the redistricting. The basic difference between Section 3 and Section 5 is that preclearance review under Section 3 may be performed by either the *Patino* court or the US Attorney General, under Section 5, review was conducted either by the Attorney General or by a Three-Judge district court in the District of Columbia.

## Retrogression standard

In past redistricting cycles, Section 5 review involved considering whether a proposed new districting plan had a retrogressive effect. The issue is whether the net effect of the proposed new plan would be to reduce minority voters' ability to elect their preferred candidates when the plan is compared to the prior benchmark plan. In other words, does the new districting plan result in a reduction of the minority group's ability to elect? That same standard will apply under Section 3.

To determine if retrogression exists, it is necessary to compare a proposed plan against a benchmark, typically the *prior* district boundary plan, but considered using the *new* 2020 Census population and demographic data.

Voting age population data ("VAP") – the Census count of persons eighteen years of age or older at the time the Census was taken (*i.e.*, as of April 1, 2020). It is a measure of the number of people old enough to vote if they are otherwise eligible to do so. Since the retrogression inquiry focuses on whether a minority group's overall voting strength has been reduced, and VAP is a more direct measure of voting strength than total population, VAP should be considered in the retrogression analysis, not just total population.

In combination with a balanced consideration of the other applicable redistricting criteria, the entity's governing body will need to consider the effects of any changes to the benchmark measures that its proposed plan produces. Because of changes in population and the need to comply with one person-one vote principles, sometimes it may be impossible to avoid drawing a retrogressive plan. But if a proposed new plan is retrogressive, careful consideration should be given before adopting it.

## Adoption of Redistricting Criteria

Adoption of appropriate redistricting criteria – and adherence to them during the redistricting process – is potentially critical to the ultimate defensibility of an adopted redistricting plan. Traditional redistricting criteria that the governing body might wish to consider adopting include, for example:

- use of identifiable boundaries;

- using whole voting precincts, where possible and feasible; or, where not feasible, being sure that the plan lends itself to the creation of reasonable and efficient voting precincts;

- maintaining communities of interest (*e.g.*, traditional neighborhoods);

- basing the new plan on existing districts;

- adopting districts of approximately equal population;

- drawing districts that are compact and contiguous;

- keeping existing representatives in their districts; and

- narrow-tailoring to comply with the Voting Rights Act and *Shaw v. Reno.*.

There may be other criteria that are appropriate for an individual entity's situation, but all criteria adopted should be carefully considered and then be followed to the greatest degree possible. A copy of a sample criteria adoption resolution is provided as Attachment F. You may wish to include additional criteria; or determine that one or more on that list are not appropriate. We will discuss with you appropriate criteria for your situation.

## Requirements for Plans Submitted by the Public

You should also consider imposing the following requirements on any plans proposed by the public for your consideration: (1) any plan submitted for consideration must be a complete plan, that is, it must be a plan that includes configurations for all districts and not just a selected one or several. This is important because, although it may be possible to draw a particular district in a particular way if it is considered only by itself, that configuration may have unacceptable consequences on other districts and make it difficult or impossible for an overall plan to comply with the applicable legal standards; and (2) any plan submitted for consideration must follow the adopted redistricting criteria.

# **ATTACHMENT D**

## **GLOSSARY**

# GLOSSARY

**Census blocks, census block groups, census VTDs, census tracts** – Geographic areas of various sizes recommended by the states and used by the Census Bureau for the collection and presentation of data.

**Citizen voting age population (CVAP)** – Persons 18 and above who are citizens. This is a better measure of voting strength than VAP; however, the relevant citizenship data will need to be developed.

**Compactness** – Having the minimum distance between all parts of a constituency.

**Contiguity** – All parts of a district being connected at some point with the rest of the district.

**Cracking** – The fragmentation of a minority group among different districts so that it is a majority in none. Also known as "fracturing."

**Fracturing** – *See* "cracking."

**Homogeneous district** – A voting district with at least 90 percent population being of one minority group or of Anglo population.

**Ideal population** – The population that an ideal sized district would have for a given jurisdiction. Numerically, the ideal size is calculated by dividing the total population of the political subdivision by the number of seats in the legislative body.

**Majority minority district** – Term used by the courts for seats where an ethnic minority constitutes a numerical majority of the population.

**One person, one vote** – U.S. Constitutional standard articulated by the U.S. Supreme Court requiring that all legislative districts should be approximately equal in size.

**Packing** – A term used when one particular minority group is consolidated into one or a small number of districts, thus reducing its electoral influence in surrounding districts.

**Partisan gerrymandering** – The deliberate drawing of district boundaries to secure an advantage for one political party.

**PL 94-171** – The Public Law that requires the Census Bureau to release population data for redistricting. The data file, referred to as "PL 94-171", was supposed to be released by April 1, 2021, although due to technical issues it was not released until August, is reported at the block level, and contains information on:
- Total population
- Voting age population
- By Race
- By Hispanic origin

**Racial gerrymandering** – The deliberate drawing of district boundaries to secure an advantage for one race.

**Retrogression** – The Section 5 standard (not applicable in this redistricting cycle) that considered whether a proposed new districting plan made it less likely a protected minority group could elect candidates of the group's choice.

**Section 2 of the Voting Rights Act** – The part of the federal Voting Rights Act that protects racial and language minorities from discrimination in voting practices by a state or other political subdivision.

**Section 3 of the Voting Rights Act** – The part of the federal Voting Rights Act permitting a federal court that finds a violation of the 14th and 15th Amendment to impose a Section 5-type preclearance requirement. This requirement has been imposed on Pasadena and will apply until June 30, 2023.

**Section 5 of the Voting Rights Act** – The part of the federal Voting Rights Act that required certain states and localities (called "covered jurisdictions") to preclear all election law changes with the U.S. Department of Justice ("DOJ") or the federal district court for the District of Columbia before those laws may take effect. Not applicable this redistricting cycle.

***Shaw v. Reno*** – The first in a line of federal court cases in which the U.S. Supreme Court held that the use of race as a dominant factor in redistricting was subject to a "strict scrutiny" test under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. This case and the line of Supreme Court cases that follows it establishes that race should not be used as a predominant redistricting consideration, but if it is, it must be used only to further a "compelling state interest" recognized by the courts and even then must be used only as minimally necessary to give effect to that compelling state interest ("narrow tailoring").

**Spanish surnamed registered voters (SSRV)** – The Texas Secretary of State publishes voter registration numbers that show the percentage of registered voters who have Spanish surnames. It is helpful to measure Hispanic potential voting strength, although it is not exact.

**Total population** – The total number of persons in a geographic area. Total population is generally the measure used to determine if districts are balanced for one person, one vote purposes.

**Voting age population (VAP)** – The number of persons aged 18 and above. DOJ requires this to be shown in section 5 submissions. It is used to measure potential voting strength. For example, a district may have 50 percent Hispanic total population but only 45 percent Hispanic voting age population.

**Voter tabulation district (VTD)** – A voting precinct drawn using census geography. In most instances, especially in urban areas, VTDs and voting precincts will be the same. In rural areas, it is more likely they will not be identical.

**ATTACHMENT  E**

**HYPOTHETICAL POPULATION DEVIATION CALCULATION**

# Hypothetical Population Deviation Calculation

Consider a hypothetical political subdivision with four districts and a total population of 40,000. The "ideal district" for this political subdivision would have a population of 10,000 (total population / number of districts). This is the target population for each district. The deviation of each district is measured against this ideal size.

Suppose the latest population data reveals that the largest district, District A, has 11,000 inhabitants. The deviation of District A from the ideal is thus 1000 persons, or 10 percent. Suppose also that the smallest district, District D, has 8000 inhabitants; it is underpopulated by 2000 persons compared to the ideal size. It thus has a deviation of –20 percent compared to the ideal size. The *maximum total deviation* is thus 30 percent. Since this is greater than the 10 percent range typically allowed by the courts for one person-one vote purposes, this hypothetical subdivision must redistrict in order to bring its maximum total deviation to within the legally permissible limits.

The following table illustrates this analysis:

| District | Ideal district | District total pop. | Difference | Deviation |
|----------|----------------|---------------------|------------|-----------|
| A | 10,000 | 11,000 | 1000 | + 10.0 percent |
| B | 10,000 | 10,750 | 750 | + 7.5 percent |
| C | 10,000 | 10,250 | 250 | + 2.5 percent |
| D | 10,000 | 8,000 | - 2000 | - 20.0 percent |
| Totals: | 40,000 | 40,000 | net=    0 | net=  0  percent |

Total maximum deviation = difference between most populous and least populous districts = 10 percent + 20 percent = 30 percent.

# ATTACHMENT F

## ILLUSTRATIVE REDISTRICTING CRITERIA RESOLUTION

# ILLUSTRATIVE REDISTRICTING CRITERIA RESOLUTION

(Here is an example of what the body of a resolution or ordinance adopting redistricting criteria might contain, but not including the footnotes. They are only included here by way of explanation to you of some of the criteria.)

The City Council will observe the following criteria, to the greatest extent possible, when drawing district boundaries:

1.      Easily identifiable geographic boundaries should be followed.

2.      Communities of interest should be maintained in a single district, where possible, and attempts should be made to avoid splitting neighborhoods.

3.      Districts should be composed of whole voting precincts. Where this is not possible or practicable, districts should be drawn considering county election precincts. Avoid splitting census blocks unless necessary.

4.      Although it is recognized that existing districts will have to be altered to reflect new population distribution, any districting plan should, to the extent possible, be based on existing districts.

5.      Districts must be configured so that they are relatively equal in total population according to the 2020 federal census. In no event should the total population deviation between the largest and the smallest district exceed ten percent as compared to the ideal district size.

6.      Districts should be compact and composed of contiguous territory. Compactness may contain a functional,[1] as well as a geographical, dimension.

7.      Consideration may be given to the preservation of incumbent-constituency relations by recognition of the residence of incumbents and their history in representing certain areas.

8.      The plan should be narrowly tailored to avoid racial gerrymandering in violation of *Shaw v. Reno.*

---

[1]      Functional compactness is a sometimes-controversial notion that has appeared in some cases.  Basically, the concept is that compactness is not simply a matter of geography but can include considerations such as (1) the availability of transportation and communication, (2) the existence of common social and economic interests, (3) the ability of the districts to relate to each other, and (4) the existence of shared interests.  We do not anticipate that we will rely heavily on functional compactness, but there may be instances in which it comes into play. For example, we might be able to draw a very geographically compact district by including land on both sides of a river. If, however, the nearest bridge is several miles away, our geographically compact district may not be functionally compact. Saying that compactness has a functional dimension gives us flexibility to address this type of situation.

9.    The plan should not fragment[2] a geographically compact minority community or pack[3] minority voters in the presence of polarized voting so as to create liability under the Voting Rights Act.

10.   The plan should not be retrogressive in the ability of a protected minority group's ability to participate in the political process and to elect candidates of its choice.

The Council will review all plans considering these criteria and will evaluate how well each plan conforms to the criteria.

Any plan submitted by a citizen to the Council for its consideration should be a complete plan — *i.e.*, it should show the full number of districts and should redistrict the entire city. The Council may decline to consider any plan that is not a complete plan.

All plans submitted by citizens, as well as plans submitted by staff, consultants, and members of the Council should conform to these criteria.

---

[2]    Fragmenting or fracturing occurs when a geographically compact area of minority voters is split into two or more districts when, if the area had been put in a single district, minority voters would have had greater voting strength.

[3]    Packing refers to concentrating excessively large numbers of minority voters in a single district. For example, if a district is drawn to be 90 percent African-American, that group's influence may be limited to that single district when, if it had been split, the group might have had an opportunity to elect candidates of their choice in two districts.

**ATTACHMENT G**

**ILLUSTRATIVE REDISTRICTING GUIDELINES RESOLUTION**

# ILLUSTRATIVE REDISTRICTING GUIDELINES RESOLUTION

(Here is an example of what the body of a resolution or ordinance adopting redistricting guidelines for public participation might contain.)

The following guidelines are to be followed by each person submitting a redistricting plan for consideration or submitting comments:

1.    Proposed plans must be submitted in writing and be legible. If a plan is submitted orally, there is significant opportunity for misunderstanding, and it is possible that errors may be made in analyzing it. The City Council wants to be sure that all proposals are fully and accurately considered.

2.    Any plan must show the total population and voting age population for African-Americans, Hispanics, Asians, and Anglo/Other for each proposed district, based on the 2020 Census Data. If a plan is submitted without a population breakdown, the Council may not have sufficient information to give it full consideration.

3.    Plans should redistrict the entire entity, so the Council may consider the effect of any plan on the entire city. All plans are subject to the Voting Rights Act, which protects various racial and language minorities. Thus, as a matter of federal law, the Council will be required to consider the effect of any proposal on multiple racial and ethnic groups. If a plan does not redistrict the entire [county, city, district], it may be impossible for the Council to assess its impact on one or more protected minority groups.

4.    Plans should conform to the criteria the Council will be using in drawing the precincts.

5.    Comments must be submitted in writing and be legible, even if the person also makes the comments orally at a public hearing.

6.    Persons providing comments and those submitting proposed plans must identify themselves by full name and home address and provide a phone number and, if available, an email address. The Council may wish to follow up on such comments or obtain additional information about submitted plans.

7.    All comments and proposed plans must be submitted to the City Council [by the close of / no later than __ days before] the public hearing.

This resolution shall be effective upon passage by the City Council.

# **ATTACHMENT H**

## **SUGGESTED INITIAL ASSESSMENT AGENDA ITEM LANGUAGE**

# SUGGESTED INITIAL ASSESSMENT AGENDA ITEM LANGUAGE

Here is suggested language for the agenda item for receiving the Initial Assessment and for adopting the two suggested resolutions (criteria, guidelines).

**Receive Initial Assessment regarding whether redistricting is required considering the new 2020 census data; and, if so, consider adoption of criteria to apply to development of new districting plans, and guidelines for public participation in the redistricting process.**

If your practice is to specifically post executive session items, you may wish to use this language:

**<u>Executive Session.</u> The City Council may go into executive session pursuant to Texas Government Code section 551.071 to receive advice from legal counsel regarding the City's redistricting obligations.**

# Exhibit B

# AGENDA REQUEST

☐ ORDINANCE    ☒ RESOLUTION          Reso K  NO: 2022-103

CAPTION: A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF PASADENA, TEXAS, ADOPTING CRITERIA FOR USE IN THE REDISTRICTING 2022 PROCESS; AND PROVIDING AN EFFECTIVE DATE

RECOMMENDATIONS & JUSTIFICATION: TO COMPLY WITH REDISTRICTING LAWS.

(IF ADDITIONAL SPACE IS REQUIRED, PLEASE ATTACH SECOND PAGE)

BUDGETED: ☐                COUNCIL DISTRICT(S) AFFECTED:

REQUIRES APPROPRIATION: ☐
See attached Certification

*amanda F. Muella*

City Secretary   DATE: 6/17/2022
REQUESTING PARTY (TYPED)

| | COUNCIL ACTION | |
|---|---|---|
| | FIRST READING: | FINAL READING: |
| BUDGET DEPARTMENT | MOTION | MOTION *Valerio* |
| PURCHASING DEPARTMENT | SECOND | SECOND *Van Houte* |
| APPROVED: | | |
| CITY ATTORNEY | DATE | DATE 06-21-22 |
| MAYOR | DEFERRED: | |

RESOLUTION NO. 2022- 103

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF PASADENA, TEXAS ADOPTING CRITERIA FOR USE IN THE REDISTRICTING 2022 PROCESS; AND PROVIDING AN EFFECTIVE DATE.**

WHEREAS, the City Council and Mayor have certain responsibilities for redistricting under federal and state law, including but not limited to, Amendments 14 and 15 to the United States Constitution, U.S.C.A. (West 2006), and the Voting Rights Act, 42 U.S.C.A. §§ 1973 and 1973c (West 2010); and Tex. Gov't Code Ann. §§ 2058.001 and 2058.002 (Vernon 2008); and

WHEREAS, the City Council and Mayor have certain responsibilities for redistricting under the City Charter; and

WHEREAS, on review of the 2020 Census data, it appears that a population imbalance exists requiring redistricting of the City's councilmember districts; and

WHEREAS, it is the intent of the City to comply with the Voting Rights Act and with all other relevant law, including *Shaw v. Reno* jurisprudence; and

WHEREAS, a set of established redistricting criteria will serve as a framework to guide the City in the consideration of districting plans; and

WHEREAS, established criteria will provide the City a means by which to evaluate and measure proposed plans; and

WHEREAS, redistricting criteria will assist the City

in its efforts to comply with all applicable federal and state laws.

**NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF PASADENA, HARRIS COUNTY, TEXAS:**

A. **THAT** the City of Pasadena, Texas, in its adoption of redistricting plan for city councilmember districts, will adhere to the following criteria to the greatest degree practicable:

1. Where practicable, easily identifiable geographic boundaries should be followed.

2. Communities of interest should be maintained in a single councilmember district, where practicable, and attempts should be made to avoid splitting neighborhoods.

3. To the extent practicable, councilmember districts should be composed of whole voting precincts. Where this is not possible or practicable, councilmember districts should be drawn in a way that permits the creation of practical voting precincts and that ensures that adequate facilities for polling places exist in each voting precinct; and splitting census blocks should be avoided.

4. Although it is recognized that existing councilmember districts will have to be altered to reflect new population distribution, any districting plan should, to the extent practicable, be based on existing councilmember districts.

5. Councilmember districts must be configured so that they are relatively equal in total population according to the 2020 federal Census. In no event should the total deviation in population between the largest and the smallest councilmember districts exceed ten percent.

6. The councilmember districts should be compact and composed of contiguous territory. Compactness may contain a functional, as well as a geographical

dimension.

7. Consideration may be given to the preservation of
   incumbent-constituency relations by recognition of the
   residence of incumbents and their history in
   representing certain areas.

8. The plan should be narrowly tailored to avoid
   retrogression in the position of racial minorities and
   language minorities as defined in the Voting Rights Act
   with respect to their effective exercise of the electoral
   franchise.

9. The plan should not fragment a geographically compact
   minority community or pack minority voters in the
   presence of polarized voting so as to create liability
   under Section 2 of the Voting Rights Act, 42 U.S.C. §
   1973.

B. The City Council and Mayor will review all plans in light
   of these criteria and will evaluate how well each plan
   conforms to the criteria.

C. All plans submitted by citizens, as well as plans submitted
   by staff, consultants, and members of the City Council
   should conform to these criteria.

D. The City Council and Mayor may decline to consider any
   plans that do not conform to these criteria.

E. This Resolution shall be effective upon passage by the City
   Council.

**THAT** the City Council officially determines that a sufficient written notice of the date, hour, place and subject of this meeting of the City Council was posted at a place convenient to the public at the City Hall of the City for the time required by law preceding this meeting, as required by the Open Meetings Law, Chapter 551, Texas Government Code; and that this meeting has been open to the public as required by Law at all times during which this resolution and the subject matter thereof has been discussed, considered and formally acted upon. The City Council further confirms such written notice and the contents and posting thereof.

PASSED, APPROVED AND ADOPTED THIS THE 21st day of $June$,

A.D., 2022.

JEFF WAGNER, MAYOR
OF THE CITY OF PASADENA, TEXAS

ATTEST:

AMANDA F. MUELLER
CITY SECRETARY
CITY OF PASADENA, TEXAS

APPROVED:

JAY W. DALE
CITY ATTORNEY
CITY OF PASADENA, TEXAS

# Exhibit C

# AGENDA REQUEST

☒ ORDINANCE  ☐ RESOLUTION  2K  NO: 2022-124

**CAPTION:** AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF PASADENA, TEXAS, APPROVING THE REDISTRICTING OF THE CITY'S SINGLE-MEMBER COUNCIL DISTRICTS AND ESTABLISHING NEW DISTRICT BOUNDARY LINES BASED ON 2020 CENSUS DATA FOR PASADENA CITY COUNCIL ELECTIONS; DIRECTING THE CITY'S REDISTRICTING CONSULTANT TO SUBMIT THE ADOPTED PLAN FOR PRECLEARANCE UNDER SECTION 3 OF THE FEDERAL VOTING RIGHTS ACT; AND PROVIDING FOR AN EFFECTIVE DATE.

**RECOMMENDATIONS & JUSTIFICATION:** Adopting the new redistricting plan for the City of Pasadena's eight single-member council districts.

*(IF ADDITIONAL SPACE IS REQUIRED, PLEASE ATTACH SECOND PAGE)*

BUDGETED: ☐

COUNCIL DISTRICT(S) AFFECTED:

REQUIRES APPROPRIATION: ☐
See attached Certification

*Amanda Mueller*

AMANDA MUELLER  DATE: 7/25/22
REQUESTING PARTY (TYPED)

_____
BUDGET DEPARTMENT

_____
PURCHASING DEPARTMENT

APPROVED:

_____
CITY ATTORNEY

_____
MAYOR

| COUNCIL ACTION | |
|---|---|
| **FIRST READING:** | **FINAL READING:** |
| *Schoenbein* MOTION | *Van Hoote* MOTION |
| *Harrison* SECOND | *Harrison* SECOND |
| 08-02-22 DATE | 08-16-22 DATE |

DEFERRED: _____

Nays: Estrada      Nay: Estrada

ORDINANCE NO. 2022-124

**AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF PASADENA, TEXAS, APPROVING THE REDISTRICTING OF THE CITY'S SINGLE-MEMBER COUNCIL DISTRICTS AND ESTABLISHING NEW DISTRICT BOUNDARY LINES BASED ON 2020 CENSUS DATA FOR PASADENA CITY COUNCIL ELECTIONS; DIRECTING THE CITY'S REDISTRICTING CONSULTANT TO SUBMIT THE ADOPTED PLAN FOR PRECLEARANCE UNDER SECTION 3 OF THE FEDERAL VOTING RIGHTS ACT; AND PROVIDING FOR AN EFFECTIVE DATE.**

**WHEREAS,** the results of the 2020 federal Census have been considered and indicate that the City of Pasadena's single-member council districts are sufficiently out of population balance to require redistricting in order to comply with the "one-person, one-vote" (equal population) principle established by the U.S. Constitution; and

**WHEREAS,** the City of Pasadena (the "City") engaged the law firm of Bickerstaff Heath Delgado Acosta LLP to act as the City's redistricting consultant, including advising and assisting the City Council in preparation of a new redistricting plan in compliance with applicable requirements of state and federal law; and

**WHEREAS,** on June 21, 2022, the City Council adopted redistricting criteria to assist the City and the public in developing redistricting plans which comply with applicable federal and state laws, and the adopted redistricting criteria were applied in the development of the City's new redistricting plan; and

**WHEREAS,** on June 21, 2022, the City Council also adopted redistricting guidelines regarding the submission of comments and proposed plans by the public, to ensure the ability of the City to timely receive and adequately consider them; and

**WHEREAS,** during the redistricting process the City provided notice to the public of its proposed discussions and development of a redistricting plan through meeting agendas posted in compliance with the Texas Open Meetings Act, notices on the City's website, and publication of newspaper notices regarding public hearings; and

**WHEREAS,** the City Council has considered the proposed redistricting plans and process at City Council meetings on, June 21, 2022, July 5, 2022 and at a public hearing held on July 19, 2022, and has considered oral testimony, written comments, reports from the City's redistricting consultant, and various proposed plans regarding the appropriate reconfiguration of the council member districts; and

**WHEREAS,** the City Council finds that the attached city council district redistricting plan is in the best interest of the citizens of the City, complies with the adopted redistricting criteria, and is believed to comply with all state and federal requirements, including requirements for preclearance as required by the final judgment of the United States District Court in *Patino v. City of Pasadena,* No. H-14-3241, dated January 16, 2017.

## NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF PASADENA, TEXAS:

**A.** That the City Council hereby finds and adopts the preamble to this Ordinance.

**B.** That the existing single-member council district boundary lines for the City of Pasadena are hereby amended, and the new districting plan depicted on the map attached hereto as **Exhibit A,** defining new districts, as such new districts are further described in the tables attached hereto as **Exhibit B** reporting populations and demographic statistics for each such new district, is hereby adopted and designated to define the City's eight (8) single-member council districts from and after the Effective Date; that **Exhibits A and B** are incorporated by reference in and made a part of this ORDINANCE, and shall be kept on file in the City Secretary's Office; and, further, that the City's redistricting consultant is hereby authorized and directed to submit the adopted plan for preclearance under the Section 3 of the Voting Rights Act as required by the court's final judgment in *Patino v. City of Pasadena.*

C. That this ORDINANCE shall take and be given effect immediately upon preclearance of the adopted plan under Section 3 of the Voting Rights Act; and that thereafter all Pasadena City Council elections shall be held under and in accordance with the new single- member council district districting plan here adopted by the City Council until such time as a subsequent lawfully-enacted districting plan shall be adopted to replace this plan.

**D.** That the City Council officially determines that a sufficient written notice of the date, hour, place and subject of this meeting of the City Council was posted at a place convenient to the public at the City Hall of the City for the time required by law preceding this meeting, as required by the Open Meetings Law, Chapter 551, Texas Government Code; and that this meeting has been open to the public as required by law at all times during which this ordinance and the subject matter thereof has been discussed, considered and formally acted upon. The City Council further confirms such written notice and the contents and posting thereof.

(SIGNATURE AND APPROVAL- NEXT PAGE)

PASSED ON FIRST READING by the City Council of the City of Pasadena, Texas in regular meeting in the City Hall this the 2ⁿᵈ day of August , A.D., 2022.

APPROVED this the 2ⁿᵈ day of August , A.D., 2022.

JEFF WAGNER, MAYOR
OF THE CITY OF PASADENA, TEXAS

ATTEST:

AMANDA F. MUELLER
CITY SECRETARY
CITY OF PASADENA, TEXAS

APPROVED:

JAY W. DALE
CITY ATTORNEY
CITY OF PASADENA, TEXAS

PASSED ON FIRST READING by the City Council of the City of Pasadena, Texas in regular meeting in the City Hall this the 16ᵗʰ day of August , A.D., 2022.

APPROVED this the 16ᵗʰ day of August , A.D., 2022.

JEFF WAGNER, MAYOR
OF THE CITY OF PASADENA, TEXAS

ATTEST:

AMANDA F. MUELLER
CITY SECRETARY
CITY OF PASADENA, TEXAS

APPROVED:

JAY W. DALE
CITY ATTORNEY
CITY OF PASADENA, TEXAS

# EXHIBIT A



# City of Pasadena
## Council Districts - Illustrative Plan 1

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other features obtained from the 2020 Tiger/line files, U.S. Census Bureau

Created: 7/5/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

**Legend**
Benchmark District Lines
Illustrative Plan 1
A
B
C
D
E
F
G
H

0 0.75 1.5 3 Miles



# City of Pasadena
## Council Districts - Illustrative Plan 1
### District A

Legend
- Benchmark District Lines
- 2022 Election Precincts
- Streets
- Illustrative Plan 1

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau.

Created: 7/5/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

0    0.275    0.55    1.1
Miles



# City of Pasadena
## Council Districts - Illustrative Plan 1
### District B

**Legend**
- Benchmark District Lines
- 2022 Election Precincts
- Streets
- Illustrative Plan 1

0  0.125  0.25  0.5 Miles

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other features obtained from the 2020 Tiger/line files, U.S. Census Bureau

Created: 7/5/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.



# City of Pasadena
## Council Districts - Illustrative Plan 1
### District C

**Legend**
- Benchmark District Lines
- 2022 Election Precincts
- Streets
- Illustrative Plan 1

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau

Created: 7/5/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

0   0.125   0.25   0.5
Miles



## City of Pasadena
## Council Districts - Illustrative Plan 1
### District D

**Legend**

Benchmark District Lines
2022 Election Precincts
Streets
Illustrative Plan 1

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau.

Created: 7/5/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

0    0.3    0.6    1.2
Miles



City of Pasadena
Council Districts - Illustrative Plan 1

District E

Legend
Benchmark District Lines
2022 Election Precincts
Streets
Illustrative Plan 1

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau

Created: 7/5/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

0   0.175   0.35   0.7   Miles



# City of Pasadena
## Council Districts - Illustrative Plan 1
### District F

Legend
- Benchmark District Lines
- 2022 Election Precincts
- Streets
- Illustrative Plan 1

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tigerline files, U.S. Census Bureau

Created: 7/5/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

0  0.225  0.45  0.9
Miles



# City of Pasadena
## Council Districts - Illustrative Plan 1
### District G

**Legend**

Benchmark District Lines
2022 Election Precincts
Streets
Illustrative Plan 1

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau

Created: 7/5/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.



## City of Pasadena
## Council Districts - Illustrative Plan 1
*District H*

**Legend**

- Benchmark District Lines
- 2022 Election Precincts
- Streets
- Illustrative Plan 1

A B C D E F G H

© 2022 Bickerstaff Heath Delgado Acosta LLP
Data Source: Roads, Water and other
features obtained from the 2020
Tiger/line files, U.S. Census Bureau

Created: 7/5/2022
Differences between the Benchmark Boundary and the 2021 Census Geography.

0   0.5   1   2 Miles

# EXHIBIT B

# Plan Name: Pasadena City:Council Districts - Illustrative Plan 1



## Demographics Report - Summary 2020 Census Total Population
Plan Last Edited on: 7/5/2022 3:21:25 PM

| District | Persons | Ideal Size | Deviation | Hispanic % of Total Population | Non-Hispanic White % of Total Population | Non-Hispanic Black % of Total Population | Non-Hispanic Asian % of Total Population | Non-Hispanic Other % of Total Population |
|---|---|---|---|---|---|---|---|---|
| A | 18,733 | 18,988 | -1.34% | 86.59% | 9.17% | 2.22% | 0.65% | 1.38% |
| B | 18,921 | 18,988 | -0.35% | 85.47% | 10.64% | 2.57% | 0.34% | 0.97% |
| C | 18,537 | 18,988 | -2.38% | 81.64% | 12.89% | 3.58% | 0.24% | 1.65% |
| D | 18,590 | 18,988 | -2.10% | 76.91% | 19.14% | 1.87% | 0.49% | 1.57% |
| E | 19,246 | 18,988 | 1.36% | 73.02% | 21.20% | 3.28% | 0.49% | 2.01% |
| F | 18,760 | 18,988 | -1.20% | 53.50% | 37.49% | 3.07% | 2.85% | 3.09% |
| G | 19,579 | 18,988 | 3.11% | 63.41% | 23.83% | 6.81% | 3.75% | 2.24% |
| H | 19,539 | 18,988 | 2.90% | 23.61% | 61.00% | 2.76% | 8.57% | 4.08% |
| **TOTAL:** | 151,905 | | | 67.77% | 24.61% | 3.29% | 2.21% | 2.13% |

**Ideal Size:  151905 / 8 = 18988**

**Total Population: 151,905**

**Overall Deviation: 5.49%**

*Some percentages may be subject to rounding errors.*

Based on: 2020 Census Geography, 2020 PL94-171




## Demographics Report - Summary 2020 Census Voting Age Population

Plan Last Edited on: 7/5/2022 3:21:25 PM

| District | Total VAP* | | Hispanic % of Total VAP | Non-Hispanic Anglo % of Total VAP | Non-Hispanic Black % of Total VAP | Non-Hispanic Asian % of Total VAP | Non-Hispanic Other % of Total VAP |
|---|---|---|---|---|---|---|---|
| A | 13,202 | | 85.06% | 10.67% | 2.09% | 0.77% | 1.42% |
| B | 13,240 | | 82.70% | 13.26% | 2.59% | 0.36% | 1.07% |
| C | 12,908 | | 78.94% | 15.50% | 3.37% | 0.32% | 1.87% |
| D | 13,324 | | 73.88% | 22.24% | 1.73% | 0.58% | 1.57% |
| E | 13,934 | | 68.39% | 25.80% | 3.10% | 0.53% | 2.18% |
| F | 14,361 | | 48.64% | 42.57% | 3.04% | 3.04% | 2.70% |
| G | 14,369 | | 59.46% | 28.19% | 6.11% | 4.13% | 2.14% |
| H | 15,738 | | 20.84% | 63.87% | 2.95% | 8.60% | 3.72% |
| | 111,076 | | 63.52% | 28.75% | 3.15% | 2.45% | 2.13% |

\* VAP - Voting Age Population

*Some percentages may be subject to rounding errors.*




# Plan Name: Pasadena City:Council Districts - Illustrative Plan 1

## Demographics Report - Detailed 2020 Census Total Population

Plan Last Edited on: 7/5/2022 3:21:25 PM

| District | Persons | Ideal Size | Deviation | Hispanic | Hispanic % of Total Population | ANGLO | Non-Hispanic Anglo % of Total Population | Black | Black % of Total Population | Asian | Asian % of Total Population | AM Indian Native | IND/NAT% TOT Pop. | Haw Pac. Isl. | HAW/PAC % of Total Pop. | Other | Other % of Total Pop. | Two or More Races | Two or More Races % Tot Pop |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 18,733 | 18,988 | -1.34% | 16,220 | 86.59% | 1,718 | 9.17% | 415 | 2.22% | 121 | 0.65% | 16 | 0.09% | 6 | 0.03% | 67 | 0.36% | 170 | 0.91% |
| B | 18,921 | 18,988 | -0.35% | 16,171 | 85.47% | 2,014 | 10.64% | 487 | 2.57% | 64 | 0.34% | 13 | 0.07% | 2 | 0.01% | 25 | 0.13% | 144 | 0.76% |
| C | 18,537 | 18,988 | -2.38% | 15,134 | 81.64% | 2,390 | 12.89% | 663 | 3.58% | 45 | 0.24% | 30 | 0.16% | 9 | 0.05% | 79 | 0.43% | 187 | 1.01% |
| D | 18,590 | 18,988 | -2.10% | 14,298 | 76.91% | 3,558 | 19.14% | 348 | 1.87% | 92 | 0.49% | 15 | 0.08% | 2 | 0.01% | 33 | 0.18% | 242 | 1.30% |
| E | 19,246 | 18,988 | 1.36% | 14,053 | 73.02% | 4,080 | 21.20% | 632 | 3.28% | 95 | 0.49% | 43 | 0.22% | 11 | 0.06% | 63 | 0.33% | 269 | 1.40% |
| F | 18,760 | 18,988 | -1.20% | 10,037 | 53.50% | 7,033 | 37.49% | 575 | 3.07% | 534 | 2.85% | 40 | 0.21% | 6 | 0.03% | 59 | 0.31% | 475 | 2.53% |
| G | 19,579 | 18,988 | 3.11% | 12,415 | 63.41% | 4,665 | 23.83% | 1,334 | 6.81% | 734 | 3.75% | 70 | 0.36% | 13 | 0.07% | 60 | 0.31% | 295 | 1.51% |
| H | 19,539 | 18,988 | 2.90% | 4,613 | 23.61% | 11,919 | 61.00% | 540 | 2.76% | 1,675 | 8.57% | 33 | 0.17% | 10 | 0.05% | 79 | 0.40% | 675 | 3.45% |
| TOTAL: | 151,905 | | | 102,941 | 67.77% | 37,377 | 24.61% | 4,994 | 3.29% | 3,360 | 2.21% | 260 | 0.17% | 59 | 0.04% | 465 | 0.31% | 2,457 | 1.62% |

**Ideal Size: 151905 / 8 = 18988**

**Total Population: 151,905**

**Overall Deviation: 5.49%**

*Some percentages may be subject to rounding errors.*





## Bickerstaff
Heath Delgado Acosta LLP

# Plan Name: Pasadena City:Council Districts - Illustrative Plan 1
## Demographics Report - Detailed 2020 Census Voting Age Population
Plan Last Edited on: 7/5/2022 3:21:25 PM

| District | Total VAP | Hispanic VAP | % Hispanic VAP | Anglo VAP | % Anglo VAP | Black VAP | % Black VAP | Asian VAP | % Asian VAP | AM IND NATIVE VAP | % AM IND NATIVE VAP | HAW/PAC VAP | % HAW/PAC VAP | Other VAP | % Other VAP | Two or More Races VAP | % Two or more VAP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 13,202 | 11,230 | 85.06% | 1,408 | 10.67% | 276 | 2.09% | 101 | 0.77% | 13 | 0.10% | 2 | 0.02% | 46 | 0.35% | 127 | 0.96% |
| B | 13,240 | 10,950 | 82.70% | 1,755 | 13.26% | 343 | 2.59% | 48 | 0.36% | 13 | 0.10% | 2 | 0.02% | 17 | 0.13% | 110 | 0.83% |
| C | 12,908 | 10,189 | 78.94% | 2,001 | 15.50% | 435 | 3.37% | 41 | 0.32% | 19 | 0.15% | 9 | 0.07% | 61 | 0.47% | 153 | 1.19% |
| D | 13,324 | 9,844 | 73.88% | 2,963 | 22.24% | 230 | 1.73% | 77 | 0.58% | 13 | 0.10% | 2 | 0.02% | 15 | 0.11% | 179 | 1.34% |
| E | 13,934 | 9,529 | 68.39% | 3,595 | 25.80% | 432 | 3.10% | 74 | 0.53% | 35 | 0.25% | 4 | 0.03% | 45 | 0.32% | 220 | 1.58% |
| F | 14,361 | 6,985 | 48.64% | 6,114 | 42.57% | 437 | 3.04% | 436 | 3.04% | 37 | 0.26% | 2 | 0.01% | 40 | 0.28% | 309 | 2.15% |
| G | 14,369 | 8,544 | 59.46% | 4,050 | 28.19% | 878 | 6.11% | 594 | 4.13% | 49 | 0.34% | 6 | 0.04% | 39 | 0.27% | 213 | 1.48% |
| H | 15,738 | 3,280 | 20.84% | 10,052 | 63.87% | 464 | 2.95% | 1,354 | 8.60% | 30 | 0.19% | 9 | 0.06% | 62 | 0.39% | 485 | 3.08% |
| TOTALS: | 111,076 | 70,551 | 63.52% | 31,938 | 28.75% | 3,495 | 3.15% | 2,725 | 2.45% | 209 | 0.19% | 36 | 0.03% | 325 | 0.29% | 1,796 | 1.62% |

* VAP - Voting Age Population

*Some percentages may be subject to rounding errors.*

EDGE 2020